## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| STATE OF WEST VIRGINIA, *ex rel*. JOHN B. McCUSKEY, Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>3M COMPANY F/K/A MINNESOTA MINING AND MANUFACTURING CO.,<br><br>Defendant. | Civil Action No.   2:25-cv-00750<br><br><br>**NOTICE OF REMOVAL** |

Defendant 3M Company (3M), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Circuit Court of Kanawha County, West Virginia, to the United States District Court for the Southern District of West Virginia. As grounds for removal, 3M alleges as follows:

### PRELIMINARY STATEMENT

1.      The 8210 respirator is a gold-standard filtering facepiece respirator on the market today.  It is a type of "N95" respirator, which the National Institute for Occupational Safety and Health (NIOSH) defines to mean a filtering facepiece respirator that filters at least 95% of airborne particles.  The 8210 has been approved by NIOSH since 1995; it meets strict government standards for performance and quality.

2.      During the COVID-19 pandemic, the 8210 respirator protected first responders, healthcare professionals, essential workers, and countless others, in West Virginia and around the world.

3.    Before the pandemic, 3M was one of the only manufacturers of N95 respirators in the United States. When rates of COVID-19 surged in the spring of 2020, the high demand for N95s outpaced even an accelerated rate of production.

4.    Beginning in early April 2020, in an effort to protect the health of American first-responders, the United States government directed 3M, pursuant to the Defense Production Act (DPA), to divert over 200 million N95 respirators—including the 8210—from 3M's production facilities in Asia for exclusive sale to the Federal Emergency Management Agency (FEMA). The United States government transported the requisitioned 8210 respirators into the United States using government-chartered flights and other transport, and then FEMA distributed the respirators to states, including West Virginia.

5.    The United States government directed 3M to prioritize FEMA orders over any private contracts for 8210 respirators. At the same time, the United States government worked with 3M to increase its production of N95 respirators, which 3M did—more than tripling its rate of production in the United States.

6.    During the pandemic, the 8210 respirator protected healthcare workers and first responders across the country. Here in West Virginia, current Attorney General John McCuskey (in his prior role as elected state auditor) approved the purchase of N95s, including 3M's NIOSH-approved 8210 respirator, for use by West Virginians.

7.    NIOSH requires that all NIOSH-approved respirators be labeled with the NIOSH stamp and approval number. 42 C.F.R. § 84.33(g) (requiring that respirators "shall . . . be labeled distinctly"); *see also* Nat'l Inst. for Occupational Safety & Health, *How to Tell If Your N95 Respirator Is NIOSH Approved*, DHHS (NIOSH) Pub. No. 2021-124 (Sept. 2021), https://www.cdc.gov/niosh/docs/2021-124/pdfs/2021-124.pdf.

8. On December 22, 2025, the State of West Virginia filed in state court a consumer protection action against 3M in connection with the labeling and sale of 8210 respirators, including the very respirators 3M provided to FEMA at the direction and under the control of the United States government. The State alleges, *inter alia*, that 3M "should have provided a warning on the respirator itself akin to 'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL.'" Compl. ¶ 160. The State maintains that 3M's representations about the effectiveness of the respirator misled West Virginians, including coal miners, in violation of the West Virginia Consumer Credit and Protection Act (WVCCPA). The State seeks civil penalties and to enjoin the sale of 8210 respirators into West Virginia.

9. The State's sweeping claims—alleging that the sale and distribution of all 8210 respirators in West Virginia violates the WVCCPA—necessarily include those respirators manufactured and sold pursuant to the federal government's orders under the DPA.

10. 3M has at least three federal defenses to the State's claims. First, the DPA immunizes 3M from liability for acts directly or *indirectly* related to its compliance with the DPA; those acts include the manufacture, distribution, and sale of 8210 respirators in West Virginia. Second, the State's claim that the WVCCPA required 3M to include a warning to "IGNORE NIOSH COAL APPROVAL," *id.* ¶ 160, is preempted by federal law. And third, 3M is immune from suit under the Public Readiness and Emergency Preparedness Act (PREP Act), 42 U.S.C. §§ 247d-6d, for the manufacture, distribution, and sale of personal respiratory protective devices.

