# Exhibit 2

# THOMAS COMBS & SPANN, PLLC

P O BOX 3824
CHARLESTON, WEST VIRGINIA 25338
------------------
300 SUMMERS STREET, SUITE 1380
CHARLESTON, WEST VIRGINIA  25301

TELEPHONE:  (304) 414-1800
FACSIMILE:  (304) 414-1801
WEBSITE:  www.tcspllc.com

Bryant J. Spann
Direct Dial: (304) 414-1836
E-mail: bspann@tcspllc.com

October 13, 2025

Jace H. Goins
Chief Deputy Attorney General
Office of the WV Attorney General
1900 Kanawha Blvd., East
State Capitol, Building 1, Room E-26E
Charleston, WV  25305

Re:     Threatened lawsuit regarding 3M 8210 N95

Dear Jace:

I have reviewed with my client the draft complaint that you forwarded to my colleague, Bernadette Catalana, on October 2, 2025. The allegations in that complaint are frivolous and, if ultimately made, would be in bad faith. I will address some of them in detail below, but you should know that threatening to file this complaint was a mistake, and actually filing it would be a worse one.

The product you are threatening to attack, the 8210 N95, is the gold standard filtering facepiece respirator on the market today. During the pandemic, it saved countless West Virginian lives, including those of healthcare workers and first responders. The Attorney General told us that he personally ordered this product for use by state workers during the pandemic.  The 8210 N95 continues to save lives in West Virginia and across the country. Your threatened injunction would hurt West Virginians—and only West Virginians—by depriving *only West Virginians* of this critical safety product.

Your outside counsel also knows that the draft complaint is baseless.  Here are specific examples of provably false allegations:

- The fundamental claim in the draft complaint is that the 8210 N95 cannot fit workers' faces.  NIOSH researchers in Morgantown have concluded exactly the

opposite in multiple published, peer-reviewed studies.[1] NIOSH concluded that the 8210 is one of the best-fitting respirators on the market. For example, the studies found that, simply by following 3M's fitting instructions for the 8210 N95, users achieved the expected level of protection 95% of the time or more. Further, the lower 5th percentile of those test results—the people who got the worst fit—nevertheless received more than *double* the level of protection the 8210 N95 is supposed to provide. At trial before Judge Hoke, the State's expert witness, Dr. Jack Price, testified that he has (1) personally fitted users of the 8210 N95 and (2) that, based on those fit tests, he sent them into hospitals during the pandemic.[2] In a recent deposition that your lawyers don't know about, Dr. Price admitted that the 8210 N95 achieves an acceptable fit with a majority of people on whom it is tested.[3] Thus the allegation that workers cannot achieve an acceptable fit with the 8210 N95 is blatantly false, contrary to your own expert's sworn testimony, and not made in good faith.

- The draft complaint also alleges that the 8210 N95 does not have an assigned protection factor (APF) of 10. That is false as a matter of federal law.[4] In 2006, after a years-long review of all available data on how respirators like the 8210 N95 (and the 3M 8710) perform in actual workplaces on actual workers' faces, OSHA concluded that filtering-facepiece respirators merit an APF of 10. In that rulemaking, OSHA examined the same criticisms recycled in your draft complaint—alleged problems with fit, inability to perform a fit check, durability concerns, level of protection provided—and *rejected all of them*, based on the

---

[1] Coffey et al., Fitting Characteristics of Eighteen N95 Filtering-Facepiece Respirators, J. OCCUP. & ENV'TL HYGIENE, 1:262-71 (2004) (Attached as Ex. 1); Campbell et al., Respiratory Protection as a Function of Respirator Fitting Characteristics & Fit-Test Accuracy, AM. INDUS. HYGIENE ASSOC. J., 62:36-44 (2001) (Attached as Ex. 2).

[2] Price Trial Testimony 01/15/2025 at 453:4-10(Attached as Ex. 3) (Q: "[I]n fact, during COVID, you actually fit tested people at Northeastern University with the 8210 and sent them out wearing the 8210 for protection against the coronavirus in healthcare facilities. A: That was one of the masks that were provided, yes."); *id.* at 460:13-22 (Dr. Price has measured workers achieving a fit factor of greater than 100 with the 8210, indicating that the 8210 did fit those people properly); *id.* at 461:4-12 (Dr. Price acknowledges that a fit factor of 100 is a fit that "OSHA accepts as a valid fit").

[3] Jack Price Depo. in *Blackburn v. 3M* (09/24/2025) 94:13 to 95:15 (agreeing that "a majority of the people did get fit factors greater than 100"); *id.* at 100:5-8 ("Q. The vast majority of these people actually got fit factors greater than 100. A. Again, you can say that from the data, yes.") (Attached as Ex. 4).

[4] Assigned Protection Factors Final Rule, 71 F.R. 50122 (08/24/2006) (Attached as Ex. 5).

actual performance data. OSHA specifically found that filtering-facepiece respirators "can be reliably fit tested and fit checked."[5] Interestingly, OSHA rejected *by name* the views of the same biased, outlier scientists that the State relies on in its draft complaint (Ching-Tsen Bien, James Johnson). But OSHA specifically credited the research and detailed statistical analysis of WVU's own Dr. Warren Myers, who you know is testifying on 3M's behalf in the pending case.[6] Furthermore, the State's own expert, Dr. Price, actually teaches students at Harvard School of Public Health that the 8210 N95 has an APF of 10.[7] It is astounding that the State would now ignore (1) the sworn testimony of its own expert witness, (2) the sworn testimony and published research of a WVU tenured professor, and (3) governing federal law to sue 3M for *accurately* stating that the 8210 N95 has an APF of 10. There is no good faith basis for this allegation.

- The suggestion that it is inaccurate to say that the 8210 N95 can provide protection for a full shift is also demonstrably wrong. Again, Dr. Price himself teaches that N95 respirators can be used not just for a full shift, but for *multiple shifts* "until a change in breathing resistance is noted."[8]

- Any criticism of 3M for using the NIOSH approval number on the front of the 8210 N95 is nonsensical. As your outside lawyers and experts all know, NIOSH *mandates* that 3M print the federal approval number on the front of its product. Your lawyers invent reasons that, somehow, the 8210 isn't really certified, even though NIOSH has certified and recertified it multiple times from 1995 to the present.

- The 1995 document cited in the draft complaint does not mean what you believe it does. The clear proof is that, in the same submission packet, 3M sent to NIOSH, and NIOSH approved, 3M's fit check instructions for the 8210. The allegation that 3M somehow concealed something about its product by *disclosing it to federal regulators* makes no sense. Furthermore, as discussed above, NIOSH's own

---

[5] *Id.* at 50164.
[6] *Id.* at 50138-41.
[7] Price Teaching Slides, slide 46 (showing that OSHA assigns half-mask, air-purifying respirators a protection factor of 10 and, "This APF category includes filtering facepieces") (Attached as Ex. 6).
[8] *Id.* slide 42 (N95s "may be used multiple shifts and use may continue until a change in breathing resistance is noted).

research shows that when users follow the 8210 N95's fit check instructions, 95% (or more) of them receive the expected level of protection (*i.e.,* a protection factor greater than 10).[9]

These are just some of the clearest examples where your draft complaint is facially false. If necessary, 3M will further demonstrate that the 8210 N95 provides reliable protection when properly selected, fitted, and used. This conclusion is supported by 3M's internal testing, testing in government labs, testing in workplaces, and testing in a West Virginia coal mine. There is not a single published test indicating that the 8210 N95 does not work as advertised.

In addition to being wrong on the merits, your proposed complaint would be dead on arrival under multiple affirmative defenses. The claim for civil penalties fails under the statute of limitations set forth in W. Va. Code § 46A-7-111(2). The same outside lawyers have been suing 3M over the 8210 N95 since at least 2018, while simultaneously serving as Special Assistant Attorneys General in the Lincoln County case. The "not fit-checkable" document cited in your draft complaint has been sitting in their files since at least as early as 2019. For these and many other reasons, the Attorney General's office has had actual notice of the supposed violations listed in the draft complaint for much more than four years. The proof is on the face of the draft complaint itself—a majority of its factual allegations relate to the 3M 8710, which the Attorney General has been suing 3M over since 2003.

Additionally, your injunctive theory fails under the doctrines of laches and unclean hands, as well as others. Given the *decades* that have passed since the Attorney General began suing 3M over its disposable respirators, there is no world in which its failure to sue over the 8210 N95 before now is not a prejudicial and unreasonable delay. Further, the fact that this is plainly being done to force a settlement in a pending suit would give rise to a wide range of equitable defenses. In addition, the lack of a factual, good-faith basis for the State's claims exposes both the State, and its individual attorneys, to potential counterclaims for which qualified immunity would not be available.

The State's motives in threatening this lawsuit are as clear as they are improper. The current trial about the 8710 in Lincoln County is going poorly for the State, both in terms of substance and timing. There is no clear end in sight: The State should lose on the statute of limitations and on the merits and, in any event, the Court will not resolve this case anytime soon. You admitted to Ms. Catalana that you are threatening this second lawsuit

---

[9] *See* Ex. 1.

# THOMAS COMBS & SPANN, PLLC

to "shake the tree" on settlement efforts in the first case. In other words, you know the underlying case is going poorly and you are hoping this threat will change the narrative. To the extent it changes anything, it has strengthened 3M's resolve.

It is not lost on 3M that this threat is the brainchild of private lawyers representing the State in the Lincoln County trial about the 8710; those lawyers also have a personal financial interest in pending lawsuits involving the 8210. Those lawyers could be seen as improperly leveraging their public office for their private financial benefit in pending litigation.

If the State wants to settle the pending matter about the 8710 in Lincoln County, threatening a lawsuit about the 8210 is not the way to do it. Instead, the State should make a genuine and realistic demand to spark a meaningful conversation.

Sincerely,

BRYANT J. SPANN

BJS/lag
Enclosures

# EXHIBIT 1





## Journal of Occupational and Environmental Hygiene

ISSN: 1545-9624 (Print) 1545-9632 (Online) Journal homepage: https://oeh.tandfonline.com/loi/uoeh20

# Fitting Characteristics of Eighteen N95 Filtering-Facepiece Respirators

Christopher C. Coffey, Robert B. Lawrence, Donald L. Campbell, Ziqing Zhuang, Catherine A. Calvert & Paul A. Jensen

**To cite this article:** Christopher C. Coffey, Robert B. Lawrence, Donald L. Campbell, Ziqing Zhuang, Catherine A. Calvert & Paul A. Jensen (2004) Fitting Characteristics of Eighteen N95 Filtering-Facepiece Respirators, Journal of Occupational and Environmental Hygiene, 1:4, 262-271, DOI: 10.1080/15459620490433799

**To link to this article:** https://doi.org/10.1080/15459620490433799

Published online: 17 Aug 2010.

Submit your article to this journal

Article views: 822

View related articles

Citing articles: 9 View citing articles

*Journal of Occupational and Environmental Hygiene*, 1: 262–271
ISSN: 1545-9624 print / 1545-9632 online
Copyright © 2004 JOEH, LLC
DOI: 10.1080/15459620490433799

# Fitting Characteristics of Eighteen N95 Filtering-Facepiece Respirators

**Christopher C. Coffey,[1] Robert B. Lawrence,[1] Donald L. Campbell,[1] Ziqing Zhuang,[2] Catherine A. Calvert,[1] and Paul A. Jensen[1]**

[1]National Institute for Occupational Safety and Health, Division of Respiratory Disease Studies, Morgantown, West Virginia

[2]National Institute for Occupational Safety and Health, National Personal Protective Technology Laboratory, Pittsburgh, Pennsylvania

*Four performance measures were used to evaluate the fitting characteristics of 18 models of N95 filtering-facepiece respirators: (1) the 5th percentile simulated workplace protection factor (SWPF) value, (2) the shift average SWPF value, (3) the h-value, and (4) the assignment error. The effect of fit-testing on the level of protection provided by the respirators was also evaluated. The respirators were tested on a panel of 25 subjects with various face sizes. Simulated workplace protection factor values, determined from six total penetration (face-seal leakage plus filter penetration) tests with re-donning between each test, were used to indicate respirator performance. Five fit-tests were used: Bitrex<sup>TM</sup>, saccharin, generated aerosol corrected for filter penetration, PortaCount® Plus corrected for filter penetration, and the PortaCount Plus with the N95-Companion<sup>TM</sup> accessory. Without fit-testing, the 5th percentile SWPF for all models combined was 2.9 with individual model values ranging from 1.3 to 48.0. Passing a fit-test generally resulted in an increase in protection. In addition, the h-value of each respirator was computed. The h-value has been determined to be the population fraction of individuals who will obtain an adequate level of protection (i.e., SWPF ≥ 10, which is the expected level of protection for half-facepiece respirators) when a respirator is selected and donned (including a user seal check) in accordance with the manufacturer's instructions without fit-testing. The h-value for all models combined was 0.74 (i.e., 74% of all donnings resulted in an adequate level of protection), with individual model h-values ranging from 0.31 to 0.99. Only three models had h-values above 0.95. Higher SWPF values were achieved by excluding SWPF values determined for test subject/respirator combinations that failed a fit-test. The improvement was greatest for respirator models with lower h-values. Using the concepts of shift average and assignment error to measure respirator performance yielded similar results. The highest level of protection was provided by passing a fit-test with a respirator having good fitting characteristics.*

**Keyword**  filtering-facepiece, fit-test, respirator, simulated workplace protection factor

Address correspondence to Christopher C. Coffey, Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, Division of Respiratory Disease Studies, 1095 Willowdale Road, Morgantown, WV 26505-2888; e-mail: ccoffey@cdc.gov.

Mention of a specific product or company does not constitute endorsement by the Centers for Disease Control and Prevention or Applied Industrial Hygiene, Inc.

## INTRODUCTION

In 1995, the National Institute for Occupational Safety and Health (NIOSH) promulgated new certification regulations for particulate respirators.[1] Soon after the introduction of N95 filtering-facepiece respirators into the marketplace, NIOSH and the Occupational Safety and Health Administration (OSHA) received many inquiries regarding the face-fitting characteristics of these respirators. In response, NIOSH has conducted two studies of N95 respirators. The first study evaluated 21 models of filtering-facepiece respirators purchased in 1996.[2,3] The current study evaluated the protection level of 18 respirator models purchased in late 1998. There are currently over 165 certified models of N95 filtering-facepiece respirators.

The first study of N95 filtering-facepiece respirators conducted by NIOSH was intended to determine: (1) the simulated workplace performance of N95 filtering-facepiece respirators; (2) if the simulated workplace performance of these respirators improved when a quantitative fit-test was used to eliminate wearers with poorly fitting respirators; and (3) the effect of various pass/fail criteria for a quantitative fit-test on the performance of these respirators.[2,3]

To answer these questions, the previous study determined the total penetration (the combination of filter penetration and face-seal leakage) of 21 models, each tested on a panel of 25 subjects. Four total penetration tests were performed on each subject/respirator combination and these 100 measurements were used to calculate a 95th percentile total penetration

value for each respirator (i.e., 95 percent of wearers of that respirator can expect to have a total penetration value below the 95th percentile total penetration value). The first total penetration test was then used as a surrogate fit-test by subtracting the filter penetration to determine face-seal leakage. Those subjects having face-seal leakage greater than a given criterion were removed from the data set. The remaining subjects were then used to determine a new 95th percentile total penetration value to indicate expected performance of the respirator when used by individuals who pass a fit-test.

The study found that the level of performance among the N95 respirators tested varied greatly. Without fit-testing, the 95th percentile total penetration values for each respirator ranged from 6 to 88%. The 95th percentile total penetration value for all the respirator models combined was 33%, which exceeds by more than three times the level of performance (i.e., 10% penetration) normally expected of a half-facepiece respirator.[4–6] Five respirator models had a 95th percentile total penetration value $\leq 10\%$.

When the surrogate fit-test was applied to the data, the 95th percentile total penetration values for individual respirator models improved, ranging from 1 to 16%. The 95th percentile total penetration value for all the respirators combined was only 4%, which is less than one-eighth of the value (33%) without fit-testing. However, only 4 of the 21 models successfully fit more than 50% of the test subjects when a pass/fail criterion of 1% face-seal leakage was used.

The fitting characteristics of these 21 models were evaluated using a parameter called the h-value, which is the fraction of the population who will obtain an adequate fit when a respirator is selected and donned (including a user seal check) in accordance with the manufacturer's instructions prior to a fit-test being performed.[7] An adequate fit is one that results in a protection factor being greater than or equal to the commonly accepted assigned protection factor (APF). Assuming the APF for filtering, half-facepiece N95 respirators to be 10, the resulting h-values for individual respirator models ranged from 0.44 to 0.99, with a median value of 0.83. Only four of the models had an h-value $\leq 0.95$, a value used by Hyatt[8] in establishing his APF values. That is, only four models provided protection factors $\leq 10$ in at least 95 out of 100 donnings.

Campbell et al.[9] used a mathematical formula to estimate the respirator assignment error for each of the 21 models. The respirator assignment error is the percentage of respirator wearers erroneously assigned a poorly-fitting respirator despite passing a fit-test. The formula predicted respirator assignment errors ranging from 0 to 20%, depending upon the h-value of the particular respirator and the type of fit-test used.

The current study was carried out to assess the level of protection provided by 18 models of N95 filtering-facepiece respirators and the effect of fit-testing on the level of protection. Four different means were used to measure the level of protection: (1) the 5th percentile simulated workplace protection factor (SWPF) value, (2) the shift average SWPF, (3) the h-value, and (4) the assignment error.

## MATERIALS AND METHODS

### Respirator Models

The study's resource and time constraints allowed only 18 models of N95 filtering-facepiece respirators to be tested. The respirator models were randomly selected for this study from the over 165 commercially available at the time the study began in 1998. The models tested in this study may not necessarily represent the models currently available. Some models may no longer be manufactured and marketed in the version tested since they may have been either modified by the manufacturer or replaced by newer versions.

### Fit-Testing and Simulated Workplace Testing

Thirty-three people (18 females and 15 males) participated in this study. From this group, a panel of only 25 subjects with various face sizes (based on the Los Alamos panel) tested each respirator.[10] The Los Alamos researchers investigated 21 facial dimensions to determine their applicability for assessing the facepiece-to-face seal. For half-facepiece respirators, face length and lip length (mouth width) were selected as the key dimensions for the selection of face sizes for testing half-facepiece respirators. The subjects in the current study had face lengths ranging from 93.5 mm to 133.5 mm and lip lengths of 34.5 mm to 61.5 mm. The performance of the respirators was determined using a SWPF test. The SWPF test determined the total penetration of six tests using the PortaCount® Plus (TSI, Inc., St. Paul, Minn.) with re-donning between each test.

The fit-tests used were: Bitrex™ (Allegro Industries, Paramount, Calif.); PortaCount Plus corrected for filter penetration; the PortaCount Plus with the N95-Companion™ accessory (which is designed to count only particles resulting from face-seal leakage); and either saccharin or generated aerosol corrected for filter penetration. Each panel member was assigned a separate respirator for each model tested. The two methods corrected for filter penetration are not currently used by the general public as they are not in the OSHA regulations.[7] They were included in this study to determine the feasibility and practicality of using the same hardware for fit-testing filtering-facepiece respirators as is used for other respirator types. The fit-test methods and the SWPF test are described in detail elsewhere.[11]

When the study began, NIOSH did not recommend the use of the saccharin fit-test due to its potential carcinogenicity. Halfway through the study NIOSH revised its policy regarding the saccharin fit-test method for use in qualitative fit-testing to be consistent with the OSHA regulations.[12] Due to resource limitations all 18 respirator models could not be tested with all five fit-test methods after the policy was changed. Since the saccharin fit-test method is the most commonly used qualitative fit-test method, it was decided to include it and drop the seldom used generated aerosol fit-test method. The modified generated aerosol, Bitrex, Companion, and PortaCount Plus methods were used with the models tested before the change in NIOSH policy. The saccharin, Bitrex, Companion, and PortaCount Plus

methods were used with the models tested after the change in NIOSH policy.

## Data Analysis

### Fit-Test Passing Rate

The fit-test passing rate (i.e., the number of subjects passing each fit-test method divided by the total number of subjects performing that fit-test) was also computed for each model. The fit-test passing rate assists employers in selecting filtering-facepiece respirators that would likely fit the greatest percentage of their employees. This would result in time and financial savings by reducing the number of repeat fit-tests required and the number of respirators needing to be stocked. The level of protection (performance) provided by the various models of filtering-facepiece respirators were evaluated and rank-ordered in four ways.

## Techniques for Measuring Respirator Performance

### 5th Percentile SWPF Values

The first technique to determine filtering-facepiece respirator performance was to investigate the distribution of the 5th percentile SWPF values. From the 150 overall SWPF values determined for each respirator model from each of the 25 subjects donning the respirator six times, the 5th percentile SWPF for each model was calculated, using the geometric mean (GM) and the geometric standard deviation (GSD), as $GM/GSD^{1.645}$.[13] These 5th percentile SWPF values were calculated without regard to the results of the fit-tests. The subjects were then divided into two groups for each fit-test method: those who passed that fit-test and those who failed it. Passing the qualitative fit-tests meant the subject did not taste the fit-test agent. Passing the quantitative tests meant that a subject had a fit factor $\geq 100$ with a particular respirator model. The 5th percentile SWPF values were then separately calculated for subjects passing a fit-test and for subjects failing that fit-test.

### Shift Average SWPF

The second method of determining respirator performance was the shift average SWPF, which corresponds to the protection factor averaged over the several donnings typical of a workday. It was computed by converting each of the six SWPF values for each subject/respirator combination into total penetration values (1/SWPF) and computing the average penetration and the shift average SWPF (1/average penetration). This resulted in 25 shift average values for each respirator model. The 5th percentile, geometric mean, and geometric standard deviation of those 25 values were calculated for each respirator model.

### h-Values

The third manner of assessing respirator performance was to compute the h-value for all the models combined as well as for each individual model. For this study, a respirator was considered to provide an adequate fit when its SWPF was greater than a specified target protection factor value. The h-value is the number of SWPF values greater than or equal to the target protection value divided by the total number of SWPF

values. The three target protection values used were 10, 5, and 3. Ten was selected because it is the APF usually assigned to half-facepiece respirators.[4-6] Five was selected because that was the APF previously recommended by NIOSH for a single-use dust respirator if it was not quantitatively fit-tested.[4] Three was selected to determine how the poorer-performing models of filtering-facepiece respirators performed when compared to a lower performance standard.

### Assignment Error

The fourth procedure for determining respirator performance was to compute the assignment error. A respirator assignment error is the percentage of respirator users who, even though they pass a fit-test, would mistakenly be assigned a poorly-fitting respirator. An assignment error was estimated using the formula (Equation 1) developed by Campbell et al. to account for the fact that an individual will have more than one chance to pass a fit-test. The assignment error was estimated for the case where only two fit-tests are allowed.[9]

$$A_e = N_{b,p}/(N_{b,p} + N_{g,p}) \qquad (1)$$

where $A_e$ = the fraction of the population of qualified respirator wearers with an inherently poor respirator fit who have mistakenly passed a fit-test and are assigned that respirator to wear in the workplace; $N_{b,p}$ = the total number of respirator wearers with an inherently bad fit who have qualified for respirator use by mistakenly passing either one of the two fit-test tries; and $N_{g,p}$ = the total number of respirator wearers with an inherently good fit who have qualified for respirator use by appropriately passing either one of the two fit-test tries.

## RESULTS

### 5th Percentile SWPF Values

Table I is a summary of the 5th percentile SWPF values without fit-testing for all subjects and for those passing and failing each of the five fit-test methods for all 18 models combined (labeled as "All 18 Models" in Tables I through V) as well as for each individual model. Without fit-testing, the 5th percentile SWPF values ranged from 1.3 (i.e., virtually no protection) to 48.

Of the three models that had a 5th percentile SWPF $\geq 10$ without fit-testing, the lowest was 13.7, approximately twice that of the next best-fitting respirator. For each respirator model, the 5th percentile SWPF value varied by fit-test method. The Companion method provided the highest 5th percentile SWPF value for 11 of the 12 respirator models having subjects passing this fit-test. The exception was the 3M 8212, for which the PortaCount Plus provided the highest 5th percentile SWPF value. The 3M 8212 had the lowest 5th percentile SWPF value compared to the other 11 respirators.

### Shift Average SWPF

Table II contains the 5th percentile SWPF values based on the shift average method for the 18 models. The results are

**TABLE I.  Summary of 5th Percentile SWPF Values Without and with Fit-Testing by Fit-Test Method**

| Model | Without Fit-Testing | Bitrex | | Saccharin | | Companion | | PortaCount Plus | | Generated Aerosol | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pass | Fail | Pass | Fail | Pass | Fail | Pass | Fail | Pass | Fail |
| MSA Affinity Ultra | 56.9 | 30.6 | 48.0 | TNP[A] | TNP[A] | 122.1 | 48.0 | 43.8 | 67.2 | 43.7 | 74.7 |
| 3M 8110S/8210 | 22.0 | 33.5 | 16.6 | TNP[A] | TNP[A] | 90.4 | 16.6 | 13.5 | 18.0 | 28.4 | 15.6 |
| 3M 1860/1860S | 17.0 | 26.1 | 13.7 | TNP[A] | TNP[A] | 86.9 | 13.7 | 37.3 | 10.0 | 33.5 | 12.5 |
| Moldex 2200N95/2201N95 | 11.4 | 11.4 | 6.1 | TNP[A] | TNP[A] | 105.2 | 6.1 | 32.2 | 5.8 | NP[B] | 6.1 |
| MSA Affinity Plus | 8.4 | 14.8 | 5.2 | TNP[A] | TNP[A] | 100.4 | 5.2 | NP[B] | 5.2 | NP[B] | 5.2 |
| 3M 8512 | 8.2 | 10.9 | 4.1 | 4.1 | 3.6 | 100.3 | 4.1 | 24.3 | 3.3 | TNP[A] | TNP[A] |
| North 7175N95 | 8.0 | 12.3 | 7.2 | 5.6 | 4.7 | 10.1 | 6.7 | NP[B] | 7.3 | NP[B] | 7.2 |
| Gerson 2737 | 7.7 | 9.0 | 4.9 | TNP[A] | TNP[A] | NP[B] | 4.9 | 6.7 | 4.8 | NP[B] | 2.0 |
| Willson N9510F | 7.2 | 13.8 | 5.6 | 5.6 | 4.4 | 85.1 | 5.6 | 13.6 | 4.3 | TNP[A] | TNP[A] |
| Willson 1410N95 | 7.0 | 6.2 | 4.4 | TNP[A] | TNP[A] | NP[B] | 4.5 | 14.9 | 4.5 | NP[B] | 4.5 |
| Aearo Safety Pleats | 6.9 | 6.7 | 4.4 | TNP[A] | TNP[A] | 119.7 | 4.4 | 37.9 | 3.9 | 11.8 | 3.9 |
| Moldex 2300N95/2301N95 | 5.5 | 4.8 | 2.3 | 2.3 | 2.1 | NP[B] | 2.3 | NP[B] | 2.3 | TNP[A] | TNP[A] |
| Moldex 2700N95/2701N95 | 5.4 | 19.0 | 1.9 | 1.9 | 1.6 | 95.9 | 1.9 | 18.7 | 1.7 | TNP[A] | TNP[A] |
| Moldex 2207N95 | 5.3 | 13.4 | 2.1 | 2.1 | 1.9 | NP[B] | 2.1 | NP[B] | 2.1 | TNP[A] | TNP[A] |
| Willson N9520F | 5.3 | 12.8 | 2.7 | 2.7 | 1.7 | 86.1 | 2.7 | 21.9 | 2.1 | TNP[A] | TNP[A] |
| Survivair 1930 | 5.2 | 15.5 | 2.4 | TNP[A] | TNP[A] | 96.7 | 2.4 | 33.7 | 2.0 | NP[B] | 2.4 |
| 3M 8212 | 3.9 | 4.4 | 1.3 | 1.3 | 1.1 | 2.2 | 1.3 | 10.7 | 1.0 | TNP[A] | TNP[A] |
| U.S. Safety ADN95 | 3.6 | 6.8 | 2.0 | 2.0 | 2.0 | NP[B] | 2.0 | NP[B] | 2.0 | TNP[A] | TNP[A] |
| All 18 Models | 2.9 | 7.4 | 2.1 | 6.9 | 1.9 | 74.5 | 2.3 | 14.6 | 2.7 | 21.6 | 4.7 |

[A]Test not performed using this model.
[B]No subjects passed the fit-test with this model.

similar to the 5th percentile SWPF values without fit-testing. The same three models that had 5th percentile SWPF values ≥10 also had shift average SWPF values ≥10. As with the 5th percentile SWPF values, the lowest of these three values was over 1.5 times greater than that of the next best-fitting respirator.

### h-Values

Table III summarizes the h-value results. Hyatt[8] stated that a respirator, without fit-testing, should provide at least 95% of its wearers with a protection factor at least equal to or greater than its class APF. Fit-testing is important to identify that small percentage of individuals with an inadequate fit. Using the traditional APF of 10 for a half-facepiece respirator, only three of the models met Hyatt's criteria. These are the same three models that provided adequate protection without fit-testing in Table I. Lowering the target APF to 5 resulted in only two additional models meeting the criteria. Further lowering of the target APF to 3 resulted in 11 of the 18 models having h-values

≥0.95. In addition, a target APF of 3 resulted in all the models combined h-value being equal to 0.95.

### Assignment Error

Assignment errors for each model are summarized in Table IV. Giving each wearer two trials to pass the fit-test, before requiring another model be used, resulted in assignment errors of 0.3% to 38.5% using the Bitrex method. The other four methods gave similar results.

### Fit-Test Passing Rate

Table V is a summary of the fit-test passing rates for the five fit-test methods. There is a wide variation between models in the percentage of people passing the various fit-test methods. The MSA Affinity Ultra (Mine Safety Appliances Company, Pittsburgh, Pa.) had the largest percentage of subjects passing each fit-test method. It is interesting to note that with some models, the passing rate varied greatly depending upon the method. For example, the North 7175N95 (North Safety Products, Cranston, RI) had a passing rate of 0.55 with the Bitrex

**TABLE II.  5th Percentile Shift Average SWPF by Respirator Model**

| Model | 5th Percentile Shift Average |
|---|---|
| MSA Affinity Ultra | 50.1 |
| 3M 8110S/8210 | 16.4 |
| 3M 1860/1860S | 13.3 |
| North 7175N95 | 7.6 |
| Moldex 2200N95/2201N95 | 6.1 |
| Willson N9510F | 5.7 |
| MSA Affinity Plus | 5.2 |
| Gerson 2737 | 5.0 |
| Willson 1410N95 | 4.6 |
| Aearo Safety Pleats | 4.2 |
| 3M 8512 | 4.1 |
| Willson N9520F | 2.6 |
| Survivair 1930 | 2.4 |
| Moldex 2300N95/2301N95 | 2.3 |
| Moldex 2207N95 | 2.1 |
| U.S. Safety ADN95 | 2.1 |
| Moldex 2700N95/2701N95 | 2.0 |
| 3M 8212 | 1.5 |
| All 18 Models | 3.0 |

method but no subjects passed with either the generated aerosol method or the PortaCount Plus method.

## Comparison of Respirator Performance

To determine if the 5th percentile SWPFs without fit-testing were significantly different a Duncan's multiple range test was conducted. Duncan's multiple range test is used with an analysis of variance to determine whether (1) all of the means differ; (2) one of the means (e.g., $m_A$) differs from the others; or (3) there are groups of means that are the same but differ from other groups that are also the same. All of the 5th percentile SWPFs for each respirator model were converted to 95th percentile total penetration values by taking their reciprocals (i.e., 1/SWPF). The Duncan's multiple range test was conducted on the total penetration values. Table VI shows the Duncan's multiple range test results using a significance level ($\alpha$) of 0.05. The results show that there were five groups of respirator models (as indicated by the different letters) whose 95th percentile total penetration values are significantly different from the other groups. The level of performance as measured in this study for any respirator model in a given group is not significantly different from the other models in the group.

**TABLE III.  Summary of h-values by Target Protection Factor**

| Model | Total Donnings | Target Protection Factor | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **10** | | **5** | | **3** | |
| | | Donnings ≥ APF | h-value | Donnings ≥ APF | h-value | Donnings ≥ APF | h-value |
| MSA Affinity Ultra | 150 | 148 | 0.99 | 150 | 1.00 | 150 | 1.00 |
| 3M 1860/1860S | 150 | 143 | 0.95 | 149 | 0.99 | 149 | 0.99 |
| 3M 8110S/8210 | 150 | 143 | 0.95 | 150 | 1.00 | 150 | 1.00 |
| Moldex 2200N95/2201N95 | 150 | 126 | 0.84 | 142 | 0.95 | 148 | 0.99 |
| Willson N9510F | 150 | 126 | 0.84 | 139 | 0.93 | 149 | 0.99 |
| North 7175N95 | 150 | 129 | 0.86 | 146 | 0.97 | 150 | 1.00 |
| MSA Affinity Plus | 150 | 123 | 0.82 | 135 | 0.90 | 148 | 0.99 |
| Aearo Safety Pleats | 150 | 120 | 0.80 | 135 | 0.90 | 144 | 0.96 |
| Gerson 2737 | 150 | 116 | 0.77 | 135 | 0.90 | 150 | 1.00 |
| Willson 1410N95 | 150 | 110 | 0.73 | 139 | 0.93 | 149 | 0.99 |
| 3M 8512 | 150 | 110 | 0.73 | 139 | 0.93 | 146 | 0.97 |
| Survivair 1930 | 150 | 108 | 0.72 | 117 | 0.78 | 139 | 0.89 |
| Willson N9520F | 150 | 103 | 0.69 | 124 | 0.83 | 138 | 0.92 |
| Moldex 2300N95/2301N95 | 150 | 92 | 0.61 | 108 | 0.72 | 132 | 0.88 |
| 3M 8212 | 150 | 85 | 0.57 | 104 | 0.69 | 123 | 0.82 |
| Moldex 2700N95/2701N95 | 150 | 84 | 0.56 | 107 | 0.71 | 129 | 0.86 |
| Moldex 2207N95 | 150 | 75 | 0.50 | 104 | 0.69 | 131 | 0.87 |
| U.S. Safety ADN95 | 144[A] | 44 | 0.31 | 89 | 0.61 | 122 | 0.85 |
| All 18 Models | 2694 | 1985 | 0.74 | 2312 | 0.86 | 2542 | 0.95 |

[A]One subject was not able to test this respirator and could not be replaced before end of the study.

**TABLE IV.** Summary of Assignment Errors in Percent by Fit-Test Method Using a Target Protection Factor of 10

| | Fit-Test Method | | | | |
|---|---|---|---|---|---|
| Model | Bitrex | Saccharin | Companion | PortaCount Plus | Generated Aerosol |
| MSA Affinity Ultra | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 |
| 3M 1860/1860S | 1.5 | 1.3 | 1.3 | 0.9 | 1.1 |
| 3M 8110S/8210 | 1.5 | 1.3 | 1.3 | 0.9 | 1.1 |
| North 7175N95 | 4.4 | 3.9 | 4.0 | 2.8 | 3.2 |
| Moldex 2200N95/2201N95 | 5.1 | 4.6 | 4.6 | 3.3 | 3.7 |
| Willson N9510F | 5.1 | 4.6 | 4.6 | 3.3 | 3.7 |
| MSA Affinity Plus | 5.8 | 5.2 | 5.3 | 3.8 | 4.2 |
| Aearo Safety Pleats | 6.6 | 5.9 | 6.0 | 4.3 | 4.8 |
| Gerson 2737 | 7.7 | 7.0 | 7.1 | 5.1 | 5.7 |
| Willson 1410N95 | 9.4 | 8.5 | 8.6 | 6.2 | 6.9 |
| 3M 8512 | 9.4 | 8.5 | 8.6 | 6.2 | 6.9 |
| Survivair 1930 | 9.9 | 8.9 | 9.0 | 6.5 | 7.2 |
| Willson N9520F | 11.2 | 10.1 | 10.3 | 7.5 | 8.3 |
| Moldex 2300N95/2301N95 | 15.2 | 13.8 | 14.0 | 10.3 | 11.4 |
| 3M 8212 | 17.5 | 15.9 | 16.1 | 11.9 | 13.2 |
| Moldex 2700N95/2701N95 | 18.1 | 16.4 | 16.7 | 12.3 | 13.6 |
| Moldex 2207N95 | 21.9 | 20.0 | 20.3 | 15.2 | 16.7 |
| U.S. Safety ADN95 | 38.5 | 35.8 | 36.2 | 28.5 | 30.9 |
| All 18 Models | 8.9 | 8.1 | 8.2 | 5.9 | 6.6 |

**TABLE V.** Summary of Fit-Test Passing Rates by Fit-Test Method

| Model[A] | Total Number of Fit-Tests[B] | Bitrex | | Saccharin | | Companion | | PortaCount Plus | | Generated Aerosol | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Passes | Rate | Passes | Rate | Passes | Rate | Passes | Rate | Passes | Rate |
| MSA Affinity Ultra | 25 | 13 | 0.52 | TNP[C] | TNP[C] | 22 | 0.88 | 19 | 0.76 | 20 | 0.80 |
| 3M 8110S/8210 | 25 | 12 | 0.48 | TNP[C] | TNP[C] | 13 | 0.52 | 7 | 0.28 | 3 | 0.13 |
| 3M 1860/1860S | 25 | 10 | 0.40 | TNP[C] | TNP[C] | 15 | 0.60 | 8 | 0.32 | 3 | 0.13 |
| North 7175N95 | 25 | 11 | 0.55 | 7 | 0.28 | 5 | 0.20 | 0 | 0.00 | 0 | 0.00 |
| Moldex 2200N95/2201N95 | 25 | 13 | 0.52 | TNP[C] | TNP[C] | 8 | 0.32 | 2 | 0.08 | 0 | 0.00 |
| Willson N9510F | 25 | 11 | 0.44 | 11 | 0.44 | 11 | 0.44 | 8 | 0.32 | TNP[C] | TNP[C] |
| MSA Affinity Plus | 25 | 7 | 0.28 | TNP[C] | TNP[C] | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 |
| Gerson 2737 | 25 | 7 | 0.28 | TNP[C] | TNP[C] | 9 | 0.36 | 3 | 0.12 | 0 | 0.00 |
| Willson 1410N95 | 25 | 5 | 0.20 | TNP[C] | TNP[C] | 5 | 0.20 | 2 | 0.08 | 0 | 0.00 |
| Aearo Safety Pleats | 25 | 6 | 0.24 | TNP[C] | TNP[C] | 2 | 0.08 | 3 | 0.12 | 4 | 0.16 |
| 3M 8512 | 25 | 6 | 0.24 | 7 | 0.28 | 6 | 0.24 | 6 | 0.24 | TNP[C] | TNP[C] |
| Moldex 2300N95/2301N95 | 25 | 5 | 0.20 | 4 | 0.16 | 11 | 0.44 | 0 | 0.00 | TNP[C] | TNP[C] |
| Willson N9520F | 25 | 10 | 0.40 | 10 | 0.40 | 7 | 0.28 | 4 | 0.16 | TNP[C] | TNP[C] |
| Survivair 1930 | 25 | 9 | 0.36 | TNP[C] | TNP[C] | 6 | 0.24 | 4 | 0.16 | 0 | 0.00 |
| Moldex 2207N95 | 25 | 4 | 0.16 | 3 | 0.12 | 6 | 0.24 | 0 | 0.00 | TNP[C] | TNP[C] |
| U.S. Safety ADN95[D] | 24 | 3 | 0.13 | 0 | 0.00 | 5 | 0.21 | 0 | 0.00 | TNP[C] | TNP[C] |
| Moldex 2700N95/2701N95 | 25 | 6 | 0.24 | 4 | 0.16 | 5 | 0.20 | 4 | 0.16 | TNP[C] | TNP[C] |
| 3M 8212 | 25 | 8 | 0.32 | 7 | 0.28 | 6 | 0.24 | 6 | 0.24 | TNP[C] | TNP[C] |
| All 18 Models | 449 | 155 | 0.33 | 55 | 0.25 | 146 | 0.31 | 76 | 0.16 | 30 | 0.12 |

[A]Models listed in order of performance without fit-testing.
[B]Total number of tests conducted for each type of fit-test.
[C]Test not performed using this model.
[D]One subject was not able to test this respirator and could not be replaced before the end of the study.

**TABLE VI.  Statistical Comparison of Model 95th Percentile Total Penetration Values**

| Model | 5th Percentile SWPF | 95th Percentile Total Penetration | Duncan Grouping[A] |
|---|---|---|---|
| MSA Affinity Ultra | 56.9 | 0.01758 | A |
| 3M 8110S/8210 | 22.0 | 0.04539 | A,B |
| 3M 1860/1860S | 17.0 | 0.05884 | A,B |
| Moldex 2200N95/2201N95 | 11.4 | 0.08739 | A,B,C |
| MSA Affinity Plus | 8.4 | 0.11919 | B,C |
| 3M 8512 | 8.2 | 0.12252 | B,C,D |
| North 7175N95 | 8.0 | 0.12530 | B,C,D |
| Gerson 2737 | 7.7 | 0.13069 | B,C,D |
| Willson N9510F | 7.2 | 0.13911 | B,C,D |
| Willson 1410N95 | 7.0 | 0.14293 | B,C,D |
| Aearo Safety Pleats | 6.9 | 0.14487 | B,C,D |
| Moldex 2300N95/2301N95 | 5.5 | 0.18112 | C,D,E |
| Moldex 2700N95/2701N95 | 5.4 | 0.18641 | C,D,E |
| Moldex 2207N95 | 5.3 | 0.18802 | C,D,E |
| Willson N9520F | 5.3 | 0.18996 | D,E |
| Survivair 1930 | 5.2 | 0.19190 | D,E |
| 3M 8212 | 3.9 | 0.25870 | E |
| U.S. Safety ADN95 | 3.6 | 0.27743 | E |

[A] 95th Percentile total penetration values with the same letter are not significantly different.

## DISCUSSION

### Effect of Fit-Testing on Respirator Performance

Three respirator models met the expected level of protection without fit-testing. This is similar to the results of the previous study of N95 respirator performance, in which 4 of 21 models met the expected level of protection without fit-testing.[(2,3)] Table I demonstrates the value of fit-testing. It shows poor-performing respirators as determined by 5th percentile SWPF values generally have higher levels of protection among those passing a fit-test. The exceptions were the MSA Affinity Ultra with the Bitrex, PortaCount Plus, and generated aerosol methods and the 3M 8110S/8210 with the PortaCount Plus method. These exceptions are likely a manifestation of fit-testing error.[(10)]

The "all 18 models" combined results in Table I indicate that passing a qualitative fit-test does not necessarily guarantee the wearer an adequately fitting respirator. For subjects passing the saccharin fit-test with the tested respirator models, the 5th percentile SWPF value for "all 18 models" combined was only 6.9. For subjects passing the Bitrex fit-test with the tested respirator models, the 5th percentile SWPF value for "all 18 models" combined was only 8.7 when it should have been $\geq 10$.[(5,7)] Passing a qualitative fit-test did result in an increase in protection (5th percentile SWPF value was 1.9 for those failing the saccharin fit-test and 2.1 for those failing the Bitrex fit-test). The low 5th percentile SWPF values for subjects passing the qualitative fit-tests are due to fit-test beta error. That error may be related to the effect reported by McKay[(14)] in which subjects who should have detected the taste of saccharin failed to do so.

In addition, when the individual models are considered, none of the tested models provided adequate protection (i.e., a 5th percentile SWPF value $\geq 10$) after passing the saccharin fit-test. The individual 5th percentile SWPF values ranged from 1.3 to 5.6. The better-performing respirators were tested before the NIOSH policy change to recommend the use of saccharin as a qualitative fit-test agent, so they were not used with the saccharin fit-test method. The saccharin results may apply only to the poorly performing respirators.

As with the saccharin fit-test method, the "all 18 models" combined results indicated that passing the Bitrex fit-test method did not result in adequate protection (5th percentile SWPF value = 7.4). When the results of individual models are considered, passing the Bitrex fit-test method resulted in 12 of the 18 models providing adequate protection (as assessed by SWPF $\geq 10$). The 12 respirator models with any subjects passing a Companion fit-test method provided adequate protection, but no subjects were able to pass the Companion fit-test method with six of the models. Passing the PortaCount Plus fit-test resulted in 12 of 13 models providing adequate protection (i.e., 5th percentile SWPF value $\geq 10$).

No subjects were able to pass the PortaCount Plus fit-test with the remaining five models. The generated aerosol fit-test had the greatest proportion of models (6 of 10) with no subjects passing. The remaining four models all had 5th percentile SWPF values $\geq 10$. With the three models having 5th percentile SWPF values $\geq 10$ without fit-testing, subjects failing a fit-test also received adequate protection (i.e., 5th percentile SWPF value $\geq 10$). A possible explanation is that these models had high alpha errors.[(10)] High alpha errors could result in subjects erroneously failing a particular fit-test with a higher level of protection than those subjects correctly passing the fit-test.



**FIGURE 1.** Distribution of simulated workplace protection factors without fit-testing for 5 representative respirator models using 25 subjects per respirator model and 6 simulated workplace protection factor tests per subject/respirator model combination

Figure 1 is a graphic presentation of the wide differences in protection provided by the different models without fit-testing. It indicates that one model clearly provided the highest protection without fit-testing—the MSA Affinity Ultra (with the right-most distribution of SWPF values). One of the two other models, which provided about the same level of protection that was higher than the rest of the respirators but not as high as the best performing model, is shown. At least 95% of the SWPF values for these three models were ≥10. The remaining 15 respirators provided substantially lower levels of protection. In approximately 15% to 70% of donnings, these respirators failed to provide adequate protection (i.e., their SWPF values were less than 10), without fit-testing.

Figure 2 is a graph of the three cumulative distributions of SWPF values for the Bitrex fit-test for all 18 respirator

models combined. It demonstrates the considerable increase in protection resulting from passing the Bitrex fit-test. Every simulated workplace test (6 for each respirator and subject combination) is paired with the result of its corresponding fit-test. Ignoring the results of fit-testing, inadequate protection (i.e., SWPF < 10) was provided approximately 30% of the time. Passing the Bitrex fit-test reduced this percentage to approximately 5%, a substantial decrease. The other fit-test methods provided similar results.

Figure 3 demonstrates that the level of protection is increased to a greater degree after passing a fit-test with a poorly performing respirator (i.e., one that does not provide the expected level of protection even after fit-testing) as compared with a well-performing one. This finding is consistent with previous findings that fit-testing is an important component of a respiratory protection program.[15] It should be noted that fit-testing is just one factor in determining the level of protection provided by a respirator. Respirators should be inherently designed to provide an adequate fit to the wearer. Even with an adequately performing respirator, a complete respiratory protection program must be in place for a respirator to achieve protection equal to the APF of its class.[7]

Figure 4 compares the distributions of the SWPF values for the three best-performing models with no fit-testing and the three poorest-performing models with fit-testing. Approximately 15% of the subjects, passing a Bitrex fit-test with the three poorest-performing models, had a SWPF < 10, while only 5% of those wearing the three best-performing models had a SWPF < 10, even without the benefit of a fit-test. This finding indicates why it is important for respirator manufacturers to produce well-performing respirators. By providing a respirator with both a high fit-test passing rate and a high level of protection, an employer may reduce the fraction of employees requiring another model.

## STUDY DESIGN AND LIMITATIONS

Several differences should be noted between the current study and the previous NIOSH study that evaluated performance of N95 filtering-facepiece respirators.[2,3] The previous study used only four donnings during the SWPF testing, whereas six were used for the SWPF values in the current study. Adding the two additional donnings should increase the accuracy of the 5th percentile SWPF results. Another difference is that the first study used a surrogate fit-test while this study used several actual fit-tests. Another difference is that the previous study used only a portion of the respirator to assess filter penetration for the surrogate fit-test, whereas, in the current study, the modified PortaCount Plus and generated aerosol methods utilized the complete respirator. The amount of filter penetration may vary spatially over the entire filter. Using only a portion of the respirator could have affected the results of the previous study by either overestimating or underestimating the amount of filter penetration.



**FIGURE 2.** Cumulative distributions of simulated workplace protection factors for subjects with no fit-testing and those passing and failing the Bitrex fit-test



**FIGURE 3.** Effect of fit-testing protection provided by two respirators with differing fitting characteristics

This study had several limitations. It has been shown the fit factors provided by the PortaCount Plus may overestimate the exposure of a respirator wearer under actual working conditions.[16] The second limitation was the subject panel. Los Alamos determined that a panel of 25 with face lengths ranging from 94 to 133 mm and lip lengths ranging from 35 to 61 mm would represent a majority (almost 95%) of the working population in the United States.[10] These ranges were ascertained from the surveys of male and female personnel in the United States Air Force since the male data compared favorably to the measurements of 200 males selected from all available men working at Los Alamos who had been fitted with a respirator.[10]

The 25-member Los Alamos panel was used in this study because currently it is the best representation of the United States working population and has been used in other studies and in the development and certification of respirators. Recent NIOSH research has shown that the Los Alamos panel needs to be revised to better reflect the face sizes of current respirator wearers in regards to age and race.[17] The sample size of only 25 subjects based on the Los Alamos research may not be large enough to produce results that would be directly



**FIGURE 4.** Comparison of simulated workplace protection factor distributions for the three best- and the three poorest-fitting respirators

applicable to actual respirator use. It is likely that the subjects who participated in this study may not be representative of all respirator wearers.

Another limitation is that the SWPF exercise regime used in this study consisted of six exercises that may not be representative of work activities in actual work environments. Therefore, the results obtained in this study provide the relative performance of each respirator model compared to the others under the given study conditions only. The performance data cannot be viewed as the protection that will be received in all workplace applications. The estimation of the level of protection provided to an individual can be altered by a number of factors: significant weight changes, dental changes (e.g., changes to dentures), and changes to the face in the sealing area of the respirator (e.g., scarring, facial surgery, swelling, and tumors).[18]

Only 18 randomly selected filtering-facepiece respirator models from a total of more than 165 were tested in this study. The models not tested may include ones that would have tested better or worse than any or all of these tested. In addition, respirator manufacturers are continually evaluating and re-designing their products while keeping the same model number. The respirator models tested in this study may not be representative of models currently on the market. The "all 18 models" combined results may not be representative of all N95 filtering-facepiece respirators now being manufactured.

## CONCLUSIONS

Four different analytical methods (5th percentile SWPF value, shift average SWPF, h-value, and assignment error), used to measure the performance of N95 filtering-facepiece respirators, provided approximately the same basic relative ranking for the 18 respirator models tested. The findings of this study demonstrate that, with the current state of fit-testing, it may be of more benefit to the user to wear a respirator model with good-fitting characteristics without fit-testing than to wear a respirator model with poor-fitting characteristics after passing a fit-test.

The findings also demonstrate that fit-testing is an important element of a respiratory protection program. Passing a fit-test enhances a worker's probability of wearing a respirator that provides an adequate level of protection in the workplace. The performance of poor-fitting respirator models is improved to a greater extent with fit-testing than respirator models with generally good-fitting characteristics. The highest level of protection is provided by passing a fit-test with a respirator model that has good-fitting characteristics.

The current respirator certification regulations do not contain testing of the type described in this study, though incorporating such testing would have substantial potential value.[1] If methods can be validated and widely accepted by the respirator manufacturing industry, it would be helpful to have similar standardized performance evaluations for all available models. This would allow program directors to make more informed decisions about which models to provide workers and to encourage manufacturers to improve upon the performance of respirators shown to be relatively poor performers.

## REFERENCES

1. **National Institute for Occupational Safety and Health (NIOSH):** Respiratory Protective Devices; Final Rules and Notice. *Federal Register* 60(110):30336–30398. Washington, D.C.: U.S. Government Printing Office, Office of the Federal Register, June 8, 1995.

2. **Centers for Disease Control and Prevention:** Laboratory performance evaluation of N95 filtering facepiece respirators, 1996. *MMWR 47*:1045–1049 (1998).

3. **Coffey, C.C., D.L. Campbell, and Z. Zhuang:** Simulated workplace performance of N95 respirators. *Am. Ind. Hyg. Assoc. J. 60*:618–624 (1999).

4. **National Institute for Occupational Safety and Health (NIOSH):** *NIOSH Guide to Industrial Respiratory Protection*, DHHS (NIOSH) Publication No. 87-116. Cincinnati, Ohio: NIOSH, 1987.

5. **American National Standards Institute (ANSI):** American National Standard for Respiratory Protection (ANSI-Z88.2). New York: ANSI, 1992.

6. **Industrial Safety Equipment Association:** *Use and Selection Guide for Non-Powered Air Purifying Particulate Respirators.* Arlington, Va.: Industrial Safety Equipment Association, 1996.

7. **Occupational Safety and Health Administration (OSHA):** 29 CFR Parts 1910 and 1926 Respiratory Protection: Final Rule. *Federal Register 63*(5):1278–1279. Washington, D.C.: U.S. Government Printing Office, Office of the Federal Register, January 8, 1998.

8. **Hyatt, E.C.:** Respirator Protection Factors (LA-6084-MS). Los Alamos, N.M.: Los Alamos Scientific Laboratory, 1976.

9. **Campbell, D.L., C.C. Coffey, and S.W. Lenhart:** Respiratory protection as a function of respirator fitting characteristics and fit test accuracy. *Am. Ind. Hyg. Assoc. J. 62*:36–44 (2001).

10. **Hack, A., E.C. Hyatt, B.J. Held, et al.:** Selection of respirator test panels representative of U.S. adult facial sizes (LA-5488). Los Alamos, N.M.: Los Alamos Scientific Laboratory, 1974.

11. **Coffey, C.C., R.B. Lawrence, Z. Zhuang, et al.:** Comparison of five methods for fit-testing N95 filtering facepiece respirators. *Appl. Occup. Environ. Hyg. 17*:723–730 (2002).

12. **U.S. Department of Health and Human Services (DHHS), National Institute for Occupational Safety and Health (NIOSH):** Policy Statement: Saccharin Use for Respirator Fit Testing. Washington, D.C.: DHHS, NIOSH, August 4, 1999.

13. **Lenhart, S.W., and D.L. Campbell:** Assigned protection factors for two respirator types based upon workplace performance testing. *Ann. Occup. Hyg. 28*:173–182 (1984).

14. **McKay, R.T., and E. Davies:** Capability of respirator wearers to detect aerosolized qualitative fit test agents (sweetener and Bitrex) with fixed leaks. *Appl. Occup. Environ. Hyg. 15*:479–484 (2000).

15. **Coffey, C.C., Z. Zhuang, D.L. Campbell, and W. Myers:** Quantitative fit testing of N95 respirators: Part II—Results, effect of filter penetration, fit test, and pass/fail criteria on respirator performance. *J. Int. Soc. Respir. Protect.16*:25–36 (1998).

16. **Coffey, C.C., D.L. Campbell, W.R. Myers, and Z. Zhuang:** Comparison of six respirator fit test methods with an actual measurement of exposure in a simulated health-care environment: Part II—Method comparison testing. *Am. Ind. Hyg. Assoc. J. 59*:862–870 (1998).

17. **Zhuang, Z., J. Odencrantz, P. Jensen, et al.:** "Two New Approaches for Developing Respirator Fit-Test Panels Representative of U.S. Workers." Paper 193, Book of Abstracts, p. 43. American Industrial Hygiene Conference and Exposition 2002. Fairfax, Va.: American Industrial Hygiene Association, 2002.

18. **American National Standards Institute (ANSI):** American National Standard for Respirator Fit Testing Methods (ANSI/AIHA-Z88.10). Fairfax, Va.: American Industrial Hygiene Association, 2001.

# EXHIBIT 2

AIHAJ   62:36–44 (2001)

Ms. #112

THEORETICAL & EXPERIMENTAL STUDIES

AUTHORS
D.L. Campbell[a]
C.C. Coffey[a]
S.W. Lenhart[b]

[a]Department of Health and
Human Services, Public Health
Service, Centers for Disease
Control and Prevention,
National Institute for
Occupational Safety and Health,
Division of Respiratory Disease
Studies, 1095 Willowdale Road,
Morgantown, WV 26505–2888;
[b]National Institute for
Occupational Safety and Health,
Division of Surveillance, Hazard
Evaluations and Field Studies,
4676 Columbia Parkway,
Cincinnati, OH 45226

# Respiratory Protection as a Function of Respirator Fitting Characteristics and Fit-Test Accuracy

The fitting characteristics of particulate respirators are no longer assessed in the National Institute for Occupational Safety and Health respirator certification program. It is important for respirator program administrators to understand the implications of that change and the additional burden it may impose. To address that issue, a typical respirator fit-testing program is analyzed using a mathematical model that describes the effectiveness of a fit-testing program as a function of the fitting characteristics of the respirator and the accuracy of the fit-testing method. The model is used to estimate (1) the respirator assignment error, the percentage of respirator wearers mistakenly assigned an ill-fitting respirator; (2) the number of fit-test trials necessary to qualify a group of workers for respirator use; and (3) the number of workers who will fail the fit-test with any candidate respirator model and thereby fail to qualify for respirator use. Using data from previous studies, the model predicts respirator assignment errors ranging from 0 to 20%, depending on the fitting characteristics of the respirator models selected and the fit-testing method used. This analysis indicates that when respirators do not necessarily have good fitting characteristics, respirator program administrators should exercise increased care in the selection of respirator models and increased care in fit-testing. Also presented are ways to assess the fitting characteristics of candidate respirator models by monitoring the first-time fit-testing results. The model demonstrates that significant public health and economic benefits can result when only respirators having good fitting characteristics are purchased and respirators are assigned to workers using highly accurate fit-testing methods.
**Keywords: assignment error, fit-testing, h-value, respirator**

Mention of commercial
products or trade names
does not constitute
endorsement by the National
Institute for Occupational
Safety and Health.

The National Institute for Occupational Safety and Health (NIOSH) certification requirements for particulate respirators were upgraded in 1995 with the new Part 84 regulations.[1] Although those new regulations substantially improved the requirements for particulate filters, the facepiece fitting characteristics of all particulate respirators became exempt from evaluation as a condition of NIOSH certification. This current situation increases the burden on respirator program administrators, since all respirator models will not necessarily have good fitting characteristics. Identifying respirators with good fitting characteristics is problematic, and fit-testing individual workers has become more critical. Given that fit-testing methods are not error free, it is important to explore how this current situation can affect the adequacy of a respirator program.

The most important, and most variable, attribute of any negative-pressure respirator is how well it seals to the face. The quality of face fits achieved by a group of respirator wearers is determined by two factors. First is the fitting characteristics of the respirator model. The term "fitting characteristics" is used here to refer to the ability of a particular respirator model to provide an adequate fit to a large percentage of the general population with its wide variety of face sizes

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

and shapes. An "adequate fit" is one in which an individual consistently achieves a protection factor equal to, or greater than, the assigned protection factor (APF) for the respirator class.

The second factor is the accuracy of the fit-testing method used to verify that each respirator wearer has an adequately fitting respirator. Current fit-test methods are not error free, and their inherent errors can result in individuals being inappropriately assigned poor-fitting respirators for use in hazardous environments. The chance of an individual being assigned a poorly fitting respirator increases with increasing fit-testing error and decreases with improvements in the face-fitting characteristics of the respirator.

The purpose of this study was to quantify how the fitting characteristics of respirator models and fit-test accuracy interact in a typical fit-testing program to determine the level of protection provided to a population of workers. To that end, a model simulating a typical fit-testing program was constructed. The model was used to estimate, as a function of the two factors discussed above, the respirator assignment error, defined as the fraction of respirator wearers assigned an inadequately fitting respirator. Using data from previous studies as input for the model, this assignment error ranged from 0 to 20%, depending on the fitting characteristics of the individual respirator models and on the fit-testing method used.

The model also was used to estimate the number of fit-tests necessary to qualify a group of workers for respirator use and the number of workers who do not pass any fit-testing and thereby fail to qualify for respirator use. The model thereby demonstrates to respirator program administrators the importance of selecting respirators with good fitting characteristics and the importance of using accurate fit-testing methods.

## A Respirator Fit-Testing Program Model

A model of a typical fit-testing program for negative-pressure respirators is depicted schematically in Figure 1. The model begins with a population of N people who are candidates for wearing respirator Model 1. The model assumes that each of the N individuals has selected an appropriate respirator size, will properly don the respirator, and will conduct the fit-check recommended by the manufacturer. The model conceptually divides N into two groups: those who will consistently achieve good fits during future use and those who will not. The size of each group depends on the fitting characteristics of respirator Model 1.

The parameter used to describe the fitting characteristics of a respirator is the fraction h of population N who will obtain an adequate fit when a respirator is selected, donned, and fit-checked according to its manufacturer's instructions before fit-testing. In this context an adequate fit is one resulting in a protection factor equal to or greater than the APF. In Figure 1 the number of candidate respirator wearers in the group having an inherently good fit is represented by $N_g$. By definition of h, $N_g = Nh_1$, where subscript 1 indicates the h-value for respirator Model 1. The number of candidate respirator wearers in the group having an inherently bad fit is thus $N_b = N(1-h_1)$. Fit-testing is conducted in an attempt to distinguish wearers in one group from wearers in the other.

The results of the first fit-tests are represented in the third row of Figure 1.

### First Block

The first block on the left shows $N_{b,p1}$, which is the number of candidate respirator wearers with an inherently bad fit who pass the first fit-test, shown as $N_{b,p1} = N_b \beta$. Parameter $\beta$ is the beta

error of the fit-test, which is defined as the fraction of those wearers with an inadequate fit passing the fit-test erroneously.

### Second Block

The second block represents the number of candidate wearers of poorly fitting respirators who fail the first fit-test, shown as $N_{b,f1} = N_b(1-\beta)$. This group has been identified correctly.

### Third Block

The third block represents the number of candidate respirator wearers with an inherently good fit who pass the first fit-test, shown as $N_{g,p1} = N_g(1-\alpha)$. Parameter $\alpha$ is the alpha error of the fit-test and represents the fraction of wearers with an inherently good fit failing the fit-test in error.

### Fourth Block

The fourth block represents the number of candidate wearers who inappropriately fail the first fit-test and is shown as $N_{g,f1} = N_g\alpha$.

Those passing the fit-test are qualified to wear respirator Model 1. Those failing the test are retrained in the proper respirator donning procedure and then tested a second time. The number passing and failing the second test are represented in the fourth row of Figure 1. The relationships used to compute these numbers and subsequent numbers throughout the fit-testing exercise also are shown in Figure 1.

After the second fit-test there will still be some people who have not passed. In this analysis it is assumed that these individuals will switch to a second respirator model and repeat the test process. The analysis for the second model is identical to that described for Model 1, except that the second respirator will have different fitting characteristics and therefore would have a different h-value, $h_2$. The values of $\alpha$ and $\beta$ will be unchanged, since it is assumed the same fit-test is used throughout the exercise.

It also is assumed that those individuals who do not pass the fit-test with the second model will then switch to a third model and again repeat the fit-testing process. The third respirator model also has different fitting characteristics and therefore would have a different h-value, designated $h_3$.

The analysis ends after the third model is tested. Those who have not passed a fit-test with one of the three models are considered to have failed to qualify to use a negative-pressure respirator and should be assigned responsibilities not requiring a respirator, or use a respirator type not depending on a face seal (e.g., a loose-fitting, powered, air-purifying respirator).

Using the analytic model described above, it is possible to estimate several important characteristics of a fit-testing program as a function of h, $\alpha$, and $\beta$.

The model is first used to estimate what is defined as assignment error, which is given by the following equation.

$$A_e = N_{b,p}/(N_{b,p} + N_{g,p})$$

where $A_e$ = the fraction of the population of qualified respirator wearers with an inherently poor respirator fit who have mistakenly passed the fit-test and are assigned that respirator to wear in the workplace; $N_{b,p}$ = the number of respirator wearers with an inherently bad fit who have qualified for respirator use by passing a fit-test in error; $N_{g,p}$ = the total number of wearers with an inherently good fit who have qualified for respirator use by appropriately passing a fit-test. $N_{b,p} = N_{b,p1} + N_{b,p2} + N^2_{b,p1} + N^2_{b,p2} + N^3_{b,p1} + N^3_{b,p2}$, which is the sum of the underlined cells in Figure 1, and $N_{g,p} = N_{g,p1} + N_{g,p2} + N^2_{g,p1} + N^2_{g,p2} + N^3_{g,p1} + N^3_{g,p2}$,

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



FIGURE 1. The flow of N candidate respirator wearers through a typical respirator fit-testing program. The proportion h has an inherently good fit with a particular respirator model whereas the proportion 1-h does not. Those failing the first fit-test are retrained in respirator donning and then fit-tested a second time. Those failing the second fit-test with the first model repeat the process with a second respirator model. Those failing with the second model try a third model. The alpha and beta error of the fit-test are represented by $\alpha$ and $\beta$, respectively. As an example, the number shown to the right of each cell is the number of workers in that cell for the case when N=1000, $\alpha$=0.5, $\beta$=0.1, and $h_1$=$h_2$=$h_3$=0.8. The underlined cells are wearers assigned a poor-fitting respirator because of an error in the fit-test. In the example, the total of such workers is 20 + 18 + 7 + 6 + 3 + 2 = 56.

which is the sum of cells in Figure 1 with a double line on the right.

The model can be used to determine how the number of fit-tests necessary to qualify a given number of respirator wearers varies as a function of h, $\alpha$, and $\beta$. Inspection of Figure 1 shows that the number of fit-tests per candidate respirator wearer is $N_{tests/c}$ = $(N_b + N_g + N_{b,f1} + N_{g,f1} + N^2_b + N^2_g + N^2_{b,f1} + N^2_{g,f1} + N^3_b + N^3_g + N^3_{b,f1} + N^3_{g,f1})/N$, which is the sum of cells of Figure 1

with a double line on the left of the cell divided by N. However, the number of fit-tests per candidate respirator wearer, $N_{tests/c}$, is less useful than the number of fit-tests per qualified respirator wearer, $N_{tests/q}$, which is computed from $N_{tests/q} = N_{tests/c} [N/(N_{b,p} + N_{g,p})]$, where $(N_{b,p} + N_{g,p})$ is the total number of candidates who pass a fit-test.

The model can also be used to estimate how the number of workers failing to qualify for respirator use varies as a function of

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

$h$, $\alpha$, and $\beta$. The number who do not qualify to wear any of the three models is given by $N_{hq} = N^3_{h,\Omega2} + N^3_{g,\Omega2}$. The number who fail to qualify per qualified respirator wearer, $N_{fq/qp}$ is given by $N_{fq/qp} = N_{hq}[1/(N_{h,p} + N_{g,p})]$, where $N_{h,p}$ and $N_{g,p}$ are as defined above.

The respirator fit-testing program modeled here is only one of many possible fit-testing scenarios, some having more fitting trials and others having fewer. In general, the more fit-tests conducted with each model, the greater the risk of passing a fit-test in error. The approach used here can easily be modified to simulate other testing scenarios.

## Input h-Values

To determine a realistic range of values for h, the authors followed the work of Hyatt, who established APF values in the mid-1970s using a quantitative fit-testing method.[12] (A brief history of fit-testing is provided in Appendix 1.) Every negative-pressure respirator model available in the United States at that time was evaluated on a panel of test subjects having a distribution of facial sizes approximating the general worker population. The respirator classes so studied included full-facepiece, half-facepiece, quarter-facepiece, single-use, and self-contained breathing apparatus. The APF values were established for each class so that every model in the class would provide protection factors equal to or greater than the APF for 95% of the test subjects. For example, all of the 8 then-available half-facepiece respirator models were found to provide 95% of the population with fit factors greater than 10 (without prior fit-testing to screen out subjects with poor fit). The APF was, therefore, set at 10. The performance of the other classes was similarly evaluated, and the APFs were established accordingly. Thus, the h-value was 0.95 or better for all respirator models available in the mid-1970s.

Hyatt reasoned that fit-tests on each individual worker were necessary to identify the 5% of wearers who would not achieve a protection factor at least equal to the APF and those few people with facial sizes not represented on the test panels. Thus, Hyatt's APF values depended first on respirators with good fitting characteristics (h ≥0.95) and second on fit-tests of each individual worker.

In a 1990 study of three models of elastomeric, half-facepiece respirators, h-values for 61 men and 60 women were measured.[3] The percentage of men obtaining protection factors of at least 10 were 84, 85, and 84% for the three models, or h-values of 0.84, 0.85, and 0.84. The h-values for the women were 0.89, 0.73, and 0.72.

To estimate the range of h-values of currently available respirators, the authors relied on a study of 21 models of N95 half-facepiece respirators certified under the revised certification regulations that do not include an assessment of fitting characteristics.[4,5] Twenty were filtering-facepiece respirators, whereas one was an unconventional elastomeric respirator. Each of the 21 models was evaluated by obtaining 100 measurements of simulated protection factors (4 replications on a panel of 25 subjects who had a distribution of facial sizes approximating that of the general population). The original data was used to compute h-values for each of the 21 models. The computed h-values are presented in Table I. For an APF of 10, h-values ranged from 0.99 to 0.44, with a median h-value of 0.83. Only 4 of the 21 models met Hyatt's criterion of an h-value of 0.95 or greater. The best-performing model provided a protection factor of 10 or greater in 99 of the 100 donnings (h= 0.99). The poorest performing model provided protection factors of 10 or greater in only 44 of the 100 donnings (h= 0.44).

**TABLE I. Computed h-Values from Study of 21 N95 Half-Facepiece Respirators**

| Manufacturer/Model | h-value |
|---|---|
| Gerson/2735 | 0.99 |
| 3M/1860 | 0.98 |
| 3M/8210 | 0.96 |
| Uvex/Pro-Tech N95 | 0.96 |
| BBI/RX-2 | 0.93 |
| Technol/PFR95 170-174 | 0.93 |
| Moldex/2001/2002 | 0.90 |
| Gerson/1730 | 0.91 |
| Racal/Delta | 0.85 |
| MSA/Affinity Pro | 0.84 |
| Technol/PFR95110-114 | 0.83 |
| Uvex/Pro-Tech N95-A | 0.82 |
| MSA/Affinity | 0.78 |
| Survivair/1930 | 0.76 |
| Willson/N6510 | 0.68 |
| San Huei/3810 | 0.66 |
| Racal/Racal | 0.59 |
| Air Ace/9100 | 0.58 |
| Alpha Pro Tech/MAS695 | 0.56 |
| Moldex/2300N95 | 0.55 |
| Willson/N9501 | 0.44 |

Since h-values are a function of APF value, the authors also computed the h-value corresponding to an APF of 5. For an APF of 5, h-values ranged from 1.0 to 0.71. The best model provided a protection factor of at least 5 in all of the 100 trials, whereas the poorest model provided a protection factor of at least 5 in 71% of the 100 trials. The median h-value was 0.95. Only 11 of the 21 models met Hyatt's criterion for an APF of 5.

The study of 21 N95 respirators was completed in 1997 and is not necessarily representative of respirators available in 2001, or any that will be marketed in the future. After their initial NIOSH certification, respirators frequently are modified throughout their market life. Although NIOSH reevaluates respirators to assure that they still meet the certification requirements, that evaluation does not include an assessment of the fitting characteristics, which may have changed.

As input for the model, the authors used a range of h-values from 0.95 to 0.45 to span the h-values described above. For this analysis, the laboratory tests (on which the h-values are determined) were considered to be a measure of workplace protection, although laboratory-measured protection factors may overestimate workplace protection factors (WPFs) and thus overestimate the workplace performance of a respirator. WPFs also may overestimate the real day-to-day protection provided by respirators because, by definition, measurements of WPFs are conducted in idealized respirator programs. Research to address these questions completely likely will not be completed in the near future. In the meantime, it is necessary to rely on the best available tools to assess respirator performance. If more refined methods become available to measure respirator performance, those methods also will be compatible with the model presented herein.

## Input α- and β-Errors

The second and third parameters needed for this analysis are the $\alpha$ and $\beta$ errors of the fit-tests. Beta errors of 5% ($\beta = 0.05$) are generally considered the goal for acceptable qualitative fit-testing methods. The authors used this value of $\beta$ as a reference value in the simulations. Lower values of $\beta$ also were used to see the effects

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

THEORETICAL & EXPERIMENTAL STUDIES

**TABLE II. Respirator Assignment Error, $A_c$, the Percentage of Respirator Wearers Assigned an Inadequately Fitting Respirator**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Beta Error ($\alpha = 0.5$) | 0.05 | 0.68% | 2.2% | 4.2% | 6.5% | 9.6% | 14% |
| | 0.10 | 1.3% | 4.3% | 7.8% | 12% | 17% | 24% |
| | 0.15 | 1.9% | 6.1% | 11% | 17% | 23% | 31% |
| | 0.20 | 2.5% | 7.8% | 14% | 21% | 28% | 37% |
| | 0.25 | 3.0% | 9.3% | 16% | 24% | 32% | 42% |

of fit-testing methods that were not up to that standard or fit-testing methods that were not conducted carefully. Alpha errors of 50% ($\alpha = 0.5$) or less are generally considered adequate for respirator fit-testing, and this value was used in the following analysis. The authors also used lower and higher values of $\alpha$ to quantify whether the overall fit-testing program was sensitive to $\alpha$ error. A range of $\alpha$- and $\beta$-errors have been reported for the fit-testing methods in common use.[6–10]

Given that the purpose of a fit-test is to assure that an individual will achieve a protection factor at least equal to the APF in the great majority of donnings throughout the work year, the single-donning approach of current fit-testing methods introduces uncertainty in the understanding of fit-testing errors. In the single-donning approach, the pass/fail level is increased by a factor of 10, seemingly to compensate for the use of a single donning when there is known to be a high degree of donning-to-donning variation. For example, when the APF is 10, the pass/fail level of the fit-test is set at 100. Although this approach introduces statistical uncertainty in both the $\alpha$- and $\beta$-errors and substantially increases the $\alpha$- error, the authors have not seen it analyzed in the literature. For the purpose of this analysis the $\alpha$- and $\beta$-errors reported in the literature were used without regard to these uncertainties. On the other hand, these single-donning uncertainties do not apply to determining the h-value; h-values, by definition, must be determined by multiple donnings on a population of candidate respirator wearers.

## RESULTS AND DISCUSSION

Tables II and III show the respirator assignment error, $A_c$, predicted by the model for a range of h-values and various combinations of $\alpha$ and $\beta$. The tables show that less than 1% of the population of respirator wearers will have an inappropriate respirator assigned to them ($A_c < 1\%$) when the respirator models have inherently good fitting characteristics (h $\geq 0.95$) and when the fit-testing method is highly accurate ($\beta \leq 0.05$). At the other extreme, it can be seen that without a highly accurate fit-test and without respirators with good fitting characteristics, the percentage of respirator wearers assigned inadequately fitting respirators can be quite high.

In general, the assignment error, $A_c$, increases as the quality of the fitting characteristics decrease (h decreases). Also, $A_c$ increases when the reliability of the fit-test decreases ($\alpha$ and $\beta$ increase). Although $A_c$ increases as $\alpha$ increases, $A_c$ is not as sensitive to the value of $\alpha$ as it is to the value of $\beta$. Overall, to minimize $A_c$, it is necessary for a respirator program to utilize (1) respirator models having good fitting characteristics (high h-values) and (2) highly accurate fit-testing methods (low $\alpha$ and $\beta$).

As a realistic example of the application of the model, consider the results of a study of 21 N95 half-facepiece respirators described earlier combined with the results of a recent study of the Bitrex™ qualitative fit-testing method ($\alpha = 41\%$ and $\beta = 9\%$).[4,10] For the poorest performing respirator in that study (h = 0.44) the model predicts a respirator assignment error of 20.8%. On the other hand, the model predicts that the four respirators with the best fitting characteristics (h $\geq 0.96$) would have assignment errors of less than 1%.

Tables IV and V show the number of fit-tests necessary to qualify 100 respirator wearers when there is a range of h-values and various combinations of $\alpha$ and $\beta$. The number of fit-tests is a measure of the cost and disruption resulting from a respirator fit-testing program. From the tables it is clear that the cost of fit-testing is minimized with the use of (1) the most accurate fit-tests (low $\alpha$) and (2) respirator models with good fitting characteristics (high h). Failure to incorporate both factors may significantly increase the number of tests needed.

Tables VI and VII show the number of workers who fail to qualify for respirator use under a range of h-values and various combinations of $\alpha$ and $\beta$ and again demonstrate that a respirator must have good fitting characteristics and that the fit-test must be highly accurate. Failure to qualify may be a significant problem for both individual workers and employers. Not surprisingly, the number of workers failing to qualify is highly sensitive to h-value and to $\alpha$ error while being less sensitive to $\beta$ error. There is a significant decrease in workers failing to qualify as $\beta$ error increases when the respirator has poor fitting characteristics. This decrease results from the increased number of workers who pass the fit-test in error.

Overall, the above analysis supports the hypothesis that minimizing the health risk to respirator wearers requires (1) respirators with inherently good fitting characteristics and (2) highly accurate fit-testing methods. The analysis demonstrates that there also can

**TABLE III. Respirator Assignment Error, $A_c$, the Percentage of Respirator Wearers Assigned an Inadequately Fitting Respirator**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Alpha Error ($\beta = 0.05$) | 0.3 | 0.56% | 1.9% | 3.4% | 5.5% | 8.1% | 12% |
| | 0.4 | 0.61% | 2.0% | 3.7% | 5.9% | 8.7% | 12% |
| | 0.5 | 0.68% | 2.2% | 4.2% | 6.5% | 9.6% | 14% |
| | 0.6 | 0.80% | 2.6% | 4.8% | 7.6% | 11% | 16% |
| | 0.7 | 1.0% | 3.3% | 6.0% | 9.3% | 14% | 19% |

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**TABLE IV. Number of Fit-Test Trials Per 100 Qualified Respirator Wearers**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Beta Error ($\alpha = 0.5$) | 0.05 | 212 | 240 | 275 | 318 | 373 | 447 |
| | 0.10 | 211 | 234 | 262 | 296 | 337 | 389 |
| | 0.15 | 209 | 229 | 251 | 278 | 308 | 345 |
| | 0.20 | 207 | 223 | 241 | 262 | 285 | 311 |
| | 0.25 | 206 | 219 | 233 | 248 | 265 | 283 |

**TABLE VI. Number of Workers Failing to Qualify for Respirator Use Per 100 Qualified Respirator Wearers**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Beta Error ($\alpha = 0.5$) | 0.05 | 2 | 4 | 8 | 12 | 19 | 29 |
| | 0.10 | 2 | 4 | 6 | 10 | 14 | 21 |
| | 0.15 | 2 | 3 | 5 | 8 | 11 | 15 |
| | 0.20 | 2 | 3 | 4 | 6 | 8 | 11 |
| | 0.25 | 2 | 3 | 4 | 5 | 6 | 8 |

be economic and practical benefits as the number of fit-tests needed to qualify a group of workers is reduced.

Hoping to provide additional guidance to the practicing industrial hygienist, the authors explored the possibility of monitoring fit-test failure rates to assess the fitting characteristics of respirator models. However, they were unable to find a meaningful way to do that; it is not possible to determine what part of the fit-test failures is the result of a poor-fitting respirator and what part is the result of a high $\alpha$-error of the fit-test. Tables VIII and IX show the failure rate for the initial respirator model after a first fit-test trial. That failure rate was calculated as $(N_{g,fl} + N_{b,fl})/N$, where $N_{g,fl}$ is the number of subjects who failed the first fit-test trial because of the $\alpha$-error in the fit-test, and where $N_{b,fl}$ is the number who appropriately fail because of inadequate fit. Tables VIII and IX show that the first-trial failure rate is quite sensitive to the $\alpha$-error. Therefore, the authors see no meaningful way to obtain an indication of the respirator fitting characteristics (h-value) from the results of qualitative fit-testing.

A recent study of 211 subjects wearing half-mask respirators in the United Kingdom found a first-trial fit-test failure rate of 69% using the saccharin qualitative fit-test.[11] That is not necessarily an indication of poor fitting characteristics; it is possible that the seemingly high failure rate was simply the result of the high $\alpha$-error that can be associated with this test. Tables VIII and IX show that even a respirator with good fitting characteristics (h $\geq 0.95$) can have first-trial failure rates of 70% when the $\alpha$-error is 0.7. Alpha errors that high have been reported for the saccharin fit-test.[6]

Also, a low first-trial failure rate is not necessarily a reliable indicator that a respirator model has good fitting characteristics; a low failure rate may simply reflect a high $\beta$-error. A high $\beta$-error can result from a fit-test that is not carefully and accurately performed.

Those who conduct quantitative fit-testing on a large population of workers, however, do have a more precise way to assess the fitting characteristics of a particular respirator. The h-value can be computed directly as the fraction of the first-trial protection factors that are above the APF of the respirator class. For all the

reasons described above, a respirator with good fitting characteristics would have an h-value of 0.95 or above.

Although the accuracy of fit-testing methods as actually used in the workplace is unknown, it is generally believed that quantitative fit-testing in which facepiece leakage is measured is more accurate than qualitative fit-tests that rely on the subjective response of the wearer. In practice, quantitative fit-tests are typically used as a reference for the evaluation of qualitative fit-testing methods.[6-10] Previously, only qualitative fit-tests could be used for filtering facepiece-type respirators, one of the most popular respirator types. However, with the increased performance of filters required in all particulate respirators by NIOSH Part 84 regulations, filtering facepiece respirators now can be quantitatively fit-tested.[12] In addition, modern instruments have greatly simplified and quickened the procedures in quantitative fit-testing. Many vendors of fit-testing services offer both qualitative and quantitative tests at essentially the same cost. Thus, with the availability of modern test instruments and improved respirator filter performance, quantitative fit-testing has become an option not previously available.

## RECOMMENDATIONS

For the public health and economic reasons described above, the authors make the obvious recommendation to first purchase only respirators with good fitting characteristics (h $\geq 0.95$) and then carefully conduct fit-tests on individual workers. Beyond that, the following specific research recommendations also are suggested.

Continuing studies are necessary to measure and report the h-values for the large and ever-increasing number of available respirator models. As mentioned earlier, h-values can be determined by monitoring the first-donning protection factors measured in quantitative fit-testing programs. Administrators of large respirator programs already may be generating the data necessary to do this analysis. The authors encourage the sharing of such data with respirator users.

Research also is needed to measure the assignment errors of

**TABLE V. Number of Fit-Test Trials Per 100 Qualified Respirator Wearers**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Alpha Error ($\beta = 0.05$) | 0.3 | 153 | 177 | 207 | 244 | 293 | 358 |
| | 0.4 | 178 | 203 | 235 | 275 | 326 | 394 |
| | 0.5 | 212 | 240 | 275 | 318 | 373 | 447 |
| | 0.6 | 264 | 296 | 335 | 383 | 444 | 525 |
| | 0.7 | 350 | 388 | 433 | 489 | 559 | 649 |

**TABLE VII. Number of Workers Failing to Qualify for Respirator Use Per 100 Qualified Respirator Wearers**

| | | $h = h_1 = h_2 = h_3$ | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Alpha Error ($\beta = 0.05$) | 0.3 | 0 | 1 | 3 | 6 | 10 | 18 |
| | 0.4 | 1 | 2 | 4 | 8 | 14 | 22 |
| | 0.5 | 2 | 4 | 8 | 12 | 19 | 29 |
| | 0.6 | 6 | 9 | 14 | 20 | 28 | 40 |
| | 0.7 | 15 | 20 | 26 | 34 | 45 | 58 |

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**TABLE VIII. Percentage of Workers Failing Initial Fit-Testing with First Candidate Respirator**

| | | h = | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Beta Error | 0.05 | 52% | 57% | 61% | 66% | 70% | 75% |
| ($\alpha = 0.5$) | 0.10 | 52% | 56% | 60% | 64% | 68% | 72% |
| | 0.15 | 52% | 55% | 59% | 62% | 66% | 69% |
| | 0.20 | 52% | 55% | 58% | 61% | 64% | 67% |
| | 0.25 | 51% | 54% | 56% | 59% | 61% | 64% |

respirator fit-testing programs as actually used in the workplace. Other than the work presented here, the authors are not aware of other studies of the overall effectiveness of respirator fit-testing programs. Although studies of the accuracy of fit-testing methods have been published, studies of workplace fit-testing programs have not.[6–10] Assignment errors could be assessed in future research by conducting multiple-donning, quantitative fit-testing trials on a population of previously fit-tested respirator wearers and determining the fraction of that population not consistently achieving protection factors equal to, or greater than, the APF.

Also recommended is a statistical analysis of the current approach to fit-testing that uses a single respirator donning coupled with a "safety factor" of 10. Although it is a critical element in a fit-testing method, the authors have found no statistical analysis to justify this approach. Given the large donning-to-donning variation in protection factors, such analysis seems to be warranted.

There is a special group of respirator wearers who also need additional study. The above discussion concerns workers who have the advantage of some kind of fit-testing program. However, there are many workers who are not fit-tested at all, either because they are not covered by regulations that require fit-testing, not aware of such regulations, or because such regulations are not always followed.[13] For example, voluntary respirator use does not require fit-testing, and workers in agricultural workplaces are not covered by the Occupational Safety and Health Administration respiratory protection standard. Without the benefit of fit-tests, these workers depend entirely on the fitting characteristics of the respirator. The h-value is an estimate of the percentage of these workers who will achieve an adequate fit. If the h-value, for example, were 0.6, then only 60% of these respirator wearers would have an adequate fit even if the manufacturer's donning instructions were carefully followed. More research is needed to better understand the level of protection actually provided by respirators to this group of workers.

## ACKNOWLEDGMENTS

The authors wish to acknowledge Ms. Priscilla Wopat of the NIOSH Spokane Research Laboratory for her talented editorial assistance throughout the development of this manuscript.

**TABLE IX. Percentage of Workers Failing Initial Fit-Testing Trial with First Candidate Respirator**

| | | h = | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.95 | 0.85 | 0.75 | 0.65 | 0.55 | 0.45 |
| Fit-Test Alpha Error | 0.3 | 33% | 40% | 46% | 53% | 59% | 66% |
| ($\beta = 0.05$) | 0.4 | 43% | 48% | 54% | 59% | 65% | 70% |
| | 0.5 | 52% | 57% | 61% | 66% | 70% | 75% |
| | 0.6 | 62% | 65% | 69% | 72% | 76% | 79% |
| | 0.7 | 71% | 74% | 76% | 79% | 81% | 84% |

## REFERENCES

1. "Respiratory Protective Devices," *Federal Register* 60:110 (8 June, 1995). p. 30336.
2. **Hyatt, E.C.:** "Respirator Protection Factors" (LA–6084–MS). Los Alamos, N.M.: Los Alamos Scientific Laboratory, 1976.
3. **Gross, S.F., and S.W. Horstman:** Half-mask respirator selection for a mixed worker group. *Appl. Occup. Environ. Hyg.* 5:229–235 (1990).
4. **Coffey, C.C., D.L. Campbell, and Z. Zhuang:** Simulated workplace performance of N95 respirators. *Am. Ind. Hyg. Assoc. J. 60:618–624* (1999).
5. **Centers for Disease Control and Prevention:** Laboratory performance evaluation of N95 filtering facepiece respirators, 1996. *Morb. Mort. Wkly Rep. 47:*1045–1049 (1998).
6. **Marsh, J.L.:** Evaluation of saccharin qualitative fitting test for respirators. *Am. Ind. Hyg. Assoc. J. 45:*371–376 (1984).
7. **Nelson, T.J., O.T. Skrevedt, J.G. Loschiavo, and S.W. Dixon:** Development of an improved qualitative fit-test using isoamyl acetate. *J. ISRP 2:*225–248 (1984).
8. **Danisch, S.G., H.E. Mullins, and C.R. Rhoe:** A quantitative fit test for dust/mist respirators: Part II. *App. Occup. Environ. Hyg. 7:*241–245 (1992).
9. **Mullins, H.E., S.G. Danisch, and A.R. Johnston:** Development of a new qualitative test for fit-testing respirators. *Am. Ind. Hyg. Assoc. J. 56:*1068–1073 (1995).
10. **Coffey, C.C., Z. Zhuang, and D.L. Campbell:** Evaluation of the Bitrex® qualitative fit test method using N95 filtering-facepiece respirators. *J. ISRP 16:*48–55 (1998).
11. **Burgess, G.L., and M.T. Mashingaidze:** Respirator leakage in the pharmaceutical industry of Northwest England. *Ann. Occup. Hyg. 48:* 513–517 (1999).
12. **Zhuang, Z., C.C. Coffey, D.L. Campbell, and W.R. Myers:** Comparison of two newly developed methods for fit testing N95 respirators. *J. ISRP 16:*37–47 (1998).
13. **Nash, N.T., and D.R. Williams:** Occupational exposure to crystalline silica during tuckpointing and the use of engineering controls. *Appl. Occup. Environ. Hyg. 15:*8–10 (2000).
14. **Winslow, C.E.A., L. Greenburg, and E.H. Reeves:** The efficiency of certain devices used for the protection of sand blasters against the dust hazard. *Public Health Rep. 35:*518–534 (1920).
15. **Drinker, P., and T. Hatch:** Dust respirators and air masks. In *Industrial Dust*, 2nd ed. New York: McGraw–Hill, 1954.
16. **Bureau of Mines:** "Procedure for Testing Filter–Type Dust, Fume, and Mist Respirators for Permissibility." Schedule 21, August 20, 1934.
17. **Brown, C.E.:** Respiratory protective devices. *J. Ind. Hyg. Toxicol. 19:* 95–107 (1937).
18. **Bureau of Mines:** "Filter-Type Dust, Fume, and Mist Respirators, Requirements Investigation, Testing, and Certification." Schedule 21B, March 23, 1965.
19. **Burgess, W.A., L. Silverman, and F. Stein:** A new technique for evaluating respirator performance. *Am. Ind. Hyg. Assoc. J. 22:*422–429 (1961).
20. **Hyatt, E.C.:** Air purifying respirators for protection against airborne radioactive contaminants. *Health Physics 9:*425–432 (1963).
21. "Respiratory Protective Devices; Tests for Permissibility; Fees." *Code of Federal Regulations*, Title 30, Part 11. (1972).
22. **Hack, A., E.C. Hyatt, B.J. Held, T.O. Moore, C.P. Richards, and J.T. McConville:** "Selection of Respirator Test Panels Representative of U.S. Adult Facial Sizes" (LA–5488). Los Alamos, N.M.: Los Alamos Scientific Laboratory, 1974.
23. **Douglas, D.D.:** "Respirator Studies for the National Institute for Occupational Safety and Health" (LA–6386–PR). Los Alamos, N.M.: Los Alamos Scientific Laboratory, 1976.
24. **Coffey, C.C., D.L. Campbell, W.R. Myers, Z. Zhuang, and S. Das:** Comparison of six respirator fit-test methods with an actual measurement of exposure in a simulated health care environment: Part I—protocol development." *Am. Ind. Hyg. Assoc. J. 59:*852–861 (1998).

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

THEORETICAL & EXPERIMENTAL STUDIES



**FIGURE A1.** Coal dust deposition pattern on the faces of subjects after wearing half-facepiece respirators in the "coal dust tightness test" conducted by the former Bureau of Mines as part of its respirator certification program from 1934 until 1972. Only the center subject shows no leaks. The other two show leaks induced during a demonstration by a toothpick under the facepiece. Many facepieces submitted to the Bureau of Mines had to be redesigned before they could meet fitting requirements.[17]

25. **Coffey, C.C., D.L. Campbell, W.R. Myers, and Z. Zhuang:** Comparison of six respirator fit-test methods with an actual measurement of exposure in a simulated health care environment: Part II—method comparison testing. *Am. Ind. Hyg. Assoc. J. 59:*862–870 (1998).

26. **Coffey, C.C., D.L. Campbell, W.R. Myers, and Z. Zhuang:** Comparison of six respirator fit-test methods with an actual measurement of exposure in a simulated health care environment: Part III—validation. *Am. Ind. Hyg. Assoc. J. 60:*862–870 (1999).

# APPENDIX 1

## History of Respirator Certification Regulations

For decades, concern over the importance of respirator facepiece fit motivated efforts to develop methods that would reliably indicate whether a respirator fit well or poorly. The following history of facepiece fit-testing methods and, in particular, their use as respirator certification requirements may be useful for clear understanding of the findings described in this article.

In 1911, German researchers reported studies in which two people entered a test chamber containing aerosolized industrial dusts (e.g., cotton, cement, slag, or rouge dust) mixed with bacterial spores.[14] However, only one wore a respirator. Both breathed through their noses, which were filled with cotton to filter out inhaled dust "without interfering too seriously with respiration." After each test, spores captured on the nose filters of each person were counted, and the difference was reported as the measure of a respirator's fit.

The Bureau of Mines (BOM) began issuing schedules or methods for testing respirators in 1919, but the first schedule for dust respirators was not issued until 1934.[15,16] In a 1937 article the BOM reported that "the difficulty of properly fitting the half-mask facepieces of mechanical-filter respirators to all types of faces has been brought out by the approval work on such respirators."[17] To address this concern, the BM added facepiece fit-testing to its respirator certification requirements.

One of the earliest fit-testing methods used at the BM was the "coal dust tightness test." This qualitative fit-test was used until 1972 and involved "three test subjects having full, average, and lean facial features."[18] After each person donned eye protection and a test respirator, a high concentration of fine coal dust was blown around the edges of each facepiece for 3 min. Figure A1 shows three subjects after this test. The requirements for a passing test were that "the following shall not show appreciably more black particulate matter than was observed before the test: the forced nasal discharge as shown on a white cloth; the sputum; and the nasal cavities, when examined with the aid of a speculum and illumination; and that part of the face covered by the facepiece of the respirator." A similar fit-test was used later by others for evaluating facepiece fits in a workplace. A worker blew his nose before donning a respirator, wore the respirator on the job, and blew his nose again after removing the respirator.[15] This test was said "to appeal to anyone's common sense and lifted respirator wearing out of the disciplinary regime into that of reason."

In 1959 the Atomic Energy Commission (AEC) Respirator Committee proposed specifications for evaluating how well respirators performed in purifying the air of radioactive contaminants.[19,20] Respirator performance was to be evaluated by a gas or particulate challenge. To pass, a respirator model had to adequately fit at least 95% of the *normal* adult population. Adequate fit for a half-facepiece respirator was face seal leakage of less than 1%. The 5% of wearers not achieving a fit were to be identified "by some measurable facial dimension." This facial dimension was not specified. In 1961 a report published describing a quantitative method for evaluating facepiece fit that met the AEC Respirator Committee's specifications.[19] This method was the first that evaluated fit by simultaneously measuring the concentration of a challenge agent both outside and inside a facepiece while the test subject wore a respirator in an enclosure.

When the BOM published revised regulations for dust respirators (Schedule 21B) in 1965, facepiece fit-tests included the coal dust tightness test, a pressure tightness test, and an isoamyl acetate tightness test.[18] The pressure tightness test was essentially a positive-pressure, user seal check undergone by "15 to 20 persons

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

having a wide variety of facial shapes and sizes." The isoamyl acetate tightness test was a qualitative fit-test. For half-facepiece dust respirators, this test required modifying the device by using organic vapor cartridges. Then 15 to 20 people wore the respirator while doing exercises in a chamber containing 100 ppm of isoamyl acetate. A respirator was considered to have failed if one or more wearers smelled isoamyl acetate.

Schedule 21B also included a new facepiece-fit requirement. Quantitative fit-testing using a challenge of 100 mg/m$^3$ of dioctyl phthalate (DOP) was required for respirators having high-efficiency filters.[2] Part of this test required each of three people to wear a respirator continuously for 2 hours. Three 15-min test periods inside the DOP chamber were alternated with two periods outside the chamber. The outside periods totaled 75 min during which the subjects "engaged in normal activities."[18]

In 1972, responsibility for testing and certifying respirators was transferred from the BOM to NIOSH, and respirator approvals were issued jointly by both agencies.[21] However, all facepiece fit-tests except the isoamyl acetate tests were omitted from the NIOSH requirements, and the number of test subjects involved was reduced to six or fewer.[22] A lack of specific criteria for the facial dimensions of test subjects remained a weakness of fit-testing requirements.

Soon after NIOSH began testing respirators, a contract was awarded to researchers at Los Alamos National Laboratories "to develop detailed anthropometric specifications to replace the vague and inadequate ones in the existing regulations."[22] A 16-member test panel was developed initially, but included only men, and the panel was later expanded to 25 to include women. Criteria for quantitative fit-testing using a 25-person test panel were developed by 1976. Borrowing from the AEC specifications, 24 of the 25 test subjects (95%) had to pass a quantitative fit-test for a respirator model to be acceptable. A test subject passed the quantitative fit-test when the face seal leakage was less than 10%.[23] (The AEC specification was 1%.) The 5% of wearers not achieving a fit were to be identified by "a stringent qualitative or quantitative fitting test or by anthropometric facial measurements."[2]

Although the Los Alamos research resulted in a promising solution to the fit-testing problem, isoamyl acetate fit-tests remain part of the NIOSH certification requirements, except that fit-tests for particulate respirators were omitted entirely from the updated certification requirements adopted in 1995.[1] A major reason for the omission was that a significant relationship had never been shown between any facepiece fit-test and the performance of a respirator in the workplace. NIOSH promised that it would "address issues associated with face-fit efficacy in a separate module (regulatory revision) upon completion of the necessary research."[1] Since 1995, NIOSH researchers have studied this issue, and fit-testing methods correlating with exposure have been validated.[24–26]

Given this long history of recognizing the importance of assessing fitting-characteristics as a requirement of certification and given the current absence of such requirements for the most popular respirator types certified in the United States, it is important to understand the added responsibility this places on respirator program administrators. To that end, it is useful to quantify how the fitting characteristics of individual respirator models affect the adequacy of respirator programs.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# EXHIBIT 3

1   IN THE CIRCUIT COURT OF LINCOLN COUNTY, WEST VIRGINIA
               CIVIL ACTION NO. 03-C-109
2                 HONORABLE JAY M. HOKE

3

4    STATE OF WEST VIRGINIA,
    ex rel., PATRICK
5    MORRISEY, ATTORNEY
    GENERAL,
6              Plaintiff,

7    VS.

8    MINNESOTA MINING AND
    MANUFACTURING COMPANY,
9    a foreign corporation,
    MINE SAFETY APPLIANCES
10   COMPANY, a foreign
    corporation, and
11   AMERICAN OPTICAL
    CORPORATION, a foreign
12   company,
             Defendants.
13

14

15           BENCH TRIAL - VOLUME III
               **AMENDED**
16

17        Volume III of the transcript of the
   proceedings held before the Honorable Jay M. Hoke,
   Judge, in regard to the Bench Trial in the
18   above-styled matter, on the day of 15th day of
   January, 2025, beginning at 9:24 A.M.
19

20

21

22

23

24

1    trying to avoid being exposed to the coronavirus;

2    true?

3         A.   Yes.

4         Q.   And, in fact, during COVID, you actually

5    fit tested people at Northeastern University with

6    the 8210 and sent them out wearing the 8210 for

7    protection against the coronavirus in healthcare

8    facilities; right?

9         A.   That was one of the masks that were

10   provided, yes.

11        Q.   Okay.  And you would expect the 8210 and

12   the 8710 to have either identical or very similar

13   fit characteristics on the face; true?

14        A.   Yes.

15        Q.   In teaching your class, you teach -- you

16   talk about a concept called fit testing a

17   respirator; right?

18        A.   Yes.

19        Q.   So what is fit testing a respirator?

20        A.   It's basically to determine whether or not

21   the respirator is going to provide a certain

22   protection factor.  So you can do that either

23   qualitatively or quantitatively to challenge the --

24   the worker puts the respirator on after doing a

1    count the particles; right?

2        A.   Yes.  In this case it would be the

3    PortaCount with the companion.

4        Q.   That's right.

5             And you have achieved fit factors of

6    greater than a hundred with the 8210, haven't you?

7        A.   Any fit factor less than -- depending on

8    the worker and how they put the respirator on.

9        Q.   Yeah.  There's not a single respirator out

10   there of any kind that's tight-fitting that fits

11   everybody's face, is there?

12       A.   That's true.

13       Q.   But you have absolutely put this

14   respirator, the 8210, on people's face, done a

15   quantitative fit test and got a quantitative fit

16   factor on greater than a hundred on people that it

17   fits?

18       A.   Yeah.  Obviously, we don't test a lot of

19   people to correlate the percentage, but, I think,

20   it's recognized that you can get a fit factor

21   greater than a hundred as long as it's put on

22   properly and the worker is trained.

23       Q.   The fit factor means --

24       A.   And it fits them.  Obviously, if the

1    respirator comes in a different size, we'd have

2    them change for a different size.

3         Q.   Sure.

4              A fit factor of a hundred means there's a

5    hundred times more particle outside than there are

6    inside the mask; right?

7         A.   Yes.

8         Q.   And fit factor of a hundred matters

9    because that, under quantitative fit test, is a fit

10   that NIOSH accepts as a valid fit -- I'm sorry --

11   that OSHA accepts as a valid fit; right?

12        A.   Just for the half mask respirators.

13        Q.   Yeah.  That's what I'm talking about.  I'm

14   not talking about any other kind of respirator.

15             Fit factor of a hundred is accepted as a

16   valid fit for half mask respirators; right?

17        A.   Yes.  The reason I'm being careful here is

18   because sometimes the test is misused.  If you're

19   wearing a full face respirator and you're expected

20   to have an assigned protection factor of 50, you

21   cannot use the qualified -- the qualitative fit

22   test; you have to use a quantified.

23        Q.   Well, let's stick with the kind of

24   respirators we're talking about here.

1  State of West Virginia

2  County of Lincoln, to wit:

3

4

5         I, Kathy J. Davis, Official Reporter of

6  the Circuit Court of Lincoln County, West Virginia,

7  and Registered Merit Reporter, do hereby certify

8  that the foregoing is a true and correct transcript

9  of the proceedings had and testimony taken in

10  Amended Volume III in the action of STATE OF WEST

11  VIRGINIA ex rel. AG versus MINNESOTA MINING AND

12  MANUFACTURING COMPANY, et al., Case No. 03-C-109,

13  on the 15th day of January, 2025.

14         I hereby certify that the transcript

15  within meets the requirements of the Code of the

16  State of West Virginia, 51-7-4, and all rules

17  pertaining thereto as promulgated by the Supreme

18  Court of Appeals.

19         Given under my hand this 5th day of

20  August, 2025.

21  _____

22  Kathy J. Davis, RPR, RMR, CRC, CRR
   Official Reporter, Circuit Court
23  of Lincoln County, West Virginia

24

# EXHIBIT 4

1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2            SOUTHERN DISTRICT AT PIKEVILLE
           CASE NO. No. 7:23-cv-00075-REW-CJS
3

4

5

MICKEY BLACKBURN,         :
6                         :
      Plaintiff,          :
7                         :
vs.                       :
8                         :
3M COMPANY, et al.,       :
9                         :
      Defendants.         :
10

11

12

13

14          Deposition of JOHN M. PRICE, M.D.,

15   an expert witness herein, taken as upon

16   cross-examination by the Defendants, pursuant

17   to the Federal Rules of Civil Procedure, via

18   Zoom platform before me, Kelly Green, RPR, a

19   Notary Public within and for the State of

20   Kentucky, on Wednesday, September 24, 2025,

21   10:00 a.m.

22

23

24

25



¹ qualitative fit testing on him, did they?

²     A.    From his deposition, there may have

³ been a question about that, and there's no

⁴ indication that he was fit tested.

⁵     Q.    Okay. I want to -- I'm going to go

⁶ to, actually, the -- you've got a summary of

⁷ sort of 3M's internal fit testing at the end

⁸ of your report, this Appendix B, right?

⁹     A.    Yes.

¹⁰     Q.    You're familiar with this; you

¹¹ helped put this together?

¹²     A.    Yes.

¹³     Q.    Feel free to tell me where to

¹⁴ scroll to -- or look at it on your own

¹⁵ computer or whatever you want to do, but I

¹⁶ want to talk to you about some of these

¹⁷ results. Would you agree that a majority of

¹⁸ the test subjects that were tested in these

¹⁹ 3M internal fit tests -- a majority of them

²⁰ got fit factors greater than 100?

²¹     A.    Well, that's one way to --

²²     MR. MARTIN: Objection to form.

²³     A.    -- analyze the data, but the

²⁴ criteria was, certainly, that they wanted the

²⁵ fit factor at the 5th percentile to be at



¹ 100.

² Q. But the answer to my question is

³ correct: a majority of the people in these

⁴ panels achieved fit factors greater than 100,

⁵ true?

⁶ MR. MARTIN: Objection to form.

⁷ A. And, again, that is one way of

⁸ analyzing this data.

⁹ Q. And if you analyze the data that

¹⁰ way, the answer to my question is true; a

¹¹ majority of the people did get fit factors

¹² greater than 100, right?

¹³ MR. MARTIN: Objection to form.

¹⁴ A. If we look at the data, we could

¹⁵ say that, yes.

¹⁶ Q. Okay.

¹⁷ A. As to members of the panel for that

¹⁸ particular test, yes.

¹⁹ Q. But certainly, each one of these

²⁰ tests, if we look at the GM here, the

²¹ geometric mean -- because if we go to

²² geometric mean of 225, 165 -- a couple of

²³ them had geometric means that were lower.

²⁴ But in each one of these, we've got some

²⁵ people that are getting fit factors greater



¹ achieved a fit factor of 100 or greater,

² doesn't it?

³     A.    Yes.   That's one way of looking at

⁴ the data, yes.

⁵     Q.    The vast majority of these people

⁶ actually got fit factors greater than 100,

⁷ didn't they?

⁸     A.    Again, you can say that from the

⁹ data, yes.

¹⁰     Q.    Have you gone back and calculated

¹¹ what percent of all of test subjects got a

¹² fit factor of greater than 100?

¹³     A.    I think that's in the table, if I

¹⁴ recall.

¹⁵     Q.    And it's most of them, right?

¹⁶     A.    Yes.

¹⁷     Q.    Have you ever plotted any -- I

¹⁸ think I know the answer, but let me just ask

¹⁹ it.  Have you ever plotted results like these

²⁰ out for any other respirator manufacturer?

²¹     A.    No, because I don't have insight to

²² their data.

²³     Q.    So the 5th percentile results -- a

²⁴ fit factor for any other respirator -- you

²⁵ don't know -- you don't know what those



1                        CERTIFICATE
    STATE OF KENTUCKY :SS
2   COUNTY OF KENTON  :

3               I, Kelly Green, a duly qualified

4   and commissioned Ohio Notary Public, do

5   hereby certify that before the giving of the

6   deposition, JOHN M. PRICE, M.D., was by me

7   first duly sworn to tell the truth; the

8   foregoing is a true and accurate record of

9   the testimony given at said time and place by

10  said deponent; and said deposition was taken

11  by me in stenotype and transcribed by

12  computer-aided transcription.

13              I certify that I am not a relative,

14  employee of, or attorney for any of the

15  parties or attorneys in the above-captioned

16  action; I am not financially interested in

17  the action; I am not under a contract as

18  defined in Civil Rule 28(D).

19              IN WITNESS WHEREOF, I hereunto set

20  my hand and official seal September 28, 2025.

21

22

23

24                      _____
    My Commission expires:     Kelly Green, RPR
25  May 15, 2029               Notary Public, Kentucky



# EXHIBIT 5

Thursday,
August 24, 2006



Part II

# Department of Labor

Occupational Safety and Health
Administration

29 CFR Parts 1910, 1915, and 1926
Assigned Protection Factors; Final Rule

Defs. Ex. # 3m-22.82

## DEPARTMENT OF LABOR

**Occupational Safety and Health Administration**

**29 CFR Parts 1910, 1915, and 1926**

[Docket No. H049C]

**RIN 1218–AA05**

**Assigned Protection Factors**

**AGENCY:** Occupational Safety and Health Administration (OSHA), Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, OSHA is revising its existing Respiratory Protection Standard to add definitions and requirements for Assigned Protection Factors (APFs) and Maximum Use Concentrations (MUCs). The revisions also supersede the respirator selection provisions of existing substance-specific standards with these new APFs (except for the respirator selection provisions of the 1,3-Butadiene Standard).

The Agency developed the final APFs after thoroughly reviewing the available literature, including chamber-simulation studies and workplace protection factor studies, comments submitted to the record, and hearing testimony. The final APFs provide employers with critical information to use when selecting respirators for employees exposed to atmospheric contaminants found in general industry, construction, shipyards, longshoring, and marine terminal workplaces. Proper respirator selection using APFs is an important component of an effective respiratory protection program. Accordingly, OSHA concludes that the final APFs are necessary to protect employees who must use respirators to protect them from airborne contaminants.

**DATES:** The final rule becomes effective November 22, 2006.

**ADDRESSES:** In compliance with 28 U.S.C. 2212(a), the Agency designates Joseph M. Woodward, the Associate Solicitor for Occupational Safety and Health, Office of the Solicitor, Room S–4004, U.S. Department of Labor, 200 Constitution Avenue, NW., Washington, DC 20210, as the recipient of petitions for review of this rulemaking.

**FOR FURTHER INFORMATION CONTACT:** For technical inquiries regarding this final rule, contact Mr. John E. Steelnack, Directorate of Standards and Guidance, Room N–3718, OSHA, U.S. Department of Labor, 200 Constitution Ave., NW., Washington, DC 20210; telephone (202) 693–2289 or fax (202) 693–1678. For general inquiries regarding this final standard contact Kevin Ropp, OSHA Office of Public Affairs, Room N–3647, U.S. Department of Labor, 200 Constitution Ave., NW., Washington, DC 20210 (telephone (202) 693–1999). Copies of this **Federal Register** notice are available from the OSHA Office of Publications, Room N–3101, U.S. Department of Labor, 200 Constitution Ave., NW., Washington, DC 20210 (telephone (202) 693–1888). For an electronic copy of this notice, as well as news releases and other relevant documents, go to OSHA's Web site (*http://www.osha.gov*), and select "**Federal Register**," "Date of Publication," and then "2006".

**SUPPLEMENTARY INFORMATION:**

## I. General

### A. Table of Contents

The following Table of Contents identifies the major preamble sections of this final rule and the order in which they are presented:

I. General
  A. Table of Contents
  B. Glossary
II. Events Leading to the Final Standard
  A. Regulatory History of APFs
  B. Non-Regulatory History of APFs
  C. Need for APFs
III. Methodology for Developing APFs for Respirators
  A. Introduction
  B. Background
  C. Methodology, Data, and Studies on Filtering Facepieces and Elastomerics
  D. Alternative Approaches
  E. Updated Analyses
  F. Summary of Studies Submitted During the Rulemaking
IV. Health Effects
V. Summary of the Final Economic Analysis and Initial Regulatory Flexibility Analysis
  A. Introduction
  B. The Rule and Affected Respirator Users
  C. Compliance Costs
  D. Benefits
  E. Economic Feasibility
  F. Economic Impacts to Small Entities
VI. Summary and Explanation of the Final Standard
  A. Definition of Assigned Protection Factor
  B. APF Provisions
  C. Assigned Protection Factors for Specific Respirator Types
    1. APF for Quarter Mask Air-Purifying Respirators
    2. APF for Half Mask Air-Purifying Respirators
    3. APF for Full Facepiece Air-Purifying Respirators
    4. APF for Powered Air-Purifying Respirators (PAPRs)
    5. APF for Supplied-Air Respirators (SARs)
    6. APF for Self-Contained Breathing Apparatuses (SCBAs)
  D. Definition of Maximum Use Concentration
  E. MUCs for Mixtures and Hazard Ratios
  F. MUC Provisions
  G. Superseding the Respirator Selection Provisions of Substance-Specific Standards in Parts 1910, 1925, and 1926
VII. Procedural Determinations
  A. Legal Considerations
  B. Paperwork Reduction Act
  C. Federalism
  D. State Plans
  E. Unfunded Mandates
  F. Applicability of Existing Consensus Standards
List of Subjects in 29 CFR Parts 1910, 1915, and 1926
Authority and Signature
Amendments to Standards

### B. Glossary

This glossary specifies the terms represented by acronyms, and provides definitions of other terms, used frequently in the preamble to the final rule. This glossary does not change the legal requirements in this final rule, nor is it intended to impose any new regulatory requirements on the regulated community.

1. Acronyms

*ACGIH:* American Conference of Governmental Industrial Hygienists

*AIHA:* American Industrial Hygiene Association

*ANSI:* American National Standards Institute

*APF:* Assigned Protection Factor

*APR:* Air-purifying respirator

*Ci:* Concentration measured inside the respirator facepiece

*Co:* Concentration measured outside the respirator

*DOP:* Dioctylphthalate (see definition below)

*DFM:* Dust, fume, and mist filter

*EPF:* Effective Protection Factor (see definition below under "Protection factor study")

*HEPA:* High efficiency particulate air filter (see definition below)

*IDLH:* Immediately dangerous to life or health (see definition below)

*LANL:* Los Alamos National Laboratory

*LASL:* Los Alamos Scientific Laboratory

*LLNL:* Lawrence Livermore National Laboratory

*MSHA:* Mine Safety and Health Administration

*MUC:* Maximum Use Concentration

*NFPA:* National Fire Protection Association

*NIOSH:* National Institute for Occupational Safety and Health

*NRC:* Nuclear Regulatory Commission

*OSHA:* Occupational Safety and Health Administration

*OSH Act:* The Occupational Safety and Health Act of 1970 (29 U.S.C. 655, 657, 665).

*PAPR:* Powered air-purifying respirator (see definition below)

*PEL:* Permissible Exposure Limit
*PPF:* Program Protection Factor (see definition below under "Protection factor study")
*QLFT:* Qualitative fit test (see definition below)
*QNFT:* Quantitative fit test (see definition below)
*RDL:* Respirator Decision Logic (see definition below)
*REL:* Recommended Exposure Limit (see definition below)
*SAR:* Supplied-air (or airline) respirator (see definition below)
*SCBA:* Self-contained breathing apparatus (see definition below)
*WPF:* Workplace Protection Factor (see definition below under "Protection factor study")
*TLV:* Threshold Limit Value (see definition below)
*SWPF:* Simulated Workplace Protection Factor (see definition below under "Protection factor study")

## 2. Definitions

Terms followed by an asterisk (*) refer to definitions that can be found in paragraph (b) ("Definitions") of OSHA's Respiratory Protection Standard (29 CFR 1910.134).

*Air-purifying respirator\*:* A respirator with an air-purifying filter, cartridge, or canister that removes specific air contaminants by passing ambient air through the air-purifying element.

*Atmosphere-supplying respirator\*:* A respirator that supplies the respirator user with breathing air from a source independent of the ambient atmosphere, and includes SARs and SCBA units.

*Canister or cartridge\*:* A container with a filter, sorbent, or catalyst, or combination of these items, which removes specific contaminants from the air passed through the container.

*Continuous flow respirator\*:* An atmosphere-supplying respirator that provides a continuous flow of breathable air to the respirator facepiece.

*Demand respirator\*:* An atmosphere-supplying respirator that admits breathing air to the facepiece only when a negative pressure is created inside the facepiece by inhalation.

*Dioctylphthalate (DOP):* An aerosolized agent used for quantitative fit testing.

*Elastomeric:* A respirator facepiece made of a natural or synthetic elastic material such as natural rubber, silicone, or EPDM rubber.

*Filter or air-purifying element\*:* A component used in respirators to remove solid or liquid aerosols from the inspired air.

*Filtering facepiece (or dust mask)\*:* A negative pressure particulate respirator

with a filter as an integral part of the facepiece or with the entire facepiece composed of the filtering medium.

*Fit factor\*:* A quantitative estimate of the fit of a particular respirator to a specific individual and typically estimates the ratio of the concentration of a substance in ambient air to its concentration inside the respirator when worn.

*Fit test\*:* The use of a protocol to qualitatively or quantitatively evaluate the fit of a respirator on an individual.

*Helmet\*:* A rigid respiratory inlet covering that also provides head protection against impact and penetration.

*High-efficiency particulate air filter (HEPA)\*:* A filter that is at least 99.97% efficient in removing monodisperse particles of 0.3 micrometers in diameter. The equivalent NIOSH 42 CFR part 84 particulate filters are the N100, R100, and P100 filters.

*Hood\*:* A respiratory inlet covering that completely covers the head and neck and may also cover portions of the shoulders and torso.

*Immediately dangerous to life or health (IDLH)\*:* An atmosphere that poses an immediate threat to life, would cause irreversible adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere.

*Loose-fitting facepiece\*:* A respiratory inlet covering that is designed to form a partial seal with the face.

*Negative pressure respirator (tight-fitting)\*:* A respirator in which the air pressure inside the facepiece is negative during inhalation with respect to the ambient air pressure outside the respirator.

*Permissible Exposure Limit (PEL):* An occupational exposure limit specified by OSHA.

*Positive pressure respirator\*:* A respirator in which the pressure inside the respiratory inlet covering exceeds the ambient air pressure outside the respirator.

*Powered air-purifying respirator (PAPR)\*:* An air-purifying respirator that uses a blower to force the ambient air through air-purifying elements to the inlet covering.

*Pressure demand respirator\*:* A positive pressure atmosphere-supplying respirator that admits breathing air to the facepiece when the positive pressure is reduced inside the facepiece by inhalation.

*Protection factor study:* A study that determines the protection provided by a respirator during use. This determination generally is accomplished by measuring the ratio of the concentration of an airborne contaminant (e.g., hazardous substance)

outside the respirator (Co) to the concentration inside the respirator (Ci) (i.e., Co/Ci). Therefore, as the ratio between Co and Ci increases, the protection factor increases, indicating an increase in the level of protection provided to employees by the respirator. Four types of protection factor studies are:

*Effective Protection Factor (EPF) study:* A study, conducted in the workplace, that measures the protection provided by a properly selected, fit-tested, and functioning respirator when used intermittently for only some fraction of the total workplace exposure time (i.e., sampling is conducted during periods when respirators are worn and not worn). EPFs are not directly comparable to WPF values because the determinations include both the time spent in contaminated atmospheres with and without respiratory protection; therefore, EPFs usually underestimate the protection afforded by a respirator that is used continuously in the workplace.

*Program Protection Factor (PPF) study:* A study that estimates the protection provided by a respirator within a specific respirator program. Like the EPF, it is focused not only on the respirator's performance, but also the effectiveness of the complete respirator program. PPFs are affected by all factors of the program, including respirator selection and maintenance, user training and motivation, work activities, and program administration.

*Workplace Protection Factor (WPF) study:* A study, conducted under actual conditions of use in the workplace, that measures the protection provided by a properly selected, fit-tested, and functioning respirator, when the respirator is worn correctly and used as part of a comprehensive respirator program that is in compliance with OSHA's Respiratory Protection Standard at 29 CFR 1910.134. Measurements of Co and Ci are obtained only while the respirator is being worn during performance of normal work tasks (i.e., samples are not collected when the respirator is not being worn). As the degree of protection afforded by the respirator increases, the WPF increases.

*Simulated Workplace Protection Factor (SWPF) study:* A study, conducted in a controlled laboratory setting and in which Co and Ci sampling is performed while the respirator user performs a series of set exercises. The laboratory setting is used to control many of the variables found in workplace studies, while the exercises simulate the work activities of respirator users. This type of study is designed to determine the optimum

performance of respirators by reducing the impact of sources of variability through maintenance of tightly controlled study conditions.

*Qualitative fit test (QLFT)\*:* A pass/ fail fit test to assess the adequacy of respirator fit that relies on the individual's response to the test agent.

*Quantitative fit test (QNFT)\*:* An assessment of the adequacy of respirator fit by numerically measuring the amount of leakage into the respirator.

*Recommended Exposure Limit (REL):* An occupational exposure level recommended by NIOSH.

*Respirator Decision Logic (RDL):* Respirator selection guidance developed by NIOSH that contains a set of respirator protection factors.

*Self-contained breathing apparatus (SCBA)\*:* An atmosphere-supplying respirator for which the breathing air source is designed to be carried by the user.

*Supplied-air respirator (or airline) respirator (SAR)\*:* An atmosphere-supplying respirator for which the source of breathing air is not designed to be carried by the user.

*Threshold Limit Value (TLV):* An occupational exposure level recommended by ACGIH.

*Tight-fitting facepiece\*:* A respiratory inlet covering that forms a complete seal with the face.

## II. Events Leading to the Final Standard

### A. Regulatory History of APFs

Congress established the Occupational Safety and Health Administration (OSHA) in 1970, and gave it the responsibility for promulgating standards to protect the health and safety of American workers. As directed by the OSH Act, the Agency adopted existing Federal standards and national consensus standards developed by various organizations such as the NFPA and ANSI. The ANSI standard Z88.2–1969, "Practices for Respiratory Protection," was the basis of the first six sections (permissible practice, minimal respirator program, selection of respirators, air quality, use, maintenance and care) of OSHA's Respiratory Protection Standard (29 CFR 1910.134) adopted in 1971. The seventh section was a direct, incomplete incorporation of ANSI Standard K13.1–1969, "Identification of Gas Mask Canisters."

The Agency promulgated an initial respiratory protection standard for the construction industry (29 CFR 1926.103) in April 1971. On February 9, 1979, OSHA formally applied 29 CFR 1910.134 to the construction industry (44 FR 8577). Federal agencies that

preceded OSHA developed the original maritime respiratory protection standards in the 1960s (e.g., Section 41 of the Longshore and Harbor Worker Compensation Act). The section designations adopted by OSHA for these standards, and their original promulgation dates, are: Shipyards—29 CFR 1915.82, February 20, 1960 (25 FR 1543); Marine Terminals—29 CFR 1917.82, March 27, 1964 (29 FR 4052); and Longshoring—29 CFR 1918.102, February 20, 1960 (25 FR 1565). OSHA incorporated 29 CFR 1910.134 by reference into its Marine Terminal standards (Part 1917) on July 5, 1983 (48 FR 30909). The Agency updated and strengthened its Longshoring and Marine Terminal standards in 1996 and 2000, and these standards now incorporate 29 CFR 1910.134 by reference.

Under the Respiratory Protection Standard that OSHA initially adopted, employers were required to follow the guidance of the Z88.2–1969 ANSI standard to ensure proper selection of respirators. Subsequently, OSHA published an Advance Notice of Proposed Rulemaking ("ANPR") to revise the Respiratory Protection Standard on May 14, 1982 (47 FR 20803). Part of the impetus for this notice was the Agency's inclusion of new respirator requirements in the comprehensive substance-specific standards promulgated under section (6)(b) of the OSH Act, e.g., fit testing protocols, respirator selection tables with assigned protection factors, use of PAPRs, changing filter elements whenever an employee detected an increase in breathing resistance, and referring employees with breathing difficulties, either at fit testing or during routine respirator use, to a physician trained in pulmonary medicine (see, e.g., 29 CFR 1910.1025 (OSHA's Lead Standard)). The respirator provisions in these substance-specific standards reflected advances in respirator technology and changes in related guidance documents that were state-of-the-art information at the time when OSHA published these substance-specific standards. These standards recognized that effective respirator use depends on a comprehensive respiratory protection program that includes the use of APFs.

In the 1982 ANPR, OSHA sought information on the effectiveness of its current Respiratory Protection Standard, the need to revise the standard, and recommendations regarding what revisions should be made. The 1982 ANPR referenced the ANSI Z88.2–1980 standard on respiratory protection with its table of protection factors, the 1976

report by Ed Hyatt from LASL titled "Respiratory Protection Factors" (Ex. 2), and the RDL developed jointly by OSHA and NIOSH, as revised in 1978 (Ex. 9, Docket No. H049). The 1982 ANPR asked for comments on how OSHA should use protection factors. The Agency received 81 responses to this inquiry. The commenters generally supported revising OSHA's Respiratory Protection Standard, and provided recommendations regarding approaches for including a table of protection factors (Ex. 15).

On September 17, 1985, OSHA announced the availability of a preliminary draft of the proposed Respiratory Protection Standard. This preproposal draft standard included a discussion of the public comments received in response to the 1982 ANPR, and OSHA's analysis of revisions needed in the Respiratory Protection Standard to address up-to-date respiratory protection. The Agency received 56 responses from interested parties (Ex. 36), which OSHA carefully reviewed in developing the proposed rule.

On November 15, 1994, OSHA published the proposed rule to revise 29 CFR 1910.134, and provided notice of an informal public hearing on the proposal (59 FR 58884). The Agency convened the informal public hearing on June 6, 1995. In response to the comments OSHA received on the proposal, the Agency proceeded to develop APFs. On June 15, 1995, as part of the public hearing, OSHA held a one-day panel discussion by respirator experts on APFs. The discussion included measuring respirator performance in WPF and SWPF studies, the variability of data from these studies, and setting APFs for various types of respirators that protect employees across a wide variety of workplaces and exposure conditions.

OSHA also reopened the rulemaking record for the revised Respiratory Protection Standard on November 7, 1995 (60 FR 56127), requesting comments on a study performed for OSHA by Dr. Mark Nicas titled "The Analysis of Workplace Protection Factor Data and Derivation of Assigned Protection Factors" (Ex. 1–156). This study, which the Agency placed in the rulemaking docket on September 20, 1995, addressed the use of statistical modeling for determining respirator APFs. OSHA received 12 comments on the Nicas report. This report, and the comments received in response to it, convinced OSHA that more information would be necessary before the Agency could resolve the complex issues regarding how to establish APFs,

including what methodology to use in analyzing existing protection factor studies. (See Section IV. Methodology for Developing Assigned Protection Factors in the June 6, 2003 NPRM, 68 FR 34044, for a detailed discussion of the Nicas report and the comments OSHA received.)

OSHA published the final, revised Respiratory Protection Standard, 29 CFR 1910.134, on January 8, 1998 (63 FR 1152). The standard contains worksite-specific requirements for program administration, procedures for respirator selection, employee training, fit testing, medical evaluation, respirator use, and other provisions. However, OSHA reserved the sections of the final standard related to APFs and MUCs pending further rulemaking (see 63 FR 1182 and 1203). The Agency stated that, until a future rulemaking on APFs is completed:

[Employers must] take the best available information into account in selecting respirators. As it did under the previous [Respiratory Protection] standard, OSHA itself will continue to refer to the [APFs in the 1987 NIOSH RDL] in cases where it has not made a different determination in a substance specific standard. (63 FR 1163)

The Agency subsequently established a separate docket (i.e., H049C) for the APF rulemaking. This docket includes copies of material related to APFs that previously were placed in the docket (H049) for the revised Respiratory Protection Standard. The APF rulemaking docket also contains other APF-related materials, studies, and data that OSHA obtained after it promulgated the final Respiratory Protection Standard in 1998.

On June 6, 2003, the Agency published in the **Federal Register** an NPRM titled "Assigned Protection Factors; Proposed Rule" (68 FR 34036) that contained proposed definitions for APFs and MUCs, a proposed Table 1 with APFs for the various respirator classes, and proposed revisions to the APF provisions and tables in OSHA's substance-specific standards. The NPRM announced that OSHA would be holding an informal public hearing in Washington, DC on the proposal. The public hearings were held over three days, from January 28–30, 2004. OSHA received extensive pre-hearing comments (Exs. 9–1 through 9–43 and 10–1 through 10–60), written hearing testimony (Exs. 16–1 through 16–25), post-hearing comments (Exs. 17–1 through 17–12), and post-hearing briefs (Exs. 18–1 through 18–9 and 19–1 through 19–8). Transcripts of the public hearings also were made and added to the APF Docket (Exs. 16–23–1, 16–23–2, and 16–23–3). It is from these public

comments, exhibits, hearing transcript, and post-hearing submissions that OSHA has prepared this final APF and MUC provisions and revisions to substance-specific standards.

### B. Non-Regulatory History of APFs

In 1965, the Bureau of Mines published "Respirator Approval Schedule 21B," which contained the term "protection factor" as part of its approval process for half mask respirators (for protection up to 10 times the TLV) and full facepiece respirators (for protection up to 100 times the TLV). The Bureau of Mines based these protection factors on quantitative fit tests, using DOP, that were conducted on six male test subjects performing simulated work exercises.

The Atomic Energy Commission (AEC) published proposed protection factors for respirators in 1967, but later withdrew them because quantitative fit testing studies, which the AEC used to determine APFs, were available for some, but not all, types of respirators. To address this shortcoming, the AEC sponsored respirator performance studies at LASL, starting in 1969.

ANSI standard Z88.2–1969, which OSHA adopted by reference in 1971, did not contain APFs for respirator selection. Nevertheless, this ANSI standard recommended that "due consideration be given to potential inward leakage in selecting devices," and contained a list of the various respirators grouped according to the expected quantity of leakage into the facepiece during routine use.

In 1972, NIOSH and the Bureau of Mines published new approval schedules for respiratory protection under 30 CFR 11. However, these new approval schedules did not include provisions for determining facepiece leakage as part of the respirator certification process.

NIOSH sponsored additional respirator studies at LASL, beginning in 1971, that used quantitative test systems to measure the overall performance of respirators. In a 1976 report titled "Respirator Protection Factors", Edwin C. Hyatt of LASL included a table of protection factors for: single-use dust respirators; quarter mask, half mask, and full facepiece air-purifying respirators; and SCBAs (Ex. 2). Hyatt based these protection factors on data from DOP and sodium chloride quantitative fit test studies performed at LASL on these respirators between 1970 and 1973. The table also contained recommended protection factors for respirators that had no performance test data. Hyatt based these recommended protection factors on the judgment and experience

of LASL researchers, as well as extrapolations from available facepiece leakage data for similar respirators. For example, Hyatt assumed that performance data for SCBAs operated in the pressure-demand mode could be used to represent other (non-tested) respirators that maintain positive pressure in the facepiece, hood, helmet, or suit during inhalation. In addition, Hyatt recommended in his report that NIOSH continue testing the performance of respirators that lacked adequate fit test data. To increase the database, Hyatt used a representative 35-person test panel to conduct quantitative fit tests from 1974 to 1978 on all air-purifying particulate respirators approved by the Bureau of Mines and NIOSH.

In August 1975, the Joint NIOSH–OSHA Standards Completion Program published the RDL (Ex. 25–4, Appendix F, Docket No. H049). The RDL contained a table of protection factors that were based on quantitative fit testing performed at LASL and elsewhere, as well as the expert judgment of the RDL authors. In 1978, NIOSH updated the RDL specifying the following protection factors:

5 for single-use respirators;
10 for half mask respirators with DFM or HEPA filters;
50 for full facepiece air-purifying respirators with HEPA filters or chemical cartridges;
1,000 for PAPRs with HEPA filters;
1,000 for half mask SARs operated in the pressure-demand mode;
2,000 for full facepiece SARs operated in the pressure-demand mode; and
10,000 for full facepiece SCBAs operated in the pressure-demand mode.

ANSI's Respiratory Protection Subcommittee ("Subcommittee") decided to revise Z88.2–1969 in the late 1970s. During its deliberations, the Subcommittee conducted an extensive discussion regarding the role of respirator protection factors in an effective respiratory protection program. As a result, the Subcommittee decided to add an APF table to the revised standard. In May 1980, ANSI published the revision as Z88.2–1980 which contained the first ANSI Z88.2 respirator protection factor table (Ex. 10, Docket H049). The ANSI Subcommittee based the table on Hyatt's protection factors, which it updated using results from fit testing studies performed at LANL and elsewhere since 1973. For example, the protection factor for full facepiece air-purifying particulate respirators was 100 when qualitatively fit tested, or 1,000 when equipped with

HEPA filters and quantitatively fit tested. The table consistently gave higher protection factors to tight-fitting facepiece respirators when employers performed quantitative fit testing rather than qualitative fit testing. The ANSI Subcommittee concluded that PAPRs (with any respiratory inlet covering), atmosphere-supplied respirators (in either a continuous flow or pressure-demand mode), and pressure-demand SCBAs required no fit testing because they operated in a positive-pressure mode. ANSI assigned high protection factors to these respirators, but limited their use to concentrations below the IDLH values. Pressure-demand SCBAs and combination continuous flow or pressure-demand airline respirators with escape provisions for use in IDLH atmospheres were assigned protection factors of 10,000 plus.

In response to a complaint to NIOSH that the PAPRs used in a workplace did not appear to provide the expected protection factor of 1,000, Myers and Peach of NIOSH conducted a WPF study during silica-bagging operations. Myers and Peach tested half mask and full facepiece PAPRs under these conditions, and found protection factors that ranged from 16 to 215. They published the results of their study in 1983 (Ex.1–64–46). The results of this study led NIOSH and other researchers, as well as respirator manufacturers, to perform additional WPF studies on PAPRs and other respirators.

NIOSH revised its RDL in 1987 (Ex. 1–54–437Q) to address advances in respirator technology and testing. The revision retained many of the provisions of the 1978 RDL, but also lowered the APFs for other respirators based on NIOSH's WPF studies. For example, the APFs were lowered for the following respirator classes: PAPRs with a loose-fitting hood or helmet (reduced to 25); PAPRs with a tight-fitting facepiece and a HEPA filter (lowered to 50); supplied-air continuous flow hoods or helmets (decreased to 25); and supplied-air continuous flow tight-fitting facepiece respirators (reduced to 50).

In August 1992, ANSI again revised its Z88.2 Respiratory Protection Standard (Ex. 1–50). The ANSI Z88.2–1992 standard contained a revised APF table, based on the Z88.2 Subcommittee's review of available protection factor studies. In a report describing the revised standard (Ex. 1–64–423), Nelson, Wilmes, and daRoza described the rationale used by the ANSI Subcommittee in setting APFs:

If WPF studies were available, they formed the basis for the [APF] number assigned. If no such studies were available, then laboratory studies, design analogies, and

other information [were] used to decide what value to place in the table. In all cases where the assigned protection factor changed when compared to the 1980 standard, the assigned number is lower in the 1992 standard.

In addition, the 1992 ANSI Z.88.2 standard abandoned ANSI's 1980 practice of giving increased protection factors to some respirators when quantitative fit testing was performed.

Thomas Nelson, the co-chair of the ANSI Z88.2–1992 Subcommittee, published a second report entitled "The Assigned Protection Factor According to ANSI" (Ex. 135) four years after the Z88.2 Subcommittee completed the revised 1992 standard. In the report, Nelson reviewed the reasoning used by the ANSI Subcommittee in setting the 1992 ANSI APFs. Nelson noted that the Z88.2 Subcommittee gave an APF of 10 to all half mask air-purifying respirators, including quarter-mask, elastomeric, and disposable respirators. The Subcommittee also recommended that full facepiece air-purifying respirators retain an APF of 100 (from the 1980 ANSI standard) because no new data were available to justify another value. Nelson noted that the Z88.2 Subcommittee approved the RDL's reduction to an APF of 25 for loose-fitting facepieces and PAPRs with helmets or hoods based on their performance in WPF studies. For half mask PAPRs, the ANSI Subcommittee set an APF of 50 based on a WPF study by Lenhart (Ex. 1–64–42). The ANSI Subcommittee had no WPF data available for full facepiece PAPRs, so Nelson indicated that the Subcommittee selected an APF of 1,000 to be consistent with the APF for PAPRs with helmets or hoods. The Subcommittee, in turn, based its APF of 1,000 for PAPRs with helmets or hoods on design similarities (i.e., same facepiece designs, operation at the same airflow rates) between these respirators and airline respirators. Nelson noted that the results from a subsequent WPF report by Keys (Ex. 1–64–40) on PAPRs with helmets or hoods were consistent with an APF of 1,000. According to Nelson, the Subcommittee used WPF studies by Myers (Exs. 1–64–47 and 1–64–48), Gosselink (Ex. 1–64–23), and Que Hee and Lawrence (Ex. 1–64–60) to set an APF of 25 for PAPRs with loose-fitting facepieces. Nelson stated that two WPF studies, conducted by Gaboury and Burd (Ex. 1–64–24) and Stokes (Ex. 1–64–66) supported no publication of ANSI Z88.2–1992, supported the APF of 25 selected by the Subcommittee for PAPRs with loose-fitting facepieces.

Nelson also stated in his report that the ANSI Subcommittee had no new information on atmosphere-supplying

respirators. Therefore, the APFs for these respirators were based on analogies with other similarly designed respirators (Ex. 135). The ANSI Subcommittee based the APF of 50 for half mask continuous flow atmosphere-supplying respirators, and the APF of 25 for loose-fitting continuous flow atmosphere-supplying respirators, on the similarities between these respirators and PAPRs with the same airflow rates. Nelson noted that the ANSI Subcommittee set the APF of 1,000 for full facepiece continuous flow atmosphere-supplying respirators consistent with the APF for SARs with helmets or hoods using the results of two earlier studies: a WPF study by Johnson (Ex. 1–64–36) and a SWPF study by Skaggs (Ex. 1–38–3). The Subcommittee used the design analogy between PAPRs and continuous flow supplied-air respirators to select the APF of 50 for half mask pressure-demand SARs and an APF of 1,000 for full facepiece pressure-demand SARs. Nelson stated, "The committee believed that setting a higher APF because of the pressure-demand feature was not warranted, but rather that the total airflow was critical" (Ex. 135).

Nelson noted in the report that the Subcommittee selected no APF for SCBAs. In explaining the committee's decision, he stated that "the performance of this type of respirator may not be as good as previously measured in quantitative fit test chambers." Nelson also observed that the ANSI Z88.2–1992 standard justified this approach in a footnote to the APF table. The footnote states:

A limited number of recent simulated workplace studies concluded that all users may not achieve protection factors of 10,000. Based on [these] limited data, a definitive assigned protection factor could not be listed for positive pressure SCBAs. For emergency planning purposes where hazardous concentrations can be estimated, an assigned protection factor of no higher than 10,000 should be used.

A new ANSI Z88.2 Subcommittee recently finished revising the ANSI Z88.2–1992 standard, in accordance with the ANSI policy specifying that each standard receive a periodic review. This revised ANSI Z88.2 standard is currently under appeal to the ANSI Board.

## C. Need for APFs

When OSHA published the final Respiratory Protection Standard in January 1998, it noted that the revised standard was to "serve as a 'building block' standard with respect to future standards that may contain respiratory protection requirements" (63 FR 1265).

OSHA's final Respiratory Protection Standard established the minimum elements of a comprehensive program that are necessary to ensure effective performance of a respirator. The only parts missing from this building block standard are the APF and MUC provisions that are being finalized in this rulemaking. In the standard the Agency recommended that employers in the interim "take the best information into account in selecting respirators. As it did under the previous standard, OSHA itself will continue to refer to the NIOSH APFs in cases where it has not made specific compliance interpretations" (63 FR 1203).

In October 2004, NIOSH published its Respirator Selection Logic (RSL), an update of the 1987 RDL. The APF tables in the new RSL have not changed from those in the 1987 RDL. However, NIOSH stated in the forward to the 2004 RSL: "[w]hen the OSHA standard on APFs is finalized NIOSH intends to consider revisions to this RSL." (Ex. 20–4.)

The ANSI Z88.2–1992 APF table also has been a source for interim APFs while OSHA completed its APF rulemaking. However, the ANSI Z88.2–1992 respiratory protection standard was withdrawn by ANSI in 2003. While a revised ANSI Z88.2 standard has been written, the final ANSI standard has yet to be published since it is currently under appeal. Therefore, no ANSI respiratory protection standard with recommended APFs is available at this time. The draft APF table from the ANSI Z88.2 revision was submitted to the OSHA rulemaking docket (Ex.13–7–2), and was the subject of discussion during the public hearings on APFs. OSHA considered the draft ANSI table during its deliberations in this rulemaking.

Throughout the Respiratory Protection Standard rulemaking, OSHA has emphasized that the APF and MUC definitions and the APF table are an integral part of the overall standard. A careful review of the submitted comments and information supports the Agency's conclusion that this final standard is necessary to guide employers in selecting the appropriate class of respirator needed to reduce hazardous exposures to acceptable levels. The final APF for a class of respirators specifies the workplace level of protection that a class of respirator should provide under an effective respiratory protection program. In addition, the APFs can be utilized by employers to determine a respirator's MUC for a particular chemical exposure situation.

The final APFs must be used in conjunction with the existing provisions of the Respiratory Protection Standard.

Integration of the final APF and MUC provisions into the reserved provisions of paragraph (d) completes that standard. With the addition of these provisions, appropriate implementation of the Respiratory Protection Standard by employers in their workplaces should afford each affected employee the maximum level of respiratory protection.

## III. Methodology for Developing APFs for Respirators

### A. Introduction

In the proposed rule for Assigned Protection Factors (APFs), OSHA raised a number of issues or questions about its proposed methodology for deriving APFs (68 FR 34112–34113). OSHA asked for information on: (1) The evidence-based method used by OSHA in developing the proposed APFs; (2) any additional studies that may be useful in determining APFs that were not already identified by OSHA in the proposal; and, (3) statistical analyses, treatments, or approaches, other than those described in the proposal, available for differentiating between, or comparing, the respirator performance data. The vast majority of the comments in response to the NPRM addressed the use of WPF studies for establishing the APF for filtering facepiece half mask respirators. OSHA also received comments on the methodology and data it used for determining the filtering facepiece APF, and was provided with new studies on these respirators for consideration. OSHA's quantitative analyses for establishing the APFs for other classes of higher performing respirators drew little comment, and no new studies on these respirators were submitted. This section, therefore, focuses on methodology and new information relative to the APF for half mask air-purifying respirators.

More specifically, Part C of this section contains a discussion of the comments about OSHA's proposed methodology for determining APFs for filtering facepiece half mask respirators, including comments on data analysis and study selection. In addition, OSHA is providing an overview of Dr. Kenny Crump's statistical analyses (Ex. 20–1) of the updated half mask database (Ex. 20–2). Comments about alternative approaches are discussed in Part D ("Methodology, Data, and Studies on Filtering Facepieces and Elastomerics"). The Agency's overall conclusions on methodology, and summaries of new studies submitted during the public comment process, are presented under Part E. Discussion of the comments and opinions regarding the APF for half

mask respirators and the establishment of the APFs for higher performing respirators is included in Section VI, Summary and Explanation of the Final Standard.

### B. Background

The Occupational Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C. 651–678, enacted to ensure safe and healthy working conditions for employees, empowers OSHA to promulgate standards and provides overall guidance on how these standards are to be developed. It states:

(5) The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, *shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence,* that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life. *Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate.* In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be *the latest available scientific data in the field,* the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired. 29 U.S.C. 655(b)(5) [emphasis added].

A reviewing court will uphold standards set under this section when they are supported by substantial evidence in the record considered as a whole (29 U.S.C. 655(f)). In searching for the "best available evidence" upon which to base its rulemaking, OSHA is required to "identify the relevant factual evidence, * * * to state candidly any assumptions on which it relies, and to present its reasons for rejecting any significant contrary evidence or argument." *Public Citizen Health Research Group* v. *Tyson,* 796 F.2d 1479, 1495 (D.C. Cir. 1986).

OSHA has retained the multifaceted approach it used in the proposal to determine the APFs for classes of respirators. That is, the Agency reviewed all of the available literature, including the various analyses by respirator authorities, as well as quantitative analyses of data from WPF and SWPF studies. During revision of the overall Respiratory Protection Standard, the Agency used a similar approach when reviewing protection factor studies related to the effectiveness and necessity of a comprehensive respiratory protection program.

The Agency did not use Effective Protection Factor (EPF) and Program Protection Factor (PPF) studies in its APF analyses since these measure deficiencies in respirator program practices. More specifically, EPFs are not directly comparable to WPF values because the determinations include the time spent in contaminated atmospheres both with and without respiratory protection. PPFs are affected by any deficient elements of a respirator program, including inadequate respirator selection and maintenance, poor user training and motivation, work activities, and inadequate program administration. Therefore, OSHA relied on WPF and SWPF studies, since they focus on the performance characteristics of the respirator only.

During the APF rulemaking, OSHA reviewed the extensive literature on APFs and developed selection criteria for including studies and data in its quantitative analysis of respirator performance. This procedure ensured that only carefully designed and executed WPF and SWPF studies were included in the analysis. The Agency then used these studies to compile the NPRM's original database. The database was comprised of 917 data points from 16 WPF studies for half mask respirators (Matrix 1) and 443 data points from 13 studies for PAPRs and SARs (Matrix 2), conducted in a variety of American workplaces. OSHA made the studies, its selection criteria, the data, and its analyses available to the public electronically and through the rulemaking docket. In addition, the Agency encouraged the public to access this information and to reanalyze the data using methods of their choice. The Agency also sought submissions from the public of any additional studies for inclusion in its database. Four additional WPF studies of half masks were submitted during the public comment period following publication of the NPRM. Dr. Kenny Crump updated the Matrix 1 half mask database with these additional studies (Ex. 20–2) and reanalyzed the resulting 1,339 data points for half mask respirators (Ex. 20–1).

Dr. Crump also performed a second quantitative analysis in which the 1,339 accepted data points (original NPRM database updated with data from the four new studies) for half mask respirators were combined with 403 data points from 12 studies that the Agency originally excluded from the analysis. This second analysis corroborated the original findings to the extent practicable. The results of both of these analyses provide compelling support of OSHA's conclusions

regarding the appropriate APF for half mask respirators. The Agency believes that the database it constructed represents the best available data on APFs, and that its conclusions are based on substantial evidence. *See Texas Independent Ginners' Association v. Marshall,* 630 F.2d 398, 413 n. 48 (5th Cir. 1980), citing *Industrial Union Dept., AFL–CIO–CIC v. American petroleum Institute,* 448 U.S. 607, 661 (1980).

In past rulemakings, OSHA's conclusions as to the best available evidence have been upheld as based on substantial evidence when it has relied on a body of reputable scientific evidence. *See ASARCO v. Occupational Safety and Health Administration,* 746 F.2d 483, 494 (9th Cir. 1984). OSHA need not accept all data presented to it as long it considers the data and rejects it on reasonable grounds. *See id.* Furthermore, each study relied upon by the Agency need not be a model of textbook scientific inquiry, and OSHA need not find one definitive study supporting its decision. *Public Citizen Health Research Group,* 796 F.2d at 1489, 1495. Rather, the Agency is justified in adopting a conclusion when the cumulative evidence is compelling. *Id.* at 1489, 1491, 1495. OSHA's conclusions are strongest when it has relied on multiple data sources that support each other, as it has in this rulemaking.

*C. Methodology, Data, and Studies on Filtering Facepieces and Elastomerics*

1. Comments on the Methodology

OSHA developed the proposed APFs through a multi-faceted approach. As it stated in the preamble to the proposal, "The Agency reviewed the various analyses of respirator authorities, available WPF and SWPF studies, and other APF literature." It later concluded that "the APFs proposed by OSHA in this rulemaking represent the Agency's evaluation of all available data and research literature i.e., a composite evaluation of all relevant quantitative and qualitative information" (68 FR 34050). OSHA then asked the public if this method was appropriate to determine APFs. The methodology was supported by a number of commenters, including NIOSH (Ex. 9–13), the Department of the Army (Ex. 9–42), ALCOA (Ex. 10–31), and others (e.g., Exs. 9–1, 9–4, 9–14, 9–16, 9–22, 10–2, 10–17, 10–18, and 10–59). NIOSH stated:

NIOSH agrees that the APF values resulting from this multi-faceted approach are reasonable indications of the level of protection that should be expected for each class of respirators. * * *

The available data are not ideal because there can be considerable model-to-model variation and only a few models in each class have been evaluated. Given that lack of complete data, the approach taken by OSHA is the most appropriate currently possible. (Ex. 9–13.)

The United States Army Center for Health Promotion and Preventive Medicine commented:

The method of APF development used by OSHA is appropriate. OSHA reviewed available data, both published and unpublished; utilized technical reviews and summaries from subject matter experts outside-OSHA; weighed study findings and conclusions based on study shortfalls, as then state-of-the-art technical bias and procedural omissions; and used a conservative approach to maintain confidence that minimal risk of respirator selection and use errors will exist in worker protection from proposed APF use. (Ex. 9–42–1.)

Nevertheless, some commenters did not agree with OSHA's approach. These participants included several labor organizations (Exs. 9–27, 9–29, 9–34, 9–40, and 10–37), trade associations (Exs. 9–24 and 10–27), and individuals (e.g., Exs. 9–17, 9–25, 9–33, 9–41, 10–33, and 10–42). Criticisms of OSHA's approach focused on the Agency's selection of WPF studies for its determination of the proposed APFs. Reasons given to support these criticisms included: The differences between the studies do not permit comparison of the studies; the study conditions are not representative of typical workplaces; the study data are too old; the data do not cover all configurations of filtering facepieces available; and, the analytical method employed by some studies was too sensitive.

A few commenters (Exs. 10–34 and 10–47) recommended that certain criteria should be met before a WPF study is deemed acceptable for analysis. These criteria include: Exposures to small particle sizes; work time of at least four hours; moderate to heavy work rate; and, high temperature and humidity. Still others believed that OSHA should develop and perform SWPFs on a representative subset of all filtering facepieces or all configurations of filtering facepiece respirators and all respirator models, and establish APFs for all classes of respirators based on the SWPF study results (Exs. 9–41 and 10–27). A more detailed discussion of data issues is presented below.

2. Comments on Data and Study Problems

*Selection bias in WPF studies.* Several commenters stated that the authors of WPF studies "cherry-picked" either the workplaces in which the studies were

HeinOnline -- 71 Fed. Reg. 50128 2006

conducted or the individual tasks that were performed by workers chosen for monitoring (Pascarella, Tr. at 464; Faulkner, Tr. at 549 and 564–565). "Cherry-picking" is a common term for "selection bias." Selection bias is a matter of concern when either workplace study participants or job tasks are selected for inclusion in the study in a manner that skews the results of the study away from the true value.

Selection bias is a matter of concern for all scientific studies, not just WPF studies, and peer reviewers typically evaluate its effects before a study is accepted for publication in a peer-reviewed journal. Most of the studies included in OSHA's analysis of WPF studies were either published in peer-reviewed journals or were presented at the AIHCE, and met the criteria for respirator research studies accepted by the industrial hygiene community. The half mask database consists of 16 studies performed in a variety of workplaces over a range of years (from 1976 to 2004) by many different researchers. Therefore, it is highly improbable that these studies were subject to selection bias. OSHA could find no instance of selection bias either in its review of the scientific studies or its analysis of the data. Finally, OSHA repeatedly asked commenters who raised concerns about "cherry-picking" for specific studies in which selection bias occurred. In no case did the commenters provide any details to support their allegations.

*Observer effect in WPF studies.* Several commenters (Shine, Tr. at 644 and Macaluso, Tr. at 652) stated that data from the WPF studies considered by OSHA were the result of a condition known as the "observer effect." The observer effect occurs when the act of observing or monitoring test subjects causes their responses to differ from their usual (nonobserved) responses. In some of the WPF studies used by OSHA, the researchers stated that during the study, they were present to monitor the test equipment to ensure that the sampling equipment functioned properly, thereby increasing the usefulness of the results. In other WPF studies, the researchers did not indicate their presence during the study.

The mere presence of an observer does not, in and of itself, presume that there will be an observer effect. For example, if the observer is a researcher who is monitoring the test equipment instead of a supervisor who is monitoring the workers' practices, the workers are unlikely to change their practices.

Although the Agency repeatedly asked the commenters who raised this concern to identify specific studies in which the observer effect may have been involved, they could not do so (i.e., in no case did the commenters provide any example to support their allegations). In its own analysis of the WPF studies, the Agency was also unable to find any evidence of an observer bias.

*Representativeness of the data.* A number of commenters expressed concern that the study data analyzed by OSHA were not representative of conditions found in the construction industry (Ex. 9–29, Building Construction Trades Department), or of workplace conditions in general (e.g., Exs. 9–34, International Union Operating Engineers; 9–35, Melissa Rich; 9–40, United Steel Workers of America; and 10–60, Paul Hewett). The bulk of these concerns are represented in the comments of Melissa Rich, a Department of Energy respirator program manager, who stated:

The selection of the test sites for the cited APF proposed rulemaking WPF studies are not representative of the worksite for American workers. Many test sites chosen for these studies were selected on availability only. Moreover, key study attributes such as hot humid conditions, long work hours, and heavy workload were the exception, not the norm for most of the cited studies. Most test sites had ambient concentrations less than the OSHA half mask respirator maximum use limit (i.e., ten times the PEL).

\* \* \* \* \*

The various particle sizes, a critical issue in a WPF, cited in many of the APF proposed rule Workplace Protection Factor studies are so large that they do not penetrate the facESEAl. Many respiratory protection studies have indicated that particles larger than two microns are less likely to penetrate the most important attribute of a respirator, the facESEAl. Most of the APF proposed rule Workplace Protection Factor studies have a particle size greater than two-microns. (Ex. 9–35.)

The studies analyzed by OSHA consisted of a varied cross-section of workplaces and conditions. For example, workplaces included ship breaking, asbestos removal, aluminum and lead smelters, brass foundries, and aircraft painting and manufacturing. Two of the four new studies analyzed by OSHA involved concrete-block manufacturing. The authors of an aluminum smelter study (Ex. 1–64–24) noted that employees were required to rest in a cool area for 50% of each hour due to high heat, and a steel mill study (Ex. 1–64–50) and a primary lead smelter study (Ex. 1–64–42) both were conducted in the sinter plant and blast furnace areas. The asbestos study (Ex. 1–64–54) was conducted under high humidity conditions. Tasks performed by test subjects included welding and

grinding, torch cutting, pouring molten metal, handling concrete blocks, and spray painting. Work rates for these studies, when provided, ranged from low to heavy.

The purpose of a WPF study is to evaluate a respirator's effectiveness under actual workplace use conditions. Consequently, the contaminant concentrations and particle sizes contained in the analyzed studies were generated while the workers performed their normal job duties. With regard to concerns about particle size, Myers et al. (Ex.1–64–51) found particles larger than 10 microns inside the respirator facepiece. The Agency believes that accepting only WPF studies that are conducted at exposure levels close to 10 times the PEL, with particulates of two microns in size or less, would not be representative of the conditions found in the workplace. Studies based on such selective criteria would be more akin to a SWPF, rather than a WPF, study. OSHA has concluded that the data used in its analyses are applicable to other American work settings because a range of work rates and environmental conditions were represented, and many of the tasks performed by the test subjects are performed in a variety of workplaces, including construction. Accordingly, the Agency is not persuaded by comments suggesting that the studies were so narrowly focused that the data cannot be applied to other work settings.

*Sensitive analytical method.* Several commenters questioned the use of sensitive analytical methods for the analyses of workplace exposures, sometimes accompanied by a recommendation to test respirators under controlled laboratory settings, and at sufficiently high concentrations to obtain inside-the-facepiece measurements ($C_i$) that can be assessed by less sensitive methods (e.g., Exs. 9–32, 9–35; 10–6, 10–37, and 10–49). The commenters believed that sensitive analytical methods (particularly PIXEA, proton-induced x-ray emission analysis) permit the determination of low Ci concentrations, resulting in high protection factors.

In response to these comments, OSHA reviewed the seven half mask studies that used the PIXEA analytical method (Exs. 1–64–19, 1–64–51, 1–64–52, 1–64–15, 1–64–16, and 1–64–34) and found that six of the studies used the method to measure both the Ci and Co concentrations. The seventh study (Ex. 3–12) used PIXEA to measure the Ci concentration but used atomic absorption (AA) to assess Co concentrations because the respirator filters were overloaded. However, the

HeinOnline -- 71 Fed. Reg. 50129 2006

Agency does not believe that this study provided inaccurate results. Under conditions of high Co concentrations, the AA method must be used because the PIXEA method would exceed its maximum measurement limits. Therefore, the PIXEA method would be unable to provide accurate Co data. Based on its review of these seven studies, the Agency found that the sensitive analytical method (i.e., PIXEA) allowed the investigators to quantify small amounts of contaminant that penetrate a respirator. This method permitted accurate assessment of Ci concentrations under conditions of low ambient concentrations, thereby permitting the use of actual Ci values in determining WPFs. Less sensitive methods would result in penetration values that are nondetectable or less than the limit of detection (LOD) for the analytic method, thereby requiring the study to discard these data or to correct for nondetected values using unvalidated statistical techniques. On the other hand, the sensitive analytical method was able to quantify low Ci concentrations, thereby enhancing the validity of the subsequent analysis by retaining the actual data and avoiding unvalidated statistical corrections.

Craig Colton of 3M provided the following testimony in support of OSHA's conclusions:

Some commenters also asserted that the use of analytical methods with low detection limits are a reason to invalidate some of the WPF studies. The claim is erroneously made that the analytical sensitivity affects the results from WPF studies. However, the actual amount of contaminant on the Ci sample is not changed by the analytical method.

* * * Because the [Ci levels are] typically very small in a WPF study, the higher sensitivity of [the PIXEA method] is necessary to get the best data.

* * * The WPF protocol from the AIHA Respirator Committee recommended the use of analytical methods with sensitive detection limits. * * * Use of less sensitive analytical methods for * * * [Ci] sample[s] that result in nondetect values are not meaningful for determining true exposure. (Tr. at 413–414.)

In its post-hearing comments, 3M illustrated the value of sensitive analytical methods using the following example:

[C]onsider three filters "spiked with 1 μg of silicon each and analyzed by three different methods [gravimetric, atomic absorption (AA), and PIXEA]. In the case of gravimetric and AA analyses, it is certain only that the silicon mass on the filter is between 0 μg and 10 [μg] or 0 μg and 5 μg respectively. However, PIXE[A] has sufficient analytical sensitivity to "find" the true value of 1 μg. Because the mass of contaminants on a Ci filter is typically very small in a WPF

study, the higher sensitivity of PIXE[A] is necessary to get the best data. (Ex. 19–3–1.) .

Tom Nelson commented that "[t]he analytical method must be sensitive for a WPF study. For a half facepiece respirator[,] the detection limit should be at least ¹⁄₁₀₀ of the ambient concentration" (Ex. 18–9). Later in these comments, Nelson stated, "The [low-concentration Ci] samples are part of the distribution of WPF samples collected during a study. These represent true measures of performance."

Based on the evidence in the record, OSHA concludes that using sensitive analytic methods for assessing Ci samples is both necessary and appropriate. Specifically, the Agency sees no scientific basis for excluding WPF studies that used PIXEA, particularly when using the method to determine both Ci and Co. The Agency's review of the record evidence shows that a leading national organization representing industrial hygienists (i.e., the AIHA) recommends using sensitive analytic methods for assessing Ci samples. Furthermore, using sensitive analytic methods improves significantly the validity of data analyses by allowing studies to retain low Ci values, and by reducing substantially the need to use unvalidated techniques to correct low Ci values. Therefore, OSHA concludes that the data from the WPF studies used in its analyses are accurate, and that the availability of data with low Ci values improved the validity of the APFs derived from these analyses.

*Large particles.* Several commenters (e.g., Exs. 9–33, 9–35, 10–6, 10–37, and 10–41) postulated that larger particles (greater than one or two microns) do not penetrate a respirator's faceseal. They believed that WPF studies having large particles in the Co concentration should be excluded from OSHA's analyses. They reasoned that these large particles were being measured as part of the Co but had no chance of being measured in the Ci, and consequently were inflating the WPF values.

These commenters appear to be ignoring the possibility that half masks (both elastomerics and filtering facepieces) with faceseals that selectively filter large particles still are capable of providing an adequate level of protection. Nevertheless, OSHA notes that in one of the WPF studies used in OSHA's data analyses, Myers et al. found large particles (i.e., 10 microns in diameter) inside the facepiece, indicating that large particles are capable of penetrating a respirator faceseal (Ex. 1–64–51). Consistent with these results, Tom Nelson stated in his comments that "[t]he particle size of

contaminants in the various WPF studies in the docket range from [about] 0.5 [microns] to 14 [microns] MMAD," and that "particles much larger than those that would be predicted from laboratory studies have been found inside the facepiece in WPF studies" (Ex. 18–9). At the hearing, Nelson presented data showing that large particles enter half mask respirators, probably through breaks in the faceseal; moreover, these data demonstrate that no relationship exists between particle size and the WPF obtained for the respirator (Tr. at 146–148). The 3M Company addressed this point further, stating in its comments:

Laboratory studies have shown that particle losses occur through fixed leaks. A faceseal leak is not accurately represented by a fixed leak, however. To perform these studies[,] assumptions were made regarding leak size, shape, and the particle size penetrating those leaks. These assumptions have been shown to be wrong. Myers has shown that large particles can be found inside the facepiece[,] much larger than could have occurred with the fixed leaks used by several researchers.[] As shown in Figure 1 [of the Myers et al. study], an analysis of particle size and the geometric mean WPF from a number of studies does not show any relationship between particle size and WPF. If the size of the particle played a role in faceseal leaks, a relationship would be evident. (Ex. 9–16.)

Based on the evidence in the record, OSHA concludes that the data in its APF analyses for half masks were the same as particle sizes found in the workplaces represented in the WPF studies. Therefore, eliminating the study data from the Agency's analyses would be unnecessary and inappropriate.

*Probe bias.* Probe bias refers to the misplacement of the sampling probe when taking measurements inside the respirator facepiece. Some commenters expressed concern that probe bias may have underestimated Ci in the half mask WPF studies analyzed by Dr. Brown (e.g., Exs. 9–17, 9–30, 9–35, and 10–42). These commenters suggested that OSHA reanalyze its database after applying a correction factor to account for probe bias. Tim Roberts provided a specific description of this concern when he testified:

Respirator probe error is an issue. It's been better characterized for elastomeric type respirators than it has for filtering facepiece respirators, and we think that this needs some additional work as well, to characterize what that means when we put probes in different locations in elastomeric facepieces (Tr. at 208).

Later in the hearings, Ching-tsen Bien questioned Craig Colton of 3M on Colton's experiences with probe location while conducting filtering

facepiece WPF studies. Colton responded:

· [S]treamlining that you see is similar to that in the elastomeric half-facepieces. You see it streamlining from the leak up to the mouth and nose. And so what Dr. Myers indicated in his sampling bias—not really probe bias, but the sampling bias—was that location becomes important because if your probe is flushed with the facepiece, you can miss the streamlines. So his recommendation was that the probe needs to be ideally on the midline, between the mouth and the nose, and as close to the face as possible. And so that's what we attempt to do as best as you can with the products you end up testing to meet his recommendations. (Tr. at 455–456.)

Colton also noted that, although some of his studies may show probes entering the side of the filtering facepiece, a probe extension was used to place the sampling inlet in the nose-mouth area (Tr. at 455–456). Tom Nelson explained the purpose of the probe location when he commented, "The sampling probe is placed so that it is close to the nose and mouth. This minimizes sampling bias" (Ex. 18–9). Warren Myers testified that, in unusual circumstances, the configuration of a half mask (including some elastomerics) requires placing the sampling probe on the side of the mask instead of the centerline between the nose and the mouth; in these cases, a study can control for sampling bias by randomly alternating the location of the probe on the right and left side of the mask (Tr. at 77).

OSHA also reviewed the 13 half mask studies analyzed by Dr. Brown. The authors of nine of these studies specifically state that the probe was located in the area of the nose and mouth. While the remaining four studies do not specify the probe's location, no evidence from this rulemaking indicates that the sampling probes were inappropriately placed. Therefore, the majority of the WPF studies, along with the new studies included in the updated database, located the sampling probe in the nose-mouth area. Of the 1,339 data points in the updated database, approximately 220 of these points (about 16%) are from the four studies in which no information on probe placement are available. OSHA believes the sampling methodology that was used in these studies was consistent with comments indicating that the optimum location for a probe is at the centerline between the nose and the mouth. At this location, the probe will sample any streamlining that occurs between a faceseal leak and the nose-mouth area, thereby detecting the maximum Ci exposure level. In addition, no analysis was submitted indicating that the data from these

studies, whether corrected for probe bias or excluded altogether, would have resulted in APFs that differed from the final APFs derived from this rulemaking.

3. Summary and Conclusion

OSHA considered the comments addressing the data and study problems identified by commenters, but does not find that these comments merit rejection of the data or analyses. The studies OSHA analyzed were conducted on employees in actual workplaces who were performing their normal job duties. Consequently, the particle sizes, work rates, work times, and environmental conditions varied among these studies. The Agency has concluded that using data collected under these various conditions presents a more accurate picture of workplace use of these respirators and is a better measure of the protection provided by half mask respirators than data collected only from SWPF or other highly controlled studies.

D. Alternative Approaches

1. Alternatives Based on Non-Compliant Respirator Programs

Several commenters suggested alternative means for ascertaining APFs. While not completely disagreeing with OSHA's approach, Paul Hewett of Exposure Assessment Solutions Incorporated (Ex. 10–60) stated that OSHA should include EPF studies in its APF deliberations. He commented that EPF studies account for actual use conditions in that they factor in the time that the employee does not wear the respirator but is still exposed to atmospheric contaminants. He also believed that determination of an appropriate APF should represent respirator use in hot, strenuous jobs. Therefore, he recommended that "OSHA should factor in real world conditions and not rely exclusively on WPF and particularly SWPF studies" (Ex. 10–60.)

OSHA noted in the proposal that the Agency would analyze only WPF and SWPF studies since they address respirator performance exclusively (68 FR 34045). This alternative approach already has been addressed above by the Agency in its discussion of the usefulness of WPF data. The Agency has no data in the record showing that EPF studies would improve, or even complement, its analyses. Therefore, OSHA is not convinced that EPF data would increase the validity of the APFs derived in this final rule. The discussion of an EPF study by Harris et

al. (Ex. 27–11; 63 FR 1167) substantiates these conclusions.

Ching-tsen Bien of LAO Consulting, Inc. (Ex. 18–5) wanted OSHA to enter into the record any available independent assessment reports (and applicable check lists) for the year prior to, and for the year of, each WPF study. Bien noted that the reports would have covered applicable program elements, and ensure that OSHA selected studies for its analyses that were in compliance with appropriate respiratory protection standards. He also requested that OSHA enter the "selection criteria, decision matrix for each study, and the review report for these studies to the H–049C Docket" (Ex. 18–5.)

As stated in the NPRM at 68 FR 34046, the Agency evaluated all studies used in its analyses for compliance with the requirements of OSHA's Respiratory Protection Standard (29 CFR 1910.134), as well as for completeness of the data. The Agency also compiled a list of criteria (Ex. 5–5) for evaluating each study. Accordingly, OSHA evaluated each published article or each written study report to determine whether the test subjects were trained properly, fit tested, medically evaluated, and in compliance with the requirements of the OSHA Respiratory Protection Standard. The researchers performing these WPF studies ensured that fit testing was performed on the test subjects, trained them on doffing and donning the respirator, as well as the performance of user seal checks, on the selection of proper-sized respirators, and on the other elements of a complete OSHA-compliant respirator program. These researchers did not rely on the existing workplace respirator program, but instead performed the necessary actions to ensure that the test subjects in their WPF studies met the respirator program requirements.

The WPF studies the Agency evaluated were either WPF studies that had been published previously, or were newly performed studies that were submitted during the rulemaking for inclusion in the OSHA database. OSHA did not perform these studies, and was not involved in the selection of the worksites being tested. Therefore, the Agency could not gather additional information on a worksite's respirator program that was in effect when a WPF study was performed, as Bien requested. Additionally, such information is irrelevant to the results of a WPF study since the researchers had to demonstrate compliance with the required respirator program before OSHA included the study in its database.

HeinOnline -- 71 Fed. Reg. 50131 2006

## 2. Alternatives Based on SWPF Studies

The American Chemistry Council (Ex. 10–25) stated that OSHA's APFs should be based on SWPF studies, and that the APFs derived from this rulemaking should be used only as interim values until SWPF studies could be performed. OSHA notes that basing APFs on SWPF studies, rather than on WPF studies, was recommended by a number of commenters including Organizational Resource Counselors Worldwide (ORC) (Ex. 10–27), Paper, Allied-Industrial, Chemical & Energy Workers International Union (PACE) (Ex. 10–37), and others (e.g., Exs. 9–32, 9–41, 10–6, 10–49, 9–33, 9–35, and 18–5). These commenters expressed various concerns about the WPF studies, and stated that SWPF studies permit investigators to control a number of variables (e.g., particle size, contaminant concentration, environmental conditions) that cannot be controlled in WPF studies.

SWPF studies use sensitive analytical methods, such as PIXEA, to obtain measurable Ci information. SWPF studies safely test a respirator in a high-concentration atmosphere (i.e., at the respirator's limit of protection) to generate enough penetration for the analytical method to quantify Ci results. OSHA agrees that SWPF testing permits an investigator to control factors such as particle size, contaminant concentration, temperature, and humidity. Accordingly, the Agency used data generated from all available SWPF studies in determining APFs. However, OSHA concluded that controlled SWPF studies alone are not representative of, nor can they be extrapolated readily to, typical workplaces. Standardized protocols for conducting such testing, or a methodology for extrapolating SWPF results to protection levels expected in the workplace, are not available. ORC stated, "We advocate development of a protocol based on a combination of laboratory testing and field trials for determining expected respirator performance" (Ex. 10–27). NIOSH also supported the use of both SWPF and WPF studies, noting, "NIOSH agrees that the APF values resulting from OSHA's multifaceted approach to analysis of existing data provide reasonable values for the level of protection that should be expected for each class of respirators" (Tr. at 102). NIOSH continued, "Given this lack of complete data, the noted model-to-model variation and the imperfection in protection level measurements, the approach taken by OSHA is the best currently possible based upon available data" (Tr. at 103). The Agency has

concluded that its approach in using both WPF and SWPF studies is well supported by the rulemaking record and is appropriate for determining APFs specified in this final rule.

## 3. Model-Specific APFs

The Organization Resources Counselors Worldwide (Ex. 10–27), the American Chemistry Council (Ex. 10–25), and the Pharmaceutical Research and Manufacturers of America (Ex. 9–24) urged OSHA to develop model-specific APFs. Under this recommendation, each respirator model would undergo testing and be assigned a unique APF. NIOSH did not support this approach. In response to questioning by OSHA, NIOSH stated:

This morning's expert witnesses and the questions I think clearly identified that there is variability, and because of this variability, we believe that class APFs are more appropriate and consistent with the state of the art today. In order to achieve more precise data, much, much larger data sets, including the numbers of test subjects that would have to be involved to eliminate this variability, seems impractical based upon the state of the art today. So we are for these reasons supporting class APFs, not model-specific APFs. (Tr. at 120.)

OSHA considered the use of SWPF studies in developing model-specific APFs. The Agency's review of the ORC SWPF study of PAPRs and SARs in the proposal (68 FR 34069) stated that ORC had recommended that "the [ORC SWPF] study methodology should be the basis for determining APFs for all respiratory protective equipment regulated by OSHA" (68 FR 34070). However, only a few SWPF studies are available that measured the performance of a few PAPRs and SARs. Model-specific SWPF studies for the remaining respirator classes have not been performed. In addition, the respirator protection community has not agreed on a standard protocol for conducting SWPF studies, or how the results relate to APFs. These issues would have to be addressed before it would be possible to use model-specific APFs. Also, insufficient data are available to set model-specific APFs, and developing the methodology and conducting the testing could take years. OSHA believes that completing the APF rulemaking with the information available now is necessary. Delaying this rulemaking to develop model-specific APFs will result in employers not knowing what respirators to select and, consequently, employees will not receive adequate protection. Based on the rulemaking record, the Agency has concluded it will determine an APF for each respirator

class using information from existing WPF and SWPF studies.

## 4. Nicas-Neuhaus Model

Several commenters (Paul Hewett, Ex. 10–60; Bill Kojola, AFL–CIO, Ex. 17–2; and NIOSH, Ex. 17–7–1) asked OSHA to consider a February 2004 article by Nicas and Neuhaus (Ex. 17–7–2) that applies a model for analyzing WPF data to establish APFs. The Nicas-Neuhaus article is based on the variability of WPFs (i.e., the variability between different test subjects, as well as the variability within a test subject resulting from repeated donnings of the respirator). APFs based on this Nicas-Neuhaus model require that WPFs for 95% of all workers be above the APF 95% of the time. However, the established method for deriving APFs used by OSHA, NIOSH, and ANSI sets the APFs at the 95% percentile of the between-subject WPFs. By controlling for within-subject variability, APFs based on the Nicas-Neuhaus model will always be smaller than APFs derived using the established method.

To account for within-subject variability, the Nicas-Neuhaus model requires repeated measurements on each test subject which is not required by the established method. Consequently, most available WPF studies did not include multiple measures on individual test subjects, resulting in an extremely limited database for applying the Nicas-Neuhaus model. Nicas and Neuhaus were able to analyze only seven half mask respirator studies, comprising a total of 310 data pairs. In comparison, the database established and analyzed by OSHA for determining the final APFs contains 1,339 data pairs from 16 half mask respirator studies. Also, OSHA had rejected for its analyses several of the WPF studies used by Nicas and Neuhaus in developing their model because these studies did not meet the Agency's selection criteria.

The Nicas-Neuhaus model is a significant departure from established and accepted practices used by the respirator research community. The Agency has concluded that there are insufficient data to fully evaluate the proposed model, and to incorporate it in setting APFs.

## 5. Other Alternative Approaches

Sheldon Coleman recommended that OSHA select a panel from AIHA members to review the APF data and OSHA's APF determinations (Ex.10–40). OSHA believes this rulemaking has provided ample opportunity for comment from the public and professional associations. Further analysis would delay the development

of the final APFs, and is unnecessary as the rulemaking record is sufficient to determine APFs.

### 6. Summary and Conclusion

OSHA is relying on science, data, and established quantitative analyses to establish the final APFs for filtering facepiece and elastomeric half mask respirators, and is limiting its statistical analyses to those procedures that use the selected data to the fullest extent possible. Reliance on alternative approaches is not supported by the evidence in the record. The data to use such approaches are not currently available, and require either a different set of data or a standardized testing protocol that requires testing every respirator model. OSHA concludes that the available data and analytic methods used in determining the final APFs are appropriate.

### E. Updated Analyses

#### 1. Review of the Original WPF and SWPF Databases

In developing its proposed rule regarding APFs for respirators, OSHA contracted with Dr. Kenneth Brown to investigate possible approaches for evaluating respirator performance data from WPF and SWPF studies. To assist Dr. Brown in this evaluation, the Agency reviewed the available studies and created a database from these studies. In deciding which WPF studies to include in this database, OSHA evaluated studies with respect to compliance with the requirements of its Respiratory Protection Standard (29 CFR 1910.134) and the completeness of the data. In doing so, the Agency excluded WPF studies of gas or vapor contaminants due to the limited number of these studies and the difficulties in conducting and interpreting data from such studies (68 FR 34046). During the rulemaking, OSHA received new WPF data on half mask respirators. No new SWPF data were submitted for half masks, and no new WPF data were

submitted for higher-performing respirators.

In the NPRM, Dr. Brown initially divided negative pressure half mask air-purifying respirators (APRs) into five classes. Four classes of filtering facepiece half masks were derived based on whether a respirator had adjustable head straps, an exhalation valve, a double-shell construction, or a foam-ring faceseal. Elastomeric half masks were grouped together in a single fifth class. (See Ex. 5–1 for details on respirator class definitions.) In his analyses, Dr. Brown found no clear evidence of a difference in WPFs across these different classes. In particular, he found that elastomeric half masks performed substantially the same as filtering facepieces. From the original database of 917 WPF measurements for negative pressure half mask APRs, 36 WPF measurements (3.9%) were found to have an APF less than 10, and 96.1% at 10 and above.

#### 2. Updated OSHA Database on APRs

In the NPRM, OSHA asked if any more WPF or SWPF studies should be considered in setting APFs. Data from four additional studies were submitted for OSHA's evaluation during the comment period, and an updated half mask database was compiled using these studies (Ex. 20–2). During the post-hearing comment period, the 3M Company provided OSHA with data from two additional WPF studies of filtering facepiece respirators. One study (Colton and Bidwell, Ex. 9–16–1–1) measured the performance of three different types of filtering facepiece respirators used by 21 workers at a lead-battery manufacturing plant. One respirator (3M 8710) was approved under 30 CFR part 11, and two respirators were N95 particulate respirators (3M 8210 and 3M 8510) approved under 42 CFR part 84. Up to three WPF measurements were made with each worker on each respirator type, for a total of 143 WPF

measurements. The data submitted to OSHA from this study are provided in Appendix A of Dr. Crump's report on the reanalysis of the half mask database (Ex. 20–1).

The second set of WPF data provided by 3M Company was from a study by Bidwell and Janssen (Ex. 9–16) on the performance of a "flat-fold" filtering facepiece respirator conducted at a concrete-block manufacturing facility. Repeated measurements of WPFs were made on 19 workers, and each sample was analyzed for both silicon and calcium. A total of 73 Co and 73 Ci air samples were collected, for a total of 146 WPF measurements. Eleven of the 146 Ci measurements were non-detectable (all coming from silicon exposures).

The third study added to the database was a WPF study by Colton (Ex. 4–10–4) on the performance of an elastomeric half mask respirator. This study had been submitted earlier to OSHA, but was not included in the NPRM database since it was received too late for inclusion in Dr. Brown's original analysis. The data from this study, conducted in the battery-pasting and assembly areas of a battery manufacturing plant, have now been added to OSHA's updated database. Also, three additional data points from a study by Myers and Zhuang (Ex. 1–64–50 and 3–14) were added to the updated database. These data were collected in a concrete-block facility while elastomeric half mask respirators were worn as protection against calcium and silicon particulates.

The updated OSHA half mask database (Ex. 20–2), summarized in Table III–1, contains 1,339 WPF measurements—760 collected from filtering facepiece respirators, and 579 from elastomeric respirators. The database originally analyzed by Dr. Brown contained 917 WPF measurements—471 from filtering facepieces, and 446 from elastomerics.

TABLE III–1.—SUMMARY OF OSHA WPF DATABASE FOR APRS

| Respirator class | Figure 1 No. | Constituent sampled | Author | Exhibit No. | Number samples per study | Number samples per class |
|---|---|---|---|---|---|---|
| **Filtering Facepiece Respirators** | | | | | | |
| 1 | 1 | Asbestos | Dixon | 1–64–54 | 26 | 474 |
| 1 | 2 | Fe | Myers | 1–64–50, 3–14 | 21 | |
| 1 | 3 | Mn | Wallis | 1–64–50 | 69 | |
| 1 | 4 | Al | Colton | 1–64–15 | 23 | |
| 1 | 5 | Al | Johnston | 1–64–34 | 13 | |
| 1 | 6 | Si | Johnston | 1–64–34 | 15 | |
| 1 | 7 | Ti | Johnston | 1–64–34 | 18 | |
| 1 | 8 | Pb | Colton & Bidwell | 9–16–1–1 | 143 | |
| 1 | 9 | Si | Bidwell & Janssen | 9–16 | 73 | |

TABLE III–1.—SUMMARY OF OSHA WPF DATABASE FOR APRs—Continued

| Respirator class | Figure 1 No. | Constituent sampled | Author | Exhibit No: | Number samples per study | Number samples per class |
|---|---|---|---|---|---|---|
| 1 | 10 | Ca | Bidwell & Janssen | 9–16 | 73 | |
| 3 | 11 | Pb | Myers | 1–64–51, 3–12 | 19 | 162 |
| 3 | 12 | Zn | Myers | 1–64–51, 3–12 | 20 | |
| 3 | 13 | Fe | Colton | 1–146 | 31 | |
| 3 | 14 | Mn | Colton | 1–146 | 32 | |
| 3 | 15 | Ti | Colton | 1–146 | 28 | |
| 3 | 16 | Zn | Colton | 1–146 | 32 | |
| 4 | 17 | Pb | Colton | 1–64–16 | 62 | 124 |
| 4 | 18 | Zn | Colton | 1–64–16 | 62 | |
| **Elastomeric Respirators** | | | | | | |
| 5 | 19 | Asbestos | Dixon | 1–64–54 | 46 | 579 |
| 5 | 20 | B(a)Pyrene | Gaboury | 1–64–24 | 18 | |
| 5 | 21 | Pb | Lenhart | 1–64–42 | 25 | |
| 5 | 22 | Pb | Myers | 1–64–51, 3–12 | 46 | |
| 5 | 23 | Zn | Myers | 1–64–51, 3–12 | 46 | |
| 5 | 24 | Fe | Myers | 1–64–50, 3–14 | 30 | |
| 5 | 25 | Cr | Myers | 1–64–52, 4–5 | 35 | |
| 5 | 26 | Ti | Myers | 1–64–52, 4–5 | 33 | |
| 5 | 27 | Cd | Colton | 1–64–13 | 68 | |
| 5 | 28 | Pb | Colton | 1–64–13 | 57 | |
| 5 | 29 | Pb | Dixon & Nelson | 1–64–19 | 42 | |
| 5 | 30 | Pb | Colton | 4–10–4 | 130 | |
| 5 | 31 | Calcium | Myers | 1–64–50, 3–14 | 3 | |
| **Grand Total** | | | | | | 1339 |

3. Variability of the APF Data

Several commenters (Faulkner, Ex. 9–40 and Kojola, Ex. 9–27) criticized WPF studies because the studies demonstrated what they considered to be a high degree of variability of the data. However, it is inappropriate to describe the variability of the data with terms such as "high" or "low" because no recognized standard exists by which to characterize variability. The variability of the data should reflect the true variability in respirator fit and performance experienced by workers who wear respirators. It is reasonable to expect variability because respirator performance is determined by many factors, including: Respirator type, the workers' face shapes, work practices and effort levels, and workplace conditions such as temperature and humidity. Thus, the key issue is not whether the data have too much or too little variability, but whether the variability in the data reflects the true variability in respirator performance under actual workplace conditions.

A logarithmic transformation was applied to the WPF data set to adjust for a skewed distribution and extreme outliers, both of which are common with ratio-based data. As Figure III–1 shows, when a logarithmic transformation is applied to OSHA's WPF database, the data closely follow a standard normal distribution. Therefore, OSHA's analysis of the data, which assumes that WPFs are log-normally distributed with a geometric mean of 307 and a geometric standard deviation of 7.1, appropriately accounts for the variability in the WPF data.

TABLE III–1.— SUMMARY OF DATABASE FOR APRs—Continued

## Figure III–1

### Logarithm of WPFs for Updated Data Base

### Versus Quantiles of the Standard Normal Distribution



4. Analysis of Updated Database on APRs

OSHA proposed an APF of 10 for negative pressure half mask APRs, including both filtering facepieces and elastomerics (68 FR 34096). Accordingly, the present analysis focuses on estimating this APF, particularly the percent of WPFs that are less than 10.

Figure III–2 displays the 1,339 WPF values, grouped by respirator class,[1] study, and contaminant. Each column of data points in the figure corresponds to a row number listed in column 2 of Table III–1. This figure shows that more WPFs for elastomerics are less than 10 than was the case for filtering facepieces, even though a much larger proportion of these WPFs are from filtering facepieces.

---

[1] Includes four of the five classes originally determined in the analysis conducted for OSHA by Dr. Ken Brown; no data were available for Class 2. Dr. Brown characterized disposable half marks according to combinations of the following four design characteristics: (1) Adjustable head straps, (2) presence of an exhalation valve, (3) double shell construction, and (4) foam ring liner. Class 1 has none of the four design characteristics. Class 2 has design characteristics (1) and (3). Class 3 has design characteristics (1) through (3). Class 4 has all four of the design characteristics. Class 5 consists of all elastomeric half masks.

HeinOnline -- 71 Fed. Reg. 50135 2006

### Figure III-2

### Graph of WPFs by Study



Figure III–2 also shows that differences exist between WPFs measured in different studies, even among respirators of the same type. For example, both the Colton (Ex. 1–64–15, #4 in Figure 2) and the Colton and Bidwell (Ex. 9–16–1–1, #8 in Figure 2) studies were conducted by some of the same investigators, and both studies used Class 1 filtering facepieces. Nevertheless, all but one of the 23 WPFs in the Colton study (Ex. 1–64–15) are less than 40, while all 143 of the WPFs from the Colton and Bidwell study (Ex. 9–16–1–1) are at least 58 or higher. However, the Colton study evaluated respirators approved under 30 CFR part 11, whereas the Colton and Bidwell

study evaluated respirators approved under 42 CFR part 84.

Table III–2 shows the percentages of WPFs less than 10 by respirator class, along with the 90% statistical confidence intervals on these percentages. The exact confidence intervals are based on a binomial distribution for counts. The percentage of WPFs less than 10 is less than 5% for all four classes, and the 90% statistical confidence interval on this percentage excludes 5% for every class except elastomerics. Also, elastomerics had the highest percentage of WPFs less than 10 (4.5%). Over all classes, 38/1339, or 2.8%, of WPFs were less than 10 (90% confidence interval: 2.1%, 3.7%). The upper bound of this two-sided 90%

confidence interval, 3.7%, is equivalent to a one-sided 95% upper statistical confidence bound on the true proportion of WPFs less than 10. This bound may be interpreted as follows: assuming the database is representative of workplace WPFs in general (more specifically, that the data approximate a random sample of WPFs from all workers who use respirators), when the true proportion of WPFs less than 10 is 3.7%, the probability of observing 2.8% or less (the observed percentage) would be $1 - 0.95 = 0.05$. Thus, under these assumptions, it is unlikely that the true proportion of WPFs less than 10 is as high as 3.7% (and extremely unlikely to be as high as 5%).

TABLE III–2.—PERCENT OF WPFS LESS THAN 10 BY RESPIRATOR CLASS

|  | Total n | n < 10 | Percent | (90% CI) |
|---|---|---|---|---|
| Class 1 | 474 | 11 | 2.3 | (1.3%, 3.8%) |
| Class 3 | 162 | 0 | 0.0 | (0.0%, 1.8%) |
| Class 4 | 124 | 1 | 0.8 | (0.0%, 3.8%) |
| Class 1–4 (Filtering Facepieces) | 760 | 12 | 1.6 | (0.9%, 2.5%) |
| Class 5 (Elastomerics) | 579 | 26 | 4.5 | (3.2%, 6.2%) |
| Total | 1339 | 38 | 2.8 | (2.1%, 3.7%) |

HeinOnline -- 71 Fed. Reg. 50136 2006

In the earlier database analyzed by Dr. Brown, 3.9% of the WPFs were less than 10. By comparison, among the 422 WPFs added to the database, only $\frac{2}{422}$ (0.5%) were less than 10. Thus, the new data indicate a higher level of protection by APRs.

In addition to the 1,339 WPFs in the updated OSHA database, an additional 403 WPFs from 12 studies were coded by OSHA but were not included in either the present database or the one analyzed by Dr. Brown. These data were omitted for various reasons, including too few WPF measurements in a study and problems with the quality of the studies (i.e., study did not meet requirements of OSHA's Respiratory Protection Standard). In addition, as noted earlier, OSHA did not include data from studies in which exposures were predominantly to a gas or vapor. To determine the effect that excluding these data had on the results in Table III–2, the 403 WPFs were added to the updated data base of 1,339 WPFs (for a total of 1,742 WPFs), and the overall fraction of WPFs less than 10 was computed (Table III–3). The percent of WPFs less than 10 was 4.0% (90% confidence interval: 3.2%, 4.8%). Thus, even with no data exclusions, the overall percent of WPFs smaller than 10 is less than 5%, and the 95% statistical upper confidence bound is also less than 5% (i.e., 4.8%).

### TABLE III–3.—COMPARISON OF PERCENT OF WPFs LESS THAN 10 IN STUDIES USED AND NOT USED BY OSHA

|  | Total n | n < 10 | Percent | (90% CI) |
|---|---|---|---|---|
| Used | 1339 | 38 | 2.8 | (2.1%, 3.7%) |
| Unused | 403 | 31 | 7.7 | (5.6%, 10.2%) |
| Both Used and Unused | 1742 | 69 | 4.0 | (3.2%, 4.8%) |

Consistent with the WPF studies used in its analysis, OSHA adopted the point estimate of the lower 5th percentile of WPF or SWPF data to establish APFs. Table III–4 shows the point estimate of the 5th percentiles of WPFs for different categories of respirators using the updated database. The 5th percentile of WPFs for filtering facepieces as a whole was 18.1, and for elastomerics it was 12.0. In both cases, the point estimate was above the APF of 10 proposed by OSHA. Since several commenters expressed concern about whether sufficient evidence is available to support an APF of 10 for filtering facepieces, OSHA also calculated 90% confidence intervals for each point estimate. (As noted earlier, the lower limit estimate of a two-sided 90% confidence interval is equivalent to a one-sided 95% lower confidence bound.) The lower 95% confidence bounds for the 5th percentile of WPFs exceeded 10 for all classes combined, and, with the exception of elastomerics, for each individual class. The confidence limits for the 5th percentiles were computed using the method for distribution-free confidence intervals of Hahn and Meeker (1991), as implemented in SAS (2001). Therefore, OSHA concludes that sufficient statistical evidence is available to justify an APF of at least 10 for filtering facepieces.

### TABLE III–4.—FIFTH PERCENTILES OF WPFs BY RESPIRATOR CLASS

|  | 5th percentile | (90% CI) |
|---|---|---|
| Class 1 | 14.8 | (12, 18) |
| Class 3 | 19.7 | (15, 24) |
| Class 4 | 27.0 | (22, 49) |
| Class 1–4 (Filtering Facepieces) | 18.1 | (15, 22) |
| Class 5 (Elastomerics) | 12.0 | (7, 14) |
| Total | 14.7 | (13, 18) |

5. Comparison of Respirators Approved Under 30 CFR Part 11 Versus 42 CFR Part 84

Several commenters expressed concern that the majority of WPF and SWPF studies were conducted on respirators certified by NIOSH under requirements in 30 CFR 11, instead of the newer NIOSH certification procedure described in 42 CFR 84. While these commenters did not explain the basis of their concern, two major studies were submitted that examined the performance of 42 CFR 84-approved respirators. The 3M study by Colton and Bidwell (Ex. 9–16–1–1) evaluated one respirator approved under 30 CFR 11, and two respirators approved under 42 CFR 84. In this study, WPFs were measured on up to nine different occasions for 21 workers (143 total measurements), 17 of whom used each type of respirator on at least one occasion, with none of them using the same type respirator on more than three occasions. Thus, this study provides an opportunity for comparing the performance of respirators approved under the two standards. Table III–5 shows the performance of these three respirators using three methods: the proportion of samples with Ci non-detects, the distribution of the 30 smallest WPF values among the three respirators, and the geometric mean of WPFs. The two 42 CFR 84-approved respirators performed similarly with each of these methods, and they both performed better than the 30 CFR 11-approved respirator (see Table III–5).

TABLE III–5.—PERFORMANCE OF THE 30 CFR PART 11 RESPIRATOR (3M 8710) AND THE 42 CFR PART 84 RESPIRATORS (3M 8511 AND 3M 8210)

| | Inside-the-mask non-detects | Dist. of 30 smallest WPF | WPF geometric means [1] |
|---|---|---|---|
| 3M 8710 ........................................ | 5/49 | 15 | 792 |
| 3M 8511 ........................................ | 23/47 | 7 | 2506 |
| 3M 8210 ........................................ | 19/47 | 8 | 2405 |

[1] Modeled assuming log-normal distribution with non-detects set at detectin limit.

The geometric means of WPFs of the 42 CFR 84 respirators were similar (2506 and 2405), and were significantly (p < 0.0001) higher than the geometric mean of the 30 CFR 11 respirator (792). This comparison was made using a repeated measures analysis that accounted for dependence among different samples collected from the same worker, assumed log-normally distributed WPFs, and set non-detects at the detection limit (which should minimize differences between the two respirator types). All three respirators performed well in this study, with the smallest of the 143 WPFs being 52, well above the APF of 10 proposed by OSHA.

When the 146 WPF measurements from the Bidwell and Janssen study (Ex. 9–16) (that assessed the 3M 9211 respirator approved under 42 CFR 84) are added to the 94 WPFs from the Colton and Bidwell study (Ex. 9–16–1–1), 240 WPFs in the OSHA database are from 42 CFR 84 respirators. None of these WPFs was less than 10 (0/240). This finding, along with the evidence that 42 CFR 84 respirators performed better than 30 CFR 11 respirators in the same study, suggests that the new filtering facepiece respirators certified under 42 CFR 84 may perform better than the respirators relied on by OSHA for its analyses, which consisted mainly of respirators approved under 30 CFR 11. Because the respirators approved under 42 CFR 84 outperformed those respirators approved under 30 CFR 11, which were adequately protective, OSHA is confident that current workers will be well protected by the respirators approved under 42 CFR 84.

**6. Methodology of Evaluating Overexposure**

Another method to assess the appropriateness of an APF is to determine whether an overexposure occurs (Exs. 10–17). The Agency reviewed relevant studies on this subject cited by several commenters (Exs. 9–16, 9–22, and 10–17–1) to determine if such an analysis would

provide useful information on filtering facepiece and elastomeric half mask respirators.

Two major studies (Exs. 9–16–1–9 and 4–21) address the likelihood that half mask respirators will not sufficiently reduce occupational exposures to airborne contaminants. In the first of these two studies (Nelson et al., Ex. 9–16–1–9), the authors evaluated the risk of overexposure for selected APFs using Monte Carlo simulation modeling. For a half mask respirator with an APF of 10, the calculations indicated a low risk of being exposed above an occupational exposure limit (OEL), with mean exposures being controlled well below an OEL. In the second article by Drs. Myers and Zhuang (Ex. 4–21), ambient (Co) and in-facepiece exposure monitoring data (Ci) from studies of worker exposures in foundry, aircraft-painting, and steel-manufacturing industries were compared with the OSHA PEL for single-substance exposures. The 5th percentiles of the protection factor (Co/Ci) data from each study were calculated. The authors used a new binomial analysis of likelihood of successes (no overexposure) and failures (overexposures). Their calculations indicate, for both half mask elastomeric and filtering facepiece respirators, that the <5% of workers who fail to achieve an APF of 10 are still being protected.

OSHA considered Nelson's analysis along with the findings of Myers and Zhuang when it conducted its own analysis. Accordingly, the Agency was persuaded to quantify the probability of overexposure by applying the Myers and Zhuang binomial analysis to OSHA's updated database. OSHA's expert, Dr. Gerry Wood, performed the analysis and presented his results in a report (Ex. 20–3) described below. The updated OSHA half mask database (Ex. 20–2) used in this analysis contains 1,339 WPFs from both filtering facepiece half mask respirators (760 WPFs) and elastomeric half mask

respirators with cartridge filters (579 WPFs). This database also contains Co and Ci measurements (expressed in µg/m³), with asbestos fiber counts converted as follows: 1 fiber/cm³ = 30 µg/m³); these measurements permit binomial analysis of overexposure through calculation of hazard ratios (HR).

The following 8-hour TWA PELs were used to calculate HR = Co/PEL for this study (see Table III–6).

TABLE III–6.—8-HOUR TWA PELS USED TO CALCULATE THE HAZARD RATIOS

| Analyte | PEL (mg/m³) |
|---|---|
| Benzo(a)pyrene ..................... | 0.2 |
| Lead ...................................... | 0.05 |
| Zinc ....................................... | 15 |
| Iron ....................................... | 10 |
| Chromium .............................. | 0.5 |
| Titanium ................................ | 15 |
| Manganese ........................... | 5 |
| Aluminum .............................. | 15 |
| Asbestos ............................... | 0.003 (0.1 fiber/cm³) |
| Silica ..................................... | 10 |
| Cadmium ............................... | 0.005 |
| Calcium ................................. | 15 |

Values for individual WPFs then were plotted against HR as illustrated in the figures of the Myers and Zhuang reference (Ex. 4–21, Figure 1, page 798, and Figure 2, page 799). The same reference lines and labels were used, but the scales were expanded to include all data in the OSHA database.

Figure 1 below shows the plot of all data for both filtering facepieces and elastomerics. The line labeled CD represents WPF = 10; 38 (2.8%) of the 1,339 data points fell below this line and five data points (0.37%) fell within the triangle defined by the letters ABK; Myers and Zhuang (Ex. 4–21) label this triangle as "Inadequate Protection, Overexposure," which corresponds to the region in which Ci exceeds the PEL.

Figure 1. All Half Mask Respirators



Figure 2 shows the same plot for studies using filtering facepieces only. Twelve data points (1.6%) are below the WPF = 10 line. Two of these twelve data points equal WPF = 10 when rounded off to the nearest whole number. Only 2 (0.26%) of the points are within the ABK overexposure region. The data point in the A corner (from a study by Colton (Ex. 1–64–16, CL4.15.Pb)) represents a Co just above the lead PEL (HR = 1.20) that, with a WPF = 1.15 (almost no protection), gave a Ci = 1.04 * PEL; this value represents an inside-the-mask exposure just barely higher than the PEL. The only other data point in the over-exposure region is from the asbestos (PEL–0.1 fiber/cm³) study by Dixon (Ex. 1–64–54, CL1.2.Asb) which corresponds to HR = 77, WPF = 47, and a Ci = 1.6 * PEL, (or 0.16 fiber/cm³).

Figure 2. Filtering Facepiece Respirators (PELs since August 1994)

If the MUC is defined as MUC = APF × PEL, and an APF = 16 is assumed, then data points in the triangle labeled AHE represent overexposures. With one data point in this triangle, filtering facepieces are 99.4% effective in protecting employees at an APF = 10 and an MUC = 10 × PEL (i.e., 160 of 161

data points in the AGFE area, with an HR ranging from 1 to 10, are outside the triangle (AHE) that represents diminished protection).

Figure 3 shows the same plot for the elastomerics. Of these 579 data points, 26 (4.5%) fall below WPF = 10. Three data points (0.5%) in the ABK

overexposure triangle are from an asbestos study by Dixon (Ex. 1–64–54, CL5.2.Abs). However, no data points of 265 in the AGFE area fall within the AHE triangle, indicating that all of these respirators provided protection at APF = 10 × PEL.

**Figure 3. Elastomeric Respirators (PELs since August 1994)**



Figures 4 and 5 demonstrate that both filtering facepiece and elastomeric respirators maintain the level of employee protection found in Figures 2 and 3, even when the data are plotted using the higher PELs specified by the older OSHA asbestos standard (pre-August 1994) and cadmium standard

(pre-April 1993). The combined data for both Figures 4 and 5 show that filtering facepieces had only one data point of 160 (with an HR ratio of 1 to 10) in the overexposure area (i.e., the AHE triangle), while none of the 241 data points for elastomeric respirators fell into this area. Therefore, Figures 4 and

5 and Figures 2 and 3 demonstrate that both filtering facepiece and elastomeric respirators afford employees effective exposure levels of asbestos and cadmium.

**BILLING CODE 4510–26–P**



Figure 4. Filtering Facepiece Respirators
(PELs before August 1994)





Figure 5. Elastomeric Respirators
(PELs before April 1993)

BILLING CODE 4510-26-C

### 7. Summary of Quantitative Analyses of the Updated Database

First, OSHA's database includes the best available data. As part of the APF rulemaking process, the Agency conducted a metaanalysis of data collected from numerous scientific studies related to APFs: OSHA established criteria that were used to evaluate each study's design and data quality to assure that the database included only the most valid data. The Agency, at each step in the rulemaking process, called on participants to identify additional studies to augment the dataset or to discuss alternative methods of analysis. In response, a number of commenters expressed these concerns about the data analysis: The statistical treatment minimized the true

differences between elastomeric and filtering facepieces, and there was too much variability in the data. In all cases, concerns raised by commenters about the composition of the dataset used in the metaanalysis, or the statistical methods used to conduct the analyses, were unsubstantiated by evidence submitted to the record despite repeated requests by OSHA for either specific examples or additional evidence.

Second, the best available data support an APF of 10 for half mask elastomerics and filtering facepieces. The final APF half mask database consists of 1,339 data points from 16 different studies, which represents a data increase of 46% over the 917 data points initially available for analysis in the proposal. The full data set indicates: (a) The precise APF for filtering facepieces is 18.1, with a 90% confidence interval between 15 and 22; (b) the precise APF for elastomerics is 12.0, with a 90% confidence interval between 7 and 14; and (c) that a greater percentage of elastomerics failed to achieve an APF of 10 (4.5%) than filtering facepieces (1.6%). In both cases, fewer than 5% of the respirators failed to achieve an APF of 10, which is the maximum failure rate historically allowed by both OSHA and other standards-setting bodies.

Third, OSHA substantiated its previous analysis by adding to its updated database 403 data points that were excluded originally because they did not meet OSHA's selection criteria and reanalyzing the database. This additional analysis also supports an APF of 10 for both types of respirators, with the results being highly similar to the analysis based on the best-available data.

Fourth, new studies submitted during the rulemaking allowed OSHA to compare the performance of similar respirators that were certified under both NIOSH's old (30 CFR 11) and new (42 CFR 84) certification standards. The 42 CFR 84 respirators achieved a WPF that was better than the 30 CFR 11 respirators. This finding is significant because the majority of the WPF studies, and the only studies in OSHA's original data set, were conducted on respirators certified under 30 CFR 11. Thus, the improved performance of 42 CFR 84 respirators indicates that these respirators are likely to be even more protective of worker health than an APF of 10 as provided for in the final rule.

OSHA also addressed the issue of overexposure among workers. In doing so, it reviewed the respirator literature and performed an analysis of overexposure risk using filtering facepiece or elastomeric respirators.

Based on this risk analysis, OSHA concluded that workers participating in effective respirator programs had an extremely low risk of overexposure.

In conclusion, the extensive quantitative analyses of the databases clearly indicate that both filtering facepieces and elastomeric respirators are capable of achieving an APF of 10. The results demonstrate that no statistical justification exists for assigning an APF of less than 10 to either of these two types of respirators. Finally, the results show that an APF of 10 is an underestimate of the true protection provided by both types of respirators. Therefore, the final APF of 10 determined by this rulemaking provides employees who use respirators with an extra margin of safety against airborne contaminants.

*F. Summary of Studies Submitted During the Rulemaking*

1. Additional Studies Used in the Updated Analyses

OSHA found the studies discussed in this section to be of sufficient quality for inclusion in its APF analyses.

*Bidwell and Janssen study (Exs. 9–16– 1–1 and 9–16).* J. O. Bidwell and L. Janssen of 3M gave a presentation at the May 2003 American Industrial Hygiene Conference and Exposition (AIHCE) on a workplace protection factor study they performed in a concrete-block manufacturing plant with workers using a NIOSH-approved N95 flatfold filtering facepiece respirator. The filtering facepiece respirator tested was the 3M Particulate Respirator 9211, approved by NIOSH under the 42 CFR 84 respirator certification standards. The authors measured silicon and calcium exposures to 19 workers in the bagging and block-handling areas of the plant. In the bagging areas, workers placed bags over cement-dust chutes for filling, and then transferred the bags to pallets. In the other areas of the plant sampled by the authors, workers handled concrete blocks, swept and shoveled dust and block pieces into containers, and cleaned out mullers with chipping tools. The workers were informed of the purpose and procedures of, and their role in, the study, and were provided with instructions on proper donning, fitting, and user seal check procedures, as well as respirator operation. In addition, the workers had to pass a Bitrex® qualitative fit test that followed the fit test protocol described in OSHA's Respiratory Protection Standard prior to study participation. They also had to be clean shaven. They were observed by the authors in the workplace on a one-

on-one basis throughout the sampling periods.

The inside-the-facepiece sampling train consisted of a 25-mm three-piece cassette with a 0.8-micron pore-size polycarbonate filter with porous plastic back-up pads for collecting the inside samples. For sampling purposes, a Liu probe was inserted opposite the mouth near the midline of the respirator. It projected one centimeter into the facepiece. The sampling cassette was attached directly to the probe, and a cassette heater was used to prevent condensation of moisture from exhaled breath. Outside-the-facepiece samples used a 25-mm three-piece cassette with a 0.8-micron pore-size mixed cellulose-ester filter. The outside sample cassette also was connected to a Liu probe, and this combination was attached in the worker's breathing zone. Inside samples and outside samples were collected at a flow rate of two liters per minute. Respirators were donned and doffed, and sampling trains started and stopped, in a clean area. Field blanks were used to evaluate for sample-handling contamination, and manufacturer blanks were collected to determine background contamination on the filters.

The inside samples were analyzed using proton-induced X-ray emission analysis (PIXEA), and the outside samples were analyzed by inductively coupled plasma (ICP) spectroscopy. For both calcium and silicon, the authors presented the range of Co, Ci, and the associated geometric means and standard deviations. Three sets of WPF results were determined: One for calcium, a second for silicon, and a harmonic mean for the combined calcium and silicon samples. Silicon was not detected on eleven of the Ci samples. However, by using 70% of the limit of detection as the inside mass, the authors were able to include these samples in the statistical analysis. No field-blank adjustments were made (i.e., no calcium or silicon detected), and no mention is made of adjusting the data for pulmonary retention of particles. In addition, three sample sets were invalidated as a result of equipment and procedural problems. The authors reported a mean WPF of 152, with a 5th percentile of 13, for the calcium samples; a mean WPF of 394, with a 5th percentile of 34, for the silicon samples; and a harmonic mean of the calcium and silicon samples of 206, with a 5th percentile of 20. The authors noted a difference in the WPFs measured for calcium and silicon (using the same respirator), and discussed a number of possible reasons for the difference (e.g., random sampling and analytical errors,

HeinOnline -- 71 Fed. Reg. 50142 2006

possible non-uniformity of the challenge aerosol over time). The authors concluded, "The estimated WPF for this respirator model based on this study exceeds the APF of 10 assigned to this respirator class by ANSI Z88.2–1992 and proposed by OSHA." They also stated, "The respirator provided an adequate level of protection and reliably provided workplace protection factors of at least 10 when properly fitted, worn, and used" (Ex. 9–16, page 40).

*Colton and Bidwell study (Ex. 4–10– 4)*. C. Colton and J. Bidwell of 3M made a presentation on May 25, 1995 at the AIHCE comparing the workplace performance of two different types of HEPA filters on an elastomeric half mask respirator in a battery manufacturing plant. The HEPA filters and the respirator model tested were approved under the 30 CFR 11 respirator certification standards. The half facepiece respirator tested was the 3M 7000, available in three sizes. The HEPA filters tested were the 3M 7255 high-efficiency (mechanical) filter and the 3M 2040 high efficiency (electret) filter. The authors measured lead exposures for 19 workers in the battery-pasting and assembly areas of the plant because these areas had the highest lead exposures. The workers were informed of the purpose and procedures of, and their role in, the study, and were provided with instructions on proper donning and fitting procedures, as well as respirator operation. In addition, the workers had to pass a saccharin qualitative fit test performed using the fit test protocol described in OSHA's Lead Standard. Workers had to be clean shaven. They were observed in the workplace by the authors on a one-on-one basis throughout the sampling periods.

For sampling purposes, a Liu probe was inserted opposite the mouth near the midline of the respirator. It projected one centimeter into the facepiece. The sampling cassette was attached directly to the probe, and a cassette heater was used to prevent condensation of moisture from exhaled breath. A Liu probe was also attached to the outside sample to ensure that particle loss for the outside samples would be similar to that with the inside samples. Inside samples and outside samples were collected at a flow rate of two liters per minute, and sampling times ranged from 56 to 200 minutes. Up to four samples were collected per day on each worker, each worker was sampled for two days, field blanks were used, and care was taken to avoid handling contamination. The filter for the first day was assigned randomly, with a worker using one filter type on

the first day and the second filter type on the second day.

The inside- and outside-the-facepiece samples were analyzed for lead by ICP spectroscopy. The authors presented the range of outside and inside lead concentrations, and the associated geometric means and standard deviations. Two sets of WPF results were determined: One for the 3M 2040 filter and a second for the 3M 7255. A total of 140 samples were collected— one sample was eliminated due to low mass loading, 10 samples were lost due to equipment problems, and 85 samples had inside-sample mass values that were non-detectable. Of the remaining 44 samples, one outlier was identified in the electret filter data set, leaving 22 sets for the 3M 2040 filter and 21 sets for the 3M 7255 filter. No field blank adjustments were reported (i.e., no lead was detected on the field blanks). The authors reported a mean WPF of 562 and a 5th percentile of 71 for the 3M 2040 filter-respirator combination, and a mean WPF of 1006 and a 5th percentile of 80 for the 3M 7255 filter-respirator combination.

When no lead was detected for the inside samples, the WPF results were recalculated using the detection limit to represent the mass for these samples. From these recalculations, the authors identified one outlier in the electret filter data set and two outliers in the mechanical filter data set. They then calculated geometric means, geometric standard deviations, and 5th percentile WPFs for the 67 samples for the 3M 2040 filter and for the 59 samples for the 3M 7255 filter. The authors reported a mean WPF of 420 and a 5th percentile of 101 for the 3M 2040 filter-respirator combination, and a mean WPF of 549 and a 5th percentile of 138 for the 3M 7255 filter-respirator combination.

The authors concluded that the performance differences between the two filter types were not statistically significant. Both filters provided 5th percentile protection factors above 10. No WPFs were less than 30. Under these workplace conditions, no difference was found in the level of protection provided by the electrostatic HEPA filter compared to a mechanical HEPA filter.

*Colton and Bidwell study (Ex. 9–16)*. C. Colton and J. Bidwell of 3M presented a research paper at the May 1999 AIHCE on a WPF study they performed in a battery manufacturing plant with workers using three NIOSH-approved filtering facepiece respirators. The filtering facepiece respirators tested were the 3M 8210 and 3M 8511, approved by NIOSH under the 42 CFR 84 respirator certification standards, and the 3M 8710 filtering facepiece,

approved by NIOSH under the 30 CFR 11 respirator certification standards. The authors measured lead exposures for 21 workers in the battery-manufacturing and assembly areas of the plant. The worker job classifications tested were stackers, heat sealers, burners, and assemblers. The workers were informed of the purpose and procedures of, and their role in, the study, and were provided with instructions on proper donning, fitting, and user seal check procedures, as well as respirator operation. In addition, the workers had to pass a Bitrex® qualitative fit test with all three respirators, and they had to be clean shaven. They were observed in the workplace by the authors on a one-on-one basis throughout the sampling periods.

The sampling probe was a Liu probe that was inserted opposite the mouth near the midline of the respirator. It projected one centimeter into the facepiece. The sampling cassette was attached directly to the probe, and a cassette heater was used to prevent condensation of moisture from exhaled breath. Inside and outside samples were collected at a flow rate of two liters per minute for 79 to 159 minutes. Three samples were collected per day for each worker. Field blanks were used, and care was taken to avoid handling contamination.

The inside samples were analyzed for lead using PIXEA. Outside samples were analyzed by ICP spectroscopy. The authors presented the range of outside and inside sample lead concentrations, and the associated geometric means and standard deviations for each respirator model tested. Three sets of WPF results were determined: One for the 3M 8710, a second for the 3M 8210, and a third for the 3M 8511. Lead was not detected on five of the inside samples for the 3M 8710, 19 for the 3M 8210, and 23 for the 3M 8511. No field blank adjustments were reported (i.e., no lead was detected on the field blanks). The authors reported a mean WPF of 730, with a 5th percentile of 105, for the 3M 8710 respirator; a mean WPF of 955, with a 5th percentile of 73, for the 3M 8210; and a mean WPF of 673, with a 5th percentile WPF of 169, for the 3M 8511 using test samples with detectable lead levels. When no lead was detected on the inside samples, the WPF results were calculated by using 70% of the limit of detection as the mass for inside samples. The authors reported a mean WPF of 804, with a 5th percentile of 111, for the 3M 8710 respirator; a mean WPF of 2210, with a 5th percentile of 133, for the 3M 8210; and a mean WPF

of 1970, with a 5th percentile WPF of 223, for the 3M 8511.

The authors stated, "All respirator models provided an equivalent level of protection," and that "[a]ll the respirators tested reliably provided workplace protection factors of 10 when properly fitted, worn, and used." No reported WPFs were less than 51, and no difference in workplace protection was found between workers using 30 CFR part 11-approved respirators and workers using 42 CFR 84-approved respirators. The authors concluded that, using the 5th percentile WPFs as an indicator of performance, the APFs should not differ between these respirators.

2. Additional Studies Not Used in the Updated Analyses

The Agency received a number of comments on the relationship between fit testing and APFs. OSHA regulations require that when a respirator user cannot pass a fit test with a particular respirator model, it cannot be used. OSHA does not believe that it is appropriate to assign a lower protection factor to a respirator (e.g., half the APF) when the respirator doesn't fit. However, a number of fit test studies, and one study on farm worker exposures to bioaerosols, were submitted to the record for the Agency to evaluate in terms of APFs. OSHA has evaluated these studies and determined that they do not meet the criteria that data must meet to be included in the database. These criteria have been described above.

NIOSH agreed (Tr. at 102) that the APF values resulting from OSHA's multifaceted approach provide reasonable values for the level of protection expected for each respirator class. Proposed Table 1 ("Assigned Protection Factors") represents the state of the art for each class or respirator. However, NIOSH stated that designating a specific APF for a respirator class will not ensure that a respirator will perform as expected. The protection afforded by a respirator is contingent on: the respirator user adhering to the respirator program requirements of OSHA's Respiratory Protection Standard; the use of NIOSH-certified respirators in their approved configuration; and fit testing for each employee that ensures selection of a properly fitting respirator. The following studies, which OSHA did not include in its updated analyses, typically violated one or more of these three conditions.

*Don-Hee Han study (Ex. 9–13–2).* NIOSH (Ex. 9–13) submitted a study by Don-Hee Han (Ex. 9–13–2) of the 3M 8511 cup-shaped filtering facepiece, the

MSA Affinity foldable FR 200, and the Willson N95 10FL produced by Dalloz Safety in response to OSHA's request in the NPRM for additional studies that may be useful in determining APFs. The author of the study permitted workers who did not pass a fit test with a minimum fit factor of 100, as required by OSHA's Respiratory Protection Standard, to participate in the study. OSHA reviewed this study and did not add the data set to its quantitative analyses because it was a PPF study that is not directly comparable with WFP studies used by OSHA in its APF determinations. However, the study results confirmed that when a worker's filtering facepiece respirator is fit tested properly, it is capable of achieving a protection factor of at least 10.

*Peacock study (Ex. 9–13–4).* This fit test research report was submitted to the record by NIOSH. In this study, a liquid-aerosol QNFT (Large Particle QNFT (LPQNFT)) was developed and used to evaluate filter penetration of a regular N95 respirator. Protection factors determined by the LPQNFT were compared to fit factors obtained using the saccharin QLFT. The sensitivity and specificity of the saccharin QLFT were evaluated. The results for the specificity of the LPQNFT indicated that workers who failed the saccharin QLFT also failed the LPQNFT when using a protection factor ≥ 100. The sensitivity was low. Twelve (12) subjects passed both the LPQNFT and the saccharin QLFT (out of 28 subjects), but another 16 subjects failed the saccharin test while passing the LPQNFT. Peacock concluded that the LPQNFT may be subject to particle deposition at leakage sites, as well as conditions inside the facepiece that would lead to sampling bias. OSHA did not rely on these fit test data for setting APFs because, as Peacock noted, further studies should be conducted to identify the cause of these problems.

*Lee and Nicas study (Ex. 17–7–3).* NIOSH submitted this study of N95 respirators used against *Mycobacterium tuberculosis* (TB). In this study, Lee and Nicas (Ex. 17–7–3) computed risks of TB infection using five medium- or regular-size N95 filtering facepiece respirators. Five NIOSH-approved respirators were selected for evaluation after reviewing manufacturer-provided fit test, comfort, and cost data. After extensive evaluation, the original five brands were rank ordered from highest to lowest fit test pass rates, and the authors calculated the risk of TB transmission. The authors concluded that fit testing is necessary to ensure that respirators perform as expected. However, OSHA did not accept this study for its APF

analyses because it is not a WPF or SWPF study, and addresses only fit testing issues.

*Coffey, et al. study (Ex. 17–7–4).* NIOSH submitted to the record a publication by Coffey et al. (Ex. 17–7–4). In this study, 18 N95 filtering facepiece respirators were evaluated. The authors determined the following measurements from the results: 5th percentile SWPF value; the average SWPF per shift; the h-value; and the assignment error. A SWPF test was used to determine respirator performance, which was assessed using a Portacount Plus with test subjects performing six standard fit test exercises. However, the generally accepted format for a SWPF study involves test subjects performing simulated workplace exercises (e.g., shoveling pebbles, moving blocks, pounding nails).

Using this procedure, the authors found that when properly fit tested, over 80% of the poorly performing respirators achieved a protection factor of more than 10. However, OSHA did not use this study in its APF determinations since this was not a WPF or SWPF study. Nevertheless, the study supports the requirement that APFs apply only when used within the context of a comprehensive respirator program.

*Reponen et al. study (Exs. 19–8–3 and 19–8–4).* The purpose of this study was to further develop a prototype personal-sampling system for use with N95 filtering facepiece respirators. The study results were calculated from 30–60 minute Co and Ci measurements taken across multiple agricultural settings, tasks, and simulated exposures. The data were combined to calculate dust, microorganism, and cultured microorganism exposures. Descriptions of tasks in several workplaces were provided.

The N95 respirators in this study performed at or above a WPF of 10 when evaluated using dust measurements. However, the dust-exposure measurements counted both dust particles and microorganisms because the optical-particle counter used for this purpose does not differentiate between organic and nonorganic particles. When they calculated WPFs for the microorganism samples alone, the WPFs decreased somewhat. The authors concluded that the geometric mean WPF increased with increasing particle size, and that the WPFs were smaller for biological particles than for dust. The authors speculated that differences in WPFs may result from the measurement effects of particle size or density. They also said that even a small variation in the

density of particles can have a pronounced effect on the loss of dust particles through facenseal leaks due to impaction. The authors concluded that their findings deserve further research.

OSHA agrees with the authors that further research is needed to substantiate and explore these findings. Also, the Agency has significant concern regarding the measurement methodology used in this prototype study. For example, it is not clear whether the WPF differences are valid or are simply the result of using different measurement methods. Therefore, the Agency decided not to use this study for developing APFs.

*Summary and conclusions for studies not used in the updated database.* OSHA reviewed the studies submitted to the APF rulemaking docket and determined that five of them were unsuitable for the database used to develop APFs. OSHA established a set of criteria in the proposal for evaluating new studies for inclusion in the APF database. The studies by Han (Ex. 9–13–4), Peacock (Ex. 9–13–4), Lee and Nicas (Ex. 17–7–3), Coffey *et al.* (Ex. 17–7–4), and Reponen *et al.* (Exs. 19–8–3 and 19–8–4) were not used by OSHA in setting the final APFs because these studies did not follow established WPF or SWPF protocols, or required further research to substantiate or explore the results.

## IV. Health Effects

American workers use respirators as a means of protection against a multitude of respiratory hazards that include chemical, biological, and radiological agents. Respirators provide protection from hazards that are immediately life-threatening, as well as hazards associated with routine operations for which engineering controls and work practices do not protect employees sufficiently. When respirators fail, or do not provide the degree of protection expected by the user, the user is placed at an increased risk of adverse health effects that result from exposure to the respiratory hazards present. Therefore, it is critical that respirators perform properly to ensure that users are not at an increased risk of experiencing adverse effects caused by exposure to respiratory hazards.

In this final rulemaking, OSHA defined the minimal level of protection a respirator is expected to achieve (i.e., the APFs in Table 1), as well as the MUCs for the respirators. The Agency also is superseding most of the existing

APF table requirements in its substance-specific standards. By superceding the APF tables, the Agency estimates that the benefits for the final APFs under the Respiratory Protection Standard will be available as well to employers who must select respirators for employee use under the substance-specific standards. In addition, the Agency believes that harmonizing the APFs of the substance-specific standards with the APFs in the Respiratory Protection Standard will reduce confusion among the regulated community and aids in uniform application of APFs, while maintaining employee protection at levels at least as protective as the existing APF requirements.

## V. Summary of the Final Economic Analysis and Regulatory Flexibility Analysis

### A. Introduction

OSHA's Final Economic and Regulatory Flexibility Screening Analysis (FEA) addresses issues related to the costs, benefits, technological and economic feasibility, and economic impacts (including small business impacts) of the Agency's Assigned Protection Factors (APF) rule. The Agency has determined that this rule is not an economically significant rule under Executive Order 12866. The economic analysis meets the requirements of both Executive Order 12866 and the Regulatory Flexibility Act (RFA; as amended in 1996). The FEA presents OSHA's full economic analysis and methodology. The Agency entered the complete FEA into the docket as Exhibit 11. The remainder of this section summarizes the results of that analysis.

The purpose of this FEA is to:

• Evaluate the costs employers would incur to meet the requirements of the APF rule;

• Estimate the benefits of the rule;

• Assess the economic feasibility of the rule for affected industries; and

• Determine the impacts of the rule on small entities and the need for a Regulatory Flexibility Analysis.

### B. The Rule and Affected Respirator Users

OSHA's APF rule would amend 29 CFR 1910.134(d)(3)(i)(A) of the Respiratory Protection Standard by specifying a set of APFs for each class of respirators. These APFs specify the highest multiple of a contaminant's permissible exposure limit (PEL) at

which an employee can use a respirator safely. The APFs would apply to respirator use for protection against overexposure to any substance regulated under 29 CFR 1910.1000. In addition, OSHA rules for specific substances under subpart Z (regulated under the authority of section 6(b)(5) of the OSH Act of 1970, 29 U.S.C. 655) specify APFs for respirators used for protection against these chemicals (hereafter referred to as § 6(b)(5) substances). The rule would supercede most of these protection factors, and harmonize APFs for these substances with those for general respirator use.

OSHA based estimates of the number of employees using respirators and the corresponding number of respirator-using establishments on the NIOSH-BLS survey of respirator use and practices [2] (Ex. 6–3). The NIOSH-BLS survey provides up-to-date use estimates by two-digit industry sector and respirator type for establishments in which employees used respirators during the previous 12 months.[3] As shown in Table V–1, an estimated 291,085 establishments reported respirator use in industries covered by OSHA's regulation. Most of these establishments (208,528 or 71.6 percent) reported use of filtering facepieces. Substantial percentages of establishments also reported the use of half-mask and full facepiece non-powered air-purifying respirators (49.0 and 21.4 percent, respectively). A smaller number of establishments reported use of powered air-purifying respirators (PAPRs) and supplied-air respirators (SARs). Fifteen percent of establishments with respirators (43,154) reported using PAPRs and 19 percent (56,022) reported using SARs. Table V–2 presents estimates of the number of respirator users by two-digit industry sector. An estimated 2.3 million employees used filtering facepiece respirators in the last 12 months, while 1.5 million used half masks, and 0.7 million used full facepiece non-powered air-purifying respirators. Fewer employees reported using PAPRs (0.3 million) and SARs (0.4 million). The industry-specific estimates show substantial respirator use in several industries, including the construction sector, several manufacturing industries (SICs 28, 33, 34, and 37), and Health services (SIC 80).

BILLING CODE 4510–26–P

---

[2] Preliminary results from the 2001 NIOSH–BLS "Survey of Respirator Use and Practices" in press. NIOSH commissioned the survey to be conducted

by BLS, who also tabulated the data after completing the survey.

[3] The survey was conducted between August 2001 and January 2002. It asked: "During the past

12 months, how many of your current employees used respirators at your establishment?" It excluded voluntary use of respirators from detailed followup respirator use questions (Ex. 6–3).

HeinOnline -- 71 Fed. Reg. 50145 2006

Table V-1

Estimated Number of Establishments With Respirator Users, by Type

| SIC | Title | All Respirator Types | Non-powered Air-Purifying Filtering Facepiece | Half-mask | Full-face | PAPR | Supplied-Air Total | SCBA |
|---|---|---|---|---|---|---|---|---|
| 07 | Agricultural services | 7,566 | 6,466 | 1,142 | 33 * | 105 * | 240 * | 164 * |
| 08 | Forestry | 281 | 261 | 208 | 1 * | 4 * | 8 * | 6 * |
| 09 | Fishing, hunting, and trapping | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | Oil and gas extraction | 1,097 | 490 | 1,097 | 499 | 220 | 412 | 250 |
| 15 | General building contractors | 19,071 | 15,069 | 6,729 | 1,859 | 1,520 | 1,213 | 674 * |
| 16 | Heavy construction, except building | 4,718 | 3,816 | 2,432 | 915 | 767 | 1,213 | 355 |
| 17 | Special trade contractors | 40,823 | 31,380 | 17,025 | 10,181 | 7,136 | 8,198 | 2,693 |
| 20 | Food and kindred products | 3,608 | 1,928 | 1,433 | 1,901 | 428 | 1,010 | 720 |
| 21 | Tobacco products | 30 | 17 | 13 * | 0 | 20 | 20 | 20 |
| 22 | Textile mill products | 720 | 627 | 272 | 201 | 139 | 9 | 0 |
| 23 | Apparel and other textile products | 1,111 | 943 * | 925 | 14 * | 0 | 0 | 0 |
| 24 | Lumber and wood products | 1,995 | 1,326 | 1,273 | 353 | 197 | 168 | 106 |
| 25 | Furniture and fixtures | 2,053 | 1,745 | 1,469 | 317 | 80 | 83 | 28 |
| 26 | Paper and allied products | 649 | 448 | 329 | 293 | 122 | 193 | 153 |
| 27 | Printing and publishing | 124 | 105 * | 45 | 2 * | 0 | 3 | 0 |
| 28 | Chemicals and allied products | 5,052 | 3,047 | 2,896 | 2,698 | 910 | 2,077 | 1,632 |
| 29 | Petroleum and coal products | 432 | 64 | 189 | 200 | 99 | 249 | 151 |
| 30 | Rubber and misc. plastics products | 3,140 | 2,094 | 1,707 | 1,117 | 695 | 838 | 121 |
| 31 | Leather and leather products | 14 * | 12 * | 6 * | 0 | 0 | 340 | 0 |
| 32 | Stone, clay, and glass products | 3,109 | 2,089 | 1,765 | 495 | 589 | 530 | 119 |
| 33 | Primary metal industries | 1,974 | 1,533 | 861 | 385 | 491 | 550 | 183 |
| 34 | Fabricated metal products | 7,374 | 4,601 | 4,988 | 1,103 | 1,510 | 2,456 | 361 |
| 35 | Industrial machinery and equipment | 7,458 | 4,425 | 4,151 | 1,700 | 1,093 | 2,131 | 441 |
| 36 | Electronic and other electric equipment | 2,731 | 1,676 | 1,412 | 656 | 341 | 525 | 252 |
| 37 | Transportation equipment | 3,768 | 1,957 | 2,158 | 1,656 | 738 | 1,225 | 337 |
| 38 | Instruments and related products | 1,282 | 711 | 1,033 | 736 | 468 | 568 | 155 |
| 39 | Miscellaneous manufacturing industries | 3,140 | 2,389 | 2,295 | 1,442 | 1,276 | 439 | 133 |
| 40 | Railroad transportation | 846 | 417 | 803 | 380 | 375 | 503 | 134 |
| 41 | Local and interurban passenger transit | 809 | 405 | 522 | 87 * | 73 | 86 | 86 |
| 42 | Trucking and warehousing | 4,090 | 3,240 | 793 | 850 | 463 | 751 | 617 |
| 43 | United States Postal Service | 1,012 ** | 801 ** | 196 ** | 210 ** | 115 ** | 186 ** | 153 ** |
| 44 | Water transportation | 50 * | 7 * | 50 * | 5 * | 14 * | 55 * | 0 |
| 45 | Transportation by air | 48 * | 7 * | 48 * | 5 * | 13 | 10 * | 0 |
| 46 | Pipelines, except natural gas | 252 | 35 * | 180 | 74 | 69 * | 96 * | 91 |
| 47 | Transportation services | 8 * | 1 * | 7 * | 0 | 2 | 7 * | 0 |
| 48 | Communications | 100 * | 14 * | 99 * | 11 * | 27 | 18 * | 0 |
| 49 | Electric, gas, and sanitary services | 5,085 | 1,856 | 2,975 * | 1,488 | 821 | 2,737 * | 1,956 |
| 50 | Wholesale trade—durable goods | 18,854 | 10,795 | 9,641 | 3,259 | 2,776 | 2,926 | 1,278 |
| 51 | Wholesale trade—nondurable goods | 8,573 | 4,660 | 3,619 | 4,303 | 2,192 | 3,045 | 2,533 |
| 52 | Building materials and garden supplies | 2,386 | 2,386 | 1,433 | 688 * | 496 | 89 | 66 |
| 53 | General merchandise stores | 687 * | 211 * | 471 * | 190 * | 143 * | 19 * | 19 * |
| 54 | Food stores | 2,394 * | 736 * | 1,642 * | 662 * | 498 | 67 * | 67 * |
| 55 | Automotive dealers and service stations | 10,243 | 7,139 | 6,127 | 2,271 * | 2,403 | 3,211 * | 1,048 * |
| 56 | Apparel and accessory stores | 308 * | 95 * | 211 * | 85 * | 64 | 1,442 | 9 |
| 57 | Furniture and homefurnishings stores | 2,769 | 2,586 | 1,710 | 799 * | 576 * | 77 * | 77 * |
| 58 | Eating and drinking places | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 59 | Miscellaneous retail | 978 | 679 | 700 * | 282 * | 203 | 27 * | 27 |
| 60 | Depository institutions | 1,372 * | 1,349 * | 36 * | 59 * | 6 * | 0 | 0 |
| 61 | Nondepository institutions | 299 * | 294 * | 8 * | 8 * | 13 * | 1 | 0 |
| 62 | Security and commodity brokers | 278 * | 274 * | 7 * | 12 * | 1 | 0 | 0 |
| 63 | Insurance carriers | 442 * | 435 * | 62 | 19 * | 2 | 0 | 0 |
| 64 | Insurance agents, brokers, and services | 744 * | 732 * | 19 * | 32 * | 3 | 0 | 0 |
| 65 | Real estate | 1,541 | 1,031 | 1,115 | 67 * | 7 | 0 | 0 |
| 67 | Holding and other investment offices | 157 * | 155 * | 4 * | 7 * | 0 | 0 | 0 |
| 70 | Hotels and other lodging places | 1,326 | 1,326 | 621 | 531 | 7 * | 0 | 0 |
| 72 | Personal services | 9,743 | 4,779 | 9,115 | 1,192 | 52 * | 0 | 0 |
| 73 | Business services | 13,517 | 11,574 | 4,952 | 4,578 | 72 * | 925 | 925 |
| 75 | Auto repair, services, and parking | 32,113 | 26,523 | 19,588 | 6,793 | 5,655 | 6,778 * | 3,263 * |
| 76 | Miscellaneous repair services | 3,375 | 3,375 | 1,199 * | 313 * | 18 * | 4,258 | 0 |
| 78 | Motion pictures | 17 * | 8 * | 6 * | 2 * | 0 | 2 | 0 |
| 79 | Amusement and recreation services | 1,612 | 1,348 | 1,184 | 150 | 9 * | 0 | 0 |
| 80 | Health services | 16,486 | 14,625 | 1,991 | 1,307 | 879 | 303 | 260 |
| 81 | Legal services | 61 * | 29 * | 22 * | 6 * | 0 | 3 | 0 |
| 82 | Educational services | 564 | 267 * | 431 | 52 * | 3 * | 0 | 0 |
| 83 | Social services | 6,668 | 5,812 | 2,217 * | 579 * | 36 * | 0 | 0 |
| 84 | Museums, botanical, zoological gardens | 235 | 112 * | 235 | 22 * | 1 * | 16 | 16 |
| 86 | Membership organizations | 533 | 252 ** | 383 | 48 * | 3 * | 0 | 0 |
| 87 | Engineering and management services | 10,292 | 4,004 | 7,297 | 1,800 | 5,117 | 254 | 254 |
| 89 | Services, n.e.c. | 6 * | 3 * | 2 * | 0 | 0 | 3 | 0 |
| | State and local governments | 6,893 *** | 4,936 *** | 3,392 *** | 1,479 *** | 1,023 *** | 1,327 *** | 530 *** |
| | Totals | 291,085 | 208,528 | 142,947 | 62,448 | 43,154 | 56,022 | 22,461 |

Source: Preliminary results from the 2001 NIOSH/BLS Survey of Respirator Use and Practices, in press. Benchmarked to 1997 establishment counts from U.S. Bureau of the Census, Statistics of U.S. Businesses, 1997.
* Suppressed industry-level estimates extrapolated from sector totals.
** Estimated based on respirator use patterns in SIC 42.
*** Estimated based on private-sector respirator use patterns.

Table V-2

Estimated Number of Respirator Users, by Respirator Type

| SIC | Title | Non-powered Air-Purifying | | | PAPR | Supplied-Air | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Filtering Facepiece | Half Mask | Full Facepiece | | Total[1] | With SCBA |
| 07 | Agricultural services | 52,919 | 6,030 * | 1,713 * | 139 * | 942 * | 567 * |
| 08 | Forestry | 765 * | 208 * | 23 * | 3 * | 32 * | 20 * |
| 09 | Fishing, hunting, and trapping | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | Oil and gas extraction | 12,086 * | 14,108 | 1,587 * | 6,242 | 3,071 | 2,405 |
| 15 | General building contractors | 77,827 | 36,770 * | 7,752 | 2,750 | 6,047 | 4,744 |
| 16 | Heavy construction, except building | 31,518 | 30,503 | 8,747 | 4,929 | 8,652 | 1,933 |
| 17 | Special trade contractors | 259,240 | 247,483 | 158,559 | 49,285 | 81,803 | 17,005 |
| 20 | Food and kindred products | 31,317 | 15,454 | 13,559 | 2,465 | 9,693 | 7,093 |
| 21 | Tobacco products | 4,232 * | 390 * | 0 | 173 | 412 | 412 |
| 22 | Textile mill products | 31,996 * | 3,198 | 3,510 | 3,243 | 41 * | 0 |
| 23 | Apparel and other textile products | 3,326 * | 2,444 | 213 * | 0 | 0 | 0 |
| 24 | Lumber and wood products | 17,615 * | 8,855 | 2,869 | 3,083 | 1,761 | 1,096 |
| 25 | Furniture and fixtures | 15,196 | 7,544 | 1,916 * | 843 | 530 | 180 |
| 26 | Paper and allied products | 13,435 | 16,139 | 6,313 | 1,808 | 6,724 | 6,222 |
| 27 | Printing and publishing | 1,060 * | 341 * | 57 * | 0 | 0 | 0 |
| 28 | Chemicals and allied products | 62,742 | 88,807 | 71,534 | 14,156 | 46,708 | 28,306 |
| 29 | Petroleum and coal products | 3,021 * | 20,737 | 20,737 | 3,448 | 19,007 | 12,675 |
| 30 | Rubber and misc. plastics products | 20,523 * | 15,285 * | 5,902 | 1,729 | 5,803 | 1,383 |
| 31 | Leather and leather products | 101 * | 8 * | 0 | 0 | 0 | 0 |
| 32 | Stone, clay, and glass products | 34,520 * | 17,862 | 5,433 | 2,595 | 2,025 | 705 |
| 33 | Primary metal products | 42,016 | 50,150 * | 8,770 | 6,316 | 12,168 | 5,827 |
| 34 | Fabricated metal products | 41,546 * | 38,192 | 6,824 * | 6,135 | 11,960 | 2,335 |
| 35 | Industrial machinery and equipment | 29,381 | 23,080 | 9,998 | 4,313 | 9,605 | 2,448 |
| 36 | Electronic and other electric equipment | 20,550 | 28,259 | 10,688 | 2,339 | 11,422 | 7,882 |
| 37 | Transportation equipment | 42,965 | 86,796 | 18,958 | 6,520 | 16,930 | 3,493 |
| 38 | Instruments and related products | 11,414 | 13,602 | 9,192 | 1,342 | 4,470 | 1,296 |
| 39 | Miscellaneous manufacturing industries | 18,431 * | 15,452 | 2,401 * | 6,554 | 2,337 | 555 |
| 40 | Railroad transportation | NA | NA | NA | NA | NA | NA |
| 41 | Local and interurban passenger transit | 5,589 * | 2,536 | 203 * | 467 | 587 * | 419 * |
| 42 | Trucking and warehousing | 26,422 * | 9,488 * | 7,702 | 4,299 | 4,879 | 2,446 |
| 44 | Water transportation | 973 * | 20,591 * | 143 * | 20,591 | 64 * | 0 |
| 45 | Transportation by air | 3,443 * | 3,443 * | 3,443 * | 13 * | 11,282 | 0 |
| 46 | Pipelines, except natural gas | 40 * | 471 * | 237 * | 160 | 295 | 215 |
| 47 | Transportation services | 25 * | 214 * | 0 | 2 | 8 * | 0 |
| 48 | Communications | 336 * | 2,844 * | 49 * | 27 | 18 * | 0 |
| 49 | Electric, gas, and sanitary services | 22,784 | 62,648 | 35,279 * | 7,147 | 27,403 | 13,905 |
| 50 | Wholesale trade--durable goods | 35,783 | 22,876 | 16,548 * | 4,734 | 6,936 | 5,072 |
| 51 | Wholesale trade--nondurable goods | 75,813 * | 50,120 | 13,576 | 16,524 | 19,157 | 4,244 |
| 52 | Building materials and garden supplies | 34,024 * | 8,296 * | 4,061 * | 496 | 89 * | 66 * |
| 53 | General merchandise stores | 1,008 * | 1,008 * | 190 * | 1,008 | 19 * | 19 * |
| 54 | Food stores | 2,786 * | 2,110 * | 802 * | 498 | 921 | 621 |
| 55 | Automotive dealers and service stations | 66,440 * | 52,361 * | 22,888 | 16,426 | 19,415 * | 7,139 |
| 56 | Apparel and accessory stores | 867 * | 345 * | 85 * | 64 | 1,442 * | 9 * |
| 57 | Furniture and homefurnishings stores | 4,556 * | 2,723 * | 799 * | 1,494 | 77 * | 77 * |
| 58 | Eating and drinking places | 0 | 0 | 0 | 0 | 0 | 0 |
| 59 | Miscellaneous retail | 7,034 * | 1,577 * | 787 * | 203 | 27 * | 27 * |
| 60 | Depository institutions | 1,933 * | 1,790 * | 59 * | 57 | 0 | 0 |
| 61 | Nondepository institutions | 294 * | 238 * | 13 * | 1 | 0 | 0 |
| 62 | Security and commodity brokers | 274 * | 222 * | 12 * | 1 | 0 | 0 |
| 63 | Insurance carriers | 1,055 * | 761 * | 19 * | 2 | 0 | 0 |
| 64 | Insurance agents, brokers, and services | 732 * | 593 * | 32 * | 3 | 0 | 0 |
| 65 | Real estate | 5,760 * | 10,161 * | 218 * | 7 | 0 | 0 |
| 67 | Holding and other investment offices | 595 * | 165 * | 7 * | 0 | 0 | 0 |
| 70 | Hotels and other lodging places | 72,978 * | 4,959 * | 18,012 * | 21 * | 0 | 0 |
| 72 | Personal services | 10,771 * | 19,239 * | 12,074 * | 188 * | 0 | 0 |
| 73 | Business services | 78,724 * | 45,461 * | 24,576 * | 261 * | 30,116 | 29,997 |
| 75 | Auto repair, services, and parking | 115,969 * | 56,952 | 15,320 | 12,888 | 23,583 | 6,787 |
| 76 | Miscellaneous repair services | 26,018 * | 15,868 * | 6,066 * | 72 * | 4,730 | 0 |
| 78 | Motion pictures | 859 * | 650 * | 243 * | 0 | 0 | 0 |
| 79 | Amusement and recreation services | 14,915 * | 7,217 | 3,650 * | 26 * | 0 | 0 |
| 80 | Health services | 637,932 * | 123,157 * | 64,125 * | 69,893 | 4,236 * | 3,829 |
| 81 | Legal services | 3,145 * | 2,379 * | 890 * | 0 | 0 | 0 |
| 82 | Educational services | 29,197 * | 2,691 | 8,259 * | 226 | 0 | 0 |
| 83 | Social services | 7,868 * | 5,128 * | 1,813 * | 129 * | 0 | 0 |
| 84 | Museums, botanical, zoological gardens | 2,212 * | 2,652 * | 586 * | 4 * | 625 | 624 |
| 86 | Membership organizations | 1,035 * | 1,276 * | 326 * | 9 * | 0 | 0 |
| 87 | Engineering and management services | 69,687 * | 42,515 * | 19,530 * | 6,350 | 3,354 | 3,354 |
| 89 | Services, n.e.c. | 715 * | 928 * | 0 | 0 | 0 | 0 |
| | Totals | 2,250,327 | 1,376,547 | 655,857 | 294,682 | 421,402 | 187,728 |

Source: Preliminary results from the 2001 NIOSH-BLS "Survey of Respirator Use and Practices", in press. Benchmarked to 1997 establishment counts from U.S. Bureau of the Census, Statistics of U.S. Businesses, 1997.
* Suppressed industry-level estimates extrapolated from sector totals.
[1] Includes both SCBA and respirators with air supplied by hose.

BILLING CODE 4510-26-C

The standard would have different impacts on employers using respirators to comply with OSHA substance-specific standards than for employers using respirators for other purposes. Therefore, OSHA used findings from the NIOSH-BLS survey of establishments that reported respirator use, by general respirator class, for protection against specific substances (see Table V–3). OSHA applied these numbers to all respirator users and establishments within the industries that make up each sector to derive substance-specific estimates of respirator use. For those § 6(b)(5) substances not reported by NIOSH, OSHA used expert judgments of a consultant with experience in the respirator industry to estimate the percentage of establishments and employees that use respirators for protection against these chemicals (Ex. 6–2) (see Table V–3).

*C. Compliance Costs*

The standard does not raise issues of technological feasibility because it requires only that employers use respirators already on the market. Further, these respirators are already in use and have proven feasible in a wide variety of industrial settings. However, costs for the APF standard result from requiring some users to switch to more protective respirators than they currently use. When the APF is lower than the baseline (current) APF, respirator users must upgrade to a more protective model. Both the 1992 ANSI Z88.2 Respiratory Protection Standard and the 1987 NIOSH RDL specify APFs for certain classes of respirators. The Agency assumed that employers currently use the ANSI or NIOSH APFs, or the APFs in the OSHA substance-specific standards, as applicable, to select respirators. While the Agency currently refers to the NIOSH RDL as its primary reference for APFs, in the absence of an applicable OSHA standard, this analysis assumes that, in most cases, adhering to the existing ANSI APFs fulfills employers' legal obligation for proper respirator selection

under the existing Respiratory Protection Standard. However, in the case of full facepiece negative pressure respirators, the Agency has established that an APF of 50, as opposed to ANSI's APF of 100, is currently acceptable. In this regard, all but one of the substance-specific standards with APFs for full facepiece negative pressure respirators set an APF of 50. In addition, the existing respirator rule and its supporting preamble require that quantitative fit testing of full facepiece negative pressure respirators must achieve a fit factor of 500 when employees use them in atmospheres in excess of 10 times the PEL; this requirement assumes a safety factor of 10. Therefore, based on a fit factor of 500, such respirators are safe to wear in atmospheres up to 50 times the PEL, consistent with similar requirements regarding respirator use found in existing standards for § 6(b)(5) chemicals.

BILLING CODE 4510–26–P

Table V–3A

Establishments Using Respirators to Protect Against Selected Substances

| Sector/Respirator Class | Establishments With Respirators | Arsenic | | Asbestos | | Cadmium | | Lead | | Cotton Dust [1] | | Coke Oven Emissions | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Air-Purifying Respirators** | | | | | | | | | | | | | |
| Agriculture | 13,200 | 1,200 | 9.1% | 1,200 | 9.1% | 1,200 | 9.1% | 1,100 | 8.3% | 2,500 | 18.9% | 1,000 | 7.6% |
| Mining | 3,500 | 200 | 5.7% | 400 | 11.4% | 200 | 5.7% | 300 | 8.6% | 100 | 2.9% | 100 | 2.9% |
| Construction | 60,000 | 2,800 | 4.6% | 6,000 | 10.0% | 2,600 | 4.3% | 7,900 | 13.2% | 800 | 1.3% | 900 | 1.5% |
| Manufacturing | 46,200 | 2,500 | 5.4% | 4,000 | 8.7% | 2,700 | 5.8% | 5,500 | 11.9% | 1,400 | 3.0% | 2,000 | 4.3% |
| Transportation and utilities | 9,700 | 900 | 9.3% | 2,200 | 22.7% | 600 | 6.2% | 1,400 | 14.4% | 200 | 2.1% | 200 | 2.1% |
| Wholesale trade | 28,000 | 800 | 2.9% | 2,600 | 9.3% | 1,800 | 6.4% | 3,700 | 13.2% | 1,100 | 3.9% | 700 | 2.5% |
| Retail trade | 16,100 | 100 | 0.6% | 300 | 1.9% | 200 | 1.2% | 600 | 3.7% | 100 | 0.6% | 0 | 0.0% |
| Finance, insurance, and real estate | 4,200 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Services | 86,600 | 1,600 | 1.8% | 8,700 | 10.0% | 1,500 | 1.7% | 10,800 | 12.5% | 1,000 | 1.2% | 800 | 0.9% |
| Total | 267,500 | 10,200 | 3.8% | 25,400 | 9.5% | 10,800 | 4.0% | 31,300 | 11.7% | 7,200 | 2.7% | 5,700 | 2.1% |
| **Supplied-Air Respirators** | | | | | | | | | | | | | |
| Agriculture | 500 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.05% | 0 | 0.0% |
| Mining | 600 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.00% | 0 | 0.0% |
| Construction | 10,500 | 1,700 | 16.2% | 1,000 | 9.5% | 1,600 | 15.2% | 2,400 | 22.9% | 0 | 0.00% | 0 | 0.0% |
| Manufacturing | 12,700 | 400 | 3.1% | 600 | 4.7% | 600 | 4.7% | 1,100 | 8.7% | 3 | 0.02% | 200 | 1.6% |
| Transportation and utilities | 3,800 | 100 | 2.6% | 1,000 | 26.3% | 100 | 2.6% | 300 | 7.9% | 1 | 0.02% | 0 | 0.0% |
| Wholesale trade | 6,800 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 700 | 10.3% | 1 | 0.01% | 0 | 0.0% |
| Retail trade | 2,900 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 200 | 6.9% | 0 | 0.00% | 0 | 0.0% |
| Finance, insurance, and real estate | 0 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Services | 9,500 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 400 | 4.2% | 0 | 0.00% | 0 | 0.0% |
| Total | 47,300 | 2,200 | 4.7% | 2,600 | 5.5% | 2,300 | 4.9% | 5,100 | 10.8% | 6 | | 200 | 0.4% |

Source: The 2001 NIOSH-BLS "Survey of Respirator Use and Practices", Bureau of Labor Statistics Press Release, March 20, 2002.

[1] Estimates for supplied-air respirators provided by ERG consultant Jeffrey Stull of International Personal Protection, Inc.

**Table V-3B**

**Establishments Using Respirators to Protect Against Selected Substances**

| Sector/Respirator Class | Establishments With Respirators [1] | Acrylonitrile | | Formaldehyde | | DBCP | | Ethylene oxide | | Vinyl chloride | | Butadiene | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Air-Purifying Respirators** | | | | | | | | | | | | | |
| Agriculture | 13,200 | 0 | 0.00% | 66 | 0.50% | 1 | 0.01% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Mining | 3,500 | 0 | 0.00% | 4 | 0.10% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Construction | 60,000 | 0 | 0.00% | 480 | 0.80% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Manufacturing | 46,200 | 92 | 0.20% | 554 | 1.20% | 5 | 0.01% | 231 | 0.50% | 462 | 1.00% | 370 | 0.80% |
| Transportation and utilities | 9,790 | 5 | 0.05% | 1 | 0.01% | 0 | 0.00% | 1 | 0.01% | 1 | 0.01% | 0 | 0.00% |
| Wholesale trade | 28,000 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Retail trade | 16,100 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Finance, insurance, and real estate | 4,200 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Services | 86,600 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 43 | 0.05% | 0 | 0.00% | 0 | 0.00% |
| Total | 267,500 | 97 | 0.04% | 1,105 | 0.4% | 6 | 0.00% | 275 | 0.1% | 463 | 0.17% | 370 | 0.14% |
| **Supplied-Air Respirators** | | | | | | | | | | | | | |
| Agriculture | 500 | 0 | 0.00% | 0 | 0.00% | 0 | 0.01% | 0 | 0.01% | 0 | 0.00% | 0 | 0.00% |
| Mining | 600 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Construction | 10,500 | 0 | 0.00% | 5 | 0.05% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Manufacturing | 12,700 | 64 | 0.50% | 102 | 0.80% | 1 | 0.01% | 114 | 0.90% | 152 | 1.20% | 76 | 0.60% |
| Transportation and utilities | 3,800 | 1 | 0.02% | 1 | 0.02% | 0 | 0.00% | 1 | 0.02% | 1 | 0.03% | 0 | 0.01% |
| Wholesale trade | 6,800 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Retail trade | 2,900 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Finance, insurance, and real estate | 0 | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Services | 9,500 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 0.01% | 0 | 0.00% |
| Total | 47,300 | 64 | 0.14% | 108 | 0.2% | 1 | 0.0% | 116 | 0.2% | NA | NA | 77 | 0.16% |

Source: Estimates provided by ERG consultant Jeffery Stull of International Personal Protection, Inc.
[1] The 2001 NIOSH-BLS "Survey of Respirator Use and Practices", Bureau of Labor Statistics Press Release, March 20, 2002.

BILLING CODE 4510-26-C

For each respirator type, OSHA compared the new and existing standards and, where these new APFs were lower, identified an incrementally more protective respirator model. To be adequate, the more protective respirator must have an APF greater than the current APF.

1. Number of Users Required To Upgrade Respirator Models

For a given respirator type, the number of users required to shift to a more protective respirator depends on two factors: the total number of users of that type, and the percentage of those users for whom the ambient exposure level is greater than the APF. While survey data are available to estimate the number of users, virtually no information is available in the literature that provides a basis for estimating the percentage of users required to upgrade respirators. The percentage of workers switching respirators would depend on the profile or frequency distribution of users' exposure to contaminants relative to the PEL. For example, the Agency is lowering the APFs for full facepiece respirators used to protect against cotton dust from 100 to 50; accordingly, when workers have ambient exposures that are greater than 50 times the PEL, employers must upgrade the respirator from a full facepiece negative pressure respirator to a more protective respirator (e.g., a PAPR).

Because of the absence of data on this issue, OSHA made several assumptions regarding the requirement to upgrade respirators. First, OSHA assumed that employers use respirators only when their employees have exposures above the PEL. Second, OSHA assumed employers use the most inexpensive respirator permitted, taking into consideration the employees' safety and compliance with regulatory requirements. These assumptions most likely overestimate the cost of compliance because many employers require their employees to use respirators when OSHA does not require such use, or they require respirators with higher APFs than OSHA currently requires. As a result, this analysis assumes shifts in respirators that employers may have implemented already. Two commenters on this issue agreed that these assumptions overestimate the number of employers that would need to change respirators as a result of this rule (see Exs. 9–16 and 13–8). One commenter (Ex. 9–16) noted that "For about twenty years, 3M has looked for worksites where employers were using respirators at concentrations at the upper end of the APF range. We have not been able to find these worksites." This commenter went on to note, as a result "we believe that the overall compliance costs associated with the proposal, as currently written, will likely be even lower than OSHA has estimated."

The Agency estimated distributions of exposures above the PELs based on reports from its Integrated Management Information System describing workplace monitoring of § 6(b)(5) toxic substances performed during OSHA health inspections. Of the 9,095 samples reported above the PELs, 68.0 percent reported exposures between one and five times the PEL, 13.1 percent found exposures between five and 10 times the PEL, and 9.5 percent documented exposures between 10 and 25 times the PEL. Exposures for the remaining 9.4 percent of the samples were greater than 25 times the PEL. Based on these data, OSHA modeled the current exposure distribution for each respirator type.

2. Incremental Costs of Upgrading Respirator Models

OSHA also analyzed the costs of upgrading from the current respirator to a more protective alternative. In doing so, OSHA estimated the annualized unit costs for each respirator type, including equipment and accessory costs, and the costs for training and fit testing. One commenter (Ex. 17–9) noted the importance of not just considering the initial costs of a respirator, but all associated costs. OSHA has considered

all of these costs, including training, fit testing, program development, and medical evaluation, as this commenter suggested. OSHA then calculated the incremental cost for each combination of upgrades from an existing model to a more protective one, taking into account the effect of replacement before the end of the respirator's useful life. These annualized costs range from $49.98 (for upgrading from a supplied-air, demand mode, full facepiece respirator to a supplied-air, continuous flow, half-mask respirator) to $963.73 (for upgrading from a non-powered, air-purifying full facepiece respirator to a full facepiece PAPR).

In certain instances, workers who use respirators under the substance-specific standards may have to upgrade to a SAR with an auxiliary escape SCBA. Several substance-specific standards currently specify SARs for exposures that exceed 1,000 times the PEL.[4] OSHA believes that workers are unlikely to regularly use respirators at such extreme exposure levels, i.e., they are most likely to use them only in exceptional, possibly emergency-related situations. Furthermore, exposures at levels more than 1,000 times the PEL would generally be at or above levels deemed immediately dangerous to life or health (IDLH), so employers already are required by the Respiratory Protection Standard to provide each worker with a respirator that has SCBA capability. For these reasons, this PERFSA estimated no impacts for these situations.[5]

### 3. Aggregate Compliance Costs

For each respirator type affected by the regulation, OSHA combined the incremental costs of upgrading to a more protective respirator, the estimated share of users forecast to upgrade, and the number of users involved to estimate the compliance costs

associated with each respirator type. Table V–4 shows estimated compliance costs for OSHA's APF rule. The rule would require 1,918 users of non-powered air-purifying respirators to upgrade to some respirator more expensive than they are now using at a cost of $1.8 million. The Agency estimates that 22,848 PAPR users would upgrade their respirators at a cost of $2.3 million. A relatively small number of SAR users (5,110) would upgrade to more expensive respirators at a cost of $0.4 million. Industry-specific compliance costs vary according to the number of respirator users and the proportion of these users affected by the rule. Industries with relatively large compliance costs include SIC 17, Special trade contractors ($0.8 million), and SIC 80, Health services ($0.8 million).

As discussed previously, the Agency believes the actual costs of the standard almost certainly are overestimated. The cost analysis assumes all respirator wearers have levels of exposures that require the particular respirator they are using. Under this assumption, 15,000 employees would be allowed to safely *shift to a less expensive respirator*, which could lead to cost savings for the employer. Such potential cost savings are not accounted for in this cost analysis.

In many cases, employers use respirators when respirators are not required by OSHA, or use respirators more protective than required by OSHA. As a result, OSHA's cost analysis overestimates the number of employees who are affected by the standard, and therefore overestimates costs associated with the standard.

### D. Benefits

The benefits that would accrue to respirator users and their employers take several forms. The standard would benefit workers by reducing their exposures to respiratory hazards. Improved respirator selection would augment previous improvements to the Respiratory Protection Standard, such as better fit-test procedures and improved

training, contributing substantially to greater worker protection. Estimates of benefits are difficult to calculate because of uncertainties regarding the existing state of employer respirator-selection practices and the number of covered work-related illnesses. At the time of the 1998 revisions to the Respiratory Protection Standard, the Agency estimated that the standard would avert between 843 and 9,282 work-related injuries and illnesses annually, with a best estimate (expected value) of 4,046 averted illnesses and injuries annually (63 FR 1173). In addition, OSHA estimated that the standard would prevent between 351 and 1,626 deaths annually from cancer and many other chronic diseases, including cardiovascular disease, with a best estimate (expected value) of 932 averted deaths from these causes. The APFs in this rulemaking will help ensure that these benefits are achieved, as well as provide an additional degree of protection. These APFs also will reduce employee exposures to several § 6(b)(5) chemicals covered by standards with outdated APF criteria, thereby reducing exposures to chemicals such as asbestos, lead, cotton dust, and arsenic.[6] While the Agency did not quantify these benefits, it estimates that 29,655 employees would have a higher degree of respiratory protection under this APF standard. Of these employees, an estimated 8,384 have exposure to lead, 7,287 to asbestos, and 3,747 to cotton dust, all substances with substantial health risks.

**BILLING CODE 4510–26–P**

---

[4] These standards regulate cotton dust, coke oven emissions, acrylonitrile, arsenic, DBCP, ethylene oxide, and lead.

[5] Paragraph (d)(2) of the Respiratory Protection Standard requires employers to provide either a pressure demand SCBA or a pressure demand SAR with auxiliary SCBA to any employee who works in IDLH atmospheres.

[6] In the 1998 rulemaking revising the Respiratory Protection Standard, the Final Economic Analysis noted that the standard would not directly affect the benefits for the estimated 5% of employees who use respirators under OSHA's substance-specific health standards (except to the extent that uniformity of provisions improve compliance). Therefore, the Agency likely over-estimated the benefits of that rulemaking since the standard did not affect directly the type of respirator used by those employees (63 FR 1173). Conversely, this rule directly addresses the APF provisions of the substance-specific standards; therefore, this rule would affect directly the respirators used by employees covered by these standards.

HeinOnline -- 71 Fed. Reg. 50150 2006

Federal Register / Vol. 71, No. 164 / Thursday, August 24, 2006 / Rules and Regulations

BILLING CODE 4510-26-C

HeinOnline -- 71 Fed. Reg. 50151 2006

**Table V-4**

**Summary of Costs by Respirator Class**

| SIC | Industry | Non-powered Air-Purifying Respirators | | | Powered Air-Purifying Respirators | | | Supplied-Air Respirators | | | Total Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Users [1] | No. Upgrading | Cost | Users [1] | No. Upgrading | Cost | Users [1,2] | No. Upgrading | Cost | |
| 07 | Agricultural services | 60,662 | 46 | $43,030 | 139 | 7 | $657 | 467 | 2 | $661 | $43,766 |
| 08 | Forestry | 996 | 0 | $0 | 3 | 0 | $0 | 18 | 0 | $0 | $0 |
| 09 | Fishing, hunting, and trapping | 0 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 13 | Oil and gas extraction | 27,761 | 6 | $6,016 | 6,046 | 415 | $50,667 | 666 | 12 | $1,399 | $58,302 |
| 15 | General building contractors | 122,350 | 15 | $13,713 | 4,355 | 288 | $30,819 | 5,846 | 80 | $9,067 | $53,300 |
| 16 | Heavy construction, except building | 70,768 | 17 | $15,472 | 7,342 | 380 | $38,426 | 5,719 | 90 | $9,445 | $63,344 |
| 17 | Special trade contractors | 663,282 | 296 | $276,942 | 102,625 | 3,933 | $428,165 | 85,591 | 1,007 | $87,432 | $792,539 |
| 20 | Food and kindred products | 60,330 | 58 | $54,509 | 4,105 | 107 | $12,643 | 2,600 | 80 | $6,620 | $73,772 |
| 21 | Tobacco products | 4,821 | 0 | $0 | 271 | 0 | $0 | 121 | 3 | $125 | $125 |
| 22 | Textile mill products | 38,704 | 18 | $14,112 | 6,572 | 36 | $4,153 | 164 | 4 | $190 | $18,455 |
| 23 | Apparel and other textile products | 5,984 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 24 | Lumber and wood products | 29,339 | 12 | $11,535 | 3,178 | 102 | $12,283 | 702 | 11 | $535 | $24,353 |
| 25 | Furniture and fixtures | 24,657 | 8 | $7,703 | 844 | 18 | $1,847 | 521 | 5 | $367 | $9,937 |
| 26 | Paper and allied products | 35,886 | 27 | $25,382 | 2,066 | 73 | $7,507 | 2,662 | 57 | $2,853 | $35,742 |
| 27 | Printing and publishing | 1,456 | 0 | $0 | 0 | 0 | $0 | 3 | 0 | $0 | $0 |
| 28 | Chemicals and allied products | 223,063 | 307 | $287,588 | 16,791 | 236 | $25,243 | 27,066 | 443 | $22,139 | $334,970 |
| 29 | Petroleum and coal products | 44,494 | 89 | $83,367 | 5,207 | 35 | $4,099 | 6,333 | 147 | $9,052 | $96,518 |
| 30 | Rubber and misc. plastics products | 41,711 | 25 | $23,728 | 4,437 | 43 | $5,152 | 6,283 | 84 | $8,583 | $37,463 |
| 31 | Leather and leather products | 108 | 0 | $0 | 0 | 0 | $0 | 340 | 11 | $1,651 | $1,651 |
| 32 | Stone, clay, and glass products | 57,815 | 23 | $21,844 | 4,123 | 131 | $13,691 | 1,948 | 5 | $246 | $35,781 |
| 33 | Primary metal industries | 100,933 | 36 | $35,257 | 7,163 | 270 | $27,931 | 7,061 | 60 | $6,326 | $69,534 |
| 34 | Fabricated metal products | 86,562 | 29 | $27,435 | 8,688 | 152 | $15,706 | 12,536 | 93 | $9,955 | $53,096 |
| 35 | Industrial machinery and equipment | 52,459 | 43 | $40,196 | 5,501 | 36 | $4,362 | 9,549 | 51 | $4,156 | $48,714 |
| 36 | Electronic and other electric equipment | 59,497 | 46 | $42,958 | 2,967 | 99 | $11,927 | 9,419 | 109 | $6,641 | $61,337 |
| 37 | Transportation equipment | 148,710 | 81 | $75,217 | 6,511 | 125 | $14,454 | 18,614 | 241 | $24,306 | $114,609 |
| 38 | Instruments and related products | 34,206 | 39 | $36,953 | 2,412 | 17 | $2,073 | 4,737 | 50 | $3,320 | $42,345 |
| 39 | Miscellaneous manufacturing industries | 36,285 | 10 | $9,653 | 10,640 | 539 | $54,860 | 2,161 | 22 | $1,915 | $76,427 |
| 40 | Railroad transportation | NA | NA | $0 | NA | NA | $1,054 | NA | NA | $516 | $1,561 |
| 41 | Local and interurban passenger transit | 6,327 | 0 | $0 | 1,005 | 86 | $8,330 | 168 | 2 | $124 | $8,453 |
| 42 | Trucking and warehousing | 43,611 | 22 | $21,069 | 6,492 | 326 | $39,424 | 5,632 | 104 | $9,349 | $69,843 |
| 44 | Water transportation | 21,707 | 0 | $0 | 21,460 | 2,368 | $290,046 | 64 | 1 | $107 | $290,064 |
| 45 | Transportation by air | 10,328 | 10 | $9,417 | 17 | 0 | $0 | 12,005 | 225 | $11,267 | $20,684 |
| 46 | Pipelines, except natural gas | 747 | 0 | $0 | 237 | 3 | $312 | 80 | 1 | $58 | $369 |
| 47 | Transportation services | 240 | 0 | $0 | 2 | 0 | $0 | 8 | 0 | $0 | $0 |
| 48 | Communications | 3,229 | 0 | $0 | 37 | 0 | $0 | 18 | 0 | $0 | $0 |
| 49 | Electric, gas, and sanitary services | 120,711 | 103 | $96,504 | 7,545 | 65 | $7,532 | 14,630 | 249 | $15,425 | $119,461 |
| 50 | Wholesale trade–durable goods | 73,206 | 92 | $80,246 | 5,430 | 52 | $6,040 | 5,217 | 107 | $5,846 | $100,631 |
| 51 | Wholesale trade–nondurable goods | 139,506 | 78 | $70,757 | 16,624 | 1,788 | $164,785 | 15,428 | 38 | $4,140 | $239,682 |
| 52 | Building materials and garden supplies | 45,382 | 4 | $3,347 | 852 | 19 | $1,942 | 69 | 3 | $494 | $5,683 |
| 53 | General merchandise stores | 2,206 | 0 | $0 | 1,111 | 32 | $2,932 | 0 | 0 | $0 | $2,932 |
| 54 | Food stores | 5,698 | 0 | $0 | 854 | 19 | $1,948 | 0 | 0 | $0 | $1,948 |
| 55 | Automotive dealers and service stations | 141,690 | 20 | $18,660 | 21,035 | 177 | $19,674 | 17,645 | 435 | $21,720 | $60,454 |
| 56 | Apparel and accessory stores | 1,297 | 0 | $0 | 110 | 1 | $105 | 1,442 | 56 | $5,561 | $5,667 |
| 57 | Furniture and homefurnishings stores | 6,076 | 0 | $0 | 2,089 | 71 | $7,253 | 0 | 0 | $0 | $7,253 |
| 58 | Eating and drinking places | 0 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 59 | Miscellaneous retail | 9,376 | 0 | $0 | 349 | 7 | $696 | 0 | 0 | $0 | $696 |
| 60 | Depository institutions | 3,782 | 0 | $0 | 57 | 0 | $0 | 0 | 0 | $0 | $0 |
| 61 | Nondepository institutions | 545 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 62 | Security and commodity brokers | 505 | 0 | $0 | 1 | 0 | $0 | 0 | 0 | $0 | $0 |
| 63 | Insurance carriers | 1,835 | 0 | $0 | 2 | 0 | $0 | 0 | 0 | $0 | $0 |
| 64 | Insurance agents, brokers, and service | 1,357 | 0 | $0 | 3 | 0 | $0 | 0 | 0 | $0 | $0 |
| 65 | Real estate | 16,139 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 67 | Holding and other investment offices | 768 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 70 | Hotels and other lodging places | 93,949 | 26 | $24,531 | 21 | 0 | $0 | 0 | 0 | $0 | $24,531 |
| 72 | Personal services | 42,054 | 20 | $18,497 | 188 | 0 | $0 | 0 | 0 | $0 | $18,497 |
| 73 | Business services | 148,761 | 40 | $37,651 | 261 | 0 | $0 | 119 | 3 | $132 | $37,783 |
| 75 | Auto repair, services, and parking | 185,241 | 29 | $23,471 | 28,435 | 1,308 | $141,436 | 27,632 | 815 | $91,407 | $256,314 |
| 76 | Miscellaneous repair services | 47,952 | 10 | $9,263 | 484 | 0 | $0 | 4,730 | 178 | $25,985 | $35,231 |
| 78 | Motion pictures | 1,752 | 0 | $0 | 0 | 0 | $0 | 2 | 0 | $0 | $0 |
| 79 | Amusement and recreation services | 25,782 | 6 | $5,592 | 26 | 0 | $0 | 0 | 0 | $0 | $5,592 |
| 80 | Health services | 825,213 | 100 | $95,238 | 76,340 | 8,094 | $740,937 | 1,365 | 14 | $691 | $836,866 |
| 81 | Legal services | 6,414 | 11 | $1,363 | 0 | 0 | $0 | 3 | 0 | $0 | $1,363 |
| 82 | Educational services | 40,347 | 14 | $12,652 | 226 | 0 | $0 | 0 | 0 | $0 | $12,652 |
| 83 | Social services | 14,800 | 3 | $2,778 | 129 | 0 | $0 | 0 | 0 | $0 | $2,778 |
| 84 | Museums, botanical, zoological gardens | 5,430 | 0 | $0 | 4 | 0 | $0 | 0 | 0 | $0 | $0 |
| 86 | Membership organizations | 2,636 | 0 | $0 | 0 | 0 | $0 | 0 | 0 | $0 | $0 |
| 87 | Engineering and management services | 131,731 | 32 | $29,919 | 12,065 | 734 | $67,171 | 1,114 | 23 | $1,399 | $98,488 |
| 89 | Services, n.e.c. | 1,643 | 0 | $0 | 0 | 0 | $0 | 3 | 0 | $0 | $0 |
| | Totals | 4,262,731 | 1,840 | $1,723,504 | 423,531 | 22,191 | $2,277,927 | 315,672 | 4,925 | $414,245 | $4,415,976 |

Source: OSHA estimates based preliminary results from the 2001 NIOSH-BLS "Survey of Respirator Use and Practices," in press.
[1] Includes employees who use more than one type of respirator. Total may exceed total number of users for respirator class.
[2] Excludes employees using SCBAs exclusively.

In addition to health benefits, OSHA believes other benefits result from the harmonization of APF specifications, thereby making compliance with the respirator rule easier for employers. Employers also benefit from greater administrative ease in proper respirator selection. Employers would no longer have to consult several sources and several OSHA standards to determine the best choice of respirator, but could make their choices based on a single, easily found regulation. Some employers who now hire consultants to aid in choosing the proper respirator should be able to make this choice on their own with the aid of this rule. In addition to having only one set of numbers (i.e., APFs) to assist them with respirator selection for nearly all substances, some employers may be able to streamline their respirator stock by using one respirator class to meet their respirator needs instead of several respirator classes. The increased ease of compliance would also yield additional health benefits to employees using respirators.

Alternatively, these APFs would clarify when employers can safely place employees in respirators that impose less stress on the cardiovascular system (e.g., filtering facepiece respirators). Many of these alternative respirators may have the additional benefit of being less expensive to purchase and operate. As previously discussed, OSHA estimates that over 15,000 employees currently use respirators that fall in this group (i.e., shift to a less expensive respirator).

One commenter (Ex. 9–16) agreed that the standard would have significant benefits, saying:

3M concurs with OSHA's conclusion that significant health benefits will accrue to workers as a result of this rulemaking. 3M believes that the majority of these benefits will be the result of simplification of the respirator selection process for employers. This will in turn lead to greater compliance with OSHA's various standards regarding exposure to toxic and harmful substances. * * *

In addition to these benefits from increased compliance, 3M also concurs with OSHA's determination that the simplification and clarification of the APF tables will result in lessening of cardiovascular stress, as well as other potential stresses, because of the ability to select a filtering facepiece respirator.

### E. Economic Feasibility

OSHA is required to set standards that are feasible. To demonstrate that a standard is feasible, the courts have held that OSHA must "construct a reasonable estimate of compliance costs and demonstrate a reasonable likelihood that these costs will not threaten the existence or competitive structure of an industry" (*United Steelworkers of America, AFL–CIO–CLC* v. *Marshall* (the "Lead" decision), 647 F.2d 1189 (DC Cir. 1980)).

OSHA conducted its analysis of economic feasibility on an establishment basis. Accordingly, for each affected industry, the Agency compared estimates of per-establishment annualized compliance costs with per-establishment estimates of revenues and per-establishment estimates of profits. It used two worst-case assumptions regarding the ability of employers to pass the costs of compliance through to their customers: The no-cost-pass-through assumption, and the full-cost-pass-through assumption. Based on the results of these comparisons, which define the universe of potential impacts of the APFs, OSHA then assessed the economic feasibility for all affected establishments, i.e., those covered by this rule.

The Agency assumed that establishments falling within the scope of the standard would have the same average sales and profits as other establishments in their industries. OSHA believes this assumption is reasonable because no evidence is available showing that the financial characteristics of those firms with employees who use respirators are different from firms that do not use respirators. In the absence of such evidence, OSHA relied on the best available financial data (those from the Bureau of the Census (Ex. 6–4) and Robert Morris Associates (Ex. 6–5)), used a commonly accepted methodology to calculate industry averages, and based its analysis of the significance of the projected economic impacts and the feasibility of compliance on these data.

The analysis of the potential impacts of this standard on before-tax profits and sales shown in Table V–5 is a "screening analysis," so called because it simply measures costs as a percentage of pre-tax profits and sales under the worst-case assumptions discussed above, but does not predict impacts on these before-tax profits or sales. OSHA used the screening analysis to determine whether the compliance costs potentially associated with the standard could lead to significant impacts on all affected establishments. The actual impact of the standard on the profit and sales of establishments in a specific industry would depend on the price elasticity of demand for the products or services of these establishments.

Table V–5 shows the economic impacts of these costs. For each industry, OSHA constructed the average compliance cost per affected establishment and compared it to average revenues and average profits.[7] These costs are quite small, i.e., less than 0.005 percent of revenues; the one major exception is SIC 44 (Water transportation), for which OSHA estimated the costs impacts to be 0.16 percent of revenues. When the Agency compared average compliance costs with profits, the costs also are small, i.e., less than 0.17 percent; again, the major exception was SIC 44, which had an estimated impact of 2.12 percent of profits.[8] Based on the very small impacts for establishments in all industries shown in Table V–5, OSHA concludes that the APF standard is economically feasible, in the sense of being unlikely to close or alter the competitive structure of the affected industries, for the affected establishments.

**BILLING CODE 4510–26–P**

---

[7] OSHA defines "affected establishment" as any facility that uses respirators, as represented in the NIOSH–BLS survey data.

[8] For some industries, such as SIC 44, data from the NIOSH–BLS survey were suppressed due to low response rates. In these cases, the Agency, for the purposes of assessing economic feasibility, imputed broader sector-level data from the survey to form an estimate of respirator use. This procedure may result in overestimating the impact of the standard (proposal) in some industries. See the full FEA (Ex. 11) for further details.

HeinOnline -- 71 Fed. Reg. 50152 2006

Table V-5

Costs as a Percentage of Affected Establishment Revenues and Profits
(Based on Average Compliance Costs)

| SIC | Industry | Revenues ($1,000) | Establishments | Average Revenues ($1,000) | Profit Rate | Average Profits | Affected Establishments | Average Compliance Costs to Affected Establishments | Compliance Costs as a % of Revenues | Compliance Costs as a % of Profits |
|---|---|---|---|---|---|---|---|---|---|---|
| 07 | Agricultural services | $46,797,618 | 111,841 | $418.4 | 6.02% | $25,163 | 7,566 | 6.8% | $5.78 | 0.001% | 0.02% |
| 08 | Forestry | $2,533,391 | 2,689 | $942.1 | 10.30% | $97,040 | 261 | 9.7% | $0.00 | 0.000% | 0.00% |
| 09 | Fishing, hunting, and trapping | $2,056,630 | 2,443 | $845.9 | 5.80% | $49,099 | 0 | 0.0% | NA | NA | NA |
| 13 | Oil and gas extraction | $118,956,593 | 17,957 | $6,624.5 | 8.65% | $573,023 | 1,097 | 6.1% | $53.14 | 0.001% | 0.01% |
| 15 | General building contractors | $354,383,931 | 197,940 | $1,790.4 | 4.00% | $71,614 | 19,071 | 9.6% | $2.79 | 0.000% | 0.00% |
| 16 | Heavy construction, except building | $129,200,925 | 37,918 | $3,407.4 | 4.00% | $136,295 | 4,718 | 12.4% | $13.43 | 0.000% | 0.01% |
| 17 | Special trade contractors | $351,559,520 | 433,522 | $810.9 | 4.00% | $32,438 | 40,823 | 9.4% | $19.41 | 0.002% | 0.06% |
| 20 | Food and kindred products | $488,381,169 | 22,317 | $21,883.9 | 3.46% | $757,938 | 3,608 | 16.2% | $20.45 | 0.000% | 0.00% |
| 21 | Tobacco products | $36,626,849 | 185 | $197,983.0 | 4.02% | $7,953,335 | 30 | 16.2% | $4.18 | 0.000% | 0.00% |
| 22 | Textile mill products | $81,180,135 | 6,464 | $12,558.8 | 2.77% | $347,644 | 720 | 11.1% | $25.63 | 0.000% | 0.01% |
| 23 | Apparel and other textile products | $81,000,847 | 24,460 | $3,311.6 | 2.56% | $84,716 | 1,111 | 4.5% | $0.00 | 0.000% | 0.00% |
| 24 | Lumber and wood products | $111,381,076 | 37,716 | $2,953.2 | 3.90% | $115,143 | 1,995 | 5.3% | $12.21 | 0.000% | 0.01% |
| 25 | Furniture and fixtures | $61,269,677 | 12,388 | $4,945.9 | 3.51% | $173,603 | 2,053 | 16.6% | $4.84 | 0.000% | 0.00% |
| 26 | Paper and allied products | $163,517,039 | 6,863 | $23,825.9 | 4.50% | $1,072,365 | 649 | 9.5% | $55.10 | 0.000% | 0.01% |
| 27 | Printing and publishing | $209,740,895 | 63,986 | $3,277.9 | 3.80% | $124,545 | 124 | 0.2% | $0.00 | 0.000% | 0.00% |
| 28 | Chemicals and allied products | $406,616,253 | 13,691 | $29,699.5 | 4.49% | $1,332,353 | 5,052 | 36.9% | $66.30 | 0.000% | 0.01% |
| 29 | Petroleum and coal products | $178,393,963 | 2,459 | $72,547.4 | 2.99% | $2,168,714 | 432 | 17.6% | $221.09 | 0.000% | 0.01% |
| 30 | Rubber and misc. plastics products | $160,224,446 | 17,343 | $9,238.6 | 4.02% | $371,834 | 3,140 | 18.1% | $11.93 | 0.000% | 0.00% |
| 31 | Leather and leather products | $10,125,100 | 1,922 | $5,268.0 | 2.20% | $115,725 | 14 | 0.7% | $19.63 | 0.002% | 0.10% |
| 32 | Stone, clay, and glass products | $87,837,611 | 17,167 | $5,117.8 | 4.93% | $252,139 | 3,109 | 18.1% | $11.51 | 0.000% | 0.00% |
| 33 | Primary metal industries | $189,655,505 | 6,992 | $27,124.6 | 4.52% | $1,225,408 | 1,974 | 28.2% | $35.23 | 0.000% | 0.00% |
| 34 | Fabricated metal products | $231,787,815 | 39,399 | $5,883.1 | 4.55% | $267,453 | 7,374 | 18.7% | $7.07 | 0.000% | 0.00% |
| 35 | Industrial machinery and equipment | $410,878,326 | 57,563 | $7,137.9 | 4.05% | $288,782 | 7,458 | 13.0% | $6.53 | 0.000% | 0.00% |
| 36 | Electronic and other electric equipment | $349,240,947 | 18,619 | $18,757.2 | 5.59% | $1,048,780 | 2,731 | 14.7% | $22.46 | 0.000% | 0.00% |
| 37 | Transportation equipment | $522,250,748 | 13,210 | $39,534.5 | 3.74% | $1,479,823 | 3,788 | 28.7% | $30.26 | 0.000% | 0.00% |
| 38 | Instruments and related products | $158,683,979 | 12,385 | $12,813.4 | 5.06% | $648,479 | 1,282 | 10.4% | $33.03 | 0.000% | 0.01% |
| 39 | Miscellaneous manufacturing industries | $52,171,899 | 18,711 | $2,788.3 | 3.80% | $106,073 | 3,140 | 16.8% | $24.34 | 0.001% | 0.02% |
| 40 | Railroad transportation | NA | NA | NA | 11.08% | NA | NA | NA | NA | NA | NA |
| 41 | Local and interurban passenger transit | $18,741,822 | 20,067 | $934.0 | 4.51% | $42,101 | 809 | 4.0% | $10.45 | 0.001% | 0.02% |
| 42 | Trucking and warehousing | $197,132,916 | 135,874 | $1,450.9 | 3.91% | $56,783 | 4,090 | 3.0% | $17.08 | 0.001% | 0.03% |
| 44 | Water transportation | $34,059,390 | 9,392 | $3,626.4 | 7.48% | $271,426 | 50 | 0.5% | $5,755.39 | 0.159% | 2.12% |
| 45 | Transportation by air | $175,302,797 | 13,694 | $12,847.4 | 3.62% | $465,132 | 46 | 0.4% | $427.74 | 0.003% | 0.09% |
| 46 | Pipelines, except natural gas | $7,830,792 | 971 | $8,064.7 | 6.55% | $528,055 | 252 | 25.9% | $1.47 | 0.000% | 0.00% |
| 47 | Transportation services | $39,490,484 | 52,884 | $746.7 | 3.39% | $25,322 | 8 | 0.0% | $0.00 | 0.000% | 0.00% |
| 48 | Communications | $343,904,510 | 46,030 | $7,471.3 | 5.58% | $416,833 | 100 | 0.2% | $0.00 | 0.000% | 0.00% |
| 49 | Electric, gas, and sanitary services | $446,859,099 | 22,716 | $19,671.5 | 10.37% | $2,040,974 | 5,065 | 22.4% | $23.49 | 0.000% | 0.00% |
| 50 | Wholesale trade—durable goods | $2,290,609,326 | 341,942 | $6,698.8 | 2.54% | $170,449 | 18,854 | 5.5% | $5.35 | 0.000% | 0.00% |
| 51 | Wholesale trade—nondurable goods | $1,931,943,829 | 189,025 | $10,220.6 | 4.46% | $456,162 | 8,573 | 4.5% | $27.96 | 0.000% | 0.01% |
| 52 | Building materials and garden supplies | $152,492,069 | 70,964 | $2,176.5 | 2.37% | $51,621 | 2,388 | 3.4% | $2.38 | 0.000% | 0.00% |
| 53 | General merchandise stores | $334,801,710 | 36,481 | $9,177.4 | 2.70% | $248,028 | 687 | 1.9% | $4.27 | 0.000% | 0.00% |
| 54 | Food stores | $424,619,077 | 179,120 | $2,370.5 | 1.41% | $33,443 | 2,394 | 1.3% | $0.77 | 0.000% | 0.00% |
| 55 | Automotive dealers and service stations | $787,955,460 | 202,525 | $3,890.7 | 1.45% | $56,246 | 10,243 | 5.1% | $5.90 | 0.000% | 0.01% |
| 56 | Apparel and accessory stores | $117,838,184 | 126,658 | $930.4 | 1.85% | $17,181 | 308 | 0.2% | $26.16 | 0.003% | 0.16% |
| 57 | Furniture and homefurnishings stores | $138,532,297 | 117,939 | $1,174.6 | 2.28% | $26,812 | 2,769 | 2.3% | $2.62 | 0.000% | 0.01% |
| 58 | Eating and drinking places | $249,718,654 | 484,719 | $515.2 | 3.00% | $15,447 | 0 | 0.0% | NA | NA | NA |
| 59 | Miscellaneous retail | $372,192,817 | 374,786 | $993.1 | 2.49% | $24,711 | 978 | 0.3% | $0.71 | 0.000% | 0.00% |
| 60 | Depository institutions | $626,235,388 | 115,268 | $5,432.9 | 10.80% | $586,749 | 1,372 | 1.2% | $0.00 | 0.000% | 0.00% |
| 61 | Nondepository institutions | $208,902,233 | 53,365 | $3,914.8 | 15.05% | $589,102 | 299 | 0.6% | $0.00 | 0.000% | 0.00% |
| 62 | Security and commodity brokers | $267,894,402 | 50,032 | $5,354.5 | 13.32% | $712,970 | 278 | 0.6% | $0.00 | 0.000% | 0.00% |
| 63 | Insurance carriers | $977,328,464 | 41,778 | $23,394.5 | 6.82% | $1,596,288 | 442 | 1.1% | $0.00 | 0.000% | 0.00% |
| 64 | Insurance agents, brokers, and service | $76,085,799 | 132,265 | $575.3 | 6.63% | $38,291 | 744 | 0.6% | $0.00 | 0.000% | 0.00% |
| 65 | Real estate | $161,986,451 | 257,246 | $746.3 | 13.31% | $99,329 | 1,541 | 0.6% | $0.00 | 0.000% | 0.00% |
| 67 | Holding and other investment offices | $119,637,007 | 28,175 | $4,246.2 | 24.01% | $1,019,487 | 157 | 0.6% | $0.00 | 0.000% | 0.00% |
| 70 | Hotels and other lodging places | $103,075,607 | 59,897 | $1,720.9 | 6.96% | $119,782 | 1,326 | 2.2% | $18.50 | 0.001% | 0.02% |
| 72 | Personal services | $53,965,771 | 208,546 | $258.8 | 5.86% | $15,151 | 9,743 | 4.7% | $1.90 | 0.001% | 0.01% |
| 73 | Business services | $538,701,000 | 410,246 | $1,313.1 | 4.79% | $62,857 | 13,517 | 3.3% | $2.80 | 0.000% | 0.00% |
| 75 | Auto repair, services, and parking | $102,978,905 | 194,877 | $528.4 | 4.39% | $23,214 | 32,115 | 16.5% | $7.98 | 0.002% | 0.03% |
| 76 | Miscellaneous repair services | $39,630,526 | 68,439 | $570.3 | 5.44% | $31,000 | 3,375 | 4.9% | $10.45 | 0.002% | 0.03% |
| 78 | Motion pictures | $72,351,766 | 46,844 | $1,544.5 | 5.14% | $79,355 | 17 | 0.0% | $0.00 | 0.000% | 0.00% |
| 79 | Amusement and recreation services | $94,816,280 | 99,642 | $951.6 | 4.28% | $41,728 | 1,612 | 1.6% | $3.47 | 0.000% | 0.01% |
| 80 | Health services | $824,840,187 | 505,878 | $1,630.5 | 6.17% | $100,610 | 16,488 | 3.3% | $50.94 | 0.003% | 0.05% |
| 81 | Legal services | $124,335,948 | 170,271 | $730.2 | 17.50% | $127,789 | 61 | 0.0% | $22.44 | 0.003% | 0.02% |
| 82 | Educational services | $138,669,536 | 50,146 | $2,725.4 | 8.14% | $221,895 | 564 | 1.1% | $22.44 | 0.001% | 0.01% |
| 83 | Social services | $95,229,314 | 165,519 | $575.3 | 4.44% | $25,535 | 6,668 | 4.0% | $0.42 | 0.000% | 0.00% |
| 84 | Museums, botanical, zoological gardens | $6,636,189 | 5,466 | $1,214.1 | 21.45% | $260,421 | 235 | 4.3% | $0.00 | 0.000% | 0.00% |
| 86 | Membership organizations | $111,881,925 | 249,022 | $449.3 | 7.21% | $32,400 | 533 | 0.2% | $0.00 | 0.000% | 0.00% |
| 87 | Engineering and management services | $332,197,903 | 301,160 | $1,103.1 | 6.39% | $70,494 | 10,282 | 3.4% | $9.57 | 0.001% | 0.01% |
| 89 | Services, n.e.c. | $20,335,429 | 17,650 | $1,152.1 | 6.80% | $78,346 | 6 | 0.0% | $0.00 | 0.000% | 0.00% |
| | Totals | $18,186,265,527 | 6,854,769 | $2,653.1 | NA | NA | 282,334 | 4.1% | $15.64 | 0.001% | 0.01% |

Source: OSHA Office of Regulatory Analysis. See full FEA (Ex. 11)

*F. Economic Impacts to Small Entities*

OSHA also estimated the economic impacts of the rule on affected entities with fewer than 20 employees, and for affected small entities as defined by the Small Business Administration (SBA). Table V–6 shows the estimated economic impacts for small entities with fewer than 20 employees: average compliance costs by industry are less than 0.005 percent of average revenues, and less than 0.19 percent of profits, in all industries. Table V–7 presents the economic impacts for small entities as a whole, as defined by SBA. For these firms, average compliance costs are less than 0.005 percent of average revenues and less than 0.03 percent of average profits. Thus, the Agency projects no significant impacts from the rule on small entities.

BILLING CODE 4510–26–P

Table V-6

Costs as a Percentage of Revenues and Profits for Affected Small Entities with Fewer than 20 Employees
(Based on Average Compliance Costs)

| SIC | Industry | Revenues ($1,000) | Entities | Average Revenues ($1,000) | Profit Rate | Average Profits | Affected Entities | | Average Compliance Costs to Affected Entities | Compliance Costs as a % of Revenues | Compliance Costs as a % of Profits |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07 | Agricultural services | $29,456,904 | 105,590 | $269.5 | 6.02% | $16,220 | 6,562 | 6.2% | $0.09 | 0.000% | 0.00% |
| 08 | Forestry | $1,005,916 | 2,431 | $413.8 | 10.30% | $42,627 | 231 | 9.5% | $0.00 | 0.000% | 0.00% |
| 09 | Fishing, hunting, and trapping | $934,691 | 2,325 | $402.0 | 5.80% | $23,333 | 0 | NA | NA | NA | NA |
| 13 | Oil and gas extraction | $9,568,821 | 14,566 | $656.9 | 8.65% | $56,826 | 680 | 4.7% | $0.86 | 0.000% | 0.00% |
| 15 | General building contractors | $140,742,413 | 185,921 | $757.0 | 4.00% | $30,280 | 17,671 | 9.5% | $1.06 | 0.000% | 0.00% |
| 16 | Heavy construction, except building | $25,680,517 | 29,472 | $871.4 | 4.00% | $34,854 | 2,561 | 8.7% | $0.19 | 0.000% | 0.00% |
| 17 | Special trade contractors | $156,222,049 | 395,675 | $394.8 | 4.00% | $15,793 | 35,056 | 8.9% | $4.08 | 0.001% | 0.03% |
| 20 | Food and kindred products | $13,034,058 | 11,890 | $1,096.2 | 3.46% | $37,968 | 552 | 4.6% | $7.64 | 0.001% | 0.02% |
| 21 | Tobacco products | $36,982 | 60 | $616.4 | 4.02% | $24,791 | 6 | 10.6% | $0.00 | 0.000% | 0.00% |
| 22 | Textile mill products | $2,804,537 | 3,128 | $896.6 | 2.77% | $24,820 | 99 | 3.2% | $0.00 | 0.000% | 0.00% |
| 23 | Apparel and other textile products | $7,444,651 | 16,288 | $457.1 | 2.56% | $11,693 | 260 | 1.6% | $0.00 | 0.000% | 0.00% |
| 24 | Lumber and wood products | $15,544,934 | 29,861 | $520.6 | 3.90% | $20,297 | 437 | 1.5% | $2.19 | 0.000% | 0.01% |
| 25 | Furniture and fixtures | $4,131,575 | 8,262 | $500.1 | 3.51% | $17,553 | 410 | 5.0% | $2.40 | 0.000% | 0.00% |
| 26 | Paper and allied products | $2,406,977 | 2,152 | $1,118.7 | 4.50% | $50,350 | 48 | 2.2% | $0.00 | 0.000% | 0.00% |
| 27 | Printing and publishing | $22,196,893 | 49,512 | $448.3 | 3.80% | $17,034 | 27 | 0.1% | $0.00 | 0.000% | 0.00% |
| 28 | Chemicals and allied products | $8,762,403 | 7,118 | $1,231.0 | 4.49% | $55,226 | 2,040 | 28.7% | $5.44 | 0.000% | 0.01% |
| 29 | Petroleum and coal products | $2,213,850 | 1,455 | $1,521.1 | 2.99% | $45,472 | 206 | 14.2% | $4.80 | 0.000% | 0.01% |
| 30 | Rubber and misc. plastics products | $7,183,667 | 8,170 | $879.2 | 4.02% | $35,388 | 417 | 5.1% | $6.22 | 0.000% | 0.02% |
| 31 | Leather and leather products | $570,806 | 1,252 | $456.0 | 2.20% | $10,016 | 3 | 0.2% | $0.00 | 0.000% | 0.00% |
| 32 | Stone, clay, and glass products | $6,351,359 | 11,248 | $564.7 | -4.93% | $27,819 | 718 | 6.4% | $0.00 | 0.000% | 0.00% |
| 33 | Primary metal products | $2,848,236 | 2,792 | $1,020.3 | 4.52% | $46,094 | 301 | 10.8% | $0.00 | 0.000% | 0.00% |
| 34 | Fabricated metal products | $17,077,020 | 23,326 | $732.1 | 4.55% | $33,282 | 3,541 | 15.2% | $0.90 | 0.000% | 0.00% |
| 35 | Industrial machinery and equipment | $24,064,335 | 41,000 | $586.9 | 4.05% | $23,746 | 4,295 | 10.5% | $1.38 | 0.000% | 0.01% |
| 36 | Electronic and other electric equipment | $8,356,375 | 9,477 | $881.7 | 5.59% | $49,300 | 1,185 | 12.5% | $1.45 | 0.000% | 0.00% |
| 37 | Transportation equipment | $5,635,684 | 7,977 | $731.6 | 3.74% | $27,364 | 2,087 | 26.2% | $3.44 | 0.000% | 0.01% |
| 38 | Instruments and related products | $5,684,460 | 7,528 | $755.1 | 5.06% | $38,215 | 644 | 8.6% | $3.48 | 0.000% | 0.01% |
| 39 | Miscellaneous manufacturing industries | $6,908,160 | 14,733 | $468.9 | 3.80% | $17,838 | 1,995 | 13.5% | $2.77 | 0.001% | 0.02% |
| 40 | Railroad transportation | NA | NA | NA | 11.08% | NA | NA | NA | NA | NA | NA |
| 41 | Local and interurban passenger transit | $3,052,031 | 14,602 | $209.0 | 4.51% | $9,422 | 620 | 4.2% | $0.45 | 0.000% | 0.00% |
| 42 | Trucking and warehousing | $42,301,497 | 115,943 | $364.8 | 3.91% | $14,279 | 3,662 | 3.2% | $1.54 | 0.000% | 0.01% |
| 43 | Water transportation | $4,501,041 | 7,826 | $575.1 | 7.48% | $43,045 | 45 | 0.6% | $0.00 | 0.000% | 0.00% |
| 44 | Transportation by air | $3,397,447 | 9,026 | $376.4 | 3.62% | $13,628 | 35 | 0.4% | $0.00 | 0.000% | 0.00% |
| 45 | Pipelines, except natural gas | $64,316 | 719 | $89.4 | 6.55% | $5,853 | 123 | 17.2% | $0.47 | 0.001% | 0.01% |
| 47 | Transportation services | $12,815,924 | 47,586 | $269.3 | 3.39% | $9,133 | 7 | 0.0% | $0.00 | 0.000% | 0.00% |
| 48 | Communications | $9,283,329 | 32,887 | $282.3 | 5.58% | $15,749 | 60 | 0.2% | $0.00 | 0.000% | 0.00% |
| 49 | Electric, gas, and sanitary services | $10,824,146 | 15,676 | $690.5 | 10.37% | $71,638 | 2,341 | 14.9% | $2.01 | 0.000% | 0.00% |
| 50 | Wholesale trade–durable goods | $467,174,837 | 288,051 | $1,621.8 | 2.54% | $41,267 | 10,893 | 3.8% | $0.74 | 0.000% | 0.00% |
| 51 | Wholesale trade–nondurable goods | $321,562,895 | 154,839 | $2,076.8 | 4.46% | $92,689 | 4,841 | 3.1% | $2.09 | 0.000% | 0.00% |
| 52 | Building materials and garden supplies | $37,776,200 | 59,221 | $637.9 | 2.37% | $15,129 | 1,927 | 3.3% | $0.00 | 0.000% | 0.00% |
| 53 | General merchandise stores | $3,346,901 | 20,202 | $165.7 | 2.70% | $4,477 | 114 | 0.6% | $0.00 | 0.000% | 0.00% |
| 54 | Food stores | $57,468,235 | 141,437 | $406.3 | 1.41% | $5,732 | 559 | 0.4% | $0.43 | 0.000% | 0.00% |
| 55 | Automotive dealers and service stations | $149,337,410 | 171,823 | $869.1 | 1.45% | $12,565 | 7,528 | 4.4% | $0.56 | 0.000% | 0.00% |
| 56 | Apparel and accessory stores | $18,706,435 | 110,314 | $169.6 | 1.85% | $3,132 | 79 | 0.1% | $0.00 | 0.000% | 0.00% |
| 57 | Furniture and homefurnishings stores | $45,392,798 | 105,329 | $431.0 | 2.28% | $9,837 | 2,218 | 2.1% | $0.00 | 0.000% | 0.00% |
| 58 | Eating and drinking places | $61,841,796 | 345,818 | $178.8 | 3.00% | $5,362 | 0 | 0.0% | $0.00 | NA | NA |
| 59 | Miscellaneous retail | $119,265,615 | 333,875 | $357.2 | 2.49% | $8,889 | 578 | 0.2% | $0.29 | 0.000% | 0.00% |
| 60 | Depository institutions | $15,538,559 | 87,085 | $178.4 | 10.80% | $19,270 | 988 | 1.1% | $0.00 | 0.000% | 0.00% |
| 61 | Nondepository institutions | $13,454,697 | 46,988 | $286.3 | 15.05% | $43,092 | 229 | 0.5% | $0.00 | 0.000% | 0.00% |
| 62 | Security and commodity brokers | $19,644,662 | 42,577 | $461.4 | 13.32% | $61,437 | 218 | 0.5% | $0.00 | 0.000% | 0.00% |
| 63 | Insurance carriers | $9,416,333 | 31,420 | $299.7 | 6.82% | $20,449 | 347 | 1.1% | $0.00 | 0.000% | 0.00% |
| 64 | Insurance agents, brokers, and service | $33,660,359 | 123,996 | $271.5 | 6.83% | $18,527 | 580 | 0.5% | $0.00 | 0.000% | 0.00% |
| 65 | Real estate | $108,609,341 | 241,034 | $450.6 | 13.31% | $59,972 | 1,139 | 0.5% | $0.00 | 0.000% | 0.00% |
| 67 | Holding and other investment offices | $35,174,755 | 25,563 | $1,376.0 | 24.01% | $330,365 | 125 | 0.5% | $0.00 | 0.000% | 0.00% |
| 68 | Hotels and other lodging places | $12,241,793 | 44,739 | $273.6 | 6.96% | $19,046 | 872 | 1.9% | $0.68 | 0.000% | 0.00% |
| 72 | Personal services | $27,470,741 | 133,520 | $142.0 | 5.86% | $8,311 | 8,203 | 6.1% | $0.20 | 0.000% | 0.00% |
| 73 | Business services | $108,448,938 | 341,046 | $318.0 | 4.79% | $15,222 | 8,479 | 2.5% | $0.00 | 0.000% | 0.00% |
| 75 | Auto repair, services, and parking | $52,027,411 | 183,534 | $283.5 | 4.39% | $12,453 | 26,179 | 14.3% | $0.88 | 0.000% | 0.01% |
| 76 | Miscellaneous repair services | $16,035,716 | 63,732 | $283.0 | 4.44% | $15,383 | 2,762 | 4.3% | $6.96 | 0.000% | 0.05% |
| 78 | Motion pictures | $13,026,870 | 41,250 | $315.8 | 5.14% | $16,226 | 10 | 0.0% | $0.00 | 0.000% | 0.00% |
| 79 | Amusement and recreation services | $26,704,545 | 82,535 | $323.6 | 4.28% | $13,648 | 1,206 | 1.5% | $0.00 | 0.000% | 0.00% |
| 80 | Health services | $167,087,490 | 433,861 | $385.1 | 6.17% | $23,764 | 12,768 | 2.9% | $0.19 | 0.000% | 0.00% |
| 81 | Legal services | $54,265,197 | 160,755 | $337.6 | 17.50% | $59,074 | 42 | 0.0% | $0.00 | 0.000% | 0.00% |
| 82 | Educational services | $8,902,333 | 35,222 | $252.7 | 8.14% | $20,578 | 421 | 1.2% | $0.00 | 0.000% | 0.00% |
| 83 | Social services | $22,228,579 | 133,954 | $165.9 | 4.44% | $7,365 | 4,955 | 3.7% | $0.10 | 0.000% | 0.00% |
| 84 | Museums, botanical, zoological gardens | $1,283,445 | 4,594 | $279.4 | 21.45% | $59,921 | 175 | 3.8% | $0.00 | 0.000% | 0.00% |
| 86 | Membership organizations | $43,668,772 | 224,283 | $194.7 | 7.21% | $14,041 | 400 | 0.2% | $0.00 | 0.000% | 0.00% |
| 87 | Engineering and management services | $90,405,763 | 271,244 | $333.3 | 6.39% | $21,300 | 6,602 | 2.4% | $0.17 | 0.000% | 0.00% |
| 89 | Services, n.e.c. | $5,728,501 | 16,488 | $347.4 | 6.80% | $23,625 | 3 | 0.0% | $0.00 | 0.000% | 0.00% |
| | Totals | $2,781,208,926 | 5,797,803 | $479.7 | NA | NA | 194,364 | 3.4% | $1.53 | 0.000% | 0.01% |

Source: OSHA Office of Regulatory Analysis. See full FEA (Ex.11).

Table V-7

Costs as a Percentage of Revenues and Profits for all Affected Small Entities*
(Based on Average Compliance Costs)

| SIC | Industry | Revenues ($1,000) | SBA Entities | Average Revenues ($1,000) | Profit Rate | Average Profits | Affected Entities | Average Compliance Costs to Affected Entities | Compliance Costs as a % of Revenues | Compliance Costs as a % of Profits |
|---|---|---|---|---|---|---|---|---|---|---|
| 07 | Agricultural services | $38,501,047 | 109,663 | $351.1 | 6.02% | $21,130 | 6,718 | 6.1% | $0.13 | 0.000% | 0.00% |
| 08 | Forestry | $1,496,747 | 2,400 | $623.6 | 10.30% | $64,235 | 233 | 9.7% | $0.00 | 0.000% | 0.00% |
| 09 | Fishing, hunting, and trapping | NA | NA | NA | 5.80% | NA | NA | NA | NA | NA | NA |
| 13 | Oil and gas extraction | $29,931,841 | 14,787 | $2,024.2 | 8.55% | $175,093 | 890 | 6.0% | $18.51 | 0.001% | 0.01% |
| 15 | General building contractors | $234,203,450 | 195,315 | $1,199.1 | 4.00% | $47,964 | 17,540 | 9.0% | $1.11 | 0.000% | 0.00% |
| 16 | Heavy construction, except building | $68,664,092 | 35,618 | $1,927.8 | 4.00% | $77,112 | 3,314 | 9.3% | $3.43 | 0.000% | 0.00% |
| 17 | Special trade contractors | $270,401,924 | 426,477 | $634.0 | 4.00% | $25,361 | 34,756 | 8.1% | $15.53 | 0.002% | 0.06% |
| 20 | Food and kindred products | $104,829,113 | 15,992 | $6,542.6 | 3.46% | $226,600 | 1,791 | 11.1% | $8.03 | 0.000% | 0.00% |
| 21 | Tobacco products | $1,255,255 | 91 | $13,794.0 | 4.02% | $554,130 | 10 | 11.1% | $0.00 | 0.000% | 0.00% |
| 22 | Textile mill products | $20,377,246 | 4,845 | $4,205.8 | 2.77% | $116,423 | 458 | 9.4% | $2.71 | 0.000% | 0.00% |
| 23 | Apparel and other textile products | $38,507,048 | 22,383 | $1,720.4 | 2.56% | $44,010 | 841 | 3.8% | $0.00 | 0.000% | 0.00% |
| 24 | Lumber and wood products | $58,343,756 | 35,076 | $1,663.4 | 3.90% | $64,854 | 1,278 | 3.6% | $2.08 | 0.000% | 0.00% |
| 25 | Furniture and fixtures | $26,295,821 | 11,217 | $2,344.3 | 3.51% | $82,285 | 1,540 | 13.7% | $1.88 | 0.000% | 0.00% |
| 26 | Paper and allied products | $31,334,277 | 4,057 | $7,723.5 | 4.50% | $347,629 | 249 | 6.1% | $7.33 | 0.000% | 0.00% |
| 27 | Printing and publishing | $85,620,541 | 57,018 | $1,501.6 | 3.80% | $57,055 | 91 | 0.2% | $0.00 | 0.000% | 0.00% |
| 28 | Chemicals and allied products | $59,010,014 | 8,227 | $7,172.7 | 4.49% | $321,776 | 1,955 | 23.8% | $52.28 | 0.001% | 0.02% |
| 29 | Petroleum and coal products | $13,950,653 | 1,047 | $13,324.4 | 2.99% | $398,317 | 118 | 11.3% | $52.22 | 0.000% | 0.01% |
| 30 | Rubber and misc. plastics products | $58,709,872 | 13,043 | $4,501.3 | 4.02% | $181,167 | 1,627 | 12.5% | $5.14 | 0.000% | 0.00% |
| 31 | Leather and leather products | $4,003,751 | 1,675 | $2,390.3 | 2.20% | $52,509 | 184 | 11.0% | $4.34 | 0.000% | 0.01% |
| 32 | Stone, clay, and glass products | $34,254,470 | 11,791 | $2,905.1 | 4.93% | $143,127 | 1,393 | 11.8% | $14.13 | 0.000% | 0.01% |
| 33 | Primary metal industries | $36,511,582 | 4,806 | $7,597.1 | 4.52% | $343,213 | 1,023 | 21.3% | $18.88 | 0.000% | 0.01% |
| 34 | Fabricated metal products | $113,752,781 | 34,250 | $3,321.2 | 4.55% | $150,988 | 4,015 | 11.7% | $3.26 | 0.000% | 0.00% |
| 35 | Industrial machinery and equipment | $127,178,710 | 52,548 | $2,420.2 | 4.05% | $97,917 | 4,176 | 7.9% | $3.48 | 0.000% | 0.00% |
| 36 | Electronic and other electric equipment | $69,499,940 | 14,355 | $4,841.5 | 5.59% | $270,705 | 1,292 | 9.0% | $5.67 | 0.000% | 0.00% |
| 37 | Transportation equipment | $41,544,504 | 10,653 | $3,899.8 | 3.74% | $145,974 | 1,984 | 18.6% | $10.84 | 0.000% | 0.01% |
| 38 | Instruments and related products | $33,998,725 | 10,190 | $3,327.6 | 5.06% | $168,410 | 767 | 7.7% | $8.93 | 0.000% | 0.01% |
| 39 | Miscellaneous manufacturing industries | $30,627,905 | 17,837 | $1,717.1 | 3.80% | $65,322 | 2,267 | 12.7% | $12.90 | 0.000% | 0.02% |
| 40 | Railroad transportation | NA | NA | NA | 11.08% | NA | NA | NA | NA | NA | NA |
| 41 | Local and interurban passenger transit | $7,690,815 | 16,537 | $465.1 | 4.51% | $20,964 | 540 | 3.3% | $1.40 | 0.000% | 0.01% |
| 42 | Trucking and warehousing | $79,888,400 | 114,623 | $697.0 | 3.91% | $27,278 | 3,166 | 2.8% | $2.64 | 0.000% | 0.01% |
| 44 | Water transportation | $14,075,608 | 8,051 | $1,748.3 | 7.48% | $130,855 | 45 | 0.6% | $3.73 | 0.000% | 0.00% |
| 45 | Transportation by air | $15,156,218 | 6,386 | $2,373.4 | 3.62% | $85,925 | 22 | 0.3% | $0.00 | 0.000% | 0.00% |
| 46 | Pipelines, except natural gas | $986,979 | 39 | $25,307.2 | 6.55% | $1,657,050 | 1 | 3.9% | $0.43 | 0.000% | 0.00% |
| 47 | Transportation services | $19,513,397 | 40,529 | $481.5 | 3.39% | $16,327 | 6 | 0.0% | $0.00 | 0.000% | 0.00% |
| 48 | Communications | $41,125,079 | 17,482 | $2,352.4 | 5.58% | $131,244 | 28 | 0.2% | $0.00 | 0.000% | 0.00% |
| 49 | Electric, gas, and sanitary services | $10,824,146 | 8,938 | $1,211.0 | 10.37% | $125,541 | 1,323 | 14.8% | $1.69 | 0.000% | 0.00% |
| 50 | Wholesale trade—durable goods | $837,107,306 | 258,492 | $3,238.4 | 2.54% | $82,401 | 9,740 | 3.8% | $7.55 | 0.000% | 0.01% |
| 51 | Wholesale trade—nondurable goods | $637,454,850 | 143,751 | $4,434.4 | 4.46% | $197,917 | 4,455 | 3.1% | $41.68 | 0.001% | 0.02% |
| 52 | Building materials and garden supplies | $37,776,200 | 46,450 | $813.3 | 2.37% | $19,289 | 1,368 | 2.9% | $0.00 | 0.000% | 0.00% |
| 53 | General merchandise stores | $3,346,501 | 8,796 | $380.5 | 2.70% | $10,283 | 85 | 1.0% | $0.00 | 0.000% | 0.00% |
| 54 | Food stores | $101,566,500 | 123,572 | $821.9 | 1.41% | $11,595 | 852 | 0.7% | $0.00 | 0.000% | 0.00% |
| 55 | Automotive dealers and service stations | $149,337,410 | 116,015 | $1,287.2 | 1.45% | $18,609 | 5,043 | 4.3% | $0.81 | 0.000% | 0.00% |
| 56 | Apparel and accessory stores | $18,706,435 | 50,308 | $371.8 | 1.85% | $6,867 | 63 | 0.1% | $0.00 | 0.000% | 0.00% |
| 57 | Furniture and homefurnishings stores | $45,392,798 | 78,842 | $575.7 | 2.28% | $13,142 | 1,494 | 1.9% | $0.00 | 0.000% | 0.00% |
| 58 | Eating and drinking places | $128,561,814 | 355,297 | $361.8 | 3.00% | $10,850 | 0 | 0.0% | NA | NA | NA |
| 59 | Miscellaneous retail | $119,265,615 | 258,538 | $461.3 | 2.49% | $11,479 | 488 | 0.2% | $0.00 | 0.000% | 0.00% |
| 60 | Depository institutions | $15,538,559 | 14,378 | $1,080.7 | 10.80% | $116,718 | 186 | 1.3% | $0.00 | 0.000% | 0.00% |
| 61 | Nondepository institutions | $13,454,697 | 21,262 | $632.8 | 15.05% | $95,230 | 157 | 0.6% | $0.00 | 0.000% | 0.00% |
| 62 | Security and commodity brokers | $19,644,662 | 27,262 | $720.6 | 13.32% | $95,949 | 157 | 0.6% | $0.00 | 0.000% | 0.00% |
| 63 | Insurance carriers | $5,850,805 | 4,967 | $1,177.9 | 8.82% | $80,375 | 73 | 1.5% | $0.00 | 0.000% | 0.00% |
| 64 | Insurance agents, brokers, and service | $47,083,678 | 119,907 | $392.7 | 6.83% | $26,800 | 616 | 0.5% | $0.00 | 0.000% | 0.00% |
| 65 | Real estate | $142,479,284 | 230,304 | $618.7 | 13.31% | $82,340 | 1,139 | 0.5% | $0.00 | 0.000% | 0.00% |
| 67 | Holding and other investment offices | $35,174,755 | 21,022 | $1,673.2 | 24.01% | $401,733 | 116 | 0.6% | $0.00 | 0.000% | 0.00% |
| 70 | Hotels and other lodging places | $24,876,889 | 47,698 | $521.5 | 6.96% | $36,302 | 1,070 | 2.2% | $0.84 | 0.000% | 0.01% |
| 72 | Personal services | $36,957,629 | 176,477 | $209.4 | 5.86% | $12,262 | 7,222 | 4.1% | $0.30 | 0.000% | 0.00% |
| 73 | Business services | $188,061,601 | 337,126 | $557.8 | 4.79% | $26,703 | 9,637 | 2.9% | $0.84 | 0.000% | 0.00% |
| 75 | Auto repair, services, and parking | $66,003,652 | 167,057 | $395.1 | 4.39% | $17,356 | 22,771 | 13.6% | $0.99 | 0.000% | 0.01% |
| 76 | Miscellaneous repair services | $25,861,556 | 63,328 | $408.4 | 5.44% | $22,198 | 2,746 | 4.4% | $6.67 | 0.002% | 0.03% |
| 78 | Motion pictures | $13,026,870 | 29,859 | $434.8 | 5.14% | $22,341 | 9 | 0.0% | $0.00 | 0.000% | 0.00% |
| 79 | Amusement and recreation services | $47,922,810 | 90,742 | $528.1 | 4.28% | $22,604 | 1,231 | 1.4% | $0.00 | 0.000% | 0.00% |
| 80 | Health services | $243,370,668 | 413,561 | $588.5 | 6.17% | $36,312 | 11,837 | 2.9% | $0.18 | 0.000% | 0.00% |
| 81 | Legal services | $54,265,197 | 156,877 | $345.9 | 17.50% | $50,534 | 47 | 0.0% | $0.00 | 0.000% | 0.00% |
| 82 | Educational services | $25,677,052 | 40,592 | $632.6 | 8.14% | $51,502 | 398 | 1.0% | $0.00 | 0.000% | 0.00% |
| 83 | Social services | $50,553,841 | 117,544 | $430.1 | 4.44% | $19,088 | 3,960 | 3.4% | $0.16 | 0.000% | 0.00% |
| 84 | Museums, botanical, zoological gardens | $2,928,264 | 4,912 | $596.1 | 21.45% | $127,873 | 186 | 3.8% | $0.00 | 0.000% | 0.00% |
| 86 | Membership organizations | $378,452,141 | 242,081 | $324.1 | 7.21% | $23,371 | 429 | 0.2% | $0.00 | 0.000% | 0.00% |
| 87 | Engineering and management services | $151,671,072 | 271,169 | $559.3 | 6.39% | $35,745 | 8,091 | 3.0% | $2.93 | 0.001% | 0.01% |
| 89 | Services, n.e.c. | $8,169,050 | 16,395 | $498.3 | 6.80% | $33,882 | 4 | 0.0% | $0.00 | 0.000% | 0.00% |
| | Totals | $5,197,315,827 | 5,382,627 | $965.6 | 4.67% | $45,139 | 191,294 | 3.6% | $6.40 | 0.001% | 0.01% |

**BILLING CODE 4510-26-C**

HeinOnline -- 71 Fed. Reg. 50156 2006

When costs exceed one percent of revenues or five percent of profits, OSHA considers the impact on small entities significant for the purposes of complying with the RFA. For all classes of affected small entities, the Agency found that the costs were less than one percent of revenues and five percent of profits. Therefore, OSHA certifies that this regulation will not have a significant impact on a substantial number of small entities.

## VI. Summary and Explanation of the Final Standard

This section of the preamble provides a summary and explanation of each revision made to OSHA's Respiratory Protection Standard involving APFs.

### A. Definition of Assigned Protection Factor

As part of its 1994 proposed rulemaking for the Respiratory Protection Standard, OSHA proposed a definition for APFs that read as follows: "[T]he number assigned by NIOSH [the National Institute for Occupational Safety and Health] to indicate the capability of a respirator to afford a certain degree of protection in terms of fit and filter/cartridge penetration" (59 FR 58938). OSHA proposed this definition on the assumption that NIOSH would develop APFs for the various respirator classes, building on the APFs in the 1987 NIOSH RDL (59 FR 58901–58903). However, NIOSH subsequently decided not to publish a list of APFs as part of its 42 CFR 84 Respirator Certification Standards (60 FR 30338), and reserved APFs for a future NIOSH rulemaking.

During his opening statement on June 15, 1995, at an OSHA-sponsored expert-panel discussion on APFs, Adam Finkel, then Director of the Agency's Directorate of Health Standards Programs, noted that OSHA would explore developing its own list of APFs (H–049, Ex. 707–X). The Agency then announced in the preamble to the final Respiratory Protection Standard (63 FR 1182) that it would propose an APF table "based on a thorough review and analysis of all relevant evidence" in a subsequent rulemaking. In the final Respiratory Protection Standard, OSHA reserved space for a table for APFs, a paragraph ([d)(3)(i)(A)) for APF requirements, and a definition of APF under paragraph (b).

In its 1987 RDL, NIOSH defined an APF as "[t]he minimum anticipated protection provided by a properly functioning respirator or class of respirators to a given percentage of properly fitted and trained users" (Ex. 1–54–437Q). ANSI subsequently

developed a definition for an APF in its Z88.2–1992 Respiratory Protection Standard that reads, "The expected workplace level of respiratory protection that would be provided by a properly functioning respirator or class of respirators to properly fitted and trained users" (Ex. 1–50). The ANSI Z88.2 subcommittee that developed the 1992 standard used the NIOSH definition of an APF as a template for its APF definition. However, the Z88.2 subcommittee revised the phrase "minimum anticipated protection" in the NIOSH definition to "expected workplace level of respiratory protection." It also removed the NIOSH phrase "to a given percentage" from its definition.

The phrase "a given percentage" implies that some respirator users will not achieve the full APF under workplace conditions. The "given percentage" usually is about five percent, which is a percentage derived from statistical analyses of results from WPF studies. In this regard, five percent represents the 5th percentile of the geometric distribution of individual protection factors in a WPF study. Therefore, the 5th percentile is the threshold for specifying the APF for the respirator tested under those workplace conditions. Using the 5th percentile means that about five percent of the employees who use the respirator under these workplace conditions may not achieve the level of protection assigned to the respirator (or class of respirators), even after they receive proper fit testing and use the respirator correctly under a comprehensive respiratory protection program. However, ANSI dropped the phrase "to a given percentage" to reduce confusion (i.e., the phrase did not specify a percentage), and to emphasize the level of protection needed by the vast majority of employees who use respirators in the workplace. See also subsection E.4 ("Analysis of Updated Database on APFs") of Section III ("Methodology for Developing APFs for Respirators") of this preamble.

The Agency's review of the available data on respirator performance, as well as findings from surveys of personal protective equipment (Exs. 6–1 and 6–2), indicate that existing APF definitions are confusing to the respirator-using public. Accordingly, OSHA has developed its own definition in this final rule that will reduce confusion among employers and employees regarding APFs, thereby assisting employers in providing their employees with effective respirator protection, consistent with its Respiratory Protection Standard.

The major revision the Agency made to the ANSI APF definition in developing the proposed APF definition included adding the phrase "when the employer implements a continuing, effective respiratory protection program as specified by 29 CFR 1910.134." The Agency added this phrase to emphasize the already existing requirement that employers must select a respirator in the context of a comprehensive respiratory protection program. Also, the Agency revised the phrase "as specified by 29 CFR 1910.134" at the end of the proposed APF definition to read "as specified by this section" to conform to style conventions for referencing an entire standard. Therefore, the Agency is adopting the APF definition that was proposed in the NPRM except for this minor revision. OSHA's final definition for APF reads as follows:

*Assigned protection factor (APF)* means the workplace level of respiratory protection that a respirator or class of respirators is expected to provide to employees when the employer implements a continuing, effective respiratory protection program as specified by this section.

### B. APF Provisions

1. Paragraph (d)(3)(i)(A)—APF Provisions

Paragraph (d)(3)(i)(A) is the provision in OSHA's Respiratory Protection Standard that requires employers to use the APFs in Table 1 of this final standard to select respirators. The language of the final provision is the same as the language in the proposal. Therefore, paragraph (d)(3)(i)(A) in the final rule reads as follows:

(A) *Assigned Protection Factors (APFs).* Employers must use the assigned protection factors listed in Table 1 to select a respirator that meets or exceeds the required level of employee protection. When using a combination respirator (e.g., airline respirators with an air-purifying filter), employers must ensure that the assigned protection factor is appropriate to the mode of operation in which the respirator is being used.

The proposed language in paragraph (d)(3)(i)(A) also contained the following note that addressed two issues related to APFs:

**Note to paragraph (d)(3)(i)(A):** The assigned protection factors listed in Table 1 are effective only when the employer has a continuing, effective respiratory protection program as specified by 29 CFR 1910.134, including training, fit testing, maintenance and use requirements. These assigned protection factors do not apply to respirators used solely for escape.

The first sentence of the note was proposed to remind employers that the APFs in Table 1 are effective only when

they have a complete respirator program that meets the requirements of OSHA's Respiratory Protection Standard. Table 1 of the final rule already contains a note (footnote 2) that essentially repeats this language. Therefore, to avoid unnecessary duplication, the Agency decided to remove this language for the final rule. However, the Agency is retaining the last part of the note as a footnote in Table 1 of the final rule (see discussion of footnote 5 in the following subsection).

### 2. Table 1—APF Table

The NPRM contained Table 1 ("Assigned Protection Factors"), which listed the APFs for the various respirator classes. The final APFs for these respirators are discussed in detail in subsection C ("Assigned Protection Factors for Specific Respirator Types") of this section.

The proposed APF Table also contained a set of footnotes that informed users regarding the application of APFs in the table. In the final rule, footnote 1 remains essentially unchanged from the proposal. Footnote 2 has been clarified to explain when APFs are effective, rather than when APFs apply. All employers who use respirators need to comply with the Respiratory Protection Standard. The language in footnote 3 of the proposed table was revised from the proposal. Proposed footnote 3 stated "This APF category includes quarter masks, filtering facepieces, and half-masks." The reference to quarter masks has been removed from this footnote since quarter mask respirators have been assigned a separate APF in Table 1. Also, the phrase "with elastomeric facepieces" has been added to the description of half masks to clarify that elastomeric facepieces are included in the half mask respirator class. Final footnote 3 reads as follows in the final rule: "This APF category includes, filtering facepieces, and half masks with elastomeric facepieces."

Footnote 4 relates to the testing of PAPRs with helmets or hoods to demonstrate that these respirators can perform at the required APF of 1,000 or greater for this class. The proposed footnote and the changes made to it in the final standard are discussed in subsection C ("Assigned Protection Factors for Specific Respirator Types") in item 4 ("APF for Powered Air-Purifying Respirators (PAPRs)") of this section.

Footnote 5 in the proposal described limitations for the APF of 10,000 (maximum) for pressure-demand SCBAs. The proposed footnote 5 described an SWPF study demonstrating

that, when test subjects used pressure-demand SCBAs under high work rates, a few of the study results indicated that the respirators may not achieve an APF of 10,000. Consequently, the proposed footnote cautioned employers not to use these respirators under conditions that would require protection above this level. In discussing this footnote in the proposal, OSHA stated that, "the employer must restrict [pressure-demand SCBA] use to conditions in which the required level of employee protection is at or below an APF of 10,000" (68 FR 34105). While the Agency received no comments on the proposed footnote, it believes that, when employers use these respirators, they must assess the exposure conditions prior to such use as required by paragraph (d)(1)(iii) of OSHA's Respiratory Protection Standard. In view of the already existing requirement, the Agency decided that the information in proposed footnote 5 was unnecessary, and, therefore, removed it from the final rule.

As noted previously under subsection B ("Paragraph (d)(3)(i)(A)—APF Provisions") of this section, OSHA is adding a new footnote 5 to Table 1 in the final rule. The new footnote will remind employers that they cannot apply the APFs specified in Table 1 to emergency-escape conditions. OSHA believes this footnote is important because precise exposures levels, which serve as the basis for determining APFs, cannot be assessed accurately for emergency-escape conditions. Under these conditions, the only appropriate respirators for employee use are respirators designated for escape (i.e., escape respirators), consistent with the requirements specified by OSHA's Respiratory Protection Standard at 29 CFR 1910.134(d)(2)(ii). New footnote 5 is similar to the APF provisions of the Agency's substance-specific standards that designate appropriate respirators for use under emergency-escape conditions. Because both the substance-specific standards and 29 CFR 1910.134(d)(2)(ii) contain requirements for selecting escape respirators, the Agency is revising the note slightly to ensure that employers refer to the appropriate provisions. Therefore, footnote 5 to Table 1 in the final rule will read as follows:

These APFs do not apply to respirators used solely for escape. For escape respirators used in association with specific substances covered by 29 CFR part 1910 subpart Z, employers must refer to the appropriate substance-specific standard in that subpart. Escape respirators for other IDLH atmospheres are specified by 29 CFR 1910.134(d)(2)(ii).

### C. Assigned Protection Factors for Specific Respirator Types

OSHA received comments on APFs during the public comment period following publication of the NPRM, and at the public hearing. These comments and hearing testimony are addressed in the following sections.

#### 1. APF for Quarter Mask Air-Purifying Respirators

*Introduction.* OSHA proposed an APF of 10 for quarter mask air-purifying respirators (i.e., quarter masks/quarter mask respirators), including them in the same category as filtering facepieces and half mask air-purifying respirators (68 FR 43115). However, the Agency specifically requested comment on whether this action was appropriate (see 68 FR 34112).

The following recommendations include all of the issues raised by commenters regarding quarter mask respirators: assign them an APF of 10; assign them an APF of 5; prohibit their use altogether; or refrain from assigning an APF to them until more studies become available. In general, those commenters who recommended an APF of 10 for quarter mask respirators based their recommendations on the analogous structural characteristics (i.e., similarities in design) of quarter mask and half mask respirators. Commenters who recommended an APF of 5 pointed out that the only available APF data for quarter mask respirators were in the 1976 study by Edwin C. Hyatt entitled "Respiratory Protection Factors" (Ex. 2)). Based on this study, Hyatt assigned quarter masks an APF of 5.

*Comments regarding quarter mask respirators.* The commenters who advised OSHA to give quarter mask respirators an APF of 10 believed that when these respirators are used in a workplace where the employer has implemented a complete respirator program as required by 29 CFR 1910.134, their performance should be the same as that of half mask respirators. For example, Thomas Nelson of Nelson Industrial Hygiene Systems, Inc. testified,

There is no unique property of a quarter mask respirator that makes it[s] use different from half facepiece respirators provided the person using the respirator is trained, fitted, and maintains the respirator. OSHA should include quarter masks in the half facepiece category. (Ex. 10–17.)

Michael Runge of 3M Corporation recommended that both half mask and quarter mask respirators should receive an APF of 10 because of their similarity

in performance, which he described as follows:

[L]eakage into a respirator can occur through three pathways[:] defects, filter penetration or faceseal leakage. Leakage through defects is controlled by the respirator maintenance program. Quarter facepiece respirators are no harder to maintain than half facepiece respirators; they have many of the same parts * * * Filter leakage is controlled by the NIOSH certification process * * * Faceseal leakage is controlled through fit testing. The same fit tests can be used with either type of respirator, hence the same maximum face seal leakage would be expected for the quarter and half facepiece respirator. (See Ex. 9–16.)

Daniel Shipp and Janice Bradley of the International Safety Equipment Association and Kenneth V. Bobetich of MSA made similar statements (Exs. 9–22, 9–37, and 16–14).

Thomas Nelson asserted that the Hyatt Study may have underestimated the APF for quarter mask respirators because the study did not control adequately for respirator leakage. His comment was based on the fact that the authors of the study: (1) Did not administer a proper fit test to the test subjects prior to measuring particle contamination inside the respirator, and (2) used a fine particle (sodium chloride) as a test aerosol, that may have penetrated both the faceseal and filter, thereby artificially increasing concentrations inside the respirator (Tr. at 163 and Ex. 18–9).

The commenters who recommended that OSHA assign quarter mask respirators an APF of 5 stressed that no studies, including WPF and SWPF studies, on quarter mask respirators have been performed since the Hyatt Study. Few quantitative data are thus available on which OSHA can rely to set an APF for quarter mask respirators. These commenters, who include NIOSH, pointed out that NIOSH used the Hyatt Study to set the APF for quarter mask respirators at 5 in its 1987 RDL. NIOSH commented further that, "quarter mask respirators should be separated from half mask respirators into a class of their own with an APF of 5. The data from Hyatt's study [1976] do not support an APF of 10" (Ex. 17–7–1). Similarly, James S. Johnson stated, "We object to the agency's proposed APF of 10 for quarter mask respirators. There is no evidence in the record, from either WPF or simulated workplace protection factor (SWPF) studies that support this conclusion" (Ex. 16–9–1). Johnson's comments were echoed by the AFL–CIO (Exs. 9–27 and 19–1–1). These comments indicate that the Hyatt Study was not a valid WPF or SWPF study

because it was a fit test protocol, not an experimental study.

The International Brotherhood of Teamsters and the AFL–CIO Building and Construction Trades Department supported an APF of 5 for quarter mask respirators because they believed that quarter mask respirators were more likely than half mask respirators to move around on workers' faces when the workers communicate, or because of movement, exertion, or perspiration. These commenters stated:

Since the lower seal of the facepiece in quarter mask respirators is on the chin, rather than below the chin, the seal is much more likely to be compromised than the seal on a half face respirator. Additionally, in use factors such as movement, exertion, and perspiration add to the likelihood that the seal of these masks will be compromised in the work place. (Exs. 9–12 and 9–29.)

The Nuclear Regulatory Commission commented that its regulations prohibit the use of quarter masks because of "the potential lack of stability of fit and the availability of acceptable alternatives (half-face respirators)" (Ex. 10–7). Tracy Fletcher of Parsons-Oderbrecht JV recommended that OSHA prohibit the use of both quarter and half masks, stating, "Employees are required to wear eye protection with the respirator, and use of the two together is difficult as the wearer will find that the glasses rest on the nose piece of the respirator creating an entry point for an overspray, splash or whatever." (Ex. 10–1.)

A small number of commenters expressed the opinion that, because the Hyatt Study provides the only data on the protection afforded by quarter mask respirators, OSHA should reserve its decision on the APF for these respirators until more studies can be completed. ORC Worldwide commented that "[q]uarter masks should be evaluated as individual respirator models. In the absence of comprehensive testing data over the last 27 years, there is no valid basis for giving them an APF of any kind" (Ex. 10–27). David Spence, an industrial hygienist, stated:

We recommend that SWPF studies be performed on quarter masks respirators in a manner analogous to the ORC SWPF studies performed on powered air-purifying respirators and supplied-air respirators. To not delay publishing APFs for the other classes of respirators, the section on APF of quarter masks could be reserved pending completion of SWPF studies. (Ex. 10–6.)

*Summary and conclusions.* In light of these comments, the Agency has reconsidered the proposed APF of 10 for quarter masks. The comments recommending an APF of 10 for quarter mask respirators are based solely on

structural analogies between quarter masks and half masks, and not on the functional characteristics of these respirators. Accordingly, the rulemaking record contains no quantitative or qualitative data or other convincing evidence confirming that quarter mask and half mask respirators function in a similar fashion to provide employees with equal levels of respiratory protection. No WPF or SWPF studies conducted on quarter mask respirators were submitted to the record. The Hyatt Study, which consisted of testing quarter masks using a fit testing protocol, provides the only data available for quarter mask respirators, and it supports an APF of 5. Therefore, OSHA has decided to separate quarter mask respirators into their own category and assign them an APF of 5.

It is possible that the facepieces of quarter masks and half masks are not functionally analogous. Some commenters noted that half masks rest *under* the chin, while quarter masks rest *on* the chin. Consequently, quarter masks are more prone than half masks to slip and compromise the face seal when a worker talks or performs heavy work. While the record contains no quantitative evidence supporting such assertions, there is ample qualitative evidence, and OSHA is entitled under these circumstances to take a conservative approach in weighing the available evidence (see, e.g., 29 U.S.C. 655(b)(5) and *United Steelworkers of America, AFL–CIO–CLC* v. *Marshall,* 647 F.2d 1189, 1248 (D.C. Cir. 1980)). Moreover, OSHA believes that these respirators can be used safely at an APF of 5 because properly administered fit testing protocols (including administering the fit test with glasses and other protective equipment worn during respirator use),[9] as well as appropriate respirator training, will inform employees of this problem and the procedures they can use to prevent it.

In further response to those commenters who advised OSHA to prohibit quarter masks, OSHA does not believe that this approach is reasonable. As discussed at the public hearing, quarter mask respirators are not widely used, but they do have some popularity in particular industries (Tr. at 558). All existing quarter mask respirators have received an N95 rating under NIOSH's certification program, indicating that the respirators are designed to prevent at least 95% of the challenge agent from penetrating the filter. Therefore, these certification results, along with the

[9] As required under Appendix A (Part IA, paragraph 13) of 29 CFR 1910.134.

other evidence in the rulemaking record, have convinced OSHA that employees can use these quarter mask respirators safely at an APF of 5 in workplaces that implement a respirator program that complies with 29 CFR 1910.134.

Regarding those commenters who advised OSHA to delay the APF decision for quarter mask respirators until WPF or SWPF studies are available, OSHA notes that in the intervening 29 years following the Hyatt Study, no WPF or SWPF studies have been conducted on quarter mask respirators. If OSHA was to delay setting an APF for quarter mask respirators pending further study, it could in effect be deciding to delay setting an APF for these respirators indefinitely. OSHA has not been persuaded by the record to delay setting an APF for quarter mask respirators. Moreover, as noted in the previous paragraph, OSHA has concluded that the record evidence supports an APF of 5 for quarter mask respirators.

### 2. APF for Half Mask Air-Purifying Respirators

*Introduction.* OSHA proposed an APF of 10 for both elastomeric and filtering facepiece half mask respirators. During the public comment period, interested parties expressed two divergent views on this proposed APF. The healthcare industry (Ex. 9–18 to 9–21), NIOSH (Tr. 107 and 112) and other commenters (e.g., Exs. 9–11, 9–22, 9–26, 9–42, and 10–18) agreed to an APF of 10 for both types of respirators, while a number of commenters stated that filtering facepieces should be assigned a protection factor of 5 (e.g., Exs. 9–8, 9–12, 9–29, and 10–6; AFL–CIO Tr. at 122–126). The following sections discuss this issue in detail.

A number of reasons were presented for limiting filtering facepiece half masks to an APF of 5. These reasons can be categorized generally into concerns related to: (1) WPF studies and associated data; (2) design of filtering facepiece respirators; (3) respirator use in the workplace; and (4) ANSI standards. As discussed in Section III above, some commenters believed that the WPF studies evaluated by OSHA suffered from multiple problems (e.g., old data, studies not representative of typical workplaces). While these points are addressed in detail in Section III of this preamble, some of these concerns warrant further discussion here.

*Some filtering facepieces do not achieve an APF of 10.* Comment was made that the data presented in the studies analyzed by OSHA indicate that not all filtering facepieces achieved an

APF of 10. Consequently, these commenters argued that the entire class of respirators should receive an APF of 5 (Exs. 9–29, 9–27, and 10–54). The AFL–CIO stated:

> An examination of the summary table of WPF studies for filtering facepieces and half-mask elastomeric respirators at 68 FR 30495 of OSHA's preamble to this proposed rule justifies our position. Of the seven respirators that had a 5th percentile WPF less than 9, five of [the] respirators that failed consisted of the filtering facepiece style of respirator. Thus [of] the overwhelming majority of the half masks respirators that failed, five of the seven or 71%, were filtering facepieces. At the qualitative level then, this data clearly indicates that most of the problem with failing to provide adequate protection rests with filtering facepieces and not with half-mask elastomerics. (Ex. 9–27.)

The summary table in the proposal at 68 FR 34095 contains several studies that were reviewed by OSHA, but did not meet the selection criteria and were excluded from the quantitative analyses. The two filtering facepiece respirators (one marked in each study) evaluated in these excluded studies had WPFs less than 9 (Cohen, Ex. 1–64–11; and Reed, Ex. 1–64–61), while five of the respirators included in OSHA's analyses failed to achieve a WPF of 9. Three of these five respirators were filtering facepiece respirators and the remaining two respirators were elastomeric half masks. As noted at the hearing, OSHA conducted a Chi-square analysis to determine if the proportion of filtering facepieces having a WPF less than 9 differed from the proportion of elastomerics with a WPF less than 9 (Trans. at 135–136). This statistical comparison showed that these proportions did not differ significantly from each other, indicating that similar proportions of filtering facepiece and elastomeric respirators performed at this level—i.e., that the filtering facepiece respirators did not perform more poorly than the elastomeric respirators.

After updating the proposal's half mask WPF database (Ex. 20–2) with new and additional data, Dr. Crump reanalyzed the database (Ex. 20–1). Plotting the observed protection factors for both the elastomeric and the filtering facepiece half masks shows that over 95% of each type of half mask attained an APF of at least 10. Moreover, a review of these updated analyses reveals that more elastomeric than filtering facepiece respirators failed to achieve an APF of 10 (see Table 2 in Ex. 20–1). Even when the data from studies excluded from these analyses were added to the database, over 95% of the WPFs for both types of half mask (separately and combined) are still equal

to or greater than 10. (A detailed discussion of Dr. Crump's analyses can be found in section III (Methodology) of this preamble.) Therefore, OSHA does not agree that the evidence in the record supports an APF for filtering facepieces of 5 as suggested by these commenters.

*Respirator configuration and certification issues.* Commenters also stated that not all configurations (e.g., cups, duckbills, fold flats) of filtering facepiece respirators have been studied (e.g., Exs. 9–17, 9–34, 9–40, 10–33, and 10–34; Tr. at 204–205). In addition, some commenters mentioned that none of the respirators in the studies evaluated by the Agency for the proposal were certified under NIOSH's new 42 CFR 84 requirements (Exs. 9–33, 9–34, 10–22, and 10–38). The focus of these comments was that OSHA should not assume that all filtering facepieces perform the same as those filtering facepieces that were tested. These commenters believed that filtering facepiece half masks should be given an APF of 5 because, in their view, there is a lack of information on 42 CFR 84 filtering facepieces.

OSHA recognizes that its analyses do not encompass all configurations or models of filtering facepiece half masks. However, this is true for all types of respirators, not just filtering facepiece half masks. Since filter efficiency is certified by NIOSH, the filter media of all filtering facepiece (and elastomeric) half mask configurations are equivalent. Therefore, any differences in performance would arise from variations in faceseal leakage among the different configurations. OSHA's Respiratory Protection Standard requires that all respirator users pass a respirator fit test to ensure that a minimum acceptable faceseal performance is achieved. Therefore, because all respirators must be used in accordance with the Respiratory Protection Standard, the Agency sees no reason to conclude that differences in configuration will result in performance variations. In addition, Section III of this preamble discusses two studies that compare the workplace performance of 42 CFR 84 and 30 CFR 11 filtering facepiece half masks. The 42 CFR 84 respirators demonstrated superior performance when compared to the 30 CFR 11 respirators. OSHA concludes that, based on the more stringent filter efficiency certification requirements and these study results, 42 CFR 84 respirators provide performance at least equal to 30 CFR 11 respirators. Therefore, the record evidence does not support lowering the APF for filtering facepieces to 5.

*Determining faceseal leakage.* Several commenters mentioned that NIOSH had eliminated the fit test portion of its certification procedures. They believed that as a result of this NIOSH action, one could not be sure if a filtering facepiece respirator achieves an adequate faceseal and provides the expected protection (Exs. 9–8, 9–27, 9–29, 9–34, 9–35, 9–40, 9–41, 10–22, 10–33, 10–38, 10–50, and 10–55). During the public hearing, NIOSH indicated that it would establish a new respirator certification testing procedure, stating:

Such changes would result in additional certification tests to assure or assess the overall performance of every respirator model, and thus assure that every model is capable of providing a level of protection consistent with the class APF. (Tr. at 103.)

Several commenters supported this approach, and indicated that implementing such a procedure would be beneficial. For example, Tim Roberts (Exs. 17–8 and 18–4) stated that the procedure would help to identify respirators that may not have adequate workplace performance. The AFL–CIO (Ex. 19–1) believed that while the procedure would help assure certified filtering facepieces are capable of fitting an employee properly, these respirators should still be given an APF of 5.

Two respirator manufacturers also addressed this issue. The 3M Company commented that no evidence exists showing that employee protection would be enhanced by adding a fit test requirement to NIOSH's certification procedures, and added that proper respirator fit must be determined by fit testing each wearer (Ex. 18–7). When asked by OSHA about the proposed NIOSH testing, Jay Parker of Bullard responded that he believed such testing would be an improvement over the current procedures (Tr. at 497).

OSHA has reviewed this information and supports NIOSH's plans to add performance testing to its respirator certification procedures. The Agency agrees with the 3M Company that proper facepiece fit can only be assured through individual fit testing. However, OSHA also agrees with Tim Roberts that performance testing will assist in identifying respirators with poor fitting characteristics that may not provide protection consistent with the respirator's APF. Thus, OSHA concludes that performance testing will enhance the information needed for selecting appropriate respirators, and encourages NIOSH to expedite its efforts

in this area. However, employers and respirator users should note that using a respirator certified by NIOSH through performance tests does not preclude individual fit testing as required by OSHA's Respiratory Protection Standard.

*Filtering facepiece design problems.* Several commenters urged an APF of 5 for filtering facepiece half masks based on the design characteristics of these respirators. Some commenters expressed concern that, in comparison to elastomeric half masks, filtering facepieces are poorly constructed (e.g., non-adjustable head straps, prone to crushing or denting, facepiece too stiff or too soft) (e.g., Exs. 9–34, 10–37, 10–38, 10–54, and 12–7–1). For example, T.C. Lefford of Fluor Hanford stated:

Elastomeric half-mask respirators provide a better face seal that filtering facepieces (Disposable respirators or maintenance-free masks). Most elastomeric half-mask respirators are made of more pliable silicone rubber that provides a much better seal on the face. Elastomeric half-mask respirators have three sizes with adjustable head straps and a head cradle to improve stability while the majority of filtering facepieces have one or two sizes and the head straps are non-adjustable. (Ex. 9–32.)

OSHA believes that concerns about loose, dented, or crushed filtering facepieces are addressed adequately by compliance with existing program requirements under 29 CFR 1910.134(d) and (g).

In addition, comment was received alleging that the 42 CFR 84 requirements for increased filter efficiency result in respirators with stiff facepieces, poor face seals, and high breathing resistance, thereby producing filtering facepieces with increased faceseal leakage (e.g., Exs. 9–34, 9–41–1, 10–46, and 10–50). Mark Haskew, Tim Roberts, and Ching-tsen Bien (Exs. 12–7–1, 16–12, 16–20–3, and 17–5) also expressed concern about the increased filter efficiency requirements of the new 42 CFR 84 certification standards and their effect on the performance of filtering facepiece respirators. In their written comments, Mark Haskew and Tim Roberts stated that the 42 CFR 84 filter efficiency requirements "would increase the breathing resistance and in turn cause an increase in faceseal leakage when compared to 30 CFR part 11 filtering facepieces" (Ex. 12–7–1). Haskew, Roberts and Bien also questioned the ability of 42 CFR 84 filtering facepieces to fit the user's face, and the applicability of 30 CFR part 11

study data to 42 CFR 84 respirators. For example, Mark Haskew testified:

The other problem with the old data is that the 30 CFR 11 respirators are significantly different in performance, or at least we would anticipate that they may be different in the performance that they provide. Based on the newer filter media with the 95, 99 and 100 series, there's an allowance for increased breathing resistance. And because the efficiency has to be greater, the filter media itself tends to be stiffer. And the concern we have, of course, which is untested in the research as far as we know, is that it may not conform as well to a wearer's face. (Tr. at 203.)

Based on their opinion that manufacturers would have to produce thicker, stiffer filter media to meet the new filter efficiency requirements, these commenters concluded that the data for 42 CFR 84 filtering facepieces would show a decrease in performance compared to the older 30 CFR 11 respirators. These commenters, based on this assumption, concluded that it would be inappropriate to set the APF for filtering facepieces based on WPF studies of the older 30 CFR 11 respirators. However, they presented no data to substantiate this claim.

When NIOSH published the 42 CFR 84 respiratory protective devices final rule (60 FR 30336), Section 84.180 of this rule increased the maximum allowable breathing resistance levels during inhalation to 35 mm (of water pressure), and during exhalation, to 25 mm. NIOSH explained this increase as follows:

[It will] enable manufacturers to produce respirators meeting the new requirements more expeditiously and at lower cost. * * * This small increase in maximum allowable breathing resistance for particulate respirators does not add substantially to physiologic burden for respirator users, and will be compensated for by increased worker protection provided by the new filter efficiency tests and classification system. (60 FR 30346.)

However, when respirator manufacturers developed new particulate filters to meet the 42 CFR 84 performance requirements, they were able to meet them without increasing the breathing resistance levels. For example, the 3M Company submitted the following table of breathing resistance values for several classes of 42 CFR 84 filters made by different manufacturers (Ex. 17–9–1, page 6; derived from a paper submitted by 3M to the OSHA docket (Ex. 9–16–1–3)).

| Filter Class | Manufacturer A (ΔP mmH₂O) | Manufacturer B (ΔP mmH₂O) |
|---|---|---|
| N95 | 11.5 | 9.7 |
| R95 | No Product | 13.6 |
| P95 | 14.9 | No Product |
| P100 | 23.9 | 17.3 |

No measurement in this table exceeds the 30 CFR 11 limit of 30 mm of water pressure. As the 3M Company stated, "Breathing resistance of 42 CFR 84 respirators are contained within the range of breathing resistances allowed for 30 CFR 11 respirators, rather than being significantly higher" (Ex. 16–25–2, page 17).

OSHA also received comments that higher breathing resistance leads to increased faceseal leakage (Exs. 9–34, 9–35, 9–41, 10–38, and 10–50). During the public hearings, 3M submitted two new studies of filtering facepiece respirators certified under 42 CFR 84 (Ex. 16–25–3). The 42 CFR 84 certified filtering facepieces used in these studies performed better, overall, than comparable filtering facepieces certified under 30 CFR 11 (see discussion above under Section III ("Methodology, etc.")). These results indicate that faceseal leakage, if it existed, did not impair the performance of these filtering facepieces.

At the 2004 AIHCE in Atlanta, Georgia, Larry Janssen of the 3M Company presented the results of a recently completed study (Ex. 17–9–1) using the OHD FitTester 3000 controlled negative pressure (CNP) fit testing instrument to measure faceseal leak rate (i.e., a drop in pressure inside the mask). Leak-rate measurements first were made using the negative pressure and flow-rate settings listed for the CNP fit test in Appendix A of 29 CFR 1910.134. Without disturbing the fit of the respirator, four additional leak-rate measurements then were made at four different negative pressures and flow rates ranging from 5.6 through 20.1 mm of water pressure, followed by a final measurement at the CNP fit test rates. Janssen found that test subjects with a fit equal to or greater than a fit factor of 100:

[D]id not show any increase in leak rate as pressure drop increased. Subjects with a fit factor below 100 * * * showed significant variability in leakage as the settings were changed, but the amount of leakage did not correlate with increasing pressure drop, i.e., sometimes the leakage was higher and sometimes lower. (Ex. 18–7, page 49.)

The 3M Company concluded that the study "demonstrates the value of fit testing: respirators that fit well enough to be assigned to a worker do not exhibit increased leakage as pressure drop increases" (Ex. 18–7, page 49). Janssen, in a summary of this study that he presented at the May 2004 AIHCE stated, "Results of this study do not support the concept of increased faceseal leakage with increased pressure drop."

While concern was expressed by some commenters about increased filter efficiency requirements resulting in increased breathing resistance and faceseal leakage, no data were submitted to support this viewpoint. However, studies were submitted that demonstrated that 42 CFR 84 filtering facepiece respirators perform at least as well as 30 CFR 11 filtering facepieces, and that increased filter efficiency does not result in increased faceseal leakage. After reviewing this information, OSHA is persuaded that 42 CFR 84 half masks are as protective as 30 CFR 11 half masks and that increased face seal leakage in such respirators has not been demonstrated by evidence in the record. Therefore, these arguments do not support an APF for filtering facepieces of 5.

The efficacy of user seal checks provided by respirator manufacturers also was questioned by several commenters. These commenters stated that user seal checks for filtering facepieces either could not be performed or were more difficult than user seal checks with elastomeric facepieces (e.g., Exs. 9–27, 9–31, 9–34, 9–35, 9–40–1, 9–41–1, and 10–54). In general, their opinion was that the inability to perform an adequate user seal check on filtering facepiece respirators would lead to decreased protection, thereby warranting a reduced APF for this type of respirator.

Bill Kojola of the AFL–CIO (Exs. 9–27 and 19–1) stated that "user seal checks are rarely performed on filtering facepieces in the field and * * * it is extremely difficult, if not impossible, to perform effective user seal checks on filtering facepieces." He stated that it was "easy for wearers to perform effective user seal checks on elastomerics." Kojola cited this difficulty in performing user seal checks as a reason for separating filtering facepieces from elastomerics, and giving filtering facepieces an APF of 5. However, he did not provide any data to support his experience that filtering facepieces demonstrate a difference in user seal check performance compared to elastomerics.

Similar concerns were voiced by Mark Haskew (Exs. 17–5 and 18–3), Tim Roberts (Exs. 9–8, 10–55, and 17–8), and Ching-tsen Bien (Exs. 9–43–2 and 18–5). In addition, Mark Haskew stated that filtering facepieces with adjustable nose pieces cannot normally obtain repeatable fit factors. However, these commenters did not submit any supporting data for this contention. In his post-hearing submission, Tim Roberts (Ex. 18–4) stated that data demonstrating this difference in performance are not available.

James Johnson (Exs. 10–33, 16–9–1, and 17–10) also stated that filtering facepieces cannot be fit checked effectively, and presented results from a series of fit tests he performed on himself with filtering facepieces and elastomeric half masks. Three of the four elastomeric half masks that he tested passed a positive or negative user seal check, and consistently achieved a fit factor of 1500 or more using the Portacount fit test instrument. One elastomeric half mask did poorly (fit factor of less than 100), and it was identified clearly as a failure by a user seal check and a subsequent fit test. He found that it was difficult to achieve a minimum fit factor of 100 or greater with filtering facepieces using the Portacount Companion fit test instrument. However, two of the eight filtering facepiece models he tested achieved fit factors of 100 or greater. He stated that he was able to identify obvious leaks with the filtering facepieces he tested by exhaling heavily and sensing the airflow, but that cupping his hands over the facepiece was not an effective user seal check for him. He stated further that these preliminary fit test results demonstrated a significant difference in performance between elastomeric and filtering facepiece half masks, and that OSHA should give filtering facepieces an APF of 5 based on these results.

The numerical differences in fit factors between filtering facepieces and elastomeric half masks reported by Johnson may not be significant. Achieving a fit factor of 170, as Johnson did with the 3M 9211 foldable filtering

facepiece using the Portacount Companion, is not necessarily worse than achieving a fit factor of 2200 with a MSA Comfo elastomeric half mask using the Portacount alone. In this regard, the fit test instruments identified the elastomeric half masks and filtering facepieces that provided adequate fits on Johnson (i.e., they met their required fit factor of 100), and he was able to perform user seal checks with both respirators. Therefore, OSHA finds that these fit test measurement differences are not a convincing argument for an APF for filtering facepiece respirators of 5. The Agency believes that Johnson's pilot study proves only that some makes and models of filtering facepieces are not suitable for his face size and shape. When he wore a filtering facepiece or elastomeric respirator that fit him, an APF of at least 10 was achieved.

In response to these concerns, the 3M Company (Ex. 17–9–2) and the Aearo Company (Ex. 17–3–1) submitted to the record instructions for conducting user seal checks on their filtering facepiece respirators. The Aearo Company instructs users to cup their hands over the respirator to test the seal, stating: "If air flows around your nose, tighten the nosepiece; if air leaks around the edges, reposition the straps to fit better (Ex. 17–3–1)." User seal check instructions for 3M filtering facepieces read, "If air leaks between the face and faceseal of the respirator, reposition it and readjust the nose clip for a more secure seal" (Ex. 17–9–2).

In their post-hearing comments (Exs. 9–16, 17–9–1, 18–7, and 19–3), 3M responded to the comments raised at the public hearing regarding the difficulty or impossibility of performing user seal checks on filtering facepiece respirators. The 3M Company pointed out that no data were offered to support this position, nor was recognition given to the methods contained in both the 1980 and 1992 editions of the ANSI Z88.2 respirator standard for performing user seal checks. The 3M Company also cited a study in the docket by Myers et al. (Ex. 9–16–1–13), which concluded that no difference was found in the effectiveness of performing user seal checks on filtering facepiece respirators or elastomeric respirators. This study also referenced a comment by Daniel K. Shipp of the ISEA (Ex. 9–22) that user seal checks can be performed with filtering facepieces. A second evaluation of user seal checks submitted by 3M (Ex. 17–9–10) involved the use of a 3M flat-fold filtering facepiece by novice respirator users. It showed that novice respirator users can be trained to effectively perform user seal checks, and

that the use of seal checks improved the overall quality of respirator fit.

The 3M Company also stated that the ease or difficulty in performing user seal checks is based on many factors. These factors include difficulty in performing a user seal check on some elastomeric respirators when the exhalation valve cover must be removed without disturbing the fit. Also, it can be difficult to perform a user seal check on elastomerics by blocking off the filter when a respirator user has small hands. In addition, 3M cited an analysis from its report at the 2001 AIHCE (Ex. 4–10–7) that showed no significant differences in WPF results for filtering facepieces measured in the morning and afternoon, with repeated redonnings of the respirators performed during each of these periods. These results indicate that the user seal check conducted after each redonning was effective in ensuring proper respirator fit.

During the rulemaking, several commenters referred to the use of fit check cups to perform user seal checks. These devices are designed to assist the respirator user in performing a positive and negative pressure seal check by covering the surface of a filtering facepiece respirator. For example, Tim Roberts stated:

One of the manufacturers did recognize that there was difficulty in doing these types of fit checks, and they designed, and constructed, and sold a fit-check cup that actually fit over the facepiece of a respirator, a filtering facepiece respirator, so that it would actually check the seal in a more conventional manner. We think that that may be another alternative approach to assuring that these respirators fit properly if there was a requirement to do that. (Tr. at 216.)

Another commenter who discussed the use of fit check cups was Donald Faulkner of the United Steelworkers, who stated during his questioning of Warren Myers:

[W]e don't see a real good fit with the hands-over filtering facepiece. That's why the cups were developed by many manufacturers, but we don't see them being utilized, bought, or anything else. (Tr. at 95.)

He elaborated in his post-hearing comment: "Filtering facepieces do not allow seal checks to be performed without the assistance of additional equipment [i.e., fit check cups] that is never provided by the employers, as being cost prohibitive." (Ex. 19–2.)

Bill Kojola of the AFL–CIO (Tr. at 132) and George Macaluso of the Building Construction Trades Department of the AFL–CIO (Tr. at 654) made similar statements regarding the infrequent use of fit check cups, i.e., that they are generally not used in the workplaces their unions represent. They

asserted that user seal checks that involve cupping the hands over the facepiece were not effective, and that the use of fit check cups should be required by OSHA. They implied that fit check cups are a generic device for doing user seal checks, and that one manufacturer's fit check cup can be used with other types of filtering facepieces. On the other hand, Ken Wilson of the Ohio Board of Water Quality, Division of Safety and Hygiene (Ex. 10–3) stated that he has not seen fit check cups used in the field, and doubted that their use would allow a respirator user to achieve a successful fit check.

OSHA has considered carefully the opinions presented about fit check cups and user seal checks. The Agency recognizes that the use of a fit check cup is one way of performing a user seal check. However, these cups can be inconvenient when used in the workplace on a daily basis. In this regard, each respirator user would need ready access to a fit check cup, not only to perform the required user seal checks when initially donning the respirator, but for any repeated respirator donnings that occur throughout the workday. The fit check cup would be another piece of equipment for respirator users to carry with them, and it can be misplaced. However, most respirator manufacturers have not adopted the use of fit check cups, and these manufacturers recommend cupping the hands over the filtering facepiece to perform a user seal check. As the 3M Company stated in describing the use of fit check cups, "Based on our experience, user seal checks without cups are effective, more convenient, and easier to perform" (Ex. 17–9–1, page 4).

Since only a few respirator manufacturers have fit check cups, it is not surprising that they are seldom used in the workplace. The fit check cups that exist are designed by the respirator manufacturer to work with a specific facepiece configuration and respirator model, and the cups do not necessarily work with other models of respirators, even models made by the same manufacturer. OSHA knows of only one series of 42 CFR part 84 filtering facepiece respirators that have fit check cups available.

OSHA does not find merit in the comments that fit check cups are necessary to perform user seal checks with filtering facepieces. While a fit check cup designed to work with a particular model of respirator can be used to perform a user seal check, it is not the only way to perform this function. Accordingly, the Agency believes that respirator users can follow

a respirator manufacturer's instructions to perform a user seal check, e.g., whether the seal check involves cupping the hands over the facepiece or the use of a fit check cup.

The OSHA Respiratory Protection Standard requires that an employee perform a user seal check to use a respirator. The WPF database that OSHA developed contains over 1,000 WPF data points for half mask respirators collected from workers using respirators in programs that included user seal checks. Analyses of these data showed that the filtering facepiece respirators achieved an APF of 10. These data are derived from WPF studies in which user seal checks were performed on filtering facepiece respirators by 100s of workers. In addition, 3M's analysis (Ex. 4–10–7) indicates that user seal checks performed on filtering facepiece respirators ensure proper redonning of these respirators. When a respirator user cannot perform a user seal check with a particular respirator model, then that respirator cannot be used by that employee, and the employer must find another respirator model on which a user seal check can be performed. This requirement applies to all tight-fitting facepieces, including filtering facepieces and elastomeric half masks. How easy or difficult it is for an employee to perform a user seal check on a particular type of respirator is not an issue that precludes other employees from using that respirator. Therefore, the comments on user seal checks do not provide convincing evidence that would support decreasing the APF for filtering facepieces to 5.

OSHA argued previously in *National Cottonseed Products Association* v. *Brock*, 825 F.2d 482 (D.C. Cir. 1987) that filtering facepieces used to protect employees against exposure to cotton dust should have an APF of 5 based on the difficulty of fit testing, particularly fit checking on a daily basis. However, the Agency now believes that the record evidence for this rulemaking shows that the industrial-hygiene research community has developed and refined qualitative and quantitative fit tests, as well as developed sophisticated techniques for determining respirator leakage. Several commenters (Exs. 16–25–3 and 17–9–1) provided evidence that filtering facepieces could be fit tested and then used effectively. Seal-check techniques and procedures (e.g., fit-test cups, manual testing) also have been developed to help ensure that filtering facepieces maintain their fit while being worn in the workplace. These new developments allowed the Agency to reassess filtering facepieces

and find that these respirators can be reliably fit tested and fit checked.

The WPF studies provide further support for this conclusion. In fact, every WPF study of filtering facepieces in the OSHA APF database involved fit testing the respirator, using the new and refined methods, prior to the worker using the respirator in the study. Researchers used the available fit testing and checking technologies and methodologies in the studies to be assured that employees would be protected during the study by the respirators when exposed to airborne contaminants up to 10 times the PEL, and so that they could determine the results of the study would be accurate.

*Non-compliance and economic incentive issues.* Several commenters asserted that filtering facepiece half masks should be given an APF less than 10 because employers do not comply with the Respiratory Protection Standard (e.g., by not performing fit testing) (e.g., Exs. 9–40–1, 10–33, and 10–52; Tr. at 663). In this regard, Donald Faulkner of the United Steelworkers of America (USWA) stated:

We observe in many worksites that the employers are using filtering masks as if they were candies. They don't have respiratory protection programs, requirements to be clean shaven, and no medical or no idea of the MUC of the contaminant that the worker needs to be protected from. (Ex. 9–40–1.)

However, the 3M Company commented that non-compliance with the Respiratory Protection Standard should not be a factor in determining APFs, noting:

OSHA has appropriately made the proposed APFs contingent upon the existence of an effective and well-managed respiratory protection program. This is the only circumstance under which APFs can be used. Setting APFs on assumptions of poor fit and lack of training is impossible because of the countless variables that exist in the workplace and workforce. APFs can only apply under properly managed respiratory protection programs. This is supported by following the American Industrial Hygiene Association Respiratory Protection Committee definition of APFs: An APF is the level of respiratory protection that a properly functioning respirator or class of respirators would be expected to provide to properly fitted and trained users in the workplace. The APF takes into account all expected sources of facepiece penetration (e.g., face seal penetration, filter penetration, valve leakage). It is not intended to take into account factors that degrade performance such as poor maintenance, failure to follow manufacturers' instructions, and failure to wear the respirator during the entire exposure period. (Ex. 9–16.)

Several commenters voiced concern that assigning a protection factor of 10

to both elastomeric and filtering facepiece half masks will result in an economic incentive for employers to provide filtering facepiece respirators to employees rather than elastomeric half masks. These commenters assumed that the less expensive filtering facepiece respirators were less protective than the more expensive elastomerics (e.g., Exs. 9–29, 10–38, and 10–54; Tr. at 212–213 and 659–660). The USWA expressed this concern, stating, "If OSHA gives the filtering face piece type of respirator an APF of 10, employers would interpret this as 'let's take the cheap way out.' It will be a dis-incentive to issue to workers the proven protection of the elastomeric face piece respirator" (Ex. 9–40–1). Responding to an OSHA question about this issue, Thomas O'Connor of the National Grain and Feed Association stated:

Well, clearly, if [you] had two respirators that provided the comfort and fit to the employee that's needed and one was half the cost of the other one, obviously anybody would select the lower cost respirator. But as I noted, that's not the primary motivation, cost. The primary motivation is complying with the standard, making sure that the employee[s] wear it and it fits properly and it's comfortable. * * * If an employee's wearing a respirator that's not comfortable, there's going to be an incentive for them possibly not to wear that respirator * * * when they should be wearing it. So from our perspective, comfort is one of the primary considerations in selecting a respirator for an employee. (Tr. at 684–685.)

OSHA considered these comments and concludes that neither cost nor non-compliance with the Respiratory Protection Standard is an appropriate basis for determining the final APF for half masks. Employers are required to comply with all the provisions of the Respiratory Protection Standard. Non-compliance is not an option for employers. Thus, there is no compliance reason to reduce the APF for half masks.

As to whether assigning a protection factor of 10 to filtering facepiece half masks will provide an economic incentive to use these respirators, OSHA concludes that so long as a respirator achieves an APF of 10, it doesn't matter what respirator an employer uses. Once again, OSHA's data analyses, as well as consensus standards, show that filtering facepieces can attain an APF of 10.

*ANSI's updated APF of 5.* Several commenters noted that the recent draft of the ANSI Z88.2 respirator standard gave filtering facepieces an APF of 5 (e.g., Exs. 9–8, 10–51, and 10–54; Tr. at 124–125 and 197–201). For example, Bill Kojola of the AFL–CIO testified:

The AFL–CIO's position that filtering facepieces should be given an APF of 5 is

also provided by other organizations with considerable expertise on respiratory protection. Indeed, the ANSI Z88.2 Committee, charged with the responsibility for the American standard for respiratory protection, has recently proposed an APF of 5 for filtering facepiece respirators. We believe that OSHA should give serious consideration to this ANSI position as well when it issues its final rule. (Tr. at 124–125.)

OSHA considered the draft ANSI standard during this APF rulemaking. However, this draft standard currently is under appeal, and has not been designated by ANSI as a final standard (Ex. 17–9–10–2). Jill Snyder, Standards Coordinator for the AIHA secretariat of the ANSI Z88 committee, addressed the status of the draft ANSI Z88.2 revised respiratory protection standard in an e-mail sent to participants in Roundtable 228 held at the 2004 AIHCE. This e-mail stated:

Until a standard is approved by ANSI, it is not an ANSI standard. Therefore, we should not say things like 'ANSI completed drafting * * *' etc. It is actually the Accredited Standards Committee (ASC) Z88 or Z88.2 that put together what is still the DRAFT standard. We also have to make sure we call it a draft standard, not a standard at this point. (Ex. 17–9–10–2.)

The method used by ANSI to determine the draft APFs also differs from OSHA's approach, which used data analyses and expert opinion to arrive at the final APF for half masks. James Johnson, representing the ANSI Z88.2 subcommittee, stated that the subcommittee did not perform an extensive quantitative analyses similar to OSHA's in determining the draft APFs (Tr. at 357). In response to questions from Thomas Nelson, ANSI-subcommittee member George Macaluso confirmed that an overall tabulation and review of available WPF data was not conducted by the ANSI subcommittee in determining APFs (Tr. at 663–666).

With regard to the decision of the ANSI subcommittee, James Johnson

agreed that a subcommittee composed of other members may have reached a different conclusion regarding the APF for filtering facepiece half masks (Tr. at 354–355). He also stated:

There's nothing in the consensus process that says every part of the standard has to have an absolute defendable, scientific, technically traceable base. It doesn't exist. It's not there. We have tremendous numbers of standards that are out there that the professionals develop with the best knowledge and experience that they have, and this is the process. (Tr. at 363.)

*Summary and conclusions.* In this section, OSHA considered the issue of the appropriate APF for filtering facepieces. OSHA's data analyses in the record support an APF of 10 for filtering facepiece respirators. Moreover, a number of commenters supported the APF of 10. Some commenters recommended a lower APF for filtering facepieces than proposed based on the poor structural integrity of the mask, the availability of additional models of respirator protection, poor compliance with the respirator program requirements, difficulty performing user seal checks, increased breathing resistance among filtering facepieces approved under 42 CFR part 84, and the recent ANSI draft APF for filtering facepieces. As discussed in the previous sections, the evidence in the record with regard to these issues justifies retaining in this final rulemaking the proposed APF of 10 for filtering facepieces.

3. APF for Full Facepiece Air-Purifying Respirators

*Introduction.* In a 1976 report, Ed Hyatt of LANL developed an APF table that included this respirator class (Ex. 2). In this report, Hyatt used the results from quantitative fit testing to assess six models of full facepiece negative pressure air-purifying respirators equipped with HEPA filters. Five of these respirators achieved a protection

factor of at least 100 for 95% of the respirator users. The sixth respirator attained this level of protection for 70% of the users. Based on the results for the sixth respirator, Hyatt recommended an APF of 50 for the respirator class as a whole.

The 1980 ANSI respirator standard listed an APF of 100 for full facepiece air-purifying respirators with DFM filters (Ex. 7–3). ANSI increased the APF for this respirator class from 50 to 100 because the poorly performing respirator in Hyatt's study was no longer in production. Using the 1976 LANL quantitative fit testing results, the 1980 ANSI standard increased this APF to a maximum of 1,000 when the respirator used HEPA filters and respirator users received quantitative fit testing (Ex. 7–3).

Based on Hyatt's 1976 data, the 1987 NIOSH RDL recommended that this respirator class receive an APF of 50 when equipped with a HEPA filter. However, the RDL gave these respirators an APF of 10 when using DFM filters. NIOSH gave these respirators an APF of 10 when equipped with HEPA filters because testing that it conducted showed that the filters had relatively low efficiency.

The 1992 ANSI respirator standard retained the 1980 ANSI standard's APF of 100 for full facepiece air-purifying respirators, but required that respirator users perform quantitative fit testing and achieve a minimum fit factor of 1,000 prior to using the respirators. QNFTs were necessary because no QLFTs could achieve a fit factor of 1,000. The ANSI standard kept this APF because the ANSI committee found, as it did in 1980, that no WPF or SWPF studies had been performed for this respirator class.

The following table summarizes the previous APFs assigned to full facepiece air-purifying respirators.

| Fully facepiece air-purifying respirators | APFs | | | |
| | LANL (1976) | 1980 ANSI standard | NIOSH RDL (1987) | 1992 ANSI standard |
|---|---|---|---|---|
| All respirators in the class ........ | 50 (with HEPA filter) ............... | 10 (with QLFT) ........................... <br> 100 maximum (with QNFT) .... | 10 (with DFM filter) ................ <br> 50 (with HEPA filter) ............... | 100 |

In the proposal, OSHA also discussed a WPF study that Colton, Johnston, Mullins, and Rhoe (Ex. 1–64–14) conducted in a lead smelter. The respirator used in this study was a 3M 7800 full facepiece air-purifying respirator equipped with HEPA filters. The authors found a 5th percentile protection factor of 95 for the sample,

but concluded that the respirator only provided reliable protection at a protection factor of 50. In addition, a LANL SWPF study by Skaggs, Loibl, Carter, and Hyatt (Ex. 1–38–3) measured the protection afforded by the MSA Ultra Twin respirator with HEPA filters. The authors reported fit factors with geometric means ranging from 1,000 to

5,300. However, 23 of the 60 measurements reported were less than 1,000, seven were less than 100, and three were less than 50. Based on a careful review of these studies, OSHA proposed an APF of 50 for full facepiece air-purifying respirators.

OSHA requested comment in question #7 of the proposal on whether it should

limit full facepiece negative pressure respirators to an APF of 20 when N95 filters are used. The NIOSH certification tests for 42 CFR part 84 filters are conducted using monodisperse aerosols of the most penetrating particle size (0.3 µm) delivered at a high flow rate of 85 liters per minute. Also, the 42 CFR part 84 certification standards allow up to 5% filter leakage with an N95 filter. If this level of leakage were to occur in the workplace, an APF of 20 would be appropriate for a full facepiece respirator using N95 filters. However, as several commenters noted (Exs. 9–16, 9–22, 9–23, 9–37, 10–6, 10–17, 10–27, 10–59, and 10–60), workplace filter penetration is always much less than filter penetration estimated from certification testing. Kenneth Bobetich of MSA (Ex. 9–37) stated that while 5% leakage is the worst case, such leakage does not occur in the workplace. Compared to the aerosols used in certification testing, workplace aerosols are many times larger, and are delivered through the filters at a lower flow rate. In addition, the 3M Company (Ex. 9–16) cited studies performed by Janssen (Exs. 9–16–1–3 and 9–16–1–4) that compared the performance of N95 and P100 filters made by two manufacturers and used during grinding operations in a steel plant. Workplace performance of both filters was equivalent statistically, and the study showed that N95 filter performance was adequate under these conditions. Lisa Brosseau of the University of Minnesota (Ex. 10–59) stated that it was entirely inappropriate for OSHA to consider a 5% leakage effect for N95 filters because such leakage would only occur when the aerosol is monodisperse and of a small size, conditions that she said are unlikely to occur in most workplaces.

Bill Kojola of the AFL–CIO (Ex. 9–27), Pete Stafford of the Building Construction Trades Department of the AFL–CIO (Ex. 9–29), and Michael Watson of the International Brotherhood of Teamsters (Ex. 9–7) supported limiting the APF for full facepieces to 20 when N95 filters are used. Watson stated that if OSHA gave these respirators an APF higher than 20, employees would likely be exposed to hazardous levels of workplace contaminants. Kojola stated further that OSHA should take into account both sources of leakage (filter and faceseal), and lower the APF accordingly. However, neither Watson nor Kojola provided any evidence to support these misgivings about the performance of these respirators.

NIOSH (Ex. 9–13) recommended that OSHA consider the limitations of the filter, but did not have any WPF or SWPF data on the performance of full facepiece respirators certified under 42 CFR part 84 using N, R, or P95 filters. NIOSH stated that because the filters are tested at the most penetrating particle size, filter efficiency in the workplace should exceed certification efficiency. However, NIOSH noted that some workplace tasks, such as welding and grinding, may result in high leakage rates through the N95 filter because the tasks produce fine or ultra fine particles. Loraine Krupa-Greshman of the American Chemistry Council (Ex. 10–25) stated that OSHA could not justify using a simplistic, generalized treatment of N95 filter efficiency to limit the APF to 20. She noted that using N95 or N100 filters is a matter of professional judgment, based on the type and concentration of the contaminant. Frank White of ORC Worldwide (Ex. 10–27) stated that reducing the APF to 20 was unnecessary because protection factors and filter performance need to be considered separately as part of the respirator selection process. Ted Steichen of the American Petroleum Institute (API) (Ex. 9–23) mentioned that API believes that OSHA should further evaluate the data before assigning, based on worst-case assumptions, an APF of 20 to these respirators. Thomas O'Connor of the National Grain & Feed Association (Ex. 10–13) commented that he was not aware of any scientific information that refuted assigning an APF of 50 to full facepiece respirators or justified lowering the APF for N95 filters to 20. He supported retaining the proposed APF of 50 for this class of respirators. Sheldon Coleman of the Hanford Site Respiratory Protection Committee (Ex. 10–40) stated that, based on fit testing data, an APF of 50 for these respirators already is conservative.

OSHA agrees with these commenters that full facepiece respirators with N95 filters provide sufficient protection to maintain an APF of 50, and Table 1 of the final standard reflects this decision. Any effect of filter penetration on respiratory protection is best addressed during respirator selection, which also is the case for half masks and other respirator classes using particulate filters. In rare cases, when workplace exposures consist of a large percentage of particles of the most penetrating size, this information must be taken into account by the employer when selecting the appropriate class of particulate filter for any respirator, not just for full facepieces.

*Summary and conclusions.* In the proposal, OSHA asked for any additional studies of full facepiece air-purifying respirators, but none was submitted. After carefully evaluating the original studies reviewed in the proposal, the Agency is setting an APF of 50 for full facepiece air-purifying respirators. The final APF agrees with the conclusion of Colton, Johnston, Mullins, and Rhoe (Ex. 1–64–14) cited earlier in this discussion that this class of respirators provides reliable protection at an APF of 50. Importantly, an APF of 50 corresponds with the APF previously assigned to full facepiece air-purifying respirators by OSHA in its substance-specific standards, and by NIOSH in its 1987 RDL. Therefore, OSHA is assigning an APF of 50 to full facepiece air-purifying respirators based on: the results of WPF and SWPF studies (which used N95 filters at moderate to high contaminant levels); The APFs given previously to this respirator class by NIOSH and ANSI; comments in the record indicating that N95 filters function effectively under the workplace exposure conditions in which they are used; and years of experience showing that these respirators, when equipped with an N95 filter, are safe when used in the manner prescribed by OSHA's respiratory protection standards. However, as with any respirator, if a full facepiece air-purifying respirator is unsuitable for the exposure conditions, paragraph (d)(1) of OSHA's Respiratory Protection Standard requires that employers select a respirator that will protect employees from the exposure hazards.

### 4. APF for Powered Air-Purifying Respirators (PAPRs)

*Half mask tight-fitting PAPRs.* In the proposal, OSHA assigned an APF of 50 to tight-fitting half mask PAPRs (68 FR 34098 and 34115) based on the 1987 NIOSH RDL and the Z88.2–1992 ANSI respirator standard. In arriving at a proposed APF of 50 for these respirators, the Agency relied heavily on the WPF study conducted by Lenhart and Campbell (Ex. 1–64–42), instead of the WPF study performed by Myers and Peach (Ex. 1–64–46) and the SWPF studies of Skaggs et al. (Ex. 1–38–3) and da Roza et al. (Ex. 1–64–94). In explaining its position, OSHA stated:

[The Lenhart and Campbell] study was well controlled and collected data under actual workplace conditions; these conditions ensure that the results are reliable and represent the protection employees likely would receive under conditions of normal respirator use. The Agency did not consider the Myers and Peach WPF study * * * for this purpose because of problems involving filter assembly leakage and poor facepiece fit reported by the authors; consequently, the abnormally high levels of silica measured inside the mask would most likely underestimate the true protection

afforded by the respirator. The two SWPF studies * * * reported much higher geometric mean protection factors than did the WPF study performed by Lenhart and Campbell. However, OSHA believes that the higher protection factors reported for these SWPF studies are consistent with the proposed APF of 50 based on data obtained for this respirator class in the Lenhart and Campbell WPF study because SWPF studies typically report significantly higher protection factors than WPF studies of the same respirator. (68 FR 34098.)

During this rulemaking, OSHA received no substantive comments or other information regarding the proposed APF of 50 for these respirators. Nevertheless, OSHA believes that the existing WPF and SWPF studies on this class proved adequate support for OSHA's conclusion that an APF of 50 is an appropriate level to predict the protection capabilities of this class of respirators.

*Full facepiece PAPRs and PAPRs with hoods or helmets.* In the proposal, OSHA assigned an APF of 1,000 to tight-fitting full facepiece PAPRs (68 FR 34099). In support of the proposed APF, OSHA cited a WPF study by Colton and Mullins that found a corrected fifth percentile protection factor of 1,335 for these respirators. OSHA received no substantive comments or other information regarding the proposed APF of 1,000 for these respirators. However, the ANSI Z88.2–1992 respirator standard and the 2004 draft revision to the ANSI standard both assign an APF of 1,000 to this respirator class. Based on its review of these consensus standards and the existing WPF research literature (see Exs. 1–64–12 and 1–64–40), and WPF research studies (Ex. 3–4), OSHA concludes that this respirator class warrants an APF of 1,000.

In proposing an APF of 1,000 for PAPRs with helmets or hoods, the Agency stated in footnote 4 of proposed Table 1 that "only helmet/hood respirators that ensure the maintenance of a positive pressure inside the facepiece during use, consistent with performance at a level of protection of 1,000 or greater, receive an APF of 1,000" and that "[a]ll other helmet/hood respirators are treated as loose-fitting facepiece respirators and receive an APF of 25." (See 68 FR 34115.) OSHA proposed this condition because available WPF and SWPF studies found that some of these hood/helmet respirators achieved protection factors well below 1,000 (Exs. 3–4 and 3–5). Under the proposed condition, the burden of conducting any testing likely would fall on respirator manufacturers, but the employer would be responsible for selecting a properly tested respirator.

According to James Johnson of LLNL, simple and effective equipment and procedures are available for detecting leaks in these respirators. In this regard, Johnson noted that LLNL developed equipment that monitors and records positive pressure in these respirators using a commercially available device. As he stated at the hearing:

[T]his is the one we chose, a data logging micro manometer, the TSI–DP Calc, with a range of –5 to +15 inches of water gauge, and data recording intervals of one second and longer were chosen. * * * We plan on using this technique periodically to monitor actual high-contamination work activities to assure this PAPR maintains a positive pressure. (Ex. 16–9–1.)

A number of commenters provided additional support for using positive pressure inside the facepiece as the criterion for protection. For example, Rick Givens of the Atlanta, GA Utilities Department stated that "the maintenance of positive pressure is an appropriate method for distinguishing high-performing hood/helmet respirators from others" (Ex. 10–2), while Sheldon Coleman of the Hanford, Washington DOE site asserted:

In the last three years, our program has used approximately 10,000 PAPR hoods. We have conducted some limited fit testing using particulate fit testers (although the hood manufacturer does not recommend using a particulate tester due to the extensive dead space in the hood). All of our information suggests that an APF of 1,000 is appropriate for a PAPR hood that maintains positive pressure inside of the hood. (Ex. 10–40.)

Several commenters took exception to the positive pressure criterion. Craig Colton of 3M stated that "3M disagrees with OSHA's proposed requirement that hoods and helmets should ensure that they maintain positive pressure at all times of use to receive an APF of 1,000" (Tr. at 390). In this regard, Colton argued that the recent study conducted on PAPRs with hoods/helmets by ORC and LLNL showed that every respirator tested in the study "had two or more brief negative pressure spikes within the respiratory inlet covering. Under the current proposal, all of these respirators, except the poorest performing supplied-air respirator would have received an APF of 25, even though the 5th percentile SWPFs found in the study ranged from 86,000 to 250,000" (Tr. at 391). Colton then added, "This study indicates that pressure within the respiratory inlet covering is only one of a complex set of factors that determine the protection provided by PAPRs and supplied-air respirators, and should not be considered by itself" (Tr. at 391). John P. Farris of Safe Bridge Consultants

echoed this concern (Exs. 9–11 and 10–32).

Other comments focused either on the need for a protocol to determine if the respirators could perform at an APF level of 1,000, or on design characteristics that would permit respirator users to select appropriate respirators. In advocating the testing approach, Stephan Graham of the U.S. Army Center for Health Promotion and Preventative Medicine noted that respirators that have high APFs should receive credit for their design and performance. Graham recommended that manufacturers test their hooded and helmeted respirators, and set the maximum APF (to a maximum of 1,000) based on the results (Ex. 9–42–1). The 3M Company stated that if OSHA retains a testing requirement in the final rule, it must specify the testing conditions. The 3M Company recommended testing at a work rate of 40 liters per minute, ensuring that pressure inside the hood or helmet is maintained at a minimum level of one atmosphere at this work rate, measuring this pressure at the flow rate recommended by the manufacturer, and maintaining the maximum static pressure inside the hood or helmet at 38 mm of water pressure (Ex. 18–7). Similarly, Jay Parker of the Bullard Co. stated that "without oversight and guidance, testing performed may not achieve such goals. This may lead to the use of respirators and an APF of 1,000 that actually should not be used at that level because the testing performed was not really capable of ensuring that level of performance" (Tr. at 492).

ORC Worldwide stated that "the approach proposed by OSHA would hold hood/helmet or loose-fitting facepiece PAPRs and SARs to a higher standard than that required of other respirator classes, based simply on the results of one model" (Ex. 10–27), a point made as well by Alice E. Till of the Pharmaceutical Research and Manufacturers Association (PhRMA) (Ex. 9–24). Nevertheless, ORC concluded that, "[s]hould OSHA retain this requirement, the final rule should clearly specify acceptable testing criteria to which respirator manufacturers must conform" (Ex. 10–27). PhRMA believed that OSHA should consider the proposed APF table to be an interim step in a transition toward the development of a certification protocol by NIOSH that provides APFs for each respirator model (Ex. 9–24). Thomas Nelson of NIHS, Inc. agreed, stating, "Specific test conditions and performance criteria must be identified" (Ex. 10–17).

NIOSH provided the following information that addressed the concerns of these commenters:

Respirator models should not be assigned to the higher APF level following promulgation of the proposed APF rule unless the respirator manufacturer provides evidence that testing of that model demonstrates performance at the higher APF level. A standard test protocol is needed to assure reliable and reproducible results when determining if a hood/helmet PAPR * * * can consistently achieve a protection factor of 1000. NIOSH will assist in developing this protocol. With implementation of new NIOSH certification criteria, every respirator model could be evaluated using this protocol as a condition of certification to assure overall performance consistent with the established APF. Thus, NIOSH will assure that approved respirators are capable of providing this assigned level of protection so that employers have appropriate guidance and APF values when selecting respirators for their workers. (Ex. 16–4.)

Proponents of using design criteria, instead of testing, to assess the protection afforded by these respirators recommended that poorer performing respirators should be identifiable by either their appearance or technical specifications. For example, John Ferris of Safe Bridge Consultants, stated:

In my experience, the most important factor in achieving workplace protection factors of 1,000 or greater with these devices is the ability to tuck the inner bib (or shroud) into the outer work garment with the outer shroud placed over the shoulders on the outside of the garment. I support the use of a 1000-fold APF for helmet hood PAPRs without the footnote. (Ex. 9–11.)

Robert Barr of Alcoa noted that design flaws need to be identified, stating, "For example, flip-front types could be designated 25; and helmets with shrouds at 1000" (Exs. 9–26 and 10–31). PhRMA, ORC, and the American Chemistry Council argued that OSHA should base the APFs for these respirators on design and construction characteristics that would "enable a more exacting selection process, and * * * would be conducive to eventually assigning protection factors based on individual model performance" (Exs. 9–24 and 10–27). However, Jay Parker of the Bullard Co. noted that the latest ANSI Z88.2 subcommittee "was unable to agree on the design characteristics of a hood or helmet that would lead to a performance level equivalent to an APF of 25" (Tr. at 480). Continuing, Jay Parker stated:

I don't see that we will ever be able to define the performance of a respirator by its design. We don't want to stifle innovation. We want to be able to allow respirator manufacturers to develop new hoods and helmets. If OSHA comes up with a definition that limits a hood or helmet to a certain design, then that would limit the manufacturer's ability to innovate with new designs. (Tr. at 480.).

After reviewing the comments on proposed footnote 4, OSHA concludes that: no single parameter (e.g., positive pressure inside the facepiece) will identify respirators that consistently perform at a high APF level; no agreement exists on how to determine APFs for these respirators based on design characteristics alone; no uniform testing criteria are available to use in determining APFs for these respirators; and ample evidence demonstrates that WPF or SWPF studies conducted under a variety of conditions reliably determine reliable and safe protection factors for these respirators. Therefore, OSHA is revising footnote 4 to Table 1 in the final standard to read as follows:

The employer must have evidence provided by the respirator manufacturer that testing of these respirators demonstrates performance at a level of protection of 1,000 or greater to receive an APF of 1,000. This level of performance can best be demonstrated by performing a WPF or SWPF study or equivalent testing. Absent such testing, all other PAPRs and SARs with helmets/hoods are to be treated as loose-fitting facepiece respirators, and receive an APF of 25.

The Agency is setting an APF of 1,000 for tight-fitting facepiece PAPRs with hoods and helmets when the manufacturers of these respirators conduct testing that demonstrates that the respirators provide a level of protection of at least 1,000(e.g., demonstrating WPFs of at least 10,000 or greater divided by a safety factor of 10, or lower fifth percentile SWPFs of at least 25,000 divided by a safety factor of 25). Based on its review of the record regarding these respirators, the Agency believes that tight-fitting PAPRs with hoods and helmets tested in a manner that is consistent with the SWPF testing performed previously under the ORC–LLNL study of respirators in this class (Ex. 3–4–1) will provide the required level of protection for employees who use these respirators.

While proposed footnote 4 emphasized that respirator manufacturers have responsibility for testing these respirators, it did not address who is responsible for selecting properly tested respirators. Consistent with Section 5 of the OSH Act (29 U.S.C. 654), which places the responsibility for employee protection on employers, footnote 4 in the final rule now clearly places the responsibility for proper respirator selection on employers. Accordingly, employers may use a respirator at an APF of 1,000 only when they have appropriate test results provided by the respirator manufacturer demonstrating that the respirator performs at a protection level of 1,000 or greater.

Evidence in the rulemaking record indicates that the technology exists to measure any leakage into the facepiece from the ambient atmosphere that could lessen the protection afforded by a PAPR or SAR with a helmet or hood (Ex. 16–9–1). This evidence also shows that small amounts of leakage measured by this technology during testing did not reduce the performance of the respirator below a level that was consistent with an APF of at least 1,000 (Exs. 3–4–1, 1–38–3, 1–64–12, and 1–64–40) Based on this evidence, OSHA believes that it is important for respirator manufacturers to determine, using available technology, that leakage into a respirator does not compromise the respirator's capability to maintain a level of performance throughout testing that is consistent with an APF of at least 1,000. Therefore, the Agency removed from footnote 4 in the final rule the language in proposed footnote 4 stating that "only helmet/hood respirators that ensure the maintenance of positive pressure inside the respirator during use * * * receive an APF of 1000."

*Loose-fitting facepiece PAPRs with hoods or helmets.* OSHA proposed an APF of 25 for loose-fitting PAPRs with hoods or helmets based on WPF studies described in the proposal (68 FR 34100), the NIOSH RDL, and the Z88.2–1992 ANSI respirator standard. In supporting the proposed APF, ISEA commented that "as the reports of many WPF studies have shown, the performance of loose-fitting PAPRs with loose-fitting facepieces warrants a lower APF than for loose-fitting hoods and helmets" (Ex. 9–24). Additional support came from Warren Myers, OSHA's expert witness at the rulemaking hearing, who stated:

Our summary conclusion was that PAPRs were incorrectly considered as positive pressure devices by the respirator community and that a minimum certification air flow of 170 liters a minute, at least for the loose-fitting class of devices, does not necessarily provide a positive pressure operational characteristic with the respirator. And then finally, that the assigned protection factor for these devices with those types of air flows would be 25. (Tr. at 69.)

The WPF studies previously cited (68 FR 34100) demonstrate that OSHA based the proposed APF on valid data that were substantiated by the Myers study. OSHA concludes that an APF of 25 is appropriate for loose-fitting facepiece PAPRs with hoods or helmets, and therefore is retaining this APF for this respirator class in the final rule. No

adverse comments regarding the proposed APF were submitted.

**5. APFs for Supplied-Air Respirators (SARs)**

*Half mask SARs.* The Agency based its proposed APF of 10 for this respirator class on the analogous performance between these respirators and negative pressure half mask air-purifying respirators tested in WPF and SWPF studies (68 FR 34100). Furthermore, the Agency proposed to give half mask SARs that function in continuous flow or pressure-demand modes an APF of 50, consistent with the analogous performance between these respirators and half mask PAPRs operated in a continuous flow mode during WPF and SWPF studies. Additional support for the proposed APFs came from the Z88.2–1992 ANSI respirator standard that assigned an APF of 10 to half mask airline SARs operated in the demand mode, and an APF of 50 to these respirators when operated in the continuous flow or pressure-demand modes. The 1987 NIOSH RDL also gave half mask demand SARs an APF of 10, but recommended an APF of 1,000 for these respirators when functioning in the pressure-demand or other positive-pressure modes.

OSHA received no comments or other information during this rulemaking regarding these proposed APFs. However, the Agency is confident that the available WPF and SWPF studies for half mask air-purifying respirators cited in the proposal provide sufficient data to retain an APF of 10 for half mask SARs when operated in the demand mode, and an APF of 50 for these respirators when operated in the continuous flow or pressure-demand modes. Therefore, OSHA is retaining these APFs in Table 1 of the final rule.

*Full facepiece SARs.* OSHA stated in the proposal that "[n]o WPF or SWPF studies were available involving tight-fitting full facepiece SARs operated in the demand mode. Therefore, in the absence of any such quantitative data, the Agency assigned this respirator class an APF of 50" (68 FR 34102). OSHA based the proposed APF on the analogous operational characteristics of these respirators and negative pressure full facepiece air-purifying respirators tested under WPF conditions in the demand mode. Also, the proposed APF is the same as the APF recommended for this respirator class by the 1987 NIOSH RDL.

The Agency proposed an APF of 1,000 for full facepiece SARs operated in continuous flow, pressure-demand, or other positive-pressure mode (68 FR 34102). It based the proposed APF on a

SWPF study (Ex. 1–38–3) in which the results for these respirators showed geometric mean protection factors ranging from 8,500 to 20,000. Further justification for the proposed APF came from the similarity in operational characteristics between these respirators and tight-fitting full facepiece continuous flow PAPRs, which had a proposed APF of 1,000. The proposed APF for these respirators also was consistent with the APFs of 1,000 assigned to them under the Z.88.2–1992 ANSI respirator standard, and was substantially lower than the APF of 2,000 recommended for these respirators by the 1987 NIOSH RDL.

OSHA received no comments on full facepiece SARs operated in a demand, pressure-demand, or other positive-pressure mode. The Agency believes that the evidence in the proposal is sufficient to support an APF of 50 for these respirators when operated in the demand mode, and an APF of 1,000 when the respirators function in a pressure-demand or other positive-pressure mode, and has included these APFs in the final standard.

*SARs with hoods or helmets.* Based on a number of WPF studies, OSHA proposed an APF of 1,000 for continuous flow SARs with hoods or helmets, contingent on the manufacturers' demonstration that the respirators meet the criteria specified in Table 1 of the proposed standard (68 FR 34103). In responding to the proposed APF, Paul Schulte of NIOSH noted that an APF of 1,000 is appropriate for these respirators only when the manufacturer demonstrates that the models performed at this level (Ex. 9–13). ORC Worldwide stated that only SWPF data would give employers the assurance that the SAR offers the necessary protection for their workers (Ex. 10–27). ISEA recommended that further testing be performed before assigning an APF of 1,000 for continuous flow SARs with hoods and helmets (Ex. 9–22). MSA concluded that an APF of 1,000 is appropriate (Ex. 16–10) because, it asserted, every credible WPF study demonstrates that continuous flow SARs with hoods and helmets perform at an APF of 1,000.

These commenters generally agree that continuous flow SARs with hoods or helmets should be assigned an APF of 1,000 only after manufacturers demonstrate through appropriate WPF or SWPF studies that the respirators are capable of performing at an APF of 1000. Therefore, based on the evidence cited in the proposal, the comments from ORC Worldwide, NIOSH, and ISEA, and the absence of any new studies or evidence submitted in

response to the proposal, OSHA is assigning these respirators an APF of 1,000 in the final rule only when the employer can provide evidence from the respirator manufacturers that demonstrates the respirators perform at that level; absent such testing, these respirators must receive an APF of 25.

*Loose-fitting facepiece SARs.* OSHA proposed an APF of 25 for this class of respirators based on analogous performance between these respirators and loose-fitting facepiece PAPRs (68 FR 34104). Additional support cited in the proposal included data from NIOSH showing that the two types of respirators (i.e., loose-fitting facepiece SARs and PAPRs) have the same minimum airflow rates when evaluated under 42 CFR part 84. The proposed APF also is consistent with the APF specified for respirators in the 1987 NIOSH RDL and the Z88.2–1992 ANSI respirator standard.

Commenters agreed with OSHA's proposed APF of 25 (Exs. 9–22 and 10–39; Tr. at 75 and 546). For example, Warren Myers stated, "I believe it is reasonable for OSHA to use analogous operational characteristics between PAPRs and SARs equipped with loose-fitting hoods or helmets to set the APF for the SARs devices at 25" (Tr. at 75). ISEA noted that WPF studies conducted on loose-fitting facepieces justify an APF of 25 for these respirators (Ex. 9–22). Based on these comments, the analogous performance with loose-fitting PAPRS, NIOSH certification testing at the same minimum flow rates, and the APFs given these respirators in the 1987 NIOSH RDL and the ANSI Z88.2–1992 respirator standard, OSHA has concluded that an APF of 25 is appropriate for this respirator class. Therefore, the final rule will list an APF of 25 for SARs with loose-fitting facepieces.

**6. APF for Self-Contained Breathing Apparatuses (SCBAs)**

Ed Hyatt, in 1976, assigned a protection factor of 50 to a full facepiece SCBA operated in the demand mode, the same protection factor he assigned to full facepiece SARs used in this mode. Based on results from a panel of 31 respirator users tested at LANL, he gave full facepiece SCBAs used in the pressure demand mode an APF of 10,000+ (Ex. 2). The 1980 ANSI respirator standard listed half mask and full facepiece SCBAs operated in the demand mode with APFs of 10 and 100, respectively, when qualitatively fit tested. The APFs for half mask or full facepiece SCBAs functioning in the demand mode were the protection factors obtained during quantitative fit

HeinOnline -- 71 Fed. Reg. 50169 2006

testing, with this APF limited to the sub-IDLH value. Full facepiece SCBAs used in the pressure-demand mode received an APF of 10,000+. The 1987 NIOSH RDL recommended that half mask and full facepiece SCBAs operated in the demand mode receive APFs of 10 and 50, respectively, and that the APF for full facepiece SCBAs operated in the pressure-demand or other positive pressure mode be 10,000.

The Z88.2 subcommittee responsible for the 1992 ANSI respirator standard could not reach a consensus on an APF for full facepiece pressure-demand SCBAs. Available WPF and SWPF studies reported that, in some cases, the respirators did not achieve an APF of 10,000 (Ex. 1–50). Nevertheless, the subcommittee found that a maximum APF of 10,000 was appropriate when employers use the respirators for emergency-planning purposes and could estimate levels of hazardous substances in the workplace.

Two respirators equipped with hoods, Draeger's Air Boss Guardian and Survivair's Puma, have operational characteristics similar to SCBAs. The facepiece of the Draeger respirator consists of a hood with an inner nose cup and a tight-fitting seal at the neck, and an air cylinder that supplies breathing air to the facepiece. NIOSH reviewed this respirator in accordance with its 42 CFR part 84 certification requirements, and in January 2001 certified the respirator as a tight-fitting full facepiece demand SCBA when equipped with a cylinder having a 30-minute service life. NIOSH also approved the respirator for use in entering and escaping from hazardous atmospheres. In a May 16, 2001 letter to OSHA's Directorate of Enforcement Programs (Ex. 7–1), Richard Metzler of NIOSH justified the classification of the Draeger respirator as an SCBA on the basis that the neck seal, which is integral to the facepiece, forms a gas-tight or dust-tight fit with the face consistent with the definition of a tight-fitting facepiece specified by 42 CFR 84.2(k). This letter also noted that the fit testing procedures used for full facepiece demand SCBAs apply to the Draeger SCBA, and that, as a full facepiece demand SCBA, NIOSH recommended that the respirator receive an APF of 50 in accordance with its 1987 RDL.

NIOSH subsequently certified the Survivair Puma respirator, which has a tight-fitting hood supplied by an air cylinder, as a pressure-demand SCBA with a tight-fitting facepiece. As part of the 42 CFR part 84 certification process, NIOSH specified that the fit testing requirement for tight-fitting SCBAs would apply to this respirator. However, Steve Weinstein of Survivair (Ex. 7–2) stated that the hood totally encapsulates the respirator user's hair, making quantitative fit testing (e.g., with a Portacount) impossible. In such cases, the fit testing instrument treats dander and other material shed by the hair as particulates originating from outside the respirator, causing the fit factor to be artificially low. Nevertheless, qualitative fit testing with the hood is possible because Survivair provides an adapter and P100 filters for this purpose. Such fit testing meets the fit-testing requirements for tight-fitting SCBAs specified in paragraph (f)(8) of OSHA's Respiratory Protection Standard.

The table below provides a summary of APFs given to the half mask and full facepiece SCBAs by different groups.

| SCBAs | APFs | | | 1992 ANSI standard |
| | LANL (1976) | 1980 ANSI standard | NIOSH RDL (1987) | |
|---|---|---|---|---|
| Tight-fitting half mask | 10 (demand) .............. | 10 (demand; with QLFT) Same as QNFT factor (demand; sub-IDLH value max.). | 10 (demand). | |
| Tight-fitting Full facepiece. | 50 (demand) .............. | 100 (demand; with QLFT) Same as QNFT factor (demand; sub-IDLH value max.). | 50 (demand). | |
| Tight-fitting Full facepiece. | 10,000 (pressure demand). | 10,000+ (pressure demand) ......................... | 10,000 (pressure demand). | 10,000 maximum (emergency planning purposes only). |

OSHA received no new WPF or SWPF studies for tight-fitting half mask SCBAs and tight-fitting full facepiece SCBAs operated in the demand mode in response to the proposal. In the only WPF study conducted on full facepiece positive-pressure SCBAs, Campbell, Noonan, Merinar, and Stobbe of NIOSH assessed the performance of two different models of full facepiece pressure-demand SCBAs that met the NFPA 1981 air-flow requirements for respirators used by firefighters (Ex. 1–64–7). While the authors could not determine protection factors for these respirators because contaminant levels measured inside the facepiece were too low, pressure measurements taken inside the facepiece proved more useful. These measurements showed that four of the 57 test subjects (i.e., firefighters) experienced one or more negative pressure incursions inside the facepiece while performing firefighting tasks. After analyzing the data for these firefighters using two different methods, the authors estimated that the overall protection factor exceeded 10,000.

In the first of two SWPF studies performed on full facepiece SCBAs used in the pressure-demand mode, McGee and Oestenstad determined the protection afforded to members of a respirator test panel who used the Biopack 60 closed-circuit SCBA (Ex. 1–64–36). Three members of the panel had protection factors of 4,889, 7,038, and 18,900, with the remaining members having protection factors over 20,000. In the second study, Johnson, da Roza, and McCormack of LLNL (Ex. 1–64–98) tested the Survivair Mark 2 SCBA that met NFPA 1981 air-flow requirements. During testing, a panel of 27 test subjects exercised on a treadmill at 80% of their cardiac reserve capacity. Although the authors found negative pressure incursions inside the facepiece at high work rates, they concluded that the respirator "provided [a minimum] average fit factor of 10,000 [for any single subject], with no single subject having a fit factor less than 5,000 at a high work rate." The tables below summarize the results of the WPF and SWPF studies performed on full facepiece pressure-demand SCBAs.

| WPF studies for tight-fitting full facepiece pressure demand SCBAs (by name of authors and model of respirator tested) | Sample size | Geometric mean | Geometric standard deviation | 5th percentile WPF |
|---|---|---|---|---|
| Campbell et al. (Ex. 1–64–7) Unspecified model (with NFPA-compliant airflow). | 57 | ................. | ................. | >10,000 (estimated). |

| SWPF studies for ight-fitting full facepiece pressure demand SCBAs (by name of authors & mode of respirator tested) | Sample size | Geometric mean | Geometric standard deviation | 5th percentile WPF |
|---|---|---|---|---|
| McGee and Oestenstad (Ex. 1–64–86) Biopack 60 (closed circuit) ................ | 23 | >20,000 | ................. | ................. |
| Johnson et al. (Ex. 1–64–98) Survivair mark 2 with NFPA-compliant airflow ............... | 27 | 29,000 | 1.63 | ................. |

Janice Bradley (Ex. 9–22) of the International Safety Equipment Association and Kenneth Bobetich of the MSA Company (Ex. 9–37) both stated that footnote 5 in the proposed OSHA APF Table 1 was not necessary because most SCBA models now meet the increased air-flow requirements in the NFPA 1981 standard. They further noted that the study that served as the basis of the footnote was more than 15 years old, and that OSHA should remove the footnote. They recommended that the APF should be 10,000 for pressure-demand SCBAs that meet the air-flow requirements of NFPA 1981. Janice Bradley (Tr. at 531) cited the WPF study NIOSH performed with firefighters (Ex. 1–64–7) as supporting the conclusion that SCBAs meeting the NFPR 1981 requirements would provide APFs of 10,000.

*Summary and conclusions.* OSHA is setting APFs of 10 and 50, respectively, for tight-fitting half mask SCBAs and tight-fitting full facepiece SCBAs operated in the demand mode. In the absence of any new WPF and SWPF studies on these respirators, the Agency is basing the final APFs on analogous operational characteristics between these respirators and half mask facepiece and full facepiece air-purifying respirators, that have APF values of 10 and 50, respectively. In addition, the final APFs are consistent with the APFs recommended by the 1987 NIOSH RDL for these respirators. (Note that the 1992 ANSI standard did not assign APFs for these respirator classes.)

For tight-fitting full facepiece SCBAs used in the pressure-demand or other positive pressure modes, OSHA is setting an APF of 10,000 in the final standard, which is consistent with the 1987 NIOSH RDL and the 1992 ANSI respirator standard. Empirical support for the final APF comes from the WPF study conducted by Campbell, Noonan, Merinar, and Stobbe (Ex. 1–64–7). This study showed that protection factors for these respirators, when operating at NFPA-compliant air flows, far exceed

10,000. While four respirator wearers experienced momentary negative-pressure spikes inside their facepieces, which indicates possible leakage into the facepiece under some workplace conditions, these spikes did not impair overall respirator performance. The Agency concludes that these study results justify an unrestricted APF of 10,000 for tight-fitting full facepiece SCBAs.

For the class of respirators designated as pressure-demand SCBAs with tight-fitting hoods or helmets, including the Survivair Puma, OSHA is setting an APF of 10,000. The basis for this final APF is the analogous operational characteristics between these respirators and tight-fitting full facepiece pressure-demand SCBAs.

*D. Definition of Maximum Use Concentration*

Employers use MUCs to select appropriate respirators, especially for use against organic vapors and gases. MUCs specify the maximum atmospheric concentration that an employee can experience while wearing a specific respirator or class of respirators. MUCs are a function of the APF determined for a respirator (or class of respirators), and the exposure limit of the hazardous substance in the workplace.

1. Introduction

Ed Hyatt, in the 1976 LASL report on respiratory protection factors (Ex. 2, Docket H049), recounted the early history of MUCs, starting with the MUC recommendations of the joint AIHA–ACGIH committee in 1961. This committee recommended that, for highly toxic compounds, full facepiece respirators with HEPA filters use a maximum limit of 100 times the TLV. Hyatt noted that Dr. Letts in 1961 in the United Kingdom, recommended that half mask dust respirators provided effective protection against airborne contaminant levels no greater than 10 times the TLV.

In 1974, NIOSH and OSHA started the Standards Completion Program to develop standards for substances with existing PELs. As part of this process, the initial respirator decision logic was developed and the concept of MUCs began to be used. NIOSH Criteria Documents also recommended MUCs for different types of respirators. The information for these MUCs were obtained from various sources, including NIOSH Current Intelligence Bulletins and recognized industrial hygiene references. NIOSH later published this information in its Pocket Guide to Chemical Hazards. Other source documents for MUC definitions and regulations include the 1987 NIOSH RDL, and the ANSI Z88.2–1980 and ANSI Z88.2–1992 respiratory protection standards.

OSHA's 1994 proposed Respiratory Protection Standard contained the following definition of MUC:

*Maximum use concentration (MUC)* means the maximum concentration of an air contaminant in which a particular respirator can be used, based on the respirator's assigned protection factor. The MUC cannot exceed the use limitations specified on the NIOSH approval label for the cartridge, canister, or filter. The MUC can be determined by multiplying the assigned protection factor for the respirator by the permissible exposure limit for the air contaminant for which the respirator will be used. (59 FR 58884.)

Several commenters to this 1994 proposal recommended alternatives to this definition. Reynolds Metal Company recommended defining MUC as "the maximum concentration of an air contaminant in which a particular respirator can be used, based on the respirator's assigned protection factor" (Ex. 1–54–222). The American Petroleum Institute (API) noted NIOSH developed the term "MUC," and that, to avoid confusion, OSHA should not use the term (Ex. 1–54–330). API proposed using the term "assigned use concentration" to replace MUC. API defined "assigned use concentration" as "the maximum concentration of an air contaminant in which a particular

respirator can be used, based on the respirator's assigned protection factor'' (Ex. 1–54–330). However, when the Agency published the final Respiratory Protection Standard in 1998, it reserved the definition of MUC in paragraph (b), and the MUC requirements in paragraph (d)(3)(i)(B), for future rulemaking because it reserved the APF provisions of the respirator selection section of the standard (i.e., MUCs could not be determined without knowing the APF values).

In the June 6, 2003 proposal, OSHA defined MUC as follows:

*Maximum use concentration (MUC)* means the maximum atmospheric concentration of a hazardous substance from which an employee can be expected to be protected when wearing a respirator, and is determined by the assigned protection factor of the respirator or class of respirators and the exposure limit of the hazardous substance. The MUC usually can be determined mathematically by multiplying the assigned protection factor specified for a respirator by the permissible exposure limit, short-term exposure limit, ceiling limit, peak limit, or any other exposure limit used for the hazardous substance. (68 FR 34036.)

Under this definition, MUC represents the maximum atmospheric concentration of a hazardous substance against which a specific respirator or class of respirators with a known APF can protect employees who use these respirators. Accordingly, MUCs are a function of the APF determined for a respirator (or class of respirators) and the exposure limit of the hazardous substance in the workplace.

The last sentence in the definition describes the MUC in terms of a mathematical calculation, i.e., that employers can "usually" determine the MUC by multiplying the APF for the respirator by the exposure limit used for the hazardous substance.[10] The last sentence of the proposed definition also specifies the exposure limits as "permissible exposure limit (PEL), short-term exposure limit (STEL), ceiling limit (CL), peak limit, or any other exposure limit used for the hazardous substance." Although OSHA received no comments on the proposed definition, it nevertheless is making several minor revisions to the definition in the final rule. First, the Agency is removing the term "usually" from the definition because multiplying the assigned protection factor by the exposure limit for a hazardous substance is the currently accepted

method used by safety and health professionals for calculating MUCs. Absent any other accepted method, the term "usually" is confusing and unnecessary.

The second revision to the proposed MUC definition involves the last part of the second sentence, which required employers to consider an "exposure limit" when determining an MUC. OSHA is making two changes to this proposed language to make clear its intent regarding the information employers need to consider when making this calculation. First, OSHA is clarifying the language to require employers to calculate an MUC using an OSHA exposure limit in those instances where one exists. OSHA was concerned that employers could have misinterpreted the language in the proposed MUC definition as meaning that they could use any available exposure limit for calculating an MUC (and, by implication, for protecting employees from hazardous airborne contaminants). This revision emphasizes the priority that OSHA exposure limits have in regulating hazardous airborne contaminants.

Second, OSHA is changing the language to make clear the information employers need to consider to determine an MUC in the absence of an OSHA exposure limit. The Agency revised the language to require employers to use relevant available information and informed professional judgment when determining an MUC when no OSHA exposure limit exists. This language more clearly states OSHA's intent that employers can utilize a wide range of available information in calculating an MUC when OSHA has not yet promulgated an exposure limit for a hazardous airborne contaminant. While not required, some employers may choose to conduct individualized risk assessments of hazards. Others may consult information from manufacturers or other published exposure limits (e.g., the NIOSH RELs or the AIHA WEELs) for making MUC determinations. However, whatever approach employers choose to take, the MUC must provide adequate protection for their employees. OSHA believes this approach provides employers with greater flexibility than the proposed MUC definition while still maintaining employee protection.

The Agency also broadened the language in this second sentence by requiring employers to "take the best available information into account" when determining an MUC in the absence of an OSHA exposure limit. This language is consistent with the guidance that the Agency provided to

employers in the preamble to the Respiratory Protection Standard for determining APFs in the absence of a final APF standard (see, e.g., 63 FR 1203). OSHA believes this language gives employers maximum flexibility to develop MUCs that protect their employees from hazardous airborne contaminants, including the use of other exposure limits when appropriate.

In the proposal to this final rule, OSHA requested comments on the development of the MUC for substances with no OSHA PEL, limiting factors such as eye irritation, LELs and IDLHs, and mixtures of substances (68 FR 34112). OSHA received numerous comments on these issues, as well as on hazard ratios, an issue raised by several commenters. These issues are discussed in the following sections.

2. MUCs for Substances With No OSHA PEL or Other Limiting Factors

OSHA received many comments on this issue. Some commenters believed that in the absence of a PEL it is appropriate for the Agency to require calculation of MUCs based on other information (Exs. 10–54, 9–27, and 10–3). Other commenters supported using any occupational exposure limit for this purpose, but some of these commenters specified that no other limiting factors should be used (Exs. 9–26, 9–42, 10–27). Others specified that additional limiting factors were needed (Exs. 9–13, 9–15, 9–29, 10–6, and 10–60). Several commenters recommended using only the OSHA PELs with limiting factors (Ex. 10–17, 10–25, and 9–16) or without limiting factors (Exs. 9–22 and 9–23). A few commenters addressed limiting factors only, either supporting specific factors (Exs. 9–12 and 10–1) or stating that no limiting factors were needed when determining MUCs (Ex. 9–37). These comments are discussed in the following paragraphs.

W.M. Parris of Alabama Power (Ex. 9–15) proposed the following generic definition of MUC that would include all possible MUCs:

*Maximum use concentration (MUC)* means the maximum atmospheric concentration of a hazardous substance from which an employee can be expected to be protected when wearing a respirator. The MUC will be the lowest of the following: (1) IDLH value for the substance, (2) the LEL value, (3) limitations set by manufacturer, or (4) mathematically determined by multiplying the assigned protection factor specified for the respirator by the permissible exposure limit, short term exposure limit, ceiling limit, peak, or another occupational exposure limit used for the hazardous substance.

Paul Schulte of NIOSH (Exs. 9–13, 13–11–1, and 16–4) recommended that

---

[10] For example, when the hazardous substance is lead (with a PEL of 50 µg/m³), and the respirator used by employees has an APF of 10, the calculated MUC is 500 µg/m³ or 0.5 mg/m³ (i.e., 50 µg/m³ × 10).

employers use the RELs, or in the absence of a REL, another appropriate exposure limit. Schulte also stated that, for both regulated and non-regulated substances, the MUC for any respirator other than a pressure-demand SCBA should never exceed the IDLH value. Schulte noted further that NIOSH did not agree with the use of the LEL as an appropriate respirator-selection factor for MUCs unless the respirator is the source of an ignition hazard (e.g., respirators with communication systems). Accordingly, Schulte (Ex. 9–13) proposed revising the MUC definition to read as follows:

*Maximum use concentration (MUC)* means the maximum atmospheric concentration of a hazardous substance from which an employee can be expected to be protected when wearing a respirator, and is determined by the lesser of
• APF times (x) exposure limit
• The respirator manufacturer's maximum use concentration for a hazardous substance (if any)
• The IDLH, unless the respirator is a positive-pressure, full facepiece SCBA

Daniel K. Shipp of the International Safety Equipment Association (ISEA) (Ex. 9–22) commented that ISEA believed that OSHA should not expand the MUC definition to include MUCs for hazardous substances not regulated by OSHA, and that the definition should not involve limiting factors. He indicated that employers should have the flexibility to determine what to do in these situations. Shipp also stated that the NIOSH approval labels on chemical cartridges already read "Do not exceed maximum use concentrations established by regulatory standards." In this regard, he suggested that OSHA rewrite the MUC definition to require that MUCs used to select respirators shall not be exceeded.

Michael Sprinker of the International Chemical Workers Union Council of the United Food and Commercial Workers Union (Ex. 10–54) believed that OSHA's definition of MUC should be revised because it is unclear whether the MUC is a concentration never to be exceeded or a time weighted average. He also stated that OSHA should require employers to determine MUCs for substances for which no OSHA PEL is available, and that these MUCs can be derived from occupational exposure limits issued by NIOSH, ACGIH, EPA, or the manufacturer.

Robert W. Barr and Linda M. Maillet of Alcoa, Inc. (Exs. 9–26 and 10–31) said that OSHA should not expand the definition and application of MUCs to hazardous substances it does not regulate because that would constitute adoption of these exposure limits as

OSHA rules. The Alcoa representatives said that employers should be free to select the criteria for calculating MUCs based on their own risk assessments. Also, they did not want the lower NIOSH RELs to replace OSHA PELs in calculating MUCs. They did not believe that OSHA should specify the LEL or 10% of the LEL as a limiting factor because LEL is an independent indicator of a physical hazard. They asserted that respirator users who could be exposed to an explosive level of a substance must not enter such an area because of the physical hazard—the characteristics of their respirators are irrelevant in such situations. Similarly, Daniel P. Adley and William L. Shoup of the Society for Protective Coatings (Ex. 9–10) did not agree with the "or any other exposure limit" in the definition of MUC, which would give regulatory authority to TLVs, RELs, and other industry—established exposure limits.

Bill Kojola of the AFL–CIO (Exs. 9–27 and 16–5) believed that OSHA should expand the definition and application of MUC to include substances it does not regulate, and that the exposure limits issued by NIOSH, ACGIH, EPA, or the manufacturer should be used when available. Pete Stafford of the Building and Construction Trades Department, AFL–CIO (Ex. 9–29) recommended that OSHA expand the definition of MUC to include appropriate exposure values because thousands of harmful and potentially harmful chemicals used in the workplace are not regulated by OSHA. He indicated that alternative MUCs calculated for chemicals using a non-OSHA exposure limit should be used when these MUCs are lower than the MUCs determined from using PELs. He also recommended that OSHA specify 10% of the LEL as a limiting factor for MUCs.

Stephan C. Graham of the United States Army Center for Health Promotion and Preventive Medicine (Exs. 9–42, 9–42–1, and 9–42–2) indicated that OSHA should expand the MUC definition to include hazardous substances it does not regulate. However, he did not believe that NIOSH MUCs should be used when they are lower than the MUCs calculated using OSHA PELs. Rick N. Givens of Augusta Utilities Department (Ex. 10–2) also agreed that OSHA should require employers to calculate MUCs for substances that do not have OSHA PELs. Ken M. Wilson of the Division of Safety & Hygiene, Ohio Board of Water Control (Ex. 10–3) stated that OSHA should require employers to determine MUCs for substances that have no

OSHA PEL because many of these substances can harm employees.

David L. Spelce (Ex. 10–6) stated that the PELs in 29 CFR 1910.1000 were adopted by OSHA in 1971 and came mostly from the 1968 ACGIH TLVs. He recommended that OSHA require employers to use the ACGIH TLVs and AIHA Workplace Environmental Exposure Levels when no OSHA PEL exists. He indicated that these alternative values also should be used when they are more stringent than the OSHA PELs. He agreed with OSHA that when the IDLH level is lower than the calculated MUC, the IDLH concentration must take precedence. In such circumstances, only the most protective atmosphere-supplying respirators should be used. He also stated that IDLH limits should be established based on toxicological data, but, in the absence of toxicological data, 10% of the LEL should be used as the limiting factor (i.e., having the same weight as the IDLH for flammable substances).

Thomas C. O'Connor of the National Grain and Feed Association (NGFA) (Exs.10–13 and 16–19) recommended a revised MUC definition that would read as follows:

*Maximum use concentration (MUC)* * * * usually can be determined mathematically by multiplying the assigned protection factor specified for a respirator by the permissible exposure limit or ceiling value as appropriate. In a situation when such regulatory limits have not been set by OSHA, the employer may rely on limits established by non-regulatory organizations based on professional judgment and the working environment.

However, he (Ex. 10–13) said that NGFA strongly opposes requiring employers to determine MUCs for substances for which no OSHA PELs are available. The NGFA also opposed any requirement that employers rely on MUCs developed by NIOSH, but supported the use of non-OSHA exposure limits as aids employers can use in establishing MUCs.

Thomas Nelson of NIHS, Inc. (Ex. 10–17) indicated that OSHA should not require employers to determine MUCs for substances that have no OSHA PELs. Nelson said that OSHA first must determine when a need for such exposure limits exists, and then issue new PELs. Furthermore, Nelson stated that OSHA cannot rely on other groups to establish limits for OSHA's use. He also said that the only limiting factors that should be used in calculating MUCs are APFs and IDLHs, and that the Agency should specify the LEL, or a value close to the LEL (e.g., 90% of the

LEL), when no IDLH exists for a substance.

Lorraine Krupa-Greshman of the American Chemistry Council (ACC) (Ex. 10–25) indicated that NIOSH MUCs should not be adopted as a specific requirement, but should remain available for guidance. The ACC also does not support requiring compliance with NIOSH MUCs when they are lower than OSHA's MUCs. The ACC recommends a requirement for employers to determine the appropriate MUCs for substances that do not have an OSHA PEL. However, employers should be allowed to designate and document the basis for these MUCs using either the OSHA formula or other criteria. She stated that the IDLH is a reasonable limit on the MUC for some types of respirators, and that an IDLH should be based on health effects. She noted that using the LEL or a percentage of the LEL to limit MUCs is confusing and inappropriate because an LEL is used to determine whether an employee can safely enter an area with a fire hazard, not for selecting respirators.

Frank A. White of ORC Worldwide (Ex. 10–27) stated that OSHA should not require employers to calculate MUCs for substances that have no OSHA PEL, but that employers should have the freedom to select the occupational exposure limits used for calculating MUCs based on their own risk assessments. He emphasized that it is important that employers be able to show the documented evidence used to support their MUC decisions. ORC Worldwide also indicated that OSHA should not expand the application of MUCs to hazardous substances it does not regulate because these exposure limits (e.g., developed by chemical manufacturers, ACGIH, NIOSH, EPA) would become OSHA regulations. He also stated that OSHA should not enforce the 1994 NIOSH IDLHs, but instead should continue to rely on those IDLHs that NIOSH developed in 1990. OSHA should not use either the LEL or 10% of the LEL as a limiting factor because these factors are not health-based, and are used as indicators of a physical hazard.

Ted Steichen of the American Petroleum Institute (Ex. 9–23) believed that the determination of MUCs for substances with no OSHA PELs should be left to the good practices of the employer. He stated that OSHA would be exceeding its authority if it expanded the definition and application of MUC to hazardous substances that it does not regulate. Steichen said that the use of the LEL to limit the MUC is confusing and inappropriate. He stated that the LEL has no relationship to the

protection provided by a respirator, but is an essential factor to consider when working with flammable or combustible materials.

Paul Hewett of Exposure Assessment Solutions, Inc. (Ex. 10–60) believed that OSHA should require employers to determine MUCs for those substances that have no OSHA PEL. He pointed out that employers already are required to consider all hazardous substances, including those substances without an OSHA PEL, under the "recognized hazards" provision of the general-duty clause of the OSH Act. He recommended that OSHA indicate, either by regulation or by repeated emphasis in the preamble of this final standard and in all respirator guidelines, that these requirements also apply to overexposures involving unregulated substances. Hewett also stated that OSHA should not require employers to comply with MUCs calculated using NIOSH RELs when these MUCs are lower than the MUCs calculated using NIOSH PELs. He recommended as well that OSHA should specify an upper bound on MUCs that is a percentage of the IDLH for a substance, e.g., the MUC is no more than 25% of the IDLH.

Michael Watson of the International Brotherhood of Teamsters, AFL–CIO (Ex. 9–12), Pete Stafford of the Building and Construction Trades Department, AFL–CIO (Ex. 9–29), and Rick N. Givens of the Augusta Utilities Department (Ex. 10–2) agreed with using the IDLH as a limiting factor for MUCs. Givens also recommended that OSHA specify 10% of the LEL as an additional limiting factor for MUCs.

Michael Runge of the 3M Company (Exs. 9–16, 16–25, and 16–25–2) said that only APFs and IDLHs should be used to calculate MUCs. The LEL and eye irritation, as well as all other limitations, already are considered in the respirator selection process, and do not necessarily need to be considered when establishing specific MUCs. He did not support use of 10% of the LEL as a limiting factor, but stated that OSHA should specify the LEL when no IDLH is available for a chemical. He also stated that when employers use the REL for an unregulated contaminant to select a respirator, the APF and MUC principles specified in the proposal should apply.

Kenneth Bobetich of Mine Safety Appliances (Ex. 9–37) believed that OSHA's definition of MUC is sufficient to cover the limitations, and that MUCs should not be based on eye irritation. Tracy C. Fletcher of Parsons-Odebrecht JV (Ex. 10–1) recommended that OSHA use 10% of the LEL as an MUC-limiting

factor. Accordingly, when the atmosphere reaches 10% of the LEL, the employee should be removed and steps taken to make the work area safe (e.g., ventilate the area). When the area cannot be made safe, the employer should provide the employee with a fire-retardant suit and supplied air.

### 3. Summary and Conclusions

As noted above in the discussion of the MUC definition, the final standard will require employers to use an OSHA exposure limit when available. However, absent an OSHA exposure limit, employers must use relevant available information combined with informed professional judgment to determine MUCs. The purpose of this approach is to permit employers to rely on existing data sources and professional judgment when determining an MUC that will provide adequate protection for their employees from hazardous airborne contaminants that have no OSHA exposure limit.

### E. MUCs for Mixtures and Hazard Ratios

#### 1. MUCs for Mixtures

Paragraph (d)(3)(i)(B)(1) requires employers to select respirators for employee use that maintains the employees exposure to the hazardous substance at or below the MUC. However, a question arises regarding how to make these calculations for mixtures. Question 12 in Section VIII. ("Issues") of the proposal addressed this issue by requesting comments on the proposed MUC for mixtures. About half of the commenters supported the MUC provisions as proposed, but believed that insufficient data were available to perform the calculations for mixtures (Exs. 9–23, 9–37, 10–17, 10–25, and 10–59). Another group of commenters supported performing the calculations based on information that each component of a mixture has a non-additive effect on independent organ systems. In this case, the commenters suggested either a separate MUC for each component, or lowering the MUC according to the proportion of each component in the mixture (Exs. 9–12, 9–13, 9–22, 9–29, and 9–37). Still others recommended lowering the MUC by an unspecified proportion when individual components of the mixture have synergistic effects on organ systems (Ex. 9–42), or simply requiring employers to use supplied-air respirators when employees are exposed to mixtures (Ex. 10–1).

Daniel K. Shipp of the International Safety Equipment Association (Ex. 9–22) pointed out that the effect of the mixture on canister/cartridge service life

must be evaluated, and an appropriate change schedule established for a mixture of gases or vapors. Shipp indicated that no MUC equation is available for mixtures. He suggested that when the health effects of a mixture's components are not additive, then each component should be evaluated separately, and the respirator must be appropriate for the sum of the individual chemical concentrations.

Kenneth Bobetich of Mine Safety Appliances (Ex. 9–37) noted that no evidence exists to indicate that respirator performance is different when the exposure is to a mixture of particulates versus a single particulate. However, the effect of a mixture of gases or vapors on canister/cartridge service life must be evaluated, and an appropriate change schedule established. He further mentioned that Dr. Gerry Wood of LANL is conducting a study to evaluate the effect of mixtures on service life, and is developing a model to predict cartridge service life. Bobetich indicated that when the health effects of the mixture components are on the same organ system and these effects are additive, an additive formula can be used to establish the PEL for the mixture. However, when the health effects are not additive, then each component should be evaluated individually and the respirator must be appropriate for the sum of the individual chemical concentrations.

Thomas Nelson of NIHS, Inc. (Ex. 10–17) said that, because exposures to multiple organic vapors will affect the service life of a cartridge, the employer already is required to consider multiple contaminants in setting a cartridge change schedule. He recommended that, to determine the MUC for a mixture that affects the same organ system, employers should assume that the health effects of each component are additive.

Frank A. White of ORC Worldwide (Ex. 10–27) indicated that exposure to multiple gas or vapor contaminants may affect the service life of respirator filters and cartridges differently than exposure to a single contaminant. He, too, mentioned that Dr. Gerry Wood is working on this issue with NIOSH, and that a service life calculation model for multiple contaminants will soon be available. He emphasized that the more important consideration in determining MUCs for mixtures is the health effects of multiple contaminants. He stated that the employers are in the best position to apply recommendations from chemical manufacturers and information on health effects to their specific workplaces. He noted that industrial hygienists should determine if the

contaminants have additive health effects, and they should use the additive mixture formula set by ACGIH and OSHA to calculate the MUC.

Michael Watson of International Brotherhood of Teamsters, AFL-CIO (Ex. 9–12) and Pete Stafford of the Building and Construction Trades Department, A FL-CIO (Ex. 9–29) stated:

> The presence of multiple contaminants in the workplace should be taken into consideration when the employer determines the MUC and respirator change schedules for gases and vapors. Mixtures may have similar effects on chemical cartridge loading, so the MUC of each component of a mixture should be lowered in proportion to its percentage of the total concentration of contaminants in air.

Paul Schulte of NIOSH (Exs. 9–13, 13–11–1, and 16–4) recommended that the equation $C_1/MUC_1 + C_2/MUC_2 + * * * + C_n/MUC_n = 1$ should be used to determine MUCs for mixtures. He asserted that the MUC would be safe only when the result is ≥1. Schulte also stated that the rated service life of the cartridge may be shortened during exposure to a mixture (i.e., one or more of the mixture's components may break through before the rated end-of-service-life).

Ted Steichen of American Petroleum Institute (Ex. 9–23) indicated that no data are available comparing respirator performance during exposure to multiple contaminants and exposure to single contaminants, and that it is impractical to discuss establishing different MUCs for mixtures. Stephan C. Graham of the United States Army Center for Health Promotion and Preventive Medicine (Exs. 9–42, 9–42–1, and 9–42–2) stated that MUCs for mixtures should differ from MUCs for single compounds depending on whether the health effects are additive or synergistic.

Tracy C. Fletcher of Parsons-Odebrecht JV (Ex. 10–1) believed that supplied-air respirators should be used to eliminate the risk of filter failure caused by chemical reactions that may occur among the components of a mixture. Lorraine Krupa-Greshman of the American Chemistry Council (ACC) (Ex. 10–25) indicated that by addressing contaminants with additive effects, 29 CFR 1910.1000(d)(2)(i) and the proposal provide adequate means of achieving suitable protection. Also, she said that MUCs can be developed for multiple contaminants that have independent health effects by using the change schedule provisions of 1910.134(d)(3)(iii)(B)(2). The ACC does not believe that adequate information and data are available to develop MUCs for mixtures with synergistic effects.

Lisa M. Brosseau of the University of Minnesota (Ex. 10–59) believed that the issue of mixtures, as addressed in the proposal, is confusing and incorrect. She stated that the only requirements needed are to assure that respirators have the required filters and that gases and vapors have appropriate cartridges.

## 2. Use of Hazard Ratios

Michael Runge of the 3M Company (Ex. 9–16), Daniel K. Shipp of the International Safety Equipment Association (Ex. 9–22), and Lisa M. Brosseau of the University of Minnesota (Ex. 10–59) supported another method for selecting respirators, the hazard ratio (HR). The HR is defined as the ratio of the workplace concentration of an airborne contaminant divided by the occupational exposure limit (e.g., PEL). Any respirator that has an APF equal to or greater than the HR may be selected. They stated that the HR is more useful to employers than MUCs because employers likely will have information on airborne concentrations and occupational exposure limits when selecting respirators. Both Runge and Shipp said that the HR is similar to the MUC. Brosseau noted that it makes more sense to use the HR rather than the MUC to select respirators, and she recommended that OSHA require the HR method, and use the MUC as guidance.

OSHA is not adopting hazard ratios under this final rulemaking because it was not addressed in the notice of proposed rulemaking. Accordingly, OSHA would have to provide the public with notice and an opportunity for comment on this issue before taking such action.

## 3. Summary and Conclusions

OSHA agrees with the commenters who stated that the data on mixtures are limited, and that no revision is needed for OSHA's proposed single-contaminant MUC definition (Exs. 9–23, 9–37, 10–17, 10–25, and 10–59). The existing requirement for setting change schedules for respirator cartridges and canisters specified in 29 CFR 1910.134 (d)(3)(iii)(B)(2) already requires that employers consider the effects of each component in organic vapor mixtures when they develop change schedules. The Agency recognizes that reliable methods are not available to develop MUCs for mixtures based on whether the components of the mixture act additively or synergistically, and whether they affect the same organ or different organs. Therefore, OSHA will rely on the provisions at 29 CFR 1910.1000(d)(2)(i) to assist employers in calculating MUCs.

While the determination of MUCs and service life are both necessary for respirator selection, they should not be confused. MUCs can be used to decide if a certain type of respirator even qualifies for consideration for use in defined workplace concentrations. Service life estimation identifies how long a properly selected respirator can be expected to provide worker protection and, therefore, is useful for setting change schedules.

OSHA has established at 29 CFR 1910.1000(d)(2)(i) an equivalent exposure requirement for mixtures of air contaminants. Accordingly, MUCs for respirators used in a mixture of contaminants must satisfy the following equation:

$$E_m = (C_1 + L_1 + C_2 + L_2) + * * * + (C_n + L_n)$$

Where:

$E_m$ is the equivalent exposure for the mixture

$C$ is the concentration of a particular contaminant

$L$ is the exposure limit for that substance

The value of $E_m$ shall not exceed unity (1).

OSHA is maintaining the MUC as a requirement in the final standard for determining the maximum concentration of an airborne contaminant from which a respirator will protect an employee. In addition, the Agency cannot revise the final rule to mandate the use of hazard ratios because the regulated community must have adequate notice of, and an opportunity to comment on, any such revision to the standard.

*F. MUC Provisions*

1. Paragraph (d)(3)(i)(B)—MUC Provisions

These final requirements consist of three separate paragraphs ((d)(3)(i)(B)(1) through (d)(3)(i)(B)(3)). Paragraph (d)(3)(i)(B)(1), which sets the requirements for the use and application of MUCs, reads, "The employer must select a respirator for employee use that maintains the employee's exposure to the hazardous substance, when measured outside the respirator, at or below the MUC." This paragraph, which has the same designation in the proposal, requires employers to select respirators for employee protection that are appropriate to the ambient levels of the hazardous substance found in the workplace, i.e., that the ambient level of the hazardous substance must never exceed the MUC, which is the exposure limit specified for the hazardous substance multiplied by the respirator's

APF. Accordingly, this provision ensures that employers maintain employees' direct exposure to hazardous substances (i.e., inside the respirator) below levels specified by OSHA's Z tables and substance-specific standards, and, when OSHA has no standards, below exposure levels determined by the employer. Therefore, this provision provides employee protection consistent with existing regulatory requirements and prevailing industrial-hygiene practice.

In the MUC provision following paragraph (d)(3)(i)(B)(1) in the proposal, OSHA had incorporated a note that stated: "MUCs are effective only when the employer has a continuing, effective respiratory protection program as specified by 29 CFR 1910.134, including training, fit testing, maintenance and use requirements." The Agency is removing this note because the program already is required under its Respiratory Protection Standard for all employers using respirators, and OSHA believes that duplicating this information in a note is unnecessary.

The second MUC provision in the proposal, paragraph (d)(3)(i)(B)(2), required employers to use MUCs determined by respirator manufacturers when those MUCs were lower than the MUCs determined using the general calculation (i.e., MUC = APF × PEL). Several commenters objected to the proposed provision, stating that it gave regulatory status to manufacturer's MUCs (e.g., Exs. 9–10, 9–22, 9–23, 9–24, 9–26, and 10–13). However, the Agency often defers in its rules to instructions and other documents published by manufacturers (e.g., no fewer than seven provisions of OSHA's Respiratory Protection Standard refer to manufacturers' instructions or recommendations). Nevertheless, the Agency believes that the proposed provision is unnecessary because using the general calculation specified in the MUC definition is an accepted safe practice in the industrial-hygiene community.

Paragraph (d)(3)(i)(B)(2) of the final MUC provisions (which was designated as paragraph (d)(3)(i)(B)(3) in the proposal) specifies that employers must not use MUCs to select respirators for employees who are entering an IDLH atmosphere. OSHA previously specified the requirements for selecting respirators for use in IDLH atmospheres in paragraph (d)(2) of its Respiratory Protection Standard. Paragraph (d)(2) requires employers to select for this purpose a full facepiece pressure-demand SCBA certified by NIOSH to have a service life of at least 30 minutes, or a combination full facepiece

pressure-demand supplied-air respirator with an auxiliary self-contained air supply. In the preamble to the final Respiratory Protection Standard, the Agency justified selecting these respirators as follows: "In [IDLH] atmospheres there is no tolerance for respirator failure. This record supported OSHA's preamble statement that IDLH atmospheres 'require the most protective types of respirators for workers' " (59 FR 58896). Commenters to the APF proposal, including NIOSH, ANSI, and representatives of both labor and management, agreed that employees should use these respirators, which are the most protective respirators available, when exposed to IDLH atmospheres. (See 63 FR 1201 for a more complete discussion of these comments.)

Ted Steichen of the American Petroleum Institute (Ex. 9–23) requested that OSHA clarify that a pressure-demand full facepiece SAR with auxiliary SCBA can be used at an APF higher than 1,000. He said that positive-pressure SARs with auxiliary SCBAs often are used by the petroleum industry for non-emergency work in high-hazard operations (e.g., cleaning refinery flare systems) that may involve potential exposures greater than 1,000 times the PEL. Under proposed Table 1, he questioned whether OSHA would consider this use of SARs with auxiliary SCBAs to be acceptable. The Agency notes that paragraph (d)(2)(i)(B) of its Respiratory Protection Standard already permits employers to use a combination full facepiece pressure-demand supplied-air respirator (SAR) with auxiliary pressure self-contained air supply in IDLH atmospheres. Also, paragraph (d)(3)(i)(A) of this final standard states, "When using a combination respirator * * * employers must ensure that the assigned protection factor is appropriate to the mode of operation in which the respirator is being used." In this case, the combination pressure-demand full facepiece SAR with auxiliary SCBA respirator is equivalent to an SCBA, and, therefore, the APF for an SCBA applies.

The last MUC provision, proposed paragraph (d)(3)(i)(B)(4), would have required that "[w]hen the calculated MUC exceeds another limiting factor such as the IDLH level for a hazardous substance, the lower explosive limit (LEL), or the performance limits of the cartridge or canister, then employers must set the maximum MUC at that lower limit." Accordingly, the IDLH limits for hazardous substances would take precedence over the calculated MUC when the IDLH limits result in lower employee exposures to the hazardous substances. Consequently,

this provision increases employee protection against these hazardous substances. OSHA is retaining a revised version of this proposed provision in the final rule (redesignated as paragraph (d)(3)(i)(B)(*3*)). The remaining paragraphs of this subsection discuss the revisions.

The previous discussion of MUCs for substances with no OSHA PEL or other limiting factors (see subsection 2 ("MUCs for Substances with No OSHA PEL or Other Limiting Factor") of this section) addressed the use of the LEL as a limiting factor to be considered when calculating the MUC. NIOSH did not agree with the use of the LEL as a limiting factor for MUCs in respirator selection unless the respirator is the source of an ignition hazard (Ex. 9–13). Alcoa, Inc. did not believe OSHA should use the LEL as a limiting factor for MUCs since the LEL "is not health-based, rather it is an independent indicator of a physical hazard" (Ex. 10–31). The American Chemical Council commented using the LEL to set MUCs was confusing and inappropriate, because the LEL is used to determine whether an employee can safely enter an area with a fire hazard, not for selecting respirators (Ex. 10–25). The American Petroleum Institute also questioned the use of the LEL to limit the MUC because the LEL has no relationship to the protection provided by a respirator, but is a factor to consider when working with flammable or combustible substances (Ex. 9–23). The 3M Company stated that the LEL already is required under the Respiratory Protection Standard when selecting respirators, and does not need to be taken into account when establishing specific MUCs (Ex. 9–16).

The Agency agrees with these commenters that the LEL is not appropriate as a limiting factor in setting MUCs. Therefore, OSHA removed from paragraph (d)(3)(i)(B)(*3*) in the final rule the language that identified the LEL as a limiting factor in setting MUCs. The Agency made this revision to the proposal because the LEL is not related to the performance of the respirator, but is an independent indicator of a physical hazard (i.e., the flammability or combustibility of a substance) that already must be considered when determining whether an employee can safely enter a hazardous area.

The revised and redesignated final paragraph (d)(3)(i)(B)(*3*) now reads as follows:

(*3*) When the calculated MUC exceeds the IDLH level for a hazardous substance, or the performance limits of the cartridge or canister, then employers must set the maximum MUC at that lower limit.

## G. Superseding the Respirator Selection Provisions of Substance-Specific Standards in Parts 1910, 1915, and 1926

### 1. Introduction

OSHA proposed to revise the provisions in its substance-specific standards under 29 CFR parts 1910, 1915, and 1926 that regulate APFs (except the APF requirements for the 1,3-Butadiene Standard at 29 CFR 1910.1051). These substance-specific standards specify numerous requirements for regulating employee exposure to toxic substances. The proposed revisions would have removed the APF tables from these standards, as well as any references to these tables, and would have replaced them with a reference to the APF and MUC provisions specified by proposed paragraphs (d)(3)(i)(A) and (d)(3)(i)(B) of the Respiratory Protection Standard at 29 CFR 1910.134. In justifying these proposed revisions, the Agency stated that the proposed revisions would simplify compliance for employers by removing many APF requirements across its substance-specific standards. The proposed revisions would enhance consolidation and uniformity of these requirements, and conform them to each other and to the general APF and MUC requirements specified by 29 CFR 1910.134 (68 FR 34107).

As noted elsewhere in this preamble to the final APF rule, OSHA developed the final APFs using the best available evidence. The development of these final APFs included a careful review of the comments, testimony, data, and other evidence submitted to the rulemaking record, a quantitative (i.e., statistical) analysis of the results from WPF studies performed among workers wearing air-purifying half mask respirators (both filtering facepieces and elastomerics) discussed above in this preamble, and a thorough qualitative and qualitative review of existing WPF and SWPF studies performed with other types of respirators. Using the best data and analytic techniques available, as well as the extensive comments and testimony provided to the rulemaking record, lends a high degree of reliability and validity to the final APF determinations.

The Agency believes that the final APFs developed under this rulemaking will improve the substance-specific standards. The final APFs will provide employers with confidence that their employees will receive the level of protection from airborne contaminants signified by these APFs when they implement a respiratory protection program that complies with the requirements of 29 CFR 1910.134. In addition, applying the final APFs to the

substance-specific standards is consistent with OSHA's goal of bringing uniformity to its respiratory protection requirements. Moreover, protection for workers likely will be increased because the final APFs result in regulatory consistency, enhanced employer compliance, and reduced the compliance burden on the regulated community, and, consequently, further increases the protection afforded to employees who use respirators.

In its Respiratory Protection Standard, OSHA noted that the revised standard was to "serve as a 'building block' standard with respect to future standards that may contain respiratory protection requirements." (See 63 FR 1265, 1998.) However, in the proposed APF rulemaking that would provide generic APFs and MUCs as part of the Respiratory Protection Standard, the Agency decided to retain former respirator selection provisions in the existing substance-specific standards that it found supplemented or supplanted the proposed APFs and MUCs (e.g., organic vapor cartridge and canister procedures, prohibiting use of filtering facepieces or half mask respirators). OSHA did so because these provisions enhance the respirator protection afforded to employees.

### 2. Comments Regarding the Respirator Selection Provisions of the 1,3-Butadiene Standard

The former respirator selection provisions being retained in this final rule include those provisions in the 1,3-Butadiene (BD) Standard. In issue 13 of the proposed APF rule (68 FR 34112), OSHA asked if exclusion of this standard was warranted. The responses to this question addressed only the service life requirement for cartridges used to absorb atmospheric BD. Typical of these responses is the following comment from the 3M Company:

A short service life does not affect the ability of a specific respirator to reduce a concentration of a contaminant below the PEL. * * * [W]ith the cartridge change requirements in 1910.134 there is no need to limit the use of organic vapor cartridges or canisters to specific levels of BD. The employer is required to determine a useful service life. If that service life is very short, the employer will need to determine if the replacement schedule is realistic. (Ex. 18–7.)

However, two other commenters made important observations. First, the American Chemistry Council representative noted that "[E]xclusion of [the BD] standard is reasonable since this standard has a more comprehensive

respirator section that includes end of service life specifications' (Ex. 10–25). Second, ORC Worldwide stated, "Excluding [BD] is warranted. Additional verbiage relative to service lives developed under a negotiated rulemaking process should not be changed" (Ex. 10–27).

Commenters who recommended adopting the change-out schedule provisions of 29 CFR 1910.134 provided no compelling rationale for disturbing the extensive change-out schedules developed for the BD Standard on the recommendation of industry and labor representatives . Substituting the performance-based provisions that regulate change schedules under 29 CFR 1910.134 for the existing BD Standard's change schedule provisions for the sake of convenience is insufficient justification for revisiting these relatively recently promulgated provisions. In this regard, the latter two commenters clearly recognized the importance of the process that resulted in the existing change schedule requirements. .

In the preamble to the final BD Standard, the Agency reviewed test data that demonstrated short breakthrough times for BD concentrations above 50 ppm. Accordingly, these short breakthrough times justified setting at 50 ppm the upper limit at which employees can use air-purifying respirators for protection against BD exposures. The Agency used these data to develop change schedules for cartridges and canisters that are unique for BD exposures (see Table 1 of the BD Standard). OSHA reviewed the test data when it published the final standard in 1996 and found that these conclusions remain valid. The Agency believes that it would impose an unnecessary burden on employers who are subject to the BD Standard to require them to repeat the review already conducted by OSHA on BD breakthrough times, and then develop their own change-out schedules under 29 CFR 1910.134. Moreover, employee protection from exposure to BD is unlikely to be increased.

The Agency acknowledged in the preamble to the final BD Standard that it took a conservative approach to employee protection. In this regard, OSHA noted that its "decision to rely on the more protective NIOSH APFs is based on evidence showing that organic vapor cartridges and canisters have limited capacity for adsorbing BD and may have too short a service life when used in environments containing greater than 50 ppm BD." (See 61 FR 56816.) With regard to the change-out schedules, the Agency concluded:

Allowing for a reasonable margin of protection, and given that test data were available only for a few makes of cartridges and canisters, OSHA believes that air-purifying devices should not be used for protection against BD present in concentrations greater than 50 ppm, or 50 times the 1 ppm PEL. Thus, OSHA finds that the ANSI APFs of 100 for full facepiece, air-purifying respirators and 1,000 for PAPRs equipped with tight-fitting facepieces are inappropriate for selecting respirators for BD.

Accordingly, OSHA is retaining the respirator selection provisions of the BD Standard to avoid imposing on employers the new burden of developing their own change-out schedules, and to ensure maximum protection for employees exposed to BD.

3. Comments Regarding the Respirator Selection Provisions of Other Substance-Specific Standards

The Agency proposed to retain a number of special respirator selection provisions in the existing substance-specific standards. In this regard, OSHA noted that the respirator selection requirements proposed for retention were developed in rulemakings to provide protection against a hazardous characteristic or condition that is unique to the regulated substance. Additionally, the Agency stated that retaining these requirements would not increase the existing employer burden because they already must comply with these requirements. Consequently, retaining these provisions would maintain the level of respiratory protection currently afforded to employees. These provisions were in the substance-specific standards regulating employee exposure to vinyl chloride, inorganic arsenic, asbestos, benzene, coke oven emissions, cotton dust, ethylene oxide, and formaldehyde. Under issue 13 in the proposal, OSHA requested comments on the need to standardize the respirator selection provisions being proposed for retention. The Agency received numerous comments and hearing testimony on this issue. Most of these comments and testimony encouraged OSHA not to retain these provisions in their existing form, but instead to subsume these provisions under the Respiratory Protection Standard at 29 CFR 1910.134. An example of such a recommendation was provided by the 3M Company (3M) when it stated, in its hearing testimony, "It is neither necessary nor justified to retain any of the substance-specific requirements · in the substance-specific standards. * * * They do not reflect the changes in science and technology, respirator design, respirator certification, or respirator regulation under 29 CFR 1910.134" (Tr. at 393). In subsequent

testimony, a representative from 3M stated, "We contend that requiring separate respirator APFs and selection requirements in the substance-specific standards as proposed would only add confusion to the respirator selection process, and is not justified by any scientific or practical evidence" (Tr. at 394). Thomas Nelson of NIHS, Inc., provided similar rationale in support of standardizing these provisions, stating:

The proposal would retain information [on] cartridge change schedules, filter selection and some specific respirator selection requirements in the substance-specific standards. None of these requirements are necessary in the substance-specific standard[s]. The current 1910.134 with the addition of an assigned protection factor table contains requirements that are protective (Ex. 18–9.)

Many of these comments addressed issues involving single substance-specific standards, including their cartridge, canister, and filter requirements. The following paragraphs provide a summary of the comments that pertain to individual substance-specific standards, as well as OSHA's response to these comments.

• *Inorganic Arsenic (29 CFR 1910.1018).* A commenter wanted OSHA to "[c]larify if filtering facepieces will be acceptable [under this standard]," and asserted that requiring "gas masks or SARs for exposures above the PEL is unnecessary (Ex. 9–5). Two commenters, the Mine Safety Appliances Co., and the 3M Company, questioned the need to require a HEPA filter when using a cartridge or canister for exposures above a specified limit (Exs. 9–37, 18–7), while one of these commenters claimed that any filter approved by NIOSH under 42 CFR part 84 would provide the required level of filter efficiency (Ex. 18–7).

The Agency did not address, as part of this rulemaking, the use of filtering facepieces during inorganic arsenic exposures. This question deals with compliance. The other two commenters provided no basis for questioning the requirement for HEPA filters, while the issue of filters approved under 42 CFR part 84 is addressed below (see section entitled "Substituting N95 Filters for HEPA Filters").

• *Asbestos (29 CFR 1910.1001 and 29 CFR 1926.1101).* The 3M Company (3M) objected to the provision in this standard that prohibits the use of disposable half masks, but permits the use of elastomeric respirators, at asbestos concentrations that are 10 times the PEL (Ex. 18–7). In these comments 3M stated that this disparity "is counter to OSHA's analysis of WPF data that does not show a difference

between filtering facepieces and elastomeric facepieces." The 3M Company continued by noting that NIOSH stated that the aerosol size used in its respirator certification test ensures that filter performance will be at least as efficient "for essentially all other aerosol sizes" (see 60 FR 30344). While this comment implies that NIOSH would accept filtering facepieces for protection against asbestos, another commenter observed that the 1997 *NIOSH Pocket Guide to Chemical Hazards* expressly prohibits such use (Ex. 18–5).

The rebuttal made by the last commenter indicates that 3M's concerns regarding the use of disposable respirators are controversial. Consequently, revision would require a new rulemaking.

• *Coke Oven Emissions (29 CFR 1910.1029).* A 3M representative asserted that OSHA made an error when it proposed to revise the term "single-use respirator" to "filtering facepiece respirators" in item (b)(1) of Table 1 in paragraph (g)(3) of this standard (Ex. 18–7). This commenter supported his assertion by noting that "[t]he 'single use type' respirator was a term that NIOSH started after promulgation of the coke oven emission standard," and that "[d]isposable dust/mist respirators are not prohibited from use under the * * * standard." In conclusion, this commenter remarked that, by revising the term "single-use respirator" to "filtering facepiece respirators," the Agency is "prohibiting disposable particulate respirators from being used, which was not the intent of the original standard." However, another commenter took exception to removing the proposed prohibition against all filtering facepiece respirators (Ex. 18–5), claiming that the particle size of coke oven emissions is unknown, and that coke oven fumes may degrade the electrostatic filters used in filtering facepieces. This commenter asserted that employers should use only HEPA filter cartridges, or P100 filtering facepieces that respirator manufacturers demonstrate will not degrade when exposed to coke oven fumes.

The Agency agrees with the first commenter that the term "single-use respirator" is outdated. It believes that the regulated community now designates these respirators as filtering facepiece respirators. Accordingly, the definition of filtering facepiece respirators in paragraph (b) of 29 CFR 1910.134 consists of three key characteristics—they function under negative pressure, are used against particulates and vapors, and consist of a filtering medium that is an integral part of the facepiece or that constitutes the entire facepiece. These characteristics also describe single-use respirators. This definition does not specify the functional characteristics of filtering facepieces, only their structural features. In this regard, both filtering facepiece and single-use respirators generally are considered disposable, with the period of effectiveness determined by the functional characteristics of either respirator. Therefore, because single-use and filtering facepiece respirators are identical with regard to their structural characteristics, OSHA is retaining the proposed terminology in the final APF standard. However, while paragraph (b)(1) of the Table I in the Coke Oven Emissions Standard prohibits using a single-use paragraph, paragraph (b)(2) of this table permits its use when it functions as a "particulate filter respirator." Accordingly, employers may select filtering facepiece respirators when employees are exposed to coke oven emissions and those emissions (1) consist solely of particulates, and (2) the exposure conditions are no more than 10 times the PEL for coke oven emissions. Finally, OSHA simply cannot adopt the recommendation of the second commenter to use only P100 filtering facepieces under these conditions as this issue was not part of this rulemaking.

• *Cotton Dust (29 CFR 1910.1043).* The comments concerning this standard addressed whether filtering facepieces used to protect employees against cotton dust exposure should retain the current APF of 5 or be upgraded to an APF of 10. In this regard, one commenter believed that revising this standard to upgrade the APF of filtering facepieces to 10 would be consistent with the results of OSHA's statistical analysis of WPF studies for filtering facepiece respirators (Ex. 18–7). This commenter stated, "[F]iltering facepieces should have the same APF of 10 for cotton dust as they would for all other dusts. Filtering facepieces do not show selective performance to cotton dust versus other aerosols." Three additional commenters echoed a similar concern with regard to filtering facepieces used against cotton dust. Two of these commenters noted that no technical reason exists "to reduce the APF to 5 for filtering facepieces" (Exs. 9–22 and 9–37), while the third commenter stated that "[n]ot allowing filtering facepieces for greater than 5 times the PEL is inconsistent with an APF of 10 indicated in [proposed] Table 1" (Ex. 9–42).

Several commenters responded negatively to the recommendations to raise the APF from 5 to 10 for filtering facepieces used for protection against cotton dust (Exs. 12–7–1 and 18–5; Tr. at 41–43). However, these commenters provided no technical or safety-and-health rationale for their position. Typical of these comments was the following statement made at the rulemaking hearing by one of the participants: "If OSHA goes ahead and assigns a 10 * * * for [filtering facepieces] for the cotton dust standard * * *, you're going against what was established way back when and settled by the court [at] an APF of 5." (Tr. at 43.)

The first set of commenters recommended revising this standard to raise the APF for filtering facepieces from 5 to 10, consistent with the APF for filtering facepieces proposed for 29 CFR 1910.134. However, the Agency did not propose to raise the APF for filtering facepieces used against cotton dust, and the record is inadequate to make that decision at this time. The second set of comments noted that revising the APF from 5 to 10 for filtering facepieces used during exposures to cotton dust would be foreclosed by the court's decision in *Minnesota Mining and Manufacturing Co.* v. *OSHA,* 825 F.2d 482 (D.C. Cir. 1987); this decision upheld the Cotton Dust Standard's assignment of an APF of 5 for disposable respirators. While OSHA is not revising the APF for filtering facepieces used against cotton dust at this time, the Agency notes that the court's decision in this case does not preclude it from revising the Cotton Dust Standard in the future based on an appropriate rulemaking record.

4. Change-Out Schedules for Vinyl Chloride (29 CFR 1910.1017), Benzene (29 CFR 1910.1028), Formaldehyde (29 CFR 1910.1048), and Ethylene Oxide (29 CFR 1910.1047)

The International Safety Equipment Association (ISEA), the Mine Safety Appliances Co., and the 3M Company (3M) requested OSHA to remove the existing cartridge change-out schedules under the Vinyl Chloride Standard and replace them with the change-out schedule provisions of 29 CFR 1910.134 (Exs. 9–22, 9–37, and 18–7). In its comments on this issue, 3M stated that "the nature of toxicity of any analyte does not affect the service life of a chemical cartridge" (Ex. 18–7). ISEA and 3M submitted similar comments regarding the existing cartridge change-out schedules in the Benzene Standard (Exs. 9–22 and 18–7). Accordingly, 3M noted that the Agency should not limit cartridge selection to only organic vapor

cartridges specified for benzene absorption, but should expand the permitted cartridges to organic vapor cartridges for acid gas or formaldehyde absorption, as well as multi-gas cartridges (Ex. 18–7). The three commenters also recommended that OSHA remove the requirements for cartridges, filters, and the cartridge change-out schedules in the Ethylene Oxide Standard, as well as the specifications for cartridges/canisters and change-out schedules in the Formaldehyde Standard, asserting that employers could refer to 29 CFR 1910.134 to obtain the necessary information (Exs. 9–22, 9–37, and 18–7).

In response to these commenters, the Agency notes that it believes the minimum change-out schedules specified by these standards ensure that employers use the designated respirators at appropriate concentration levels of the regulated substance. OSHA also recognizes that retaining these specifications may limit employers' flexibility in adopting change-out schedules. However, it considers this limitation justified because the specified change-out schedules provide a high level of protection for employees against the dangerous properties of these substances. In addition, adopting the change-out schedule provisions of 29 CFR 1910.134 for current OSHA health standards is beyond the scope of this APF rulemaking. The Agency cannot make revisions to this final rule based on these comments because the regulated community must have adequate notice of, and an opportunity to comment on, any proposed revisions.

5. Miscellaneous Comments Regarding Superseding Other Substance-Specific Standards

A number of comments were general, and did not address a single substance-specific standard. These comments centered on respirator selection issues that involved two or more of the substance-specific standards, such as HEPA filters and training. The following paragraphs identify the issues addressed in these comments, and provide a summary of the comments that address these general issues, including OSHA's response to them.

• *Skin absorption and eye irritation.* Three commenters argued that it was unnecessary to preclude the use of half masks against eye irritants in the Ethylene Oxide, Methylene Chloride, and Formaldehyde standards when employees wear appropriate eye protection with half masks (Exs. 9–22, 9–37, and 9–42). A fourth commenter made a similar statement regarding protection against eye irritants, but did

not identify any specific substances (Ex. 9–59). One of these commenters asked, "Why make it a requirement to wear eye protection unless the concentrations are at irritant levels?" (See Ex. 9–42.) This commenter also noted that OSHA does not permit the use of half mask respirators during exposure to arsenic trichloride, but did not apply this prohibition to other chemicals that employees may absorb rapidly through the skin. This commenter recommended that the Agency "[p]rovide consistent recommendations that involve chemicals that can be absorbed through the skin in significant amounts (e.g., chemicals with PEL or TLV with 'skin' notations)." Another commenter took a different approach to this issue, proposing that OSHA should "[r]emove all references to [the] use of respirators for protection from substances that can be absorbed through the skin or irritate the skin or eyes. There are other ways that the skin can be protected" (Ex. 10–59).

The purpose of this rulemaking was to provide the regulated community with notice of, and an opportunity to comment on, specific respirator selection provisions that the Agency proposed for revision. In this regard, OSHA proposed no revisions to any requirements in the substance-specific standards that addressed protection against eye or skin irritants. Accordingly, these provisions will remain intact. The Agency believes that the requirements of existing substance-specific standards that specify the use of protective clothing and the other personal protective equipment requirements of 29 CFR 1910 subpart D will prevent serious skin absorption of toxic substances. Moreover, provisions in the substance-specific standards that require the use of full facepiece respirators and other high-end respirators for eye protection will provide employees with an integrated protection system that assures maximum respiratory and eye protection.

• *HEPA Filters.* Several commenters took exception to requirements in many substance-specific standards that some respirators use HEPA filters. For example, one commenter stated that NIOSH's updated respirator testing protocol in 42 CFR 84 eliminated the need for HEPA filters (Ex. 9–22). Similarly, a second commenter noted that HEPA filters were no longer listed in the NIOSH certification categories, and that OSHA should update the language in the Respiratory Protection Standard to be consistent with these categories (Ex. 10–59). A third commenter recommended that the

Agency remove references to HEPA filters from a number of its substance-specific standards because "[p]article properties such as size and form are no longer needed in filter selection" (Ex. 9–37). Another commenter stated that P100 filters were equivalent to HEPA filters, and that OSHA should "[p]rovide clear generic guidance on when HEPA or P100 filters should be used, as opposed to another less efficient filter"(Ex. 9–42).

In addressing other issues, one commenter stated that OSHA would be breaching an earlier decision if it superseded dust-mist-fume respirators with respirators using HEPA filters at lead levels that are equal to or below 0.5 mg/m$^3$ (Ex. 10–4).[11] Another commenter recommended limiting the use of all electrostatic (fiber) filters (Ex. 18–5). This commenter based this recommendation on evidence presented at the 1994 NIOSH hearing on the proposed filter certification requirements of 42 CFR 84. This commenter stated that the evidence showed, when tested with a heated DEHP aerosol challenge agent, the average filter efficiency for electrostatic P100 filters was less than the average filter efficiency for respirators that used a mechanical filter media. In one of these tests, the average filter efficiency for a P100 electrostatic filter was as low as 84.5%.

While it is beyond the scope of this rulemaking to make the revisions recommended by these commenters, the Agency notes that the definition of HEPA filters in paragraph (b) of 29 CFR 1910.134 equates these filters with high-end filters tested under the NIOSH certification scheme specified by 42 CFR 84. In this regard, the definition notes that, under 42 CFR 84, HEPA filters are equivalent to the N100, R100, and P100 particulate filters certified by NIOSH. Therefore, the Respiratory Protection Standard already describes HEPA filters in language that equates them to N100, R100, and P100 filters certified by NIOSH (i.e., the terms are interchangeable). OSHA Directive No. CPL 2–0.120 of September 25, 1998 ("Inspection Procedures for the Respiratory Protection Standard") also states, "When HEPA filters are required by an OSHA standard, N100, R100, and P100 filters can be used to replace them." In addition, an Agency letter of interpretation to Neoterik Health Technologies, Inc. dated March 18, 1996 concludes that, "when any OSHA standard requires the use of HEPA filters[,] then the employer may satisfy

---

[11] OSHA published this decision at 44 FR 5446 (January 26, 1979).

the requirement by choosing to use a P100, N100, or R100 filter certified under 42 CFR 84, since such filters would exhibit minimum leakage." Therefore, for over eight years, OSHA has consistently equated HEPA filters to the high-end filters certified by NIOSH under 42 CFR 84.

OSHA believes that this definition is sufficient to meet the recommendations of these commenters regarding the need to update the description of HEPA filters consistent with the NIOSH certification program, including the need to provide the "clear generic guidance" requested by one of the commenters (Ex. 9–42). As noted by another commenter (Ex. 9–37), the definition of HEPA filters contained in the Respiratory Protection Standard also specifies the filtering criterion that these filters must meet in terms of particulate size. The definition recognizes that the N100, R100, and P100 filters meet this criterion, thereby updating the HEPA definition as recommended by this commenter.

Contrary to the assertions made by one of the commenters (Ex. 10–4), the Agency is not breaching its earlier decision to permit the use of dust-mist-fume respirators (instead of respirators configured with HEPA filters) when employees are exposed to lead levels that are equal to or below 0.5 mg/m³. Although this commenter mentioned that the decision covered N95 respirators as well, N95 respirators were not even available in 1979 when the Agency published the decision and, therefore, were never part of the decision. The remarks of the last commenter (Ex. 18–5) described special testing conditions (using a heated DEHP aerosol challenge agent) that appeared to degrade specific types of filters. While this information may be of interest to NIOSH in determining the efficacy of its filter certification program, it is unclear how useful this information would be in selecting respirators for use in workplaces that vary substantially from these specialized testing conditions.

• *Substituting N95 Filters for HEPA Filters.* A representative for the 3M Company (3M) argued strongly that OSHA should require only N95 particulate filters for respirators, noting that OSHA based the existing requirement to use HEPA filters under some exposure conditions on NIOSH's outdated filter certification process specified in 30 CFR 11 (Tr. at 396). The 3M Company then described a WPF study conducted by Jensen et al. in a steel foundry on employees who performed a grinding operation involving a heavy work load (i.e., as

shown by high airflow rates through the filters) and exposure to an iron aerosol. The 3M Company claimed that under these conditions, no significant difference existed between P95 and P100 particulate filters used by these employees with regard to the percentage of workplace iron penetration inside the filter. In addition, they asserted that neither type of filter permitted any detectable oil mist penetration (Ex. 18–7; Tr. at 397).

Later in the hearing, when asked about the test conditions under which NIOSH certifies filter efficiency, the 3M representative stated:

NIOSH's testimony yesterday, which I agree with, is that they've got a worst case, or close to worst case, testing, and, as they've stated, * * * they expect performance in the workplace to be better than that rating. * * * So I believe that in the N95 filter[s], while you see a difference in their performance in the laboratory, when they're used against workplace aerosols, there is no difference. (Tr. at 429.)

In his testimony the previous day, the NIOSH representative made the following statement:

Well, NIOSH does not accept the premise that efficiency levels for filters that we test should be considered at higher efficiency levels. The approval program designates an efficiency level for the filters, which is well known to be tested with a near-worst case aerosol. However, this is done so that every workplace does not have to conduct sizing tests before they selected proper filters in the workplace. We think that this is a proper way to go, and we also do not think that assuming particle sizes and greater efficiencies on the filters is a very wise approach for protecting workers. (Tr. at 121.)

The 3M Company also mentioned that another justification for substituting N95 filters for N100 filters is that "increased breathing resistance caused by use of a 100 filter may decrease overall respirator effectiveness by reducing user comfort and thereby reducing the time the respirator is worn" (Ex. 18–7).

In its post-hearing comments, NIOSH acknowledged, "It is possible that a specific NIOSH certified 95-level filter may have filter penetration less than 5% in a specific workplace. However, this type of workplace-specific result may not be generalized to all 95-level filters in all workplace settings'" (Ex. 17–7–1). Later in these comments it stated, "NIOSH has included rigorous certification tests to help assure that filter performance in the workplace will be maintained at least at the certification level even under severe conditions," and "the NIOSH certification criteria are designed to assure that filters meet minimum

performance requirements. NIOSH does not certify that they will perform any better than these criteria."

Revising the existing respirator selection requirements for HEPA filters, or for filters certified by NIOSH as N100, R100, and P100 under 42 CFR part 84, is beyond the scope of the present rulemaking. Additionally, the commenters did not provide any evidence demonstrating that 95-level filters would protect employees when used under the worst-case conditions simulated during the NIOSH certification tests. However, from the evidence presented here, OSHA believes that NIOSH's filter certification program provides a substantial margin of protection to employees who use respirators. In addition, it is unclear from the study discussed by these commenters whether the results are applicable to the extreme range of exposure conditions used by NIOSH in its filter certification testing. Consequently, the Agency believes that adopting the recommendations made by these commenters may enable employers to purchase respirators that do not perform at the designated level of efficiency under extreme workplace exposure conditions, thereby jeopardizing seriously the health of their employees. Absent data demonstrating that 95-level filters perform effectively under near worst-case experienced conditions, OSHA is retaining its existing HEPA filter requirements.

• *Mixed-Versus Single-Substance Contaminants.* Several commenters recommended superseding the individualized canister/cartridge change-out schedules in the substance-specific standards with the performance-based provisions for developing change-out schedules described in OSHA's Respiratory Protection Standard. Their rationale for this recommendation is that schedules developed using the Respiratory Protection Standard provisions are capable of accommodating employee exposure to multiple contaminants, while the schedules provided in the substance-specific standards are limited to a single atmospheric contaminant. For example, 3M noted that:

[T]he benzene standard requires the cartridges be changed before the beginning of the next shift. In a refinery, workers may be exposed to benzene along with [toluene] and [x]ylene. The change schedule should be based on the exposure to the mixture as required by 29 CFR 1910.134, not just the benzene, because the mixture may result in requiring the cartridge to be changed sooner than eight hours. By following the requirements of 134, a change schedule would be established resulting in changing

the cartridge before loss of service life, thereby, increasing worker protection. (Tr. at 396.)

The International Safety Equipment Association and Thomas Nelson of NIHS, Inc., made similar statements (Tr. at 518 and Ex. 18–9). In further justification, 3M remarked that "[r]espirator program administrators may not be aware that the cartridge change schedules contained in the substance specific [standards] may not be protective if multiple contaminants are present" (Ex. 18–7).

These comments are a variation of the comments cited earlier in this section that recommended removing the change-out schedules specified for substance-specific standards and replacing them with the provisions of 29 CFR 1910.134 governing change-out schedules. This recommendation involves a major revision to these standards, and, therefore, is beyond the scope of this rulemaking. However, such a revision likely is unnecessary because change-out schedules involving multiple-contaminant exposures would not be covered under the substance-specific standards. Instead, employers must develop these change-out schedules for air-purifying respirators not equipped with an end-of-service-life indicator according to the requirements of the Respiratory Protection Standard, notably paragraph (d)(3)(iii)(B)(2).

• *Retaining APF Tables for Lead and Asbestos.* Several unions requested that OSHA retain the revised APF tables in the construction standards for lead and asbestos. During the hearing, a representative from the Building Construction Trades Department of the AFL–CIO (BCTD) stated that union-management training centers "conduct a great deal of worker training on lead and asbestos," and that "these tables * * * greatly facilitate the understanding of appropriate respirator selection" (Tr. at 615). This representative stated further:

It is much more usable for these parties to go directly to the substance-specific standard with the air-monitoring results and choose the appropriate type of respirator. If employers had to do calculations to determine the appropriate type of respirator to select, that is simply an added barrier to compliance. Additionally, the tables are of great help when communicating the need for respirators to employers who may not normally be engaged in lead and asbestos work. (Tr. at 615.)

The BCTD representative later noted that "[i]t's the idea of jumping from [the respiratory protection] standard to [the lead/asbestos construction] standard, that's why we don't want the table [removed]" (Tr. at 647). The BCTD post-hearing comments expanded on this

testimony, stating, "Calculations to determine appropriate respirator add [a] barrier to compliance * * *" (Ex. 9–29).

A representative of the Insulators and Asbestos Workers International ("IAWI") found the tables to be invaluable as a teaching aid, and added that:

I am asked by all types of people, regulators, legislators, facility engineers, owners of companies, [and] consultants where to find the information [about APFs]. I just tell them [to] look in the tables. * * * The common worker knows where to find this. It is where it should be. There are no OSHA libraries on the job sites. * * * I am asked by a lot of people in charge of sites where these [APFs] are in writing. If it is taken out of the rules, if it is not written, it will not be adhered to. (Tr. at 623.)

However, this representative later admitted that "[e]very one of our supervisors gets a copy of an updated [construction] standard," and "[h]e gets the 1910.134 [i.e., the Respiratory Protection Standard]" (Tr. at 645.) Similarly, another commenter remarked that "[e]mployers covered by [substance-]specific standards are already required to refer to 29 CFR 1910.134 for most respirator program elements including fit testing, inspection and cleaning, and program evaluation," and that "[i]f some employers would not bother to consult 29 CFR 1910.134 for APFs, these same employers are most likely not complying with other necessary program elements"(Ex. 18–7).

The Agency believes that employers know they are required to use the Respiratory Protection Standard. Retaining the APF tables in the construction standards for lead and asbestos is unlikely to result in any savings or convenience to employers or other parties because these tables cannot be used safely and effectively without consulting the requirements of 29 CFR 1910.134. Even one of the union representatives recognized this necessity when stating that supervisors must have access to both the construction standards and the Respiratory Protection Standard at the job site (Tr. at 646). In addition, OSHA believes that any respirator selection requirements that are unique to a substance-specific standard (i.e., not subsumed by this rulemaking under the Respirator Protection Standard) will remain available for easy access under the particular standard. In this regard, the Agency concludes that it is unnecessary to retain the APF tables for the lead and asbestos standards in the construction standards because the required APF tables can be assembled readily for training purposes from the

available information in the revised substance-specific standards and the Respiratory Protection Standard.

• *Upgrading Respirator Type at Employee Request.* At the hearing, the BCTD representative mentioned that several of the substance-specific standards required employers to upgrade respirators when requested to do so by employees. The representative encouraged the Agency to include such a requirement in current and future substance-specific standards (Tr. at 616). The IAWI representative commented:

[S]ome of our members, for a variety of reasons, like working in PAPRs. * * * Some people work in them, feel comfortable in them. They want them. And it makes them more at ease at doing their work. * * * It makes the person more productive, cools them down; there's a variety of reasons. (Tr. at 648.)

When asked how often employers upgrade respirators when doing so is discretionary, this representative replied, "I wouldn't say it's 100 percent. I'd say a portion of them would allow somebody that activity" (Tr. at 649).

Placing a burden on employers to upgrade respirators at an employee's request is beyond the scope of this rulemaking. However, the Agency recognizes the advantages, as well as disadvantages, to upgrading a respirator at an employee's request. As it stated in the preamble to the Respiratory Protection Standard with regard to PAPRs:

OSHA continues to believe that under some circumstances PAPRs provide superior acceptability. These include situations where employees wear respirators for full shifts, where employees frequently readjust their negative pressure respirators to achieve what they consider a more comfortable or tighter fit, and where the air flow provided by a PAPR reduces the employee's psychological and physiological discomfort. However, where ambient temperatures are extremely high or low, PAPRs are often unacceptable because of the temperature of the airstream in the facepiece. * * * (63 FR 1201.)

OSHA noted further, "The Agency continues to believe that it is good industrial hygiene practice to provide a respirator that the employee considers acceptable" (63 FR 1201). Therefore, employers are free to upgrade respirators voluntarily at an employee's request when the employee meets the medical qualifications for using the respirator and receives the necessary training.

5. Summary of Superseding Actions

The following table summarizes final revisions to the existing respirator selection provisions of OSHA's

substance-specific standards. Section VIII ("Amendments to Standards") of this rulemaking notice provides the full, plain-language regulatory text of these final revisions.

## SUMMARY OF SUPERSEDING ACTIONS FOR SUBSTANCE-SPECIFIC STANDARDS

| Existing provisions | Final action |
|---|---|
| 29 CFR 1910.1001(g)(2)(ii) ............................................ | Revise. |
| .1001(g)(3) ............................................ | Remove Table 1 and revise. |
| .1001(l)(3)(ii) ............................................ | Redesignate Table 2 as Table 1. |
| .1017(g)(3)(i) ............................................ | Remove table and revise. |
| .1017(g)(3)(iii) ............................................ | Remove. |
| .1018 (Tables I and II) ............................................ | Remove. |
| .1018(h)(3)(i) ............................................ | Revise. |
| .1018(h)(3)(ii) ............................................ | Remove. |
| .1018(h)(3)(iii) ............................................ | Redesignate as .1018 (h)(3)(ii). |
| .1025(l)(2)(ii) ............................................ | Remove Table II. |
| .1025(f)(3)(i) ............................................ | Revise. |
| .1027(g)(3)(i) ............................................ | Remove Table 2 and revise. |
| .1028(g)(3)(ii) ............................................ | Remove Table 1. |
| .1028(g)(2)(i) ............................................ | Revise. |
| .1028(g)(3)(i) ............................................ | Revise. |
| .1029(g)(3) ............................................ | Remove Table I and revise. |
| .1043(f)(3)(i) ............................................ | Remove Table I and revise. |
| .1043(f)(3)(ii) ............................................ | Revise. |
| .1044(h)(3) ............................................ | Remove Table 1 and revise. |
| .1045(h)(2)(i) ............................................ | Revise. |
| .1045(h)(3) ............................................ | Remove Table I and revise. |
| .1047(g)(3) ............................................ | Remove Table I and revise. |
| .1048(g)(2) ............................................ | Revise. |
| .1048(g)(3) ............................................ | Remove Table I and revise. |
| .1050(h)(3)(l) ............................................ | Remove Table I and revise. |
| .1052(g)(3) ............................................ | Remove Table 2 and revise. |
| 29 CFR 1915.1001(h)(2)(i) through (h)(2)(iv) ............................................ | Remove Table 1 and revise. |
| 29 CFR 1926.60(l)(3)(i) ............................................ | Remove Table 1 and revise. |
| .62 (f)(3)(i) ............................................ | Remove Table 1 and revise. |
| .1101(h)(3)(i) through (h)(3)(iv) ............................................ | Remove Table 1 and revise. |
| .1127(g)(3)(i) ............................................ | Remove Table 1 and revise. |

### 6. Use of Plain Language

In the proposal, OSHA rewrote into plain language the respirator-selection provisions of the substance-specific standards retained in this final rule. The Agency received no comments on these proposed revisions. OSHA believes that using plain language will improve the uniformity and comprehensibility of these provisions. These improvements will, in turn, enhance employer compliance with the provisions and, concomitantly, increase the protection afforded to employees. The Agency also found that rewriting the respirator-selection provisions of the existing substance-specific standards into plain-language provisions did not alter the substantive requirements of the existing provisions. (The following table lists the plain-language provisions in the final rule and the corresponding provisions in the existing standards.) Therefore, OSHA is retaining these plain-language revisions in the final rule.

## PLAIN-LANGUAGE PROVISIONS IN THE FINAL RULE AND CORRESPONDING PROVISIONS IN THE EXISTING STANDARDS

| Plain-language provisions | Existing provisions |
|---|---|
| § 1910.1001(g)(2)(ii) ............................................ | § 1910.1001(g)(2)(ii). |
| § 1910.1001(g)(3)(i) ............................................ | § 1910.1001(g)(3); Table 1. |
| § 1910.1001(g)(3)(ii) ............................................ | § 1910.1001(g)(3); Table 1. |
| § 1910.1017(g)(3)(i)(B) ............................................ | § 1910.1017(g)(3)(i); undesignated table. |
| § 1910.1017(g)(3)(i)(C) ............................................ | § 1910.1017(g)(3)(i); undesignated table. |
| § 1910.1018(h)(3)(i)(B) ............................................ | § 1910.1018(h)(3)(i); Table II (footnote 2). |
| § 1910.1018(h)(3)(i)(C) ............................................ | § 1910.1018(h)(3)(i); Table I and Table II. |
| § 1910.1018(h)(3)(i)(D)(1) ............................................ | § 1910.1018(h)(3)(ii). |
| § 1910.1018(h)(3)(i)(D)(2) ............................................ | § 1910.1018(h)(3)(ii); Table II. |
| § 1910.1025(f)(3)(i)(B) ............................................ | § 1910.1025(f)(3)(i); Table II (footnote 2). |
| § 1910.1025(f)(3)(i)(C) ............................................ | § 1910.1025(f)(3)(i); Table II. |
| § 1910.1025(f)(3)(ii) ............................................ | § 1910.1025(f)(3)(ii). |
| § 1910.1027(g)(3)(i)(B) ............................................ | § 1910.1027(g)(3)(i)(B); Table 2 (footnote b). |
| § 1910.1027(g)(3)(i)(C) ............................................ | § 1910.1027(g)(3)(i)(B); Table 2. |
| § 1910.1028(g)(3)(i)(B) ............................................ | § 1910.1028(g)(3)(i); Table 1. |
| § 1910.1028(g)(3)(i)(C) ............................................ | § 1910.1028(g)(3)(i); Table 1. |
| § 1910.1028(g)(3)(i)(D) ............................................ | § 1910.1028(g)(3)(i); Table 1 (footnote 1). |
| § 1910.1029(g)(3) ............................................ | § 1910.1029(g)(3); Table I. |
| § 1910.1043(f)(3)(i)(A) ............................................ | § 1910.1043(f)(3)(i); Table I. |

HeinOnline -- 71 Fed. Reg. 50183 2006

PLAIN-LANGUAGE PROVISIONS IN THE FINAL RULE AND CORRESPONDING PROVISIONS IN THE EXISTING STANDARDS—Continued

| Plain-language provisions | Existing provisions |
| --- | --- |
| § 1910.1043(f)(3)(i)(B) | § 1910.1043(f)(3)(i); Table I. |
| § 1910.1043(f)(3)(ii) | § 1910.1043(f)(3)(ii). |
| § 1910.1044(h)(3)(ii) | § 1910.1044(h)(3); Table 1. |
| § 1910.1045(h)(3)(ii) | § 1910.1045(h)(3); Table I. |
| § 1910.1047(g)(3)(i) | No provision of the original ethylene oxide standard contains this text. However, the only respirators designated for selection are either full facepiece respirators or respirators with hoods and helmets. Also, § 1910.1047(g)(4) ("Protective clothing and equipment") states, "When employees could have eye or skin contact with EtO or EtO solutions, the employer must select and provide * * * appropriate protective clothing or other equipment * * * to protect any area of the employee's body that may come in contact with the EtO or EtO solution * * *." |
| § 1910.1047(g)(3)(ii) | § 1910.1047(g)(3); Table 1. |
| § 1910.1047(g)(3)(iii) | § 1910.1047(g)(3); Table 1. |
| § 1910.1048(g)(2)(ii) | § 1910.1048(g)(2)(ii). |
| § 1910.1048(g)(3)(i)(B) | § 1910.1048(g)(3)(i); Table 1. |
| § 1910.1048(g)(3)(i)(C) | § 1910.1048(g)(3)(i); Table 1. |
| § 1910.1048(g)(3)(ii) | § 1910.1048(g)(3)(i); Table 1 (footnote 2). |
| § 1910.1048(g)(3)(iii) | § 1910.1048(g)(3)(ii). |
| § 1910.1050(h)(3)(i)(B) | § 1910.1050(h)(3)(i); Table 1. |
| § 1910.1050(h)(3)(i)(C) | § 1910.1050(h)(3)(i); Table 1. |
| § 1910.1050(h)(3)(i)(D) | § 1910.1050(h)(3)(i); Table 1 (footnote 2). |
| § 1910.1052(g)(3)(i) | No provision of the original methylene chloride standard contains this text. However, the only respirators designated for selection are either full facepiece respirators or respirators with hoods and helmets. Also, § 1910.1052(h)(1) ("Protective work clothing and equipment") states, "Where needed to prevent MC-induced skin and eye irritation, the employer shall provide clean protective clothing and equipment which is resistant to MC * * *." |
| § 1910.1052(g)(3)(ii) | § 1910.1052(g)(3); Table 2. |
| § 1915.1001(h)(2)(i) | § 1915.1001(h)(2)(i); Table 1. |
| § 1915.1001(h)(2)(ii) | § 1915.1001(h)(2)(i); Table 1. |
| § 1915.1001(h)(2)(iii) | § 1915.1001(h)(2)(iii)(A). |
| § 1915.1001(h)(2)(iv) | § 1915.1001(h)(2)(iv). |
| § 1915.1001(h)(2)(v) | § 1915.1001(h)(2)(v). |
| § 1926.60(i)(3)(i)(B) | § 1926.60(i)(3)(i); Table 1. |
| § 1926.60(i)(3)(i)(C) | § 1926.60(i)(3)(i); Table 1. |
| § 1926.60(i)(3)(i)(D) | § 1926.60(i)(3)(i); Table 1 (footnote 2). |
| § 1926.62(f)(3)(i)(B) | § 1926.62(f)(3)(i); Table 1 (footnote 2). |
| § 1926.62(f)(3)(i)(C) | § 1926.62(f)(3)(i); Table 1. |
| § 1926.1101(h)(3)(i)(A) | § 1926.1101(h)(3)(i); Table 1. |
| § 1926.1101(h)(3)(i)(B) | § 1926.1101(h)(3)(i); Table 1. |
| § 1926.1101(h)(3)(ii) | § 1926.1101(h)(3)(ii). |
| § 1926.1101(h)(3)(iii) | § 1926.1101(h)(3)(iii). |
| § 1926.1101(h)(3)(iv) | § 1926.1101(h)(3)(iv). |
| § 1926.1127(g)(3)(i)(B) | § 1926.1127(g)(3)(i); Table 1 (footnote b). |
| § 1926.1127(g)(3)(i)(C) | § 1926.1127(g)(3)(i); Table 1. |

## VII. Procedural Determinations

### A. Legal Considerations

The purpose of the Occupational Safety and Health Act, 29 U.S.C. 651 et seq. ("the Act") is to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources" (29 U.S.C. 651(b)). To achieve this goal, Congress authorized the Secretary of Labor to promulgate and enforce occupational safety and health standards (see 29 U.S.C. 654(b) (requiring employers to comply with OSHA standards) and 29 U.S.C. 655(b) (authorizing promulgation of standards pursuant to notice and comment)).

A safety or health standard is a standard "which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment or places of employment." (29 U.S.C. 652(8)). A standard is reasonably necessary or appropriate within the meaning of Section 652(8) of the Act when it substantially reduces or eliminates significant risk, and is technologically and economically feasible, cost effective, consistent with prior Agency action or supported by a reasoned justification for departing from prior Agency action, and supported by

substantial evidence; it also must effectuate the Act's purposes better than any national consensus standard it supersedes (see *International Union, UAW* v. *OSHA* (*LOTO II*), 37 F.3d 665 (DC Cir. 1994; and 58 FR 16612–16616 (March 30, 1993)).

The APFs specified by this final rule are an integral part of OSHA's Respiratory Protection Standard. This standard ensures that respirators reduce or eliminate the significant risk to employee health resulting from exposure to hazardous airborne substances. Accordingly, employers need the APFs provided in this final rule to select appropriate respirators for employees use when the employers

HeinOnline -- 71 Fed. Reg. 50184 2006

must rely on respirators to maintain hazardous substances at safe levels in the workplace. The APFs in this final rule will help ensure that the Respiratory Protection Standard achieves the annual health benefits estimated for that standard (i.e., 932 averted work-related deaths (best - estimate) and 4,046 work-related illnesses (best estimate)) (see 63 FR 1173).

In this rulemaking, OSHA also is superseding the existing APF requirements in its substance-specific standards. As noted in section V of this preamble ("Summary of the Final Economic Analysis and Regulatory Flexibility Analysis"), the Agency estimates that the final APFs will reduce significantly employee exposures to the hazardous airborne substances regulated by these substance-specific standards, especially asbestos, lead, cotton dust, and arsenic. Consequently, employees will receive additional protection against the chronic illnesses resulting from exposure to these hazardous substances, notably a variety of cancers and cardiovascular diseases.

The Agency believes that a standard is technologically feasible when the protective measures it requires already exist, can be brought into existence with available technology, or can be developed using technology that can reasonably be expected to be available (see *American Textile Mfrs. Institute* v. *OSHA* (*Cotton Dust*), 452 U.S. 490, 513 (1981); *American Iron and Steel Institute* v. *OSHA* (*Lead II*), 939 F.2d 975, 980 (DC Cir. 1991)). A standard is economically feasible when industry can absorb or pass on the costs of compliance without threatening the industry's long-term profitability or competitive structure (see *Cotton Dust*, 452 U.S. at 530 n. 55; *Lead II*, 939 F.2d at 980), and a standard is cost effective when the protective measures it requires are the least costly of the available alternatives that achieve the same level of protection (see *Cotton Dust*, 452 U.S. at 514 n. 32; *International Union, UAW* v. *OSHA* (*LOTO III*), 37 F.3d 665, 668 (DC Cir. 1994)).

All standards must be highly protective (see 58 FR 16612, 16614–15 (March 30, 1993); *LOTO III*, 37 F.3d at 669). Accordingly, section 8(g)(2) of the Act authorizes OSHA "to prescribe such rules and regulations as [it] may deem necessary to carry out its responsibilities under the Act" (see 29 U.S.C. 657(g)(2)). However, health standards also must meet the "feasibility mandate" of section 6(b)(5) of the OSH Act, 29 U.S.C. 655(b)(5). Section 6(b)(5) of the Act requires OSHA to select "the most protective

standard consistent with feasibility" needed to reduce significant risk when regulating health hazards (see *Cotton Dust*, 452 U.S. at 509). Section 6(b)(5) also directs OSHA to base health standards on "the best available evidence," including research, . demonstrations, and experiments (see 29 U.S.C. 655(b)(5)). In this regard, OSHA must consider "in addition to the attainment of the highest degree of health and safety protection * * * the latest scientific data * * * feasibility and experience gained under this and other health and safety laws" (Id.). Furthermore, section 6(b)(5) of the Act specifies that standards must "be expressed in terms of objective criteria and of the performance desired" (see 29 U.S.C. 655(b)(7)).

The APF and MUC provisions in this final rule are integral components of an effective respiratory protection program. Respiratory protection is a supplemental method used by employers to protect employees against airborne contaminants in workplaces when feasible engineering controls and work practices are not available, have not yet been implemented, or are not in themselves sufficient to protect employee health. Employers also use respiratory protection under emergency conditions involving, for example, the accidental release of airborne contaminants. The amendments to OSHA's Respiratory Protection Standard, and the Agency's substance-specific standards, specified in this final rule will provide employers with critical information to use when selecting respirators for employees exposed to airborne contaminants found in general industry, construction, shipyard, longshoring, and marine terminal workplaces. Since it is generally recognized that different types of respiratory protective equipment provide different degrees of protection against hazardous exposures, proper respirator selection is of critical importance. Failure to select the proper respirator for use against exposure to hazardous substances may result in employees being overexposed to these substances, thereby resulting in an increased incidence of cancer, cardiovascular disease, and other illnesses. The APF and MUC provisions in this final rule will greatly enhance an employer's ability to select a respirator that will adequately protect employees.

The Agency also developed the provisions of this final rule to be feasible and cost effective, and is specifying them in terms of objective criteria and the level of performance desired. In this regard, section V of this preamble ("Summary of the Final

Economic Analysis and Regulatory Flexibility Screening Analysis") provides the benefits and costs of the final rule, and describes several other alternatives as required by section 205 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1535). Based on this information, OSHA concludes that the APF and MUC provisions of the final rule constitute the most cost-effective alternative for meeting its statutory objective of reducing risk of adverse health effects to the extent feasible.

Several benefits will accrue to respirator users and their employers from this rulemaking. First, the standard benefits workers by reducing their exposures to respiratory hazards. Improved respirator selection augments previous improvements to the Respiratory Protection Standard, such as better fit-test procedures and improved training, contributing substantially to greater worker protection. At the time of the 1998 revisions to the Respiratory Protection Standard, the Agency estimated that the standard would avert between 843 and 9,282 work-related injuries and illnesses annually, with a best estimate (expected value) of 4,046 averted illnesses and injuries annually (63 FR 1173). In addition, OSHA estimated that the standard would prevent between 351 and 1,626 deaths annually from cancer and many other chronic diseases, including cardiovascular disease, with a best estimate (expected value) of 932 averted deaths from these causes. The APFs in this rulemaking will help ensure that these benefits are achieved, as well as provide an additional degree of protection. These APFs also will reduce employee exposures to several § 6(b)(5) chemicals covered by standards with outdated APF criteria, thereby reducing exposures to chemicals such as asbestos, lead, cotton dust, and arsenic. While the Agency did not quantify these benefits, it estimates that 29,655 employees would have a higher degree of respiratory protection under this APF standard. Of these employees, an estimated 8,384 have exposure to lead, 7,287 to asbestos, and 3,747 to cotton dust, all substances with substantial health risks.

In addition to health benefits, OSHA believes other benefits result from the harmonization of APF specifications, thereby making compliance with the respirator rule easier for employers. Employers also benefit from greater administrative ease in proper respirator selection. Employers no longer have to consult several sources and several OSHA standards to determine the best choice of respirator, but can make their choices based on a single, easily found

standard. Some employers who now hire consultants to aid in choosing the proper respirator should be able to make this choice on their own with the aid of this rule. In addition to having only one set of numbers (i.e., APFs) to assist them with respirator selection for nearly all substances, some employers may be able to streamline their respirator stock by using one respirator type to meet their respirator needs instead of several respirator types. The increased ease of compliance also yields additional health benefits to employees using respirators.

*B. Paperwork Reduction Act*

After a thorough analysis of the final provisions, OSHA believes that these provisions do not add to the existing collection-of-information (i.e., paperwork) requirements regarding respirator selection. OSHA determined that its existing Respiratory Protection Standard at 29 CFR 1910.134 has two provisions that involve APFs and also impose paperwork requirements on employers. These provisions require employers to: Include respirator selection in their written respiratory protection program (29 CFR 1910.134(c)(1)(i)); and inform employees regarding proper respirator selection (29 CFR 1910.(k)(ii)). The information on respirator selection addressed by these two provisions must include a brief discussion of the purpose of APFs, and how to use them in selecting a respirator that affords an employee protection from airborne contaminants. The burden imposed by this requirement remains the same whether employers currently use the APFs published in the 1987 NIOSH RDL or the ANSI Z88.2–1992 Respiratory Protection Standard, or implement the final APFs in this rulemaking. Therefore, the use of APFs in the context of these two existing respirator selection provisions does not require an additional paperwork-burden determination because OSHA already accounted for this burden under its existing Respiratory Protection Standard (see 63 FR 1152–1154; OMB Control Number 1218–0099).

Both OSHA's existing Respiratory Protection Standard and the final APF provisions require employers to use APFs as part of the respirator selection process. This process includes obtaining information about workplace exposure to an airborne contaminant, identifying the exposure limit (e.g., permissible exposure limit) for the contaminant, using this information to calculate the required level of protection (i.e., the APF), and referring to an APF table to determine which respirator to select. Admittedly, this process involves the

collection and use of information, but it does not require employers to inform others, either orally or in writing, about the process they use to select respirators for individual employees, or the outcomes of this process. By not requiring employers to communicate this information to others, OSHA removed this process from the ambit of the Paperwork Reduction Act of 1995 (PRA–95) (44 U.S.C. 3506(c)(2)(A)). In the alternative, even if PRA–95 applies, the final provisions involve the same information collection and use requirements with regard to APFs as the existing standard (see paragraphs (d)(1) and (d)(3)(i) of 29 CFR 1910.134, and the rationale for the existing APF requirements in the preamble to the final Respiratory Protection Standard, 63 FR 1163 and 1203–1204). Accordingly, the paperwork burden imposed by the final standard would be equivalent to the burden already imposed under the existing standard.

*C. Federalism*

The Agency reviewed the final APF provisions according to the most recent Executive Order on Federalism (Executive Order 13132, 64 FR 43225, August 10, 1999). This Executive Order requires that federal agencies, to the extent possible, refrain from limiting state policy options, consult with states before taking actions that restrict their policy options, and take such actions only when clear constitutional authority exists and the problem is of national scope. The Executive Order allows federal agencies to preempt state law only with the expressed consent of Congress. In such cases, federal agencies must limit preemption of state law to the extent possible.

Under section 18 of the Occupational Safety and Health Act ("the Act"), Congress expressly provides OSHA with authority to preempt state occupational safety and health standards to the extent that the Agency promulgates a federal standard under section 6 of the Act. Accordingly, section 18 of the Act authorizes the Agency to preempt state promulgation and enforcement of requirements dealing with occupational safety and health issues covered by OSHA standards unless the state has an OSHA-approved occupational safety and health plan (i.e., is a state-plan state) (see *Gade v. National Solid Wastes Management Association*, 112 S. Ct. 2374 (1992)). Therefore, with respect to states that do not have OSHA-approved plans, the Agency concludes that this final rule conforms to the preemption provisions of the Act. Additionally, section 18 of the Act prohibits states without approved plans

from issuing citations for violations of OSHA standards; the Agency finds that this final rulemaking does not expand this limitation.

OSHA asserts that it has authority under Executive Order 13132 to issue final APF requirements because the problems addressed by these requirements are national in scope. As noted in section V ("Summary of the Final Economic Analysis and Regulatory Flexibility Screening Analysis") of this preamble, hundreds of thousands of employers must select appropriate respirators for millions of employees. These employees are exposed to many different types and levels of airborne contaminants found in general industry (including healthcare), construction, shipyard, longshoring, and marine terminal workplaces. Accordingly, OSHA concludes that the requirements in this final rule will provide all covered employers in every state with critical information to use when selecting respirators to protect their employees from the risks of exposure to airborne contaminants. However, while OSHA drafted the final APF and MUC requirements to protect employees in every state, section 18(c)(2) of the Act permits state-plan states to develop their own requirements to deal with any special workplace problems or conditions, provided these requirements are at least as effective as the requirements specified by this final rule.

*D. State Plans*

The 26 states and territories with their own OSHA-approved occupational safety and health plans must adopt provisions comparable to the provisions in this final rule within six months after the Agency publishes the rule. These State-Plan states and territories are: Alaska, Arizona, California, Hawaii, Indiana, Iowa, Kentucky, Maryland, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and Wyoming. Connecticut, New Jersey, New York, and the Virgin Islands have OSHA-approved State Plans that apply to state and local government employees only. Until a state-plan state promulgates its own comparable provisions, federal OSHA will provide the state with interim enforcement assistance, as appropriate.

*E. Unfunded Mandates*

The Agency reviewed the final APF and MUC provisions according to the Unfunded Mandates Reform Act of 1995 (UMRA) (2 U.S.C. 1501 *et seq.*) and Executive Order 12875. As discussed in

section V ("Summary of the Final Economic Analysis and Regulatory Flexibility Screening Analysis") of this preamble, OSHA estimates that compliance with this final rule will require private-sector employers to expend about $4.6 million each year. However, while this final rule establishes a federal mandate in the private sector, it is not a significant regulatory action within the meaning of section 202 of the UMRA (2 U.S.C. 1532).

OSHA standards do not apply to state and local governments, except in states that have voluntarily elected to adopt an OSHA-approved state occupational safety and health plan. Consequently, the provisions of this final rule do not meet the definition of a "Federal intergovernmental mandate"(see section 421(5) of the UMRA (2 U.S.C. 658(5)). Therefore, based on a review of the rulemaking record, the Agency believes that few, if any, of the affected employers are state, local, and tribal governments. Therefore, this final rule do not impose unfunded mandates on state, local, and tribal governments.

*F. Applicability of Existing Consensus Standards*

Section 6(b)(8) of the Occupational Safety and Health Act (29 U.S.C. 655(b)(8)) requires OSHA to explain "why a rule promulgated by the Secretary differs substantially from an existing national consensus standard," by publishing "a statement of the reasons why the rule as adopted will better effectuate the purposes of the Act than the national consensus standard." Regarding APFs, the American National Standard Institute (ANSI) issued in 1992 is the only publicly available consensus standard (i.e., ANSI Z88.2–1992, "Respiratory Protection") that provided APFs for the various respirators covered by this final rule (i.e., "the 1992 ANSI APFs") (Ex. 1–50). However, ANSI withdrew this consensus standard in 2003, and it has yet to officially adopt a replacement standard.

The Agency relied heavily on the 1992 ANSI APFs in developing this final standard. Nevertheless, the APFs specified in this final rule differ in important ways from the 1992 ANSI APFs. For example, the APFs for full facepiece air-purifying respirators differ substantially between the two standards. Additionally, the APF of 1,000 for powered air-purifying respirators with helmets or hoods listed in Table 1 of this final rule is based on achieving specific test results, while the 1992 ANSI APF for this respirator class is not contingent on any test results. As

noted above in section VI of the preamble to this final rule ("Summary and Explanation of the Final Standard"), OSHA has determined that the differences between the APFs specified in this final rule and the 1992 ANSI APFs will afford employees increased protection when they are exposed to hazardous airborne contaminants. Therefore, the Agency did not adopt outright the 1992 ANSI APFs under this final rule.

In addition to the differences between the APF standards described in the previous paragraph, use of the 1992 ANSI APFs depends on meeting six other respirator-selection provisions, several of which differ substantially from the respirator-selection provisions specified in OSHA's Respiratory Protection Standard. In this regard, use of the 1992 ANSI APFs is contingent on "the nature of the hazardous operation or process," "the location of the hazardous area in relation to the nearest area having respirable air," "the activities of workers in hazardous areas," and "the physical characteristics and functional capabilities and limitations of the various types of respirators"; none of these conditions is specified in this manner in the Agency's Respiratory Protection Standard. Revising OSHA's Respiratory Protection Standard to accommodate the six respirator-selection provisions that are an integral part of the 1992 ANSI APFs is beyond the scope of this rulemaking, which provides additional justification for the Agency not adopting directly the 1992 ANSI APFs.

Finally, the APFs adopted here represent a clear enforceable requirement, not merely a recommendation. When employers and employees can easily determine what respirator is appropriately protective, compliance is simplified and enhanced.

List of Subjects in 29 CFR Parts 1910, 1915, and 1926

Assigned protection factors, Airborne contaminants, Health, Occupational safety and health, Respirators, Respirator selection.

Authority and Signature

Edwin G. Foulke, Jr., Assistant Secretary of Labor for Occupational Safety and Health, U.S. Department of Labor, 200 Constitution Ave., NW., Washington, DC 20210, directed the preparation of this notice. The Agency issues these final sections under the following authorities: Sections 4, 6(b), 8(c), and 8(g) of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, 657); Section 3704 of the Contract Work Hours and Safety Standards Act

(the Construction Safety Act) (40 U.S.C. 3701 *et seq.*); Section 41, the Longshore and Harbor Worker's Compensation Act (33 U.S.C. 941); Secretary of Labor's Order No. 5–2002 (67 FR 65008); and 29 CFR part 1911.

Signed at Washington, DC on August 9, 2006.

**Edwin G. Foulke, Jr.,**

*Assistant Secretary of Labor.*

VIII. Amendments to Standards

■ For the reasons stated in the preamble of this final rule, the Agency is amending 29 CFR parts 1910, 1915, and 1926 to read as follows:

PART 1910—[AMENDED]

Subpart I—[Amended]

■ 1. Revise the authority citation for subpart I of part 1910 to read as follows:

**Authority:** Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, and 657); and Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (62 FR 50017), or 5–2002 (67 FR 65008), as applicable.

Sections 1910.132, 1910.134, and 1910.138 of 29 CFR also issued under 29 CFR part 1911.

Sections 1910.134, 1910.135, and 1910.136 of 29 CFR also issued under 29 CFR part 1911 and 5 U.S.C. 553.

■ 2. Amend § 1910.134 as follows:
■ a. Add the text of the definitions for "Assigned protection factor (APF)" and "Maximum use concentration (MUC)" to paragraph (b);
■ b. Add the text of paragraphs (d)(3)(i)(A), including Table 1, and (d)(3)(i)(B); and
■ c. Revise paragraph (n).

The added and revised text reads as follows:

§1910.134  Respiratory protection.

\*  \*  \*  \*  \*

(b) \*  \*  \*

*Assigned protection factor (APF)* means the workplace level of respiratory protection that a respirator or class of respirators is expected to provide to employees when the employer implements a continuing, effective respiratory protection program as specified by this section.

\*  \*  \*  \*  \*

*Maximum use concentration (MUC)* means the maximum atmospheric concentration of a hazardous substance from which an employee can be expected to be protected when wearing a respirator, and is determined by the assigned protection factor of the respirator or class of respirators and the

- HeinOnline -- 71 Fed. Reg. 50187 2006

exposure limit of the hazardous substance. The MUC can be determined mathematically by multiplying the assigned protection factor specified for a respirator by the required OSHA permissible exposure limit, short-term exposure limit, or ceiling limit. When no OSHA exposure limit is available for a hazardous substance, an employer must determine an MUC on the basis of relevant available information and informed professional judgment.

\* \* \* \* \*

(d) \* \* \*

(3) \* \* \*

(i) \* \* \*

(A) *Assigned Protection Factors (APFs).* Employers must use the assigned protection factors listed in Table 1 to select a respirator that meets or exceeds the required level of employee protection. When using a combination respirator (e.g., airline respirators with an air-purifying filter), employers must ensure that the assigned protection factor is appropriate to the mode of operation in which the respirator is being used.

### TABLE 1.—ASSIGNED PROTECTION FACTORS [5]

| Type of respirator [1,2] | Quarter mask | Half mask | Full face-piece | Helmet/ hood | Loose-fitting facepiece |
|---|---|---|---|---|---|
| 1. Air-Purifying Respirator | 5 | [3] 10 | 50 | | |
| 2. Powered Air-Purifying Respirator (PAPR) | | 50 | 1,000 | [4] 25/1,000 | 25 |
| 3. Supplied-Air Respirator (SAR) or Airline Respirator | | | | | |
| • Demand mode | | 10 | 50 | | |
| • Continuous flow mode | | 50 | 1,000 | [4] 25/1,000 | 25 |
| • Pressure-demand or other positive-pressure mode | | 50 | 1,000 | | |
| 4. Self-Contained Breathing Apparatus (SCBA) | | | | | |
| • Demand mode | | 10 | 50 | 50 | |
| • Pressure-demand or other positive-pressure mode (e.g., open/closed circuit) | | | 10,000 | 10,000 | |

Notes:

[1] Employers may select respirators assigned for use in higher workplace concentrations of a hazardous substance for use at lower concentrations of that substance, or when required respirator use is independent of concentration.

[2] The assigned protection factors in Table 1 are only effective when the employer implements a continuing, effective respirator program as required by this section (29 CFR 1910.134), including training, fit testing, maintenance, and use requirements.

[3] This APF category includes filtering facepieces, and half masks with elastomeric facepieces.

[4] The employer must have evidence provided by the respirator manufacturer that testing of these respirators demonstrates performance at a level of protection of 1,000 or greater to receive an APF of 1,000. This level of performance can best be demonstrated by performing a WPF or SWPF study or equivalent testing. Absent such testing, all other PAPRs and SARs with helmets/hoods are to be treated as loose-fitting facepiece respirators, and receive an APF of 25.

[5] These APFs do not apply to respirators used solely for escape. For escape respirators used in association with specific substances covered by 29 CFR 1910 subpart Z, employers must refer to the appropriate substance-specific standards in that subpart. Escape respirators for other IDLH atmospheres are specified by 29 CFR 1910.134 (d)(2)(ii).

(B) *Maximum Use Concentration (MUC).* (1) The employer must select a respirator for employee use that maintains the employee's exposure to the hazardous substance, when measured outside the respirator, at or below the MUC.

(2) Employers must not apply MUCs to conditions that are immediately dangerous to life or health (IDLH); instead, they must use respirators listed for IDLH conditions in paragraph (d)(2) of this standard.

(3) When the calculated MUC exceeds the IDLH level for a hazardous substance, or the performance limits of the cartridge or canister, then employers must set the maximum MUC at that lower limit.

\* \* \* \* \*

(n) *Effective date.* Paragraphs (d)(3)(i)(A) and (d)(3)(i)(B) of this section become effective November 22, 2006.

\* \* \* \* \*

### Subpart Z—[Amended]

■ 3. Revise the authority citation for subpart Z of part 1910 to read as follows:

**Authority:** Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, and 657); Secretary of Labor's Orders 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), or 3–2000 (62 FR 50017); and 29 CFR part 1911.

\* \* \* \* \*

■ 4. Amend § 1910.1001 by:

■ a. Removing Table 1 in paragraph (g)(3);

■ b. Redesignating Table 2 in paragraph (l)(3)(ii) as Table 1;

■ c. Removing the reference to "Table 2" in paragraph (l)(3)(ii) and adding "Table 1" in its place; and

■ d. Revising paragraphs (g)(2)(ii) and (g)(3).

The revisions read as follows:

### § 1910.1001 Asbestos.

\* \* \* \* \*

(g) \* \* \*

(2) \* \* \*

(ii) Employers must provide an employee with a tight-fitting, powered air-purifying respirator (PAPR) instead of a negative pressure respirator selected according to paragraph (g)(3) of this standard when the employee chooses to use a PAPR and it provides adequate protection to the employee.

\* \* \* \* \*

(3) *Respirator selection.* Employers must:

(i) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use filtering facepiece respirators for protection against asbestos fibers.

(ii) Provide HEPA filters for powered and non-powered air-purifying respirators.

■ 5. In § 1910.1017, remove the table in paragraph (g)(3)(i), remove paragraph (g)(3)(iii), and revise paragraph (g)(3)(i) to read as follows:

### § 1910.1017 Vinyl chloride.

\* \* \* \* \*

(g) \* \* \*

(3) \* \* \*

(i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide an organic vapor cartridge that has a service life of at least one hour when using a chemical cartridge respirator at vinyl chloride concentrations up to 10 ppm.

(C) Select a canister that has a service life of at least four hours when using a powered air-purifying respirator having a hood, helmet, or full or half facepiece, or a gas mask with a front-or back-mounted canister, at vinyl chloride concentrations up to 25 ppm.

\* \* \* \* \*

■ 6. In § 1910.1018, remove Tables I and II and paragraph (h)(3)(ii), redesignate paragraph (h) (3)(iii) as paragraph (h)(3)(ii), and revise paragraph (h)(3)(i) to read as follows:

### § 1910.1018  Inorganic arsenic.

\* \* \* \* \*

(h) \* \* \*
(3) \* \* \*
(i) Employers must:
(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Ensure that employees do not use half mask respirators for protection against arsenic trichloride because it is absorbed rapidly through the skin.

(C) Provide HEPA filters for powered and non-powered air-purifying respirators.

(D) Select for employee use:
(1) Air-purifying respirators that have a combination HEPA filter with an appropriate gas-sorbent cartridge or canister when the employee's exposure exceeds the permissible exposure level for inorganic arsenic and the relevant limit for other gases.

(2) Front-or back-mounted gas masks equipped with HEPA filters and acid gas canisters or any full facepiece supplied-air respirators when the inorganic arsenic concentration is at or below 500 mg/m³; and half mask air-purifying respirators equipped with HEPA filters and acid gas cartridges when the inorganic arsenic concentration is at or below 100 µg/m³.

\* \* \* \* \*

■ 7. In § 1910.1025, remove Table II in paragraph (f)(2)(ii) and revise paragraphs (f)(3)(i) and (f)(3)(ii) to read as follows:

### § 1910.1025  Lead.

\* \* \* \* \*

(f) \* \* \*
(3) \* \* \*
(i) Employers must:
(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide employees with full facepiece respirators instead of half mask respirators for protection against lead aerosols that cause eye or skin irritation at the use concentrations.

(C) Provide HEPA filters for powered and non-powered air-purifying respirators.

(ii) Employers must provide employees with a powered air-purifying respirator (PAPR) instead of a negative pressure respirator selected according to paragraph (f)(3)(i) of this standard when an employee chooses to use a PAPR and it provides adequate protection to the employee as specified by paragraph (f)(3)(i) of this standard.

\* \* \* \* \*

■ 8. In § 1910.1027, remove Table 2 in paragraph (g)(3)(i) and revise paragraph (g)(3)(i) to read as follows:

### § 1910.1027  Cadmium.

\* \* \* \* \*

(g) \* \* \*
(3) \* \* \*
(i) Employers must:
(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide employees with full facepiece respirators when they experience eye irritation.

(C) Provide HEPA filters for powered and non-powered air-purifying respirators.

\* \* \* \* \*

■ 9. In § 1910.1028, remove Table 1 in paragraph (g)(3)(ii) and revise paragraphs (g)(2)(i) and (g)(3)(i) to read as follows:

### § 1910.1028  Benzene.

\* \* \* \* \*

(g) \* \* \*
(2) \* \* \*
(i) Employers must implement a respiratory protection program in accordance with 29 CFR 1910.134 (b) through (d) (except (d)(1)(iii)), and (f) through (m).

\* \* \* \* \*

(3) \* \* \*
(i) Employers must:
(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide employees with any organic vapor gas mask or any self-contained breathing apparatus with a full facepiece to use for escape.

(C) Use an organic vapor cartridge or canister with powered and non-powered air-purifying respirators, and a chin-style canister with full facepiece gas masks.

(D) Ensure that canisters used with non-powered air-purifying respirators have a minimum service life of four hours when tested at 150 ppm benzene at a flow rate of 64 liters per minute (LPM), a temperature of 25 °C, and a relative humidity of 85%; for canisters used with tight-fitting or loose-fitting powered air-purifying respirators, the flow rates for testing must be 115 LPM and 170 LPM, respectively.

\* \* \* \* \*

■ 10. In § 1910.1029, remove Table I in paragraph (g)(3) and revise paragraph (g)(3) to read as follows:

### § 1910.1029  Coke oven emissions.

\* \* \* \* \*

(g) \* \* \*
(3) *Respirator selection.* Employers must select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers may use a filtering facepiece respirator only when it functions as a filter respirator for coke oven emissions particulates.

\* \* \* \* \*

■ 11. In § 1910.1043, remove Table I in paragraph (f)(3)(i) and revise paragraphs (f)(3)(i) and (f)(3)(ii) to read as follows:

### § 1910.1043  Cotton dust.

\* \* \* \* \*

(f) \* \* \*
(3) \* \* \*
(i) Employers must:
(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use filtering facepieces for protection against cotton dust concentrations greater than five times (5 ×) the PEL.

(B) Provide HEPA filters for powered and non-powered air-purifying respirators used at cotton dust concentrations greater than ten times (10 ×) the PEL.

(ii) Employers must provide an employee with a powered air-purifying respirator (PAPR) instead of a non-powered air-purifying respirator selected according to paragraph (f)(3)(i) of this standard when the employee chooses to use a PAPR and it provides adequate protection to the employee as specified by paragraph (f)(3)(i) of this standard.

\* \* \* \* \*

■ 12. In § 1910.1044, remove Table 1 in paragraph (h)(3) and revise paragraph (h)(3) to read as follows: § 1910.1044 1,2-Dibromo-3-chloropropane.

\* \* \* \* \*

(h) \* \* \*

(3) *Respirator selection.* Employers must:

(i) Select, and provide to employees, the appropriate atmosphere-supplying respirator specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(ii) Provide employees with one of the following respirator options to use for entry into, or escape from, unknown DBCP concentrations:

(A) A combination respirator that includes a supplied-air respirator with a full facepiece operated in a pressure-demand or other positive-pressure or continuous-flow mode, as well as an auxiliary self-contained breathing apparatus (SCBA) operated in a pressure-demand or positive-pressure mode.

(B) An SCBA with a full facepiece operated in a pressure-demand or other positive-pressure mode.

* * * * *

■ 13. In § 1910.1045, remove Table I in paragraph (h)(2)(i) and (h)(3) to read as follows:

**§ 1910.1045 Acrylonitrile.**

* * * * *

(h) * * *

(2) * * *

(i) Employers must implement a respiratory protection program in accordance with 29 CFR 1910.134 (b) through (d) (except (d)(1)(iii)), and (f) through (m).

* * * * *

(3) *Respirator selection.* Employers must:

(i) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(ii) For escape, provide employees with any organic vapor respirator or any self-contained breathing apparatus permitted for use under paragraph (h)(3)(i) of this standard.

* * * * *

■ 14. In § 1910.1047, remove Table 1 in paragraph (g)(3) and revise paragraph (g)(3) to read as follows:

**§ 1910.1047 Ethylene oxide.**

* * * * *

(g) * * *

(3) *Respirator selection.* Employers must:

(i) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use half masks of any type because EtO may cause eye irritation or injury.

(ii) Equip each air-purifying, full facepiece respirator with a front-or back-mounted canister approved for protection against ethylene oxide.

(iii) For escape, provide employees with any respirator permitted for use under paragraphs (g)(3)(i) and (ii) of this standard.

* * * * *

■ 15. In § 1910.1048, remove Table 1 in paragraph (g)(3)(i) and revise paragraphs (g)(2) and (g)(3) to read as follows:

**§ 1910.1048 Formaldehyde.**

* * * * *

(g) * * *

(2) *Respirator program.* (i) Employers must implement a respiratory protection program in accordance with 29 CFR 1910.134 (b) through (d) (except (d)(1)(iii)), and (f) through (m).

(ii) When employees use air-purifying respirators with chemical cartridges or canisters that do not contain end-of-service-life indicators approved by the National Institute for Occupational Safety and Health, employers must replace these cartridges or canisters as specified by paragraphs (d)(3)(iii)(B)(1) and (B)(2) of 29 CFR 1910.134, or at the end of the workshift, whichever condition occurs first.

(3) *Respirator selection.* (i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Equip each air-purifying, full facepiece respirator with a canister or cartridge approved for protection against formaldehyde.

(C) For escape, provide employees with one of the following respirator options: A self-contained breathing apparatus operated in the demand or pressure-demand mode; or a full facepiece respirator having a chin-style, or a front-or back-mounted industrial-size, canister or cartridge approved for protection against formaldehyde.

(ii) Employers may substitute an air-purifying, half mask respirator for an air-purifying, full facepiece respirator when they equip the half mask respirator with a cartridge approved for protection against formaldehyde and provide the affected employee with effective gas-proof goggles.

(iii) Employers must provide employees who have difficulty using negative pressure respirators with powered air-purifying respirators permitted for use under paragraph (g)(3)(i)(A) of this standard and that affords adequate protection against formaldehyde exposures.

* * * * *

■ 16. In § 1910.1050, remove Table 1 in paragraph (h)(3)(i) and revise paragraph (h)(3)(i) to read as follows:

**§ 1910.1050 Methylenedianiline.**

* * * * *

(h) * * *

(3) * * *

(i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide HEPA filters for powered and non-powered air-purifying respirators.

(C) For escape, provide employees with one of the following respirator options: Any self-contained breathing apparatus with a full facepiece or hood operated in the positive-pressure or continuous-flow mode; or a full facepiece air-purifying respirator.

(D) Provide a combination HEPA filter and organic vapor canister or cartridge with powered or non-powered air-purifying respirators when MDA is in liquid form or used as part of a process requiring heat.

* * * * *

■ 17. In § 1910.1052, remove Table 2 in paragraph (g)(3) and revise paragraph (g)(3) to read as follows:

**§ 1910.1052 Methylene chloride.**

* * * * *

(g) * * *

(3) *Respirator selection.* Employers must:

(i) Select, and provide to employees, the appropriate atmosphere-supplying respirator specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use half masks of any type because MC may cause eye irritation or damage.

(ii) For emergency escape, provide employees with one of the following respirator options: A self-contained breathing apparatus operated in the continuous-flow or pressure-demand mode; or a gas mask with an organic vapor canister.

* * * * *

**PART 1915—[AMENDED]**

■ 18. Revise the authority citation for part 1915 to read as follows:

**Authority:** Section 41, Longshore and Harbor Workers' Compensation Act (33 U.S.C. 941); Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (20 U.S.C. 653, 655, and 687); and Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (62 FR 50017), or 5–2002 (67 FR 65008) as applicable.

Sections 1915.120 and 1915.152 of 29 CFR also issued under 29 CFR part 1911.

## Subpart Z—[Amended]

■ 19. In § 1915.1001, remove Table 1 in paragraph (h)(2)(iii) and revise paragraph (h)(2) to read as follows:

### § 1915.1001 Asbestos.

*   *   *   *   *

(h) * * *

(2) *Respirator selection.* (i) Employers must select, and provide to employees at no cost, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use filtering facepiece respirators for use against asbestos fibers.

(ii) Employers are to provide HEPA filters for powered and non-powered air-purifying respirators.

(iii) Employers must:

(A) Inform employees that they may require the employer to provide a tight-fitting, powered air-purifying respirator (PAPR) permitted for use under paragraph (h)(2)(i) of this standard instead of a negative pressure respirator.

(B) Provide employees with a tight-fitting PAPR instead of a negative pressure respirator when the employees choose to use a tight-fitting PAPR and it provides them with the required protection against asbestos.

(iv) Employers must provide employees with an air-purifying, half mask respirator, other than a filtering facepiece respirator, whenever the employees perform:

(A) Class II or Class III asbestos work for which no negative exposure assessment is available.

(B) Class III asbestos work involving disturbance of TSI or surfacing ACM or PACM.

(v) Employers must provide employees with:

(A) A tight-fitting, powered air-purifying respirator or a full facepiece, supplied-air respirator operated in the pressure-demand mode and equipped with either HEPA egress cartridges or an auxiliary positive-pressure, self-contained breathing apparatus (SCBA) whenever the employees are in a regulated area performing Class I asbestos work for which a negative exposure assessment is not available and the exposure assessment indicates that the exposure level will be at or below 1 f/cc as an 8-hour time-weighted average (TWA).

(B) A full facepiece, supplied-air respirator operated in the pressure-demand mode and equipped with an auxiliary positive-pressure SCBA whenever the employees are in a regulated area performing Class I asbestos work for which a negative exposure assessment is not available and the exposure assessment indicates that the exposure level will be above 1 f/cc as an 8-hour TWA.

*   *   *   *   *

## PART 1926—[AMENDED]

### Subpart D—[Amended]

■ 20. Revise the authority citation for subpart D of part 1926 to read as follows:

**Authority:** Section 3704 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 3701 *et seq.*); Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, and 657); Secretary of Labor's Orders 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (62 FR 50017), or 5.2002 (67 FR 650008); as applicable; and 29 CFR part 11.

Sections 1926.58, 1926.59, 1926.60, and 1926.65 also issued under 5 U.S.C. 553 and 29 CFR part 1911.

Section 1926.62 of 29 CFR also issued under section 1031 of the Housing and Community Development Act of 1992 (42 U.S.C. 4853).

Section 1926.65 of 29 CFR also issued under section 126 of the Superfund Amendments and Reauthorization Act of 1986, as amended (29 U.S.C. 655 note), and 5 U.S.C. 553.

■ 21. In § 1926.60, remove Table 1 and revise paragraph (i)(3)(i) to read as follows:

### § 1926.60 Methylenedianiline.

*   *   *   *   *

(i) * * *

(3) * * *

(i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide HEPA filters for powered and non-powered air-purifying respirators.

(C) For escape, provide employees with one of the following respirator options: Any self-contained breathing apparatus with a full facepiece or hood operated in the positive-pressure or continuous-flow mode; or a full facepiece air-purifying respirator.

(D) Provide a combination HEPA filter and organic vapor canister or cartridge with air-purifying respirators when MDA is in liquid form or used as part of a process requiring heat.

*   *   *   *   *

■ 22. In § 1926.62, remove Table 1 in paragraph (f)(3)(ii) and revise paragraph (f)(3)(i) to read as follows:

### § 1926.62 Lead.

*   *   *   *   *

(f) * * *

(3) * * *

(i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide employees with a full facepiece respirator instead of a half mask respirator for protection against lead aerosols that may cause eye or skin irritation at the use concentrations.

(C) Provide HEPA filters for powered and non-powered air-purifying respirators.

*   *   *   *   *

### Subpart Z—[Amended]

■ 23. Revise the authority citation for subpart Z of part 1926 to read as follows:

**Authority:** Section 3704 of the Contract Work Hours and Safety Standards Act (40 U.S.C. 3701 *et seq.*); Sections 4, 6, and 8 of the Occupational Safety and Health Act of 1970 (29 U.S.C. 653, 655, 657); Secretary of Labor's Orders 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (62 FR 50017), or 5–2002 (67 FR 65008) as applicable; and 29 CFR part 11.

Section 1926.1102 of 29 CFR not issued under 29 U.S.C. 655 or 29 CFR part 1911; also issued under 5 U.S.C. 553.

■ 24. In § 1926.1101, remove Table 1 in paragraph (h)(3)(i) and revise paragraph (h)(3) to read as follows:

### § 1926.1101 Asbestos.

*   *   *   *   *

(h) * * *

(3) *Respirator selection.* (i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134; however, employers must not select or use filtering facepiece respirators for use against asbestos fibers.

(B) Provide HEPA filters for powered and non-powered air-purifying respirators.

(ii) Employers must provide an employee with tight-fitting, powered air-purifying respirator (PAPR) instead of a negative pressure respirator selected according to paragraph (h)(3)(i)(A) of this standard when the employee chooses to use a PAPR and it provides adequate protection to the employee.

(iii) Employers must provide employees with an air-purifying half mask respirator, other than a filtering facepiece respirator, whenever the employees perform:

(A) Class II or Class III asbestos work for which no negative exposure assessment is available.

(B) Class III asbestos work involving disturbance of TSI or surfacing ACM or PACM.

(iv) Employers must provide employees with:

(A) A tight-fitting powered air-purifying respirator or a full facepiece, supplied-air respirator operated in the pressure-demand mode and equipped with either HEPA egress cartridges or an auxiliary positive-pressure, self-contained breathing apparatus (SCBA) whenever the employees are in a regulated area performing Class I asbestos work for which a negative exposure assessment is not available and the exposure assessment indicates that the exposure level will be at or below 1 f/cc as an 8-hour time-weighted average (TWA).

(B) A full facepiece supplied-air respirator operated in the pressure-demand mode and equipped with an auxiliary positive-pressure SCBA whenever the employees are in a regulated area performing Class I asbestos work for which a negative exposure assessment is not available and the exposure assessment indicates that the exposure level will be above 1 f/cc as an 8-hour TWA.

*    *    *    *    *

■ 25. In § 1926.1127, remove Table 1 in paragraph (g)(3)(i) and revise paragraph (g)(3)(i) to read as follows:

**§ 1926.1127   Cadmium.**

*    *    *    *    *

(g) *  *  *

(3) *  *  *

(i) Employers must:

(A) Select, and provide to employees, the appropriate respirators specified in paragraph (d)(3)(i)(A) of 29 CFR 1910.134.

(B) Provide employees with full facepiece respirators when they experience eye irritation.

(C) Provide HEPA filters for powered and non-powered air-purifying respirators.

*    *    *    *    *

[FR Doc. 06–6942 Filed 8–23–06; 8:45 am]

**BILLING CODE 4510–26–P**

# EXHIBIT 6









# RESPIRATORY PROTECTION







Face Covering/Mask: public health protection (PHP)

vs

Respirator: personal protective equipment (PPE)

## DO NOT choose masks that



Are made of fabric that makes it hard to breathe, for example, vinyl



Have exhalation valves or vents, which allow virus particles to escape



Are intended for healthcare workers, including N95 respirators or surgical masks

## DO choose masks that



Have two or more layers of washable, breathable fabric



Completely cover your nose and mouth



Fit snugly against the sides of your face and don't have gaps

# Respiratory Protection Program(s)

Respiratory Protection Program  (29 CFR 1910.134)

also:

- substance specific standards (asbestos, lead, etc.)

- Industry specific standards (confined space; Hazwoper, etc.)

Emergency temporary standard (health care):

Mini Respiratory Protection Program   (29 CFR 1910.504)



# Respiratory Protection Program(s)

| KEY PROGRAM ELEMENT[1] | MINI RPP[2] (1910.504) | NORMAL RPP[3] (1910.134) |
|---|---|---|
| Medical Evaluation | | ✓ |
| Fit Testing | | ✓ |
| Written Program | | ✓ |
| User Seal Checks | ✓ | ✓ |
| Training | ✓ | ✓ |

[1] This is not a comprehensive list of required program elements
[2] These are key requirements pertaining to employer-provided respirators (as opposed to worker-provided respirators)
[3] For additional information about the Respiratory Protection standard's requirements, see: NIOSH/OSHA's "Hospital Respiratory Protection Program Toolkit Resources for Respirator Program Administrators" at: www.osha.gov/sites/default/files/publications/OSHA3767.pdf

**Table 2.** Applicability of the mini respiratory protection program vs. the Respiratory Protection standard

| COVID-19 ETS PROVISION | MINI RPP (1910.504) | NORMAL RPP (1910.134) |
|---|---|---|
| 1910.502(f)(2) – for exposure to person with suspected/confirmed COVID-19 | | ✓ |
| 1910.502(f)(3) – for AGP[1] on person with suspected/confirmed COVID-19 | | ✓ |
| 1910.502(f)(4) – in place of facemask when respirator is not required | ✓ | |
| 1910.502(f)(5) – for Standard and Transmission-Based Precautions | | ✓ |

[1] AGP = aerosol-generating procedure (as defined by 1910.502)

# Objectives

General overview of respiratory protection as PPE
- Types of respirators
- When should a respirator be used
- Components of a respiratory protection program
- Hazard determination – risk assessment
- Respirator selection – NIOSH approved
- Protection factors
- Medical evaluation
- Education for PPE care & maintenance
- Fit testing
- Program evaluation – continuous improvement

# Types of Respirators



Self Contained Breathing Apparatus (SCBA)



Continuous Flow Supplied Air Respirator



Half Mask,
Dual Cartridge
Reusable



Powered air Purifying
Respirator (PAPR)



Half Mask,
Dual Cartridge
Disposable



Canister Type
Gas Mask



Half Mask,
Particulate



Full-Face
Dual Cartridge
Reusable

National Personal Protective Technology Laboratory (NPPTL)



A full-face mask adds eye protection.

A cartridge captures certain gases and vapors.

A valve opens when you exhale and closes when you inhale.

A face seal keeps contaminants out of the mask.

Straps hold the mask snugly in place.

A filter or prefilter traps particles.

Anatomy of a Respirator

# WHEN SHOULD A RESPIRATOR BE USED?

- When engineering or administrative controls are not technically **feasible**

- While **engineering controls** are being installed or repaired

- In **emergencies** or other temporary situations, e.g., maintenance operations



Coal Mine Worker
Respirator not in use ?



Coal Mine   Engineering controls: water spray and ventilation   RPD: ½ mask filtering facepiece



Coal Mine    RPD: Powered Air Purifying Respirator hood/helmet (loose fitting)



Fiberglas mold fabrication:

RPD: half face disposable APR (tight fitting)

# EBOLA public health threat



Care for potentially contagious patient.
RPD: Powered Air Purifying Respirator w/loose fitting hood

SARS-CoV-2



RPD: half-face reusable (elastomeric) with HEPA (P-100) filters (wearing eye protection)



Approved American National Standard

# AMERICAN NATIONAL STANDARD

ANSI/ASSE Z88.2 – 2015
*American National Standard*
*Practices for Respiratory Protection*



AMERICAN SOCIETY OF
SAFETY ENGINEERS

# COMPONENTS OF A RESPIRATORY PROTECTION PROGRAM

- Written program (with qualified program administrator)
- Respirator Selection procedures (hazard assessment)
- Use of approved respirators (NIOSH certification)
- Training employees including uses and limitations
- Medical evaluation for respirator use
- Fit testing
- Cleaning, storage, inspection and maintenance procedures
- Workplace surveillance procedures
- Assessment of effectiveness of the program (record keeping)

# HAZARD DETERMINATION

- Determine what contaminants are present
- Determine allowable levels (TLVs, PELs)
- Determine IDLH
- Determine $O_2$ concentration
- Measure/estimate concentration of contaminant
- Determine physical state of the contaminant
- Assess possibility of dermal absorption
- Determine presence or absence of warning properties

**Mandatory vs. Voluntary**



# Respirator-Use Requirements Flow Chart
## 29 CFR 1910.134(c)

Are respirators:
- necessary to protect the health of the employee; or
- required by the employer?

**YES** → Must establish and implement a written respirator program with worksite-specific procedures.

**NO** → Does the employer permit voluntary use of respirators?

**NO** → STOP

**YES** → Does the only use of respirators involve the voluntary use of filtering facepieces (dust masks)?

**YES** →
- Employer determines that the respirator itself does not create a hazard.
- Must provide users with information contained in Appendix D.
- No respirator program required.

**NO** →
- Employer determines that the respirator itself does not create a hazard.
- Must provide users with information contained in Appendix D.
- Must establish and implement those elements of a written respirator program necessary to ensure that employee is medically able to use that respirator.

# Choosing an Appropriate Type of Respiratory Protective Equipment



SCBA – Self-Contained Breathing Apparatus
SAR – Supplied-Air Respirator
NIOSH Particulate filter classifications:
- "N" – Not oil resistant
- "R" – Oil resistant
- "P" – Oil proof



# RESPIRATOR SELECTION

- Respirators must be certified by NIOSH

- The respirator must only be used for conditions/contaminants consistent with the certification

- A hazard assessment must be performed to identify and evaluate respiratory hazards

# CERTIFICATION OF RESPIRATORS



- NIOSH Respirator Certification

  *NIOSH testing standard for particulate respirators is 42 CFR Part 84*

- Other respirators certified under previous standards for gases, vapors etc.

- Certified as a unit

  *All parts i.e., valves, straps etc. must be in place and in working order or the certification is voided*

# MARKINGS

## Required Labeling of NIOSH-Approved N95 Filtering Facepiece Respirators

For more information about NIOSH-Approved respirators, go to: **http://knowits.NIOSH.gov**

**Example of Exterior Markings** — Approval holder business name, a registered trademark or an easily understood abbreviation.

If privately labeled, the private label name or logo will appear instead of the approval holder business name.

**NIOSH** — NIOSH name in block letters or NIOSH logo.

**TC-Approval Number (TC-84A-XXXX)** — For products manufactured after September 2008, the TC-Approval number is required to appear on the product.



**Model # XXXX** — Model Number or Part Number

**Lot # XXXX** — Lot Number and Date of Manufacture (recommended, but not required)

**Filter Designation** — NIOSH filter series. Alpha-numerical rating followed by filter efficiency level (example, N95, N99, N100, R95, P95, P99, P100)

**Exterior View**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

# CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN)

NIOSH adopted a new voluntary standard on December 28, 2001, for the testing and evaluation of self-contained breathing apparatus (SCBA) for use against Chemical, Biological, Radiological and Nuclear (CBRN) agents. This voluntary standard has been adopted so that First Responders and others who wear SCBA can be assured of the very best available respiratory protection in the event of acts involving CBRN agents.





**CBRN Agent Approved**

See Instructions for Required Component Part Numbers, Accessories, and Additional Cautions and Limitations of Use

## CBRN Approval Label

## The CBRN Special Tests under NIOSH 42 CFR 84.63

**Live-Agent Testing (LAT)** tests for resistance to permeation and penetration of Sarin (GB) and Distilled Sulfur Mustard (HD). The CBRN SCBA facepiece is installed on a head-and-upper-torso manikin called Smartman. The Smartman tester is enclosed in an airtight chamber and exposed to Sarin vapor and distilled Sulfur Mustard. A breather pump simulates a breathing person.

# CBRN CARTRIDGE



# CBRN ESCAPE



# TYPES OF RESPIRATORS

- Atmosphere supplying
  - SCBA (self contained breathing apparatus)
    - Pressure demand (30-60 min)
    - Re-breathers (45 min to 4 hours)
    - Escape
    - Demand

# SELF CONTAINED BREATHING APPARATUS (SCBA)







## ATMOSPHERE SUPPLYING (CONT.)

Continuous flow hoods: air flows to hood from a compressor or other large air supply





CONTINUOUS FLOW HOODS







# IDLH ATMOSPHERES

## Immediately Dangerous to Life & Health

- ◆ "An atmospheric concentration of any toxic, corrosive or asphyxiant substance that poses an immediate threat to life or would cause irreversible or delayed adverse health effects or would interfere with an individual's ability to escape from a dangerous atmosphere. [29 CFR 1910.120]"

# IDLH

- NIOSH publishes IDLH values: "IDLHs were based on the effects that might occur as a consequence of a 30-minute exposure"

  - *Does not mean you can stay 30 minutes you must exit as quickly as possible*

- Usually any atmosphere <19.5% oxygen is considered IDLH. There are some differences based on altitude but the most straightforward answer is <19.5%

- Where exposure cannot be identified or reasonably estimated, it must be considered IDLH

# IDLH

- When the atmosphere is IDLH, the following are the only approved respirators:

  - Full facepiece pressure demand SCBA certified for 30 minutes minimum service

  - Combination full facepiece pressure demand supplied air respirator with auxiliary self-contained air supply







# AIR PURIFYING RESPIRATORS

- Use filters to remove aerosols
- Use chemical filters to remove specific gases/vapors
  - sorbents-usually activated carbon
    - activated carbon has surface area 1000-2000 m$^2$/g
    - occasionally the surface is treated with another chemical such as iodine to make it reactive

# AIR PURIFYING (CONT.)




- Available for:
  - Mercury
  - Organic vapors
  - Acid gases
  - Ammonia
  - Sulfur dioxide
  - Hydrogen sulfide
  - Many more with many combinations, e.g., organic vapor + particulate

# CARTRIDGE COLORS



| | | |
|---|---|---|
| White | - | Acid gas |
| Black | - | Organic vapors |
| Green | - | Ammonia gas |
| Yellow | - | Acid gas and organic vapors |
| Magenta | - | Radioactive materials, particulates |
| Orange | - | Dust, fumes, and mists |
| Olive | - | Other gases and vapors |







HALF-MASKS

FULL FACE





POWERED AIR PURIFYING RESPIRATORS








PAPR: Loose vs. Tight Fit







# PARTICULATE FILTRATION



- Most penetrating particle size
  - normally 0.2-0.4 µm (for flow rates of interest in respiratory protection)
  - testing of respirators normally performed with 0.3 µm DOP and NaCl

- interception
- sedimentation (gravity)
- impaction
- diffusion
- electrostatic

# CLASSIFICATIONS OF PARTICULATE RESPIRATORS

| Resistance to efficiency filter degradation | Filter efficiencies[†] | | |
|---|---|---|---|
| | 95 (95%) | 99 (99%) | 100 (99.97%) |
| N (Not resistant to oil) | N95 | N99 | N100 |
| R (Resistant to oil) | R95 | R99 | R100 |
| P (Oil proof) | P95 | P99 | P100 |

* Code of Federal Regulations.
[†] The percentages in parenthesis indicate the minimum allowable laboratory filter efficiency value when challenged with 0.3 $\mu$m particles.

# CLASSIFICATIONS OF PARTICULATE RESPIRATORS

| 42 CFR Part 84 Particulate Filters | Service Time |
|---|---|
| **N-Series:** use for protection against solid and water based particles.<br><br>-N95<br><br>-N99<br><br>-N100 | All N series filters have no specific service time. They may be used multiple shifts and use may continue until a change in breathing resistance is noted |
| **R- Series:** use for protection against any particles.(including oil aerosols)<br><br>-R95<br><br>-R99<br><br>-R100 | All R series filters have a useful service time of an 8-hour shift. |
| **P-Series:** use for protection against any particles,(including oil aerosols)<br><br>-P95<br><br>-P99<br><br>-P100 | All P series filters have varying service times. See manufacturers time use limitations for more information. |

## N-95
## SURGICAL MASK

# P-100

# N-100







Filtering Face Piece Respirators (N95)






# Protection Factor (research & evaluation)

Ratio of concentration outside of mask to inside of mask (Co/Ci)

- Effective Protection Factor (EPF) study (intermittent use)

- Program Protection Factory (PPF) study

- Workplace Protection Factor (WPF) study

- Simulation Workplace Protection Factor (SWFP) study

Assigned Protection Factors for the Revised Respiratory Protection Standard

OSHA 3352-02 2009

# Assigned Protection Factors (OSHA)

| Type of respirator[1], [2] | Quarter mask | Half mask | Full facepiece | Helmet/hood | Loose-fitting facepiece |
|---|---|---|---|---|---|
| 1. Air-Purifying Respirator | 5 | [3]10 | 50 | .......... | .......... |
| 2. Powered Air-Purifying Respirator (PAPR) | .......... | 50 | 1,000 | [4]25/1,000 | 25 |
| 3. Supplied-Air Respirator (SAR) or Airline Respirator | | | | | |
| • Demand mode | .......... | 10 | 50 | .......... | .......... |
| • Continuous flow mode | .......... | 50 | 1,000 | [4]25/1,000 | 25 |
| • Pressure-demand or other positive-pressure mode | .......... | 50 | 1,000 | .......... | .......... |
| 4. Self-Contained Breathing Apparatus (SCBA) | | | | | |
| • Demand mode | .......... | 10 | 50 | 50 | .......... |
| • Pressure-demand or other positive-pressure mode (e.g., open/closed circuit) | .......... | .......... | 10,000 | 10,000 | .......... |

**Notes:**

[1]Employers may select respirators assigned for use in higher workplace concentrations of a hazardous substance for use at lower concentrations of that substance, or when required respirator use is independent of concentration.

[2]The assigned protection factors in Table 1 are only effective when the employer implements a continuing, effective respirator program as required by this section (29 CFR 1910.134), including training, fit testing, maintenance, and use requirements.

[3]This APF category includes filtering facepieces, and half masks with elastomeric facepieces.

[4]The employer must have evidence provided by the respirator manufacturer that testing of these respirators demonstrates performance at a level of protection of 1,000 or greater to receive an APF of 1,000. This level of performance can best be demonstrated by performing a WPF or SWPF study or equivalent testing. Absent such testing, all other PAPRs and SARs with helmets/hoods are to be treated as loose-fitting facepiece respirators, and receive an APF of 25.

[5]These APFs do not apply to respirators used solely for escape. For escape respirators used in association with specific substances covered by 29 CFR 1910 subpart Z, employers must refer to the appropriate substance-specific standards in that subpart. Escape respirators for other IDLH atmospheres are specified by 29 CFR 1910.134 (d)(2)(ii).

# MUC=MAXIMUM USE CONCENTRATION

(APF) x (PEL) = MUC

If APF=100 and PEL=5 ppm

MUC = 100 x 5 ppm = 500 ppm

# WHEN DOES THE CARTRIDGE STOP WORKING?

- Particulate Filtering Cartridge
  - Experience resistance to air flow

- Chemical/Vapor removal Cartridge
  - ESLI (End of service life indicators) OR
    - Calculated Time to Exhaust Chemical absorbent/adsorbent
  - If no ESLI is available the employer MUST develop a change-out schedule, i.e., the frequency with which the worker needs to change the cartridge.

  - *Odor/Breakthrough is not acceptable as sole means of determining when cartridge is expired.*

# ESLI EXAMPLES




When the indicator strip matches the top reference color on the cartridge shell, it is new and ready to use.

Over time, the indicator strip will gradually change to match the bottom reference color.

When the indicator matches the bottom reference color on the cartridge, it is time to replace it.

The North respirator 7700 with cartridges RT 41 (ammonia) with ESLI. The indicator is in the field of view of the employee (oval window in the center changes color after saturation of the sorbent)

The new cartridge

The expired cartridge

# Manufacturers' information

Admin <u>Click Here</u> to Login

## Select and Service Life

**Application**
- Respirator Selection
- Service Life Calculation
- End of Service Life Indicator

**Resources**
- Download Software

## 3M Select & Service Life Software

This program uses a respirator selection logic based on U.S. Occupational Safety & Health Administration (OSHA) regulations. Do not use this program if you are not governed by U.S. regulations. Consult the authority having jurisdiction in your country for respirator selection requirements.

3M has designed state of the art software to help make the selection of 3M™ Respirators easier and to help estimate the service life of 3M™ Gas and Vapor Cartridges.

Just point and click, following the prompts to select an appropriate 3M respirator. The software contains more than 700 different chemicals and provides a record of your choices. This software is made available to you at no cost.







### ESL Software

3M™ ESL Software is designed to determine if you can rely on the 3M™ 6001 and 609211 Organic Vapor Cartridges with End of Service Life Indicator (ESLI) for the organic vapors and exposure concentrations in your workplace.

<u>Begin 3M™ ESL Software</u>

### Select Software

3M™ Select Software is designed to help you choose the appropriate 3M disposable or reusable respirator for your work environment.

<u>Begin 3M™ Select Software</u>

### Service Life Software

3M™ Service Life Software is designed to help you estimate the service life of 3M gas/vapor respirators and cartridges.

<u>Begin 3M™ Service Life Software</u>

---

Select & Service Life Software: <u>PSD Home Page</u> | <u>Contact Us</u>

Legal Information | Privacy Policy

© 3M 2016. All Rights Reserved.

# Medical Evaluation



# Education

## Three Key Factors Required for a Respirator to be Effective

**Correct\***      **Incorrect**





① The respirator must be put on correctly and worn during the exposure.

② The respirator must fit snugly against the user's face to ensure that there are no gaps between the user's skin and respirator seal.

③ The respirator filter must capture more than 95% of the particles from the air that passes through it.







\*If your respirator has a metal bar or a molded nose cushion, it should rest over the nose and not the chin area.

# Facial Hairstyles and Filtering Facepiece Respirators

Intended for workers who wear tight-fitting respirators



Original image vector by fredrisher/Shutterstock.com

*If your respirator has an exhalation valve, some of these styles may interfere with the valve working properly if the facial hair comes in contact with it.

This graphic may not include all types of facial hairstyles. For any style, hair should not cross under the respirator sealing surface.

Source: OSHA Respiratory Protection Standard
https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=standards&p_id=12716
Further Reading: NIOSH Respirator Trusted-Source Webpage
https://www.cdc.gov/niosh/npptl/topics/respirators/disp_part/respsource3/rtfact.html

Centers for Disease Control and Prevention
National Institute for Occupational Safety and Health

2017

# Seal Check

## USER SEAL CHECK:

A positive and negative pressure User Seal Check assures you the respirator is seated correctly and in good working order. Before performing Seal Checks, exhale vigorously.

**If any air leaks are detected during either check, reposition the facepiece and/or readjust the head straps including loosening the straps, if they have been overtightened. Repeat the seal check(s) until a seal is obtained.**



**15** Negative Pressure Seal Check. Place the palm of each hand over the two cartridges or filters so they are completely sealed and inhale. Hold your breath for 5 seconds. If you have a good seal, the facepiece will be pulled inward toward your face.



**14** Positive Pressure Seal Check. Place the palm of your hand over the exhalation valve so it is completely sealed and exhale gently. If you have a good seal, the facepiece will be pushed away from your face very slightly.

https://sps.honeywell.com/us/en/products/safety/respiratory-protection

# Respirator Maintenance



- Cleaning
- Disinfection
- Inspection
- Storage

References





ANSI/AIHA Z88.10-2010

# Respirator Fit
## Testing Methods

*A Publication by*
*American Industrial Hygiene Association*

....................

BY THE **ANSI/AIHA Z88.10 SUBCOMMITTEE**

# FIT TESTING

- Fit tests involve
  - Donning the respirator & doing seal check
  - Performing various exercises
    - Normal breathing
    - Deep breathing
    - Turning head side to side
    - Talk out loud (reading "rainbow passage" is common)
    - Grimace
    - Bending over as if to touch toes

- Fit is determined by either a detection of an odor/taste OR by a series of measurements (e.g., Co/Ci) while these exercises are being performed

# QUALITATIVE FIT TESTING

- Qualitative Fit Testing
  - Irritant Smoke (very irritating, particulate)
  - Bitrex (very bitter tasting particulate)
  - Saccharin (sweet tasting particulate)
  - Isoamyl Acetate (banana smell, vapor)

- Fit is determined by the ability of the worker to detect the challenge agent while wearing the respirator and performing the required activities (discussed on previous slide)

# QUALITATIVE FIT TESTING

Assess sensitivity to agent
- No respirator
- Challenge with 10% Concentration

Don respirator (seal check)
- Test with 100% strength
- Perform specific exercises



# QUALITATIVE FIT TEST

## 3M QLFT Kit



# QUANTITATIVE FIT TESTING

- Controlled Negative Pressure
  - Measures leakage directly by pulling slight vacuum on the facepiece

- Condensation Nuclei
  - Measures differences in particle counts inside and outside the respirator

# CONTROLLED NEGATIVE PRESSURE



Applies a negative pressure to the inside of the mask then measures the amount of air removed while maintaining the negative pressure.

# CONDENSATION NUCLEI COUNTER



## Theory of Operation



# CONDENSATION NUCLEI COUNTER



Comments !







QUESTIONS?





