# Exhibit 3

EFILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL**,

      Plaintiff,

v.

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.**,

      Defendant.

Civil Action No.  25-C-_____
Judge _____

## COMPLAINT AND APPLICATION FOR TEMPORARY RELIEF PURSUANT TO *W.VA. CODE* § 46A-7-110

**STATE OF WEST VIRGINIA,** *ex rel.*
John B. McCuskey, Attorney General**,**

By Counsel,


/s/     *Robert M. Bastress III*
Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
(WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
(WV Bar # 8231)
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021

J. Timothy DiPiero     (W.Va. Bar # 1021)
Lonnie C. Simmons    (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar # 9616)
**DiPIERO SIMMONS**
**McGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133
Rob.bastress@dbdlawfirm.com

**TABLE OF CONTENTS**

PARTIES, JURISDICTION & VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.      Since at least the *1960's*, 3M knew its disposable respirators must have an effective filter, a proper and consistent fit, and a proper and consistent faceseal in order to protect the wearers, including coal miners, from dangerous lung diseases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.    In the *late 1960's/early 1970's*, 3M developed the first-of-its-kind 8710 disposable respirator; obtained government approval for the 8710 to be used for protection from coal dust, silica, and asbestos; and marketed the 8710 to the coal mining industry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III.   Defendant 3M knew the government approval of the 8710 was fundamentally flawed and was a marketing device, not a true measure of safety . . . . . . . . 12

    IV.   By the *early 1970's*, 3M recognized internally that the fit of its disposable, valveless, cup-shaped respirators was a problem . . . . . . . . . . . . . . . . . . . . . . 13

    V.    *In 1995,* a change in the federal regulations meant 3M had to swap out the 8710 disposable respirator for its counterpart, the 8210 disposable respirator. . 14

    VI.   While the filters are different, 3M has repeatedly admitted the 8710 is the same as the 8210 in terms of their "fit characteristics.". . . . . . . . . . . . . . . . . . . . . . 15

    VII.  Defendant 3M knew the 8710 and 8210 had the same fit defects making them unsafe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    Lack of a Reliable Fit Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Lack of Reliable and Practical Fit Test . . . . . . . . . . . . . . . . . . . . . . . . 23

        C.    Defendant 3M has known for decades that the valveless design of the 8710 and 8210 disposable respirators causes hot and humid exhaled breath – as well as humidity in a natural environment like coal mining -- to increase the breathing resistance and the respirators to flex and then potentially collapse, all of which leads to faceseal leakage endangering the wearer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

            i.    Defendant 3M has long known that increased breathing

resistance/pressure drop leads to dangerous increased faceseal leakage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ii.      Breathing resistance/pressure drop regulations were added in 30 C.F.R. § 11 for safety reasons. . . . . . . . . . . . . . . . . . . . . . . . . 31

iii.    *For the first decade of the 8710's product life beginning in 1972*, Defendant 3M knew the 8710 could not meet the 15 mm limit in the breathing resistance regulations in 30 CFR § 11 and 3M's QC plans/Test Methods, and yet, 3M sold millions of the 8710 anyways.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iv.    In the *early 1980's*, 3M fraudulently manipulated the 91-97% relative humidity range required by the regulations and 3M QC plans for the breathing machine test so that the 8710 would appear to "pass" the test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

v.     Defendant 3M did not advise NIOSH of 3M's continuing violations of the regulations and 3M internal QC plans/Test Methods.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

vi.    Defendant 3M should have reviewed the 8210's breathing resistance and propensity to collapse before representing the 8210 provides protection for, among other things, coal mining.. . . 44

vii.   *Beginning in the 1970's* and continuing throughout the product life of the 8710, 3M recognized internally the flexing and collapse defect due to humidity as a "major problem" and "product limitation" that made it "unacceptable in the underground mining area." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

viii.   Defendant 3M has long understood that the same propensity of the valveless, disposable 8710 respirator to "collapse from build up of high heat and humidity" applies to 8210. . . . . . . . . . . . 47

D.     Lack of Durability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

E.     Lack of Strap Adjustability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

F.     One-Size-Fits-All Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

G.     Defendant 3M's Internal Document Summarizing Fit Defects . . . . 51

VIII.   To retain its market share, Defendant 3M continues to sow confusion and misunderstanding, makes misrepresentations, suppresses and omits material facts in connection with the sale and advertisement of its 8210 disposable, valveless, cup-shaped respirator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    A.   *WEBSITE MISREPRESENTATIONS*: Defendant 3M's current website makes many repeated misrepresentations regarding the 8210. . . . . . . 53

        i.   PROTECTION: "Effective Respiratory Protection"; "Reliable, Effective Protection"; "Quality Reliable Worker Protection"; & "Protection Equivalent to a Rubber Facepiece Respirator"; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        ii.   "Durable"; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

        iii.   "Collapse Resistant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        iv.   For Use in Coal Mining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        v.   "Fits . . . protect[s] all day long" . . . . . . . . . . . . . . . . . . . . . . . 56

    B.   8210 Respirator and 8210 Box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        i.   Defendant 3M has a history of considering possible warnings on valveless, disposable respirators, and 3M has recognized that warnings adversely affect its bottom line. . . . . . . . . . . . . . . . . 57

        ii.   "Warning" on the 8210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        iii.   An illustration of what 3M could have done is seen in the asbestos example where after years of fighting the federal government 3M was forced in the *mid-80's* to add the warning with respect to disposable respirators: "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL." . . . . . . . . . . . . 61

        iv.   The 8210 box contains fit check instructions without acknowledging a fit check is "difficult, if not impossible" to do on the 8210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CLAIM (*COUNT I - VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . 67

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Now comes Plaintiff, State of West Virginia *ex rel.* John B. McCuskey, Attorney General ("The State"), by counsel, and alleges the following against Defendant 3M Company ("Defendant" or "3M"):

**PARTIES, JURISDICTION & VENUE**:

1.      The State brings this lawsuit to temporarily enjoin 3M's violation of the West Virginia Consumer Credit and Protection Act, *West Virginia Code* § 46A-1-101, *et seq.* ("WVCCPA") and otherwise fraudulent and unconscionable conduct in connection with the sale and advertisement of its 8210 disposable respirator and ultimately to seek civil penalties for 3M's repeated and willful statutory violations of the WVCCPA (and associated attorneys' fee and interest) also in connection with the sale and advertisement of the 8210 disposable respirator.  In doing so, the State hopes to end 3M's practice of putting wearers of its 8210, including West Virginia coal miners, in needless danger.

2.      Defendant 3M is a foreign resident corporation. Defendant 3M has advertised, marketed, and sold and continues to advertise, market, and sell its 8210 disposable respirator into West Virginia, some of which are sold through various distributors within the State, who, in turn, sell 8210's to, *inter alia*, West Virginia coal mines where the 8210's are worn by West Virginia coal miners.[1]  In a brochure on 3M's website, it describes the 8210 as "[o]ne of the most widely used

---

[1]For example, the following are a few examples of individual lawsuits filed by West Virginia coal miners who wore the 8210 in West Virginia coal mines and have significant lung diseases.  *See, e.g.*, *Darrell Bailey v. 3M, et al.*; *Charles E. Bailey, Jr. v. 3M, et al.*; *Oliver Bradley v. 3M, et al.*; *Terry Collins, v. 3M, et al.*; *Kenneth Dillon v. 3M, et al.*; *Gary Edwards v. 3M, et al.*; *Jack Ferguson v. 3M, et al.*; *James Goodwin v. 3M, et al.*; *Jason Griffith v. 3M, et al.*; *Douglas W. Hager, Sr. v. 3M, et al.*; *John Ingram v. 3M, et al.*; *James Law v. 3M, et al.*; *Mark Lester v. 3M, et al.*; *Charles Lilly v. 3M, et al.*; *Raymond Lovejoy v. 3M, et al.*; *Ashley Marsh v. 3M, et al.*; *Cecil Matney v. 3M, et al.*; *Eric Maynor v. 3M, et al.*; *Carrell McMillion v. 3M, et al.*; *Ricky Miller v. 3M, et al.*; *Roby Mitchum v. 3M, et al.*; *Owen Neff v. 3M, et al.*; *Roy Nelson v. 3M, et al.*; *Mark Perry v. 3M, et al.*; *David Petry v. 3M, et al.*; *Scott Petry v. 3M, et al.*; *Darrell Price v. 3M, et al.*; *William Reid v. 3M, et al.*; *Arnold Rouse v. 3M, et al.*; *Gary Scott v. 3M, et al.*; *Gary Sheaves v. 3M, et al.*; *William Snyder v. 3M, et al.*; *Matthew Steele v. 3M, et al.*; *Dixie Stelle v. 3M, et al.*; *Jeremy Taylor v. 3M, et al.*; *Wayne Taylor*

1

disposable respirators in the industry." (3M Brochure Excerpt, a copy of which is attached as **Ex. A**).[2]

3.      Defendant 3M previously and improperly removed a case brought by the Attorney General involving 3M's 8710 disposable respirator (the 8210's predecessor), which was remanded by Judge Copenhaver in 2005. *See generally West Virginia ex rel. McGraw v. Minnesota Mining and Mfg., Co.*, 354 F.Supp.2d 660 (S.D. W.Va. 2005).[3]  The 8710 respirator case brought by the West Virginia Attorney General against 3M has been pending in Lincoln County for more than 22 years and is now styled *State of W.Va. ex rel. McCuskey v. 3M, et al.*  The first phase of the ongoing trial of the 8710 case began in Lincoln County in January 2025 and is now in recess until it is scheduled to resume on March 23, 2026.

4.      Venue exists under *W.Va. Code* § 46A-7-114 inasmuch as "an act upon which the proceeding is based occurred" in this County and inasmuch further as 3M "transacts business" in this County by, among other things, marketing, advertising, and selling 8210 disposable respirators and other 3M products into this County.

## INTRODUCTION:

5.      For starters, Defendant 3M makes misrepresentations that the 8210 is a proper use for coal mining when it is not.[4] ███████████████████████████

---

*v. 3M, et al.*; *Carl Turner v. 3M, et al.*; *Rex Vance v. 3M, et al.*; *Donald Varney v. 3M, et al.*; *Ricky Wagner v. 3M, et al.*; *Rickie Warner v. 3M, et al.*; *Kevin Weikle v. 3M, et al.*

[2]*Available at:* https://multimedia.3m.com/mws/media/540004O/3m-disposable-respirator.pdf?&fn=Disposable _Respiratory_Product_Catalog_R13.pdf.

[3]Plaintiff is the State of West Virginia and not a resident of any State.  *See generally West Virginia ex rel. McGraw v. Minnesota Mining and Mfg., Co.*, 354 F.Supp.2d 660 (S.D. W.Va. 2005).

[4]With respect to whether 3M respirators were or are safe for coal mining, Defendant 3M's own SEC reports are telling.  Defendant 3M provided the following to the SEC under the heading

████████████████████████████████████████████████████████ [5]

In 1977, Defendant 3M recognized internally the following about the 8710, the 8210's predecessor: "**we now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity**." (Trial Ex. 300, 3M 338879). Defendant 3M's expert and former employee, Dr. Alan Johnston, admitted the 8710 and 8210 "perform similarly" regarding collapse in "high humidity environments[.]" (*See infra* ¶¶ 103). Yet, on 3M's current website and on the 8210 box, 3M repeatedly indicates one of the "uses" for the 8210 is "coal" and one of the "recommended industries" is "mining." (*See infra* ¶¶ 138-41, 150-51). These are blatant violations of the WVCCPA. (*See infra* ¶¶ 165-75).

6.    Defendant 3M's disposable, valveless, cup-shaped respirators like the 8710 and 8210

---

"Respirator Mask/Asbestos Litigation": "During March and April 2019, the [3M] Company agreed in principle to settle a substantial majority of the coal mine dust lawsuits in Kentucky and West Virginia for $340 million, including the [$67 million] jury verdict in April 2018 in the Kentucky case mentioned above." (2020 3M 10-K at p. 112, *available at*: https://investors.3m.com/financials/sec-filings?form_type=Annual&year=2021##document-4629 -0001558370-21-000737-2). Defendant 3M's 2020 10-k continued: "As of December 31, 2020, the [3M] Company had an accrual for respirator mask/asbestos liabilities (excluding Aearo accruals) of $662 million. This accrual represents the Company's best estimate of probable loss and reflects an estimation period for future claims that may be filed against the Company approaching the year 2050." (*Id.* at 113). A more recent 3M SEC report stated: "In 2024, the Company made payments for legal defense costs and settlements of $87 million related to the respirator mask/asbestos litigation. As of December 31, 2024, the Company had an accrual for respirator mask/asbestos liabilities (excluding Aearo accruals) of $523 million. This accrual represents the Company's estimate of probable loss and reflects an estimation period for future claims that may be filed against the Company approaching the year 2050." (3M 2024 10-k at p. 86, *available at*: https://investors.3m.com/financials/sec-filings?form_type=Annual&year=##document-5110-000 0066740-25-000006-2).

[5] The originally filed version of this Complaint has redacted portions that 3M has designated **CONFIDENTIAL**, albeit improperly, in document productions in other litigation. An unredacted version of this Complaint will be filed UNDER SEAL, and a copy will be provided to 3M's counsel. The State believes the unredacted version should be made public, and the State has no objection to the Court doing so.

3

provide a dangerous illusion of safety. According to one Occupational Safety Health Administration (OSHA) Area Office Industrial Hygienist, who observed the 8710 in the field for six years in the 1970's and early 1980's:

> "During the past six years, in virtually every instance I have seen these masks (#8710) used, the employee is not being protected adequately against the hazard . . .
>
> These respirators are dangerous. They are dangerous because employees are using them for protection against systemic poisons . . . and without the masks providing a proper face seal under actual-use conditions. They are dangerous because the employee is lulled into a false sense of security – a belief he/she is being protected against hazardous airborne contaminants when, in fact, he/she is not.
>
> * * *
>
> Every expert on respiratory protective devices I have talked to, including those in NIOSH and Los Alamos Scientific Laboratory, has denigrated this respirator both technically (on specifications and quantitative fit-testing criteria) and on its practical performance in the field.
>
> OSHA should re-examine its policy regarding the use of this respirator . . . ."

(Trial Ex. 519, WV-AG-00123263.001-.003).

7.    Beyond just coal mining, experts in the respirator industry have long warned about the unreliable fit provided by disposable, valveless, cup-shaped respirators like the 8710 and 8210. Defendant 3M has repeatedly admitted the 8710 and 8210 have the same "fit characteristics." (*See infra* ¶¶ 30-33). As explained below, 3M has known for decades that both of these disposable, valveless, cup-shaped respirators share the same fit defects making them unsafe for use involving potentially harmful dusts. ████████████████████

████████████████████████████████

██████    Defendant 3M further violates the WVCCPA with respect to advertising protection, fit, *etc.* in its communications regarding the 8210 while knowing the unreliable fit of 3M's 8210 makes it

unsafe for any use involving potentially harmful dusts.

