# Exhibit 5

No. 24-813

# In the Supreme Court of the United States

◆◆

CHEVRON U.S.A. INCORPORATED, ET AL.,

*Petitioners,*

v.

PLAQUEMINES PARISH, ET AL.,

*Respondents.*

_____

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**BRIEF OF *AMICI CURIAE* STATES OF
WEST VIRGINIA, ALASKA, IOWA, GEORGIA,
MISSOURI, NEBRASKA, AND OKLAHOMA
IN SUPPORT OF PETITIONERS**

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
mwilliams@wvago.gov
(304) 558-2021

MICHAEL R. WILLIAMS
*Solicitor General*
*Counsel of Record*

*Counsel for* Amicus Curiae *State of West Virginia*
[additional counsel listed after signature page]

## TABLE OF CONTENTS

Introduction  and Interests of *Amici Curiae* ..................... 1

Summary of Argument ......................................................... 5

Argument ............................................................................. 6

I.  The majority below wrongly narrowed the "relating to" aspect of the federal-officer removal statute ............................................................. 6

II.  The Court should protect the paramount national interest in energy ...................................... 15

Conclusion ......................................................................... 23

II

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agyin* v. *Razmzan*,
986 F.3d 168 (2d Cir. 2021) ........................................... 7

*Alabama* v. *California*,
145 S. Ct. 757 (2025) ..................................................... 20

*Ali* v. *Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ....................................................... 9

*Baker* v. *Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .......................................... 9

*Bereslavsky* v. *Esso Standard Oil Co.*,
175 F.2d 148 (4th Cir. 1949) .......................................... 3

*Betzner* v. *Boeing Co.*,
910 F.3d 1010 (7th Cir. 2018) ........................................ 7

*Boyle* v. *United Techs. Corp.*,
487 U.S. 500 (1988) ...................................................... 18

*California by & through Harrison* v.
*Express Scripts, Inc.*,
139 F.4th 763 (9th Cir. 2025) ........................................ 6

*Celotex Corp.* v. *Edwards*,
514 U.S. 300 (1995) ........................................................ 9

*Chevron Corp.* v. *Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) ........................... 22

*City & Cnty. of Honolulu* v. *Sunoco LP*,
39 F.4th 1101 (9th Cir. 2022) ...................................... 20

*Coventry Health Care of Mo., Inc.* v.
*Nevils*,
581 U.S. 87 (2017) .......................................................... 8

III

*DeFiore* v. *SOC LLC*,
  85 F.4th 546 (9th Cir. 2023) .......................................... 7

*Egelhoff* v. *Egelhoff ex rel. Breiner*,
  532 U.S. 141 (2001) ....................................................... 8

*Enbridge Energy, LP* v. *Nessel*,
  No. 24-783, 2025 WL 1787715
  (U.S. June 30, 2025)..................................................... 21

*Exxon Mobil Corp.* v. *United States*,
  108 F. Supp. 3d 486 (S.D. Tex. 2015).......................... 13

*Exxon Mobil Corp.* v. *United States*,
  No. CV H-10-2386, 2020 WL 5573048
  (S.D. Tex. Sept. 16, 2020)............................................. 2

*Former Emps. of Chevron Prods. Co.* v.
  *U.S. Sec'y of Lab.*,
  26 C.I.T. 1272 (2002).................................................... 10

*Gay* v. *Ruff*,
  292 U.S. 25 (1934) ....................................................... 15

*Gov't of Puerto Rico* v. *Express Scripts,
  Inc.*,
  119 F.4th 174 (1st Cir. 2024)......................................... 6

*Gulf Offshore Co.* v. *Mobil Oil Corp.*,
  453 U.S. 473 (1981) ..................................................... 16

*Haig* v. *Agee*,
  453 U.S. 280 (1981) ..................................................... 18

*Maryland* v. *3M Co.*,
  130 F.4th 380 (4th Cir. 2025) ........................................ 7

*McCurdy* v. *Mountain Valley Pipeline,
  LLC*,
  No. CIV.A. 1:15-03833, 2015 WL
  4497407 (S.D.W. Va. July 23, 2015) ........................... 21

IV

*Meshal* v. *Higgenbotham*,
    804 F.3d 417 (D.C. Cir. 2015) ..................................... 18

*In re Methyl Tertiary Butyl Ether Prods.*
    *Liab. Litig.*,
    399 F. Supp. 2d 356 (S.D.N.Y. 2005)........................... 21

*Moore* v. *Elec. Boat Corp.*,
    25 F.4th 30 (1st Cir. 2022)............................................. 9

*Morales* v. *Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ........................................................ 8

*New Orleans City* v. *Aspect Energy, LLC*,
    126 F.4th 1047 (5th Cir. 2025) ..................................... 4

*Nessel on behalf of People of Michigan* v.
    *Enbridge Energy, LP*,
    104 F.4th 958 (6th Cir. 2024) ..................................... 21

*Osborn* v. *Bank of U.S.*,
    22 U.S. 738 (1824) ....................................................... 16

*Patel* v. *Garland*,
    596 U.S. 328 (2022) ........................................................ 9

*Rowe* v. *N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ........................................................ 9

*Shell Oil Co.* v. *United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ..................................... 3

*Watson* v. *Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007) ................................................. 6, 15

*West Virginia ex rel. Hunt* v.
    *CaremarkPCS Health, LLC*,
    140 F.4th 188 (4th Cir. 2025) ....................................... 6

*Willingham* v. *Morgan*,
    395 U.S. 402 (1969) ........................................................ 6

V

*Wyoming* v. *Livingston*,
    443 F.3d 1211 (10th Cir. 2006) ..................................... 16

**Statutes**

28 U.S.C. § 1442 ........................................................... 6, 7, 9

42 U.S.C. § 15951 ................................................................ 17

N.Y. ENV'T CONSER. LAW § 76-0101 ................................ 21

N.Y. ENV'T CONSER. LAW § 76-0103 ................................ 21

VT. STAT. tit. 10, § 596 ...................................................... 21