11. Under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in order to have its federal defenses adjudicated in a federal forum. Such removal fulfills the federal-officer removal statute's purpose, which "is to give effect to the legislative principle that those acting at the federal government's direction should be able to defend

3

themselves in federal—not state—court, lest states be able to stym[ie] the federal government's operations." *Maryland v. 3M Co.*, 130 F.4th 380, 387 (4th Cir. 2025) (vacating district court's remand order), *cert. pet. filed*, No. 25-517 (Oct. 27, 2025).

## PROCEDURAL HISTORY

12.    In 2003, the State filed an action in the Circuit Court of Lincoln County, West Virginia against 3M and other defendants, alleging common-law tort claims and violations of the WVCCPA in connection with 3M's marketing and sale of the 8710 respirator—a now-discontinued respirator.  Complaint in *State of W.Va. ex rel. McCuskey v. 3M, et al.*, No. 03-C-109 (Aug. 6, 2003) ¶ 18.[1]  The 8710 respirator case is still pending in Lincoln County.  Compl. ¶ 3. The first phase of the trial in that case began in January 2025, and the second phase will resume in March 2026.  *Id.*

13.    In the middle of the trial of the State's claims related to the 8710 respirator, on October 1, 2025, the Chief Deputy Attorney General for the State of West Virginia alerted 3M that it intended to bring a second lawsuit pertaining to the 8210 respirator, *see* Exhibit 1 (Oct. 1, 2025 Email), and provided 3M with a copy of the anticipated complaint.  That complaint alleged that "3M's use of the NIOSH approval stamp on the front of each and every 8210 sold into West Virginia and elsewhere in connection with the advertisement and sale of the 8210 is misleading."

---

[1] After the complaint was filed in *State of West Virginia ex rel. McCuskey v. 3M, et al.*, the defendants, including 3M, jointly removed to the Southern District of West Virginia, alleging that there was diversity jurisdiction under 28 U.S.C. § 1332.  The court rejected the defendants' arguments that the State of West Virginia was "not the real party in interest" or that the State was fraudulently joined to defeat diversity jurisdiction and remanded to state court. *W. Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co.*, 354 F. Supp. 2d 660, 662–74 (S.D.W. Va. 2005). The defendants did not remove their case to federal court under the federal-officer removal statute, 28 U.S.C. § 1442.

14.    The State further disclosed that it planned to seek an order to "enjoin sale of the 8210," and represented that the Chief Deputy Attorney General's "team is confident that [it] can make the 'minimal evidentiary showing' necessary for a PI in WV that would apply universally to the 8210, as opposed to just in the coal mining arena."  Exhibit 1.

15.    3M responded by letter on October 13, 2025, informing the State that "[t]he allegations in that complaint are frivolous and, if ultimately made, would be in bad faith."  *See* Exhibit 2 (Oct. 13, 2025 Letter).  3M provided "specific examples of provably false allegations."  *Id.*[2]

16.    The State nevertheless filed this action on December 22, 2025, in the Circuit Court of Kanawha County, bearing Case No. 25-C-1514.  *See* Exhibit 3, Summons and Complaint.  The State's Complaint relies almost entirely on documents, testimony, and other record materials produced in the pending litigation regarding the 8710 respirator—information that the private attorneys representing the State have had in their possession since at least 2019.

17.    The State says that it brought this action "to end 3M's practice of putting wearers of its 8210, including West Virginia coal miners, in needless danger."  Compl. ¶ 1.  Here again, the State asserts violations of the WVCCPA, and seeks recovery for alleged acts and omissions within the four-year look-back period under Section 46A-7-111.  W. Va. Code Ann. § 46A-7-111.

18.    The State claims that 3M "should have provided a warning on the respirator itself akin to 'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL.'"  Compl. ¶ 160.