8.      Defendant 3M has known for several decades that (a) humidity causes (b) an increase breathing resistance/pressure drop which, in turn, causes (c) dangerous faceseal leakage of a respirator worn in potentially harmful environments, either by flexing or ultimate collapse of the respirator. Here, humidity is a problem both externally in a humid environment like a coal mine and because of the faulty design of the respirators where humid breath is not properly expelled by a valve. Between 1972-1998, Defendant 3M did not meet the breathing resistance/pressure drop QC parameters for the silica dust audit test required in the federal regulations (30 CFR § 11), which gave 3M the authority to represent the 8710 was government certified. Simply put, the 8710 could not meet the breathing resistance requirements when tested at the proper high humidity range required by the regulations and 3M's internal QC plan. (*See, e.g.*, 1-14-25 Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59; *see also* 10-5-18 Eitzman Trial Test. at 198-200, 203-04, 207-09, 217, 219; 10-6-22 Eitzman Dep. at 105-06, 149-50; 6-30-16 Stump Dep. at 10-13, 41, 46, 50, 88, 91-92, 94). After NIOSH contacted 3M following an audit in 1975 that indicated the 8710 was failing the breathing resistance requirements, NIOSH believed 3M had corrected the problem and did not know that 3M had addressed it by testing the 8710 at a relative humidity range lower than what was required in the regulations and 3M's QC plans. (*See generally, e.g.,* Schutz Dep. at 36, 39-40, 58; *see also, e.g.,* 1-14-25 Price Trial Trans. at 242-43, 274-75, 279, 292; 10-5-18 Eitzman Trial Test. at 174-79, 185, 215-16; *see infra*). Respirator expert and former head of Lawrence Livermore Laboratory, Dr. James S. Johnson, ██████████████████

██████████████████████████████████████████

_____

[6]This affidavit is in the record in the Lincoln County case. (*See* 6-9-25 Trial Trans. at 837).



While the certification testing changed in the 1990's leaving out the humidity test and 3M introduced the 8710's "counterpart" – the 8210 – to replace the 8710, the 8210 nevertheless had the same breathing resistance/pressure drop, "Major A"[7] defect as the 8710. Harvard and Northeastern University Professor Dr. Jack Price has explained

Defendant 3M's representations regarding the "protection"provided by -- as well as the "collapse resist[ance]" of -- the 8210 when 3M knew the limitations of the 8210 was and continue to be misleading and/or confusing representations and violations of the WVCCPA, as explained more fully below.

## FACTS:

I.    Since at least the *1960's*, 3M knew its disposable respirators must have an effective filter, a proper and consistent fit, and a proper and consistent faceseal in order to protect the wearers, including coal miners, from

---

[7]*See infra* n. 57, p. 70.

**dangerous lung diseases.**

9. Since at least the 1960's, Defendant 3M knew Coal Workers' Pneumoconiosis ("CWP") is preventable,[8] incurable,[9] potentially deadly,[10] and has obviously been a scourge in West Virginia.[11]

10. Since at least the 1960's, Defendant 3M knew that only coal miners contracted CWP, colloquially referred to as "Black Lung" (including both Simple CWP and Complicated CWP/Progressive Massive Fibrosis ("PMF")).  (*See, e.g.*, Trial Ex. 20; ███████████████████ ███████████████████████; Trial Ex. 29; *see also* Trial Ex. 1250, WV-AG—123269.002-003; *see also* Trial Ex. 1326, WV-AG-00123190.002-003 ("By the 1950's, scientists had shown that with near certainty that CWP could be caused exclusively by excessive exposure to coal dust." and "'The only thing that causes this illness is the inhalation of dust during coal mining[.]'").

11. Since at least the 1960's, 3M knew CWP, Black Lung, Silicosis, and other dangerous lung diseases have long been contracted by coal miners based upon their occupational exposure to,

---

[8]*See, e.g.,* Trial Ex. 1326, WV-AG-00123190.003 (NIOSH report author remarked, "'[c]oal workers' pneumoconiosis is an entirely preventable disease. [Coal miners] wouldn't have gotten sick without inhaling way too much coal dust[.]'"); *see also* Trial Exs. 27, 29.

[9]*See, e.g.,* Trial Ex. 1314, WV-AG-00123385.003 ("The disease is not curable, is progressive and can advance from simple CWP to progressive massive fibrosis (PMF).  PMF is characterized by extensive scarring and thickening of lung tissue, emphysema, and compromised lung function leading to death."); *see also* Trial Exs. 27-29.

[10]*See, e.g.,* Trial Ex. 19, WV-AG-00120207-08; *see also* Trial Exs. 27, 29.

[11]According to the U.S. Department of Labor, for example, 132,702 federal black lung claims were filed in West Virginia between 1973 and 2020.  *See* https://www.dol.gov/agencies/owcp/dcmwc/statistics/bls2020/DistributionOfClaimsByState2020 .; *see also, e.g.*, Trial Ex. 1418, WV-AG-00123304.001-002.

7

and inhalation of, small respirable particles in coal dust and silica.[12] (*See, e.g.,* Trial Exs. 10, 11, 14, 18, 19, 40, 73, 74, 91, 110, 198, 244, 355, 827, 1250, 1314).

12. Since at least the 1960's, 3M knew to protect coal miners and others from dangerous lung diseases, a respirator must screen out small respirable particles found in significant numbers in coal dust and silica that the body does not naturally defend against and that may penetrate deep into the alveoli of the lungs. (*See, e.g.*, Trial Ex. 19, WV-AG-00120203 & WV-AG-00120206; Trial Ex. 20, 3M 052688 (3M internal document stating "[t]he smaller the particles are, the deeper they will get into the lungs presenting potential health hazards through [alveloar] deposition"), ████████████████████████; Trial Ex. 27; ██████████████████████; Trial Ex. 29; Trial Ex. 275, 3M 1465873; Trial Ex. 1319, 3M 538305-06 (3M internal document stating "[t]he particle size of a contaminant is the main factor affecting how far it can penetrate into the lungs."); 1-14-25 Price Trial Test. at 192-200).[13]

---

[12]The small respirable particles (below 5 microns) cannot be seen with the naked eye and their size is discussed in terms of microns and sub-microns (below 1 micron). For context, a 1 micron is equivalent to 1/25,400th of an inch. (*See, e.g.,* 1-14-25 Price Test./Trial Trans. at 168). As 3M stated at one point in the Lincoln County litigation over the 8710, "[v]ery small particles are measured in microns . . . [a] grain of salt, for example, is about 60 microns wide. . . . The word 'submicron' refers to particles smaller than one micron." (10-28-22 3M Mot. *in Lim.* Re: Submicron Theory in Linc. Cty. Circ. Ct. at 2). The naked eye cannot see smaller than 50 microns.

[13]Sub-micron particles have a disproportionate affect on toxicity because of their *surface area*, (*see, e.g.,* Trial Exs. 29; Trial Ex. 1524, 3M 136418), and slow *settling rate* in the air. (*See, e.g.,* Trial Ex. 504, WV-AG-00123214.001; ████████████████████ ████). Defendant 3M recognized submicron particles are "considered to be the most hazardous per unit of mass. The systemically toxic particles of this size are most easily absorbed into the body because of the large surface area per unit mass. Lung damaging particles of this size are considered more hazardous per unit mass because their great numbers affect a greater area of the lung." (Trial Ex. 1524, 3M 136418). The slow settling rate means the submicron particles "are stable in the atmosphere, [and] there are large numbers of them present to be inhaled[.]" (Trial Ex. 1759, WV-AG-00123435.079-.080).

13.    Since at least the 1960's, 3M knew that a respirator must have *both* an effective *filter* and a proper and consistent *fit* in order to protect the wearer against small harmful respirable particles that cause dangerous lung diseases. (*See, e.g.*, Trial Ex. 27; Trial Ex. 29, 3M 116015; Trial Ex. 40, 3M 022792; Trial Ex. 660, 3M 321331, 321336; Trial Ex. 732, WV-AG-00111444-46; Trial Ex. 1917, WV-AG-00123406.002). That is, the small harmful respirable particles can enter the breathing zone inside the mask either by penetration directly through the *filter* or around the faceseal edge by leakage due to a poor *fit* or compromise of the *faceseal*. (*See, e.g.*, *id.*). Defendant 3M knew either way of entry would be dangerous to the wearer. (*See, e.g., id.*).[14]

**II.    In the *late 1960's/early 1970's*, 3M developed the first-of-its-kind 8710 disposable respirator; obtained government approval for the 8710 to be used for protection from coal dust, silica, and asbestos; and marketed the 8710 to the coal mining industry.**

14.    After learning in the late 1960's that the government might approve a disposable respirator for certain dusts, 3M identified the coal mining industry as a "large potential market" and as an area of "prime interest," in part, because it knew engineering controls would not be sufficient by themselves to eliminate the dangerous dust. (Trial Exs. 27, 29; Trial Ex. 33, 3M 0115977; Trial 44, 3M 19019; ██████████████████). In its 1972 Marketing Plan, 3M specifically identified the coal mining market in Pennsylvania and West Virginia. (Trial Ex. 102, 3M 018480).

15.    ████████████████████████████████████████████

---

[14]Much effort has been expended in the 8710 case in Lincoln County regarding whether the submicron particles for which 3M advertised the 8710 provided protection (*see, e.g.,* Trial Exs. 228, 234), and that penetrate the 8710's filter, are harmful. There, the State has provided copious amounts of evidence, including from 3M's own internal documents, that submicron particles are the most harmful size particles, *see, e.g.*, Trial Exs. 29, 1319; whereas, Defendant 3M incorrectly contends the harmful respirable particles are only in the 1-3 micron range. (10-28-22 3M Mot. *in Lim*. Re: Submicron Theory in Linc. Cty. Cir. Ct. at 2). For purposes of fit defects, however, all of these respirable particles may penetrate the breathing zone and put the respirator wearer in danger.



Trial Exs. 85, 195, 1559).

16.     Defendant 3M's 8500 respirator was <u>not</u> approved for use with asbestos, coal, silica, *etc*. Defendant 3M recognized that the 8710 would be the first disposable respirator approved for use in environments where the wearer's health was at risk.

17.     Meanwhile, worker safety efforts in the 1960's culminated with the Coal Mine Health and Safety Act of 1969 and the Occupational Safety and Health Act of 1970 aimed at protecting coal miners and workers generally which set off a "gold rush" among manufacturers to enter these new booming markets for safety products.  (Trial Ex. 281, 3M 432420; Trial Ex. 1411, WV-AG-00120017; Trial Ex. 79, 3M 2572;

18.     As late as October 1971, 3M wrote in an internal field letter: "It is becoming increasingly apparent to us that [Bob] Schutz [Chief of the Testing and Certification Branch of the Bureau of Mines][15] is very much against approving single use respirators because they will cheapen or tarnish the Bureau image that he has spent so long to build up."  (Trial Ex. 77, 3M 001916).

19.     However, Defendant 3M used its political connections in working to get approval of the 8710. (*See, e.g.,*                          ; Trial Exs. 62, 77, 1738).

20.     On May 24, 1972, 3M's 8710 disposable respirator was approved, in accordance with 30 C.F.R. § 11, *et seq.*, by the Bureau of Mines and NIOSH "for respiratory protection against

_____

[15]*See, e.g.,* Trial Ex. 286, 3M 0123589.

pneumoconiosis and fibrosis producing dusts, including but not limited to aluminum, asbestos, coal, flour, iron ore or free silica." (Trial Ex. 114, 3M 002551; Trial Ex. 85, 3M 0018573; Trial Ex. 1505, 3M 075866.003; Trial Ex. 96, 608, 3M_DEP 0006524). Defendant 3M's 8710 was the first disposable respirator approved by the government for such uses. (*See, e.g.,* Trial Ex. 129, WV-AG-00123367.002).

21.    In the 1970's, 3M marketed and advertised the 8710 in *Coal Age* and various other periodicals as being (a) competitively priced, (b) government approved, and (c) providing protection against "Black Lung" and/or "pneumoconiosis and fibrosis producing dusts." (*See, e.g.*, Trial Exs. 91, 99, 139, 158, 170, 176, 188, 248-250, 313, 348, 424, 437, 440, 1394, 1429, 1444, 1487, 1489, 1603, 1609, 1713).[16] Defendant 3M's assertions relating to the approval of the 8710 and that the 8710 provided protection against "Black Lung" and/or "pneumoconiosis and fibrosis producing dusts" were confusing or misleading representations and suppressed or omitted material facts, as described more fully below. (1-14-25 Price Trial Test. at 235-36; *see also* Trial Ex. 176).[17]

---

[16]Defendant 3M acknowledged internally in September, 1972, a few months after the 8710 had begun to be sold, that "we have done no testing, as such, against respirable dusts or asbestos fibers on the No. 8710 Respirator as we are now marketing it." (Trial Ex. 135, 3M 0015734; *see also* 1-14-25 Price Trial Test. at 218).

[17]In addition to 3M's misrepresentations that the 8710 provided protection against submicron particles and against Black Lung and pneumoconiosis and fibrosis producing dusts generally, 3M's advertising and marketing materials also contained another specific misrepresentation that was discussed and acknowledged in its internal documents. In a memorandum to 3M's advertising department on October 24, 1973, 3M's Bob Barghni wrote:

"In giving the efficiency of the product care must be taken to insure that the statement is *totally correct*."

Example:

In stating 99% efficiency make sure that it is spelled out that this is for the filter media only

**III.    Defendant 3M knew the government approval of the 8710 was fundamentally flawed and was a marketing device, not a true measure of safety.**

22.    Defendant 3M knew the government approval of the 8710 under 30 C.F.R. § 11 (known as the "silica dust test," a relic from the 1930's) was fundamentally flawed in several ways,[18] a "marketing device," a "poor predictor[] of actual respiratory performance," and did not otherwise assure that "devices produced under such a program have a sufficiently high assurance of safety." (*See, e.g.,* Trial Ex. 411, WV-AG-000120659; Trial Ex. 448A, WV-AG-00123403.009-.011; Trial Ex. 732, WV-AG-00111445; Trial Ex. 1524, 3M 136417).

23.    The certification process under 30 CFR § 11 tested breathing resistance (also known as pressure drop), but it did not directly assess the fit of respirators, despite some earlier indications that 3M received that the regulatory regime would do so. (*See, e.g.,* Trial Ex.104; *see also, e.g.,* Trial Ex. 77, 3M 1916-17 (believing in 1971 that fit assessment may be part of approval process); Trial Ex. 80).

---

because the *overall efficiency of the product is much less than that i.e. fit efficiency*. Also our test data is only against silica dust and this too should be noted."

(Trial Ex. 186, 3M 040783)(emphasis added). Despite this warning from Barghini, 3M nevertheless ran the advertisement with its confusing and misleading misrepresentation asserting the 8710's "99% efficient against dust with a mean particle diameter of .4 to .6." (Trial Ex. 249; *see also* Trial Ex. 186; 1-14-25 Price Trial Test. at 235-38, 244-47, 250).

[18]The silica dust test did not test fit as the respirators were glued on to a mannequin. (Trial Ex. 278, 3M 11108; 1-14-25 Price Trial Test. at 190). It also did not address sub-micron particle penetration and focused on mass rather the number and size of the trapped particles. It only tested 3 respirators for 90 minutes at an inexcusably low flow rate (not reminiscent of actual work) and did not test in intervals such that the only results measured were at the end of the 90-minute period which allowed for a caked/loaded filter to appear more efficient than it was in actual use. (*See, e.g.*, Trial Ex. 110, WV-AG-0061722; Trial Ex. 278; Trial Ex. 1524, 3M 136417-18; Trial Ex. 827, WV-AG–000066303-06; 1-14-25 Price Trial Test. at 189-91, 200-04, 209-11; ███████████ ███████).

12

**IV.    By the *early 1970's*, 3M recognized internally that the fit of its disposable, valveless, cup-shaped respirators was a problem.**

24.    Since the beginning of 3M's development of the 8710 in the late 1960's/early 1970's, 3M understood that the wearer's ability to get a good fit with the 8710 on a consistent basis was in question. (*See, e.g.,* Trial Exs. 38, 54; █████████████████████ Between 1969 and 1971, for instance, 3M learned about the trouble wearers were having with getting a good fit and was warned about the risks of a respirator used in potentially dangerous environments when they cannot be properly and consistently fitted. (*See id.*; Trial Ex. 38, 3M 0017795-96).[19] Indeed, 3M recognized this could especially be a problem for coal miners when it asked in an internal memo on May 23, 1969: "3. Are we going to have same fit problems in the coal mine industry?" (Trial Ex. 38, 3M 017804).