VT. STAT. tit. 10, § 599c ..................................................... 21

**Other Authorities**

Akhil Reed Amar,
    *A Neo-Federalist View of Article III:*
    *Separating the Two Tiers of Federal*
    *Jurisdiction*,
    65 BOSTON UNIV. L. REV. 205 (1985) ......................... 16

Anthony G. Amsterdam & James S.
    Liebman,
    Loper Bright *and the Great Writ*,
    56 COLUM. HUM. RTS. L. REV. 54 (2024) .................... 16

Casey Harper,
    *Jury Verdict Against Oil Industry*
    *Worries Critics, Could Drive Up*
    *Energy Costs*,
    HIGHLAND COUNTY PRESS
    (Apr. 7, 2025),
    https://tinyurl.com/vd7bpx52 ..................................... 19

VI

Commander Paul B. Blackburn,
  *Oil to Burn?,*
  74 U.S. NAVAL INST. PROCEEDINGS
  1482 (Dec. 1948) ........................................................ 12

Cong. Globe,
  39th Cong., 1st Sess. 1880
  (Apr. 18, 1866) ............................................................ 23

*Energy's Vital Role in World War II*
  *Offers Vital Lessons for Today,*
  AM. OIL & GAS REP. (Oct. 2023),
  https://tinyurl.com/25n5azxw ..................................... 1

Establishing the National Energy
  Dominance Council,
  Exec. Order 14213, 90 Fed. Reg. 9945
  (Feb. 14, 2025) ............................................................ 17

THE FEDERALIST NO. 81,
  (A. Hamilton) (J. Cooke ed. 1961) .............................. 15

Gerald D. Nash,
  *Energy Crises in Historical*
  *Perspective,*
  21 NAT. RES. J. 341 (1981) ......................................... 11

GREGORY J. LENGYEL,
  DEPARTMENT OF DEFENSE ENERGY
  STRATEGY: TEACHING AN OLD DOG
  NEW TRICKS (2007),
  https://tinyurl.com/32smt7f8 ..................................... 18

H.R. Rep. No. 112–17, pt. 1 (2011) ..................................... 8

Jeff Landry,
  *The Buddy System,* HOUMATODAY
  (Sept. 19, 2013)
  https://tinyurl.com/msjujvxd ..................................... 19

VII

Jerry P. Sanson,
*World War II Industrialization in
Louisiana*, 64PARISHES (2023),
https://tinyurl.com/2wwz5fvf ..................................... 12

Jessica Kittleberger & Michael R. Barsa,
*No Place for Morality: The Emerging
Threat to Interstate Commerce and the
Extraterritoriality Principle*,
57 CREIGHTON L. REV. 491 (2024) .............................. 10

Joseph A. Schremmer,
*Technical Operation of Refineries*,
3 L. OF ENVTL. PROT. (2024 update) .......................... 10

Julie Cart,
*Louisiana's Love-Hate Relationship
With The Oil Industry*,
L.A. TIMES (Sept. 15, 2010),
https://tinyurl.com/3mm6s5y5 .................................... 19

Llewelyn Hughes & Austin Long,
*Is There an Oil Weapon? Security
Implications of Changes in the
Structure of the International Oil
Market*,
39 INT'L SEC. 152 (2015) ............................................ 12

Lucas Martin,
78 AM. JUR. 2D WAR (May 2025 supp.) ........................ 19

Michael Toth,
*A Bad Business on the Bayou*,
WALL. ST. J. (Mar. 31, 2025),
https://tinyurl.com/48k6wwmy .................................... 19

VIII

NAT'L CAUCUS OF ENV'TL LEGISLATORS,
  2025 SUPERFUND LEGISLATION
  (CLIMATE) (2025),
  https://tinyurl.com/3enh4k2u ..................................... 22

NATIONAL WORLD WAR II MUSEUM,
  THE PELICAN STATE GOES TO WAR:
  LOUISIANA IN WORLD WAR II (2017),
  https://tinyurl.com/27pb6x2v...................................... 14

NETA C. CRAWFORD,
  PENTAGON FUEL USE, CLIMATE
  CHANGE, AND THE COSTS OF WAR
  (Nov. 13, 2019),
  https://tinyurl.com/357dnw9e..................................... 18

PETROLEUM ADMINISTRATION FOR WAR,
  A HISTORY OF THE PETROLEUM
  ADMINISTRATION FOR WAR: 1941-1945
  (John W. Frey & H. Chandler Ide eds.
  1946) .............................................................. 2, 3, 11, 12

Rachel Hudson,
  *One Size Does Not Fit All Leases—It's
  Time to Amend Bankruptcy Code
  Section 365*,
  38 EMORY BANKR. DEV. J. 317 (2022)........................ 17

THE RECORDS OF THE FEDERAL
  CONVENTION OF 1787
  (Max Ferrand ed., rev. ed. 1966)................................ 15

*Relate*,
  BLACK'S LAW DICTIONARY
  (12th ed. 2024).................................................... 8

ROBERT GORALSKI & RUSSELL W.
  FREEBURG,
  OIL & WAR (2021) ...................................................... 2, 3

IX

Robert M. Howard & Shawn T. Cobb,
    *Victory Through Production: Are
    Legacy Costs of War Scuttling the
    "GOCO Model"?*,
    46 PUB. CONT. L.J. 259 (2017) ...................................... 3

Robert N. Clinton,
    *A Mandatory View of Federal Court
    Jurisdiction: A Guided Quest for the
    Original Understanding of Article III*,
    132 U. PA. L. REV. 741 (1984) ..................................... 16

ROBERT PIROG,
    CONG. RSCH. SERV., RL32248,
    PETROLEUM REFINING: ECONOMIC
    PERFORMANCE AND CHALLENGES FOR
    THE FUTURE (2008) ...................................................... 11