---

[2] The October 13, 2025 letter also observed that "[t]he State's motives in threatening this lawsuit are as clear as they are improper.  The current trial about the 8710 . . . is going poorly for the State."  *Id.*  And the Chief Deputy Attorney General "admitted" to 3M's counsel that the State was "threatening this second lawsuit to 'shake the tree' on settlement efforts in the first case."  *Id.*

19.     The State further contends that 3M's representations about the effectiveness of the 8210 are "misleading."  *Id.* at ¶ 172 (bullet 1).  The State seeks civil penalties and to enjoin the sale of 8210 respirators into West Virginia.

### FACTUAL BACKGROUND

20.     In March 2020, the United States became keenly aware of the growing threat of COVID-19.  As fatality rates rose, the United States took action to respond to the emerging crisis.  On March 13, 2020, the COVID-19 pandemic was declared a national emergency.  But even as the federal government took steps to coordinate a response to the outbreak, concerns mounted about the shortages of needed medical equipment—including N95 respirators.

21.     The Health and Human Services (HSS) Secretary issued a declaration under the PREP Act on March 17, 2020.[3]  The Act provided immunity from liability for activities related to medical countermeasures, including the manufacture, distribution, and sale of respirators and other personal protective equipment (PPE) against COVID-19.  85 Fed. Reg. 15,198 (Mar. 17, 2020).

22.     On March 18, 2020, the federal government issued an executive order (the Executive Order) invoking the DPA, a Korean War-era law that gives the president sweeping authority to influence domestic industry—including by directing production, distribution, and sale of products by private companies—in order to further the national defense.  The Executive Order provided that personal protective equipment was "necessary" to "promote the national defense."  85 Fed. Reg. 16,227 (Mar. 18, 2020) (Executive Order 13909).

23.     On April 2, 2020, a presidential memorandum was issued under the DPA, which

---

[3] The PREP Act was enacted in 2005 in response to a different coronavirus epidemic, the SARS epidemic of 2003, in order to encourage the use of products, drugs, and devices designed to address epidemics and pandemics.  The PREP Act gives the Secretary of Health and Human Services authority to make declarations that have the effect of conferring immunity on certain persons from federal and state liability.

directed the FEMA Administrator to "use any and all authority available under the Act to acquire, from any appropriate subsidiary or affiliate of 3M Company, the number of N-95 respirators that the Administrator determines to be appropriate." This memorandum was accompanied by a directive from the United States government to 3M to increase domestic supplies of respirators, to prioritize supplying NIOSH-approved N95 respirators to American healthcare workers and first responders, to suspend exports of N95 respirators, and to start importing respirators from its manufacturing facilities in other countries.

24.    On April 3, 2020, the FEMA Administrator issued an order under the DPA for millions of "N-95 Filtering Facepiece Respirators" to be delivered to FEMA bi-weekly for three months. The order expressly stated that 3M was "required to comply" with the delivery order and that "[a]cceptance is mandatory."

25.    Against this backdrop, high-ranking federal officials met with 3M senior executives to negotiate the precise terms under which 3M would import enormous quantities of respirators made overseas and continue to export respirators to meet humanitarian needs in Canada, Mexico, and Latin America.

26.    Pursuant to the DPA, the United States government directed 3M to enable FEMA to import 166.5 million respirators into the United States from plants in Asia. The federal government specified that the importation would include 8210 respirators manufactured in Singapore and South Korea.

27.    Between April and mid-July 2020, 3M delivered to FEMA, in Asia, the full order of 166.5 million 3M respirators. The arrangement was twice extended. In total, from April to October 2020, 3M delivered more than 228 million respirators to FEMA.

28.    The federal government procured aircraft to transport the 3M respirators—

including the 8210 respirators—from Asia to locations across the United States, including West Virginia. As reflected in an April 29, 2020 press release, an early FEMA transport included 4 million 3M respirators from 3M plants in Asia.



29.    The FEMA DPA procurement contract for 8210 respirators expressly required NIOSH approval, referencing the specific testing and certification approval number.