25.    Defendant 3M recognized that the 8710 could not be properly and consistently fitted, that this was "a problem" to be "very conscious of" when placing the 8710 on the market, and that 3M should not convey to the public that the 8710 would fit all wearers.  In an internal 3M memorandum dated July 1, 1970, 3M's John Cain wrote, "These low figures were due entirely to the persons wearing the respirator not making sure he had a good face seal.  Because we realize that this problem exists, I feel we must be very conscious of it when placing the product in a test or market situation." (Trial Ex. 54, 3M 035456)(emphasis added).[20]

---

[19] *See also* Trial Ex. 80, 3M 001965 (3M noted internally that two of three participants had leakage in coal dust fit test and concluded "[a]n adequate seal was not obtained when the respirator was repositioned" and this "respirator slippage" needed to be "corrected" per NIOSH's Schutz ); Trial Ex. 135, 3M 015735 (3M's Cain wrote in a letter in September 1972 that "some leakage could be expected around the face seal if the respirator were improperly fitted)).

26.    In the 1970's, 3M's comparisons of the 8710's fit to its competitors and its other respirators further demonstrated deficiencies of these disposable, valveless respirators. (*See* Trial Ex. 192, 3M 091579-80 (3M's internal documents noted that a competitor's disposable mask "fits better than our #8710 on the individuals tested" and in a handwritten note by 3M's Einar Horne on 1/14/77 advised others that this document was "not to go to salesmen in this form"); Trial Ex. 268, 3M 010321 (in October 1, 1975 memo from Wilmes to Horne, he wrote in the section with the heading "#8710-H (#8800)" that, "The facefit of the respirator was evaluated . . . . This is about an 8X improvement over the 8710.")).

27.    In an example in 3M's internal documents, 3M was made aware of the consequences of poor fit when it wrote in 1977 that Bethlehem Steel Environmental Health Engineer Tom Kreichelt told 3M personnel that "an employee who had about 10 years exposure had been using the 8710 for the last 3-4 years, developed a silicosis problem.  Kreichelt cited this as an example of the poor fit of the 8710. And finally in a highly emotional state, he said 3M is not ethical, 3M proposes use of protection factor as a means of judging or comparing respirators . . . ." (Trial Ex. 329, 3M 016932).

**V.    *In 1995,* a change in the federal regulations meant 3M had to swap out the 8710 disposable respirator for its counterpart, the 8210 disposable respirator.**

28.    Ultimately, in 1995, NIOSH began the process of changing over from the silica dust test used by 30 CFR § 11 to the new test in 42 CFR § 84.  Effective July 10, 1995, the certification criteria changed to meet the requirements of 42 CFR § 84. There was a three-year grandfather clause that allowed the continued sale of respirators approved under 30 CFR § 11 until July 10, 1998, though the new approval criteria were established July 10, 1995.  The 8710 was no longer sold after July 10,

1998.

29.     Defendant 3M developed the 8210 disposable, single-use, valveless, cup-shaped filtering facepiece respirator to replace the 8710 disposable, single-use, valveless, cup-shaped filtering facepiece respirator in anticipation of the regulation change and expiration of the three-year grandfather clause.  (*See, e.g.,* 1-14-25 Price Trial Test. at 165; 10-6-22 Eitzman Dep. at 93-94).

**VI.     While the filters are different, 3M has repeatedly admitted the 8710 is the same as the 8210 in terms of their "fit characteristics."**

30.     Defendant 3M has long maintained that the 8710 and 8210 respirators were the same or substantially similar in many respects.  For instance, 3M employee and 3M-designated expert Alan Johnston testified in 2014 that the 8710 and 8210 "are similar in their style, obviously.  When you look at them, they look very similar. They're similar in their construction.  The primary difference between the 8710 and the 8210 is in the filter media." (9-30-14 Johnston Dep. at 464 in *Hill v. 3M*; *accord* 10-17-22 Erik Johnson Dep. at 74 (3M employee/expert stating same)).  In arguing that the masks were indistinguishable, counsel for 3M held up the 8210 and 8710 during the 2025 Lincoln County 8710 trial and stated: "This [8210] is the N95 that's on the market today that they're not suing us over.  This [8710] is the one they're suing us over." (1-9-25 Linc. Cty. Trial Trans. at 60).

31.     Defendant 3M has repeatedly admitted the 8710 and 8210 have the same "fit characteristics." (*See, e.g.*, 4-18-18 3M employee and expert Dr. Eitzman Trial Testimony at 19-21, 27; 10-6-22 Eitzman Dep. at 38-40; 1-13-25 Linc. Cty. Trial Trans. at 108).  During the Lincoln County 8710 trial earlier this year, 3M's counsel stated:

> "you'll hear from 3M experts that say the fit characteristics of these [8710 and 8210] are the same.
>      This [8210] is an updated version of the 8710.  It has different filtering material, but the size, the shape, and the fit characteristics of these two respirators are

15

the same."

(1-13-25 Linc. Cty. Trial Trans. at 108).

32.    On cross examination by 3M at the ongoing Lincoln County 8710 trial on January 15, 2025, the State's expert, Harvard and Northeastern University Industrial Hygiene Professor, Dr. Jack Price, testified as follows:

Q    [By 3M:] . . . when the new regulations came on, they took the basic construction of the 8710, they changed the filter so that it would pass the new certification tests, and they called it the 8210; right?

A    Yeah.  It's essentially the same mask, just a little more filtration material.

* * *

Q    [By 3M] . . . And you would expect the 8210 and 8710 to have either identical or very similar fit characteristics on the face; true?

A    Yes.

(1-15-25 Trial Trans. at 451-53).

**VII.    Defendant 3M knew the 8710 and 8210 had the same fit defects making them unsafe.**

33.    Because their "fit characteristics" are the same, the 8210 has the same fit defects as the 8710.  That is, the thicker 8210 filter did not remedy the well-known fit defects (including the lack of a reliable fit check; the lack of a reliable and practical fit test; the valveless design causing breathing resistance/pressure drop, flexing and collapse due to humidity; the lack of durability; the lack of adjustable straps; and the one-size-fits-all design) also found in 3M's similar 8710 disposable respirator.  (*See, e.g.*, 1-14-25 Price Trial Test. at 184-85).

34.    A 1986 letter from OSHA to 3M's counsel stated its position that elastomeric respirators offered a better fit and faceseal and corresponding protection than disposable respirators:

16

Additionally, the standards prohibit the use of disposable respirators, with or without HEPA filters,[21] because *disposable respirators*, in general, *permit greater faceseal leakage* under most conditions of use *than* half-mask respirators with *elastomeric facepieces and replaceable filters, and thus they cannot be relied upon to provide optimal protection*. 3M disputes both of these findings, but we believe there is substantial support in the record for both findings, including testimony from the National Institute for Occupational Safety and Health (NIOSH), respirator manufacturers, independent experts, industrial users of respirators, and labor unions, which represent the workers who must wear respirators. This evidence is buttressed by the Agency's collective experience promulgating and enforcing health standards. . . .

(Trial Ex. 1917, WV-AG-00123406.002-003 (emphasis added); *see also* Trial Ex. 660, 3M 321337 ("when compared to elastomeric facepiece respirators, disposable respirators do not provide a reliable face fit during use").[22]

35.    Before turning to each of the particular defects of the fit characteristics of the 8710 and 8210, the differences between a "fit check" and a "fit test" should be explained. A "fit check" and "fit test" are separate but important concepts in ensuring a respirator fits the wearer's face and adequately protects him/her from the hazards for which he/she may be exposed and for which the respirators were approved to guard against.

36.    Fit tests are "time consuming," and it is "not appropriate to require the employers to conduct" one every time the respirator is worn. *National Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987)(Ginsburg, J.).[23]  Accordingly, fit tests are intended to be conducted

---

[21]A High Efficiency Particulate Air (HEPA) filter is more than 30 times more effective than the filter on the 3M disposable respirators. (*See, e.g.*, Trial Ex. 1917, WV-AG-00123406.002-003).

[23]This D.C. Circuit opinion, authored by then Circuit Judge Ruth Bader Ginsberg, was a challenge 3M brought over OSHA's use of a Protection Factor of 5 for the 8710 for cotton dust.

every several months or once a year, not every day.  (*See, e.g., id.*; ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ ).

37.     Unlike a fit test which is done every several months, a "fit check" should be done every time the respirator is donned and takes a few seconds and certainly less than a minute.  *See Brock*, 825 F.2d at 492-93; 10-6-22 Eitzman Dep.

38.     Defendant 3M has long admitted that *both* fit checks and fit tests need to be available and conducted to ensure a proper fit and the safety of the wearer of the respirator.  (*See, e.g.,* Trial Exs. 488, 494, 696, 701, 732, 793, 826, 967, 1316; 1-14-25 Price Trial Test. at 272-73).  A respirator should not be sold if it cannot be both fit tested and fit checked.  (*See, e.g.,* 1-14-25 Price Trial Test. at 257, 272-73; *see also* 3M's Reed Dep.).

39.     In 1993, NIOSH noted that its approval label did not mean that NIOSH approved a manufacturer's fit checking and fit testing procedures for safety or otherwise.  (Trial Ex. 859, WV-AG-00034552).

40.     Moreover, on 3M's current website under the heading entitled, "Why is NIOSH Certification of Respiratory Protection Important?"with references to OSHA and the CDC, 3M suggests and implies that NIOSH approval connotes a measure of safety and proper fit of 3M respirators.  (3M Web Page on NIOSH Certification, attached as **Ex. K**).[24]  The 3M web page further creates this impression when it represents "NIOSH approval is issued only. . . after the respirator has been evaluated in the laboratory and found to comply with all requirements of Title 42, Code of

_____

[24] *Available at*:
https://www.3m.com/blog/en_US/safety-now/science-of-safety/regulatory-knowledge/why-is-niosh-certification-of-respiratory-protection-important/.

Federal Regulations, Part 84, and after the manufacturer's quality plan is determined to be satisfactory." (*Id.*).  Defendant 3M also omits there that the NIOSH regulations and approval do not test fit and are contingent upon the respirator being able to be correctly fitted. (*See id.*).  Nor does 3M indicate that there may be difficulties fitting the respirator, though it has been approved by NIOSH. (*See id.*).

41.    While 3M knew long before this, two letters from OSHA to 3M's counsel in 1986 nevertheless describe the 8710's problems with fit testing and fit checking. In one such letter rejecting 3M's attempt to have the agency re-consider its decision to disallow the 8710 to be worn around asbestos, OSHA wrote:

> "[T]he evidence in the record strongly supports OSHA 's finding that, when compared to elastomeric facepiece respirators, disposable respirators do not provide a reliable face fit during use . . . .*There is no acceptable method/or verifying their (disposable respirators) fit. . .* The record clearly shows that, as a class, *disposable respirators do not provide a reliable face fit after initial fit testing. . . They cannot be adequately fit checked* each time the same or new respirator is donned, and they are more subject to abuse, misuse, and degradation of face fit during actual use than elastomeric facepiece respirators. . . Workers unanimously opposed use of disposable respirators, Workers stated that disposable respirators do not fit well, . . .and failed to provide a good face seal."

(Trial Ex. 1917)(emphasis added).

42.    In 1992, NIOSH Guidelines provided:

> "What is more relevant, the face seal leakage for cup-shaped disposable masks can be considerably higher than 10 percent to 20 percent.  if these masks are not properly fitted to each wearer's face, fit tested by a qualified individual, and then fit checked by each wearer before respirator use. Both fit testing and fit checking are essential elements in any effective and reliable personal respiratory protection program [footnotes omitted] as summarized in Table 1 on page 20. At this time, there are no NIOSH recommended qualitative or quantitative fit tests for these masks. [footnotes omitted].  Cup-shaped disposable masks cannot be reliably fit checked [*sic*] be wearers. [footnotes omitted].  Therefore, the efficacy and reliability of the face seals on cup-shaped disposable masks are undependable because there are no proven

19

reliable fit tests nor reliable fit checks."

(Trial Ex. 826, WV-AG-00122047; *see also* 1-14-25 Price Trial Test. at 266-68).

43.     Defendant 3M has understood for decades that the lack of a reliable fit check and the lack of a reliable and practical fit test made the 8710 unsafe and makes the 8210 unsafe. (*See, e.g.,* Trial Exs. 488, 494, 696, 701, 732, 793, 967, 1316).

44.     As the D.C. Circuit observed, "[t]wo procedures, the saccharin QLFT [footnote omitted] and the positive pressure fit check (PPFC), [footnote omitted] 3M states, are available to test disposable respirators for face-fit; each, 3M contends, is independently adequate to do the job. If 3M were right about the adequacy of these tests, we would be obliged to rule in its favor . . . ." *National Cottonseed*, 825 F.2d 482, 492 (D.C. Cir. 1987). The D.C. Circuit did not rule in 3M's favor. *See id.*

### A.     Lack of a Reliable Fit Check[25]

45.     In 1994, 3M stated, "[f]it checking is an important part of respirator use." (Trial Ex. 967, WV-AG-00122899). The D.C. Circuit agreed. *See Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482, 492-93 (D.C. Cir. 1987)(Ginsburg, J.).[26]

46.     For decades, Defendant 3M has known that a daily fit check cannot be done on valveless disposable respirators like the 8710 and 8210,[27] as OSHA, ANSI, NIOSH, and the D.C. Circuit all determined at various points in the 1980's and 1990's, as illustrated by the following sub-

---

[25] A "fit check" is sometimes referred to as a "user seal" check.

[26] *Accord* Trial Ex. 1242, KY/HILL/MILLER 6708, § 2.3.3.

[27] ███████████████████████████████████████

20

paragraphs:

a. In 1985, OSHA recognized the "fitting problem." *Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987)(Ginsburg, J.) (*citing* 50 Fed.Reg. 51,154 (1985)). The D.C. Circuit rejected 3M's arguments in that case in writing the following:

> The PPFC [positive pressure fit check] procedure is an effective daily check for the fit of a gas-mask style respirator. Respirators of that type confine intended air intake to valves that can be blocked off easily by the employee's hands. By contrast, the entire surface of a disposable respirator [like the 8710] is intended to permit air intake. OSHA recognized that, in the case of disposable respirators, the worker's hands cannot effectively block intended air intake, and that intake only, while leaving unobstructed air taken in because of the respirator's improper fit. *See supra* note 6. [footnote 18 omitted] We think it evident that OSHA did not rule without reason when it adhered to the view that *no test appropriate for daily use adequately assured the proper fit for disposable respirators.*

*Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d at 492–93 (emphasis added).

b. In footnotes 5 and 6 of *Brock*, it was further explained:

> A single-use respirator is similar in shape to, but more rigid than, a surgical mask. Unlike gas-mask style respirators that have air intake and exhale valves, the entire surface area of the single-use respirator [like the 8710] is the filter.
>
> Using a gas-mask style respirator, the wearer can easily block the air flow valves, breathe deeply, and determine whether air is escaping from the face seal. For the single-use respirator [like the 8710], however, *it is difficult, if not impossible,* for the wearer to cover the entire surface area, but not the seal between the respirator and the wearer's face . . . .