William Howard Taft,
    *Address to the National Conservation
    Congress in St. Paul, Minnesota*, THE
    AMERICAN PRESIDENCY PROJECT
    (Sep. 5, 1910),
    https://tinyurl.com/4aw9nw47 .................................... 17

Unleashing American Energy,
    Exec. Order 14154, 90 Fed. Reg. 8353
    (Jan. 29, 2025) ............................................................ 17

*U.S. Gulf Coast Fuel Oil Imports at
    Record Low as Refiners Opt for
    Heavier Crude*, ENERGYNOW
    (July 7, 2025),
    https://tinyurl.com/yc4ph2nm .................................... 17

U.S. PETROLEUM ADMIN. FOR WAR,
    PETROLEUM IN WAR AND PEACE (1945) ....................... 2

X

W. Bernard Carlson,
*Pipelines are Controversial Now, But
One of the First Big Ones Helped Win
World War II*, UVATODAY
(July 22, 2021),
https://tinyurl.com/jzhfdn2p .......................................... 1

## INTRODUCTION
## AND INTERESTS OF *AMICI CURIAE*



When America found itself thrust into a global conflict during World War II, oil offered the means to fight. Indeed, "[h]istorians of World War II have long recognized that access to oil and energy supplies largely determined the course of that conflict." *Energy's Vital Role in World War II Offers Vital Lessons for Today*, AM. OIL & GAS REP. (Oct. 2023), https://tinyurl.com/25n5azxw. High-octane aviation gas—refined by Americans from American crude—gave Allied planes the added maneuverability and speed they needed to resist the German offensive during the Battle of Britain. Americans ultimately supplied six of the seven billion barrels of oil used by the Allies during the war. See W. Bernard Carlson, *Pipelines are Controversial Now, But One of the First Big Ones Helped Win World War II*, UVATODAY (July 22, 2021), https://tinyurl.com/jzhfdn2p. And this

2

"fountain" of oil for America contrasted with continuous fuel scarcity in Germany, Italy, and Japan. See ROBERT GORALSKI & RUSSELL W. FREEBURG, OIL & WAR 169, 332-33 (2021). Incredibly, "at no time did [American armed forces] lack for oil in the proper quantities, in the proper kinds and at the proper places." U.S. PETROLEUM ADMIN. FOR WAR, PETROLEUM IN WAR AND PEACE 204 (1945). So as Stalin himself recognized, "[t]he war was decided by engines and octane." GORALSKI & FREEBURG, *supra*, at 67.

America's oil-fueled victory was thanks in large part to private industry. The federal government's Petroleum Administration for War, alongside related federal entities, led the charge to supply the fuels for planes, tanks, automobiles, and more. Yet "without the wholehearted support of the [oil] industry, … th[is] petroleum war program—upon which all other military and essential civilian activities had to depend—could never have succeeded as it did." PETROLEUM ADMINISTRATION FOR WAR, A HISTORY OF THE PETROLEUM ADMINISTRATION FOR WAR: 1941-1945 55 (John W. Frey & H. Chandler Ide eds. 1946).

Still, the companies' work wasn't an entirely volunteer effort. The government exercised expansive control over the oil industry during the war. "[C]ompanies that 'weren't making essential war materials' were simply not able to run their refineries." *Exxon Mobil Corp.* v. *United States*, No. CV H-10-2386, 2020 WL 5573048, at *12 (S.D. Tex. Sept. 16, 2020) (quoting former chief counsel of the Petroleum Administration for War). And "it was always the role of Government to determine plans and policies, to direct and supervise operations requisite to their fulfillment, and to assume over-all governmental

3

responsibility for all aspects of the oil program." PETROLEUM ADMINISTRATION FOR WAR, *supra*, at 2.

This arranged marriage proved to be a success. When it came to avgas, for instance, 75% of the nearly $1 billion spent on the fuel came from industry, producing "quantities which … would have been considered miraculous a few years before." GORALSKI & FREEBURG, *supra*, at 183-84. But throughout the war, the government remained firmly in the driver's seat, as the avgas "was manufactured for the government under government direction, was sold to the government, and was used by the government." *Bereslavsky* v. *Esso Standard Oil Co.*, 175 F.2d 148, 149 (4th Cir. 1949). Through contracts and commands, "the Government exercised substantial wartime regulatory control over almost every aspect of the petroleum industry" at the time World War II avgas was produced. *Shell Oil Co.* v. *United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014).

"Private industry demanded in return nothing more than a fair and durable allocation of risk." Robert M. Howard & Shawn T. Cobb, *Victory Through Production: Are Legacy Costs of War Scuttling the "GOCO Model"?*, 46 PUB. CONT. L.J. 259, 262 (2017). Wartime avgas efforts required oil companies to "undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of refiners' entry into their avgas contracts." *Shell Oil*, 751 F.3d at 1287 (cleaned up). So the oil companies, having served their country in a time of need, were not supposed to be left holding the bag for those unanticipated burdens. *Id.* That promise was the return for having subordinated their private interests to the national interest in defense.

Now the promise is being broken. Oil companies did much of their important work during World War II in

4

Texas and Louisiana. But the State of Louisiana and several coastal parishes are trying to hold oil producers liable for damages they blame on those wartime, avgas-related activities, alongside many other decades of lawful energy-production work in the Delta region. Louisiana and its partners mean to sue the producers under a law (the State and Local Coastal Resources Management Act of 1978) that requires permits for certain post-1980 energy-related work. World War II, of course, came decades earlier. So faulting the companies for failing to secure a then-non-existent permit seems to be a questionable endeavor at best. See, *e.g.*, *New Orleans City* v. *Aspect Energy, LLC*, 126 F.4th 1047, 1052 (5th Cir. 2025) (finding that an SLCRMA claim based on pipeline canals that were acquired or constructed before 1980 was "doomed").