30.    The 8210 respirators, among others, were sold to the federal government pursuant to a FEMA "rated order." A rated order is a priority contract under the Defense Priorities and Allocation System, empowered by the DPA, which requires companies to give preferential treatment to orders placed by the government. Private (non-rated) orders could not be filled until the government's supply order was met.

31.     3M submitted regular letters to the FDA pursuant to the FDA's March 2, 2020 FDA Emergency Use Authorization, which authorized emergency use of specified respirators.  The letters informed the FDA of the actions 3M was taking to assist in the response to the COVID-19 pandemic.

32.     The respirators that 3M enabled FEMA to import—as directed by the federal government—were distributed to states, including West Virginia.  In fact, West Virginia Congressman David McKinley issued a statement on Facebook thanking the federal government for delivering "136,600 N95 Masks," noting that "West Virginia healthcare workers were supplied with more #PPE to protect themselves and others from #COVID19."  Rep. David B. McKinley (@RepMcKinley), Facebook (May 19, 2020, 2:23 PM), https://www.facebook.com/RepMcKinley/posts/2997059110361062/.



33.     In his prior role as elected state auditor from 2017 through January 2025, West Virginia Attorney General McCuskey approved the purchase of N95 respirators, including the 8210 respirator, to protect West Virginians during the COVID-19 pandemic.

34.     The 8210 respirator continues to protect wearers, including West Virginians, to this day.  It remains a gold standard in respiratory protection.

**THE PROCEDURAL REQUIREMENTS FOR REMOVAL
UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET**

35.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(b) and 1442(a) because the Circuit Court of Kanawha County is located within the Southern District of West Virginia.

36.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint are attached hereto as Exhibit 3.  A true and correct copy of the state court docket is attached as Exhibit 4.

37.     Removal is timely under 28 U.S.C. § 1446(b).  A defendant removing a case is required to file a notice of removal within 30 days of service on it by the plaintiff of an initial pleading.  28 U.S.C. § 1446(b)(1).

38.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon counsel for the State, and a copy is being filed with the Clerk of the State of West Virginia Circuit Court of Kanawha County.

39.     By filing a Notice of Removal in this matter, 3M does not waive and reserves its right to assert any defenses and/or objections to which it may be entitled.

40.     3M reserves the right to further amend or supplement this Notice of Removal.

41.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL-OFFICER
## REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

42.     Removal here is proper under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) there is a connection or association between the acts undertaken at the federal officer's direction and the plaintiff's claims; [4] and (d) the removing defendant can assert a "colorable" federal defense.  *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017).

43.     Removal rights under the federal-officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999).  Section 1442(a)(1) reflects Congress' "promise" that federal forums should be provided for officers of the United States.  *W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.,* 140 F.4th 188, 194 (4th Cir. 2025). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)."  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  To the contrary, § 1442 as a whole must be "liberally construed" in favor of removal.

---

[4] The precise contours of this element are currently before the United States Supreme Court. *See Chevron USA Inc. v. Plaquemines Parish*, Case No. 24-813 (questions presented include "[w]hether a causal-nexus or contractual-direction test survives the 2011 amendment to the federal-officer removal statute").  But under any construction of section 1442, 3M more than plausibly alleges that the State's suit is "for or relating to" acts that 3M took "under color of [federal] office."  28 U.S.C. §1442(a)(1).

*Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *see also Maryland*, 130 F.4th at 388 (also noting that "the statute must be 'liberally construed'" and that "'the ordinary presumption against removal does not apply' to federal-officer removal," and "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (quoting *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 157 (2007) and *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251)).

44.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to products manufactured, imported, distributed, or sold at the behest of the federal government.

### ALL THE REQUIREMENTS OF 28 U.S.C. § 1442(A)(1) ARE SATISFIED

#### 1.    *The "Person" Requirement Is Satisfied.*

45.    The first requirement for removal under the federal-officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Sawyer*, 860 F.3d at 255 (4th Cir. 2017).