21

*Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d at 489, nn. 5-6 (emphasis added).

c.      Also, the ANSI Z.88.2 standards in 1980 and 1992 noted that a fit check "may be difficult or impossible to carry out on valveless respirators[,]" like the 8710 and its successor, the 8210. (*See* 1-9-25 Trans. at 135-36; 3M Ex. 52.01, 3M 611650 at A7.3; 1-14-25 Price Test./Trial Trans. at 183-84).

d.      In a 1986 letter to 3M's counsel, OSHA wrote: "The disposable respirators permitted for use under the cotton dust standard do not, as the preamble explains, have either inhalation or exhalation valves.  Therefore, a simple and effective fit check cannot be performed on these respirators." (Trial Ex. 653, WV-AG-00123287; 1-14-25 Price Trial Test. at 258).

e.      In 1992, OSHA prohibited its employees from wearing disposable respirators in certain environments because they "'provide a poor face seal'" and they were "'difficult to perform an effective'" fit check.  (Trial Ex. 2295; 1-14-25 Price Test./Trial Trans. at 179-81).  As such, OSHA employees were required to instead use only elastomeric masks with HEPA filters.  (*Id.*).

f.      NIOSH confirmed in 1993 that "for over 5 years, OSHA has recognized the limitations of the positive-pressure fit check as applied to non-elastomeric disposable dust and mist respirators such as the 3M 8710…" and that in 1987, the U.S. Court of Appeals upheld the OSHA technical position that "*disposable, non-elastomeric respirators are incapable of being fit checked*". (Trial Ex. 851, WV-AG-00096437-00096438) (emphasis added); *see also* 3M 340193 (noting that OSHA has "questioned in its final standard … whether disposable respirators can be

22

effectively 'fit checked' daily by employees when they don the respirator").

g.    Likewise, Los Alamos's Darrel Bevis found it impossible for the user to perform a fit check after donning disposable, valveless, cup-shaped respirators.

h.    In addition, there was another expert industrial hygienist, "Dr. Mirer from the United Auto Workers [who] stated that 'a field fit check . . . can't be performed on the paper dust mask[.]'"  (Trial Ex. 660, 3M 321338).

47.    In 1986, OSHA cited the following data in rejecting 3M's request to apply an Assigned Protection Factor ("APF") of 10 for cotton dust: "[A]s many as 41 per 100 improperly fitted wears of 3M's 8710 respirator could be erroneously passed by 3M 's positive pressure fit check (PPFC) procedure."  (Trial Ex. 653, WV-AG-00123287.009).

48.    In its Final Rule in 2006 and based in part upon 3M's advocacy, OSHA shifted some responsibility to the purchasers of its respirators, but the widespread criticisms, recited above, remain true and reflect the point that the 8710 and 8210 were and are incapable of providing a reliably-consistent adequate fit and faceseal because of the lack of a reliable fit check for these valveless, disposable, cup-shaped respirators.

**B.    Lack of Reliable and Practical Fit Test**

49.    In the 1991 Wilmes letter, 3M admitted: "We strongly believe that there is a *tremendous risk to the wearer* of any respirator that has not been properly fit tested. This risk far out shadows any risk from the use of saccharin[,]" then thought to be a potential carcinogen.  (Trial Ex. 793)(emphasis added).

50.    Similarly, in its presentation on the discovery rule in the 2025 Lincoln County trial on its 8710 respirator, 3M acknowledged the testimony of its former employee, Katherine Reed, that

23

"'[a] respirator should not be used unless it's been fit tested.'" (1-9-25 Trial Trans. at 121-22; 3M Ex. 61.15).

51.    Also, in 1988, 3M's personnel wrote: "I believe that a respirator certification scheme should require that a respirator manufacturer in the respirator user instructions specify a validated fit test must be performed to assure adequate facefit before the respirator can be relied upon for protection.  This would provide assurances that the user has a respirator that adequately fits." (Trial Ex. 732 at p. 221, 1036, WV - AG - 00111446, Wilmes/Olsen/Hendricks Article)(emphasis added).

52.    A responsible respirator manufacturer should not sell or put on the market respirators that cannot be fit tested.  (*See, e.g.,* 1-14-25 Price Trial Test. at 257).

53.    As alluded to above, there are two types of fit testing: qualitative and quantitative. *See, e.g.*, 29 CFR § 1910.134(b); *see also* 1-14-25 Price Test./Trial Trans. at 175.  Fit tests are done qualitatively with a test/challenge agent or quantitatively with instrumentation usually involving a probe. (1-14-25 Price Test./Trial Trans. at 176-78; *see also, e.g.*, 29 C.F.R. § 1910.134(b)(1998)).

54.    "**Quantitative fit test (QNFT)** means an assessment of the adequacy of respirator fit by numerically measuring the amount of leakage into the respirator." 29 CFR § 1910.134(b)(emphasis in original).  That is, while a quantitative fit test may be theoretically done, it involves a probe that destroys the respirator and requires "a special machine[.]" (1-15-25 Price Trial Test. at 459). As the name implies, a quantitative fit test is done with instrumentation and results in a particular value after taking measurements.  (*See, e.g.,* 1-14-25 Price Test./Trial Trans. at 176). A quantitative fit test uses a device (such as a Portacount) to measure the challenge agent inside and outside the respirator, but it was and is expensive, "difficult," and not practical for employers, and in the case, at least, of the 8710, the filter was so defective it was difficult to measure the face seal. (*Id.* at 176-78; *see also* 1991

24

Wilmes Ltr., Trial Ex. 793; Trial Ex. 771, 3M 532871-72 (3M noting in 1990 that 8710 cannot be quantitatively fitted); Bien Rept.). Defendant 3M knows quantitative fit testing is not practical for employers, including coal operators.

55.     "**Qualitative fit test (QLFT)** means a pass/fail fit test to assess the adequacy of respirator fit that relies on the individual's response [usually smell or taste] to the test agent." 29 CFR § 1910.134(b)(emphasis in original); *see also* 1-14-25 Price Test./Trial Trans. at 177-78.   A qualitative fit test is a pass/fail test that relies on the subject's sensory response (smell or taste) to detect the challenge agent.  (1-14-25 Price Test./Trial Trans. at 175-78).

56.     In the 1970's, banana oil and irritant smoke were identified as qualitative fit test agents. However, the 8710 could not be fit tested using either of these two test agents because the small, sub-micron particles used in these methods would penetrate the respirator filter and cause excessive leakage to void the test.  (*See, e.g.,* Bien Rept.).

57.     The 1987 NIOSH Decision Logic on fit testing notes that:

● **Fit Testing**

No qualitative or quantitative fit tests have been demonstrated to be capable of effectively identifying inadequately fitting respirators (i.e, respirator-wearer combinations that provide less protection than the APF).  The presently used fit tests (e.g., ANSI-recommended, OSHA-approved) may fail to identify individual wearers with inadequate respiratory protection.  Thus fit tests should be used with caution and with recognition of their possible deficiencies.  As appropriate, periodic evaluations of the effectiveness of each respirator during use in the workplace should be conducted to ensure that each wearer is being provided with adequate respiratory protection.

(3M Trial Ex. 57.101 at p. 209 of 305)(emphasis in original).

58.     In the aforementioned 1991 letter from 3M manager, Don Wilmes, to NIOSH attempting to defend a qualitative test with the challenge agent involving the then potential

25

carcinogen, saccharin, 3M stated as follows:

> The test (sodium saccharin qualitative fit test) was designed and developed in the late 1970s and early 1980s as a validated qualitative fit test to be used with respirators with dust/mist filters. The test was developed because <u>up to that time there was no fit test, qualitative or quantitative suitable for use with respirators with dust and mist filters.</u>
>
> The quantitative fit tests then available were not suitable because the filter efficiency of this type of respirator filter would allow 10 to more that 20 percent of the test agent to pass through the filter masking any attempt to quantify the test aerosol that was passing through faceseal leakages.
>
> The qualitative fit tests then available were also not suitable because they were either too small of a particle, such as the irritant smoke, or a vapor, such as isoamyl acetate. The other agents mentioned in the literature were coal dust and talc powder of which both methods lack suitable sensitivity and were impractical for routine use."

(Trial Ex. 793, 1991 Wilmes Letter to OSHA; *see also* 1-14-25 Price Trial Test. at 253-57).[28]

59.     Defendant 3M has discarded the original fit test agents (irritant smoke and isoamyl acetate/banana oil) and now identifies only saccharin and bitrex as "acceptable" qualitative fit test agents for the 8210. (*See* 8210 Technical Specification Sheet, a copy attached as **Ex. B**).[29]



---

[28] *Accord Brock*, 825 F.2d 489, n. 6 (explaining fit tests "were unavailable in 1978 for the single-use respirator [8710] because all known test agents permeated its filter element").

[29] *Available at:*
https://multimedia.3m.com/mws/media/1425070O/3m-particulate-respirator-8210-n95-technical-specifications.pdf?&fn=FINAL_V2.pdf



61.    While saccharin and bitrex fit test agents are available for purchase to attempt to qualitatively fit test the 8210, no reliable and practical fit test exists for the 8210. (*See id.*)

62.    The 8710 and 8210 were and are incapable of providing a reliably-consistent adequate faceseal because, in part, of the lack of a reliable and practical fit test for these disposable, valveless, cup-shaped filtering facepiece respirators.

> **C.    Defendant 3M has known for decades that the valveless design of the 8710 and 8210 disposable respirators causes hot and humid exhaled breath – as**

**well as humidity in a natural environment like coal mining -- to increase the breathing resistance and the respirators to flex and then potentially collapse, all of which lead to faceseal leakage endangering the wearer**.

63.    Inhalation resistance and exhalation resistance are jointly referred to as "breathing resistance" and this term is also used interchangeably with the term, "pressure drop." (*See, e.g.,* 1-14-25 Price Test. Trial Trans. at 288; ███████████████████████████████████████). Breathing resistance/pressure drop refers to "the resistance to pull air through the filter" which creates "negative pressure." (*See, e.g.*, 1-14-25 Price Test. Trial Trans. at 239-40).

64.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

65.    Single-use disposable respirators such as the 8710 and 8210 had and have no exhalation or inhalation valve to prevent the exhaled breath from passing back through the entire surface of the filter media.  Consequently, the moist, warm, humid exhaled breath condenses on the exposed filter media, (a) causing degradation, loss of filter rigidity, and increased breathing resistance (a/k/a pressure drop), (b) thereby resulting in flexing and often eventual collapse, all of which, in turn, led to (c) increased leakage of the face seal.  (*See, e.g.*, ███████; *see also* 1-14-25 Price Trial Test. at 298; ████████████████████████████████████).  Defendant 3M has known about this defect for several decades.

66.    As early as 1969-70, 3M was told that the 8710 prototype needed an exhalation valve to cut down on the moisture inside the respirator, but 3M deliberately declined to do so due to cost

concerns.  (Trial Ex. 43, 3M 0017771-73, 79-80; *see also* Trial Ex. 52, 3M 17108).

67.     In October 1974, 3M's Barghini wrote, "in order to be competi[tive] future 3M single use respirators should include a valve in their designs."  (Trial Ex. 222, 3M 016598; 1-14-25 Price Trial Test. at 252-53).

68.     Recently, 3M has boasted about the development of its "cool flow valve" that has been added to some of its disposable respirators, including the 8210V (which is distinct from the 8210), in order to "release . . . hot, humid exhaled breath quickly . . . inside the facepiece[.]" (*See, e.g.*, 3M Cool Flow Valve Webpage, attached as **Ex. C**,[30] *see also* 10-6-22 Eitzman Dep. at 77 (testifying the cool flow valve "reduces heat and humidity inside the respirator"), 94, 135; 3M Web Page with Dr. Eitzman Video, attached as **Ex. D** (depicting Dr. Eitzman as answering, in part, the question "Do you know what an exhalation valve in an N95 respirator can do for you?" by saying the "[t]he cool flow valve helps that by making it easier for exhaled breath – which is hot and humid – to get out of the respirator. Otherwise, if you didn't have a valve present, what would occur is that [hot humid exhaled breath] would go into the rest of the respirator facepiece, which is filter media.  It would get warmed up and then when you breathe in the next breath you get, at least at the beginning, you get some warm air coming towards you . . . .").[31]

69.     In addition to the moist and humid exhaled breath, humidity in the external environment, often found in coal mines, (*see, e.g.,* Trial Ex. 38, 3M 017794; Trial Exs. 71, 184, 185;

---

[30] *Available at*:
https://www.3m.com/3M/en_US/respiratory-protection-us/products/disposable-respirators/cool-flow-respirator-mask/

[31] *Available at:*
https://www.3m.com/3M/en_US/worker-health-safety-us/safety-resources-training-news/calendar-of-events/n95/

7-22-98 Haggerty Dep. at Vols. II-III in *Cochran*), caused the 8710 and causes the 8210 to flex and ultimately collapse. (*See id.*).

70.    Defendant 3M has also known for decades that a humid environment would cause its disposable respirators to flex and ultimately collapse. (████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *see also* Trial Ex. 1668, 3M_DEP 0003232 (8710 "[c]an collapse under high humidity"); Trial Ex. 5013). In its presentation on the discovery rule in the Lincoln County trial, 3M acknowledged the testimony of its former employee, Robert Haggerty, that the "8710 can collapse in high humidity" but this fact was not mentioned in the warnings for the product. (1-9-25 Linc. Cty. Trial Trans. at 119-20; 3M Ex. 61.13).

> **i.    Defendant 3M has long known that increased breathing resistance/pressure drop leads to dangerous increased faceseal leakage.**

71.    In a 1994 letter, 3M acknowledged "[r]espirators with high pressure drops almost always have increased face seal leakage." (Trial Ex. 927). Dr. Price testified this concept was well understood in the respiratory protection field. (1-14-25 Price Trial Test. at 268-271).

72.    Peer review studies, including those participated in by 3M personnel (Nelson & Cotton), have likewise "concluded that breathing resistance across the facepiece increases faceseal leakage of filtering facepiece respirators like the 8710" and 8210. (████████████████████████ ████████████████ *citing* Trial Ex. 1251; *see also* 3M Trial Ex. 08.051 at p. 1 ("The measured faceseal leak rates increased as the breathing resistance increased[.]"). █████████████████ █████████████████████████████████████████████████████████████████████

30

██████████████████████████████████████████████ *citing* Trial Ex. 1251). ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████

73. In its "Conclusion" section, the 3M authors (Nelson & Cotton) explained: "An increase in breathing resistance can cause an increase in faceseal leakage. . . . The increase in faceseal leakage could lower respirator performance to unacceptable levels before breathing resistance is noted by the wearer." (3M Trial Ex. 08.051 at pp. at 3-4).

74. Faceseal leakage allows small respirable particles that can cause disease to be in the breathing zone of the respirator wearer.

### ii. Breathing resistance/pressure drop regulations were added in 30 C.F.R. § 11 for safety reasons.

75. The regulations on breathing resistance were added because it is a safety issue. (*See, e.g.,* Trial Ex. 1251).

76. As background, the silica dust test was in place between 1972-1998 in 30 C.F.R. § 11, and it included a "pull through test" for all respirators. (1-14-25 Price Test./Trial Trans. at 189). Valveless respirators like the 8710 were also subject to an additional "breathing machine test" because NIOSH was "concerned about, again, the cyclic breathing pattern as well as humidity that comes from exhaled breath through the mask since there's no valve. Air has to pass back through the filter." (1-14-25 Price Test./Trial Trans. at 189; *see also id.* at 251-53). Exhaled breath is between 92-94%

humidity. (1-14-25 Price Trial Test. at 252). The breathing machine portion of the silica dust test was developed to address the then new, valveless disposable respirators by mimicking human breath which would not escape the 8710 mask through a valve, as traditionally been done.

77.    The humidity range for the breathing machine test was supposed to be "94+/- 3 percent relative humidity," (*i.e.*, 91-97%)  to mimic exhaled breath for the "[a]ir exhaled through the respirator[.]"  30 C.F.R. § 11.140-5(c).[32]

78.    The regulatory (30 CFR § 11.140-5(c)) 91-97% relative humidity requirement in the breathing machine was further adopted by 3M's internal quality control plans, called "Test Methods." (*See, e.g.,* 10-5-18 Eitzman Trial Test. at 204, 207-09, 217). That is, the 3M Test Methods further required that the silica dust audit machines operate with exhaled air with a percent relative humidity ranging from "94 +/- 3%" or 91-97%.  (Trial Ex. 1797 – "TM-1040" 3-23-77, p. 4 (3M018931-35); Trial Ex. 1907, "OTM-2072" 5-15-84, p. 3 (3M1174227-229) (updated from 1040 and incorporated into computerized system); Trial Ex. 1940, 7-17-91 p, 3 (3M0588516-520); Trial Ex. 1940, 7-19-91, p. 3 (3M588516-520);  Trial Ex. 1956, 10-12-93 p. 4 (3M0462485-91); █████████████████████ ████████████████████████████; Trial Ex. 1895, compared to Omega Web Trial (3M094316-22)).