But merits of the case aside, Louisiana also insists that these cases can't even be heard outside its local courts. It's hard to conceive of a dispute with more federal flavor—involving a subject of national interest (energy) dictated by national authorities (civilian-military federal personnel) with decidedly national consequences (victory or loss in war). Even so, the majority below sided with Louisiana by taking a cramped view of the federal-officer removal statute and embracing an inappropriately compartmentalized conception of the oil companies' operations during the war. Although the States here are no fans of overly expansive removal rights, the decision below went too far.

The Court should reiterate that this war-driven dispute belongs in federal court. The decision shows too little fidelity to the removal statute's text. It also misunderstands how avgas was produced, divorcing upstream and downstream activities that are necessarily

5

interrelated. And if the Court embraces the Fifth Circuit's narrow approach to federal-officer removal, then all manner of issues of serious import could be relegated to state courts that prioritize local concerns over national ones. Especially in the energy space, that choice would prove disastrous.

The oil industry was there for America when America needed it most, providing the "ammunition" for the war machines that powered our troops to victory. Courts shouldn't now turn their backs on the industry merely because that approach might facilitate a boost to local governments' troubled balance sheets. The Court should reverse.

## SUMMARY OF ARGUMENT

**I.** The majority below did not appropriately apply the federal officer removal statute's "relating to" provision. That court inappropriately engrafted several additional requirements onto the text, such as the need for an express contractual provision speaking directly to the challenged conduct and the mandate that the "related" action be the only possible choice for fulfilling a federal command. No ordinary understanding of the words "relating to" supports that view. Beyond that, the Fifth Circuit majority imagined a separation between upstream and downstream oil activities that doesn't exist. Especially during wartime, exploration and production were intimately connected with—and thus "related" to— the refining work that these oil companies were contracted to perform.

**II.** In construing the federal-officer removal statute, the Court must keep its purposes top of mind. Among other things, the statute was designed to ensure that genuinely national issues were addressed by federal

6

courts. The issues here—concerning energy and our national defense—are national in the truest sense. They are an ill fit for state-court adjudication. And if the statute is applied in the kind of feeble way the Fifth Circuit did going forward, then state courts could well become a means for individual states to warp national policy. Really, that's already happening today.

## ARGUMENT

### I. The majority below wrongly narrowed the "relating to" aspect of the federal-officer removal statute.

**A.** The federal-officer removal statute—28 U.S.C. § 1442(a)(1)—represents a "congressional promise," *West Virginia ex rel. Hunt* v. *CaremarkPCS Health, LLC*, 140 F.4th 188, 194 (4th Cir. 2025), or a "legislatively-spawned value judgment," *Gov't of Puerto Rico* v. *Express Scripts, Inc.*, 119 F.4th 174, 185 (1st Cir. 2024), that a person acting under a federal officer may take any related disputes to federal court. As an "incident of federal supremacy," *Willingham* v. *Morgan*, 395 U.S. 402, 405 (1969), the removal provision assures that federal operations will not face "interference" from "trial and liability in potentially hostile state courts," *California by & through Harrison* v. *Express Scripts, Inc.*, 139 F.4th 763, 770 (9th Cir. 2025); see also *Watson* v. *Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007) ("State-court proceedings may reflect local prejudice against unpopular federal laws or federal officials." (cleaned up)).

Given how the statute's promise is "broad," it also mandates a "liberal construction." *Hunt*, 140 F.4th at 194. What's more, "[g]eneral removal principles"—like the presumption against removability that some lower courts

7

have embraced—are "inverted." *Maryland* v. *3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025); see also *DeFiore* v. *SOC LLC*, 85 F.4th 546, 554 (9th Cir. 2023) ("Removal rights under § 1442 thus are much broader than those under section 1441." (cleaned up)). And "[n]ot only must the words of § 1442 be construed broadly[,] but a court also must credit the defendants' theory of the case." *Agyin* v. *Razmzan*, 986 F.3d 168, 175 (2d Cir. 2021) (cleaned up).

The court below seemed to understand these concepts when it came to at least part of the statute: the "acting under" requirement. Section 1442(a)(1) allows someone other than the federal government to remove when they are "acting under" a federal officer. The court saw that the oil producers were doing just that when they produced avgas. Pet.App.16. "Defendants here were federal contractors that refined a product … that the government needed to fight in World War II." Pet.App.16. And given that the government (at a minimum) controlled "the size and manufacturing capacity of their refineries," the companies were "acting under" the federal government. *Id.* Just as a company is "acting under" the federal government when it builds military airplanes, *Betzner* v. *Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018), so too is it "acting under" the federal government when it makes the avgas to fuel them.

Things fell apart when the Court considered whether Louisiana and the parishes were challenging actions "relating to" their federal actions. 28 U.S.C. § 1442(a)(1) ("[A] person acting under [a federal] officer … [may remove a suit] for or relating to any act under color of such office."). The majority thought the plaintiffs were "target[ing] Defendants' oil production and exploration practices." Pet.App.20. It then focused in on specific contractual provisions that directed the companies to

8

refine oil into avgas—pointedly ignoring the Government's broader control of the oil industry in general. Pet.App.21-26. But it concluded that the challenged activities were not "relat[ed] to" the contractual provisions because none of them specifically addressed extraction of the crude. Pet.App.30. It so held even though the "refinery activities" described in the contracts concededly "have some relation to oil production." Pet.App.28.

The Fifth Circuit majority unduly narrowed the "relating to" part of the statute—even though Congress specifically "intended to broaden the universe of acts that enable Federal officers to remove to Federal court" by adding that language. H.R. Rep. No. 112–17, pt. 1, at 6 (2011).

For one thing, the phrase "relating to" is expansive. One thing "relates" to another when the former has "*some* connection to" or "stand[s] in relation to" the latter. *Relate*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). So in all kinds of contexts, the Court has stressed that this language is exceptionally broad. A state law "relates" to an ERISA plan, for instance, when it "has a connection with or reference to such a plan." *Egelhoff* v. *Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001). In another preemption case, the Court described how "Congress characteristically employs the phrase ["relate to"] to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates." *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581 U.S. 87, 96 (2017).