#### 2.    *The "Acting Under" Requirement Is Satisfied.*

46.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson*, 551 U.S. at 152. The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). A private company acts under the federal government when there is "subjection, guidance, or control" by the federal government, typified by an "'unusually close [relationship] involving detailed regulation, monitoring, or supervision.'" *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251, 253 (citation omitted). Where private companies have "fullfill[ed]" government mandates, and the government maintained "broad oversight," the

acting under "element for federal officer jurisdiction is met." *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 348 (5th Cir. 2024).

47.     Just a few months ago, the State of West Virginia joined several other states in an amicus brief to the Supreme Court in a different federal-officer removal case. *Chevron USA Inc. v. Plaquemines Parish*, No. 24-813 (U.S. Sept. 11, 2025) (States *Chevron* Br.), Exhibit 5. As the State argued in that case, section 1442(a)(1)'s "promise"—that "a person acting under a federal officer may take any related disputes to federal court"—is "broad." *Id.* at 6. "'[G]eneral removal principles—like the presumption against removability that some lower courts have embraced—are 'inverted'" here. *Id.* at 6–7.

48.     The requirement of "acting under" a federal officer is readily met here. The federal government "exert[ed]" "subjection, guidance, [and] control," *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251, on 3M with respect to its 8210 respirators. Pursuant to the DPA, the United States government required 3M to enable FEMA to import hundreds of millions of 3M NIOSH-approved respirators into the United States from plants in Asia. And the rated order required 3M to fulfill the government's contract for 8210s before it could fulfill orders for anyone else.

49.     As a result, "the federal government and its officers were actively involved" in 3M's manufacture and importation of 8210 respirators. *Carter v. Monsanto Co.*, 635 F. Supp. 2d 479, 492 (S.D.W. Va. 2009). In *Carter*, this Court relied on "the federal government's direct and detailed control over the amount of [the product] produced and the purposes for which the [product] was used" in holding that the defendant was "acting under federal direction." *Id.* at 494. Here, like in *Carter*, 3M was "required to redirect many of [its] resources" and "to prioritize the government's [order]" over other customers. *Id.* at 492. 3M specifically "redirected" 8210 respirators produced in Singapore and South Korea to the United States. Finally, the government

itself actually transported those 8210s into the United States—evidencing its "direct and detailed control" over 3M's distribution and sale of 8210 respirators. *Id.* at 494.

50. In designing, manufacturing, and supplying the 8210 respirators at issue, 3M acted under the direction and control of federal officers. 3M has satisfied the "acting under" requirement.

### 3. The "Under Color of Federal Office" Requirement Is Satisfied.

51. The third requirement, that the State's suit is "for or relating to" actions the defendant took "under color of federal office," requires "a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted). Plausible allegations suffice. And the standard is satisfied when the court can "plausibly infer" that the defendant's acts "contributed to at least a portion of their relevant conduct." *Maryland*, 130 F.4th at 391 (citations omitted). As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).[5]

52. In 2011, Congress amended the federal-officer removal statute to explicitly extend the right to federal-officer removal to include not just suits "for" actions taken under federal direction, but any suit "relating to" such actions. Removal Clarification Act, Pub. L. No. 112-51, 125 Stat. 545 (2011). Congress specifically "intended to broaden the universe of acts that enable Federal officers to remove to Federal court" by adding that language. H.R. Rep. No. 112–17, pt. 1, at 6 (2011); *see also Sawyer*, 860 F.3d at 258 (describing same).

53. As the State of West Virginia told the Supreme Court, "removal is not just warranted when it comes to actions premised on (that is, 'for') acts taken under color of a federal office— but also the other matters that 'relate' to those actions." Exhibit 5. The State emphasized: "the

---

[5] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011).

phrase 'relating to' is expansive" and "exceptionally broad." *Id.* at 8; *see also id.* (noting that "such language 'has a broad scope, and an expansive sweep, and that it is broadly worded, deliberately expansive, and conspicuous for its breadth'") (quoting *Morales v. Trans World Airlines*, 504 U.S. 374, 384 (1992)).