79.    The silica dust audit test measured breathing resistance/pressure drop by millimeters of water column.  (30 CFR  § 11.140-9(b); ████████████████████████ ██████████████). The regulations required that the maximum final inhalation resistance was 15 millimeters of water column and the maximum exhalation resistance was also 15 millimeters of water

---

[32]This humidity range in the "breathing machine" test required by 30 C.F.R. § 11.140-5(c) is distinct from the humidity range used in the "pull through" test found in 30 C.F.R. § 11.140-4(b).

column. (*Id.*).

         **iii.**       ***For the first decade of the 8710's product life beginning in 1972, Defendant 3M knew the 8710 could not meet the 15 mm limit in the breathing resistance regulations in 30 CFR § 11 and 3M's QC plans/Test Methods, and yet, 3M sold millions of the 8710 anyways.***

80.      Between 1972 and 1982, the 8710 largely and repeatedly failed the breathing resistance/pressure drop requirements set forth in the regulations for disposable respirators in the silica dust test in 30 C.F.R. § 11 and the 3M quality control manual, as further reflected in the following bullet points.[33] (*See, e.g.*, 10-6-22 Eitzman Dep. at 105:03-106:02, 149-50 (3M expert/employee admitting "there were a number of test results that were higher than the NIOSH approval limits for a product that was being produced in Aberdeen in the late 70's" that were released for sale); Trial Ex. 71, 3M 017402; Trial Ex. 291, 3M 522; Trial Ex. 396, 3M 94838; ███████████████ ██████).

•      Meeting Minutes of the 3M Respirator Committee on June 29, 1971 indicate 3M was aware of "problems in testing the No. 8710." (Trial Ex. 71, 3M 017402). Specifically, it was noted that, "some of our web would meet specifications, but this depended upon the temperature and humidity in their breathing machine. When operating in the low end of the range, satisfactory results were obtained. The high end

---

[33]As part of its quality control plan approved by the government, 3M was required to perform the silica dust internally. In late 1974, 3M obtained permission from NIOSH as an alternative means of quality control to also use the DOP test. In the 1970's, 3M personnel acknowledged, "we are faced with the conclusion that there is no correlation between the DOP machine and the silica dust regarding" pressure drop, and 3M's Wilmes noted the correlation between DOP test and silica dust test is "no longer valid." (Trial Ex. 247, 3M 1510-11; Trial Ex. 185, 3M 118541). Further, NIOSH's acceptance clearly stated that if there were conflicts, the silica dust was the reference standard as it was the test embodied in the regulation. (Trial Ex. 217, 3M 123552; *see also* ███████████ ███████████████████████).

of the range gave high pressure drop which appeared to be related to an excessive moisture accumulation in the respirator.  Bob [Barghini]'s group is studying the problem to determine what will be required to pass the test on their breathing machine[.]" (*Id.*).

● In September 1973, 3M acknowledged internally it was "gambling" with production because it could not meet the breathing resistance requirements for the 8710.  (Trial Ex. 182).

● On October 3, 1973, 3M's internal memo indicated "production is still having pressure drop  difficulties[.]" (Trial Ex. 183, 3M 2254).

● In an internal 3M memorandum from Wilmes to Barghini a few weeks later, on October 18, 1973, he wrote "the process is out of control."  (Trial Ex. 185, 3M 118541).  The memo later continued, "[it should be pointed out that the DOP release tests show the product is still acceptable but the breathing machine tests show it unacceptable. Our original correlation is no longer valid because the shift in the process.  Product must be released but every effort should be made to get back into certification specifications." (*Id.*).

● On March 22, 1974, an internal 3M memo acknowledges that the 8710's "final pressure drop on masks . . . was outside the specifications that NIOSH approved." (Trial Ex. 201, 3M 115317-19).  This internal 3M document notes "we've been skirting with this problem since September and really never been very safe in that regard to" pressure drop.  (*Id.*).  Defendant 3M's engineers further commented that the pressure drop violations were a "major defect" problem in the quality control plan: "because of

34

the seriousness of this major defect problem . . . a cooperative effort has been started among Laboratory, Production Engineering, and Process engineering personnel." (*Id.*).

● In 1974, 3M noted internally that "we find the 8710 significantly off specification in DOP penetration, DOP pressure drop, and final pressure drop" such that it ran "the risk of being challenged by NIOSH on our present 8710 certification," and later, in a separate internal document, "[t]he functional testing of the 8710 indicates an improvement in the final pressure drop but the **product is still borderline with no safety margin**." (Trial Exs. 200, 223; *see also* Trial Exs. 201-202).

● A 1976 3M document showed that 99.5% of the 8710's failed the breathing resistance requirements under 30 CFR §11.140-9(b). (Trial Ex. 291; *see also* ██████████████████████████████████████████████).

● In 1977, 1978 and 1979, almost all of the 8710's violated the final inhalation resistance limit of 15 mm in 30 CFR §11.140-9(b). The 8710 also violated the initial inhalation maximum resistance limit (12 mm), as set forth under 30 CFR § 11.140-4(b), inasmuch as more than 1% of the 8710's tested had initial resistance values exceeding 12 mm. On average, in 1977, 4% of the 8710 masks violated this limit, 30% violated this limit in 1978 and 86% violated this limit in 1979. (Ex. 6 to 9/15/15 Dep. of Dr. Leidel in *Morris v. 3M*).

● "According to [3M employee] Mr. Stump, who worked in the plant from 1976 to 1983, ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ (*citing* Stump Dep. at 88)). Stump testified that he

worked in QC of the 8710 at a 3M plant in the mid 70's to early 80's, (6-30-16 Stump Dep. at 10:11-13:20), and, though an internal 3M document noted the silica dust test "'was the most important test in the plant,'" (*id.* at 91:7-92:12; *see also* Trial Ex. 409, 3M 098301), that 3M was "so far out in left field with silica dust testing that we couldn't believe any of the results that we were getting during that time," (*id.* at 41:5-21); "the silica results really is what's bad" and "was all over the place," (*id.* at 46:1-18); the silica dust test did not correlate with the DOP test, (50:16-22); and the silica dust test never got to a point where it could work in 3M's Aberdeen plant, (*id.* at 94:6-10, 88:3-11).

81.    Because Defendant 3M could not "maintain or cause to be maintained. . . "the acceptable quality level [AQL] for each characteristic tested . . . to assure that it is manufactured according to the drawings and specifications upon which the certification is based[,]" 30 C.F.R. § 11.33(f), Defendant 3M thus plainly violated this regulation by representing the 8710 was approved. *See id.*

82.    Defendant 3M nevertheless sold the 8710's that could not pass the regulatory 15 mm breathing resistance requirements in 30 CFR §11.140-9(b).  (*See, e.g.,* 10-6-22 Eitzman Dep. at 149-50).  ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

---

[34]A lot can contain as many as 120,000-130,000 respirators.  (10-6-22 Eitzman Dep. at 102-03).

36

        iv.        **In the *early 1980's*, 3M fraudulently manipulated the 91-97% relative humidity range required by the regulations and 3M QC plans for the breathing machine test so that the 8710 would appear to "pass" the test.**

83.    Since the 1960's and 1970's, Defendant 3M had long understood that humidity was a critical factor in impacting the pressure drop of the 8710. (*See, e.g.,* ██████████████; Trial Ex. 1741; Field Letter of Barghini and Dyrud to Courtney, 6/11/71 (3M001823-25); Trial Ex. 1736, Field Letter of Barnard to Groth, 11/8/70 (3M022018, 017078-82); Trial Ex. 1869, Memo from Japuntich & Day to Woodward, 10/29/80 (3M 038074-79)). For example, in 1971, 3M noted internally that 3M's manager Bob Barghini "found that some of our web would meet specifications, but this depended upon the temperature and humidity in their breathing machine. When operating in the low end of the range, satisfactory results were obtained. The high end of the range gave high pressure drop which appeared to be related to an excessive moisture accumulation in the respirator." (Trial Ex. 71, 3M 017402).

84.





85.    Beginning around 1982, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 3M manipulated the 91-97% humidity range in the test in violation of the regulations and its internal quality control plan approved by NIOSH (as part of its certification to sell the respirator) so that the 8710 would "pass" the test. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

86.    By manipulating the humidity settings of the silica dust audit test equipment, 3M could create test results which appeared to reflect compliance with the 15 mm limit in the silica dust test,

38

even though the 8710 respirator could not comply with the silica dust test when the test was performed on a breathing machine without lowering the required 91-97% relative humidity range.

87.

*accord* 1-14-25 Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59).[35]

---

[35]In sum, Dr. Price testified as follows at the Lincoln County 8710 trial: (1) "For the valveless respirator, they were required to test that respirator with the silica dust test using the *breathing machine* so the exhaled air, which is at a warmer temperature and a higher humidity, passes through the mask, and that *is part of the test* for the performance of that type of mask." (*Id.* at 381); (2) 3M's 8710 was "*having difficulties with the pressure drop[.]*" (*Id.* at 858); (3) 3M was "*obligated to notify NIOSH that they weren't in compliance* with their quality control program and meeting the requirements of the certification approval . . . they were obligated to contact NIOSH about . . . if they were having problems with their quality control program." (*Id.* at 292); (4) *3M* "from their own internal testing and knowledge base of doing all these tests over the years, *[3M knew] that humidity was a key factor . . . that would lead to the increase in pressure drop*" (*id.* at 858-59); (5) "[F]rom reviewing other documents in other cases" and "from reviewing a lot of their quality control documents[,]" he learned that *3M "did not meet the humidity specifications for the silica dust test. They [3M] were basically passing these tests at lower humidities than what's required in the standard*." (*Id.* at 380-81, 858-59); (6) "In  the mid '80s through the -- to the end of '98 -- well, actually, '95 where it couldn't be sold  anymore, they were not doing the silica dust test at the correct relative humidity. So I think *that was the way that they ended up solving their pressure drop problem by reducing the humidity* during a breathing machine test. So that has me concerned." (*Id.* at 380); and (7) the 8710 was *"out of compliance"* with the regulations.  (*Id.* at 381-82).

39

88.    Defendant 3M's employee/expert Dr. Eitzman testified that the 3M *Test Methods* give instructions to the QC technicians to follow in performing the quality control tests and *required* 3M to test the 8710 at *91-97%* relative humidity for the breathing machine.  (10-5-18 Eitzman Trial Test. at 203:17-204:24).[36]

89.    Defendant 3M's employee/expert Dr. Eitzman acknowledged that 3M's failure to test the 8710 at the proper relative humidity range *violated the 3M internal Test Method* when he testified as follows:

Q    Again, just to kind of cut to the chase, it also had a direction to the laboratory tech to test the respirator at the relative humidity of 94 plus or minus three or 91 to 97 percent?

A    Yeah.  This test method also has that exhalation relative humidity requirement.

Q    Okay.  So, here's where – kind of struggling over.  You told me a minute ago, and the jury that after 1987 less than – not less than ten percent of the masks were tested at 91 to 97.  And then before 87 50 percent or more were tested at levels outside 91 to 97.  And that would be in violation of the test method that we just looked at here, right?

A    It would not be according to that humidity range and the test method.

(10-5-18 Eitzman Trial Test. at 208:7-20; *accord id.* at 209:10-17).[37]

_____

[36]Defendant 3M's NIOSH-approved QC guidelines -- which must be followed as mandated by the regulations, (30 CFR § 11.42(c)) -- required the same relative humidity range in the breathing machine (91-97%) that NIOSH required for the certification of single-use respirators in 30 CFR § 11.140-5(c).

[37]Dr. Eitzman reiterated:

Q    . . . So the main plant where 8710s are made has a lab booklet inside the plant for lab techs that tell them they need to test this mask at exhaled air at 91 to 97 percent, and after [*sic*] 97 ['87] 90 percent of the masks aren't tested that way, and before 87 at least 50 percent of the masks aren't tested in accordance with the test method?

90.    Defendant 3M's employee/expert Dr. Eitzman confirmed, albeit reluctantly, that 3M *should have followed* its internal Test Method:

Q    Well, are you suggesting that when you're not doing approval testing in your quality control that you don't have to follow the regulation?

A    Correct. You don't have to follow the regulation. You should follow your own test methods. And as I said, the test methods should have been changed. But there's no requirement to follow what's in the regulation in terms of doing your own test in-house.

Q    You should follow your own test methods, and you guys didn't do that?

A    Correct.

(*Id.* at 219:9-19; *accord id.* at 217:10-21).[38]

91.    In short, between the years 1982 to 1998, 3M failed to adhere to its own internal quality control Test Methods, which required 3M Company to test the 8710 in a manner consistent with the

---

A    With that particular aspect of the test method, and we know that because they accurately recorded the information.

(*Id.* at 209:10-17).

[38]Dr. Eitzman similarly testified earlier in the trial:

Q    Even though before 1987 at least half the respirators were off spec for relative humidity, and after 1987 almost 90 percent of the respirators were not being tested at the right humidity for this mask under the federal regulation?

A    Well, there's no federal regulation that relates specifically to that test as an audit test. It's included in the quality control plan and we should have followed our test method, but it's not a regulatory approval test at that –

Q    Okay. So you should have followed your test method and you didn't, right?

A    For the majority of the tests, that's correct. Or we should have changed the test method, as I said before.

(*Id.* at 217:10-21).

91-97% humidity range specified by 30 C.F.R. 11.140-5(c). This point was confirmed by 3M's expert and 3M corporate scientist employee, Dr. Philip Eitzman, in his 2018 deposition. (10-15-18 Eitzman Dep. at 198-200) (testifying that post-1987 "less than 10%"were "done at the 91 to 97"% humidity range and pre-1987 less than 50% were under the 91-97% humidity range required in the regulations)).

### v.    Defendant 3M did not advise NIOSH of 3M's continuing violations of the regulations and 3M internal QC plans/Test Methods.

92.    While NIOSH identified through an audit that the 8710 was exceeding the breathing resistance limits in 1975 and communicated and met with 3M about this issue,[39] 3M was able to convince NIOSH that it would fix this problem and NIOSH expected it to so. (Schutz Dep. at 36:13-19; *see also* Trial Ex. 1261, WV-AG- 00123159; Trial Ex. 261 (3M's notes of 1975 meeting indicate that NIOSH "will in effect issue to their Q.C. people instructions" that pressure drop of the 8710 "is not to be criticized"); Trial Ex. 262, 3M 020000-01).[40]   The late Bob Schutz, NIOSH's former Certification Chief, testified that certainly he did not remember being advised any time between 1977-1979, that the 8710 exceeded the breathing resistance limits between 84-100% of the time annually. (12-18-03 Schutz Dep. at 39:6-40:9).

93.    Schutz averred that had he known that information, NIOSH would have considered

---

[39]While at times 3M has tried to blame its own machine for its inability to meet the requirements for pressure drop then in the regulation between 1972-1998, both NIOSH and competitor AO tested the 8710 and found it to be off the regulatory specifications for pressure drop and, in at least one instance, "by a wide margin." (Trial Ex. 1261, WV-AG-00123159; *see also* Trial Ex. 262, 3M 020000 (NIOSH audited the 8710 in April 1975 and "found that strap length was off significantly and results on final pressure drop were too high."); Trial Ex. 2394).

[40]*See* Trial Ex. 251, 3M 004730-31 (NIOSH stating to 3M in 1975 letter that, "[t]he final exhalation resistances for these tests were 16.0mm and 20.3mm respectively. These resistances are greater than the requirements of 30 CFR Part 11 for final resistance of a single-use dust respirator after the silica dust test. You should correct this immediately by tightening the quality control of this characteristic. Please determine the cause of this variance and inform us of your corrective action.").

"potentially withdrawing the certification" of the 8710. (*Id.* at 40:10-16).