Elsewhere, the Court has stressed how such language "has a broad scope, and an expansive sweep, and that it is broadly worded, deliberately expansive, and conspicuous for its breadth." *Morales* v. *Trans World Airlines, Inc.*,

9

504 U.S. 374, 384 (1992) (cleaned up); see also, *e.g.*, *Celotex Corp.* v. *Edwards*, 514 U.S. 300, 308 (1995) (holding that "related to" jurisdiction in bankruptcy statute gave "comprehensive jurisdiction" over "all matters connected with the bankruptcy estate").  Conversely, one thing may be not be "related" to another when they bear only a "tenuous, remote, or peripheral" relationship.  *Rowe* v. *N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008).

Note too how the statute says the removed action must only relate to "*any act* under color of such office."  28 U.S.C. § 1442(a)(1) (emphasis added).  "[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *Ali* v. *Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (cleaned up).  And pairing the word "any" with other generous terms (like "relating to") "has a broadening effect."  *Patel* v. *Garland*, 596 U.S. 328, 338-39 (2022).  Here, the combination confirms a degree of separation—removal is not just warranted when it comes to actions premised on (that is, "for") acts taken under color of a federal office—but also the other matters that "relate" to those actions.

The majority below effectively ignored the word "any" and then folded the "relating to" portion of the statute into the "for" part.  Certainly, a specific federal directive governing exploration and production (of the kind the majority was hunting for) would have placed these suits firmly in the "for" camp.  But that wasn't necessary for removal.  See *Moore* v. *Elec. Boat Corp.*, 25 F.4th 30, 36 (1st Cir. 2022) (noting how federal-officer removal "does not demand a showing of a specific government direction, which goes well beyond the 'relating to' requirement." (cleaned up)); *Baker* v. *Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020) ("[T]he Companies did not need to allege

10

that the complained-of conduct *itself* was at the behest of a federal agency." (cleaned up)).

**B.** Now on to the application. Properly applying the statute's standards here, Petitioners frame the key question the right way: are the exploration and production activities challenged in the lawsuit "related to" the refining activities covered in the companies' federal contracts?

As a general matter, exploration and production of crude oil "relates" to its ultimate refinement. See, *e.g.*, *Former Emps. of Chevron Prods. Co.* v. *U.S. Sec'y of Lab.*, 26 C.I.T. 1272, 1287 n.16 (2002) (describing two "separate but related 'production' processes (one 'upstream' and the other 'downstream'): the exploration, drilling and 'production' of crude oil, or—alternatively—the 'production' of refined petroleum products"); accord Jessica Kittleberger & Michael R. Barsa, *No Place for Morality: The Emerging Threat to Interstate Commerce and the Extraterritoriality Principle*, 57 CREIGHTON L. REV. 491, 529 (2024) (describing how "production, refining, and transportation" are "all tied to the immediate production of the good—fuel—itself"). Exploration and production, of course, provide the most essential input to the refining process: crude. Refining cannot happen without it. And "[t]he kind and quality of crude oil and other liquids available as inputs" in turn determines "[t]he details of a refinery's operations[.]" Joseph A. Schremmer, *Technical Operation of Refineries*, 3 L. OF ENVTL. PROT. § 29:179 (2024 update). Conversely, refineries constitute the largest customers of crude oil; it's effectively never used in its unrefined state. The two operations can't exist apart from one another.

So a refinery *must* secure crude oil, and the process of obtaining it necessarily "relates"—in the most central

11

way—to the refinery's operations. And indeed, "[h]istorically, the major oil companies [have] treated the refining activity as an integrated part of a production stream that ran from exploration to final retail sale of petroleum products." ROBERT PIROG, CONG. RSCH. SERV., RL32248, PETROLEUM REFINING: ECONOMIC PERFORMANCE AND CHALLENGES FOR THE FUTURE 18 (2008); see also FTC, MERGERS IN THE PETROLEUM INDUSTRY (1982), 1982 WL 623502, at *6 ("[A]ll of the largest firms in the industry (the 'majors'), and almost all of the firms just below the 'major' category are fully integrated and participate in all four levels of operation [E&P, refining, transportation, and marketing]."). Put differently, production and refining are two connected links on the same supply chain; the majority was wrong to declare them "two entirely separate operations." Pet.App.35.

Things were no different during World War II. In fact, all the various "industry functions" had to be "synchronized" to perform effectively, as the Petroleum Administration for War recognized:

> In so closely interrelated an industry as oil, such a synchronization was indispensable, because action taken in one field produces immediate reaction in others. In order to increase refinery throughput, for example, it is necessary to produce more crude oil; and it is then necessary to make available the transportation to move this crude oil to the refineries, and move the products away.

PETROLEUM ADMINISTRATION FOR WAR, *supra*, at 110; see also, *e.g.*, Gerald D. Nash, *Energy Crises in Historical Perspective*, 21 NAT. RES. J. 341, 347-49 (1981) (describing how supply constraints with crude oil—not refinery capacity—might have been the greater concern during the

12

war). In some ways that approach merely reflected the natural state of the market even before the war, in which oil supply-chain segments were "integrated into a small number of international oil companies." Llewelyn Hughes & Austin Long, *Is There an Oil Weapon? Security Implications of Changes in the Structure of the International Oil Market*, 39 INT'L SEC. 152, 159 (2015).

Hence, the refining activities covered in the wartime governmental contracts cannot be divorced from the exploration and production activities that preceded them. Certainly the Roosevelt administration didn't perceive them that way; rather, "producing oil" was viewed as "a series of continuing, overlapping situations" that "required simultaneous attention" and coordination across "all phases of production." PETROLEUM ADMINISTRATION FOR WAR, *supra*, at 185.