54.     Here, the State's claims against 3M for alleged violations of the WVCCPA are for or relate to (at least in part) 3M's manufacture and labeling of 8210 respirators that were sold in West Virginia from December 2021 to the present.  At least some of those respirators were imported by FEMA, after the United States government requisitioned 3M's production of 8210 respirators in Asia.

55.     The 8210 respirators have a long shelf life; some of the 8210 respirators—imported by FEMA—remained in circulation in West Virginia during the period for which the State seeks civil penalties under the WVCCPA.

56.     Those 8210 respirators were NIOSH-approved.  NIOSH approves quality-control plans and performs its own tests to confirm the manufacturer's results.  When a respirator passes

15

the NIOSH certification testing, the manufacturer receives a testing and certification number.

NIOSH requires that the front of the product appear as depicted below.



Nat'l Inst. for Occupational Safety & Health, *How to Tell If Your N95 Respirator Is NIOSH Approved*, DHHS (NIOSH) Pub. No. 2021-124 (Sept. 2021) https://www.cdc.gov/niosh/docs/2021-124/pdfs/2021-124.pdf.

57.    The 8210 respirators that 3M enabled FEMA to import and distribute into West Virginia included the NIOSH stamp as reflected above.  It did not include a "warning on the respirator itself akin to 'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL'"—the absence of which the State challenges in this lawsuit.

58.    As a result, the State's claims against 3M—including the State's claims about the labeling of the 8210 respirator—relate to 3M's acts taken under color of federal office.  *See Maryland*, 130 F.4th at 391 (under-color element satisfied where the plaintiff states alleged that 3M caused contamination but it was not possible to distinguish between contaminants that arose from military use and contaminants that did not).

59.    As averred in this Notice of Removal, the alleged injuries arise from the labeling of

16

8210 respirators distributed into West Virginia.  Accordingly, the State's claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1).  *See, e.g.*, *Sawyer*, 860 F.3d at 257 ("[section] 1442 authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency") (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010)).

### 4. *The "Colorable Federal Defense" Requirement Is Satisfied.*

60.     The fourth requirement ("colorable federal defense") is satisfied by 3M's assertions of DPA immunity, its preemption defense, and immunity under the PREP Act.

61.     "A colorable federal defense is one that is defensive and based in federal law, and that arise[s] out of a defendant's official duties."  *CaremarkPCS,* 140 F.4th at 198 (quotation marks omitted).  Because the purpose of § 1442(a)(1) "is to secure that the validity of the defense will be tried in federal court," the defense "must only be plausible" in order to satisfy this requirement. *Id.* (quotation marks omitted).  "A federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous."  *Id.* (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 186 (1st Cir. 2024)).

62.     At the removal stage, a defendant need only show that its federal defense "was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 815 (3d Cir. 2016) (alteration in original) (citation omitted).  "A defendant 'need not win his case before he can have it removed.'"  *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016) (quoting same); *CaremarkPCS*, 140 F.4th at 198 ("the federal defense 'need not be clearly sustainable' . . . rather, it 'must only be plausible'").

63.    The inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014); *see also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at \*2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage.   Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted).  "[T]his inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010).

### *Defense Production Act Immunity*

64.    3M is immune from suit because at least some of the acts that West Virginia alleges give rise to liability were acts that resulted "directly or indirectly" from compliance with the DPA. As a result, 3M's DPA immunity defense is colorable and should be litigated in a federal forum. *See Jefferson Cnty.*, 527 U.S. at 447 (Scalia, J., concurring in part and dissenting in part) (noting that "the main point" of the federal-officer removal statute "is to give officers a federal forum in which to litigate the merits of immunity defenses").

65.    The DPA grants expansive immunity to manufacturers from liability for complying with orders under the DPA.  *See, e.g.*, *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 997–98 (5th Cir. 1976) (DPA immunity provision applies to "defaults resulting from any steps taken by the Government to carry out its priority requirements" because "a cumbersome and inflexible administrative process is antithetical to the pressing necessities of military procurement").  It expressly provides that "[n]o person shall be held liable for damages or penalties

18

for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557.