94. Schutz further testified that had he known about 3M's failures to comply with the breathing resistance requirements, 3M would not have been able to continue to legally assert the 8710 was approved:

> Q  . . . Mr. Schutz, if 3M, in the 1970's, had repeatedly failed to disclose to you, or someone else at NIOSH, quality control information indicating that 3M 8710 was not in compliance with these NIOSH approval regulations, do you think they should have been allowed to replace – place the approval label from NIOSH on their product?
>
> MR. KING:    Objection to the form of the question.
>
> A    I – I – I have to say no.

(*Id.* at 58:1-10; *see also id.* at 36-37, 39-40, 58, 209-10, 285).

95. In sum, Defendant 3M never advised NIOSH (or anyone else for that matter) after 1975 about 3M's persistent and sustained problems meeting the 15 mm breathing resistance limit in the late 1970's and into the 1980's or 3M's testing of the 8710 at a lower relative humidity in the breathing machine than what was required in the regulation and 3M's internal quality control plan. (*See, e.g.*, 1-14-25 Price Trial Trans. at 242-43, 274-75, 279, 292; *see also* 10-5-18 Eitzman Trial Test. at 174-79, 185, 215-16).

96. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████

> **vi.** **Defendant 3M should have reviewed the 8210's breathing resistance and propensity to collapse before representing the 8210 provides protection for, among other things, coal mining.**

97. In sum, between 1972 and 1982, the 8710 uniformly failed almost all Silica Dust Audit breathing resistance testing and between 1982 and 1998, 3M failed to properly conduct the Silica Dust Audit tests at the correct relative humidity range on the majority of 8710 masks sold. Under both scenarios, the 8710 was not able to comply with the Silica Dust Audit test, which allowed 3M to place a NIOSH certification on its labeling. Defendant 3M's non-compliance with the Silica Dust Audit test reveals that for the entire time the 8710 was sold 3M misrepresented its certification status to purchasers and users.

98. Because of this history in failing to meet the breathing resistance requirements for its predecessor, the 8710, 3M should have assessed and should be assessing the breathing resistance of the 8210.



*accord* 1-14-25

Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59).

> vii.    *Beginning in the 1970's* and continuing throughout the product life of the 8710, 3M recognized internally the flexing and collapse defect due to humidity as a "major problem" and "product limitation" that made it "unacceptable in the underground mining area."

99.    In an internal 3M Marketing Plan for the upcoming year of 1977, 3M noted it needed "an improved product" to "offset product complaints" and stated, "**we now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity**." (Trial Ex. 300, 3M 338879-81).

100.    Defendant 3M recognized the 8710 was prone to collapse from the onset of the product in the early 1970's throughout its product life ending in 1998. (Trial Ex. 5013; █████████

████████████████████████████████

████████████████████████████████

████████ ; Trial Ex. 77, 3M 1916-17; Trial Ex. 162; Trial Ex. 218; ████████████████████

████████████████████████████████ ; Trial Ex. 300,

3M 338880; ███████████████████ ; Trial Ex. 817, 3M 624062-624064 (noting in 1992 that

45

3M is still trying to solve the collapse problem and change in the design did not cure it); Trial Ex. 1499, 3M 040848-49;

; Trial Ex. 1769, 3M 0431594)(showing Kaiser Aluminum's industrial hygienist contacted 3M's in 1974 about the 8710's collapse and industrial hygienist explained the 8710 "became very wet first around the edges then with time over entire mask and mask then tended to collapse" and further that  workers would need "as many as 5 respirators/man/day."))[41]

101.    In the 1970's and 1980's, Defendant 3M recognized "collapse due to the buildup of moisture" in the filter media was a "major problem" and a "product limitation."  (Trial Ex. 300, 3M 338880; Trial Ex. 446, 3M 092114).

102.    In a 3M flyer for the 8800 respirator, 3M noted in the 1970's its "improved face fit & filtration capability" and "greater durability" including its design "to fight structural collapse under high humidity conditions.  *This assures proper employee protection . . . .*" (Trial Ex. 1499, 3M 040848-49)(emphasis added).[42]  Defendant 3M understands flexing and collapse of the 8210 is plainly a safety issue.  (*See id.*).

---

[41]Tellingly, in response to whether the collapse problem with the 8710 was resolved before it was taken off the market in July of 1998, 3M's expert and employee Alan Johnston testified in 2014 that "the issue was resolved in that we had other options for people to use.  If they didn't like the 8710, they could use a different product.  So they could buy an 8715.  They could buy another different product. So if that particular product, the 8710, wasn't the optimal product for them, they would move to a different product." (9-30-14 Alan Johnston Dep. at 485:12-22 in *Hill v. 3M, et al.*).

[42]Similarly, Defendant 3M's internal documents observed the 9900 respirator had "[i]ncreased durability" whereas the 8710 "[c]an collapse under high humidity".  (Trial Ex. 1668, 3M_DEP 0003232).

46

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Dr. Price testified as "more resistance or increase [in] the pressure drop" occurs, "you could have leakage or even start flexing the mask to the point it would basically move in towards the mouth of the worker." (1-14-25 Price Trial Trans. at 298).

> **vii.    Defendant 3M has long understood that the same propensity of the valveless, disposable 8710 respirator to "collapse from build up of high heat and humidity" applies to 8210.**

103.    Defendant 3M's expert and employee Alan Johnston testified in 2014 that the 8710 collapse defect applied equally to the 8210 as well.  (9-30-14 Alan Johnston Dep. at 464-65 in *Hill v. 3M, et al.*).  Defendant 3M's Johnston testified:

> Q    Is the 8210, is that subject to collapse from build up of high heat and humidity?
>
> A    **I would expect the 8210 and 8710 to perform fairly similarly in high humidity environments.**

(*Id.* at 465)(emphasis added).[43]

> **D.    Lack of Durability**

104.    In May 1973, 3M's J.F. Dyrud discussing papers presented at an industry conference in an internal 3M memorandum wrote: "He ran the #8710 Respirator down without explaining that we [3M] thought **the 8710 was not rugged enough for the coal mines**."  (Trial Ex. 169, 3M

---

[43]Defendant 3M's internal documents observed the 9900 had "[i]ncreased durability" whereas the 8710 "[c]an collapse under high humidity".  (Trial Ex. 1668, 3M_DEP 0003232).

004246)(emphasis added).

105.    Also in May, 1973, 3M's internal memo showed it was aware that the 8710 design had "a mechanical weakness" which would not stand up to physical abuse" in some industries, including "min[ing]." (Trial Ex. 168, McAllister Memo re: AIHA Convention, 3M 022374).

106.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

107.    Defendant 3M recognized durability as a worker protection factor.  (Trial Ex. 1571).

108.    As alluded to above, the durability defect of the 8710 also exists in the 8210.

### E.    Lack of Strap Adjustability

109.    Defendant 3M's 8710 had and 8210 has two non-adjustable head straps. (*See supra id.*).

110.    This lack of adjustability made it harder for wearers to achieve a good fit, and 3M has long known this fact.  For instance, under the "Bad Points" section of an internal 3M memo from January 1977 comparing the 8710 to a competitor's respirator, 3M wrote of the 8710: "[n]o strap adjustment, mask can fit loosely on small (female) or right on large heads.  Dependent on facial size mask can ride up or down." (Trial Ex. 192, 3M 091581).

111.    On August 11, 1975, a South Carolina Welding & Sandblasting company wrote to NIOSH about the 8710's straps and highlighted the problems with both the inability to properly adjust the straps and their tendency to break while stating:

> "the twin rubber head straps are too short, lack resiliency, lack stretchability and as a result one or both of the straps ultimately break after a very short duration; sometimes when putting them on for the first time.  And if for some quirk of fate the straps do not snap they become separated where they attach to the filter medium at the adhesive joint.  Many times I've notice the straps break immediately at this joint as though the

48

adhesive somehow weakens the rubber strap at this point.

(Trial Ex. 265, 3M 011016).[44]

112.    On June 21, 1976, NIOSH's Schutz wrote to 3M's Wilmes and advised "you have not satisfactorily resolved the headband problem.  Therefore, we request that you stop selling the 8710 as MSHA/NIOSH approved until this is resolved."  (Trial Ex. 286).

113.    Defendant 3M recognized the important role the straps played with respect to fit of disposable respirators.  For instance, describing LASL testing of the fit of various respirators, 3M's internal documents in 1976 noted that, "[t]his test method [of strap tensions] difference can cause substantial differences in performance and face seal leakage on adjustable strap respirators." (Trial Ex. 1780, 3M 565875).

114.    An internal 3M document from October 25, 1978 acknowledged the following about the 8710 in a Conclusions section: "I feel that some effort is going to have to be expanded on a better system of elastics or straps for holding the respirator on." (Trial Ex. 383, 3M__DEP 2155).

115.    Other manufacturers introduced a "four-point suspension on the head straps. To further improve the stability of the half-mask respirator, the Norton Company added a head cradle. Almost every manufacturer has adopted this design." (Bien Rept. in *Hardy v. 3M*).

116.    Defendant 3M used adjustable fabric head straps on other models like its 9910.  (*See, e.g., id.*).

117.    The same strap adjustability problems of the 8710 apply with equal vigor to the 8210, as 3M has repeatedly indicated they are the same with respect to fit characteristics.

_____

[44] Defendant 3M was also well aware of the 8710 straps frequently breaking.  (*See, e.g.,* Trial Ex. 1427, 3M 662; Trial Ex. 1769, 3M 0431594; Trial Ex. 446, 3M 092114; ████████ ███████████████████.

### F.      One-Size-Fits-All Design

118.    In 1969, 3M noted the following regarding an aspect from Dow's presentation at a respirator conference: "It is [Dow's] Mr. Hill's evaluation that no one mask will fit all face sizes. That is the main reason for offering five models to Dow employees."  (Trial Ex. 38, 3M 0017792).

119.    In the 1970's, the quantitative fit tests conducted by Edwin Hyatt of the Los Alamos Scientific Laboratory indicated that faces of U.S. workers vary greatly in size and shape.  As detailed in a July 1970 Field Letter drafted by 3M's John Cain, Ed Hyatt from Los Alamos pointed out to 3M that "1) the 3M respirators are the largest on the market, i.e. in length and width and 2) we [3M] should have at least two sizes, our present one and a smaller one, if we hope to fit the majority of workers." (Trial Ex. 55, 3M 024230).

120.    In 3M's internal Field Letter about its trip to Los Alamos Scientific Laboratory ("LASL") on January 13-14, 1971, 3M's John Cain blatantly stated: "because of the very large variety of human facial features one size just won't fit all persons requiring protection."  (Trial Ex. 62, 3M 348744).

121.    In a memorandum to 3M's advertising department on October 24, 1973, 3M's Bob Barghni wrote, "we must be careful in this and other #8710 ads that we do not in any way imply that the #8710 will fit all sizes and shapes of noses and faces with equal effectiveness.  We can say that we fit many different sizes and shapes and have test data, based on coal dust tightness test, to show this but even in this test we have a certain percentage of the test population who have failed." (Trial Ex. 186, 3M 040784; *see also* 1-14-25 Price Trial Test. at 250)(emphasis added).[45]

---

[45] Previously, C.T. Bien wrote: "A single size facepiece would not fit most workers. In the early 1980s, Survivair introduced three sizes of pliable silicone rubber elastomeric half masks. All other manufacturers, including Defendants, introduced three sizes" of masks at one point or another.

122. Don Wilmes and other officials at 3M stated in a 1988 presentation that "Faces are highly variable. They come in many sizes and shapes and contain highly variable features. Generally, no one model of respirator will fit all faces. No one to date has been successful predicting the fit of a respirator on an individual using any scheme. Yet fit is a very important aspect in respiratory protection." (Trial Ex. 732 at p. 221, 1036, WV - AG - 00111446, Wilmes/Olsen/Hendricks Article).

123. In 1992, NIOSH Guidelines noted: "Another major problem that can contribute to hazardous face-seal leakage of cup-shaped, disposable masks is that in almost all cases these masks are available in only one size. This contrasts with the elastomeric facepieces used for powered, HEPA-filtered, halfmask respirators and positive-pressure, air-line, halfmask respirators, which are generally available in up to three different sizes to fit small, medium, and large facial sizes." (Trial Ex. 826, WV-AG-00122047).

124. In 1994, 3M wrote, "The great variation in facial shapes and sizes ensures that no single model of respirator will fit all faces." (Trial Ex. 967, WV-AG-00122898).

125. During his 2022 deposition, 3M's expert and corporate scientist employee, Dr. Philip Eitzman, acknowledged the *8210 respirator would not fit 25% of men's faces*. (*See, e.g.,* 10-6-22 Dr. Eitzman Dep. at 38-40). This percentage is likely significantly higher.

126. Despite knowing the importance of a proper and consistent fit, and that one size would not fit all wearers, 3M neither added additional sizes to either one of its top sellers, the 8710 or 8210, nor warned potential wearers of the 8710 or 8210 that they could not be properly or consistently fitted.

**G.     Defendant 3M's Internal Document Summarizing Fit Defects**

127. During a brainstorming Meeting on June 21, 1985, notes in upper left hand corner of

---

(Bien Rpt. in *Hardy v. 3M*).

an internal 3M document revealed the fit problems of the 8710 (and by extension the 8210) as follows:

> "doesn't fit
> can't be fit tested
> straps break
> nose clip adhesive
> collapse
> one size
> paper mask"

(Trial Ex. 619, 3M 531543). In comparing its products, Defendant 3M also described its 8800 respirator as being 10x better than the 8710 in performance. (Trial Ex. 270, 3M 2821).

**VIII. To retain its market share, Defendant 3M continues to sow confusion and misunderstanding, makes misrepresentations, suppresses and omits material facts in connection with the sale and advertisement of its 8210 disposable, valveless, cup-shaped respirator.**

128. Defendant 3M marketed the 8710 as a low cost option approved by the government for dangerous environments like in coal mining and asbestos. (*See* ███████████████████ ████████████████████████████ ███████████████ ; Trial Ex. 38, 3M 0017797; Trial Ex. 42, 3M 0022255 (3M noted internally in 1969 that coal mining management told them disposable respirators would need government approval to gain industry acceptance), Trial Ex. 228; Trial Ex. 234; and Trial Ex. 1624).

129. Defendant 3M has long understood that coal mine operators would and will buy the cheapest, government-approved respirator on the market. (*See, e.g.,* ██████████████ ██████████████████ ; Trial Ex. 386, 3M 630590).[46]

---

[46] *See also, e.g.,* Trial Exs. 42, 166, 171, 203, 215, 226-28, 234, 388, 1443, 1453, 1492 (indicating 8710 at 55 cents was cheapest respirator available); ████████████████ ████████ Trial Ex. 125, 3M 028668-70 (advertising 8710 as "far less costly" and "one-third the cost of comparable respirators" and "inexpensive" and "cost: lowest by far"); Trial Ex. 157, 3M 0550962 (advertising 8710 on March 24, 1973 as "inexpensive" and "low cost"); Trial

130.    Before the change in the regulations in the late 1990's, the 8710 had been a big seller for 3M.  (*See, e.g.,* Trial Exs. 1559, ███████████████████████; 10-17-22 Erik Johnson Dep.).

131.    Previously, Defendant 3M's Occupational Health & Safety Products Division became dependent upon 8710's financial success.  (*See, e.g.,* Trial Ex. 517, 3M 111915; ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ ).

132.    Defendant 3M continues to sell the 8710's replacement, the 8210, en masse into West Virginia.  In doing so, 3M has had to, and continues to, engage in the following unfair or deceptive acts or practices (described below) in order to retain its share of the respirator market, despite the foregoing defects that put the 8210 wearers, including West Virginia coal miners, in danger.