The record here bears that story out, as the companies looked to their own crude oil fields to supply the refineries governed by their government contracts. As Judge Oldham explained below, "defendants satisfied their contractual avgas obligations by increasing their own exploration and production of crude." Pet.App.45 (Oldham, J., dissenting). Even the majority conceded that at least some of the oil from Petitioners' oil fields went to Petitioners' refineries. Pet.App.36. That refined oil then directly fueled the war effort; a single Standard Oil refinery in Baton Rouge, for instance, "fueled one in every fifteen planes used in the war." Jerry P. Sanson, *World War II Industrialization in Louisiana*, 64PARISHES (2023), https://tinyurl.com/2wwz5fvf; see also, *e.g.*, Commander Paul B. Blackburn, *Oil to Burn?*, 74 U.S. NAVAL INST. PROCEEDINGS 1482, 1484 (Dec. 1948) (noting how "usage of petroleum" was greatly expanded even as civilian use declined by about 14%); contra

13

Parishes.BIO.20 n.40 (contending that avgas production did not drive increase in crude production).

The majority below mistakenly tried to create distance between upstream and downstream activities by noting that the Petroleum Administration for War decided when and where to allocate crude oil to specific refineries. See Pet.App.36 (suggesting that the "allocation program severed any connection" between production and refining). So it imagined a world in which the Petroleum Administration did *not* allocate any of Petitioners' own oil to their refineries. It then concluded that this counterfactual shows the two are not related.

But while it might be true that the Petroleum Administration was legally empowered to direct the crude elsewhere, that's not what happened. And cases turn on reality, not imagination. Ultimately, Petitioners *did* use their own oil as the key ingredient for their government-controlled avgas operations. (No surprise, seeing as it was a convenient input for these integrated companies.) Anyway, individual refineries "were all treated as units in one vast national refinery," such that some diversion from one to another would have been beside the point. *Exxon Mobil Corp.* v. *United States*, 108 F. Supp. 3d 486, 495 (S.D. Tex. 2015). So the production of that oil *did* in fact "relate" to the refining operations. Whether exploration and production were "related to" refining in the reallocation scenario the Fifth Circuit described was not a question before the court.

The lower court majority was also wrong—both factually and legally—to think that the exploration and production activities were unrelated because the companies could have instead bought oil from the "open market" to refine. Pet.App.29-30.

14

Legally, the court seems to have incorrectly defined "related" activities to reach only those things that were the *singular*, necessary predicate to the acts under federal control.  Yet as explained above, no ordinary understanding of "relating" requires such a constrained view.  Two distinct possibilities—buying oil or producing it—can simultaneously "relate" to the ultimate act of refining it.

Factually, the majority was wrong to assume that the companies could have secured the necessary volumes of crude at speed, volume, and price necessary to satisfy their avgas contracts.  The last assumption (on price) was especially dubious.  If the companies had chosen to stop production and instead buy crude from others, the price would have surely skyrocketed as avgas refiners competed for a shrinking pool of oil.  And all that assumes sufficient quantities would have been available (which ignores how more crude is needed to make higher-octane fuels like avgas).  See Pet.App.46 (Oldham, J. dissenting) ("Without that increase [in production], it is unclear how defendants could have met their contractual obligations with the federal Government.").  Instead—necessity being the mother of invention—"[o]il companies discovered 29 new Louisiana oil fields during the war," and tapped those and others to supply their refineries.  NATIONAL WORLD WAR II MUSEUM, THE PELICAN STATE GOES TO WAR: LOUISIANA IN WORLD WAR II 5 (2017), https://tinyurl.com/27pb6x2v.

\* \* \*

The majority transformed the "relating to" standard into the sort of direct-causation requirement that Congress amended the statute to avoid.  Under the ordinary meaning of "relating to," the companies' exploration and production activities were "related" to

15

their governmentally directed refining work. By all accounts, the two sets of activities were operationally integrated, economically interdependent, and strategically coordinated as part of a unified wartime mission. And if activities like these don't satisfy the statute, then it's hard to imagine what would. As other amici from all quarters have recognized, see, *e.g.* Joint.Chiefs.Br.13-14, sending these suits back to State court will empower local governments "hostile to the Government" to impede crucial federal efforts in the exact way the statute means to foreclose, *Watson*, 551 U.S. at 142-43. The Court should not countenance it.

## II.    The Court should protect the paramount national interest in energy.

**A.** In construing the federal-officer removal statute, the Court should keep its animating purpose firmly in mind: to protect the national interest. After all, Section 1442's statutory predecessor was adopted as a response to one state's effort to "nullif[y]" national laws. *Gay* v. *Ruff*, 292 U.S. 25, 32 (1934). Thus, the Court should be especially reluctant to construe the statute in a way that would eject cases from federal court even though they raise clear federal or national interests.

Federal courts are better positioned to deal with issues of national import. Madison warned that "[c]onfidence" cannot always "be put in the State Tribunals as guardians of the National authority and interests." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 28 (Max Ferrand ed., rev. ed. 1966); see also, *e.g.*, THE FEDERALIST NO. 81, 547 (A. Hamilton) (J. Cooke ed. 1961) ("State judges, holding their offices during pleasure, or from year to year, will be too little independent to be relied upon for an inflexible execution of the national laws.") Indeed, "the

16

constitution itself supposes that they may not always be worthy of confidence, where the rights and interests of the national government are drawn in question." *Osborn* v. *Bank of U.S.*, 22 U.S. 738, 811 (1824). "Local factionalism" cannot be permitted to "pollute 'the law of the Union.'" Anthony G. Amsterdam & James S. Liebman, Loper Bright *and the Great Writ*, 56 COLUM. HUM. RTS. L. REV. 54, 78 (2024) (quoting Madison); see, *e.g.*, *Wyoming* v. *Livingston*, 443 F.3d 1211, 1213, 1214 (10th Cir. 2006) (discussing one state's attempt to prosecute federal agents for reintroducing wolves into a state that was "heavily dependent on livestock" and thus "vehement[ly] … opposed" the program).