66.     The federal government directed 3M, under the DPA, to enable FEMA to import hundreds of millions of 3M respirators, including 8210s, into the United States from 3M plants in Singapore and South Korea. As discussed above, the government's directive required the sale of NIOSH-approved respirators. NIOSH prescribes what 3M is permitted to print on the front of its product.

67.     The State complains that the 8210 respirators distributed in West Virginia—thus including respirators imported or manufactured under the DPA—violated the WVCCPA's ban on unfair or deceptive acts and practices. In particular, the State alleges that 3M "should have provided a warning on the respirator itself something akin to 'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL.'" Compl. ¶ 160. The State alleges that 3M's representations about the effectiveness of the 8210 were "misleading." *Id.* ¶ 172. And the State seeks recovery for the sale of each 8210 "into West Virginia." *Id.* at p. 71.

68.     The DPA provides immunity against liability for acts "resulting directly or indirectly from compliance with … [an] order issued pursuant" to the Act. 50 U.S.C. § 4557. DPA immunity applies broadly to activity undertaken in conformity with the Act. The DPA extends immunity even to liability resulting "*indirectly* from compliance." *Id.* (emphasis added).

69.     It is well established that immunity from liability applies when the defendant was "helping the Government produce an item that it needs." *Watson*, 551 U.S. at 153–54; *see also Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400–01 (5th Cir. 1998) ("agree[ing]" that DPA immunity against tort claims for product produced for use by Department of Defense was colorable federal defense) (overruled in part on other grounds); *Ryan v. Dow Chem. Co.*, 781

19

F. Supp. 934, 945 (E.D.N.Y. 1992) (holding that defendants made "a colorable claim" pursuant to the DPA).

70.    Although the State may dispute whether the DPA applies to its claims, "no dispute can exist over the application of the Act as a colorable defense." *Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195, 1202 (E.D. Tex. 1995), *aff'd*, 149 F.3d 387.

71.    3M's manufacture and distribution of 8210s was required by the DPA.  By seeking to impose civil penalties on 3M at least in part for complying with directives from the federal government, the State is attempting to use state consumer protection law to attack conduct undertaken pursuant to the DPA.  3M is immune from suit.

### *NIOSH Preemption*

72.    3M also has a colorable federal defense that the State's claims under the WVCCPA are preempted by federal law.

73.    When a regulation establishes federal standards, a "federal preemption defense is [] colorable for purposes of federal officer removal." *Caris*, 108 F.4th at 347.  A claim is preempted where, as here, a state tort claim seeks "different" labeling "than the one required by" governmental regulations.  *Fullen v. Philips Elecs. N. Am. Corp.*, 266 F. Supp. 2d 471, 478 (N.D.W. Va. 2002) (quoting *Moss v. Parks Corp.*, 985 F.2d 736, 740 (4th Cir. 1993)).  *See also*, *e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (state tort lawsuit preempted by federal labeling requirements).

74.    The State accuses 3M of violating the State consumer protection act by failing to include a label on its 8210 respirators stating: "NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL."  Compl. ¶ 160.

20

75.    But NIOSH regulations require 3M to include the NIOSH stamp and approval number on its NIOSH-compliant products.  42 C.F.R. § 84.33(g) (requiring that respirators "shall . . . be labeled distinctly"); *see also* Nat'l Inst. for Occupational Safety & Health, *How to Tell If Your N95 Respirator Is NIOSH Approved*, DHHS (NIOSH) Pub. No. 2021-124 (Sept. 2021), https://www.cdc.gov/niosh/docs/2021-124/pdfs/2021-124.pdf.

76.    The State's claim that 3M should have simultaneously instructed users to "IGNORE NIOSH COAL APPROVAL" is preempted by federal law.  Compl. ¶ 160.

77.    3M's preemption defense plainly satisfies the "low bar" of a colorable federal defense.  *CaremarkPCS*, 140 F.4th at 198 (holding that a defendant's federal preemption argument satisfied this element of § 1442 removal); *see also Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256 (holding same).