A.    *WEBSITE MISREPRESENTATIONS*: **Defendant 3M's current website makes many repeated misrepresentations regarding the 8210.**

133.    Defendant 3M's website makes a number of confusing and misleading misrepresentations and otherwise suppresses and omits material facts regarding the 8210, some of which are set forth below.

i.    **PROTECTION: "Effective Respiratory Protection"; "Reliable, Effective Protection"; "Quality Reliable Worker Protection"; & "Protection Equivalent to a Rubber Facepiece Respirator"**;

134.    For example, in a brochure on 3M's website for "3M 8000 Series Particulate

---

Ex. 212, 3M 30015 (advertising to distributors on September 1, 1974 inexpensive, disposable, NIOSH-approved, coal mining use); Trial Ex. 256, 3M 030019; Trial Ex. 282, 3M 404617; Trial Ex. 311, 3M 674326).

Respirators," 3M represents as follows:

> **Description**
> The 3M™8710, 8210, 8812 and 8822 Particulate Respirators *provide effective respiratory protection for use in industries where workers will be exposed to dust particles* and/or nonvolatile liquid particles.
>
> - Tested and certified to AS/NZS 1716:2012.
> - Traditional convex shape, with nose clip and twin strap design.
> - *Durable, collapse resistant inner shell.*
> - *Reliable, effective protection against fine particles.*
> - 3M™ Advanced Electret Filter Material gives effective filtration with low breathing resistance for consistent high quality performance.
> - 3M™ Cool Flow™ exhalation valve offers improved comfort in hot humid environments.

(3M Web Page 8000 Series Particulate Respirators, attached as **Ex. E**) (boldface in original, italics added).[47]

135.　In reality, the 8210 does not provide "reliable, effective protection against fine particles" and does not "provide effective respiratory protection for use in industries where workers will be exposed to dust particles" because of its unreliable fit. (*See supra*). Each of these are repeated and willful misrepresentations by 3M.

136.　On 3M's website on the first page of a 2-page document, entitled "Particulate Respirators 8210 and 8110S, N95," 3M provides: "**The 3M Particulate Respirator 8210, N95 is designed to help provide quality, reliable worker protection against certain non-oil based particles. . . . The 8210 . . . offer[s] a number of benefits to you and your workers.**" (3M Web

---

[47]*Available at*: https://multimedia.3m.com/mws/media/699174O/tech-data-sheet-3m-8000-series-disposable-respirators.pdf).

Page on 8210 Technical Specs Web Page, attached as **Ex. F**)(boldface in original).[48]  Defendant 3M

continues that one such benefit is as follows:

> **Helps provide worker protection**
> ●. . . . Studies have shown [the 8210] . . . can provide protection equivalent to a rubber
> facepiece respirator. . . .

(*Id.*)(emphasis in original).  Defendant 3M knew this was a repeated and willful misrepresentation.

> **ii.**　　**"Durable"**;
> **iii.**　　**"Collapse Resistant"**

137.　　Despite 3M's assertions on its website, as cited above, in reality, the 8210 is not

"durable," nor "collapse resistant."

> **iv.**　　**For Use in Coal Mining**

138.　　Currently, on its website in a "Quick Start Guide" for a number of products including

the 8210, 3M lists "coal" as one of the permissible uses for the 8210.  (3M Quick Start Guide, attached

as **Ex. G**).[49]  As explained below, the same is true for the box of the 8210 which lists "coal" as a

permissible use for the 8210.  (Photograph of 8210 box, attached as **Ex. H**).  Defendant 3M knows this

is a repeated and willful misrepresentation.  (*See, e.g., supra* ¶ 5).

139.　　Similarly, on its current website, 3M lists "Mining" as one of the "Recommended

Industries" for the 8210.  (8210 Webpage, attached as **Ex. I**).[50] Defendant 3M knows this is a repeated

---

[48]*Available at:*
https://multimedia.3m.com/mws/media/9310O/3m-particulate-respirators-8210-and-8110s-n95-technical-specifications.pdf

[49]*Available at:*
https://multimedia.3m.com/mws/media/2142059O/3m-8210plus-8210-8110s-quick-start-guide-pdf.pdf?&fn=8210_8110S_Quick-Start-Guide.pdf.

[50]*Available at:*
https://www.3m.com/3M/en_US/p/d/v000585997/?bvstate=pg:6/ct:r

and willful misrepresentation.

140. Also, on pages 15, 16 and 41 of the 2024 "3M Respirator Selection Guide" currently on 3M's website, 3M lists an N95 (which would equate to the 8210) as the type of respirator to use for the "Contaminants" of "Coal dust, Anthracite"; "Coal dust, Bituminous or Lignite"; and "Silica, crystalline." (3M 2024 Respirator Selection Guide, attached, in part, as **Ex. J**).[51] Again, 3M knows that the 8210 would not protect coal miners, and these are repeated and willful misrepresentations.

141. On the second page of a 2-page document, entitled "Particulate Respirators 8210 and 8110S, N95" on 3M's website, 3M provides that the 8210 is "use[d] for . . . solids such as those from processing minerals, coal . . . ." (3M Web Page on 8210 Technical Specs Web Page, attached as **Ex. F**).[52]

### v. "Fits . . . protect[s] all day long"

142. On its current website where 3M discusses the 8210, 3M indicates on the same webpage it has "[t]he science that helps *keep you safe* breath by breath" and provides:

**There's more to fit than meets the eye**

Fit is key, it can impact the seal of your respirator, the protection provided and even comfort. Because what *you need on the job is a respirator that fits so it can help protect you all day long.*

At 3M, fit plays a central role in the development process. Our state-of-the-art global labs pave the way for important discoveries and advancements, providing options in respiratory protection for workers around the world.

---

[51]*Available at:*
https://multimedia.3m.com/mws/media/639110O/respirator-selection-guide.pdf

[52]*Available at:*
https://multimedia.3m.com/mws/media/9310O/3m-particulate-respirators-8210-and-8110s-n95-technical-specifications.pdf

We test and *research facial structures to help us to cover many face* types and shapes.

(3M Web Page on 8210 Worker Safety, attached as **Ex. D**)(boldface in original, italics added).[53]

143.    Defendant 3M's knowledge that the 8210 could not and cannot be properly and consistently fitted is discussed at length above.

144.    Specifically, with respect to the misrepresentation that the 8210 will "protect the wearer all day long," █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████

145.    Defendant 3M thus knew the suggestion that the 8210 "fits so it can protect" the wearer "all day long" is another confusing or misleading representation in violation of the WVCCPA.

### C.    8210 Respirator and 8210 Box

---

[53] *Available at*: https://www.3m.com/3M/en_US/worker-health-safety-us/safety-resources-training-news/calendar-of-events/n95/.

      **i.**       **Defendant 3M has a history of considering possible warnings on valveless, disposable respirators, and 3M has recognized that warnings adversely affect its bottom line.**

146.     In the 1970's and 1980's, Defendant 3M considered warnings on the 8710 disposable, valveless, cup-shaped, filtering facepiece respirator. (████████████████████; Trial Ex. 383; ████████████████; Trial Ex. 651; Trial Ex. 1372; Trial Ex. 1425).   Internal 3M documents indicated that it considered adding warnings to the 8710 about its use in coal mining and its ability to be fitted in 1978 and again in the mid-1980's, but no such warnings on those points were added.   (*See id.*).

147.     For instance, Defendant 3M's Interoffice Correspondence from 3M's John Cain on October 25, 1978 states:

> **Much discussion has [*sic*] insued recently as to the appropriate warning statements for the #8500 and #8710 respirators.  The most recent problem was a warning label which appeared for the #8710 respirator listing some specific do nots.**  This label appeared on proposed labeling and packaging literature for the 6983 respirator (ART).  After discussions with various persons in marketing, tech service, packaging, literature, ad agency, and the legal department **I could find no rational[e] for listing these material on the warranty statement and thus deleted them from the proposed copy.**
>
> To set the record straight I am publishing this letter to put forth the warning statement that will be utilized on packaging and literature for these two products.
>
> I.      For the 8500 Non Toxic Particle Mask; 6985 Non Toxic Particle Mask; 8651 Dust and Pollen Mask; 3180 Dust Mask, the warning statement must read as follows: 'WARNING this product is not designed for use as protection against hazardous dusts such as asbestos, silica, cotton dust and toxic dusts, fumes, mists, gases and vapors.  Not for use in spray paint operations.'
>
> II.     The warning statement to be used for the #8710 respirator, 6983 respirator, 8520 respirator, 8550 farm and shop mask: '**WARNING this product is not designed for use as protection against toxic dusts**, fumes, mists, gases, and vapors.  NOT FOR USE IN SPRAY PAINT OPERATIONS.'

These are the warning statements that must be followed. If anyone receiving this letter has any questions on these or feels they are not appropriate please advise me immediately, otherwise **these are the warning statements that must be used** on all packaging and literature pertaining to these products.

(Trial Ex. 383, 3M_DEP 2154-55)(emphasis added). In the succeeding page, 3M's Cain's handwriting appears to indicate that the warning in "II" involving the "8710" removed "other than those dusts covered by the NIOSH certification" from the language above. (*Id.* 3M_DEP 2156). Obviously, that would include "coal" and "silica" which were in the NIOSH certification language. And so, it appears that in 1978, 3M concluded that there should be a warning that the 8710 was not designed for "toxic dusts," and there should not be an exception for NIOSH approvals for coal and silica. (*See* Trial Ex. 383). However, no such warning was added to the 8710 then.

148.   In the *mid-1980's*, 3M also appeared to consider other warnings regarding coal mining. In a handwritten note on a prototype ad for the 8710, someone at 3M wrote: "This shows that info <u>can</u> be stamped on the 8710. See our 6/14/85 letter (pic)." (Trial Ex. 1425, 3M 398928)(emphasis in original); *see also* State Trial Ex. 1372, 3M 398940 (referring to 6/14/85 letter in post-it note). In a handwritten note on a prototype of an ad for the 8710, 9900 and other respirators, someone from 3M also wrote: "Should there be a warning on 8710 not to use it for conditions in which the 9900 is being promoted?" (Trial Ex. 1425, 3M 398932). ███████████████████████

███████████████████████████).[54] Despite this recognition and its applicability to coal mining, no such warning was added to the 8710.

_____

[54]That same prototype ad itself states the following about the 9900: "Used for heavy-duty applications throughout general industry. It has all of the basic benefits of the 8710, plus: 1) double shell construction designed to improve durability in heat and humidity . . . ." (Trial Ex. 1425, 3M 398932).

149. ████████████████████████████████████████████████

████████████████████████████████████████████████

### ii. "Warning" on the 8210

150. The quasi-"warning" states and has stated on the front of the 8210 itself:

!WARNING
This respirator helps protect against certain dusts and mists.
**Misuse may result in sickness or death.** For proper use, see
supervisor or box or call 3M
1-800-___

FOR DUSTS AND MISTS TC-84A-0007

(Trial Ex. 1327 at p. 003; *see also* attached Ex. H)(boldface in original, underlining added).

151. The 8210 box indicates "coal" is a proper "use" for the 8210. (*See, e.g.,* Ex. H).

152. Defendant 3M has not otherwise made any attempts to clarify that the 8210 should not be used in coal mining or in any other applications where, due to the unreliable fit of the 8210, *inter alia*, the wearer may be exposed to dangerous small respirable particles for which the body does not have a natural defense mechanism, as 3M has long known.

153. Defendant 3M misrepresented, suppressed, omitted, and otherwise caused confusion and misunderstanding regarding the unsuitability of the 8210 for coal mining and the unreliability of the fit of the 8210.

154. Defendant 3M suppressed and omitted, among other things, these two material facts from the warning stamped on the 8210: (a) the 8210 is not suitable for coal mining and (b) the 8210 cannot be properly and consistently fitted. *See* Trial Ex. 1425, 3M 398928 (3M acknowledging feasibility of putting warnings on mask itself when it wrote: "This shows that info can be stamped on the 8710").

60

       iii.     **An illustration of what 3M could have done is seen in the asbestos example where after years of fighting the federal government 3M was forced in the *mid-80's* to add the warning with respect to disposable respirators: "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL"**

155.    In a 1980 letter to 3M's Don Wilmes expressing NIOSH's concerns with the use of respirators in connection with asbestos and other carcinogens, NIOSH wrote:

> "[*W*]*e are deeply concerned* about the use of dust, fume, and mist respirators, and other air-purifying respirators, against carcinogenic substances.  Our concerns are based on two major issues: 1) the ability of the filter media to effectively remove the carcinogenic substance during the entire period of use, and 2) the *questionable face fit* of at least some *dust, fume, and mist respirators, particularly the single-use type*. Excessive leakage of a substance such as asbestos into the respirator due to either ineffective filtration or *leakage around a poor seal is unacceptable and presents a potentially serious hazard to the wearer*.  The possibility of the development of lung cancer or mesothelioma, in the case of asbestos exposure, cannot be ignored when both filtration efficiency and adequate face seal are questionable.
>
> . . . *It is not our position that single-use dust respirators will provide adequate protection* against the cancer causing potential of asbestos. . . .

(Trial Ex. 455, 3M 020242)(emphasis added).  The letter continued, "the face seals of many of these devices are marginal or inadequate . . .  Respirators with low protection factors may not provide adequate protection against carcinogens. (*Id.* 3M 020243).

156.    Defendant 3M continued to represent the 8710 was safe for use against asbestos until 1986.

157.    In 1986, 3M included the following on the 8710 box "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL." (3M Trial Ex. 02.019; *see also* Trial Ex. 1920).

158.    While the federal government inexplicably was not as focused on coal mining, the same

logic applies here.[55]

159.   As expressed above, Defendant 3M considered various other warnings in connection with the 8710.

160.   The 8210 should have provided a warning on the respirator itself something akin to "NOT FOR USE IN COAL MINING/ IGNORE NIOSH COAL APPROVAL" and/or "CANNOT BE PROPERLY AND CONSISTENTLY FITTED." Failure to include these are material omissions and suppression in violation of the WVCCPA.

161.   The 8210 should have provided on the warning on the box of the 8210 respirators something akin to "NOT FOR USE IN COAL MINING / IGNORE NIOSH COAL APPROVAL" and "CANNOT BE PROPERLY AND CONSISTENTLY FITTED." Failure to include these are material omissions in violation of the WVCCPA.

> **iv.   The 8210 box contains fit check instructions without acknowledging a fit check is "difficult, if not impossible" to do on the 8210.**

162.   The 8210 box contains "fit check" instructions. (*See* Ex. H, attached).

163.   However, the "fit check" instructions do not include that a fit check on the valveless, disposable, cup-shaped 8210 is "difficult, if not impossible" to do.

164.   Suppression of this information and omission of it on the box creates confusion and misunderstanding and are violations of the WVCCPA.

**CLAIM:**

***COUNT I - VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION***

---

[55]According to 3M, in **"1986**: Public commentary submitted as part of an OSHA rulemaking process specifically criticized the 8710's use in coal mines." (11-16-22 3M Reply re: Stat. of Lim. Mot. in Linc. Cty. Case)(emphasis in original).

***ACT***

165.    The State incorporates all other allegations stated in the Complaint herein.

166.    The purpose of the West Virginia Consumer and Credit Protection Act ("WVCCPA") is to protect the public and promote sound business practices.  *See W. Va. Code* § 46A-6-101.

167.    *West Virginia Code* § 46A-6-104 is "among the most broadly drawn provisions" in the WVCCPA, *McFoy v. Amerigas*, 295 S.E.2d 16, 19 (W. Va. 1982), and must be interpreted liberally to further its remedial purposes.  *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.* 194 W.Va. 770, 778, 461 S.E.2d 516, 524 (1995); *see also State ex rel. McGraw v. Rite Aid of WV, Inc.*, Civil Action 09-C-217 (Cir. Ct. Boone Cty. March 15, 2011 ¶ 9).