At least when it comes to truly national issues, the Framers were right to spot a difference between federal and state courts.   Life tenure, salary guarantees, appointment by the President and confirmation by the Senate, and status as national officers provide national-oriented checks that don't exist in state courts.  See Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 BOSTON UNIV. L. REV. 205, 235-38 (1985); accord Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U. PA. L. REV. 741, 812-14 (1984); see also *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U.S. 473, 483-84 (1981) (listing factors supporting federal-court jurisdiction such as "the desirability of uniform interpretation" and "the assumed greater hospitality of federal courts to peculiarly federal claims"). That's not to say that state courts are somehow inferior— the States here think well of their own courts and the courts of others—but only that certain disputes are sometimes better handled by one forum over another.

17

This case most obviously implicates America's national interest in energy production.  According to Congress, "it serves the national interest to increase petroleum refining capacity … wherever located within the United States." 42 U.S.C. § 15951(a)(1); see also, *e.g.*, Rachel Hudson, *One Size Does Not Fit All Leases—It's Time to Amend Bankruptcy Code Section 365*, 38 EMORY BANKR. DEV. J. 317, 345-46 (2022) ("When it comes to the oil and gas industry as a whole, there is very little doubt that a federal interest exists.").  The executive branch, too, has long been "directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."  William Howard Taft, *Address to the National Conservation Congress in St. Paul, Minnesota*, THE AMERICAN PRESIDENCY PROJECT (Sep. 5, 1910), https://tinyurl.com/4aw9nw47.  More recently, President Trump has proclaimed that it is "in the national interest to unleash America's affordable and reliable energy and natural resources," oil included. Unleashing American Energy, Exec. Order 14154, 90 Fed. Reg. 8353, 8353 (Jan. 29, 2025); see also, *e.g.*, Establishing the National Energy Dominance Council, Exec. Order 14213, 90 Fed. Reg. 9945, 9945 (Feb. 14, 2025) ("We must expand all forms of reliable and affordable energy production.").  "Refineries along the Gulf Coast account for more than 55% of total U.S. refining capacity."  *U.S. Gulf Coast Fuel Oil Imports at Record Low as Refiners Opt for Heavier Crude*, ENERGYNOW (July 7, 2025), https://tinyurl.com/yc4ph2nm.  So imposing liability on these seemingly local operations really has a direct effect on the national fuel supply.

This national interest in energy is tied directly to our national security.  Even in peacetime, the Department of Defense is the "single largest consumer of energy in the United States," using tens of millions of gallons of fuel

18

each day.  GREGORY J. LENGYEL, DEPARTMENT OF DEFENSE ENERGY STRATEGY: TEACHING AN OLD DOG NEW TRICKS 14 (2007), https://tinyurl.com/32smt7f8. Military operations consume roughly 80% of all government energy consumption.  NETA C. CRAWFORD, PENTAGON FUEL USE, CLIMATE CHANGE, AND THE COSTS OF WAR 4 (Nov. 13, 2019), https://tinyurl.com/357dnw9e. This demand only grows during times of war.  So critical military operations depend on the very sort of production and refining activities targeted in these suits.

It's almost a tautology to say that national security issues like these give rise to a national interest.  See *Haig* v. *Agee*, 453 U.S. 280, 307, (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." (cleaned up)). And "the procurement of [military] equipment by the United States is an area of uniquely federal interest," especially when "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts" by forcing contractors (like the oil companies here) to either "raise [their] price[s]" or bail from the obligation.  *Boyle* v. *United Techs. Corp.*, 487 U.S. 500, 507 (1988).

Yet even as it recognized that these energy-related claims are deeply entangled with military matters, the Fifth Circuit below seemed anxious to ship this case out of a federal forum better able to grapple with such concerns. But why?  "Federal courts frequently decide cases raising national security issues and are well equipped to handle them." *Meshal* v. *Higgenbotham*, 804 F.3d 417, 446 (D.C. Cir. 2015) (Pillard, J., dissenting). In contrast, "[w]hen the federal government acts within the field of its constitutionally granted war powers, it is not subject to interference from a state government or from state laws

19

since the federal government is supreme in all war activities[.]" Lucas Martin, 78 AM. JUR. 2D WAR § 14 (May 2025 supp.). Sending such exceptional matters to state court, then, is invitation for disaster.

Here, these principles aren't academic; they're playing out in real time. Louisiana local courts are being asked whether to greenlight serial windfalls from out-of-state energy companies with whom the State already has sometimes-fraught relationships. See Julie Cart, *Louisiana's Love-Hate Relationship With The Oil Industry*, L.A. TIMES (Sept. 15, 2010), https://tinyurl.com/3mm6s5y5. Especially as some parishes are still working their way back from the destruction of Hurricane Katrina, a sudden influx of funds is much needed. And one parish has already secured a $744 million verdict, with 40 more cases to come. See Casey Harper, *Jury Verdict Against Oil Industry Worries Critics, Could Drive Up Energy Costs*, HIGHLAND COUNTY PRESS (Apr. 7, 2025), https://tinyurl.com/vd7bpx52. Even the former Attorney General of Louisiana—and now Governor—recognized that "[t]he oil and gas industry developed the natural resources of [Louisiana] in accordance with state and federal laws." Jeff Landry, *The Buddy System*, HOUMATODAY (Sept. 19, 2013) https://tinyurl.com/msjujvxd. So litigation like this, he said, amounted to "extortion," "racketeering," and an "ambulance-chasing free-for-all." *Id.* In other words, these cases are showing how national interests can quickly fall by the wayside when politics, local fiscal needs, and flush defendants come together. See Michael Toth, *A Bad Business on the Bayou*, WALL. ST. J. (Mar. 31, 2025), https://tinyurl.com/48k6wwmy. And it can all happen because of the odd view taken by the Fifth Circuit that federal refining is divorced from oil production.