78.    Federal preemption is therefore also a colorable federal defense justifying removal.

### *PREP Act Immunity*

79.    The PREP Act generally provides that "a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration [by the Secretary of HHS] has been issued with respect to such countermeasure."  42 U.S.C. § 247d-6d(a)(1).

80.    On March 17, 2020, the Secretary of HHS issued a declaration under the PREP Act to provide immunity from liability for activities related to medical countermeasures against COVID-19.  85 Fed. Reg. 15,198.  The PREP Act covers manufacturers and distributors who "prescribed, administered, or dispensed [] countermeasure[s]."  42 U.S.C. § 247d-6d(i)(2).

NIOSH-approved personal respiratory protective devices are "covered countermeasures" under the statute. *Id.* § 247d-6d(i)(1)(D)).

81.    PREP Act immunity applies here.  There can be no dispute that 3M is a covered manufacturer and distributor of a "covered countermeasure."  3M manufactured, sold, and enabled the importation and distribution of 8210s—a NIOSH-approved medical countermeasure against COVID-19.  The States' claims "relat[e]" to 3M's "administration" of the respirators.  42 U.S.C. § 247d-6d(a)(1).  3M's administration of the respirators resulted in the federal government's provision of 8210s directly to West Virginia for use by West Virginians.

82.    PREP Act immunity has been granted to manufacturers of other medical countermeasures employed during the COVID-19 pandemic.  In *Searcy v. Pfizer, Inc.*, the Middle District of Alabama granted PREP Act immunity to vaccine manufacturers and others in a wrongful-death and failure-to-warn case.  --- F. Supp. 3d ----, 2025 WL 2713736, at *6–7, *15 (M.D. Ala. Sept. 23, 2025), *appeal docketed*, No. 25-14198 (11th Cir. Dec. 1, 2025).  In *Baghikian v. Providence Health & Services*, 715 F. Supp. 3d 1265, 1273 (C.D. Cal. 2024), manufacturers of drugs used to treat COVID-19 were similarly granted immunity for claims including an alleged violation of California's False Advertising Law.

83.    3M's manufacture, distribution, and sale of 8210s is the quintessential activity protected by the PREP Act.

84.    Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal-officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Circuit Court of Kanawha County, West Virginia to this Court.

Dated: December 23, 2025                    Respectfully submitted,


                                            /s/ Robert H. Akers
                                            Bryant J. Spann, Esq. (WV Bar No. 8628)
                                            Robert H. Akers, Esq. (WV Bar No. 9622)
                                            THOMAS COMBS & SPANN, PLLC
                                            300 Summers Street, Suite 1380
                                            Charleston, WV 25301
                                            (304) 414-1800

                                            Steven R. Ruby, Esq. (WV Bar No. 10752)
                                            CAREY DOUGLAS KESSLER & RUBY PLLC
                                            901 Chase Tower
                                            707 Virginia Street, East
                                            P.O. Box 913
                                            Charleston, WV 25323

                                            Lauren Goldman, *pro hac vice* forthcoming
                                            Justine Goeke, *pro hac vice* forthcoming
                                            GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Avenue
                                            New York, NY 10166-0193
                                            Telephone: (212) 351-4000

                                            *Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I, Robert H. Akers, hereby certify that on December 23, 2025, a copy of the foregoing was served on counsel for Plaintiff via electronic mail and first class mail at the addresses indicated below.

Jace H. Goins, Esq., Chief Deputy Att'y
Gen., (WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y
Gen., (WV Bar # 8231)
OFFICE OF THE ATTORNEY
GENERAL
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

J. Timothy DiPiero (W.Va. Bar # 9616)
Lonnie C. Simmons (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar
# 9616)
DiPIERO SIMMONS
McGINLEY BASTRESS, PLLC
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: (304) 342-0133
Facsimile: (304) 342-4605
Rob.bastress@dbdlawfirm.com

*Counsel for The State*

/s/ Robert H. Akers
Robert H. Akers, Esq. (WV Bar No. 9622)

24