168.    *West Virginia Code* § 46A-6-104 bans "unfair[56] or deceptive acts or practices in any trade or commerce[.]"[57]

169.    Unfair or deceptive acts or practices (UDAP's) are specifically defined to include, *inter alia*:

---

[56] "Unfair" practices are distinct from "deceptive" acts or practices.  *See, e.g., State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Haw. 418, 448, 526 P.3d 395, 425 (2023).  A practice need only be unfair or deceptive, not both to qualify as a violation under the WVCCPA.

"An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *E.g., Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009); *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Haw. 418, 448, 526 P.3d 395, 425 (2023).  In the *Bristol-Myers* litigation with the Hawai'i Attorney General, the courts found those "Defendants also committed *unfair* acts and practices in violation of UDAP, including the failure to investigate the poor responder issue, suppression of studies regarding that and related issues, and burying their heads in the sand." (*Bristol-Myers Hawai'i AG Order*, ¶ 49 at p. 63, a copy of which is attached as **Ex. L**)(*citing Shikada*, 152 Hawai'i at 445-48, 526 P.3d at 422-25)(emphasis added).

[57] "Trade" or "commerce" means the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state. *Id.* § 46A-6-102(6).

63

(B) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(C) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

* * *

(E) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

* * *

(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

*W.Va. Code* § 46A-6-102(7).

170.    Article 7 gives the Attorney General authority to enforce the WVCCPA, including the Act's prohibition of UDAP's. *See, e.g., State by and through McGraw v. Imperial Marketing*, 203 W. Va. 203, 218, 506 S.E.2d 799, 814 (1998) (Starcher, J., concurring); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, **12-13 (W.Va. May 30, 2014). The Attorney General has broadly-stated powers under Article 7 of the WVCCPA, and those powers are to be interpreted broadly. *State ex rel. McGraw v.*

*Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 779, 781, 461 S.E.2d at 525, 527 (1995); *see also*

*State ex rel. McGraw v. Rite Aid of WV, Inc.*, Civil Action 09-C-217 (Cir. Ct. Boone Cty. March 15, 2011 ¶ 9).

171.    To prove violation of the WVCCPA, the State need not prove harm or reliance, *see, e.g., State ex rel. 3M Company v. Hoke*, 244 W.Va. 299 (2020)(Hutchison, J.), or that a consumer transaction was implicated, *see, e.g.*, *West Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co. ("3M")*, 354 F. Supp.2d 660, 667 (S.D. W. Va. 2005)(Copenhaver, J.); *see also State ex rel. Morrisey v. AmerisourceBergen Drug Co.*, Civil Action No. 12-C-141 (Cir Ct. Boone Cty., W.Va.)(Thompson, J.)(12-12-14 Order ¶ 84, attached as **Ex. M**, *citing W.Va. Code* §§ 46A-6-104, 46A-7-111(2)); *see also State ex rel. 3M Company v. Hoke*, 244 W.Va. 299, 304 (2020)(acknowledging CCPA violations are being pursued).

172.    As aforesaid, Defendant 3M's misrepresentations, suppression, omissions, and creation of confusion and misunderstanding, as aforesaid, violated and continue to violate the WVCCPA's ban on unfair or deceptive acts or practices. By way of example and not limitation, the following are 3M's continuing, repeated and willful violations of the WVCCPA with each sale of, or distributed advertisement for, the 8210:

- Defendant 3M's representations that the 8210 offers effective and/or reliable "protection" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is "durable" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is "collapse resistant" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is for "use" in "coal" and/or "mining" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 "fits" and "protects all day long" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 is not suitable for coal mining.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 cannot be properly and consistently fitted.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that a fit check is "difficult if not impossible" to do on the 8210, or in other words, that the 8210 is "not fit checkable," particularly in connection with the inclusion of the 5-step fit check instructions found on the 8210 box.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact of the 8210's propensity to flex and collapse, particularly in external hot and/or humid environments.[58]

- Defendant 3M's creation of confusion and misunderstanding and suppression and

---

████████████████████████████████████████████████

████████  Defendant 3M has long considered pressure drop (which causes the collapse) to be a "Major A" defect. (*See, e.g.*, Trial Ex. 396 ("Pressure drop and penetration are both Major A defects."); *see also* 1-14-25 Price Test. Trial Trans. at 290-91). A Major A defect "[a] defect, other than critical, that is likely to result in failure to the degree that the respirator does not provide any respiratory protection, or a defect that reduces protection and is not detectable by the user[.]" 42 CFR 84.41(d)(2); *see also* 30 CFR 11.41(d)(2). ████████████████████

████████████████████████████████████████ ).

omission of the material fact of the 8210's lack of durability in heavy work environments.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 is unable to fit at least 25% of faces based on its one-size-fits-all design.

173.    As aforesaid in the previous paragraph, Defendant 3M's misrepresentations, suppression, omissions, and creation of confusion and misunderstanding in connection with the sale, marketing, and advertisement of the 8210 were and are repeated and willful.

174.    Accordingly, the State will ultimately seek a civil penalty for each violation of the WVCCPA. *W.Va. Code* 46A-7-111(2); *see also State ex rel. Lopez v. Bristol-Myers Squibb Co.,* Civil No. 1CC141000708 (JHA) (Cir. Ct. of 1st Cir., Hawaii) (May 21, 2024).

175.    The State also seeks attorney fees and interest.  *W.Va. Code* § 46A-7-108.

**APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF**:

176.    *West Virginia Code* § 46A-7-110, entitled "Temporary Relief," is found within Article 7's powers afforded to the Attorney General in the WVCCPA.  It provides in full:

> With respect to an action brought to enjoin *violations of this chapter* or unconscionable agreements *or fraudulent or unconscionable conduct*, the Attorney General may apply to the court for appropriate temporary relief against a respondent, pending final determination of the proceedings. If the court finds after a hearing held upon notice to the respondent that there is *reasonable cause to believe* that the respondent is engaging in or is likely to engage in conduct sought to be restrained, it may grant any temporary relief or restraining order it deems appropriate.

*Id.* (emphasis added).

177.    The West Virginia Supreme Court has held:

The method of analysis which governs the propriety and scope of an injunction under

67

*W.Va.Code* 46A-7-110 (1974) *deviates from the customary standard* for the issuance of temporary relief and may best be described as whether the Attorney General has shown by the existence of *some credible evidence, even if disputed, that reasonable cause exists to believe* that the respondent is engaging in or is likely to engage in conduct sought to be restrained.

Syl. Pt. 2, in part, *State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792

(1996).

178.    Further fleshing out this standard, the *Imperial Marketing* Court explained:

There is another more pointed justification for our *deferential standard* of review of the circuit court's granting of temporary relief within the provisions of W.Va.Code 46A–7–110 (1974). When applying W.Va.Code 46A–7–110 (1974), the circuit court is *not required to adjudicate the merits* as to whether there has been a violation of the Act pending a final determination of the proceedings.  To the contrary, the court's role at this stage is to *moderate the effects of a likely violation of the Act as detected by the Attorney General* and supported by *sufficient proof that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained*.

Consequently, the judicial function is to supply a *stopgap measure* pending a final hearing when more permanent relief is sought. Therefore, our analysis of granting temporary relief under W.Va.Code 46A–7–110 (1974) is *more narrow than the typical* motion for a preliminary *injunction*. [footnote omitted]

The method of analysis which governs the propriety and scope of an injunction under W.Va.Code 46A–7–110 (1974) deviates from the customary standard for the issuance of temporary relief and may best be described as whether the Attorney General has shown by the *existence of some credible evidence, even if disputed, that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained*. In other words, the Attorney General need not prove the respondent has in fact violated the Act, but only needs to make a *minimal evidentiary showing of good reason to believe that the essential elements of a violation of the Act are in view*.

*State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 351-52, 472 S.E.2d 792, 797-98

(1996)(emphasis added).

179.    Our Supreme Court has repeatedly reiterated the exceedingly low threshold for the

68

Attorney General under the WVCCPA to be awarded temporarily relief pending resolution of the case. *See generally, e.g., Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 341, 752 S.E.2d 356, 372 (2013); Syl. pt. 4, *Telecheck Servs.*, 213 W.Va. 438, 582 S.E.2d 885 (2003); Syl. pt. 2, *Imperial Mktg*, 196 W.Va. 346.

180. More recently, the West Virginia Supreme Court found: "The Attorney General was not required to prove that the named Petitioners actually had engaged in the alleged misconduct, but rather only that there exists reasonable evidence to believe such a violation has been committed." *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 341, 752 S.E.2d 356, 372 (2013) (citing Syl. pt. 4, *Telecheck Servs.*, 213 W.Va. 438, 582 S.E.2d 885 (2003); Syl. pt. 2, *Imperial Mktg.*, 196 W.Va. 346, 472 S.E.2d 792).

181. As alluded to above, no fewer than seven experts have been critical of the fit of the disposable, valveless, cup-shaped 8710 respirator and the defects documented herein, including, for example, a who's who of respirator experts in academia and regulatory agencies, such as: (a) Dr. Nelson Leidel, former NIOSH employee; (b) the late C.T. Bien, co-author of the book, "Respiratory Protection" and OSHA employee;[59] (c) the late Darrel Bevis, former Los Alamos Scientific Laboratory

---

[59]In submitting its proposed Order on the statute of limitations issue in the Lincoln County case regarding the 8710 respirator, 3M wrote:

> In 1997, Bien published his criticisms of the 3M 8710 respirator, specifically, and filtering-facepiece respirators, generally in a book. [footnote omitted]. His book criticizes the 3M 8710 respirator because, inter alia: it started life as a bra cup; he did not approve of 3M's saccharin fit test; and he disapproved of the user seal [fit] check for filtering facepiece respirators. [footnote omitted]. The book examines, in detail, 3M's disputes with OSHA over standards for various dusts (lead, cotton, asbestos), the size of particles used in saccharine fit test, and argues that filtering-facepiece respirators allow greater face seal leakage. [footnote omitted] Bien also claims that 'according to OSHA, workers and industrial hygienists unanimously opposed the use of disposable respirators.'

employee; (d) Dr. Jack Price, Harvard and Northeastern Professor; (e) Dr. Mark Nicas, UC-Berkeley Professor; (f) James S. Johnson, Jr., Certified Industrial Hygienist, former researcher and administrator at the Lawrence Livermore National Laboratory (operated by the University of California system), and Chair of ANSI and other Respiratory Protection Committees; and (g) Dr. Sergey Grinspuhn, University of Cincinnati Professor. (Because 3M has marked many documents CONFIDENTIAL at times and there could be some offhand reference in one of the reports to a CONFIDENTIAL document buried somewhere in the reports, out of an abundance of caution and for the time being, the State is providing copies of a sample of these reports to the Court under seal in a separate filing.)[60]

182.    The ample expert evidence and testimony provided establishes, at the very least, reasonable cause that there were misrepresentations and other WVCCPA violations in connection with the sale and advertisement of the 8210 in West Virginia. (*See id.*).

183.    Based upon the record evidence attached and to be provided under seal, the State easily meets the minimal "reasonable cause" standard for temporary relief in *W.Va Code* § 46A-7-110, as further elucidated by *Imperial Marketing*, *Telecheck*, and *Cavalry*, on these papers alone. Defendant 3M's misconduct, though likely disputed by 3M, (i) plainly constitutes unfair or deceptive acts or

---

(2-25-25 3M Prop. Order on SOL in Linc. Cty. Case ¶ 59 at pp. 24-25).

[60] Former NIOSH employee Dr. Warren Myers, who has been on retainer with 3M for several years, acknowledged at the 2025 Lincoln County 8710 trial that experts in the field, Darrel Bevis and C.T. Bien, had long been critical of "disposable respirators," which would include the 8710 and the 8210. Dr. Myers acknowledged Los Alamos Scientific Laboratory's (LASL's) Bevis was on the ANSI Committee in the early 1990's, and his opinions on disposable respirators were "[a]ll negative." (1-10-25 Trans. at 199, 215, 220). Bevis said disposable respirators "couldn't be fit checked. They couldn't be fit tested. They weren't substantial. They basically just didn't work." (1-10-25 Trans. at 221). Dr. Myers testified that Bevis was passionate about his opinions. (*Id.* at 222). Another expert, OSHA's C.T. Bien, agreed with Bevis about the dangers of these disposable respirators. Both Bevis and Bien are now deceased.

practices and violates *W.Va. Code* § 46A-6-104, as defined by *W.Va. Code* §§ 46A-6-102(7)(B), (C), (E), (L), and (M); (ii) is fraudulent conduct; and/or (iii) is also unconscionable conduct. Any one of these allegations is, by itself, grounds for the "temporary relief" and "stopgap measure" sought.

184. The State requests that the Court schedule a hearing, as required by *W.Va. Code* § 46A-7-110, and following the hearing, enter an order enjoining 3M from advertising and selling the 8210 in West Virginia in violation of the WVCCPA, as aforesaid, until such time as this case has been resolved or other final determination of the proceedings.

## PRAYER FOR RELIEF:

WHEREFORE, Plaintiff State of West Virginia *ex rel.* John B. McCuskey, Attorney General, request the following:

A. The Court set a hearing, as required by *W.Va. Code* § 46A-7-110 to address the Attorney General's request for temporary relief in the form of enjoining 3M from advertising and selling the 8210 into West Virginia in violation of the WVCCPA until the final determination of the proceedings;[61]

B. At the conclusion of the preliminary hearing, the Court enter an Order granting the Attorney General's Application for Temporary Relief that enjoins 3M from advertising and selling the 8210 disposable respirator in West Virginia in violation of the WVCCPA until final determination of the proceedings or further Order of the Court; and

C. The Court set a long-term schedule for trial on the amount of civil penalties

---

[61]For convenience, the State will provide an accompanying proposed Order whereupon the Court can fill in the date and time at a time convenient for it for a hearing on the State's Application for Temporary Relief requested pursuant to *W.Va. Code* § 46A-7-110.

(and associated attorneys' fees and interest) to award the State for Defendant 3M's

repeated and willful violation of the WVCCPA in relation to its sale, marketing, and

advertisement of its 8210 disposable respirator into West Virginia as well as any other

relief the Court deems just.

Respectfully submitted,

**STATE OF WEST VIRGINIA,** *ex rel***.**
John B. McCuskey, Attorney General**,**

By Counsel,


/s/     *Robert M. Bastress III*
Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
(WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
(WV Bar # 8231)
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021

J. Timothy DiPiero     (W.Va. Bar # 1021)
Lonnie C. Simmons    (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar # 9616)
**DiPIERO SIMMONS**
**McGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133
Facsimile: 304-342-4605
Rob.bastress@dbdlawfirm.com

Michael T. Gallagher, Esq.
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713)222-8080

72

Alva A. Hollon, Jr., Esq.
**HOLLON LAW FIRM, P.A.**
100 Executive Way, Suite 211
Ponte Vedra Beach, Florida 32082-2713
Telephone: (904) 737-1995
Facsimile: (904) 506-7794
*Counsel for The State*

73

**SUMMONS**

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA
### John B. McCuskey, Attorney General v. 3M COMPANY

Service Type:    Filer - Secretary of State

NOTICE TO:    3M COMPANY, Corporation Service Company, 808 Greenbrier Street, Charleston, WV 25311

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Robert Bastress, PO Box 1631, , Charleston, WV 25326

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

12/22/2025 10:41:28 AM                    /s/ Cathy S. Gatson
            Date                                    Clerk

RETURN ON SERVICE:

☐   Return receipt of certified mail received in this office on _____

☐   I certify that I personally delivered a copy of the Summons and Complaint t _____

_____

☐   I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling or usual place of abode to

_____ , someone who is eighteen (18) years of age or above and resides there.

☐   I certify that I personally delivered a copy of the Summons and Complaint to _____ , an agent or attorney-

in-fact authorized by appointment or statute to receive service of process for the individual.

☐   I have reviewed documentation authorizing the above-named person to accept service on

behalf of the individual named on the summons.

☐   I have not reviewed documentation authorizing the above-named person to accept service

on behalf of the individual named on the summons.

☐   Not Found in Bailiwick

_____                    _____
            Date                                Server's Signature