20

**B.** This case exemplifies a vast and troubling trend: state courts positioning themselves as forums to override national policy through nuclear verdicts, onerous injunctions, and more. Louisiana dismisses concerns like these—concerns about the obvious broader implications of a narrower removal doctrine—as "pure lawyer-speak." Louisiana.BIO.17. But Louisiana is wrong. When state courts can effectively nullify national energy policy through ruinous verdicts, the constitutional balance between state and federal authority breaks down. Each State could then exercise a veto over any disfavored energy source. Proper application of federal officer removal doctrine provides a crucial check against this overreach.

So-called climate-change litigation provides one example of the problem. States, local governments, and other anti-energy actors have been using any number of state-law-based theories—consumer protection, securities law, public nuisance, and more—to sue oil companies. See *Alabama* v. *California*, 145 S. Ct. 757 (2025). But no matter the theory, the sought-after remedy is largely the same: the plaintiffs want to punish energy producers with crushing damage awards for activities that were concededly lawful (and often federally endorsed) at the time. Because at least some of these energy-related activities bore a close nexus with federal officer-led actions—such as sales of fuel to the military—defendants sometimes sought to remove under the federal-officer removal statute. See, *e.g.*, *City & Cnty. of Honolulu* v. *Sunoco LP*, 39 F.4th 1101, 1106 (9th Cir. 2022). Yet lower courts largely rejected those efforts by applying a narrow view of federal-officer removal.

Another case currently on the Court's docket shows how States are seeking injunctive relief against specific

21

pieces of energy infrastructure and then wielding cramped conceptions of removal to ensure their claims are heard in friendly forums. In *Nessel on behalf of People of Michigan* v. *Enbridge Energy, LP*, 104 F.4th 958 (6th Cir. 2024), the State of Michigan sought to enjoin the operation of a midstream pipeline across the Straits of Mackinac. The pipeline's operation tied in with all national and international laws and agreements, so Enbridge removed. *Id.* at 966. Yet the lower court dispensed with certain usual principles of statutory construction and sent the case back to state court. The Court has now granted certiorari. *Enbridge Energy, LP* v. *Nessel*, No. 24-783, 2025 WL 1787715, at *1 (U.S. June 30, 2025). But there again, we see national interests (energy security) subjugated to more local ones (a waterway passage). And unfortunately, similar efforts have even happened in the States' own backyards. See, *e.g.*, *McCurdy* v. *Mountain Valley Pipeline, LLC*, No. CIV.A. 1:15-03833, 2015 WL 4497407, at *7 (S.D.W. Va. July 23, 2015) (remanding dispute over eminent domain rights connected to interstate natural-gas pipeline).

Decisions like these reverse an earlier recognition that energy-production activities, particularly those under the direction of the federal government, *do* belong in federal court; they can thus be removed under provisions like the federal-officer removal statute. See, *e.g.*, *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 399 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2005).

The problem is likely to only get worse. States like Vermont and New York have passed laws that seek to impose billions of dollars of retroactive, strict liability on out-of-state energy producers. See N.Y. ENV'T CONSER. LAW §§ 76-0101 to -0103; VT. STAT. tit. 10, §§ 596-599c. Other states are considering similar laws. See NAT'L

22

CAUCUS OF ENV'TL LEGISLATORS, 2025 SUPERFUND LEGISLATION (CLIMATE) (2025), https://tinyurl.com/3enh4k2u. These jurisdictions appear to be trying to "leverage the expense, risks, and burden to [the oil companies] of defending [themselves] in multiple jurisdictions" to secure a much-needed cash stream. *Chevron Corp.* v. *Donziger*, 974 F. Supp. 2d 362, 475 (S.D.N.Y. 2014). Now play the tape through to the end: if energy companies don't just give in to the shakedown, then they're likely to find themselves sued in state courts. And without effective pathways for removal, the story playing out in Louisiana will repeat seriatim. The national energy industry will be crippled.

At bottom, state courts have little business deciding critical energy-related issues entangled with national-security concerns. Beyond concerns of institutional competence, this *ad hoc* approach could upset the carefully calibrated, cooperative federalism scheme that currently governs energy and environmental matters. If energy producers play by those rules, they shouldn't have to worry that they'll nevertheless face potentially catastrophic liability decades down the road when the political winds change. In an increasingly competitive global energy market, that's too much to ask. Especially so when they are supporting key federal operations.

And let's be clear: the problem extends beyond energy. If individual States can weaponize their own state-court systems to attack out-of-state actors for things that were nationally embraced as lawful and necessary at the time they were done, then there's no obvious limiting principle to the power of States to regulate far beyond their own borders. Federal courts stand as a bulwark against that threat.

23

* * *

"A great many vexatious suits have been brought" in which those working under federal officers "have been pushed very hard and put to great hardships and expense … for doing things … they were ordered to do and which they could not refuse to do."  Cong. Globe, 39th Cong., 1st Sess. 1880 (Apr. 18, 1866) (remarks of Sen. Clark).  If the Court doesn't reverse the Fifth Circuit's decision here, then no doubt a great many more will be brought against critical energy suppliers in the years to come.

## CONCLUSION

The Court should reverse and remand with instructions to allow this case to proceed in federal court.

Respectfully submitted.

JOHN B. MCCUSKEY
  *Attorney General*

MICHAEL R. WILLIAMS
  *Solicitor General*
  *Counsel of Record*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
mwilliams@wvago.gov
(304) 558-2021

*Counsel for* Amicus Curiae *State of West Virginia*

24

## ADDITIONAL COUNSEL

STEPHEN J. COX
Attorney General
State of Alaska

BRENNA BIRD
Attorney General
State of Iowa

CHRIS CARR
Attorney General
State of Georgia

CATHERINE HANAWAY
Attorney General
State of Missouri

MICHAEL T. HILGERS
Attorney General
State of Nebraska

GENTNER DRUMMOND
Attorney General
State of Oklahoma