# Case Docket Entries

| Court: | **Circuit** | County: | **20 - Kanawha** | Created Date: | **12/22/2025** | Security Level: | **Public** |
|---|---|---|---|---|---|---|---|
| Judge: | **Kenneth Ballard** | Case Type: | **Civil** | Case Sub-Type: | **Other** | Status: | **Open** |

Related Cases:

Style: **John B. McCuskey, Attorney General v. 3M COMPANY**

| | Entered Date | Event | Ref. Code | Description |
|---|---|---|---|---|
| 1 | 12/22/2025 10:41:31 AM | E-Filed | | Complaint |
| | 1-1 12/22/2025 | Civil Case Information Statement | | |
| | 1-2 12/22/2025 | Supporting Document - Civil Case Information Sheet | | |
| | 1-3 12/22/2025 | Complaint - Complaint | | |
| | 1-4 12/22/2025 | Supporting Document - Exhibit A | | |
| | 1-5 12/22/2025 | Supporting Document - Exhibit B | | |
| | 1-6 12/22/2025 | Supporting Document - Exhibit C | | |
| | 1-7 12/22/2025 | Supporting Document - Exhibit D | | |
| | 1-8 12/22/2025 | Supporting Document - Exhibit E | | |
| | 1-9 12/22/2025 | Supporting Document - Exhibit F | | |
| | 1-10 12/22/2025 | Supporting Document - Exhibit G | | |
| | 1-11 12/22/2025 | Supporting Document - Exhibit H | | |
| | 1-12 12/22/2025 | Supporting Document - Exhibit I | | |
| | 1-13 12/22/2025 | Supporting Document - Exhibit J | | |
| | 1-14 12/22/2025 | Supporting Document - Exhibit K | | |
| | 1-15 12/22/2025 | Supporting Document - Exhibit L | | |
| | 1-16 12/22/2025 | Supporting Document - Exhibit M | | |
| | 1-17 12/22/2025 | Supporting Document - Summons | | |
| | 1-18 12/22/2025 | Transmittal | | |
| | 1-19 12/22/2025 | Summons | | |
| 2 | 12/22/2025 10:41:31 AM | Judge Assigned | J-20010 | Kenneth Ballard |
| 3 | 12/22/2025 10:41:31 AM | Party Added | P-001 | John B. McCuskey, Attorney General |
| 4 | 12/22/2025 10:41:31 AM | Party Added | D-001 | 3M COMPANY |
| 5 | 12/22/2025 10:41:31 AM | Attorney Listed | P-001 | A-9616 - Robert M. Bastress, III |
| 6 | 12/22/2025 10:41:31 AM | Service Requested | D-001 | Filer - Secretary of State |
| 7 | 12/22/2025 10:54:51 AM | E-Filed | | Motion - The State's Motion to Seal |
| | 7-1 12/22/2025 | Motion - The State's Motion to Seal | | |
| | 7-2 12/22/2025 | Supporting Document - Proposed Order | | |
| | 7-3 12/22/2025 | Transmittal | | |

A TRUE COPY
TEST: _____ CLERK
CIRCUIT COURT KANAWHA COUNTY, W.VA.

# COVER SHEET

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF KANAWHA COUNTY WEST VIRGINIA

**John B. McCuskey, Attorney General v. 3M COMPANY**

**First Plaintiff:** ☐ Business ☐ Individual ☐ Government ☑ Other

**First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

**Judge:** Kenneth Ballard

## COMPLAINT INFORMATION

**Case Type:** Civil         **Complaint Type:** Other

**Origin:** ☑ Initial Filing   ☐ Appeal from Municipal Court   ☐ Appeal from Magistrate Court

**Jury Trial Requested:** ☐ Yes ☑ No      **Case will be ready for trial by:** _____

**Mediation Requested:** ☐ Yes ☑ No

**Substantial Hardship Requested:** ☐ Yes ☑ No

☐ Do you or any of your clients or witnesses in this case require special accommodations due to a disability?

  ☐ Wheelchair accessible hearing room and other facilities

  ☐ Interpreter or other auxiliary aid for the hearing impaired

  ☐ Reader or other auxiliary aid for the visually impaired

  ☐ Spokesperson or other auxiliary aid for the speech impaired

  ☐ Other: _____

☐ I am proceeding without an attorney

☑ I have an attorney:   Robert Bastress, PO Box 1631 , Charleston, WV 25326

## SERVED PARTIES

**Name:** 3M COMPANY

**Address:** Corporation Service Company 808 Greenbrier Street, Charleston WV 25311

**Days to Answer:** 30  **Type of Service:** Filer - Secretary of State

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL**,

        Plaintiff,

v.

        Civil Action No. 25-C-_____

        Judge _____

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.**,

        Defendant.

## <u>COMPLAINT AND APPLICATION FOR TEMPORARY RELIEF PURSUANT TO <i>W.VA. CODE</i> § 46A-7-110</u>

        **STATE OF WEST VIRGINIA,** *ex rel***.**
        John B. McCuskey, Attorney General**,**

        By Counsel,

        /s/    *Robert M. Bastress III*
        Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
        (WV Bar # 6894)
        Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
        (WV Bar # 8231)
        **OFFICE OF THE ATTORNEY GENERAL**
        Building 1, Room 26-E
        Capitol Complex
        Charleston, West Virginia 25305
        Telephone: 304-558-2021

        J. Timothy DiPiero    (W.Va. Bar # 1021)
        Lonnie C. Simmons   (W.Va. Bar # 3406)
        Robert M. Bastress III (W.Va. Bar # 9616)
        **DiPIERO SIMMONS**
        **McGINLEY BASTRESS, PLLC**
        P.O. Box 1631
        Charleston, West Virginia 25326
        Telephone: 304-342-0133
        Rob.bastress@dbdlawfirm.com

# TABLE OF CONTENTS

PARTIES, JURISDICTION & VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.  Since at least the *1960's*, 3M knew its disposable respirators must have an effective filter, a proper and consistent fit, and a proper and consistent faceseal in order to protect the wearers, including coal miners, from dangerous lung diseases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  In the *late 1960's/early 1970's*, 3M developed the first-of-its-kind 8710 disposable respirator; obtained government approval for the 8710 to be used for protection from coal dust, silica, and asbestos; and marketed the 8710 to the coal mining industry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  Defendant 3M knew the government approval of the 8710 was fundamentally flawed and was a marketing device, not a true measure of safety . . . . . . . . 12

IV.  By the *early 1970's*, 3M recognized internally that the fit of its disposable, valveless, cup-shaped respirators was a problem . . . . . . . . . . . . . . . . . . . . . . . 13

V.  *In 1995,* a change in the federal regulations meant 3M had to swap out the 8710 disposable respirator for its counterpart, the 8210 disposable respirator. . 14

VI.  While the filters are different, 3M has repeatedly admitted the 8710 is the same as the 8210 in terms of their "fit characteristics.". . . . . . . . . . . . . . . . . . . . . . 15

VII.  Defendant 3M knew the 8710 and 8210 had the same fit defects making them unsafe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.  Lack of a Reliable Fit Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.  Lack of Reliable and Practical Fit Test . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.  Defendant 3M has known for decades that the valveless design of the 8710 and 8210 disposable respirators causes hot and humid exhaled breath – as well as humidity in a natural environment like coal mining -- to increase the breathing resistance and the respirators to flex and then potentially collapse, all of which leads to faceseal leakage endangering the wearer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

        i.  Defendant 3M has long known that increased breathing

resistance/pressure drop leads to dangerous increased faceseal leakage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ii.    Breathing resistance/pressure drop regulations were added in 30 C.F.R. § 11 for safety reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

iii.    *For the first decade of the 8710's product life beginning in 1972*, Defendant 3M knew the 8710 could not meet the 15 mm limit in the breathing resistance regulations in 30 CFR § 11 and 3M's QC plans/Test Methods, and yet, 3M sold millions of the 8710 anyways.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iv.    In the *early 1980's*, 3M fraudulently manipulated the 91-97% relative humidity range required by the regulations and 3M QC plans for the breathing machine test so that the 8710 would appear to "pass" the test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

v.    Defendant 3M did not advise NIOSH of 3M's continuing violations of the regulations and 3M internal QC plans/Test Methods.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

vi.    Defendant 3M should have reviewed the 8210's breathing resistance and propensity to collapse before representing the 8210 provides protection for, among other things, coal mining.. . . 44

vii.    *Beginning in the 1970's* and continuing throughout the product life of the 8710, 3M recognized internally the flexing and collapse defect due to humidity as a "major problem" and "product limitation" that made it "unacceptable in the underground mining area." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

viii.    Defendant 3M has long understood that the same propensity of the valveless, disposable 8710 respirator to "collapse from build up of high heat and humidity" applies to 8210. . . . . . . . . . . . 47

D.    Lack of Durability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

E.    Lack of Strap Adjustability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

F.    One-Size-Fits-All Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

G.    Defendant 3M's Internal Document Summarizing Fit Defects . . . . 51

**VIII.** **To retain its market share, Defendant 3M continues to sow confusion and misunderstanding, makes misrepresentations, suppresses and omits material facts in connection with the sale and advertisement of its 8210 disposable, valveless, cup-shaped respirator.** ........................................ 52

    **A.** *WEBSITE MISREPRESENTATIONS*: **Defendant 3M's current website makes many repeated misrepresentations regarding the 8210.** ...... 53

        **i.** **PROTECTION: "Effective Respiratory Protection"; "Reliable, Effective Protection"; "Quality Reliable Worker Protection"; & "Protection Equivalent to a Rubber Facepiece Respirator";** ......................................... 53

        **ii.** **"Durable";** ......................................... 55

        **iii.** **"Collapse Resistant"** ................................ 55

        **iv.** **For Use in Coal Mining** .............................. 55

        **v.** **"Fits . . . protect[s] all day long"** ........................ 56

    **B.** **8210 Respirator and 8210 Box** ............................... 57

        **i.** **Defendant 3M has a history of considering possible warnings on valveless, disposable respirators, and 3M has recognized that warnings adversely affect its bottom line.** ................ 57

        **ii.** **"Warning" on the 8210** .............................. 60

        **iii.** **An illustration of what 3M could have done is seen in the asbestos example where after years of fighting the federal government 3M was forced in the *mid-80's* to add the warning with respect to disposable respirators: "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL."** ............ 61

        **iv.** **The 8210 box contains fit check instructions without acknowledging a fit check is "difficult, if not impossible" to do on the 8210.** ......................................... 62

**CLAIM (*COUNT I - VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT)* ........................................................ 62**

**APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF ....................... 67**

**PRAYER FOR RELIEF .................................................. 71**

Now comes Plaintiff, State of West Virginia *ex rel.* John B. McCuskey, Attorney General ("The State"), by counsel, and alleges the following against Defendant 3M Company ("Defendant" or "3M"):

## PARTIES, JURISDICTION & VENUE:

1. The State brings this lawsuit to temporarily enjoin 3M's violation of the West Virginia Consumer Credit and Protection Act, *West Virginia Code* § 46A-1-101, *et seq.* ("WVCCPA") and otherwise fraudulent and unconscionable conduct in connection with the sale and advertisement of its 8210 disposable respirator and ultimately to seek civil penalties for 3M's repeated and willful statutory violations of the WVCCPA (and associated attorneys' fee and interest) also in connection with the sale and advertisement of the 8210 disposable respirator. In doing so, the State hopes to end 3M's practice of putting wearers of its 8210, including West Virginia coal miners, in needless danger.

2. Defendant 3M is a foreign resident corporation. Defendant 3M has advertised, marketed, and sold and continues to advertise, market, and sell its 8210 disposable respirator into West Virginia, some of which are sold through various distributors within the State, who, in turn, sell 8210's to, *inter alia*, West Virginia coal mines where the 8210's are worn by West Virginia coal miners.[1] In a brochure on 3M's website, it describes the 8210 as "[o]ne of the most widely used

---

[1] For example, the following are a few examples of individual lawsuits filed by West Virginia coal miners who wore the 8210 in West Virginia coal mines and have significant lung diseases. *See, e.g.*, *Darrell Bailey v. 3M, et al.*; *Charles E. Bailey, Jr. v. 3M, et al.*; *Oliver Bradley v. 3M, et al.*; *Terry Collins, v. 3M, et al.*; *Kenneth Dillon v. 3M, et al.*; *Gary Edwards v. 3M, et al.*; *Jack Ferguson v. 3M, et al.*; *James Goodwin v. 3M, et al.*; *Jason Griffith v. 3M, et al.*; *Douglas W. Hager, Sr. v. 3M, et al.*; *John Ingram v. 3M, et al.*; *James Law v. 3M, et al.*; *Mark Lester v. 3M, et al.*; *Charles Lilly v. 3M, et al.*; *Raymond Lovejoy v. 3M, et al.*; *Ashley Marsh v. 3M, et al.*; *Cecil Matney v. 3M, et al.*; *Eric Maynor v. 3M, et al.*; *Carrell McMillion v. 3M, et al.*; *Ricky Miller v. 3M, et al.*; *Roby Mitchum v. 3M, et al.*; *Owen Neff v. 3M, et al.*; *Roy Nelson v. 3M, et al.*; *Mark Perry v. 3M, et al.*; *David Petry v. 3M, et al.*; *Scott Petry v. 3M, et al.*; *Darrell Price v. 3M, et al.*; *William Reid v. 3M, et al.*; *Arnold Rouse v. 3M, et al.*; *Gary Scott v. 3M, et al.*; *Gary Sheaves v. 3M, et al.*; *William Snyder v. 3M, et al.*; *Matthew Steele v. 3M, et al.*; *Dixie Stelle v. 3M, et al.*; *Jeremy Taylor v. 3M, et al.*; *Wayne Taylor*

disposable respirators in the industry." (3M Brochure Excerpt, a copy of which is attached as **Ex. A**).[2]

3.     Defendant 3M previously and improperly removed a case brought by the Attorney General involving 3M's 8710 disposable respirator (the 8210's predecessor), which was remanded by Judge Copenhaver in 2005. *See generally West Virginia ex rel. McGraw v. Minnesota Mining and Mfg., Co.*, 354 F.Supp.2d 660 (S.D. W.Va. 2005).[3]  The 8710 respirator case brought by the West Virginia Attorney General against 3M has been pending in Lincoln County for more than 22 years and is now styled *State of W.Va. ex rel. McCuskey v. 3M, et al.*  The first phase of the ongoing trial of the 8710 case began in Lincoln County in January 2025 and is now in recess until it is scheduled to resume on March 23, 2026.

4.     Venue exists under *W.Va. Code* § 46A-7-114 inasmuch as "an act upon which the proceeding is based occurred" in this County and inasmuch further as 3M "transacts business" in this County by, among other things, marketing, advertising, and selling 8210 disposable respirators and other 3M products into this County.

### INTRODUCTION:

5.     For starters, Defendant 3M makes misrepresentations that the 8210 is a proper use for coal mining when it is not.[4] ████████████████████████████████

---

*v. 3M, et al.*; *Carl Turner v. 3M, et al.*; *Rex Vance v. 3M, et al.*; *Donald Varney v. 3M, et al.*; *Ricky Wagner v. 3M, et al.*; *Rickie Warner v. 3M, et al.*; *Kevin Weikle v. 3M, et al.*

[2]*Available at:* https://multimedia.3m.com/mws/media/540004O/3m-disposable-respirator.pdf?&fn=Disposable _Respiratory_Product_Catalog_R13.pdf.

[3]Plaintiff is the State of West Virginia and not a resident of any State.  *See generally West Virginia ex rel. McGraw v. Minnesota Mining and Mfg., Co.*, 354 F.Supp.2d 660 (S.D. W.Va. 2005).

[4]With respect to whether 3M respirators were or are safe for coal mining, Defendant 3M's own SEC reports are telling.  Defendant 3M provided the following to the SEC under the heading

In 1977, Defendant 3M recognized internally the following about the 8710, the 8210's predecessor: "**we now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity**." (Trial Ex. 300, 3M 338879). Defendant 3M's expert and former employee, Dr. Alan Johnston, admitted the 8710 and 8210 "perform similarly" regarding collapse in "high humidity environments[.]" (*See infra* ¶¶ 103). Yet, on 3M's current website and on the 8210 box, 3M repeatedly indicates one of the "uses" for the 8210 is "coal" and one of the "recommended industries" is "mining." (*See infra* ¶¶ 138-41, 150-51). These are blatant violations of the WVCCPA. (*See infra* ¶¶ 165-75).

      6.     Defendant 3M's disposable, valveless, cup-shaped respirators like the 8710 and 8210

---

"Respirator Mask/Asbestos Litigation": "During March and April 2019, the [3M] Company agreed in principle to settle a substantial majority of the coal mine dust lawsuits in Kentucky and West Virginia for $340 million, including the [$67 million] jury verdict in April 2018 in the Kentucky case mentioned above." (2020 3M 10-K at p. 112, *available at*: https://investors.3m.com/financials/sec-filings?form_type=Annual&year=2021##document-4629 -0001558370-21-000737-2). Defendant 3M's 2020 10-k continued: "As of December 31, 2020, the [3M] Company had an accrual for respirator mask/asbestos liabilities (excluding Aearo accruals) of $662 million. This accrual represents the Company's best estimate of probable loss and reflects an estimation period for future claims that may be filed against the Company approaching the year 2050." (*Id.* at 113). A more recent 3M SEC report stated: "In 2024, the Company made payments for legal defense costs and settlements of $87 million related to the respirator mask/asbestos litigation. As of December 31, 2024, the Company had an accrual for respirator mask/asbestos liabilities (excluding Aearo accruals) of $523 million. This accrual represents the Company's estimate of probable loss and reflects an estimation period for future claims that may be filed against the Company approaching the year 2050." (3M 2024 10-k at p. 86, *available at*: https://investors.3m.com/financials/sec-filings?form_type=Annual&year=##document-5110-000 0066740-25-000006-2).

     [5]The originally filed version of this Complaint has redacted portions that 3M has designated **CONFIDENTIAL**, albeit improperly, in document productions in other litigation. An unredacted version of this Complaint will be filed UNDER SEAL, and a copy will be provided to 3M's counsel. The State believes the unredacted version should be made public, and the State has no objection to the Court doing so.

provide a dangerous illusion of safety. According to one Occupational Safety Health Administration (OSHA) Area Office Industrial Hygienist, who observed the 8710 in the field for six years in the 1970's and early 1980's:

> "During the past six years, in virtually every instance I have seen these masks (#8710) used, the employee is not being protected adequately against the hazard . . .
>
> These respirators are dangerous. They are dangerous because employees are using them for protection against systemic poisons . . . and without the masks providing a proper face seal under actual-use conditions. They are dangerous because the employee is lulled into a false sense of security – a belief he/she is being protected against hazardous airborne contaminants when, in fact, he/she is not.
>
> * * *
>
> Every expert on respiratory protective devices I have talked to, including those in NIOSH and Los Alamos Scientific Laboratory, has denigrated this respirator both technically (on specifications and quantitative fit-testing criteria) and on its practical performance in the field.
>
> OSHA should re-examine its policy regarding the use of this respirator . . . ."

(Trial Ex. 519, WV-AG-00123263.001-.003).

7.      Beyond just coal mining, experts in the respirator industry have long warned about the unreliable fit provided by disposable, valveless, cup-shaped respirators like the 8710 and 8210. Defendant 3M has repeatedly admitted the 8710 and 8210 have the same "fit characteristics." (*See infra* ¶¶ 30-33). As explained below, 3M has known for decades that both of these disposable, valveless, cup-shaped respirators share the same fit defects making them unsafe for use involving potentially harmful dusts. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████   Defendant 3M further violates the WVCCPA with respect to advertising protection, fit, *etc.* in its communications regarding the 8210 while knowing the unreliable fit of 3M's 8210 makes it

unsafe for any use involving potentially harmful dusts.

8.     Defendant 3M has known for several decades that (a) humidity causes (b) an increase breathing resistance/pressure drop which, in turn, causes (c) dangerous faceseal leakage of a respirator worn in potentially harmful environments, either by flexing or ultimate collapse of the respirator. Here, humidity is a problem both externally in a humid environment like a coal mine and because of the faulty design of the respirators where humid breath is not properly expelled by a valve.  Between 1972-1998, Defendant 3M did not meet the breathing resistance/pressure drop QC parameters for the silica dust audit test required in the federal regulations (30 CFR § 11), which gave 3M the authority to represent the 8710 was government certified.  Simply put, the 8710 could not meet the breathing resistance requirements when tested at the proper high humidity range required by the regulations and 3M's internal QC plan.  (*See, e.g.*, 1-14-25 Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59; *see also* 10-5-18 Eitzman Trial Test. at 198-200, 203-04, 207-09, 217, 219; 10-6-22 Eitzman Dep. at 105-06, 149-50; 6-30-16 Stump Dep. at 10-13, 41, 46, 50, 88, 91-92, 94).  After NIOSH contacted 3M following an audit in 1975 that indicated the 8710 was failing the breathing resistance requirements, NIOSH believed 3M had corrected the problem and did not know that 3M had addressed it by testing the 8710 at a relative humidity range lower than what was required in the regulations and 3M's QC plans.  (*See generally, e.g.,* Schutz Dep. at 36, 39-40, 58; *see also, e.g.,* 1-14-25 Price Trial Trans. at 242-43, 274-75, 279, 292; 10-5-18 Eitzman Trial Test. at 174-79, 185, 215-16; *see infra*).  Respirator expert and former head of Lawrence Livermore Laboratory, Dr. James S. Johnson, ███████████████████

████████████████████████████████████████████████████████

---

[6]This affidavit is in the record in the Lincoln County case.  (*See* 6-9-25 Trial Trans. at 837).



While the certification testing changed in the 1990's leaving out the humidity test and 3M introduced the 8710's "counterpart" – the 8210 – to replace the 8710, the 8210 nevertheless had the same breathing resistance/pressure drop, "Major A"[7] defect as the 8710. Harvard and Northeastern University Professor Dr. Jack Price has explained ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendant 3M's representations regarding the "protection" provided by -- as well as the "collapse resist[ance]" of -- the 8210 when 3M knew the limitations of the 8210 was and continue to be misleading and/or confusing representations and violations of the WVCCPA, as explained more fully below.

**FACTS:**

I.    **Since at least the *1960's*, 3M knew its disposable respirators must have an effective filter, a proper and consistent fit, and a proper and consistent faceseal in order to protect the wearers, including coal miners, from**

---

[7]*See infra* n. 57, p. 70.

**dangerous lung diseases.**

9.      Since at least the 1960's, Defendant 3M knew Coal Workers' Pneumoconiosis ("CWP") is preventable,[8] incurable,[9] potentially deadly,[10] and has obviously been a scourge in West Virginia.[11]

10.     Since at least the 1960's, Defendant 3M knew that only coal miners contracted CWP, colloquially referred to as "Black Lung" (including both Simple CWP and Complicated CWP/Progressive Massive Fibrosis ("PMF")). (*See, e.g.*, Trial Ex. 20; ██████████████████████ ██████████████████████████████; Trial Ex. 29; *see also* Trial Ex. 1250, WV-AG—123269.002-003; *see also* Trial Ex. 1326, WV-AG-00123190.002-003 ("By the 1950's, scientists had shown that with near certainty that CWP could be caused exclusively by excessive exposure to coal dust." and "'The only thing that causes this illness is the inhalation of dust during coal mining[.]'").

11.     Since at least the 1960's, 3M knew CWP, Black Lung, Silicosis, and other dangerous lung diseases have long been contracted by coal miners based upon their occupational exposure to,

---

[8]*See, e.g.,* Trial Ex. 1326, WV-AG-00123190.003 (NIOSH report author remarked, "'[c]oal workers' pneumoconiosis is an entirely preventable disease. [Coal miners] wouldn't have gotten sick without inhaling way too much coal dust[.]'"); *see also* Trial Exs. 27, 29.

[9]*See, e.g.,* Trial Ex. 1314, WV-AG-00123385.003 ("The disease is not curable, is progressive and can advance from simple CWP to progressive massive fibrosis (PMF). PMF is characterized by extensive scarring and thickening of lung tissue, emphysema, and compromised lung function leading to death."); *see also* Trial Exs. 27-29.

[10]*See, e.g.,* Trial Ex. 19, WV-AG-00120207-08; *see also* Trial Exs. 27, 29.

[11]According to the U.S. Department of Labor, for example, 132,702 federal black lung claims were filed in West Virginia between 1973 and 2020. *See* https://www.dol.gov/agencies/owcp/dcmwc/statistics/bls2020/DistributionOfClaimsByState2020 .; *see also, e.g.*, Trial Ex. 1418, WV-AG-00123304.001-002.

and inhalation of, small respirable particles in coal dust and silica.[12] (*See, e.g.,* Trial Exs. 10, 11, 14, 18, 19, 40, 73, 74, 91, 110, 198, 244, 355, 827, 1250, 1314).

12.     Since at least the 1960's, 3M knew to protect coal miners and others from dangerous lung diseases, a respirator must screen out small respirable particles found in significant numbers in coal dust and silica that the body does not naturally defend against and that may penetrate deep into the alveoli of the lungs. (*See, e.g.*, Trial Ex. 19, WV-AG-00120203 & WV-AG-00120206; Trial Ex. 20, 3M 052688 (3M internal document stating "[t]he smaller the particles are, the deeper they will get into the lungs presenting potential health hazards through [alveloar] deposition"), ███████████████████; Trial Ex. 27; ██████████████████; Trial Ex. 29; Trial Ex. 275, 3M 1465873; Trial Ex. 1319, 3M 538305-06 (3M internal document stating "[t]he particle size of a contaminant is the main factor affecting how far it can penetrate into the lungs."); 1-14-25 Price Trial Test. at 192-200).[13]

---

[12]The small respirable particles (below 5 microns) cannot be seen with the naked eye and their size is discussed in terms of microns and sub-microns (below 1 micron). For context, a 1 micron is equivalent to 1/25,400th of an inch. (*See, e.g.,*1-14-25 Price Test./Trial Trans. at 168). As 3M stated at one point in the Lincoln County litigation over the 8710, "[v]ery small particles are measured in microns . . . [a] grain of salt, for example, is about 60 microns wide. . . . The word 'submicron' refers to particles smaller than one micron." (10-28-22 3M Mot. *in Lim.* Re: Submicron Theory in Linc. Cty. Circ. Ct. at 2). The naked eye cannot see smaller than 50 microns.

[13]Sub-micron particles have a disproportionate affect on toxicity because of their *surface area*, (*see, e.g.,* Trial Exs. 29; Trial Ex. 1524, 3M 136418), and slow *settling rate* in the air. (*See, e.g.,* Trial Ex. 504, WV-AG-00123214.001; ██████████████████████ ███). Defendant 3M recognized submicron particles are "considered to be the most hazardous per unit of mass. The systemically toxic particles of this size are most easily absorbed into the body because of the large surface area per unit mass. Lung damaging particles of this size are considered more hazardous per unit mass because their great numbers affect a greater area of the lung." (Trial Ex. 1524, 3M 136418). The slow settling rate means the submicron particles "are stable in the atmosphere, [and] there are large numbers of them present to be inhaled[.]" (Trial Ex. 1759, WV-AG-00123435.079-.080).

13.    Since at least the 1960's, 3M knew that a respirator must have *both* an effective *filter* and a proper and consistent *fit* in order to protect the wearer against small harmful respirable particles that cause dangerous lung diseases. (*See, e.g.*, Trial Ex. 27; Trial Ex. 29, 3M 116015; Trial Ex. 40, 3M 022792; Trial Ex. 660, 3M 321331, 321336; Trial Ex. 732, WV-AG-00111444-46; Trial Ex. 1917, WV-AG-00123406.002). That is, the small harmful respirable particles can enter the breathing zone inside the mask either by penetration directly through the *filter* or around the faceseal edge by leakage due to a poor *fit* or compromise of the *faceseal*. (*See, e.g.*, *id.*). Defendant 3M knew either way of entry would be dangerous to the wearer. (*See, e.g., id.*).[14]

**II.    In the *late 1960's/early 1970's*, 3M developed the first-of-its-kind 8710 disposable respirator; obtained government approval for the 8710 to be used for protection from coal dust, silica, and asbestos; and marketed the 8710 to the coal mining industry.**

14.    After learning in the late 1960's that the government might approve a disposable respirator for certain dusts, 3M identified the coal mining industry as a "large potential market" and as an area of "prime interest," in part, because it knew engineering controls would not be sufficient by themselves to eliminate the dangerous dust. (Trial Exs. 27, 29; Trial Ex. 33, 3M 0115977; Trial 44, 3M 19019; ███████████████). In its 1972 Marketing Plan, 3M specifically identified the coal mining market in Pennsylvania and West Virginia. (Trial Ex. 102, 3M 018480).

15.    ████████████████████████████████████████████████████████

---

[14]Much effort has been expended in the 8710 case in Lincoln County regarding whether the submicron particles for which 3M advertised the 8710 provided protection (*see, e.g.,* Trial Exs. 228, 234), and that penetrate the 8710's filter, are harmful. There, the State has provided copious amounts of evidence, including from 3M's own internal documents, that submicron particles are the most harmful size particles, *see, e.g.*, Trial Exs. 29, 1319; whereas, Defendant 3M incorrectly contends the harmful respirable particles are only in the 1-3 micron range. (10-28-22 3M Mot. *in Lim.* Re: Submicron Theory in Linc. Cty. Cir. Ct. at 2). For purposes of fit defects, however, all of these respirable particles may penetrate the breathing zone and put the respirator wearer in danger.

[REDACTED] Trial Exs. 85, 195, 1559).

16. Defendant 3M's 8500 respirator was <u>not</u> approved for use with asbestos, coal, silica, *etc*. Defendant 3M recognized that the 8710 would be the first disposable respirator approved for use in environments where the wearer's health was at risk. [REDACTED]

[REDACTED]

17. Meanwhile, worker safety efforts in the 1960's culminated with the Coal Mine Health and Safety Act of 1969 and the Occupational Safety and Health Act of 1970 aimed at protecting coal miners and workers generally which set off a "gold rush" among manufacturers to enter these new booming markets for safety products. (Trial Ex. 281, 3M 432420; Trial Ex. 1411, WV-AG-00120017; Trial Ex. 79, 3M 2572; [REDACTED]

18. As late as October 1971, 3M wrote in an internal field letter: "It is becoming increasingly apparent to us that [Bob] Schutz [Chief of the Testing and Certification Branch of the Bureau of Mines][15] is very much against approving single use respirators because they will cheapen or tarnish the Bureau image that he has spent so long to build up." (Trial Ex. 77, 3M 001916).

19. However, Defendant 3M used its political connections in working to get approval of the 8710. (*See, e.g.,* [REDACTED]; Trial Exs. 62, 77, 1738).

20. On May 24, 1972, 3M's 8710 disposable respirator was approved, in accordance with 30 C.F.R. § 11, *et seq.*, by the Bureau of Mines and NIOSH "for respiratory protection against

---

[15]*See, e.g.,* Trial Ex. 286, 3M 0123589.

pneumoconiosis and fibrosis producing dusts, including but not limited to aluminum, asbestos, coal, flour, iron ore or free silica." (Trial Ex. 114, 3M 002551; Trial Ex. 85, 3M 0018573; Trial Ex. 1505, 3M 075866.003; Trial Ex. 96, 608, 3M_DEP 0006524). Defendant 3M's 8710 was the first disposable respirator approved by the government for such uses. (*See, e.g.,* Trial Ex. 129, WV-AG-00123367.002).

21. In the 1970's, 3M marketed and advertised the 8710 in *Coal Age* and various other periodicals as being (a) competitively priced, (b) government approved, and (c) providing protection against "Black Lung" and/or "pneumoconiosis and fibrosis producing dusts." (*See, e.g.*, Trial Exs. 91, 99, 139, 158, 170, 176, 188, 248-250, 313, 348, 424, 437, 440, 1394, 1429, 1444, 1487, 1489, 1603, 1609, 1713).[16] Defendant 3M's assertions relating to the approval of the 8710 and that the 8710 provided protection against "Black Lung" and/or "pneumoconiosis and fibrosis producing dusts" were confusing or misleading representations and suppressed or omitted material facts, as described more fully below. (1-14-25 Price Trial Test. at 235-36; *see also* Trial Ex. 176).[17]

---

[16]Defendant 3M acknowledged internally in September, 1972, a few months after the 8710 had begun to be sold, that "we have done no testing, as such, against respirable dusts or asbestos fibers on the No. 8710 Respirator as we are now marketing it." (Trial Ex. 135, 3M 0015734; *see also* 1-14-25 Price Trial Test. at 218).

[17]In addition to 3M's misrepresentations that the 8710 provided protection against submicron particles and against Black Lung and pneumoconiosis and fibrosis producing dusts generally, 3M's advertising and marketing materials also contained another specific misrepresentation that was discussed and acknowledged in its internal documents. In a memorandum to 3M's advertising department on October 24, 1973, 3M's Bob Barghni wrote:

"In giving the efficiency of the product care must be taken to insure that the statement is *totally correct*."

Example:

In stating 99% efficiency make sure that it is spelled out that this is for the filter media only

**III. Defendant 3M knew the government approval of the 8710 was fundamentally flawed and was a marketing device, not a true measure of safety.**

22. Defendant 3M knew the government approval of the 8710 under 30 C.F.R. § 11 (known as the "silica dust test," a relic from the 1930's) was fundamentally flawed in several ways,[18] a "marketing device," a "poor predictor[] of actual respiratory performance," and did not otherwise assure that "devices produced under such a program have a sufficiently high assurance of safety." (*See, e.g.,* Trial Ex. 411, WV-AG-000120659; Trial Ex. 448A, WV-AG-00123403.009-.011; Trial Ex. 732, WV-AG-00111445; Trial Ex. 1524, 3M 136417).

23. The certification process under 30 CFR § 11 tested breathing resistance (also known as pressure drop), but it did not directly assess the fit of respirators, despite some earlier indications that 3M received that the regulatory regime would do so. (*See, e.g.,* Trial Ex.104; *see also, e.g.,* Trial Ex. 77, 3M 1916-17 (believing in 1971 that fit assessment may be part of approval process); Trial Ex. 80).

---

because the *overall efficiency of the product is much less than that i.e. fit efficiency.* Also our test data is only against silica dust and this too should be noted."

(Trial Ex. 186, 3M 040783)(emphasis added). Despite this warning from Barghini, 3M nevertheless ran the advertisement with its confusing and misleading misrepresentation asserting the 8710's "99% efficient against dust with a mean particle diameter of .4 to .6." (Trial Ex. 249; *see also* Trial Ex. 186; 1-14-25 Price Trial Test. at 235-38, 244-47, 250).

[18]The silica dust test did not test fit as the respirators were glued on to a mannequin. (Trial Ex. 278, 3M 11108; 1-14-25 Price Trial Test. at 190). It also did not address sub-micron particle penetration and focused on mass rather the number and size of the trapped particles. It only tested 3 respirators for 90 minutes at an inexcusably low flow rate (not reminiscent of actual work) and did not test in intervals such that the only results measured were at the end of the 90-minute period which allowed for a caked/loaded filter to appear more efficient than it was in actual use. (*See, e.g.*, Trial Ex. 110, WV-AG-0061722; Trial Ex. 278; Trial Ex. 1524, 3M 136417-18; Trial Ex. 827, WV-AG–000066303-06; 1-14-25 Price Trial Test. at 189-91, 200-04, 209-11; ███████████ ██████████).

**IV.**     **By the *early 1970's*, 3M recognized internally that the fit of its disposable, valveless, cup-shaped respirators was a problem.**

24.     Since the beginning of 3M's development of the 8710 in the late 1960's/early 1970's, 3M understood that the wearer's ability to get a good fit with the 8710 on a consistent basis was in question. (*See, e.g.,* Trial Exs. 38, 54; ███████████████████████ Between 1969 and 1971, for instance, 3M learned about the trouble wearers were having with getting a good fit and was warned about the risks of a respirator used in potentially dangerous environments when they cannot be properly and consistently fitted. (*See id.*; Trial Ex. 38, 3M 0017795-96).[19] Indeed, 3M recognized this could especially be a problem for coal miners when it asked in an internal memo on May 23, 1969: "3. Are we going to have same fit problems in the coal mine industry?" (Trial Ex. 38, 3M 017804).

25.     Defendant 3M recognized that the 8710 could not be properly and consistently fitted, that this was "a problem" to be "very conscious of" when placing the 8710 on the market, and that 3M should not convey to the public that the 8710 would fit all wearers.  In an internal 3M memorandum dated July 1, 1970, 3M's John Cain wrote, "These low figures were due entirely to the persons wearing the respirator not making sure he had a good face seal.  Because we realize that this problem exists, I feel we must be very conscious of it when placing the product in a test or market situation." (Trial Ex. 54, 3M 035456)(emphasis added).[20]

---

[19] *See also* Trial Ex. 80, 3M 001965 (3M noted internally that two of three participants had leakage in coal dust fit test and concluded " [a]n adequate seal was not obtained when the respirator was repositioned" and this "respirator slippage" needed to be "corrected" per NIOSH's Schutz ); Trial Ex. 135, 3M 015735 (3M's Cain wrote in a letter in September 1972 that "some leakage could be expected around the face seal if the respirator were improperly fitted)).

███████████████████████████████████████████████████

26. In the 1970's, 3M's comparisons of the 8710's fit to its competitors and its other respirators further demonstrated deficiencies of these disposable, valveless respirators. (*See* Trial Ex. 192, 3M 091579-80 (3M's internal documents noted that a competitor's disposable mask "fits better than our #8710 on the individuals tested" and in a handwritten note by 3M's Einar Horne on 1/14/77 advised others that this document was "not to go to salesmen in this form"); Trial Ex. 268, 3M 010321 (in October 1, 1975 memo from Wilmes to Horne, he wrote in the section with the heading "#8710-H (#8800)" that, "The facefit of the respirator was evaluated . . . . This is about an 8X improvement over the 8710.")).

27. In an example in 3M's internal documents, 3M was made aware of the consequences of poor fit when it wrote in 1977 that Bethlehem Steel Environmental Health Engineer Tom Kreichelt told 3M personnel that "an employee who had about 10 years exposure had been using the 8710 for the last 3-4 years, developed a silicosis problem. Kreichelt cited this as an example of the poor fit of the 8710. And finally in a highly emotional state, he said 3M is not ethical, 3M proposes use of protection factor as a means of judging or comparing respirators . . . ." (Trial Ex. 329, 3M 016932).

### V. *In 1995,* a change in the federal regulations meant 3M had to swap out the 8710 disposable respirator for its counterpart, the 8210 disposable respirator.

28. Ultimately, in 1995, NIOSH began the process of changing over from the silica dust test used by 30 CFR § 11 to the new test in 42 CFR § 84. Effective July 10, 1995, the certification criteria changed to meet the requirements of 42 CFR § 84. There was a three-year grandfather clause that allowed the continued sale of respirators approved under 30 CFR § 11 until July 10, 1998, though the new approval criteria were established July 10, 1995. The 8710 was no longer sold after July 10,

1998.

29.     Defendant 3M developed the 8210 disposable, single-use, valveless, cup-shaped filtering facepiece respirator to replace the 8710 disposable, single-use, valveless, cup-shaped filtering facepiece respirator in anticipation of the regulation change and expiration of the three-year grandfather clause. (*See, e.g.,* 1-14-25 Price Trial Test. at 165; 10-6-22 Eitzman Dep. at 93-94).

**VI.     While the filters are different, 3M has repeatedly admitted the 8710 is the same as the 8210 in terms of their "fit characteristics."**

30.     Defendant 3M has long maintained that the 8710 and 8210 respirators were the same or substantially similar in many respects. For instance, 3M employee and 3M-designated expert Alan Johnston testified in 2014 that the 8710 and 8210 "are similar in their style, obviously. When you look at them, they look very similar. They're similar in their construction. The primary difference between the 8710 and the 8210 is in the filter media." (9-30-14 Johnston Dep. at 464 in *Hill v. 3M*; *accord* 10-17-22 Erik Johnson Dep. at 74 (3M employee/expert stating same)). In arguing that the masks were indistinguishable, counsel for 3M held up the 8210 and 8710 during the 2025 Lincoln County 8710 trial and stated: "This [8210] is the N95 that's on the market today that they're not suing us over. This [8710] is the one they're suing us over." (1-9-25 Linc. Cty. Trial Trans. at 60).

31.     Defendant 3M has repeatedly admitted the 8710 and 8210 have the same "fit characteristics." (*See, e.g.*, 4-18-18 3M employee and expert Dr. Eitzman Trial Testimony at 19-21, 27; 10-6-22 Eitzman Dep. at 38-40; 1-13-25 Linc. Cty. Trial Trans. at 108). During the Lincoln County 8710 trial earlier this year, 3M's counsel stated:

> "you'll hear from 3M experts that say the fit characteristics of these [8710 and 8210] are the same.
>          This [8210] is an updated version of the 8710. It has different filtering material, but the size, the shape, and the fit characteristics of these two respirators are

the same."

(1-13-25 Linc. Cty. Trial Trans. at 108).

32. On cross examination by 3M at the ongoing Lincoln County 8710 trial on January 15, 2025, the State's expert, Harvard and Northeastern University Industrial Hygiene Professor, Dr. Jack Price, testified as follows:

> Q [By 3M:] . . . when the new regulations came on, they took the basic construction of the 8710, they changed the filter so that it would pass the new certification tests, and they called it the 8210; right?
>
> A Yeah. It's essentially the same mask, just a little more filtration material.
>
> * * *
>
> Q [By 3M] . . . And you would expect the 8210 and 8710 to have either identical or very similar fit characteristics on the face; true?
>
> A Yes.

(1-15-25 Trial Trans. at 451-53).

## VII. Defendant 3M knew the 8710 and 8210 had the same fit defects making them unsafe.

33. Because their "fit characteristics" are the same, the 8210 has the same fit defects as the 8710. That is, the thicker 8210 filter did not remedy the well-known fit defects (including the lack of a reliable fit check; the lack of a reliable and practical fit test; the valveless design causing breathing resistance/pressure drop, flexing and collapse due to humidity; the lack of durability; the lack of adjustable straps; and the one-size-fits-all design) also found in 3M's similar 8710 disposable respirator. (*See, e.g.*, 1-14-25 Price Trial Test. at 184-85).

34. A 1986 letter from OSHA to 3M's counsel stated its position that elastomeric respirators offered a better fit and faceseal and corresponding protection than disposable respirators:

16

Additionally, the standards prohibit the use of disposable respirators, with or without HEPA filters,[21] because *disposable respirators*, in general, *permit greater faceseal leakage* under most conditions of use *than* half-mask respirators with *elastomeric facepieces and replaceable filters, and thus they cannot be relied upon to provide optimal protection*. 3M disputes both of these findings, but we believe there is substantial support in the record for both findings, including testimony from the National Institute for Occupational Safety and Health (NIOSH), respirator manufacturers, independent experts, industrial users of respirators, and labor unions, which represent the workers who must wear respirators. This evidence is buttressed by the Agency's collective experience promulgating and enforcing health standards. . . .

(Trial Ex. 1917, WV-AG-00123406.002-003 (emphasis added); *see also* Trial Ex. 660, 3M 321337 ("when compared to elastomeric facepiece respirators, disposable respirators do not provide a reliable face fit during use").[22]

35.     Before turning to each of the particular defects of the fit characteristics of the 8710 and 8210, the differences between a "fit check" and a "fit test" should be explained. A "fit check" and "fit test" are separate but important concepts in ensuring a respirator fits the wearer's face and adequately protects him/her from the hazards for which he/she may be exposed and for which the respirators were approved to guard against.

36.     Fit tests are "time consuming," and it is "not appropriate to require the employers to conduct" one every time the respirator is worn. *National Cottonseed Products Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987)(Ginsburg, J).[23] Accordingly, fit tests are intended to be conducted

---

[21]A High Efficiency Particulate Air (HEPA) filter is more than 30 times more effective than the filter on the 3M disposable respirators. (*See, e.g.*, Trial Ex. 1917, WV-AG-00123406.002-003).

[23]This D.C. Circuit opinion, authored by then Circuit Judge Ruth Bader Ginsberg, was a challenge 3M brought over OSHA's use of a Protection Factor of 5 for the 8710 for cotton dust.

every several months or once a year, not every day.  (*See, e.g., id.*; ████████████

████████████████████████████████████████████

████████████████████████████).

37.     Unlike a fit test which is done every several months, a "fit check" should be done every time the respirator is donned and takes a few seconds and certainly less than a minute.  *See Brock*, 825 F.2d at 492-93; 10-6-22 Eitzman Dep.

38.     Defendant 3M has long admitted that *both* fit checks and fit tests need to be available and conducted to ensure a proper fit and the safety of the wearer of the respirator.  (*See, e.g.,* Trial Exs. 488, 494, 696, 701, 732, 793, 826, 967, 1316; 1-14-25 Price Trial Test. at 272-73).  A respirator should not be sold if it cannot be both fit tested and fit checked.  (*See, e.g.,* 1-14-25 Price Trial Test. at 257, 272-73; *see also* 3M's Reed Dep.).

39.     In 1993, NIOSH noted that its approval label did not mean that NIOSH approved a manufacturer's fit checking and fit testing procedures for safety or otherwise.  (Trial Ex. 859, WV-AG-00034552).

40.     Moreover, on 3M's current website under the heading entitled, "Why is NIOSH Certification of Respiratory Protection Important?"with references to OSHA and the CDC, 3M suggests and implies that NIOSH approval connotes a measure of safety and proper fit of 3M respirators.  (3M Web Page on NIOSH Certification, attached as **Ex. K**).[24]  The 3M web page further creates this impression when it represents "NIOSH approval is issued only. . . after the respirator has been evaluated in the laboratory and found to comply with all requirements of Title 42, Code of

---

[24] *Available at*: https://www.3m.com/blog/en_US/safety-now/science-of-safety/regulatory-knowledge/why-is-niosh-certification-of-respiratory-protection-important/.

Federal Regulations, Part 84, and after the manufacturer's quality plan is determined to be satisfactory." (*Id.*). Defendant 3M also omits there that the NIOSH regulations and approval do not test fit and are contingent upon the respirator being able to be correctly fitted. (*See id.*). Nor does 3M indicate that there may be difficulties fitting the respirator, though it has been approved by NIOSH. (*See id.*).

41.     While 3M knew long before this, two letters from OSHA to 3M's counsel in 1986 nevertheless describe the 8710's problems with fit testing and fit checking. In one such letter rejecting 3M's attempt to have the agency re-consider its decision to disallow the 8710 to be worn around asbestos, OSHA wrote:

> "[T]he evidence in the record strongly supports OSHA 's finding that, when compared to elastomeric facepiece respirators, disposable respirators do not provide a reliable face fit during use . . . .*There is no acceptable method/or verifying their (disposable respirators) fit*. . . The record clearly shows that, as a class, *disposable respirators do not provide a reliable face fit after initial fit testing*. . . *They cannot be adequately fit checked* each time the same or new respirator is donned, and they are more subject to abuse, misuse, and degradation of face fit during actual use than elastomeric facepiece respirators. . . Workers unanimously opposed use of disposable respirators, Workers stated that disposable respirators do not fit well, . . .and failed to provide a good face seal."

(Trial Ex. 1917)(emphasis added).

42.     In 1992, NIOSH Guidelines provided:

> "What is more relevant, the face seal leakage for cup-shaped disposable masks can be considerably higher than 10 percent to 20 percent. if these masks are not properly fitted to each wearer's face, fit tested by a qualified individual, and then fit checked by each wearer before respirator use. Both fit testing and fit checking are essential elements in any effective and reliable personal respiratory protection program [footnotes omitted] as summarized in Table 1 on page 20. At this time, there are no NIOSH recommended qualitative or quantitative fit tests for these masks. [footnotes omitted].   Cup-shaped disposable masks cannot be reliably fit checked [*sic*] be wearers. [footnotes omitted].   Therefore, the efficacy and reliability of the face seals on cup-shaped disposable masks are undependable because there are no proven

reliable fit tests nor reliable fit checks."

(Trial Ex. 826, WV-AG-00122047; *see also* 1-14-25 Price Trial Test. at 266-68).

43.     Defendant 3M has understood for decades that the lack of a reliable fit check and the lack of a reliable and practical fit test made the 8710 unsafe and makes the 8210 unsafe. (*See, e.g.,* Trial Exs. 488, 494, 696, 701, 732, 793, 967, 1316).

44.     As the D.C. Circuit observed, "[t]wo procedures, the saccharin QLFT [footnote omitted] and the positive pressure fit check (PPFC), [footnote omitted] 3M states, are available to test disposable respirators for face-fit; each, 3M contends, is independently adequate to do the job. If 3M were right about the adequacy of these tests, we would be obliged to rule in its favor . . . ." *National Cottonseed*, 825 F.2d 482, 492 (D.C. Cir. 1987). The D.C. Circuit did not rule in 3M's favor. *See id.*

### A.     Lack of a Reliable Fit Check[25]

45.     In 1994, 3M stated, "[f]it checking is an important part of respirator use." (Trial Ex. 967, WV-AG-00122899). The D.C. Circuit agreed. *See Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482, 492-93 (D.C. Cir. 1987)(Ginsburg, J.).[26]

46.     For decades, Defendant 3M has known that a daily fit check cannot be done on valveless disposable respirators like the 8710 and 8210,[27] as OSHA, ANSI, NIOSH, and the D.C. Circuit all determined at various points in the 1980's and 1990's, as illustrated by the following sub-

---

[25] A "fit check" is sometimes referred to as a "user seal" check.

[26] *Accord* Trial Ex. 1242, KY/HILL/MILLER 6708, § 2.3.3.

[27] ████████████████████████████████████████████████████████

paragraphs:

a.        In 1985, OSHA recognized the "fitting problem." *Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987)(Ginsburg, J.) (*citing* 50 Fed.Reg. 51,154 (1985)). The D.C. Circuit rejected 3M's arguments in that case in writing the following:

> The PPFC [positive pressure fit check] procedure is an effective daily check for the fit of a gas-mask style respirator. Respirators of that type confine intended air intake to valves that can be blocked off easily by the employee's hands. By contrast, the entire surface of a disposable respirator [like the 8710] is intended to permit air intake. OSHA recognized that, in the case of disposable respirators, the worker's hands cannot effectively block intended air intake, and that intake only, while leaving unobstructed air taken in because of the respirator's improper fit. *See supra* note 6. [footnote 18 omitted] We think it evident that OSHA did not rule without reason when it adhered to the view that *no test appropriate for daily use adequately assured the proper fit for disposable respirators*.

*Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d at 492–93 (emphasis added).

b.        In footnotes 5 and 6 of *Brock*, it was further explained:

> A single-use respirator is similar in shape to, but more rigid than, a surgical mask. Unlike gas-mask style respirators that have air intake and exhale valves, the entire surface area of the single-use respirator [like the 8710] is the filter.
>
> Using a gas-mask style respirator, the wearer can easily block the air flow valves, breathe deeply, and determine whether air is escaping from the face seal. For the single-use respirator [like the 8710], however, *it is difficult, if not impossible*, for the wearer to cover the entire surface area, but not the seal between the respirator and the wearer's face . . . .

*Nat'l Cottonseed Prod. Ass'n v. Brock*, 825 F.2d at 489, nn. 5-6 (emphasis added).

c.      Also, the ANSI Z.88.2 standards in 1980 and 1992 noted that a fit check "may be difficult or impossible to carry out on valveless respirators[,]" like the 8710 and its successor, the 8210. (*See* 1-9-25 Trans. at 135-36; 3M Ex. 52.01, 3M 611650 at A7.3; 1-14-25 Price Test./Trial Trans. at 183-84).

d.      In a 1986 letter to 3M's counsel, OSHA wrote: "The disposable respirators permitted for use under the cotton dust standard do not, as the preamble explains, have either inhalation or exhalation valves.  Therefore, a simple and effective fit check cannot be performed on these respirators."  (Trial Ex. 653, WV-AG-00123287; 1-14-25 Price Trial Test. at 258).

e.      In 1992, OSHA prohibited its employees from wearing disposable respirators in certain environments because they "'provide a poor face seal'" and they were "'difficult to perform an effective'" fit check.  (Trial Ex. 2295; 1-14-25 Price Test./Trial Trans. at 179-81).  As such, OSHA employees were required to instead use only elastomeric masks with HEPA filters.  (*Id.*).

f.      NIOSH confirmed in 1993 that "for over 5 years, OSHA has recognized the limitations of the positive-pressure fit check as applied to non-elastomeric disposable dust and mist respirators such as the 3M 8710…" and that in 1987, the U.S. Court of Appeals upheld the OSHA technical position that "*disposable, non-elastomeric respirators are incapable of being fit checked*".  (Trial Ex. 851, WV-AG-00096437-00096438) (emphasis added); *see also* 3M 340193 (noting that OSHA has "questioned in its final standard … whether disposable respirators can be

22

effectively 'fit checked' daily by employees when they don the respirator").

g.      Likewise, Los Alamos's Darrel Bevis found it impossible for the user to perform a fit check after donning disposable, valveless, cup-shaped respirators.

h.      In addition, there was another expert industrial hygienist, "Dr. Mirer from the United Auto Workers [who] stated that 'a field fit check . . . can't be performed on the paper dust mask[.]'" (Trial Ex. 660, 3M 321338).

47.      In 1986, OSHA cited the following data in rejecting 3M's request to apply an Assigned Protection Factor ("APF") of 10 for cotton dust: "[A]s many as 41 per 100 improperly fitted wears of 3M's 8710 respirator could be erroneously passed by 3M's positive pressure fit check (PPFC) procedure." (Trial Ex. 653, WV-AG-00123287.009).

48.      In its Final Rule in 2006 and based in part upon 3M's advocacy, OSHA shifted some responsibility to the purchasers of its respirators, but the widespread criticisms, recited above, remain true and reflect the point that the 8710 and 8210 were and are incapable of providing a reliably-consistent adequate fit and faceseal because of the lack of a reliable fit check for these valveless, disposable, cup-shaped respirators.

### B.    Lack of Reliable and Practical Fit Test

49.      In the 1991 Wilmes letter, 3M admitted: "We strongly believe that there is a *tremendous risk to the wearer* of any respirator that has not been properly fit tested. This risk far out shadows any risk from the use of saccharin[,]" then thought to be a potential carcinogen. (Trial Ex. 793)(emphasis added).

50.      Similarly, in its presentation on the discovery rule in the 2025 Lincoln County trial on its 8710 respirator, 3M acknowledged the testimony of its former employee, Katherine Reed, that

"'[a] respirator should not be used unless it's been fit tested.'" (1-9-25 Trial Trans. at 121-22; 3M Ex. 61.15).

51.     Also, in 1988, 3M's personnel wrote: "I believe that a respirator certification scheme should require that a respirator manufacturer in the respirator user instructions specify a validated fit test must be performed to assure adequate facefit before the respirator can be relied upon for protection. This would provide assurances that the user has a respirator that adequately fits." (Trial Ex. 732 at p. 221, 1036, WV - AG - 00111446, Wilmes/Olsen/Hendricks Article)(emphasis added).

52.     A responsible respirator manufacturer should not sell or put on the market respirators that cannot be fit tested. (*See, e.g.,* 1-14-25 Price Trial Test. at 257).

53.     As alluded to above, there are two types of fit testing: qualitative and quantitative. *See, e.g.*, 29 CFR § 1910.134(b); *see also* 1-14-25 Price Test./Trial Trans. at 175. Fit tests are done qualitatively with a test/challenge agent or quantitatively with instrumentation usually involving a probe. (1-14-25 Price Test./Trial Trans. at 176-78; *see also, e.g.*, 29 C.F.R. § 1910.134(b)(1998)).

54.     "**Quantitative fit test (QNFT)** means an assessment of the adequacy of respirator fit by numerically measuring the amount of leakage into the respirator." 29 CFR § 1910.134(b)(emphasis in original). That is, while a quantitative fit test may be theoretically done, it involves a probe that destroys the respirator and requires "a special machine[.]" (1-15-25 Price Trial Test. at 459). As the name implies, a quantitative fit test is done with instrumentation and results in a particular value after taking measurements. (*See, e.g.,* 1-14-25 Price Test./Trial Trans. at 176). A quantitative fit test uses a device (such as a Portacount) to measure the challenge agent inside and outside the respirator, but it was and is expensive, "difficult," and not practical for employers, and in the case, at least, of the 8710, the filter was so defective it was difficult to measure the face seal. (*Id.* at 176-78; *see also* 1991

24

Wilmes Ltr., Trial Ex. 793; Trial Ex. 771, 3M 532871-72 (3M noting in 1990 that 8710 cannot be quantitatively fitted); Bien Rept.). Defendant 3M knows quantitative fit testing is not practical for employers, including coal operators.

55.     "**Qualitative fit test (QLFT)** means a pass/fail fit test to assess the adequacy of respirator fit that relies on the individual's response [usually smell or taste] to the test agent." 29 CFR § 1910.134(b)(emphasis in original); *see also* 1-14-25 Price Test./Trial Trans. at 177-78.   A qualitative fit test is a pass/fail test that relies on the subject's sensory response (smell or taste) to detect the challenge agent.  (1-14-25 Price Test./Trial Trans. at 175-78).

56.     In the 1970's, banana oil and irritant smoke were identified as qualitative fit test agents. However, the 8710 could not be fit tested using either of these two test agents because the small, sub-micron particles used in these methods would penetrate the respirator filter and cause excessive leakage to void the test.  (*See, e.g.,* Bien Rept.).

57.     The 1987 NIOSH Decision Logic on fit testing notes that:

●**Fit Testing**

No qualitative or quantitative fit tests have been demonstrated to be capable of effectively identifying inadequately fitting respirators (i.e, respirator-wearer combinations that provide less protection than the APF).  The presently used fit tests (e.g., ANSI-recommended, OSHA-approved) may fail to identify individual wearers with inadequate respiratory protection.  Thus fit tests should be used with caution and with recognition of their possible deficiencies.  As appropriate, periodic evaluations of the effectiveness of each respirator during use in the workplace should be conducted to ensure that each wearer is being provided with adequate respiratory protection.

(3M Trial Ex. 57.101 at p. 209 of 305)(emphasis in original).

58.     In the aforementioned 1991 letter from 3M manager, Don Wilmes, to NIOSH attempting to defend a qualitative test with the challenge agent involving the then potential

carcinogen, saccharin, 3M stated as follows:

> The test (sodium saccharin qualitative fit test) was designed and developed in the late 1970s and early 1980s as a validated qualitative fit test to be used with respirators with dust/mist filters. The test was developed because up to that time there was no fit test, qualitative or quantitative suitable for use with respirators with dust and mist filters.
>
> The quantitative fit tests then available were not suitable because the filter efficiency of this type of respirator filter would allow 10 to more that 20 percent of the test agent to pass through the filter masking any attempt to quantify the test aerosol that was passing through faceseal leakages.
>
> The qualitative fit tests then available were also not suitable because they were either too small of a particle, such as the irritant smoke, or a vapor, such as isoamyl acetate. The other agents mentioned in the literature were coal dust and talc powder of which both methods lack suitable sensitivity and were impractical for routine use."

(Trial Ex. 793, 1991 Wilmes Letter to OSHA; *see also* 1-14-25 Price Trial Test. at 253-57).[28]

59.     Defendant 3M has discarded the original fit test agents (irritant smoke and isoamyl acetate/banana oil) and now identifies only saccharin and bitrex as "acceptable" qualitative fit test agents for the 8210. (*See* 8210 Technical Specification Sheet, a copy attached as **Ex. B**).[29]



---

[28]*Accord Brock*, 825 F.2d 489, n. 6 (explaining fit tests "were unavailable in 1978 for the single-use respirator [8710] because all known test agents permeated its filter element").

[29]*Available at:*
https://multimedia.3m.com/mws/media/1425070O/3m-particulate-respirator-8210-n95-technical-specifications.pdf?&fn=FINAL_V2.pdf



61.     While saccharin and bitrex fit test agents are available for purchase to attempt to qualitatively fit test the 8210, no reliable and practical fit test exists for the 8210. (*See id.*)

62.     The 8710 and 8210 were and are incapable of providing a reliably-consistent adequate faceseal because, in part, of the lack of a reliable and practical fit test for these disposable, valveless, cup-shaped filtering facepiece respirators.

> **C.**     **Defendant 3M has known for decades that the valveless design of the 8710 and 8210 disposable respirators causes hot and humid exhaled breath – as**

**well as humidity in a natural environment like coal mining -- to increase the breathing resistance and the respirators to flex and then potentially collapse, all of which lead to faceseal leakage endangering the wearer**.

63.     Inhalation resistance and exhalation resistance are jointly referred to as "breathing resistance" and this term is also used interchangeably with the term, "pressure drop." (*See, e.g.,* 1-14-25 Price Test. Trial Trans. at 288; ███████████████████████████). Breathing resistance/pressure drop refers to "the resistance to pull air through the filter" which creates "negative pressure." (*See, e.g.*, 1-14-25 Price Test. Trial Trans. at 239-40).

64.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

65.     Single-use disposable respirators such as the 8710 and 8210 had and have no exhalation or inhalation valve to prevent the exhaled breath from passing back through the entire surface of the filter media. Consequently, the moist, warm, humid exhaled breath condenses on the exposed filter media, (a) causing degradation, loss of filter rigidity, and increased breathing resistance (a/k/a pressure drop), (b) thereby resulting in flexing and often eventual collapse, all of which, in turn, led to (c) increased leakage of the face seal. (*See, e.g.*, ████████; *see also* 1-14-25 Price Trial Test. at 298; ████████████████████████████). Defendant 3M has known about this defect for several decades.

66.     As early as 1969-70, 3M was told that the 8710 prototype needed an exhalation valve to cut down on the moisture inside the respirator, but 3M deliberately declined to do so due to cost

concerns.  (Trial Ex. 43, 3M 0017771-73, 79-80; *see also* Trial Ex. 52, 3M 17108).

67.     In October 1974, 3M's Barghini wrote, "in order to be competi[tive] future 3M single use respirators should include a valve in their designs."  (Trial Ex. 222, 3M 016598; 1-14-25 Price Trial Test. at 252-53).

68.     Recently, 3M has boasted about the development of its "cool flow valve" that has been added to some of its disposable respirators, including the 8210V (which is distinct from the 8210), in order to "release . . . hot, humid exhaled breath quickly . . . inside the facepiece[.]" (*See, e.g.*, 3M Cool Flow Valve Webpage, attached as **Ex. C**,[30] *see also* 10-6-22 Eitzman Dep. at 77 (testifying the cool flow valve "reduces heat and humidity inside the respirator"), 94, 135; 3M Web Page with Dr. Eitzman Video, attached as **Ex. D** (depicting Dr. Eitzman as answering, in part, the question "Do you know what an exhalation valve in an N95 respirator can do for you?" by saying the "[t]he cool flow valve helps that by making it easier for exhaled breath – which is hot and humid – to get out of the respirator. Otherwise, if you didn't have a valve present, what would occur is that [hot humid exhaled breath] would go into the rest of the respirator facepiece, which is filter media.  It would get warmed up and then when you breathe in the next breath you get, at least at the beginning, you get some warm air coming towards you . . . .").[31]

69.     In addition to the moist and humid exhaled breath, humidity in the external environment, often found in coal mines, (*see, e.g.,* Trial Ex. 38, 3M 017794; Trial Exs. 71, 184, 185;

_____

[30] *Available at*:
https://www.3m.com/3M/en_US/respiratory-protection-us/products/disposable-respirators/cool-flow-respirator-mask/

[31] *Available at:*
https://www.3m.com/3M/en_US/worker-health-safety-us/safety-resources-training-news/calendar-of-events/n95/

7-22-98 Haggerty Dep. at Vols. II-III in *Cochran*), caused the 8710 and causes the 8210 to flex and ultimately collapse. (*See id.*).

70.     Defendant 3M has also known for decades that a humid environment would cause its disposable respirators to flex and ultimately collapse. (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *see also* Trial Ex. 1668, 3M_DEP 0003232 (8710 "[c]an collapse under high humidity"); Trial Ex. 5013). In its presentation on the discovery rule in the Lincoln County trial, 3M acknowledged the testimony of its former employee, Robert Haggerty, that the "8710 can collapse in high humidity" but this fact was not mentioned in the warnings for the product. (1-9-25 Linc. Cty. Trial Trans. at 119-20; 3M Ex. 61.13).

> i.     **Defendant 3M has long known that increased breathing resistance/pressure drop leads to dangerous increased faceseal leakage.**

71.     In a 1994 letter, 3M acknowledged "[r]espirators with high pressure drops almost always have increased face seal leakage." (Trial Ex. 927). Dr. Price testified this concept was well understood in the respiratory protection field. (1-14-25 Price Trial Test. at 268-271).

72.     Peer review studies, including those participated in by 3M personnel (Nelson & Cotton), have likewise "concluded that breathing resistance across the facepiece increases faceseal leakage of filtering facepiece respirators like the 8710" and 8210. (███████████████████████████████████ *citing* Trial Ex. 1251; *see also* 3M Trial Ex. 08.051 at p. 1 ("The measured faceseal leak rates increased as the breathing resistance increased[.]"). ███████████████████████████████████████████████████████████████████████████████████████

*citing* Trial Ex. 1251).

73.    In its "Conclusion" section, the 3M authors (Nelson & Cotton) explained: "An increase in breathing resistance can cause an increase in faceseal leakage. . . . The increase in faceseal leakage could lower respirator performance to unacceptable levels before breathing resistance is noted by the wearer." (3M Trial Ex. 08.051 at pp. at 3-4).

74.    Faceseal leakage allows small respirable particles that can cause disease to be in the breathing zone of the respirator wearer.

> **ii.    Breathing resistance/pressure drop regulations were added in 30 C.F.R. § 11 for safety reasons.**

75.    The regulations on breathing resistance were added because it is a safety issue.  (*See, e.g.,* Trial Ex. 1251).

76.    As background, the silica dust test was in place between 1972-1998 in 30 C.F.R. § 11, and it included a "pull through test" for all respirators.  (1-14-25 Price Test./Trial Trans. at 189). Valveless respirators like the 8710 were also subject to an additional "breathing machine test" because NIOSH was "concerned about, again, the cyclic breathing pattern as well as humidity that comes from exhaled breath through the mask since there's no valve.  Air has to pass back through the filter."  (1-14-25 Price Test./Trial Trans. at 189; *see also id.* at 251-53).  Exhaled breath is between 92-94%

humidity. (1-14-25 Price Trial Test. at 252). The breathing machine portion of the silica dust test was developed to address the then new, valveless disposable respirators by mimicking human breath which would not escape the 8710 mask through a valve, as traditionally been done.

77.     The humidity range for the breathing machine test was supposed to be "94+/- 3 percent relative humidity," (*i.e.*, 91-97%)  to mimic exhaled breath for the "[a]ir exhaled through the respirator[.]"   30 C.F.R. § 11.140-5(c).[32]

78.     The regulatory (30 CFR § 11.140-5(c)) 91-97% relative humidity requirement in the breathing machine was further adopted by 3M's internal quality control plans, called "Test Methods." (*See, e.g.,* 10-5-18 Eitzman Trial Test. at 204, 207-09, 217). That is, the 3M Test Methods further required that the silica dust audit machines operate with exhaled air with a percent relative humidity ranging from "94 +/- 3%" or 91-97%.  (Trial Ex. 1797 – "TM-1040" 3-23-77, p. 4 (3M018931-35); Trial Ex. 1907, "OTM-2072" 5-15-84, p. 3 (3M1174227-229) (updated from 1040 and incorporated into computerized system); Trial Ex. 1940, 7-17-91 p, 3 (3M0588516-520); Trial Ex. 1940, 7-19-91, p. 3 (3M588516-520);  Trial Ex. 1956, 10-12-93 p. 4 (3M0462485-91); ████████████████████ ████████████████████; Trial Ex. 1895, compared to Omega Web Trial (3M094316-22)).

79.     The silica dust audit test measured breathing resistance/pressure drop by millimeters of water column.  (30 CFR  § 11.140-9(b); ████████████████████ ████████████). The regulations required that the maximum final inhalation resistance was 15 millimeters of water column and the maximum exhalation resistance was also 15 millimeters of water

---

[32]This humidity range in the "breathing machine" test required by 30 C.F.R. § 11.140-5(c) is distinct from the humidity range used in the "pull through" test found in 30 C.F.R. § 11.140-4(b).

column. (*Id.*).

        **iii.**     *For the first decade of the 8710's product life beginning in 1972,* **Defendant 3M knew the 8710 could not meet the 15 mm limit in the breathing resistance regulations in 30 CFR § 11 and 3M's QC plans/Test Methods, and yet, 3M sold millions of the 8710 anyways.**

80.     Between 1972 and 1982, the 8710 largely and repeatedly failed the breathing resistance/pressure drop requirements set forth in the regulations for disposable respirators in the silica dust test in 30 C.F.R. § 11 and the 3M quality control manual, as further reflected in the following bullet points.[33] (*See, e.g.*, 10-6-22 Eitzman Dep. at 105:03-106:02, 149-50 (3M expert/employee admitting "there were a number of test results that were higher than the NIOSH approval limits for a product that was being produced in Aberdeen in the late 70's" that were released for sale); Trial Ex. 71, 3M 017402; Trial Ex. 291, 3M 522; Trial Ex. 396, 3M 94838; ██████████████████ ████████).

        ●    Meeting Minutes of the 3M Respirator Committee on June 29, 1971 indicate 3M was aware of "problems in testing the No. 8710." (Trial Ex. 71, 3M 017402). Specifically, it was noted that, "some of our web would meet specifications, but this depended upon the temperature and humidity in their breathing machine. When operating in the low end of the range, satisfactory results were obtained. The high end

---

[33] As part of its quality control plan approved by the government, 3M was required to perform the silica dust internally. In late 1974, 3M obtained permission from NIOSH as an alternative means of quality control to also use the DOP test. In the 1970's, 3M personnel acknowledged, "we are faced with the conclusion that there is no correlation between the DOP machine and the silica dust regarding" pressure drop, and 3M's Wilmes noted the correlation between DOP test and silica dust test is "no longer valid." (Trial Ex. 247, 3M 1510-11; Trial Ex. 185, 3M 118541). Further, NIOSH's acceptance clearly stated that if there were conflicts, the silica dust was the reference standard as it was the test embodied in the regulation. (Trial Ex. 217, 3M 123552; *see also* ████████████ ████████████████████████████).

33

of the range gave high pressure drop which appeared to be related to an excessive moisture accumulation in the respirator. Bob [Barghini]'s group is studying the problem to determine what will be required to pass the test on their breathing machine[.]" (*Id.*).

● In September 1973, 3M acknowledged internally it was "gambling" with production because it could not meet the breathing resistance requirements for the 8710. (Trial Ex. 182).

● On October 3, 1973, 3M's internal memo indicated "production is still having pressure drop difficulties[.]" (Trial Ex. 183, 3M 2254).

● In an internal 3M memorandum from Wilmes to Barghini a few weeks later, on October 18, 1973, he wrote "the process is out of control." (Trial Ex. 185, 3M 118541). The memo later continued, "[it should be pointed out that the DOP release tests show the product is still acceptable but the breathing machine tests show it unacceptable. Our original correlation is no longer valid because the shift in the process. Product must be released but every effort should be made to get back into certification specifications." (*Id.*).

● On March 22, 1974, an internal 3M memo acknowledges that the 8710's "final pressure drop on masks . . . was outside the specifications that NIOSH approved." (Trial Ex. 201, 3M 115317-19). This internal 3M document notes "we've been skirting with this problem since September and really never been very safe in that regard to" pressure drop. (*Id.*). Defendant 3M's engineers further commented that the pressure drop violations were a "major defect" problem in the quality control plan: "because of

34

the seriousness of this major defect problem . . . a cooperative effort has been started among Laboratory, Production Engineering, and Process engineering personnel." (*Id.*).

- In 1974, 3M noted internally that "we find the 8710 significantly off specification in DOP penetration, DOP pressure drop, and final pressure drop" such that it ran "the risk of being challenged by NIOSH on our present 8710 certification," and later, in a separate internal document, "[t]he functional testing of the 8710 indicates an improvement in the final pressure drop but the **product is still borderline with no safety margin**." (Trial Exs. 200, 223; *see also* Trial Exs. 201-202).

- A 1976 3M document showed that 99.5% of the 8710's failed the breathing resistance requirements under 30 CFR §11.140-9(b). (Trial Ex. 291; *see also* ██████████████████████████████████████████████).

- In 1977, 1978 and 1979, almost all of the 8710's violated the final inhalation resistance limit of 15 mm in 30 CFR §11.140-9(b). The 8710 also violated the initial inhalation maximum resistance limit (12 mm), as set forth under 30 CFR § 11.140-4(b), inasmuch as more than 1% of the 8710's tested had initial resistance values exceeding 12 mm. On average, in 1977, 4% of the 8710 masks violated this limit, 30% violated this limit in 1978 and 86% violated this limit in 1979. (Ex. 6 to 9/15/15 Dep. of Dr. Leidel in *Morris v. 3M*).

- "According to [3M employee] Mr. Stump, who worked in the plant from 1976 to 1983, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (*citing* Stump Dep. at 88)). Stump testified that he

worked in QC of the 8710 at a 3M plant in the mid 70's to early 80's, (6-30-16 Stump Dep. at 10:11-13:20), and, though an internal 3M document noted the silica dust test "'was the most important test in the plant,'" (*id.* at 91:7-92:12; *see also* Trial Ex. 409, 3M 098301), that 3M was "so far out in left field with silica dust testing that we couldn't believe any of the results that we were getting during that time," (*id.* at 41:5-21); "the silica results really is what's bad" and "was all over the place," (*id.* at 46:1-18); the silica dust test did not correlate with the DOP test, (50:16-22); and the silica dust test never got to a point where it could work in 3M's Aberdeen plant, (*id.* at 94:6-10, 88:3-11).

81.     Because Defendant 3M could not "maintain or cause to be maintained. . . "the acceptable quality level [AQL] for each characteristic tested . . . to assure that it is manufactured according to the drawings and specifications upon which the certification is based[,]" 30 C.F.R. § 11.33(f), Defendant 3M thus plainly violated this regulation by representing the 8710 was approved. *See id.*

82.     Defendant 3M nevertheless sold the 8710's that could not pass the regulatory 15 mm breathing resistance requirements in 30 CFR §11.140-9(b).  (*See, e.g.,* 10-6-22 Eitzman Dep. at 149-50).  ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████

---

[34]A lot can contain as many as 120,000-130,000 respirators.  (10-6-22 Eitzman Dep. at 102-03).

<blockquote>
iv.    **In the *early 1980's*, 3M fraudulently manipulated the 91-97% relative humidity range required by the regulations and 3M QC plans for the breathing machine test so that the 8710 would appear to "pass" the test.**
</blockquote>

83.    Since the 1960's and 1970's, Defendant 3M had long understood that humidity was a critical factor in impacting the pressure drop of the 8710. (*See, e.g.,* ███████████████████

███ ; Trial Ex. 1741; Field Letter of Barghini and Dyrud to Courtney, 6/11/71 (3M001823-25); Trial Ex. 1736, Field Letter of Barnard to Groth, 11/8/70 (3M022018, 017078-82); Trial Ex. 1869, Memo from Japuntich & Day to Woodward, 10/29/80 (3M 038074-79)). For example, in 1971, 3M noted internally that 3M's manager Bob Barghini "found that some of our web would meet specifications, but this depended upon the temperature and humidity in their breathing machine. When operating in the low end of the range, satisfactory results were obtained. The high end of the range gave high pressure drop which appeared to be related to an excessive moisture accumulation in the respirator." (Trial Ex. 71, 3M 017402).

84.    



85. Beginning around 1982, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 3M manipulated the 91-97% humidity range in the test in violation of the regulations and its internal quality control plan approved by NIOSH (as part of its certification to sell the respirator) so that the 8710 would "pass" the test. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

86. By manipulating the humidity settings of the silica dust audit test equipment, 3M could create test results which appeared to reflect compliance with the 15 mm limit in the silica dust test,

even though the 8710 respirator could not comply with the silica dust test when the test was performed on a breathing machine without lowering the required 91-97% relative humidity range.

87. 

*accord* 1-14-25 Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59).[35]

---

[35]In sum, Dr. Price testified as follows at the Lincoln County 8710 trial: (1) "For the valveless respirator, they were required to test that respirator with the silica dust test using the *breathing machine* so the exhaled air, which is at a warmer temperature and a higher humidity, passes through the mask, and that *is part of the test* for the performance of that type of mask." (*Id.* at 381); (2) 3M's 8710 was "*having difficulties with the pressure drop[.]*" (*Id.* at 858); (3) 3M was "*obligated to notify NIOSH that they weren't in compliance* with their quality control program and meeting the requirements of the certification approval . . . they were obligated to contact NIOSH about . . . if they were having problems with their quality control program." (*Id.* at 292); (4) *3M* "from their own internal testing and knowledge base of doing all these tests over the years, *[3M knew] that humidity was a key factor . . . that would lead to the increase in pressure drop*" (*id.* at 858-59); (5) "[F]rom reviewing other documents in other cases" and "from reviewing a lot of their quality control documents[,]" he learned that *3M "did not meet the humidity specifications for the silica dust test. They [3M] were basically passing these tests at lower humidities than what's required in the standard.*" (*Id.* at 380-81, 858-59); (6) "In the mid '80s through the -- to the end of '98 -- well, actually, '95 where it couldn't be sold anymore, they were not doing the silica dust test at the correct relative humidity. So I think *that was the way that they ended up solving their pressure drop problem by reducing the humidity* during a breathing machine test. So that has me concerned." (*Id.* at 380); and (7) the 8710 was *"out of compliance"* with the regulations. (*Id.* at 381-82).

88.     Defendant 3M's employee/expert Dr. Eitzman testified that the 3M *Test Methods* give

instructions to the QC technicians to follow in performing the quality control tests and *required* 3M

to test the 8710 at *91-97%* relative humidity for the breathing machine.  (10-5-18 Eitzman Trial Test.

at 203:17-204:24).[36]

89.     Defendant 3M's employee/expert Dr. Eitzman acknowledged that 3M's failure to test

the 8710 at the proper relative humidity range *violated the 3M internal Test Method* when he testified

as follows:

Q       Again, just to kind of cut to the chase, it also had a direction to the laboratory
        tech to test the respirator at the relative humidity of 94 plus or minus three or
        91 to 97 percent?

A       Yeah.  This test method also has that exhalation relative humidity requirement.

Q       Okay.  So, here's where – kind of struggling over.  You told me a minute ago,
        and the jury that after 1987 less than – not less than ten percent of the masks
        were tested at 91 to 97.  And then before 87 50 percent or more were tested at
        levels outside 91 to 97.  And that would be in violation of the test method that
        we just looked at here, right?

A       It would not be according to that humidity range and the test method.

(10-5-18 Eitzman Trial Test. at 208:7-20; *accord id.* at 209:10-17).[37]

_____

[36]Defendant 3M's NIOSH-approved QC guidelines -- which must be followed as mandated
by the regulations, (30 CFR § 11.42(c)) -- required the same relative humidity range in the breathing
machine (91-97%) that NIOSH required for the certification of single-use respirators in 30 CFR §
11.140-5(c).

[37]Dr. Eitzman reiterated:

Q       . . . So the main plant where 8710s are made has a lab booklet inside the
        plant for lab techs that tell them they need to test this mask at exhaled air at
        91 to 97 percent, and after [*sic*] 97 ['87] 90 percent of the masks aren't tested
        that way, and before 87 at least 50 percent of the masks aren't tested in
        accordance with the test method?

90.     Defendant 3M's employee/expert Dr. Eitzman confirmed, albeit reluctantly, that 3M

*should have followed* its internal Test Method:

Q       Well, are you suggesting that when you're not doing approval testing in your
        quality control that you don't have to follow the regulation?

A       Correct.  You don't have to follow the regulation.  You should follow your own
        test methods.  And as I said, the test methods should have been changed.  But
        there's no requirement to follow what's in the regulation in terms of doing your
        own test in-house.

Q       You should follow your own test methods, and you guys didn't do that?

A       Correct.

(*Id.* at 219:9-19; *accord id.* at 217:10-21).[38]

91.     In short, between the years 1982 to 1998, 3M failed to adhere to its own internal quality

control Test Methods, which required 3M Company to test the 8710 in a manner consistent with the

---

A       With that particular aspect of the test method, and we know that because they
        accurately recorded the information.

(*Id.* at 209:10-17).

[38]Dr. Eitzman similarly testified earlier in the trial:

Q       Even though before 1987 at least half the respirators were off spec for relative
        humidity, and after 1987 almost 90 percent of the respirators were not being
        tested at the right humidity for this mask under the federal regulation?

A       Well, there's no federal regulation that relates specifically to that test as an
        audit test.  It's included in the quality control plan and we should have
        followed our test method, but it's not a regulatory approval test at that –

Q       Okay. So you should have followed your test method and you didn't, right?

A       For the majority of the tests, that's correct.  Or we should have changed the
        test method, as I said before.

(*Id.* at 217:10-21).

91-97% humidity range specified by 30 C.F.R. 11.140-5(c). This point was confirmed by 3M's expert and 3M corporate scientist employee, Dr. Philip Eitzman, in his 2018 deposition. (10-15-18 Eitzman Dep. at 198-200) (testifying that post-1987 "less than 10%"were "done at the 91 to 97"% humidity range and pre-1987 less than 50% were under the 91-97% humidity range required in the regulations)).

### v. Defendant 3M did not advise NIOSH of 3M's continuing violations of the regulations and 3M internal QC plans/Test Methods.

92. While NIOSH identified through an audit that the 8710 was exceeding the breathing resistance limits in 1975 and communicated and met with 3M about this issue,[39] 3M was able to convince NIOSH that it would fix this problem and NIOSH expected it to so. (Schutz Dep. at 36:13-19; *see also* Trial Ex. 1261, WV-AG- 00123159; Trial Ex. 261 (3M's notes of 1975 meeting indicate that NIOSH "will in effect issue to their Q.C. people instructions" that pressure drop of the 8710 "is not to be criticized"); Trial Ex. 262, 3M 020000-01).[40] The late Bob Schutz, NIOSH's former Certification Chief, testified that certainly he did not remember being advised any time between 1977-1979, that the 8710 exceeded the breathing resistance limits between 84-100% of the time annually. (12-18-03 Schutz Dep. at 39:6-40:9).

93. Schutz averred that had he known that information, NIOSH would have considered

---

[39]While at times 3M has tried to blame its own machine for its inability to meet the requirements for pressure drop then in the regulation between 1972-1998, both NIOSH and competitor AO tested the 8710 and found it to be off the regulatory specifications for pressure drop and, in at least one instance, "by a wide margin." (Trial Ex. 1261, WV-AG-00123159; *see also* Trial Ex. 262, 3M 020000 (NIOSH audited the 8710 in April 1975 and "found that strap length was off significantly and results on final pressure drop were too high."); Trial Ex. 2394).

[40]*See* Trial Ex. 251, 3M 004730-31 (NIOSH stating to 3M in 1975 letter that, "[t]he final exhalation resistances for these tests were 16.0mm and 20.3mm respectively. These resistances are greater than the requirements of 30 CFR Part 11 for final resistance of a single-use dust respirator after the silica dust test. You should correct this immediately by tightening the quality control of this characteristic. Please determine the cause of this variance and inform us of your corrective action.").

"potentially withdrawing the certification" of the 8710. (*Id.* at 40:10-16).

94.     Schutz further testified that had he known about 3M's failures to comply with the breathing resistance requirements, 3M would not have been able to continue to legally assert the 8710 was approved:

Q     . . . Mr. Schutz, if 3M, in the 1970's, had repeatedly failed to disclose to you, or someone else at NIOSH, quality control information indicating that 3M 8710 was not in compliance with these NIOSH approval regulations, do you think they should have been allowed to replace – place the approval label from NIOSH on their product?

        MR. KING:     Objection to the form of the question.

A     I – I – I have to say no.

(*Id.* at 58:1-10; *see also id.* at 36-37, 39-40, 58, 209-10, 285).

95.     In sum, Defendant 3M never advised NIOSH (or anyone else for that matter) after 1975 about 3M's persistent and sustained problems meeting the 15 mm breathing resistance limit in the late 1970's and into the 1980's <u>or</u> 3M's testing of the 8710 at a lower relative humidity in the breathing machine than what was required in the regulation and 3M's internal quality control plan. (*See, e.g.*, 1-14-25 Price Trial Trans. at 242-43, 274-75, 279, 292; *see also* 10-5-18 Eitzman Trial Test. at 174-79, 185, 215-16).

96.     ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

43

      **vi.**     **Defendant 3M should have reviewed the 8210's breathing resistance and propensity to collapse before representing the 8210 provides protection for, among other things, coal mining.**

97.     In sum, between 1972 and 1982, the 8710 uniformly failed almost all Silica Dust Audit breathing resistance testing and between 1982 and 1998, 3M failed to properly conduct the Silica Dust Audit tests at the correct relative humidity range on the majority of 8710 masks sold. Under both scenarios, the 8710 was not able to comply with the Silica Dust Audit test, which allowed 3M to place a NIOSH certification on its labeling. Defendant 3M's non-compliance with the Silica Dust Audit test reveals that for the entire time the 8710 was sold 3M misrepresented its certification status to purchasers and users.

98.     Because of this history in failing to meet the breathing resistance requirements for its predecessor, the 8710, 3M should have assessed and should be assessing the breathing resistance of the 8210.





*accord* 1-14-25

Price Trial Test. at 291-92; 1-15-25 Price Test. Trial Trans. at 380-82; 6-9-25 Price Trial Test. at 802, 831, 850, 854, 858-59).

> **vii.** *Beginning in the 1970's* **and continuing throughout the product life of the 8710, 3M recognized internally the flexing and collapse defect due to humidity as a "major problem" and "product limitation" that made it "unacceptable in the underground mining area."**

99.     In an internal 3M Marketing Plan for the upcoming year of 1977, 3M noted it needed "an improved product" to "offset product complaints" and stated, "<u>we now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity</u>." (Trial Ex. 300, 3M 338879-81).

100.    Defendant 3M recognized the 8710 was prone to collapse from the onset of the product in the early 1970's throughout its product life ending in 1998. (Trial Ex. 5013; 

; Trial Ex. 77, 3M 1916-17; Trial Ex. 162; Trial Ex. 218; 

; Trial Ex. 300, 3M 338880;                                  ; Trial Ex. 817, 3M 624062-624064 (noting in 1992 that

3M is still trying to solve the collapse problem and change in the design did not cure it); Trial Ex. 1499, 3M 040848-49; ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████; Trial Ex. 1769, 3M 0431594)(showing Kaiser Aluminum's industrial hygienist contacted 3M's in 1974 about the 8710's collapse and industrial hygienist explained the 8710 "became very wet first around the edges then with time over entire mask and mask then tended to collapse" and further that workers would need "as many as 5 respirators/man/day.")).[41]

101.    In the 1970's and 1980's, Defendant 3M recognized "collapse due to the buildup of moisture" in the filter media was a "major problem" and a "product limitation."  (Trial Ex. 300, 3M 338880; Trial Ex. 446, 3M 092114).

102.    In a 3M flyer for the 8800 respirator, 3M noted in the 1970's its "improved face fit & filtration capability" and "greater durability" including its design "to fight structural collapse under high humidity conditions.  *This assures proper employee protection . . . .*" (Trial Ex. 1499, 3M 040848-49)(emphasis added).[42]  Defendant 3M understands flexing and collapse of the 8210 is plainly a safety issue.  (*See id.*). ███████████████████████████████████████████

---

[41]Tellingly, in response to whether the collapse problem with the 8710 was resolved before it was taken off the market in July of 1998, 3M's expert and employee Alan Johnston testified in 2014 that "the issue was resolved in that we had other options for people to use.  If they didn't like the 8710, they could use a different product.  So they could buy an 8715.  They could buy another different product. So if that particular product, the 8710, wasn't the optimal product for them, they would move to a different product." (9-30-14 Alan Johnston Dep. at 485:12-22 in *Hill v. 3M, et al.*).

[42]Similarly, Defendant 3M's internal documents observed the 9900 respirator had "[i]ncreased durability" whereas the 8710 "[c]an collapse under high humidity".  (Trial Ex. 1668, 3M_DEP 0003232).

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Dr. Price testified as "more resistance or increase [in] the pressure drop" occurs, "you could have leakage or even start flexing the mask to the point it would basically move in towards the mouth of the worker." (1-14-25 Price Trial Trans. at 298).

> vii. **Defendant 3M has long understood that the same propensity of the valveless, disposable 8710 respirator to "collapse from build up of high heat and humidity" applies to 8210.**

103.    Defendant 3M's expert and employee Alan Johnston testified in 2014 that the 8710 collapse defect applied equally to the 8210 as well.  (9-30-14 Alan Johnston Dep. at 464-65 in *Hill v. 3M, et al.*).  Defendant 3M's Johnston testified:

> Q     Is the 8210, is that subject to collapse from build up of high heat and humidity?
>
> A     **I would expect the 8210 and 8710 to perform fairly similarly in high humidity environments.**

(*Id.* at 465)(emphasis added).[43]

> D.    **Lack of Durability**

104.    In May 1973, 3M's J.F. Dyrud discussing papers presented at an industry conference in an internal 3M memorandum wrote: "He ran the #8710 Respirator down without explaining that we [3M] thought **the 8710 was not rugged enough for the coal mines**."  (Trial Ex. 169, 3M

---

[43]Defendant 3M's internal documents observed the 9900 had "[i]ncreased durability" whereas the 8710 "[c]an collapse under high humidity".  (Trial Ex. 1668, 3M_DEP 0003232).

004246)(emphasis added).

105. Also in May, 1973, 3M's internal memo showed it was aware that the 8710 design had "a mechanical weakness" which would not stand up to physical abuse" in some industries, including "min[ing]." (Trial Ex. 168, McAllister Memo re: AIHA Convention, 3M 022374).

106. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

107. Defendant 3M recognized durability as a worker protection factor. (Trial Ex. 1571).

108. As alluded to above, the durability defect of the 8710 also exists in the 8210.

### E. Lack of Strap Adjustability

109. Defendant 3M's 8710 had and 8210 has two non-adjustable head straps. (*See supra id.*).

110. This lack of adjustability made it harder for wearers to achieve a good fit, and 3M has long known this fact. For instance, under the "Bad Points" section of an internal 3M memo from January 1977 comparing the 8710 to a competitor's respirator, 3M wrote of the 8710: "[n]o strap adjustment, mask can fit loosely on small (female) or right on large heads. Dependent on facial size mask can ride up or down." (Trial Ex. 192, 3M 091581).

111. On August 11, 1975, a South Carolina Welding & Sandblasting company wrote to NIOSH about the 8710's straps and highlighted the problems with both the inability to properly adjust the straps and their tendency to break while stating:

> "the twin rubber head straps are too short, lack resiliency, lack stretchability and as a result one or both of the straps ultimately break after a very short duration; sometimes when putting them on for the first time. And if for some quirk of fate the straps do not snap they become separated where they attach to the filter medium at the adhesive joint. Many times I've notice the straps break immediately at this joint as though the

48

adhesive somehow weakens the rubber strap at this point.

(Trial Ex. 265, 3M 011016).[44]

112. On June 21, 1976, NIOSH's Schutz wrote to 3M's Wilmes and advised "you have not satisfactorily resolved the headband problem. Therefore, we request that you stop selling the 8710 as MSHA/NIOSH approved until this is resolved." (Trial Ex. 286).

113. Defendant 3M recognized the important role the straps played with respect to fit of disposable respirators. For instance, describing LASL testing of the fit of various respirators, 3M's internal documents in 1976 noted that, "[t]his test method [of strap tensions] difference can cause substantial differences in performance and face seal leakage on adjustable strap respirators." (Trial Ex. 1780, 3M 565875).

114. An internal 3M document from October 25, 1978 acknowledged the following about the 8710 in a Conclusions section: "I feel that some effort is going to have to be expanded on a better system of elastics or straps for holding the respirator on." (Trial Ex. 383, 3M__DEP 2155).

115. Other manufacturers introduced a "four-point suspension on the head straps. To further improve the stability of the half-mask respirator, the Norton Company added a head cradle. Almost every manufacturer has adopted this design." (Bien Rept. in *Hardy v. 3M*).

116. Defendant 3M used adjustable fabric head straps on other models like its 9910. (*See, e.g., id.*).

117. The same strap adjustability problems of the 8710 apply with equal vigor to the 8210, as 3M has repeatedly indicated they are the same with respect to fit characteristics.

---

[44] Defendant 3M was also well aware of the 8710 straps frequently breaking. (*See, e.g.,* Trial Ex. 1427, 3M 662; Trial Ex. 1769, 3M 0431594; Trial Ex. 446, 3M 092114; ███████ ███████████████████.

### F. One-Size-Fits-All Design

118. In 1969, 3M noted the following regarding an aspect from Dow's presentation at a respirator conference: "It is [Dow's] Mr. Hill's evaluation that no one mask will fit all face sizes. That is the main reason for offering five models to Dow employees." (Trial Ex. 38, 3M 0017792).

119. In the 1970's, the quantitative fit tests conducted by Edwin Hyatt of the Los Alamos Scientific Laboratory indicated that faces of U.S. workers vary greatly in size and shape. As detailed in a July 1970 Field Letter drafted by 3M's John Cain, Ed Hyatt from Los Alamos pointed out to 3M that "1) the 3M respirators are the largest on the market, i.e. in length and width and 2) we [3M] should have at least two sizes, our present one and a smaller one, if we hope to fit the majority of workers." (Trial Ex. 55, 3M 024230).

120. In 3M's internal Field Letter about its trip to Los Alamos Scientific Laboratory ("LASL") on January 13-14, 1971, 3M's John Cain blatantly stated: "because of the very large variety of human facial features one size just won't fit all persons requiring protection." (Trial Ex. 62, 3M 348744).

121. In a memorandum to 3M's advertising department on October 24, 1973, 3M's Bob Barghni wrote, "we must be careful in this and other #8710 ads that we do not in any way imply that the #8710 will fit all sizes and shapes of noses and faces with equal effectiveness. We can say that we fit many different sizes and shapes and have test data, based on coal dust tightness test, to show this but even in this test we have a certain percentage of the test population who have failed." (Trial Ex. 186, 3M 040784; *see also* 1-14-25 Price Trial Test. at 250)(emphasis added).[45]

---

[45] Previously, C.T. Bien wrote: "A single size facepiece would not fit most workers. In the early 1980s, Survivair introduced three sizes of pliable silicone rubber elastomeric half masks. All other manufacturers, including Defendants, introduced three sizes" of masks at one point or another.

122. Don Wilmes and other officials at 3M stated in a 1988 presentation that "Faces are highly variable. They come in many sizes and shapes and contain highly variable features. Generally, no one model of respirator will fit all faces. No one to date has been successful predicting the fit of a respirator on an individual using any scheme. Yet fit is a very important aspect in respiratory protection." (Trial Ex. 732 at p. 221, 1036, WV - AG - 00111446, Wilmes/Olsen/Hendricks Article).

123. In 1992, NIOSH Guidelines noted: "Another major problem that can contribute to hazardous face-seal leakage of cup-shaped, disposable masks is that in almost all cases these masks are available in only one size. This contrasts with the elastomeric facepieces used for powered, HEPA-filtered, halfmask respirators and positive-pressure, air-line, halfmask respirators, which are generally available in up to three different sizes to fit small, medium, and large facial sizes." (Trial Ex. 826, WV-AG-00122047).

124. In 1994, 3M wrote, "The great variation in facial shapes and sizes ensures that no single model of respirator will fit all faces." (Trial Ex. 967, WV-AG-00122898).

125. During his 2022 deposition, 3M's expert and corporate scientist employee, Dr. Philip Eitzman, acknowledged the *8210 respirator would not fit 25% of men's faces*. (*See, e.g.,* 10-6-22 Dr. Eitzman Dep. at 38-40). This percentage is likely significantly higher.

126. Despite knowing the importance of a proper and consistent fit, and that one size would not fit all wearers, 3M neither added additional sizes to either one of its top sellers, the 8710 or 8210, nor warned potential wearers of the 8710 or 8210 that they could not be properly or consistently fitted.

**G. Defendant 3M's Internal Document Summarizing Fit Defects**

127. During a brainstorming Meeting on June 21, 1985, notes in upper left hand corner of

---

(Bien Rpt. in *Hardy v. 3M*).

an internal 3M document revealed the fit problems of the 8710 (and by extension the 8210) as follows:

> "doesn't fit
> can't be fit tested
> straps break
> nose clip adhesive
> collapse
> one size
> paper mask"

(Trial Ex. 619, 3M 531543). In comparing its products, Defendant 3M also described its 8800 respirator as being 10x better than the 8710 in performance. (Trial Ex. 270, 3M 2821).

**VIII. To retain its market share, Defendant 3M continues to sow confusion and misunderstanding, makes misrepresentations, suppresses and omits material facts in connection with the sale and advertisement of its 8210 disposable, valveless, cup-shaped respirator.**

128. Defendant 3M marketed the 8710 as a low cost option approved by the government for dangerous environments like in coal mining and asbestos. (*See* █████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████; Trial Ex. 38, 3M 0017797; Trial Ex. 42, 3M 0022255 (3M noted internally in 1969 that coal mining management told them disposable respirators would need government approval to gain industry acceptance), Trial Ex. 228; Trial Ex. 234; and Trial Ex. 1624).

129. Defendant 3M has long understood that coal mine operators would and will buy the cheapest, government-approved respirator on the market. (*See, e.g.,* ███████████████████████

███████████████████; Trial Ex. 386, 3M 630590).[46]

---

[46] *See also, e.g.,* Trial Exs. 42, 166, 171, 203, 215, 226-28, 234, 388, 1443, 1453, 1492 (indicating 8710 at 55 cents was cheapest respirator available); ████████████████████████

████████████████ Trial Ex. 125, 3M 028668-70 (advertising 8710 as "far less costly" and "one-third the cost of comparable respirators" and "inexpensive" and "cost: lowest by far"); Trial Ex. 157, 3M 0550962 (advertising 8710 on March 24, 1973 as "inexpensive" and "low cost"); Trial

130.    Before the change in the regulations in the late 1990's, the 8710 had been a big seller for 3M.  (*See, e.g.,* Trial Exs. 1559, ███████████████████████; 10-17-22 Erik Johnson Dep.).

131.    Previously, Defendant 3M's Occupational Health & Safety Products Division became dependent upon 8710's financial success.  (*See, e.g.,* Trial Ex. 517, 3M 111915; ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████).

132.    Defendant 3M continues to sell the 8710's replacement, the 8210, en masse into West Virginia.  In doing so, 3M has had to, and continues to, engage in the following unfair or deceptive acts or practices (described below) in order to retain its share of the respirator market, despite the foregoing defects that put the 8210 wearers, including West Virginia coal miners, in danger.

     A.     ***WEBSITE MISREPRESENTATIONS*: Defendant 3M's current website makes many repeated misrepresentations regarding the 8210.**

133.    Defendant 3M's website makes a number of confusing and misleading misrepresentations and otherwise suppresses and omits material facts regarding the 8210, some of which are set forth below.

        i.     **PROTECTION: "Effective Respiratory Protection"; "Reliable, Effective Protection"; "Quality Reliable Worker Protection"; & "Protection Equivalent to a Rubber Facepiece Respirator"**;

134.    For example, in a brochure on 3M's website for "3M 8000 Series Particulate

---

Ex. 212, 3M 30015 (advertising to distributors on September 1, 1974 inexpensive, disposable, NIOSH-approved, coal mining use); Trial Ex. 256, 3M 030019; Trial Ex. 282, 3M 404617; Trial Ex. 311, 3M 674326).

Respirators," 3M represents as follows:

**Description**

The 3M™8710, 8210, 8812 and 8822 Particulate Respirators *provide effective respiratory protection for use in industries where workers will be exposed to dust particles* and/or nonvolatile liquid particles.

- Tested and certified to AS/NZS 1716:2012.
- Traditional convex shape, with nose clip and twin strap design.
- *Durable, collapse resistant inner shell.*
- *Reliable, effective protection against fine particles.*
- 3M™ Advanced Electret Filter Material gives effective filtration with low breathing resistance for consistent high quality performance.
- 3M™ Cool Flow™ exhalation valve offers improved comfort in hot humid environments.

(3M Web Page 8000 Series Particulate Respirators, attached as **Ex. E**) (boldface in original, italics added).[47]

135. In reality, the 8210 does not provide "reliable, effective protection against fine particles" and does not "provide effective respiratory protection for use in industries where workers will be exposed to dust particles" because of its unreliable fit. (*See supra*). Each of these are repeated and willful misrepresentations by 3M.

136. On 3M's website on the first page of a 2-page document, entitled "Particulate Respirators 8210 and 8110S, N95," 3M provides: "**The 3M Particulate Respirator 8210, N95 is designed to help provide quality, reliable worker protection against certain non-oil based particles. . . . The 8210 . . . offer[s] a number of benefits to you and your workers**." (3M Web

---

[47]*Available at*: https://multimedia.3m.com/mws/media/699174O/tech-data-sheet-3m-8000-series-disposable-respirators.pdf).

Page on 8210 Technical Specs Web Page, attached as **Ex. F**)(boldface in original).[48]  Defendant 3M

continues that one such benefit is as follows:

> **Helps provide worker protection**
> ●. . . . Studies have shown [the 8210] . . . can provide protection equivalent to a rubber
> facepiece respirator. . . .

(*Id.*)(emphasis in original).  Defendant 3M knew this was a repeated and willful misrepresentation.

>    ii.    **"Durable"**;
>    iii.    **"Collapse Resistant"**

137.    Despite 3M's assertions on its website, as cited above, in reality, the 8210 is not

"durable," nor "collapse resistant."

>    iv.    **For Use in Coal Mining**

138.    Currently, on its website in a "Quick Start Guide" for a number of products including

the 8210, 3M lists "coal" as one of the permissible uses for the 8210.  (3M Quick Start Guide, attached

as **Ex. G**).[49]  As explained below, the same is true for the box of the 8210 which lists "coal" as a

permissible use for the 8210.  (Photograph of 8210 box, attached as **Ex. H**).  Defendant 3M knows this

is a repeated and willful misrepresentation.  (*See, e.g., supra* ¶ 5).

139.    Similarly, on its current website, 3M lists "Mining" as one of the "Recommended

Industries" for the 8210.  (8210 Webpage, attached as **Ex. I**).[50]  Defendant 3M knows this is a repeated

---

[48]*Available at:*
https://multimedia.3m.com/mws/media/9310O/3m-particulate-respirators-8210-and-8110s-technical-specifications.pdf

[49]*Available at:*
https://multimedia.3m.com/mws/media/2142059O/3m-8210plus-8210-8110s-quick-start-guide-pdf.pdf?&fn=8210_8110S_Quick-Start-Guide.pdf.

[50]*Available at:*
https://www.3m.com/3M/en_US/p/d/v000585997/?bvstate=pg:6/ct:r

and willful misrepresentation.

140.     Also, on pages 15, 16 and 41 of the 2024 "3M Respirator Selection Guide" currently on 3M's website, 3M lists an N95 (which would equate to the 8210) as the type of respirator to use for the "Contaminants" of "Coal dust, Anthracite"; "Coal dust, Bituminous or Lignite"; and "Silica, crystalline."  (3M 2024 Respirator Selection Guide, attached, in part, as **Ex. J**).[51]  Again, 3M knows that the 8210 would not protect coal miners, and these are repeated and willful misrepresentations.

141.     On the second page of a 2-page document, entitled "Particulate Respirators 8210 and 8110S, N95" on 3M's website, 3M provides that the 8210 is "use[d] for . . . solids such as those from processing minerals, coal . . . ."  (3M Web Page on 8210 Technical Specs Web Page, attached as **Ex. F**).[52]

**v.     "Fits . . . protect[s] all day long"**

142.     On its current website where 3M discusses the 8210, 3M indicates on the same webpage it has "[t]he science that helps *keep you safe* breath by breath" and provides:

**There's more to fit than meets the eye**

Fit is key, it can impact the seal of your respirator, the protection provided and even comfort. Because what *you need on the job is a respirator that fits so it can help protect you all day long.*

At 3M, fit plays a central role in the development process. Our state-of-the-art global labs pave the way for important discoveries and advancements, providing options in respiratory protection for workers around the world.

---

[51]*Available at:*
https://multimedia.3m.com/mws/media/639110O/respirator-selection-guide.pdf

[52]*Available at:*
https://multimedia.3m.com/mws/media/9310O/3m-particulate-respirators-8210-and-8110s-n95-technical-specifications.pdf

We test and *research facial structures to help us to cover many face* types and shapes.

(3M Web Page on 8210 Worker Safety, attached as **Ex. D**)(boldface in original, italics added).[53]

143.    Defendant 3M's knowledge that the 8210 could not and cannot be properly and consistently fitted is discussed at length above.

144.    Specifically, with respect to the misrepresentation that the 8210 will "protect the wearer all day long," ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

145.    Defendant 3M thus knew the suggestion that the 8210 "fits so it can protect" the wearer "all day long" is another confusing or misleading representation in violation of the WVCCPA.

### C.    8210 Respirator and 8210 Box

[53] *Available at*: https://www.3m.com/3M/en_US/worker-health-safety-us/safety-resources-training-news/calendar-of-events/n95/.

i. **Defendant 3M has a history of considering possible warnings on valveless, disposable respirators, and 3M has recognized that warnings adversely affect its bottom line.**

146. In the 1970's and 1980's, Defendant 3M considered warnings on the 8710 disposable, valveless, cup-shaped, filtering facepiece respirator. (███████████████████; Trial Ex. 383; ████████████████████; Trial Ex. 651; Trial Ex. 1372; Trial Ex. 1425). Internal 3M documents indicated that it considered adding warnings to the 8710 about its use in coal mining and its ability to be fitted in 1978 and again in the mid-1980's, but no such warnings on those points were added. (*See id.*).

147. For instance, Defendant 3M's Interoffice Correspondence from 3M's John Cain on October 25, 1978 states:

> **Much discussion has [*sic*] insued recently as to the appropriate warning statements for the #8500 and #8710 respirators. The most recent problem was a warning label which appeared for the #8710 respirator listing some specific do nots.** This label appeared on proposed labeling and packaging literature for the 6983 respirator (ART). After discussions with various persons in marketing, tech service, packaging, literature, ad agency, and the legal department **I could find no rational[e] for listing these material on the warranty statement and thus deleted them from the proposed copy.**

> To set the record straight I am publishing this letter to put forth the warning statement that will be utilized on packaging and literature for these two products.

> I.  For the 8500 Non Toxic Particle Mask; 6985 Non Toxic Particle Mask; 8651 Dust and Pollen Mask; 3180 Dust Mask, the warning statement must read as follows: 'WARNING this product is not designed for use as protection against hazardous dusts such as asbestos, silica, cotton dust and toxic dusts, fumes, mists, gases and vapors. Not for use in spray paint operations.'

> II.  The warning statement to be used for the #8710 respirator, 6983 respirator, 8520 respirator, 8550 farm and shop mask: '**WARNING this product is not designed for use as protection against toxic dusts**, fumes, mists, gases, and vapors. NOT FOR USE IN SPRAY PAINT OPERATIONS.'

These are the warning statements that must be followed. If anyone receiving this letter has any questions on these or feels they are not appropriate please advise me immediately, otherwise **these are the warning statements that must be used** on all packaging and literature pertaining to these products.

(Trial Ex. 383, 3M_DEP 2154-55)(emphasis added). In the succeeding page, 3M's Cain's handwriting appears to indicate that the warning in "II" involving the "8710" removed "other than those dusts covered by the NIOSH certification" from the language above. (*Id.* 3M_DEP 2156). Obviously, that would include "coal" and "silica" which were in the NIOSH certification language. And so, it appears that in 1978, 3M concluded that there should be a warning that the 8710 was not designed for "toxic dusts," and there should not be an exception for NIOSH approvals for coal and silica. (*See* Trial Ex. 383). However, no such warning was added to the 8710 then.

    148.    In the *mid-1980's*, 3M also appeared to consider other warnings regarding coal mining. In a handwritten note on a prototype ad for the 8710, someone at 3M wrote: "This shows that info <u>can</u> be stamped on the 8710. See our 6/14/85 letter (pic)." (Trial Ex. 1425, 3M 398928)(emphasis in original); *see also* State Trial Ex. 1372, 3M 398940 (referring to 6/14/85 letter in post-it note). In a handwritten note on a prototype of an ad for the 8710, 9900 and other respirators, someone from 3M also wrote: "Should there be a warning on 8710 not to use it for conditions in which the 9900 is being promoted?" (Trial Ex. 1425, 3M 398932). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮).[54] Despite this recognition and its applicability to coal mining, no such warning was added to the 8710.

_____

[54]That same prototype ad itself states the following about the 9900: "Used for heavy-duty applications throughout general industry. It has all of the basic benefits of the 8710, plus: 1) double shell construction designed to improve durability in heat and humidity . . . ." (Trial Ex. 1425, 3M 398932).

149.    ████████████████████████████████████████

████████████████████████████████████████████

### ii.    "Warning" on the 8210

150.    The quasi-"warning" states and has stated on the front of the 8210 itself:

!WARNING
This respirator helps protect against certain dusts and mists.
**Misuse may result in sickness or death.** <u>For proper use, see</u>
supervisor or <u>box</u> or call 3M
1-800-___

FOR DUSTS AND MISTS TC-84A-0007

(Trial Ex. 1327 at p. 003; *see also* attached Ex. H)(boldface in original, underlining added).

151.    The 8210 box indicates "coal" is a proper "use" for the 8210.  (*See, e.g.,* Ex. H).

152.    Defendant 3M has not otherwise made any attempts to clarify that the 8210 should not be used in coal mining or in any other applications where, due to the unreliable fit of the 8210, *inter alia*, the wearer may be exposed to dangerous small respirable particles for which the body does not have a natural defense mechanism, as 3M has long known.

153.    Defendant 3M misrepresented, suppressed, omitted, and otherwise caused confusion and misunderstanding regarding the unsuitability of the 8210 for coal mining and the unreliability of the fit of the 8210.

154.    Defendant 3M suppressed and omitted, among other things, these two material facts from the warning stamped on the 8210: (a) the 8210 is not suitable for coal mining and (b) the 8210 cannot be properly and consistently fitted.  *See* Trial Ex. 1425, 3M 398928 (3M acknowledging feasibility of putting warnings on mask itself when it wrote: "This shows that info <u>can</u> be stamped on the 8710").

iii. **An illustration of what 3M could have done is seen in the asbestos example where after years of fighting the federal government 3M was forced in the** *mid-80's* **to add the warning with respect to disposable respirators: "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL"**

155.   In a 1980 letter to 3M's Don Wilmes expressing NIOSH's concerns with the use of respirators in connection with asbestos and other carcinogens, NIOSH wrote:

> "[*W*]*e are deeply concerned* about the use of dust, fume, and mist respirators, and other air-purifying respirators, against carcinogenic substances.  Our concerns are based on two major issues: 1) the ability of the filter media to effectively remove the carcinogenic substance during the entire period of use, and 2) the *questionable face fit* of at least some *dust, fume, and mist respirators, particularly the single-use type*. Excessive leakage of a substance such as asbestos into the respirator due to either ineffective filtration or *leakage around a poor seal is unacceptable and presents a potentially serious hazard to the wearer*.  The possibility of the development of lung cancer or mesothelioma, in the case of asbestos exposure, cannot be ignored when both filtration efficiency and adequate face seal are questionable.
>
> . . . *It is not our position that single-use dust respirators will provide adequate protection* against the cancer causing potential of asbestos. . . .

(Trial Ex. 455, 3M 020242)(emphasis added).  The letter continued, "the face seals of many of these devices are marginal or inadequate . . .  Respirators with low protection factors may not provide adequate protection against carcinogens. (*Id.* 3M 020243).

156.   Defendant 3M continued to represent the 8710 was safe for use against asbestos until 1986.

157.   In 1986, 3M included the following on the 8710 box "DO NOT USE AGAINST ASBESTOS / IGNORE NIOSH ASBESTOS APPROVAL." (3M Trial Ex. 02.019; *see also* Trial Ex. 1920).

158.   While the federal government inexplicably was not as focused on coal mining, the same

logic applies here.[55]

159.     As expressed above, Defendant 3M considered various other warnings in connection with the 8710.

160.     The 8210 should have provided a warning on the respirator itself something akin to "NOT FOR USE IN COAL MINING/ IGNORE NIOSH COAL APPROVAL" and/or "CANNOT BE PROPERLY AND CONSISTENTLY FITTED." Failure to include these are material omissions and suppression in violation of the WVCCPA.

161.     The 8210 should have provided on the warning on the box of the 8210 respirators something akin to "NOT FOR USE IN COAL MINING / IGNORE NIOSH COAL APPROVAL" and "CANNOT BE PROPERLY AND CONSISTENTLY FITTED." Failure to include these are material omissions in violation of the WVCCPA.

<blockquote>
iv.     <strong>The 8210 box contains fit check instructions without acknowledging a fit check is "difficult, if not impossible" to do on the 8210.</strong>
</blockquote>

162.     The 8210 box contains "fit check" instructions. (*See* Ex. H, attached).

163.     However, the "fit check" instructions do not include that a fit check on the valveless, disposable, cup-shaped 8210 is "difficult, if not impossible" to do.

164.     Suppression of this information and omission of it on the box creates confusion and misunderstanding and are violations of the WVCCPA.

**<u>CLAIM:</u>**

***COUNT I - VIOLATION OF WEST VIRGINIA CONSUMER CREDIT AND PROTECTION***

----

[55]According to 3M, in **"1986**: Public commentary submitted as part of an OSHA rulemaking process specifically criticized the 8710's use in coal mines." (11-16-22 3M Reply re: Stat. of Lim. Mot. in Linc. Cty. Case)(emphasis in original).

165.    The State incorporates all other allegations stated in the Complaint herein.

166.    The purpose of the West Virginia Consumer and Credit Protection Act ("WVCCPA") is to protect the public and promote sound business practices.  *See W. Va. Code* § 46A-6-101.

167.    *West Virginia Code* § 46A-6-104 is "among the most broadly drawn provisions" in the WVCCPA, *McFoy v. Amerigas*, 295 S.E.2d 16, 19 (W. Va. 1982), and must be interpreted liberally to further its remedial purposes.  *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.* 194 W.Va. 770, 778, 461 S.E.2d 516, 524 (1995); *see also State ex rel. McGraw v. Rite Aid of WV, Inc.*, Civil Action 09-C-217 (Cir. Ct. Boone Cty. March 15, 2011 ¶ 9).

168.    *West Virginia Code* § 46A-6-104 bans "unfair[56] or deceptive acts or practices in any trade or commerce[.]"[57]

169.    Unfair or deceptive acts or practices (UDAP's) are specifically defined to include, *inter alia*:

---

[56] "Unfair" practices are distinct from "deceptive" acts or practices.  *See, e.g., State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Haw. 418, 448, 526 P.3d 395, 425 (2023).  A practice need only be unfair or deceptive, not both to qualify as a violation under the WVCCPA.

"An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *E.g., Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009); *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Haw. 418, 448, 526 P.3d 395, 425 (2023).  In the *Bristol-Myers* litigation with the Hawai'i Attorney General, the courts found those "Defendants also committed *unfair* acts and practices in violation of UDAP, including the failure to investigate the poor responder issue, suppression of studies regarding that and related issues, and burying their heads in the sand." (*Bristol-Myers Hawai'i AG Order*, ¶ 49 at p. 63, a copy of which is attached as **Ex. L**)(*citing Shikada*, 152 Hawai'i at 445-48, 526 P.3d at 422-25)(emphasis added).

[57] "Trade" or "commerce" means the advertising, offering for sale, sale or distribution of any goods or services and shall include any trade or commerce, directly or indirectly, affecting the people of this state.  *Id.* § 46A-6-102(6).

(B) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(C) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;

\* \* \*

(E) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

\* \* \*

(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

*W.Va. Code* § 46A-6-102(7).

170.     Article 7 gives the Attorney General authority to enforce the WVCCPA, including the Act's prohibition of UDAP's.  *See, e.g., State by and through McGraw v. Imperial Marketing*, 203 W. Va. 203, 218, 506 S.E.2d 799, 814 (1998) (Starcher, J., concurring); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, **12-13 (W.Va. May 30, 2014).  The Attorney General has broadly-stated powers under Article 7 of the WVCCPA, and those powers are to be interpreted broadly.  *State ex rel. McGraw v.*

*Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 779, 781, 461 S.E.2d at 525, 527 (1995); *see also State ex rel. McGraw v. Rite Aid of WV, Inc.*, Civil Action 09-C-217 (Cir. Ct. Boone Cty. March 15, 2011 ¶ 9).

171.    To prove violation of the WVCCPA, the State need not prove harm or reliance, *see, e.g., State ex rel. 3M Company v. Hoke*, 244 W.Va. 299 (2020)(Hutchison, J.), or that a consumer transaction was implicated, *see, e.g.*, *West Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co. ("3M")*, 354 F. Supp.2d 660, 667 (S.D. W. Va. 2005)(Copenhaver, J.); *see also State ex rel. Morrisey v. AmerisourceBergen Drug Co.*, Civil Action No. 12-C-141 (Cir Ct. Boone Cty., W.Va.)(Thompson, J.)(12-12-14 Order ¶ 84, attached as **Ex. M**, *citing W.Va. Code §§ 46A-6-104, 46A-7-111(2)); *see also State ex rel. 3M Company v. Hoke*, 244 W.Va. 299, 304 (2020)(acknowledging CCPA violations are being pursued).

172.    As aforesaid, Defendant 3M's misrepresentations, suppression, omissions, and creation of confusion and misunderstanding, as aforesaid, violated and continue to violate the WVCCPA's ban on unfair or deceptive acts or practices. By way of example and not limitation, the following are 3M's continuing, repeated and willful violations of the WVCCPA with each sale of, or distributed advertisement for, the 8210:

- Defendant 3M's representations that the 8210 offers effective and/or reliable "protection" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is "durable" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is "collapse resistant" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 is for "use" in "coal" and/or "mining" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's representations that the 8210 "fits" and "protects all day long" are misleading, confusing, and/or a misrepresentation.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 is not suitable for coal mining.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 cannot be properly and consistently fitted.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that a fit check is "difficult if not impossible" to do on the 8210, or in other words, that the 8210 is "not fit checkable," particularly in connection with the inclusion of the 5-step fit check instructions found on the 8210 box.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact of the 8210's propensity to flex and collapse, particularly in external hot and/or humid environments.[58]

- Defendant 3M's creation of confusion and misunderstanding and suppression and

---

Defendant 3M has long considered pressure drop (which causes the collapse) to be a "Major A" defect. (*See, e.g.,* Trial Ex. 396 ("Pressure drop and penetration are both Major A defects."); *see also* 1-14-25 Price Test. Trial Trans. at 290-91). A Major A defect "[a] defect, other than critical, that is likely to result in failure to the degree that the respirator does not provide any respiratory protection, or a defect that reduces protection and is not detectable by the user[.]" 42 CFR 84.41(d)(2); *see also* 30 CFR 11.41(d)(2).

).

omission of the material fact of the 8210's lack of durability in heavy work environments.

- Defendant 3M's creation of confusion and misunderstanding and suppression and omission of the material fact that the 8210 is unable to fit at least 25% of faces based on its one-size-fits-all design.

173. As aforesaid in the previous paragraph, Defendant 3M's misrepresentations, suppression, omissions, and creation of confusion and misunderstanding in connection with the sale, marketing, and advertisement of the 8210 were and are repeated and willful.

174. Accordingly, the State will ultimately seek a civil penalty for each violation of the WVCCPA. *W.Va. Code* 46A-7-111(2); *see also State ex rel. Lopez v. Bristol-Myers Squibb Co.,* Civil No. 1CC141000708 (JHA) (Cir. Ct. of 1st Cir., Hawaii) (May 21, 2024).

175. The State also seeks attorney fees and interest. *W.Va. Code* § 46A-7-108.

## <u>APPLICATION FOR TEMPORARY INJUNCTIVE RELIEF</u>:

176. *West Virginia Code* § 46A-7-110, entitled "Temporary Relief," is found within Article 7's powers afforded to the Attorney General in the WVCCPA. It provides in full:

> With respect to an action brought to enjoin *violations of this chapter* or unconscionable agreements *or fraudulent or unconscionable conduct*, the Attorney General may apply to the court for appropriate temporary relief against a respondent, pending final determination of the proceedings. If the court finds after a hearing held upon notice to the respondent that there is *reasonable cause to believe* that the respondent is engaging in or is likely to engage in conduct sought to be restrained, it may grant any temporary relief or restraining order it deems appropriate.

*Id.* (emphasis added).

177. The West Virginia Supreme Court has held:

The method of analysis which governs the propriety and scope of an injunction under

67

*W.Va.Code* 46A-7-110 (1974) *deviates from the customary standard* for the issuance of temporary relief and may best be described as whether the Attorney General has shown by the existence of *some credible evidence, even if disputed, that reasonable cause exists to believe* that the respondent is engaging in or is likely to engage in conduct sought to be restrained.

Syl. Pt. 2, in part, *State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792

(1996).

178.    Further fleshing out this standard, the *Imperial Marketing* Court explained:

There is another more pointed justification for our *deferential standard* of review of the circuit court's granting of temporary relief within the provisions of W.Va.Code 46A–7–110 (1974). When applying W.Va.Code 46A–7–110 (1974), the circuit court is *not required to adjudicate the merits* as to whether there has been a violation of the Act pending a final determination of the proceedings.  To the contrary, the court's role at this stage is to *moderate the effects of a likely violation of the Act as detected by the Attorney General* and supported by *sufficient proof that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained*.

Consequently, the judicial function is to supply a *stopgap measure* pending a final hearing when more permanent relief is sought. Therefore, our analysis of granting temporary relief under W.Va.Code 46A–7–110 (1974) is *more narrow than the typical* motion for a preliminary *injunction*. [footnote omitted]

The method of analysis which governs the propriety and scope of an injunction under W.Va.Code 46A–7–110 (1974) deviates from the customary standard for the issuance of temporary relief and may best be described as whether the Attorney General has shown by the *existence of some credible evidence, even if disputed, that reasonable cause exists to believe that the respondent is engaging in or is likely to engage in conduct sought to be restrained*. In other words, the Attorney General need not prove the respondent has in fact violated the Act, but only needs to make a *minimal evidentiary showing of good reason to believe that the essential elements of a violation of the Act are in view*.

*State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 351-52, 472 S.E.2d 792, 797-98

(1996)(emphasis added).

179.    Our Supreme Court has repeatedly reiterated the exceedingly low threshold for the

68

Attorney General under the WVCCPA to be awarded temporarily relief pending resolution of the case. *See generally, e.g., Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 341, 752 S.E.2d 356, 372 (2013); Syl. pt. 4, *Telecheck Servs.*, 213 W.Va. 438, 582 S.E.2d 885 (2003); Syl. pt. 2, *Imperial Mktg*, 196 W.Va. 346.

180.    More recently, the West Virginia Supreme Court found: "The Attorney General was not required to prove that the named Petitioners actually had engaged in the alleged misconduct, but rather only that there exists reasonable evidence to believe such a violation has been committed." *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 341, 752 S.E.2d 356, 372 (2013) (citing Syl. pt. 4, *Telecheck Servs.*, 213 W.Va. 438, 582 S.E.2d 885 (2003); Syl. pt. 2, *Imperial Mktg.*, 196 W.Va. 346, 472 S.E.2d 792).

181.    As alluded to above, no fewer than seven experts have been critical of the fit of the disposable, valveless, cup-shaped 8710 respirator and the defects documented herein, including, for example, a who's who of respirator experts in academia and regulatory agencies, such as: (a) Dr. Nelson Leidel, former NIOSH employee; (b) the late C.T. Bien, co-author of the book, "Respiratory Protection" and OSHA employee;[59] (c) the late Darrel Bevis, former Los Alamos Scientific Laboratory

---

[59]In submitting its proposed Order on the statute of limitations issue in the Lincoln County case regarding the 8710 respirator, 3M wrote:

In 1997, Bien published his criticisms of the 3M 8710 respirator, specifically, and filtering-facepiece respirators, generally in a book. [footnote omitted]. His book criticizes the 3M 8710 respirator because, inter alia: it started life as a bra cup; he did not approve of 3M's saccharin fit test; and he disapproved of the user seal [fit] check for filtering facepiece respirators. [footnote omitted]. The book examines, in detail, 3M's disputes with OSHA over standards for various dusts (lead, cotton, asbestos), the size of particles used in saccharine fit test, and argues that filtering-facepiece respirators allow greater face seal leakage. [footnote omitted] Bien also claims that 'according to OSHA, workers and industrial hygienists unanimously opposed the use of disposable respirators.'

employee; (d) Dr. Jack Price, Harvard and Northeastern Professor; (e) Dr. Mark Nicas, UC-Berkeley Professor; (f) James S. Johnson, Jr., Certified Industrial Hygienist, former researcher and administrator at the Lawrence Livermore National Laboratory (operated by the University of California system), and Chair of ANSI and other Respiratory Protection Committees; and (g) Dr. Sergey Grinspuhn, University of Cincinnati Professor.  (Because 3M has marked many documents CONFIDENTIAL at times and there could be some offhand reference in one of the reports to a CONFIDENTIAL document buried somewhere in the reports, out of an abundance of caution and for the time being, the State is providing copies of a sample of these reports to the Court under seal in a separate filing.)[60]

182.    The ample expert evidence and testimony provided establishes, at the very least, reasonable cause that there were misrepresentations and other WVCCPA violations in connection with the sale and advertisement of the 8210 in West Virginia.  (*See id.*).

183.    Based upon the record evidence attached and to be provided under seal, the State easily meets the minimal "reasonable cause" standard for temporary relief in *W.Va Code* § 46A-7-110, as further elucidated by *Imperial Marketing*, *Telecheck*, and *Cavalry*, on these papers alone.  Defendant 3M's misconduct, though likely disputed by 3M, (i) plainly constitutes unfair or deceptive acts or

_____

(2-25-25 3M Prop. Order on SOL in Linc. Cty. Case ¶ 59 at pp. 24-25).

[60] Former NIOSH employee Dr. Warren Myers, who has been on retainer with 3M for several years, acknowledged at the 2025 Lincoln County 8710 trial that experts in the field, Darrel Bevis and C.T. Bien, had long been critical of "disposable respirators," which would include the 8710 and the 8210.  Dr. Myers acknowledged Los Alamos Scientific Laboratory's (LASL's) Bevis was on the ANSI Committee in the early 1990's, and his opinions on disposable respirators were "[a]ll negative." (1-10-25 Trans. at 199, 215, 220).  Bevis said disposable respirators "couldn't be fit checked. They couldn't be fit tested.  They weren't substantial.  They basically just didn't work." (1-10-25 Trans. at 221).  Dr. Myers testified that Bevis was passionate about his opinions.  (*Id.* at 222).  Another expert, OSHA's C.T. Bien, agreed with Bevis about the dangers of these disposable respirators.   Both Bevis and Bien are now deceased.

practices and violates *W.Va. Code* § 46A-6-104, as defined by *W.Va. Code* §§ 46A-6-102(7)(B), (C), (E), (L), and (M); (ii) is fraudulent conduct; and/or (iii) is also unconscionable conduct. Any one of these allegations is, by itself, grounds for the "temporary relief" and "stopgap measure" sought.

184.    The State requests that the Court schedule a hearing, as required by *W.Va. Code* § 46A-7-110, and following the hearing, enter an order enjoining 3M from advertising and selling the 8210 in West Virginia in violation of the WVCCPA, as aforesaid, until such time as this case has been resolved or other final determination of the proceedings.

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiff State of West Virginia *ex rel.* John B. McCuskey, Attorney General, request the following:

A.    The Court set a hearing, as required by *W.Va. Code* § 46A-7-110 to address the Attorney General's request for temporary relief in the form of enjoining 3M from advertising and selling the 8210 into West Virginia in violation of the WVCCPA until the final determination of the proceedings;[61]

B.    At the conclusion of the preliminary hearing, the Court enter an Order granting the Attorney General's Application for Temporary Relief that enjoins 3M from advertising and selling the 8210 disposable respirator in West Virginia in violation of the WVCCPA until final determination of the proceedings or further Order of the Court; and

C.    The Court set a long-term schedule for trial on the amount of civil penalties

---

[61]For convenience, the State will provide an accompanying proposed Order whereupon the Court can fill in the date and time at a time convenient for it for a hearing on the State's Application for Temporary Relief requested pursuant to *W.Va. Code* § 46A-7-110.

(and associated attorneys' fees and interest) to award the State for Defendant 3M's repeated and willful violation of the WVCCPA in relation to its sale, marketing, and advertisement of its 8210 disposable respirator into West Virginia as well as any other relief the Court deems just.

Respectfully submitted,

**STATE OF WEST VIRGINIA,** *ex rel.*
John B. McCuskey, Attorney General**,**

By Counsel,


/s/    *Robert M. Bastress III*
Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
(WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
(WV Bar # 8231)
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021

J. Timothy DiPiero     (W.Va. Bar # 1021)
Lonnie C. Simmons    (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar # 9616)
**DiPIERO SIMMONS**
**McGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133
Facsimile: 304-342-4605
Rob.bastress@dbdlawfirm.com

Michael T. Gallagher, Esq.
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713)222-8080

Alva A. Hollon, Jr., Esq.
**HOLLON LAW FIRM, P.A.**
100 Executive Way, Suite 211
Ponte Vedra Beach, Florida 32082-2713
Telephone: (904) 737-1995
Facsimile: (904) 506-7794
*Counsel for The State*

# Exhibit A





# Your employees.
# They deserve reliable and quality
# respiratory protection.

Disposable respirators from 3M combine comfort with proprietary
technologies that help deliver easy breathing and comfortable
protection against particle hazards in both oil and non-oil environments.

# Breathe easy with proven technology.

Each 3M disposable particulate respirator is made of our proprietary filter media to allow greater airflow while capturing more contaminants in electrostatically charged microfibers. And that's just the start.

## Innovative technology offers protection and comfort.

These icons identify which features are included on each respirator, so you can match the right one to your environment:



**3M™ Cool Flow™ Exhalation Valve**

One-way valve for easy exhalation and easy breathing.



**M-Noseclip**

Easily adjustable to help provide a custom and secure seal.



**Cake-Resistant Filter Media**

Long-lasting and easy breathing with a layered filter media designed for welding.



**Welding Web**

Unique filter media with protective layers, designed to be flame resistant per ASTM D2859-96.*



**Carbon Filter Material**

Comfort and relief from nuisance levels** of odors, vapors and gaseous contaminants.



**Adjustable Buckle Straps**

Get a comfortable, secure seal with a simple tug.

*Not a substitute for a firesmoke.

**Nuisance level refers to concentrations not exceeding OSHA PEL or applicable occupational exposure limit, whichever is lower.

Icon key    3

# Find the right respirator for your job.

All 3M™ disposable particulate respirators have a US OSHA assigned protection factor (APF) of 10 and provide protection against airborne particulates like dust, mists or fumes. Disposable respirators will not help filter gases and vapors.

If you need protection against gases, vapors, or particulates such as solvents, cleaning products, adhesives, chemicals, paint spray or other hazards or are in healthcare and/or need a fluid-resistant respirator, please contact your sales representative to learn about other options.



**Oil environments**

I work in an oily environment for up to eight hours a day, and I plan to dispose of my respirator at the end of every shift.

I need a respirator that's resistant to oil. I'll be wearing it more than eight hours a day, and/or I plan to reuse it.

What nuisance-level odors are in my work environment?

What nuisance-level odors are in my work environment?

Organic vapors like solvents, degreasers, and resins.

Acid gases like sulfer dioxide, hydrogen fluoride, and chlorine.

My environment doesn't have any nuisance-level odors.

Organic vapors like solvents, degreasers, and resins.

Acid gases like sulfer dioxide, hydrogen fluoride, and chlorine.

My environment doesn't have any nuisance-level odors.

8247 (R95)  8246 (R95)

Featuring the 3M™ Cool Flow™ Exhalation Valve for physically demanding environments.

8577 (P95)  8576 (P95)  8271 (P95)  8577 (P95)  8576 (P95)  8271 (P95)

8293 (P100)

# Non-oil environments



I'm in welding and/or need a flame-resistant respirator.

Do I deal with any nuisance-level odors? (all welding/metalworking respirators feature the Cool Flow™ Exhalation valve)

Yes, organic vapors and some ozone*.

8214 (N95)

No, my environment has no nuisance odors

8515 (N95)

Adjustable buckle strap

8212 (N95)

I need a 100-class respirator.

8293 (P100)

8233 (N100)

I'm using this respirator for another application.

Am I working in a physically demanding environment?

No. Choose an un-valved respirator

I want a flat fold respirator.

9210+ (N95)
9105 (N95)
9105S (N95)
9205+ (N95)

I want a cup-shaped respirator.

8200 (N95)
8210 (N95)
8110S (N95)

Yes. Choose a 3M™ Cool Flow™ Exhalation valve.

I want a flat fold respirator.

9211+ (N95)

I want a cup-shaped respirator.

8210V (N95)

Braided strap

8511 (N95)

Adjustable buckle strap

8293 (P100)

8233 (N100)

*This decision tree is intended to help each employer find options for their specific situation. In the US, employers must implement a full respiratory protection program per OSHA 29 CFR 1910.134, including proper respirator selection, training, and use. Misuse of a respirator may result in overexposure to contaminants and cause sickness or death. For correct use, consult your supervisor and User Instructions, or call 3M at 1-800-247-3941.



# General purpose respirators

Reliable protection against a wide range of non-oily particles.
Engineered to provide at least 95% filtration efficiency.

## Unvalved N95 Respirators (flat fold)



### 9205+

The 3M™ Aura™ Series innovative 3-panel design combines comfort and convenience with its soft inner materials, adjustable chin tab and a sculpted, embossed top panel designed to allow more room for eyewear and help reduce eyewear fogging.

Flat fold design offers convenient storage and portability

Individual packaging helps protect respirator from contamination



### 9210+

Same great design as the 3M™ Aura™ 9205+, N95 but with braided headbands to help keep respirator securely in place and minimize pulling of hair.



### 9105 & 9105S

The economical 3M™ VFlex™ Particulate Respirator's proprietary V-shaped pleats expand to give you a spacious feel, helps make breathing easier, and flexes with mouth movement while talking. Available in two sizes.

## Unvalved N95 Respirators (cup-shaped)



### 8210

One of the most widely used disposable respirators in the industry. Features an adjustable nose clip and soft nose foam for security and comfort, and a welded head-strap attachment.



### 8110S

A small size version similar to our classic 8210, N95 respirator. Features an adjustable noseclip and soft nose foam for security and comfort.



### 8200

Lightweight, economical choice. Adjustable nose clip. Two-strap design with four point staple attachment helps provide a secure seal.

## Valved (flat fold)




### 9211+

Features new 3M™ Cool Flow™ Comfort Valve that releases warm, moist exhaled breath more quickly than the previous valve.

## Valved (cup-shaped)



### 8210V

An economical option based on our popular non-valved 8210 series.

## Valved (cup-shaped with braided strap)




### 8511

Our most popular valved model is suited for physically demanding environments and long periods of wear.

IMPORTANT: All 3M products shown in this catalog must be used in accordance with the OSHA regulations and the user instructions, warnings, and limitations accompanying each product.



# Respirators for
# oil environments

Designed for use in environments where oil mist, nuisance-level odors and gases are present. Offering protection from oil mist and other irritants, R95 respirators are somewhat resistant to oil mist, whereas P95 respirators are strongly resistant to oil mist.

## Respirators for Oil Environments



**8271 (P95)** 

Features a collapse-resistant shell.
Designed for: Grinding, sanding, sweeping, machining
and other dust-producing, oily operations.



**8293 (P100)**  

Provides minimum filter efficiency of 99.97%
against oil-based and non oil-based **particles**.

## Relief from Nuisance-Level Odors



### Organic Vapors



**8247 (R95)**      **8577 (P95)** 

Helps provide comfortable protection against nuisance levels** of organic
vapors such as solvents, degreasers and resins. Designed for: Foundry
operations, lab settings, agriculture, petrochemical manufacturing,
undercoating.

### Acid Gases



**8246 (R95)**          **8576 (P95)** 

Helps protect against nuisance levels** of acid gases such as sulfur
dioxide, hydrogen fluoride and/or chlorine. Designed for: Glass etching,
chemical processing, paper processing, aluminum.

IMPORTANT: All 3M products shown in this catalog must be used in accordance
with the OSHA regulations and the user instructions, warnings, and limitations
accompanying each product.

**Nuisance level refers to concentrations not exceeding OSHA PEL
or applicable occupational exposure limit whichever is lower.





# Flame-resistant respirators for welding

Offering protection from welding fumes, these respirators all feature 3M™ Cool Flow™ Exhalation Valve technology that helps release warm and moist exhaled breath from inside the respirator.



## N95 Welding Respirators

**8214** 

Designed to protect in welding situations, particularly with stainless, galvanized and aluminum, when ozone* and nuisance-level** organic vapors are present.

Comfortable foam face seal helps offer a secure seal.

**8212** 

Designed for tough environments with unique filter media designed specifically to be flame-resistant for welding with comfortable foam face seal for a more secure fit.



**8515** 

An economical option for welders with adjustable M-Noseclip and braided headbands for a custom, secure seal.

*3M recommended for ozone protection up to 10X PEL/OEL, for up to 8 hours of use. Not NIOSH approved for use against ozone.

**Nuisance level refers to concentrations not exceeding OSHA PEL or applicable occupational exposure limit whichever is lower.

IMPORTANT: All 3M products shown in this catalog must be used in accordance with the OSHA regulations and the user instructions, warnings, and limitations accompanying each product.

Flame-resistant respirators for welding      11



# 100 class
# disposable respirators

Offering NIOSH's highest rated filtration efficiency in disposable respirators, our 100 class disposable respirators offer protection in oil and non-oil environments.

## P100 Respirators



**8293** (P100)

Provides minimum filter efficiency of 99.97% against **non-oil and oil-based particles.**

Adjustable noseclip helps provide a custom and secure seal

3M™ Cool Flow™ Exhalation Valve

Comfortable face seal

Adjustable buckle straps help provide a secure fit

- Compatible with a variety of protective eyewear and hearing protection
- Individually packaged

## N100 Respirators



**8233** (N100)

Provides minimum filter efficiency of 99.97% against **non-oil-based particles.**

Adjustable noseclip helps provide a custom and secure seal

3M™ Cool Flow™ Exhalation Valve

Comfortable face seal

Adjustable buckle straps help provide a secure fit

- Compatible with a variety of protective eyewear and hearing protection
- Individually packaged

IMPORTANT: All 3M products shown in this catalog must be used in accordance with the OSHA regulations and the user instructions, warnings, and limitations accompanying each product.

# Product ordering information

**3M™ Disposable Particulate Respirators**

| | | NIOSH Class | SKU | Qty/Box | Boxes/Case | Case Qty |
|---|---|---|---|---|---|---|
| | 9205+ | N95 | 7100232219 | 20 | 12 | 240 |
| | 9210+ | N95 | 7100266132 | 20 | 12 | 240 |
| | 9105 | N95 | 7000002390 | 50 | 8 | 400 |
| | 9105S | N95 | 7000030028 | 60 | 8 | 400 |
| | 8210 | N95 | 7100132742 | 20 | 8 | 160 |
| | 8110S | N95 | 7000052065 | 20 | 8 | 160 |
| | 8200 | N95 | 7000052787 | 20 | 8 | 160 |
| | 9211+ | N95 | 7100303148 | 10 | 12 | 120 |
| | 8210V | N95 | 7000002462 | 10 | 8 | 80 |
| | 8511 | N95 | 7000002066 | 10 | 8 | 80 |
| **Respirators for oil environments** | 8247 | R95 | 7000002060 | 20 | 6 | 120 |
| | 8246 | R95 | 7000002059 | 20 | 6 | 120 |
| | 8577 | P95 | 7000002062 | 10 | 8 | 80 |
| | 8576 | P95 | 7000002061 | 10 | 8 | 80 |
| | 9271 | P95 | 7000002047 | 10 | 8 | 80 |
| | 8293 | P100 | 7000002055 | 1 | - | 20 |
| **Flame-resistant respirators for welding** | 8214 | N95 | 7000002093 | 10 | 8 | 80 |
| | 8515 | N95 | 7000002112 | 10 | 8 | 80 |
| | 8212 | N95 | 7000002027 | 10 | 8 | 80 |
| **100 class respirators** | 8293 | P100 | 7000002055 | 1 | - | 20 |
| | 8233 | N100 | 7000002020 | 1 | | 30 |



# 3M.com/disposable

Visit our website for more information including:

- Online Medical Evaluations
- Training Tools
- Where to buy
- Respiratory Management Program
- Videos
- Downloadable tech bulletins



**3M Personal Safety Division**
3M Center,
Building 235-2W-70
St. Paul, MN 55144-1000

**3M Canada Company PSD**
P.O. Box 5757
London, Ontario N6A 4T1
Canada

**⚠ WARNING**

These respirators help reduce exposure to certain airborne particulates. Before use, the wearer must read and understand the User Instructions provided as a part of the product packaging. A written respiratory protection program must be implemented meeting all the requirements of OSHA 1910.134 including training, fit testing and medical evaluation. In Canada, CSA standards Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Misuse may result in injury, illness or death. For correct use, consult supervisor and User Instruction, or call 3M PSD Technical Service in USA at 1-800-243-3941 and in Canada at 1-800-267-4414.

Technical Assistance in US
1-800-247-3941
Technical Assistance in Canada
1-800-267-4414
**www.3M.com/workersafety**

3M, Aura, VFlex, and Cool Flow
are trademarks of 3M Company.
Used under license in Canada.
© 3M 2023. All rights reserved.

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit B



# Technical Specification Sheet

## 3M™ Particulate Respirator 8210, N95



### Key Features
- NIOSH approved N95 rating
- Adjustable nose clip
- Nose foam
- Ultrasonically welded headbands

### Material Composition
- Straps – Thermoplastic Elastomer
- Nose Clip – Aluminum
- Nose foam - Polyurethane
- Filter – Polypropylene
- Shell – Polyester
- Coverweb - Polyester
- This respirator contains no components made from natural rubber latex
- Approximate weight of product: 0.35 oz.
- See the 3M Technical Bulletin - Cellulose Certification - Filtering Facepiece Respirators for information about which 3M respirators contain cellulose

### Country of Origin
Made in the USA with globally sourced materials

### Use For
- Use for solid particulates and liquid mists in concentrations not exceeding 10X PEL/OEL
- Always follow User Instructions and use in manners as indicated

### Do Not Use For
- DO NOT use for gases and vapors, oil aerosols, asbestos, arsenic, cadmium, lead, 4,4-methylene dianiline (MDA), or abrasive blasting
- DO NOT use for particulate concentrations exceeding 10X PEL/OEL
- DO NOT use in any manner not indicated in the User Instructions

### Approvals and Standards
- NIOSH approved N95 particulate respirator
- Meets NIOSH 42 CFR 84 N95 requirements for a minimum 95% filtration efficiency against solid and liquid aerosols that do not contain oil.
- NIOSH approval number: TC-84A-0007
- Assigned Protection Factor (APF 10) per US OSHA and Canada CSA

## Time Use Limitation

Replace the respirator when it becomes dirty, damaged, or difficult to breathe through.

## Shelf Life and Storage

- 5 years from the date of manufacture
- Use By date on box in MM/YYYY format
- Store respirators in the original packaging, away from contaminated areas, dust, sunlight, extreme temperatures, excessive moisture, and damaging chemicals
- Store in temperatures between -4°F (-20°C) and +86°F (+30°C) and not exceeding 80% RH

## WARNING! ⚠

This respirator helps reduce exposures to certain airborne contaminants. Before use, the wearer must read and understand the User Instructions provided as a part of the product packaging. Follow all local regulations. In the U.S., a written respiratory protection program must be implemented meeting all the requirements of OSHA 1910.134, including training, fit testing and medical evaluation. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. **Misuse may result in sickness or death.** For correct use, consult supervisor and the User Instructions or call 3M PSD Technical Service in USA at 1-800-243-4630 and in Canada at 1-800-267-4414.

## Acceptable Fit Test Protocols

| Fit Test Protocol* | | Acceptable with this product? |
|---|---|---|
| Qualitative Protocols | Saccharin | ☒ |
| | BitrexTM | ☒ |
| | Irritant Smoke | ☐ |
| | Isoamyl Acetate | ☐ |
| Quantitative Protocols | | ☒ |

*Refer to OSHA 1910.134





**Personal Safety Division**
3M Center, Building 0235-2W-70
St. Paul, MN 55144-1000
3M.com/workersafety

3M PSD products are occupational use only.

**For More Information**
Technical Assistance 1-800-243-4630
Hours of Operation: M-Th 8am - 6pm, Fri 8am - 4:30 pm CST
© 3M 2018. All rights reserved.

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit C



Science.
Applied to Life.™

Search

⊗

ⓐ Account ∨

Sign In

Sign in to bCom

ⓐ Account ∨

US - EN ⊕ ∨

Products

Industries

Brands

☒

3M in the United States

◉ English - EN

Change 3M Location   Save

‹

Products Industries

Abrasives

Adhesives, Sealants & Fillers

Advanced Materials

Automotive Parts & Hardware

Building Materials

Cleaning Supplies

Coatings

Compounds & Polishes

Dental & Orthodontics

Electrical

Electronics Materials & Components

Films & Sheeting

Filtration & Separation

Home

Insulation

Lab Supplies & Testing

Labels

Lubricants

Medical

Office Supplies

Personal Protective Equipment

Signage & Marking

Tapes

Tools & Equipment

View all 3M products 

Automotive

Commercial Solutions

Consumer Markets

Design & Construction

Electronics

Energy

Government

Health Care

Manufacturing

Safety

Transportation



At 3M, we discover and innovate in nearly every industry to help solve problems around the world.

United States > Safety > Worker Health & Safety > Respiratory Protection > Products > Disposable Respirators > Cool Flov

**Respiratory Protection**

OVERVIEW ▷    PRODUCTS ▼    APPLICATIONS ▷    SUPPORT ▼    CONTACT US ▷



# 3M™ Cool Flow™ Valve

## The proprietary 3M™ Cool Flow™ Valve

We're developing respirators with unique filter media technology that are highly effective and comfortable to wear. The proprietary 3M Cool Flow Valve is designed to release your hot, humid exhaled breath quickly, helping to prevent an unpleasant build up of exhaled air inside the facepiece – a cause of discomfort to respirator wearers.

# Popular 3M™ Cool Flow™ Valve Products

   

**3M™ Particulate Respirator 8511, N95 80/Case**

**3M™ Particulate Respirator 8210V, N95 Respiratory Protection 80 each/Case**

**3M™ Aura™ Particulate Respirator 9211+/37193 (AAD) N95, 120/Case**

**3M™ Particulate Respirator 8271 PS95, 80/Case**

## 3M™ Cool Flow™ Valve Product Details

▲
**Visible from outside: the comfort difference with 3M™ Cool Flow™ valve**

*The colors in the thermal images below show the change in external surface temperature of the respirators as the model inhales and exhales.*

   

*Inhalation is the cooler part of the cycle; with both valved and unvalved respirators, the 3M filter media facilitates an easy draw of external air.*

*As the wearer inhales, air is pulled through the respirator and surface temperature decreases. The valve's plastic cover, because of the material composition, retains some of the heat.*

*Exhalation: As the wearer exhales the respirator is filled with warm, moist air. The cooler thermal imaging shades of the picture on the right indicate how the respirator fitted with the Cool Flow valve expels the breath through the valve.*

*This benefit offers easy exhalation, especially when work is physically demanding and likely to cause heavy breathing.*

▼
## The 3M™ Cool Flow™ valve is only available on 3M respirators

Our Company
About 3M
3M Careers
Investor Relations
Customers and Suppliers
Sustainability
People and Community
Ethics & Compliance
News
News Center
Press Releases
Regulatory
SDS, RDS, More Regulatory & Compliance Information
Transport Information Search
CPSIA Certification Search
Lithium Battery UN 38.3 Test Summary Search
Transparency in Supply Chains and Modern Slavery Disclosures
US Ingredient Communication
Product Recalls
Help
Help Center
Site Map
Where to Buy

**3M**

Legal
|
Privacy
|
HIPAA Privacy
|
DMCA
|
Accessibility Statement
|
Your Privacy Choices
|
Cookie Preferences

© 3M 2025. All Rights Reserved.
Follow Us
(in)
(ⓞ)
(f)
(ⓞ)

The brands listed above are trademarks of 3M.

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit D



Search

 Account ∨

Sign In

Sign in to bCom

Account ∨

US - EN 🌐 ∨

Products

Industries

Brands

3M in the United States

◉ English - EN

Change 3M Location [Save]

Products Industries

Abrasives

Adhesives, Sealants & Fillers

Advanced Materials

Automotive Parts & Hardware

Building Materials

Cleaning Supplies

Coatings

Compounds & Polishes

Dental & Orthodontics

Electrical

Electronics Materials & Components

Films & Sheeting

Filtration & Separation

Home

Insulation

Lab Supplies & Testing

Labels

Lubricants

Medical

Office Supplies

Personal Protective Equipment

Signage & Marking

Tapes

Tools & Equipment

View all 3M products 

Automotive

Commercial Solutions

Consumer Markets

Design & Construction

Electronics

Energy

Government

Health Care

Manufacturing

Safety

Transportation



At 3M, we discover and innovate in nearly every industry to help solve problems around the world.

United States > Safety > Worker Health & Safety > Resources, Training & News > Calendar of Events > N95

**Worker Health & Safety**

OVERVIEW ▷    PRODUCTS ▼    INDUSTRY          ▼    TRAINING ▷    RESOURCES ▼    SUI
                            SOLUTIONS



# Take a breath and celebrate 40 years of global innovation for safer breathing.

September 5th is N95 day

# N95 NIOSH and Regulatory Certification

- ✉Email
- ⓕFacebook
- ⓧTwitter
- ⓘⓝLinkedin
- ⌁

The purpose

## Help protect your lungs, now and in the future, with a 3M N95 Respirator.

The air you breathe helps you live life to the fullest today and tomorrow. And like you, every day we go to work we're giving our best so that you can achieve yours.

From health care workers to construction to emergency responders, 5 million people in the U.S. are required to use a respirator at work every day.[1] N95 is the most common regulatory certification for respiratory protection used in the workplace.

Chipping away a mile below the surface.

Installing flooring on the thirteenth floor of a skyscraper.

Fusing metal on a pipeline that will bring energy to millions.

Holding the heart of a surgery patient in your hands.

Exposures can be cumulative, and each day really can matter. At 3M, that's why we do what we do. Across our labs, we're working 'round the clock and 'round the globe to help improve our respirators. Your life, your health, and your future matter to us.

[1] *From the Occupational Safety & Health Administration (OSHA) website (https://www.osha.gov/SLTC/respiratoryprotection/index.html)*

## What does N95 Day mean to you?

Share your photos and stories on our Facebook page.

## See 3M Product Catalog

See the extensive family of disposable respirators from 3M

*Visit catalog*

## N95 Day and NIOSH

Read about the holiday from the founders.

*Visit NIOSH*



# The science that helps keep you safe, breath by breath.

## Micro protection, macro breathability.

From proprietary filter technologies to state-of-the-art labs around the globe where we conduct advanced experiments, here's a peek at the science behind your 3M N95 respirator.

You can see dust and debris in the air, but many of the particles that threaten your airways can't always be seen with the naked eye. For hazardous environments we strive to create respiratory protection that, when used for the right hazard in the right way, helps keep invisible contaminants out. So we looked at ways we could improve the filter fibers—aka, filter media.

Over 35 years ago 3M scientists realized they could use an electrostatic charge to put fibers into action in disposable respirators. This actually attracts more particles to the fibers, catching and preventing them from entering your airways.

The resulting 3M Advanced Electrostatic Media (AEM) in the 8210 respirator tests have shown among the lowest breathing resistance when compared to several competitive respirators.[2]

The benefits go beyond the capture of particles when you wear it.

[2] Based on both 2012 customer study by Burke, Inc. and comparative testing performed by 3M

*(http://solutions.3m.com/wps/portal/3M/en_US/3M-PPE-Safety-Solutions/Personal-Protective-Equipment/safety-products/DisposableRespirators/)*

[3] Loading with flux-cored arc welding fume (mild steel wire on mild steel base) at 85L/min for. Source: "Comparison of Pressure Drop and Filtration Efficiency of Particulate Respirators using Welding Fumes and Sodium Chloride" Ann.Occup. Hyg., Vol. 55, No. 6 pp. 666-680, 2011. Note: 8212 and 8514 models were not tested but are the same construction as 8512 and 8214, respectively, with the exception of the presence of faceseal.

"We can use less filter media and therefore it makes it easier to breathe because you don't need so much filter media in the respirator.

**Dr. John Sebastian**
Senior 3M Respiratory Products Research Specialist



# There's more to fit than meets the eye

Fit is key, it can impact the seal of your respirator, the protection provided and even comfort. Because what you need on the job is a respirator that fits so it can help protect you all day long.

At 3M, fit plays a central role in the development process. Our state-of-the-art global labs pave the way for important discoveries and advancements, providing options in respiratory protection for workers around the world.

We test and research facial structures to help us to cover many face types and shapes. "We're constantly doing research to try and improve and also offer the workers a variety of models so that their employers can pick the one suited to their face and work conditions."

Nicole Vars McCullough, PhD, CIH
3M Global Technical Services Manager

# Advancing the fit test.

At 3M, our safety excellence extends far beyond lab testing. We developed one of the leading qualitative fit tests in use today. We offer OSHA-compliant fit test kits and extensive training materials that employers and safety managers can use to help ensure that selected N95 respirators can provide workers with a proper fit.

Always remember, when wearing a respirator be an advocate for respirator safety. The golden rule is that if the fit or seal of the respirator is ever compromised during use, STOP immediately, EXIT the worksite, see your supervisor, and do not return to a contaminated area until your respirator fits and functions properly.

"A fit test is done annually by your employer to ensure that he or she has chosen a respirator for you that is capable of fitting your face well."

Jessica Hauge, CIH, CSP
3M Respirator Products Technical Service Engineer



# 7 degrees of cool.

We knew that one of the biggest reasons people didn't like wearing their respirator was heat. The air that comes out of your lungs is hot and humid. It quickly fills up the respirator cavity, making contact with your face.

That got us thinking about ventilating the respirator which led to a big breakthrough, the 3M™ Cool Flow™ Valve. This unique valve seals during inhalation and opens automatically during exhalation, reducing heat and moisture and directing the air away from your face.

"We've actually conducted studies on the 8511 and found that the Cool Flow™ Valve reduced air temperature in the respirator by about seven degrees."

**Dr. Philip Eitzman**
3M Respiratory Product Development Specialist







# Safe breathing, 40 years in development.

## The history.

In 1972, 3M introduced the first National Institute for Occupational Safety and Health (NIOSH) approved disposable filtering face-piece respirator. From there, we developed a full line-up of NIOSH-approved N95 respirators for a variety of industries from agriculture to health care to construction and more.

Over the years our technologies have improved, our methodologies have changed and our research has led to industry breakthroughs. But one thing has remained the same: our commitment to protecting worker health and well-being on the job with best-in-class 3M N95 respirators.

"We want to make sure health and safety professionals in every country have the ability to provide a comprehensive respiratory program to their workers whether it's in their regulations or not."

**Nicole Vars McCullough**
3M Global Technical Services Manager





# Happy N95 Day!

## Three cheers for safe breathing.

Happy N95 Day! NIOSH created N95 Day to celebrate and promote workplace respiratory safety. The holiday falls on September 5 every year, and we celebrate by providing the N95 respirator community with educational materials promoting the proper use and selection of N95 respirators.

Celebrate respirator safety with us. Take a few minutes to ask some questions about your respirator safety – we'll get you started:

- Is it time for a new respirator?
- Do you need a refresher on performing a user seal check?

- Are your colleagues properly donning their respirator?

Reach out and spread the safety. The efforts you make on N95 Day can have a positive, lasting impact on your health and others in your workplace for decades to come.

What does N95 Day mean to you? Share what your N95 respirator means to you.

Visit Facebook to Share

# Additional Respiratory Safety Videos





3M Health Care N95 Fluid Resistance   (0:35)



40 Years of Safety - Respiratory Video   (2:30)



Difference between surgical mask and respirator   (1:10)

# Featured 3M N95 Respirator Products







**3M™ VFlex™ Health Care Particulate Respirator**

**3M™ Particulate Respirator 8210, N95**

**3M™ Particulate Respirator 8511, N95**

Customer Service: 1-800-328-1667                    Technical Service: 1-800-2·

Our Company
About 3M
3M Careers
Investor Relations
Customers and Suppliers
Sustainability
People and Community
Ethics & Compliance
News
News Center
Press Releases
Regulatory
SDS, RDS, More Regulatory & Compliance Information
Transport Information Search
CPSIA Certification Search
Lithium Battery UN 38.3 Test Summary Search
Transparency in Supply Chains and Modern Slavery Disclosures
US Ingredient Communication
Product Recalls
Help
Help Center
Site Map
Where to Buy

Legal

Privacy

|

HIPAA Privacy

|

DMCA

|

Accessibility Statement

|

Your Privacy Choices

|

Cookie Preferences

© 3M 2025. All Rights Reserved.

Follow Us

(in)

(▣)

(f)

(◎)

The brands listed above are trademarks of 3M.

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit E



# 3M™ 8000 Series Particulate Respirators

## Technical Data Sheet

## Description

The 3M™ 8710, 8210, 8812 and 8822 Particulate Respirators provide eff ective respiratory protection for use in industries where workers will be exposed to dust particles and/or nonvolatile liquid particles.

- Tested and certified to AS/NZS 1716:2012.
- Traditional convex shape, with nose clip and twin strap design.
- Durable, collapse resistant inner shell.
- Reliable, effective protection against fine particles.
- 3M™ Advanced Electret Filter Material gives effective filtration with low breathing resistance for consistent high quality performance.
- 3M™ Cool Flow™ exhalation valve offers improved comfort in hot humid environments.



8812          8822

8210          8710

## Materials

The following materials are used in the production of the 8710, 8210, 8812 and 8822 Particulate Respirators:

| Component | Material |
|-----------|----------|
| Straps | 8812, 8822 – Polyisoprene<br>8710 and 8210 – Thermoplastic Elastomer |
| Staples | 8812, 8822 – Steel<br>8710 and 8210 – no staples |
| Nose Foam | Polyester |
| Nose Clip | 8210 – Aluminium<br>8710, 8812, 8822 – Steel |
| Filter | Polyester / Polypropylene |
| Valve | Polypropylene |
| Valve Diaphragm | Polyisoprene |

**This respirator does not contain components made from natural rubber latex.**

Maximum mass of products

- Unvalved (8710 & 8210) = 8g
- Valved (8812 & 8822) = 13g

## Standards

These products meet the requirements of Australian New Zealand Standard AS/NZS 1716:2012, Respiratory protective devices. They should be used to protect the wearer from solid and non-volatile liquid particles only.

Particulate Filter Respirators are classified by filtering efficiency and maximum total inward leakage performance (P1 & P2), also by inhalation resistance.

P1 filters are intended for use against mechanically generated particulates such as those generated from sanding, grinding, drilling, sweeping etc.

P2 filters are intended for use against both mechanically and thermally generated particulates e.g. welding, brazing etc. P2 filters may also help reduce breathing in pathogenic biological airborne particulates such as influenza virus.

## Approvals

These respirators have been produced to comply with the requirements of the Australian / New Zealand Standard AS/NZS 1716:2012 under an agreed production certification scheme operated during manufacture in accordance with the SAI Global StandardsMark programme.

## Applications

These respirators are suitable for use in concentrations of solid and non-volatile liquid particles up to the following limits:

| Model | AS/NZS 1716:2012 Classification | Exhalation Valve | Protection Factor x Workplace Exposure Standard(WES)/ Workplace Exposure Limit (WEL) |
|-------|----------------------------------|------------------|----------------------------------|
| 8710 | P1 | Unvalved | up to 10x |
| 8812 | P1 | Valved | up to 10x |
| 8210 | P2 | Unvalved | up to 10x |
| 8822 | P2 | Valved | up to 10x |

Respiratory protection is only effective if it is correctly selected, fitted and worn throughout the time when the wearer is exposed to hazards.

## Storage and Transportation

The 3M™ 8710, 8210, 8812 and 8822 Particulate Respirators have a shelf life of five (5) years. End of shelf life is marked on the product packaging. Before initial use, always check that the product is within the stated shelf life (use by date). Product should be stored in clean, dry conditions within the temperature range: – 20°C to + 25°C with a maximum relative humidity of <80%. When storing or transporting this product use original packaging provided.

## Disposal

Contaminated products should be disposed as hazardous waste in accordance with local regulations.

It is recommended that wearers be fit tested in accordance with AS/NZS 1715:2009 Standard. For information regarding fit testing procedures, please contact 3M.

## Fitting Instructions - 8710 and 8210 only

See Figure 1.

All respirator components should be inspected for damage prior to each use.

1. and 2. Pre-stretch around entire length of each strap by pulling at 3cm intervals between both hands.

3. Cup respirator in one hand with nosepiece at fingertips, allow headbands to hang freely below hand.

4. Hold respirator under chin, with nosepiece up.

5. Locate the upper strap across the crown of the head and the lower strap below the ears.

6. Straps must not be twisted.

7. Using both hands, mould noseclip to the shape of the lower part of the nose to ensure a close fit and good seal. Pinching the noseclip using only one hand may result in less effective respirator performance.

8. The seal of the respirator on the face should be fit-checked before entering the workplace. Refer to Fit Check section for instructions.

**Figure 1**



## Fitting Instructions - 8812 and 8822 only

Must be followed each time the respirator is worn. Before fitting device, ensure hands are clean.

See Figure 1.

1. Cup respirator in one hand with nosepiece at fingertips, allow headbands to hang freely below hand.

2. Hold respirator under chin, with nosepiece up.

3. Locate the upper strap across the crown of the head and the lower strap below the ears.

4. Straps must not be twisted.

5. Using both hands, mould noseclip to the shape of the nose to ensure a close fit and good seal. Pinching the noseclip using only one hand may result in less effective respirator performance.

6. The seal of the respirator on the face should be fit-checked before entering the workplace. Refer to Fit Check section for instructions.

**Figure 2**



## Fit Check

1. Cover the front of the respirator with both hands being careful not to disturb the fit of the respirator.

2. (a) UNVALVED respirator - EXHALE sharply;
   (b) VALVED respirator - INHALE sharply.

3. If air leaks around the nose, re-adjust the nose clip to eliminate leakage. Repeat the above fit check.

4. If air leaks at the respirator edges, work the straps back along the sides of the head to eliminate leakage. Repeat the above fit check.

**If you CANNOT achieve a proper fit DO NOT enter the hazardous area. See your supervisor.**

**It is recommended that wearers be fit tested in accordance with AS/NZS 1715 Standard. For information regarding fit testing procedures, please contact 3M.**

## Warnings and Use Limitations

Always be sure that the complete product is:

- Suitable for the application;

- Fitted correctly;

- Worn during all periods of exposure;

- Replaced when necessary.

- Proper selection, training, use and appropriate maintenance are essential in order for the product to help protect the wearer from certain airborne contaminants.

- Failure to follow all instructions on the use of these respiratory protection products and/or failure to properly wear the complete product during all periods of exposure may adversely affect the wearer's health, lead to severe or life threatening illness or permanent disability.

- For suitability and proper, use follow local regulations, refer to all information supplied or contact an occupational hygienist, safety professional or 3M Customer Service Australia 1300 363 565 3msupport.safety.au@mmm.com New Zealand 080252 627 3msupport.safety.nz@mmm.com.

- Before use, the wearer must be trained in use of the complete product in accordance with applicable Health and Safety standards/guidance.

- These products do not contain components made from natural rubber latex.

- These products do not protect against all gases/vapours, but offer relief from nuisance levels (i.e. levels below ES) of certain gases/vapours.

- Do not use in atmospheres containing less than 19.5% oxygen. (3M definition. Individual countries may apply their own limits on oxygen deficiency. Seek advice if in doubt).

- Do not use for respiratory protection against atmospheric contaminants/concentrations which are unknown or immediately dangerous to life and health (IDLH).

**Do not use with beards or other facial hair that may inhibit contact between the face and the product thus preventing a good seal.**

- Leave the contaminated area immediately if
  a) Breathing becomes difficult.
  b) Dizziness or other distress occurs.

- Discard and replace the respirator if it becomes damaged, breathing resistance becomes excessive or at the end of the shift.

- Never alter, modify or repair this device.

- In case of intended use in explosive atmospheres, contact 3M.

# Ordering Information

| SAP ID | Legacy ID | Availability AUS | Availability NZ | Model # | Description |
|--------|-----------|------------------|-----------------|---------|-------------|
| 7000037792 | WX700900359 | • | • | 8822 | 3M™ Particulate Respirator 8822, P2, Valved, 10/Box, 24 Boxes/Case |
| 7000037790 | WX700900011 | • | • | 8210 | 3M™ Cupped Particulate Respirator 8210, P2, 20 ea/Box, 8 Boxes/Case |
| 7100368379 | UU013487200 | • | • | 8812 | 3M™ Cupped Particulate Respirator 8812, P1, Valved, 10/Box, 24 Boxes/Case |
| 7000008661 | WX700900029 | • | • | 8710 | 3M™ Cupped Particulate Respirator 8710, P1, 20 ea/Box, 8 Boxes/Case |

## Warning

Respirators must not be used until your employer has determined whether usage will be in accordance with manufacturer's instructions. The wearer must be trained in the proper fitting and use of this product. Failure to follow all instructions and warnings on the use of this product and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and result in illness or death. All respirators should be used in accordance with Australia/New Zealand standard AS/NZS 1715. It is recommended that fit testing be conducted before assigning a respirator to an individual. If you cannot achieve a proper fit, do not enter contaminated areas. Do not use with beards or other facial hair or conditions that prevent a good seal between the face and the sealing surface of the respirator.

## Important Notice

To the extent permitted by law, 3M shall not be liable for any loss or damage including any loss of business, loss of profits, or for any indirect, special, incidental or consequential loss or damage arising from reliance upon any information herein provided by 3M. Nothing in this statement will be deemed to exclude or restrict 3M's liability for death or personal injury arising from its negligence.



SCAN OR CLICK FOR:

QR-CAT-DR
**Disposable Respirator Catalogue Section**

QR-CAT-FULL
**Full Personal Safety Division Catalogue**



**3M Australia Pty Ltd**
Personal Safety Division
Bldg A, 1 Rivett Road
North Ryde NSW 2113

**3M New Zealand Ltd**
Personal Safety Division
94 Apollo Drive, Rosedale
Auckland 0632

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit F

# 3M

# Particulate Respirators
# 8210 and 8110S, N95

**Issue Date 01/01/04**

The 3M™ Particulate Respirator
8210, N95 is designed to help
provide quality, reliable worker
protection against certain non-oil
based particles. The 3M™
Particulate Respirator 8110S, N95
offers the same protection for
those workers with smaller faces.
The 8210 and the 8110S offer a
number of benefits to you and
your workers.



**3M™ Particulate Respirator 8210, N95
(Inset photo: 3M™ Particulate Respirator 8110S, N95)**

### NIOSH approved N95
• At least 95% filtration efficiency
against solid and liquid aerosols that
do not contain oil.* TC-84A-0007

### Advanced Electret Media
• Advanced electrostatically charged
microfibers make breathing easier
and cooler.

### Helps provide worker protection
• Because they are comfortable to
wear and easy to use, workers are
quick to accept and use maintenance-
free respirators, like the 8210 and
8110S. Studies have shown they can
provide protection equivalent to a
rubber facepiece respirator…at much
lower cost and greater convenience.

### Lightweight construction
• Promotes greater worker comfort.
• Contributes to increased wear time.

### Adjustable noseclip
• Helps provide a custom fit
and secure seal.
• Reduces the potential for
eyewear fogging.

### Suggested Applications



• Grinding
• Sanding
• Sweeping
• Bagging
• Other dusty
operations
• Woodworking
• Foundries



### ⚠ WARNING

These respirators help reduce exposure to certain
particles. **Misuse may result in sickness or death.**
Before use, the wearer must read and understand
**User Instructions** provided as a part of product
packaging. Time use limitations may apply. For
proper use, see package instructions, supervisor
or call 3M OH&ESD Technical Service in U.S.A.,
1-800-243-4630. In Canada, call 1-800-267-4414.

*Tested against particles approximately 0.3 micron in size (mass median aerodynamic diameter) per 42 CFR 84.

# 3M™ Particulate Respirators 8210 and 8110S, N95

| Respirators Per Box 8210 & 8110S | Respirators Per Case |
|:---:|:---:|
| 20 | 160 |

## Use For:
- Solids such as those from processing minerals, ~~coal~~, iron ore, flour, and certain other substances.
- Liquid or non-oil based particles from sprays that do not also emit harmful vapors.

## Do Not Use For:
Gases and vapors, including those present in paint spray operations, asbestos, arsenic, cadmium, lead, 4,4'-methylenedianiline (MDA) or sandblasting. Aerosol concentrations that exceed 10 times the OSHA PEL, or applicable exposure limits, whichever is lower. This respirator does not supply oxygen.

## Important
Before using these respirators, you must determine the following:
1. The type of contaminant(s) for which the respirator is being selected.
2. The concentration level of contaminant(s).
3. Whether the respirator can be properly fitted on the wearer's face. Do not use with beards, on other facial hair, or other conditions that prevent a good seal between the face and the faceseal of the respirator.
4. Before use of these respirators, a written respiratory protection program must be implemented, meeting all the requirements of OSHA 29 CFR 1910.134, including training, medical evaluation and fit testing.

## Time Use Limitation
If respirator becomes damaged, soiled, or breathing becomes difficult, leave the contaminated area immediately and dispose of the respirator.

## Technologies



**Advanced Electret Media**
Advanced electrostatically charged microfibers make breathing easier and cooler.

## Additional Information
This respirator contains no components made from natural rubber latex.

| For more information, please contact: |
| :--- |

**3M Occupational Health and Environmental Safety Division (OH&ESD)**

**In the U.S., contact:**
Sales Assistance
1-800-896-4223
Technical Assistance
1-800-243-4630
Fax On Demand
1-800-646-1655
Internet
http://www.3M.com/occsafety
For other 3M products
1-800-3M HELPS

**In Canada, contact:**
3M Canada Company, OH&ESD
P.O. Box 5757
London, Ontario N6A 4T1
Sales Assistance
1-800-265-1840, ext. 6137
Technical Assistance (Canada only)
1-800-267-4414
Fax On Demand
1-800-646-1655
Internet
http://www.3M.com/CA/occsafety

Technical Assistance In Mexico
01-800-712-0646
5270-2255, 5270-2119 (Mexico City only)
Technical Assistance In Brazil
0800-132333
Fax On Demand O.U.S. Locations
1-651-732-6530

**3M Occupational Health and Environmental Safety Division**
3M Center, Building 235-2W-70
St. Paul, MN 55144-1000

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit G

# 8210Plus/ 8210PlusMX/ 8210/8210MX/ 07048/8110S

## Particulate Respirator N95
### User Instructions
(IMPORTANT: Keep these User Instructions for reference)

## Respirateur N95 contre les particules
### Directives d'utilisation
(IMPORTANT: Conserver ces directives d'utilisation à titre de référence)

## Respirador contra partículas N95
### Instrucciones de uso
(IMPORTANTE: Conserve estas Instrucciones de uso para su consulta)

99-0060-0007-4_4

⚠ **A WARNING**

This respirator helps protect against certain airborne particles but not gases or vapors. Misuse may result in sickness or death. For proper use, see supervisor or User Instructions or call 3M in U.S.A., 1-800-243-4630. In Canada, call Technical Service at 1-800-267-4414.

⚠ **A MISE EN GARDE**

Ce respirateur aide à protéger contre certaines particules en suspension dans l'air, mais non contre les gaz ni les vapeurs. Un mauvais usage peut provoquer des maladies ou même la mort. Pour tout renseignement sur son utilisation adéquate, consulter son superviseur, lire les directives d'utilisation ou communiquer avec 3M, au Canada, au 1 800 267-4414.

⚠ **A ADVERTENCIA**

Este respirador ayuda a proteger contra ciertas partículas suspendidas en el aire, mas no contra gases ni vapores. El mal uso puede ocasionar enfermedad o incluso la muerte. Para su uso correcto, consulte a su supervisor o las Instrucciones de uso o llame a 3M EE.UU., al 1-800-243-4630. En México, llame al 01-800-712-0646 o escriba a respiradores@mmm.com.

**FOR MORE INFORMATION**
In United States, contact:
Website: www.3M.com/PPESafety
Technical Assistance: 1-800-243-4630
For other 3M products:
1-800-3M-HELPS (1-800-364-3577)

**PARA OBTENER MÁS INFORMACIÓN**
En México, comuníquese con:
3M México S.A. de C.V.
Website: www.3M.com.mx
1 800 712-0646
**PARA OBTENER MÁS INFORMACIÓN**
En Estados Unidos, comuníquese con 3M:
PRODUCTS 3M 1 800 364-3577

**RENSEIGNEMENTS**
Aux États-Unis:
Internet: www.3M.com/PPESafety
Assistance technique: 1 800 243-4630
Autres produits 3M: 1 800 364-3577
Au Canada, communiquer avec:
Service technique de 3M: 1 800 267-4414

3M
3M Personal Safety Division
3M Center, Building 0235-02-W-70
St. Paul, MN 55144-1000
3M PSD products are
occupational use only.
© 3M 2017

---



**IMPORTANT**
Before use, wearer must read and understand these User Instructions. Keep these instructions for reference.

**Use For**
Particulate such as those from grinding, sanding, sweeping, sawing, bagging, or processing minerals, coal, iron ore, flour, metal, wood, pollen, and certain other substances. Used for liquid or non-oil based particles from sprays that do not also emit harmful vapors.

**Do Not Use For**
Gases and vapors, oil aerosols, asbestos, sandblasting, lead, arsenic, cadmium, or any application not in accordance with NIOSH approvals and these User Instructions or if concentrations of contaminants are unknown or immediately dangerous to life or health (IDLH).

**Biological Particles**
The respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. mold, Bacillus anthracis, Mycobacterium tuberculosis, etc.), but cannot eliminate the risk of contracting infection, illness or disease.

**Use Instructions**
1. Failure to follow all instructions and limitations on the use of this respirator could reduce respirator effectiveness and may result in sickness or death.

---

## Time Use Limitation
If respirator becomes damaged, soiled, or breathing becomes difficult, leave the contaminated area and replace the respirator.

**Storage Conditions and Shelf Life**
Store the respirator in the original packaging, away from contaminated areas, dust, sunlight, extreme temperatures, excessive moisture, and damaging chemicals. Inspect respirator before each use to assure it is in good operating condition. Examine all the respirator components for signs of damage. The "use by" date (see shelf life designation). Shelf life is 5 years from date of manufacture when stored in the specified conditions. The shelf life and the storage temperature range for the product are shown on the product packaging. Store between -4°F (-20°C) to +86°F (+30°C). Store within the relative humidity below 80%.

[stock temperature graphic] -4°F (-20°C) to +86°F (+30°C)

⚠ ⚠

---



Approved by NIOSH / Homologué NIOSH
95% réduction des particules de filtration contre aérosols solides et liquides que ne contiennent pas d'huile.

3M
ST. PAUL, USA / E.U.
1-800-243-4630

Rev. 7-07-01-17

NIOSH

**THESE RESPIRATORS ARE APPROVED ONLY IN THE FOLLOWING CONFIGURATIONS:**

| TC- | Protection | 8210 | 8210Plus | 07048 | 8110S | 8210MX | Exhalation Valve |
|---|---|---|---|---|---|---|---|
| 84A-0007 | N95 | X | X | | | X | |
| 84A-1791 | N95 | | | X | | | |
| 84A-7048 | N95 | | | X | | | |
| 84A-3000 | N95 | | | | X | | |

# 8210Plus/ 8210PlusMX/ 8210/ 8210MX/ 07048/ 8110S/ 3201

ENGLISH · FRENCH · SPANISH

**Quick Start Guide**
N95 Particulate Respirator

**Guide de démarrage rapide**
Respirateur N95 contre les particules

**Guía de inicio rápido**
Respirador Para Partículas N95






# FITTING INSTRUCTIONS / DIRECTIVES D'AJUSTEMENT / INSTRUCCIONES DE AJUSTE

The following fitting instructions must be followed each time the respirator is worn. / Suivre les directives d'ajustement ci-dessous chaque fois qu'on utilise le respirateur. / Debe seguir las siguientes instrucciones de ajuste cada vez que se use el respirador.

**1** Position the respirator under your chin with the nosepiece up.

**2** Using two hands, place your fingertips on both sides of the metal nose piece.




**IMPORTANT:**

**Any Questions?**
**Des questions?**
**¿Alguna pregunta?**

3M Personal Safety Division / 3M Canada
In United States / Aux États-Unis / En EUA:
1-800-243-4630
In Canada / Au Canada / En Canadá:
1-800-267-4414
In Mexico / Au Mexique / En México:
01-800-712-0646

**STORAGE:**
Store at temperatures between −4°F (−20°C) to +86°F (+30°C)

**ENTREPOSAGE:**

**ALMACENAJE:**




⚠ WARNING

⚠ MISE EN GARDE

⚠ ADVERTENCIA

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit H

**IMPORTANT**
Before use, the wearer must read and understand these User Instructions provided. User Instructions are also available, going for QR code on the back or at 3M.com/8210.
**Misuse may result in sickness or death.**
**Not intended for individual resale.**

**IMPORTANT**
Avant d'utiliser ce produit, l'utilisateur doit lire et comprendre les directives d'utilisation qui se trouvent à l'intérieur. Vous pouvez également consulter les directives d'utilisation en vous rendant du code QR qui se trouve sur le carton, indiqué ou en allant à l'adresse 3M.com/8210.
**Une mauvaise utilisation peut causer des problèmes de santé ou la mort.**
**N'est pas conçu pour la revente individuelle.**

**IMPORTANTE**
Antes de usar, el usuario debe leer y entender las instrucciones al interior.
Las instrucciones también están disponibles con código QR en el panel lateral o en 3M.com/8210.
**El mal uso puede ocasionar enfermedad, o incluso la muerte.**
**No está diseñado para su venta individual.**

**N95**

# 3M

$14⁹⁵   3M N95 8210 20/BOX

Particulate Respirator N95
Respirateur N95 contre les particules
Respirador contra partículas N95

8210





20 
contiene 20 respiradores

✓ **3M Safe Guard** ✓
Product Authentication Process
Processus d'authentification des produits
Proceso de autenticación de producto

3M

8210

# 3M

**8210**

## Particulate Respirator N95
## Respirateur N95 contre les particules
## Respirador contra partículas N95

Homologué
Aprobado por
**N95**
Approved

Adjustable noseclip
Pince nasale règlable
Clip nasal ajustable

Cushioning nosefoam
Bande nasale en mousse rembourrée
Espuma nasal de cojinete

Welded strap attachment
Courroie à fixation soudée
Anexo de banda soldada

3M™ Proprietary filter media
Matériau filtrant breveté 3M™
Medio filtrante propiedad de 3M™



**⚠ WARNING**
This respirator helps protect
against certain particles.
Misuse may result in sickness
or death. For proper use, see
supervisor or box or call 3M
1-800-247-3941. NIOSH.

3M 8210



**IMPORTANT:** See insert inside for complete fitting and user instructions before using.
**IMPORTANT :** Avant l'utilisation, consulter la notice à l'intérieur de la boîte pour les directives d'ajustement et d'utilisation complètes.
**IMPORTANTE:** Antes de usar el producto, consulte el inserto en el interior para obtener las instrucciones de uso y ajuste.

# 3M

# 8210

## Respirateur N95 contre les particules

**IMPORTANT**

Avant d'utiliser ce produit, lire les *directives d'utilisation* à l'intérieur. Vous pouvez également consulter les *directives d'utilisation en vous servant du code QR qui se trouve sur le panneau latéral ou en allant à l'adresse 3M.com/UI8210.

**Utiliser pour**

Les particules provenant du meulage, du ponçage, du découpage à la scie, du balayage, de l'ensachage et du traitement des minéraux, du charbon, du minéral de fer, de la farine, du métal et du bois ainsi que le pollen et certaines autres substances. La protection des voies respiratoires contre les particules liquides ou exemptes d'huile, provenant des vaporisateurs qui n'émettent pas d'huile en aérosol ou de vapeurs. Suivre tous les règlements locaux applicables. Pour obtenir de plus amples renseignements sur les recommandations d'utilisation de cette catégorie de respirateurs, consulter le guide de sélection des respirateurs de 3M sur le site Web de la Division des produits de protection individuelle de 3M à l'adresse www.3m.com/workersafety ou composer, au Canada, le 1 800 267-4414.

**Ne pas utiliser pour**

Ne pas utiliser pour les gaz, les vapeurs, les aérosols à base d'huile, l'amiante ou le décapage au jet de sable, les concentrations de particules 10 fois supérieures à la limite d'exposition admissible en milieu de travail ou aux limites applicables établies par le gouvernement, selon la valeur la moins élevée. Aux États-Unis, ne pas utiliser si des normes de l'OSHA concernant des substances précises, comme celles concernant l'arsenic, le cadmium, le plomb dans l'industrie de la construction ou le diamino-4,4' diphénylméthane (MDA), recommandent d'autres types de protection respiratoire. Ce respirateur ne fournit pas d'oxygène.

**Approbation du NIOSH : N95**

Efficacité de filtration d'au moins 95% contre les aérosols solides et liquides exempts d'huile. Consulter la notice pour l'étiquette d'homologation.

**Durée maximale d'utilisation**

Quitter la zone contaminée immédiatement et remplacer le respirateur s'il est endommagé, encrassé ou si la respiration devient difficile.

**Conditions d'entreposage et durée de conservation**

Pour connaître les conditions d'entreposage et la date de péremption, consulter la partie inférieure de la boîte et les directives d'utilisation à l'intérieur. Entreposer conformément aux directives du fabricant, voir l'emballage.

Ce respirateur ne contient aucun composant en latex de caoutchouc naturel.



**⚠ MISE EN GARDE**

Ce respirateur protège contre certaines particules. Une mauvaise utilisation peut provoquer des problèmes de santé ou la mort. Pour tout renseignement sur l'utilisation adéquate de ce produit, consulter les directives d'utilisation ou communiquer avec le superviseur, ou encore, au Canada, composer le 1 800 267-4414.

## Respirador contra partículas N95

**IMPORTANTE**

Antes de usar, el usuario debe leer y entender las *Instrucciones* en el interior. Las *Instrucciones* también están disponibles con código QR en el panel lateral o en 3M.com/UI8210.

**Usar para**

Para partículas, como las presentes en trabajos de lijado, esmerilado, barrido, aserrado, embolsado o procesamiento de minerales, carbón, mineral de hierro, harina, metal, madera, polen y algunas otras sustancias. Partículas líquidas o partículas que no sean base aceite de aerosoles que tampoco emitan aerosoles o vapores de aceite. Siga las regulaciones locales correspondientes. Para mayores informes sobre las recomendaciones de uso de 3M para esta clase de respirador, favor de consultar la Guía de selección de respiradores 3M en el sitio de la División de Seguridad Personal 3M www.3m.com/workersafety o llame a 3M en EUA al 1-800-243-4630; En Canadá llame al 1-800-267-4414. En México llame al 01-800-712-0646; o contacte a 3M en su país.

**No usar para**

Gases y vapores, aerosoles de aceite, asbestos o sandblasteo; concentraciones de partículas que excedan 10 veces el límite de exposición ocupacional o las regulaciones gubernamentales aplicables, lo que sea menor. En Estados Unidos no use cuando las normas para sustancias específicas de la Administración de Seguridad y Salud Ocupacional (OSHA por sus siglas en inglés), como arsénico, cadmio, plomo en la industria de la construcción o 4,4'-metilen dianilina (MDA), indiquen otro tipo de protección respiratoria. Este respirador no suministra oxígeno.

**Aprobado por NIOSH: N95**

Ofrece un mínimo de 95% de eficiencia de filtración contra aerosoles sólidos y líquidos que no contengan aceite. Consulte la etiqueta de aprobación en el inserto.

**Limitaciones de tiempo de uso**

Si el respirador se daña, ensucia o se hace difícil respirar a través de él, salga inmediatamente del área contaminada y reemplácelo.

**Condiciones de almacenamiento y vida útil**

Para conocer las condiciones de almacenamiento y uso por fecha, consulte el fondo de la caja y las *Instrucciones* en el inserto. Almacene de acuerdo con las instrucciones del fabricante; consulte el empaque.

Este respirador no contiene componentes de látex natural.



**⚠ ADVERTENCIA**

Este respirador ayuda a proteger contra ciertas partículas. El uso incorrecto puede dar origen a enfermedad o incluso la muerte. Para su uso apropiado consulte a su supervisor, las *Instrucciones*, o llame a 3M en EUA al 1-800-247-3941. En Canadá llame al Servicio Técnico al 1-800-267-4414. En México llame al 01-800-712-0646; o contacte a 3M en su país.

# 3M

# 8210

## Particulate Respirator N95

**IMPORTANT**
Before use, read *User Instructions* inside. *User Instructions* are also available using the QR code on the side panel or at 3M.com/UI8210.

**Use For**
Particles such as those from grinding, sanding, sweeping, sawing, bagging, or processing minerals, coal, iron ore, flour, metal, wood, pollen, and certain other substances. Liquid or non-oil based particles from sprays that do not also emit oil aerosols or vapors. Follow all applicable local regulations. For additional information on 3M use recommendations for this class of respirator please consult the 3M Respirator Selection Guide found on the 3M Personal Safety web site at www.3m.com/workersafety or call 1-800-243-4630 in U.S.A. In Canada call 1 800 267-4414.

**Do Not Use For**
Do not use for gases and vapors, oil aerosols, asbestos, or sandblasting; particulate concentrations that exceed either 10 times the occupational exposure limit or applicable government regulations, whichever is lower. In the United States, do not use when the U.S. Occupational Safety and Health Administration (OSHA) substance specific standards, such as those for arsenic, cadmium, lead in the construction industry, or 4,4'-methylene dianiline (MDA), specify other types of respiratory protection. This respirator does not supply oxygen.

**NIOSH Approved: N95**
At least 95% filtration efficiency against solid and liquid aerosols that do not contain oil. See insert for approval label.

**Time Use Limitation**
If respirator becomes damaged, soiled, or breathing becomes difficult, leave the contaminated area immediately and replace the respirator.

**Storage Conditions and Shelf Life**
For storage conditions and use by date, see bottom of box and read *User Instructions* inside. Store in accordance with manufacturer's instructions, see packaging.

This respirator contains no components made from natural rubber latex.

 ⚠ **WARNING**

This respirator helps protect against certain particles. **Misuse may result in sickness or death.** For proper use, see supervisor, or *User Instructions*, or call 3M in U.S.A, 1-800-247-3941. In Canada, call Technical Service at 1-800-267-4414.

**FOR MORE INFORMATION**
In United States, contact:
Website: www.3m.com/workersafety
Technical Assistance: 1-800-243-4630
For other 3M products:
1-800-3M-HELPS or 1-651-737-6501

**RENSEIGNEMENTS SUPPLEMENTAIRES**
Aux États-Unis :
Internet : www.3m.com/workersafety
Assistance technique : 1 800 243-4630
Autres produits 3M :
1 800 364-3577 ou 1 651 737-6501

Exported by/Exporté par/Exportado por:
3M Personal Safety Division
3M Center, Building 0235-02-W-70
St. Paul, MN 55144-1000
Made in U.S.A. with Globally Sourced Materials.
© 3M 2016. All rights reserved.
3M is a trademark of 3M Company, used under license in Canada.
© jews of 3M products are occupational use only.

**POUR OBTENIR DE PLUS AMPLES RENSEIGNEMENTS/FOR MORE INFORMATION**
Au Canada, communiquez avec/In Canada, contact :
Internet : www.3m.ca/Safety
Assistance technique/Technical Assistance :
1 800 267-4414
Centre communication-client/Customer Care Center : 1 800 364-3577

Importé par :
3M Personal Safety Division
P.O. Box 5757 London, Ontario N6A 4T1
Made in U.S.A. with Globally Sourced Materials.
© 3M 2016. All rights reserved.
3M is a trademark of 3M Company, used under license in Canada.

Importé par :
Division des produits de protection individuelle de 3M
Compagnie 3M Canada
C.P. 5757
London, (Ontario) N6A 4T1
Fait au Canada avec des matériaux de source globale.
© 3M, 2016. Tous droits réservés.
3M est une marque de commerce de la Compagnie 3M. Utilisées sous licence au Canada.
Les produits de la Division des produits de protection individuelle de 3M sont destinés uniquement à un usage en milieu de travail.

**PARA OBTENER MÁS INFORMACIÓN**
En Estados Unidos:
Internet: www.3m.com/workersafety

 Centro de Respuesta al Cliente
52-70-2042
52-70-2255
52-70-3153
Información Técnica
01-800-712-0646

Internet: www.3m.com/es/solucionesprofesional
O llame a 3M en su localidad.

Imported by/Importado por:
3M México S.A. de C.V.
Av. Santa Fe No. 190
Col. Santa Fe, Del. Álvaro Obregón
México D.F. 01210
NYC Clave: 720509-PK4
Hecho en EUA con Materiales Adquiridos Globalmente a Proveedores Colectivos.
© 3M 2016. Todos los derechos reservados.
3M es una marca comercial de 3M Company, usada bajo licencia en Canadá.
Productos de PSD de 3M para uso ocupacional solamente.
34-8718-4938-7

   3M.com/UI8210

# 3M

8210

*Particulate Respirator N95*
*Respirateur N95 contre les particules*
Respirador contra partículas N95

**IMPORTANT**
Before use, the wearer must read and understand the *User Instructions* inside.
*User Instructions* are also available using the QR code on the side panel or at 3M.com/UI8210.
**Misuse may result in sickness or death.**
**Not intended for individual resale.**

**IMPORTANT**
Avant d'utiliser ce produit, l'utilisateur doit lire et comprendre les *directives d'utilisation* qui se trouvent à l'intérieur.
Vous pouvez également consulter les *directives d'utilisation* en vous servant du code QR qui se trouve sur le panneau latéral ou en alliant à l'adresse 3M.com/UI8210.
**Une mauvaise utilisation peut causer des problèmes de santé ou la mort.**
**N'est pas conçu pour la revente individuelle.**

**IMPORTANTE**
Antes de usar, el usuario debe leer y entender las *Instrucciones* en el interior.
Las instrucciones también están disponibles con código QR en el panel lateral o en 3M.com/UI8210.
**El mal uso puede ocasionar enfermedad, o incluso la muerte.**
**No está diseñado para su venta individual.**



# 3M

**8210Plus/8210PlusMX/
8210/8210MX/
07048/8110S**

## Particulate Respirator N95

*User Instructions*
IMPORTANT: Keep these User Instructions for reference.

## Respirateur N95 contre les particules

*Directives d'utilisation*
IMPORTANT: Conserver ces directives d'utilisation à titre de référence.

## Respirador para partículas N95

*Instrucciones*
IMPORTANTE: Conserve estas instrucciones como referencia futura.

 

06-0000-0007-4  4
34-8719-4197-6



### ⚠ WARNING
This respirator helps protect against certain hazards. Misuse may result in sickness or death. For correct use, consult supervisor and these User Instructions, or call 3M in U.S.A. 1-800-243-3941. In Canada, call Technical Service at 1-800-267-4414 or in Canada 1-800-242-2941. In Canada, call Technical Service at 1-800-267-4414.



### ⚠ MISE EN GARDE
Ce respirateur protège contre certaines particules. Une mauvaise utilisation peut provoquer des problèmes de santé ou la mort. Pour tout renseignement sur l'utilisation adéquate de ce produit, consulter son superviseur et ces directives d'utilisation ou communiquer avec 3M, aux États-Unis, au 1 800 243-3941 et au Canada, communiquer avec le Service technique du 3M au 1 800 267-4414.



### ⚠ ADVERTENCIA
Este respirador ayuda a proteger contra ciertas partículas. Uso incorrecto puede resultar en enfermedad o muerte. Para su uso correcto, consulte con su supervisor y estas instrucciones. Para otra información, en los Estados Unidos al 3M al 1-800-247-3941, en México llame al 01-800-712-0646.

**3M PERSONAL SAFETY DIVISION**
3M CENTER, BUILDING 0235-02-W-70
ST. PAUL, MN 55144-1000
3M is a trademark of 3M Company, used under license in Canada.
3M PSD products for occupational use only.

**3M CANADA COMPANY**
3M Canada Company
P.O. BOX 5757, LONDON, ONTARIO N6A 4T1
3M is a trademark of the Company, used under license in Canada

**DIVISION DES PRODUITS DE PROTECTION INDIVIDUELLE DE 3M**
C.P. 5757
LONDON (ONTARIO) N6A 4T1
3M est une marque de commerce de 3M, utilisée sous licence au Canada.
Produits de la Division des produits de protection individuelle de 3M.

**3M MÉXICO S.A. DE C.V.**
AV. SANTA FE NO. 190
COL. SANTA FE, DEL. ÁLVARO OBREGÓN
MÉXICO D.F. 01210
3M es una marca comercial de 3M utilizada, bajo licencia en Canadá.
Los productos 3M PSD sólo están destinados para uso ocupacional.

© 3M 2017

## IMPORTANT

Before use, wearer must read and understand these User Instructions. Keep these instructions for reference.

### Use For
Particles such as those from grinding, sanding, sweeping, sawing, bagging, or processing minerals, coal, iron ore, flour, metal, wood, pollen, and certain other substances. Liquid or non-oil based particles from sprays that do not also emit oil vapors or vapors. Follow all applicable local regulations. For additional information on the use recommendations for this class of respirator, please consult the 3M Respirator Selection Guide found on the Personal Safety web site at www.3M.com/respiratorselector or call 1-800-243-4630 in U.S.A. In Canada, call 1-800-267-4414.

### Do Not Use For
Do not use for gases and vapors, oil aerosols, asbestos, or sandblasting, particulate concentrations that exceed either 10 times the occupational exposure limit or applicable government regulations, whichever is lower. In the United States, do not use when the U.S. Occupational Safety and Health Administration (OSHA) minimum specific standards, such as those for arsenic, cadmium, lead in the construction industry, or 4,4'-methylene dianiline (MDA), specify other types of respiratory protection. This respirator does not supply oxygen.

### Biological Particles
This respirator can help reduce inhalation exposures to certain airborne biological particles (e.g. mold, Bacillus anthracis, Mycobacterium tuberculosis, etc.) but cannot eliminate the risk of contracting infection, illness or disease. OSHA and other government agencies have not established exposure limits for these contaminants.

### Use Instructions
1. Failure to follow all instructions and limitations on the use of this respirator and/or failure to wear this respirator during all times of exposure can reduce respirator effectiveness and may result in sickness or death.
2. In the U.S., before reconditioned use of this respirator, a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134, such as training, fit testing, medical evaluation, and applicable OSHA substance specific standards. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Follow all applicable local regulations.
3. The particles which can be dangerous to your health include those so small that you cannot see them.
4. Leave the contaminated area immediately and contact supervisor if dizziness, irritation, or other distress occurs.
5. Store the respirator away from contaminated areas when not in use.
6. Inspect respirator before each use to ensure that it is in good operating condition. Examine all the respirator parts for signs of damage including the two headbands, attachment points, nose foam, and noseclip. The respirator should be disposed of immediately upon observation of damaged or missing parts. Noseclip fasteners are to be inspected prior to each use to ensure there are no holes in the breathing zone other than the punctures around staples and no damage has occurred. Enlarged holes resulting from ripped or torn filter material around staple punctures are considered damage. Immediately replace respirator if damaged. Staple perforations do not affect NIOSH approval (For 8110S only).
7. Conduct a user seal check before each use as specified in the Fitting Instructions section. If you cannot achieve a proper seal, do not use the respirator.
8. Dispose of used product in accordance with applicable regulations.

### Use Limitations
1. This respirator does not supply oxygen. Do not use in atmospheres containing less than 19.5% oxygen.
2. Do not use when concentrations of contaminants are immediately dangerous to life and health, are unknown or when concentrations exceed 10 times the permissible exposure limit (PEL) or according to specific OSHA standards or applicable government regulations, whichever is lower.
3. Do not alter, wash, abuse or misuse this respirator.
4. Do not use with beards or other facial hair or other conditions that prevent a good seal between the face and the sealing surface of the respirator.
5. Respirators can help protect your lungs against certain airborne contaminants. They will not prevent entry through other routes such as the skin, which would require additional personal protective equipment (PPE).
6. This respirator is designed for occupational/professional use by adults who are properly trained in its use and limitations. This respirator is not designed to be used by children.
7. Individuals with a compromised respiratory system, such as asthma or emphysema, should consult a physician and must complete a medical evaluation prior to use.
8. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" date specified on the packaging.

### Storage Conditions and Shelf Life
Before use, store respirators in the original packaging away from contaminated areas, dust, sunlight, extreme temperature, excessive moisture and damaging chemicals. When stored in accordance with temperature and humidity conditions specified below, the product may be used until the "use by" date specified on packaging. Always inspect product and conduct a user seal check before use as specified in the User Instructions. If you cannot achieve a proper seal, do not use the respirator.

 **End of Shelf Life**
Use respirators before the "use by" date specified on packaging.

 **Storage Temperature Range**
-20°C (-4°F) to +30°C (+86°F).

 **Storage Maximum Relative Humidity**
<80% RH

### Time Use Limitation
If respirator becomes damaged, soiled or breathing becomes difficult, leave the contaminated area immediately and replace the respirator.

**FOR MORE INFORMATION**
In United States, contact:
Website: www.3m.com/workersafety
Technical Assistance: 1-800-243-4630
For other 3M products:
1-800-3M-HELPS or 1-651-737-6501

**RENSEIGNEMENTS SUPPLÉMENTAIRES**
Aux États-Unis :
Internet : www.3m.com/workersafety
Assistance technique : 1 800 243-4630
Autres produits 3M :
1 800 364-3577 ou 1 651 737-6501

    

## Fitting Instructions

Must be followed each time respirator is worn.

1. Preparation tab and bottom straps before electric respirator on the face connect each side (Fig. 1).

2. Cup the respirator in your hand, with the openings of your fingertips, allowing the headbands to hang freely below your hand (Fig. 2).

3. Position the respirator under your chin with the nosepiece up so that the top strap rests high at the top back of your head. Put the bottom strap over your head and position it around the neck below the ears (Fig. 3).

4. Place your fingertips from both hands at the top of the metal nosepiece. Using two hands, mold the nose area to the shape of your nose by pushing inward while moving your fingertips down both sides of the nosepiece (Fig. 4).
   ⚠ Pinching the nosepiece using one hand may result in improper fit and less effective respirator performance. Use two hands.

5. Perform a User Seal Check prior to each wearing. To check the respirator is sealed, use palms both hands completely over the respirator and exhale sharply. Be careful to distort the position of the respirator. If warm air escapes around your nose the respirator is described in step 4. If air escapes, the respirator edges, push the straps back along the sides of your face (Fig. 5). If you enter the contaminated area. See your supervisor.

---

## Removal Instructions

Remove this, it is fitting instructions and say respirator is need to maintain position on face. Pull bottom strap over head, (not holding respirator in position), pull top strap over head and remove respirator.

---

## Directions d'ajustement

Suivre ces directions chaque fois qu'on utilise le respirateur.

1. Préparer les languettes supérieures et suspendre branchez le modèle du respirateur sur le masque respiratoire (Fig. 1).

2. Placer le respirateur dans la paume de la main, les doigts pointant vers la bande nasale. Laisser pendre les courroies librement (Fig. 2).

3. Placer le respirateur sous le menton en dirigeant la pièce nasale vers le haut. Faire passer la courroie supérieure par-dessus la tête et la placer sur le dessus de la tête. Faire passer la courroie inférieure par-dessus la tête et la placer autour du cou, sous les oreilles (Fig. 3).

4. Placer les doigts des deux mains en haut de la pince nasale métallique. À l'aide des deux mains, mouler la section nasale à la forme du nez en appuyant sur la pince nasale et en imprimant des mouvements vers le bas, des deux côtés de la pièce (Fig. 4).
   ⚠ L'utilisation d'une seule main pour plier la pince nasale pourrait nuire à l'ajustement du respirateur. On doit utiliser les deux mains.

5. Effectuer une vérification de l'ajustement avant chaque utilisation. Pour ce faire, placer les deux mains de façon à couvrir complètement le respirateur et souffler vivement. Si de l'air s'échappe, ajuster le respirateur. Pour bien ajuster le respirateur, placer les doigts de chaque côté du nez et appuyer fermement vers le bas, des deux côtés de la pièce nasale. Si de l'air s'échappe près des bords du respirateur, suivre le contour en repositionnant le respirateur (Fig. 5). ATTENTEMENT N'EST PAS étanche, NE PAS pénétrer dans la zone contaminée. Consulter son superviseur.

---

## Directions de retrait

Retirer cette instruction d'ajustement et placer une main sur le respirateur pour le maintenir contre le visage. Retirer la courroie placée haut à l'arrière de la tête. En maintenant le respirateur contre le visage, passer la courroie du cou par dessus la tête, et retirer le respirateur.

---

## Instrucciones de ajuste

Debe seguir estas instrucciones durante el tiempo que usa el respirador.

1. Pre-estire la bandas superior e inferior del respirador antes de ponérselo en la cara (Fig. 1).

2. Acomode el respirador en la palma de mano que el pliegue nasal quede en la punta de los dedos, permitiendo que las bandas para la cabeza cuelguen libremente debajo de su mano (Fig. 2).

3. Coloque el respirador debajo de su barbilla con la pieza nasal hacia arriba. Jale la banda superior sobre su cabeza de modo que quede justo por detrás en la parte superior de la cabeza. Jale la banda inferior sobre la cabeza y colóquela alrededor del cuello debajo de las orejas (Fig. 3).

4. Coloque las puntas de los dedos de ambas manos en la parte superior de la pieza nasal metálica. Con ambas manos moldee el área nasal a la forma de su nariz empujando hacia dentro mientras mueve las puntas de los dedos hacia abajo en ambos lados de la pieza nasal (Fig. 4).
   ⚠ Si presiona la pieza nasal con una mano es posible que logre un mal ajuste y el desempeño del respirador sea menos efectivo. Use ambas manos.

5. Antes de cada uso realice una revisión del sello. Para revisar el sello facial del respirador coloque ambas manos sobre el respirador y exhale con fuerza. Tenga cuidado de no mover el respirador de su posición. Si hay alguna fuga de aire alrededor de la nariz, ajuste el respirador como se describe en el paso 4. Si hay fugas en los orillas, del respirador coloque las bandas a lo largo de su cabeza (Fig. 5). Si el sello está comprometido, NO PASEA alguna en buena sello. Consulte a su supervisor.

---

Este respirador hecho de material facial. Este respirador de cumple con producto de filtro de fabricación.

NIOSH Approved: N95
In case of any question efficiency against solid and liquid aerosols that do not contain oil.

Approuvé par le NIOSH : Respirateur N95
contre les aérosols solides et liquides qui ne contiennent pas d'huile.

Aprobado por NIOSH: N95
95% contra partículas sólidas y líquidas que no contienen aceite.

### 3M
### St. Paul, Minnesota, USA
### 1-800-243-4630
### 8210 Series Respirators



THESE RESPIRATORS ARE APPROVED ONLY IN THE FOLLOWING CONFIGURATIONS:



| | | RESPIRATOR COMPONENTS | | | | | | |
| | | FILTERING FACEPIECE | | | | | | |
| TC- | PROTECTION¹ | 8210 | 8210 PLUS | 8110S | 7048 | 8210MX | 8210 PLUS MX | CAUTIONS AND LIMITATIONS² |
| 84A-0007 | N95 | X | X | X | X | | | ABC JMNOP |
| 84A-7762 | N95 | | | | | X | | ABC JMNOP |
| 84A-7635 | N95 | | | | | | X | ABC JMNOP |

**1. PROTECTION**

N95 - Particulate Filter (95% filter efficiency level) effective against particulate aerosols free of oil; time use restrictions may apply.

**2. CAUTIONS AND LIMITATIONS**

A - Not for use in atmospheres containing less than 19.5 percent oxygen.
B - Not for use in atmospheres immediately dangerous to life or health.
C - Do not exceed maximum use concentrations established by regulatory standards.
J - Failure to properly use and maintain this product could result in injury or death.
M - All approved respirators shall be selected, fitted, used and maintained in accordance with MSHA, OSHA and other applicable regulations.
N - never substitute, modify, add, or omit parts. Use only exact replacement parts in the configuration as specified by the manufacturer.
O - Refer to User's Instructions, and / or maintenance manuals for information on use and maintenance of these respirators.
P - NIOSH does not evaluate respirators for use as surgical masks.

Rev. F: 07-07-17

### 3M
### St. Paul, Minnesota, USA
### 1-800-243-4630
### 8210 Série Respirateurs

CES RESPIRATEURS NE SONT APPROUVÉS QUE POUR LES CONFIGURATIONS SUIVANTES :

| | | COMPOSANTS DES RESPIRATEURS | | | | | | |
| | | FILTRATION FACIALE | | | | | | |
| TC- | PROTECTION¹ | 8210 | 8210 PLUS | 8110S | 7048 | 8210MX | 8210 PLUS MX | AVERTISSEMENTS ET RESTICTIONS³ |
| 84A-0007 | N95 | X | X | X | X | | | ABC JMNOP |
| 84A-7762 | N95 | | | | | X | | ABC JMNOP |
| 84A-7635 | N95 | | | | | | X | ABC JMNOP |

**1. PROTECTION**

N95 - Filtre contre les particules N95 (niveau d'efficacité du filtre de 95%) efficace contre les aérosols exempts d'huile mais contient des particules. Des restrictions quant à la durée d'utilisation peuvent s'appliquer.

**2. AVERTISSEMENTS ET RESTRICTIONS**

A - Ne pas utiliser dans les endroits où le taux d'oxygène est inférieur à 19,5%.
B - Ne pas utiliser lorsque l'atmosphère présente un danger immédiat pour la vie ou pour la santé.
C - Do not exceed maximum use concentrations established by regulatory standards.
J - L'utilisation et l'entretien inadéquats de ce respirateur peuvent provoquer des blessures ou la mort.
M - Tous les respirateurs approuvés doivent être choisis, ajustés, portés et entretenus conformément aux normes de la MSHA, de l'OSHA, de tout autre règlement en vigueur.
N - Ne jamais substituer ou modifier ce respirateur, ni lui ajouter ou lui enlever des pièces. N'utiliser que des pièces de rechange exactes déterminées par le fabricant.
O - Consulter les directives d'utilisation et/ou les manuels d'entretien pour obtenir des renseignements sur l'utilisation et l'entretien de ces respirateurs.
P - Le NIOSH n'évalue pas les respirateurs utilisés comme masques chirurgicaux.

Rev. E: 01-05-17

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit I

Applied to Life.

Search

X

Account ∨

Sign In

Sign in to bCom

Account ∨

US - EN ⊕ ∨

Products
Industries
Brands

X

3M in the United States

⦿ English - EN

Change 3M Location [ Save ]

[ < ]

Products Industries
Abrasives
Adhesives, Sealants & Fillers
Advanced Materials
Automotive Parts & Hardware
Building Materials
Cleaning Supplies
Coatings
Compounds & Polishes
Dental & Orthodontics
Electrical
Electronics Materials & Components
Films & Sheeting
Filtration & Separation
Home
Insulation
Lab Supplies & Testing
Labels
Lubricants
Medical
Office Supplies
Personal Protective Equipment
Signage & Marking
Tapes
Tools & Equipment
View all 3M products [ ▲ ]
Automotive
Commercial Solutions
Consumer Markets
Design & Construction
Electronics
Energy
Government
Health Care
Manufacturing
Safety
Transportation



At 3M, we discover and innovate in nearly every industry to help solve problems around the world.

United States > All 3M Products > Personal Protective Equipment > Respiratory Protection > Disposable Respirators > 3M™ Particulate Respirator 8210, N95 160 E...

3M™ Particulate Respirator 8210, N95 160 EA/Case

**Part Number 8210, 3M Product Number 46457, 3M ID 7100132742, UPC 50051138464573**

★★★★ 4.0 (185)



Hover over image to zoom in





+8 more

Change options

| | |
|---|---|
| Strap Attachment Type | Welded |
| Filter Class | N95 |
| Exhalation Valve | No |
| Strap Material | Thermoplastic Elastomer (TPE) |
| Nosefoam | Yes |
| Respirator Size | Standard |

View more details

For industrial/occupational use only. Not for consumer sale or use.

**Buy Online**                          all dealers →



| **Stauffer Safety** | **RS Hughes** | **Zoro US** |
|---|---|---|
| 🔲 1 Day | 🔲 1 Day | 🔲 1 Day |



3M™ Particulate Respirator 8210, N95

# Comfort and convenience.



## Designed to help provide comfortable, reliable worker protection against non-oil based particles.

3M™ Particulate Respirator 8210, N95 is a disposable particulate respirator that is designed to help provide reliable respiratory protection of at least 95 percent filtration efficiency against certain non-oil based particles. This respirator is designed for use with particles such as those from grinding, sanding, sweeping, sawing, bagging, or other dusty operations.

The respirator incorporates 3M's proprietary technology with advanced electrostatically charged microfiber filter media designed for ease of breathing. This respirator is compatible with a variety of protective eyewear and hearing protection.

## Recommended industries



Commercial Buildings



Construction



Food Processing



General Manufacturing



Heavy Infrastructure



Mining, Oil & Gas



Transportation



1. Two-strap design with welded dual point attachment helps provide a secure seal

2. NIOSH approved for at least 95 percent filtration efficiency against certain non-oil based particles

3. Lightweight construction

4. Advanced Electrostatic Media is designed for ease of breathing

5. Cushioning nose foam

6. Collapse-resistant cup shape design

## Wearing Your Adjustable Strap Respirator

## Step 1

Pre-stretch the straps before wearing. Place the respirator over your nose and mouth. Be sure the metal nose clip is on top.



| Step 1 |
| --- |
| Step 2 |
| Step 3 |
| Step 4 |

## 3M™ Particulate Respirator 8210, N95

This particulate respirator is NIOSH (National Institute for Occupational Safety and Health) approved for environments containing certain non-oil based particles, and provides at least 95 percent filter efficiency.



3M™ Particulate Respirator 8210, N95

3M™ Particulate Respirator 8210V, N95

3M™ Particulate Respirator 8200, N95

3M™ Particulate Respirator 8511, N95







| | 3M™ Particulate Respirator 8200, N95 | 3M™ Particulate Respirator 8210V, N95 | 3M™ Particulat |
|---|---|---|---|
| APF | 10 | 10 | |
| Class/Feature | N95 | N95 | |
| Valve | | • | |
| Shelf Life | 5 years from date of manufacture | 5 years from date of manufacture | 5 years from |

## Get more face time.
## Comfort options that work for you.

There are options to help protect against airborne particles and mists
that can affect your workers' health. 3M offers a wide selection of
NIOSH-approved filtering facepiece respirators for numerous work-
related tasks for you to evaluate and select for your workplace needs.
3M provides a variety of innovative technologies and features – all
designed to provide comfort, convenience and value.

A respirator can't give workers all the protection it was designed to
provide, unless it is selected and worn correctly during all periods of
exposure. That's why 3M uses a variety of innovative technologies and
features designed to enhance user comfort and help increase wear
time.



Details

Highlights

NIOSH approved for at least 95 percent filtration efficiency against certain non-oil based
particles

Two-strap design with welded dual point attachment helps provide a secure seal

Cushioning nose foam

Lightweight construction promotes greater worker acceptance and may help increase wear
time

Lightweight construction promotes greater worker acceptance and may help increase wear
time

Advanced electrostatic media is designed for ease of breathing

During the public health emergency of the COVID-19 pandemic, these standard N95
"industrial" respirators may be used by healthcare professionals according to the U.S. FDA's
Emergency Use Authorization (EUA). 3M™ Particulate Respirator 8210 is not cleared by the

U.S. FDA as a surgical mask, as a surgical mask and is not considered fluid resistant, therefore a face shield must be worn during use.

3M™ Particulate Respirator 8210, N95 is a disposable particulate respirator that is designed to help provide reliable respiratory protection of at least 95 percent filtration efficiency against certain non-oil based particles. This respirator is designed for use for particles such as those from grinding, sanding, sweeping, sawing, bagging, or other dusty operations. This respirator can also help reduce inhalation exposures to certain airborne biological particles (examples: mold, Bacillus anthracis, Mycobacterium tuberculosis), but cannot eliminate the risk of contracting infection, illness, or disease. The respirator incorporates 3M's proprietary technology with advanced electrostatically charged microfiber filter media designed for ease of breathing. This respirator is compatible with a variety of protective eyewear and hearing protection.

This particulate respirator is NIOSH (National Institute for Occupational Safety and Health) approved for environments containing certain non-oil based particles and provides at least 95 percent filter efficiency.

Breathing hazardous particles can pose a risk to your health. NIOSH, a Federal government regulatory agency, has tested and approved the 3M Particulate Respirator 8210, which is designed to help reduce exposure to certain airborne particles.

WARNING: These respirators help reduce exposures to certain airborne contaminants. Before use, the wearer must read and understand the User Instructions provided as a part of the product packaging. In the U.S., a written respiratory protection program must be implemented meeting all the requirements of OSHA 1910.134 including training, fit testing and medical evaluation. In Canada, CSA standards Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate. Misuse may result in sickness or death. For proper use, see package instructions, supervisor, or call 3M OH&ESD Technical Service in USA at 1-800-243-4630 and in Canada at 1-800-267-4414.

Typical properties

| Details | |
|---|---|
| Acid Gas Reduction | No |
| Advanced Electrostatic Media | Yes |
| Braided Comfort Strap | No |
| Brands | 3M™ |
| Cake-Resistant Filter Media | No |
| Class | Comfort |
| Cool Flow™ Exhalation Valve | No |
| Environment - Hot or Humid | No |
| Exhalation Valve | No |
| Faceseal | No |
| Features | Advanced Electrostatic Media |
| Filter Class | N95 |

| | |
|---|---|
| Flame Resistance (ASTM D2859-96) | No |
| Fluid Resistant (ASTM F1862) | No |
| Hazard Type | Particulate |
| Inner Packs per Case | 8 Cartons per Case |
| Nosefoam | Yes |
| Organic Vapor Reduction | No |
| Product Series | 8000 |
| Recommended Industry | Transportation, Oil & Gas, Heavy Infrastructure, Design & Construction, Commercial Buildings, General Manufacturing, Construction, Food Safety, Food Processing, Mining |
| Registered Medical Device | No |
| Respirator Size | Standard |
| Respirator Style | Cup |
| Smallest Saleable Unit | Each |
| Strap Attachment Type | Welded |
| Strap Material | Thermoplastic Elastomer (TPE) |
| Total Units per Case | 160 per Case |

Resources



3M™ Particulate Respirator, 8210, N95 Technical



## Specifications

### Data Sheets
(PDF, 414KB)



FAQ: 3M Filtering Facepiece/Disposable

## Respirator Storage Conditions and Shelf Life

### Data Sheets
(PDF, 153KB)



Quick Reference Guide - Disposable Respirators

### Data Sheets
(PDF, 5MB)

Reviews

## Review Highlights

### Pros

**Quality** 32 reviews
"We bought several boxes and have been impressed with the effectiveness and quality" **(Full review)**

**Comfort** 24 reviews
"great quality mask and once you get used to the straps behind your head rather than over your ears, it is very comfortable" **(Full review)**

**Satisfaction** 13 reviews
"Straps are a little annoying but I'm happy to have them." **(Full review)**

### Cons

**Shortcoming** 13 reviews
"Poor quality straps break after short time" **(Full review)**

**Disappointing** 4 reviews
"I am extremely disappointed that a 3M product would be i

## Reviews

Rating Snapshot

Select a row below to filter reviews.

| | | |
|---|---|---|
| 5 stars | | 105 |
| 4 stars | | 28 |
| 3 stars | | 14 |
| 2 stars | | 14 |
| 1 star | | 24 |

Overall Rating

**4.0** ★★★★ 185 Reviews

Review this Product

    

Adding a review will require a valid email for verification

Average Customer Ratings

Quality of Product

4.0

Value of Product

4.0



Most Helpful Favorable Review

★★★★★

**Outstanding**

Jane Dough

3 years ago

My employer provided us with these masks in case we needed them but we never did. Aft...

Show Full Review

👍 29 PEOPLE FOUND THIS HELPFUL

Show Reviews:   5 ★ and 4 ★

Most Helpful Critical Review

★

**not like they used to be**

jbh1

4 years ago

I have used the 3M 8210 respirator for years. These respirators are not of the same qualit...

Show Full Review

👍 86 PEOPLE FOUND THIS HELPFUL

Show Reviews:   3 ★ 2 ★ and 1 ★

360°

Customer Images and Videos



Filter Reviews

Rating ⌄

129 – 158 of 185 Reviews        Sort by   Most Recent ⌄

★★★★★

**Thumbs up**

jenweaves

✓ VERIFIED PURCHASER

3 years ago

These are great. They fit snugly and don't fog up my glasses.

⊘ Yes. I recommend this product.

Helpful? 👍 (0) 👎 (0)    Report

Quality of Product

5.0

Value of Product

4.0

★★★★
**N95 mask**
**Mar M**

✓ VERIFIED PURCHASER

**3 years ago**

Great fit. Need to gently stretch the bands before wearing or your eyes will bulge.

⊘ Yes, I recommend this product.

Helpful? 👍 (0) 👎 (0)    Report

Quality of Product

4.0

Value of Product

5.0

★★★★★
**Great product, fast shipping**
**NikkiD**

✓ VERIFIED PURCHASER

**3 years ago**

Quick shipping, quality product. I would buy from this company again.

Helpful? 👍 (0) 👎 (0)    Report

★★★★★
**Excellent product, quick delivery**
**LisaLisa**

✓ VERIFIED PURCHASER

**3 years ago**

Excellent product and customer service. Quick delivery.

⊘ Yes, I recommend this product.

Helpful? 👍 (0) 👎 (0)    Report

Quality of Product

5.0

Value of Product

5.0

★★
**N95 masks**
**Mardai**

 VERIFIED PURCHASER

**3 years ago**

The price is good for N95 masks. Unfortunately, the elastic that goes around the head is cheap rubber so it pulls hair and can be quite uncomfortable. We're taking it off every one of these and replacing it with a better more elastic piece. I would not buy them again. Argh

 No, I do not recommend this product.

Helpful? 👍 (1) 👎 (0)    Report

Quality of Product

2.0

Value of Product

3.0

> 🗨 Response from 3M.
> **3 years ago**
>
> **PSD Support**
>
> Thank you for leaving a review.
> The user instructions explain that pre-stretching of the 8210 head strap is required prior to the initial use. Please refer to the user guide for proper usage.

★★★★
**good price, fast delivery, well packed. Satisfied**
**Not Given**

 VERIFIED PURCHASER

**3 years ago**

good price, fast delivery, well packed. Satisfied w/product.

 Yes, I recommend this product.

Helpful? 👍 (0) 👎 (0)    Report

Quality of Product

4.0

Value of Product

4.0

★★★★★
**Great mask**
**NPark**

 VERIFIED PURCHASER

**3 years ago**

Great fit and easy to use. Definitely helped with ventilation issues.

 Yes, I recommend this product.

Helpful? 👍 (1) 👎 (0)    Report

Quality of Product

5.0

Value of Product

5.0

★
**Extremely uncomfortable!**

Xterralete

3 years ago

I am extremely disappointed that a 3M product would be so poorly made. The straps are fastened with staples which cut into my face when I tried to wear it.

⊗ No, I do not recommend this product.

Helpful? 👍 (1) 👎 (1)   Report

Quality of Product

1.0

Value of Product

1.0

 Response from 3M
3 years ago

**PSD Support**

Hello, thank you for taking the time to leave your review. Your experience is not what we would expect, and we would appreciate the opportunity to discuss this with you and gather further details. Please connect with our team at 800-536-6500 (option 2) Mon-Fri 8am-4:30pm CST. Thanks again, and we look forward to your call.

★★★★★
**Good fit. Comfortable.**

Scott2

☑ VERIFIED PURCHASER

3 years ago

Well fitting. Not difficult to breathe in. Doesn't really bother me to wear a long time.

⊙ Yes, I recommend this product.

Helpful? 👍 (3) 👎 (0)   Report

Quality of Product

5.0

Value of Product

5.0

★
**Straps pull off**

Nuke

3 years ago

I bought a two pack of two days ago and tried one today and the strap broke off within a couple of hours. Extremely disappointed in the performance of these masks. 3M's 8200 masks last longer than these do

⊗ No, I do not recommend this product.

Helpful? 👍 (2) 👎 (0)   Report

Quality of Product

1.0

Value of Product



Response from 3M:

**3 years ago**

**PSD Support**

3M recommends pre-stretching of the 8210 head strap prior to the initial use per the instructions on the packaging. If you make the decision to reuse the same respirator, additional pre-stretching is not needed. Depending on the number of reuses, pre-stretching each time could potentially weaken the head strap. Because they're considered disposable respirators, they're not designed for significant reuse.



★★★★★

**Great Masks**

**M Moore**

✓ VERIFIED PURCHASER

**3 years ago**

Easy ordering and prompt delivery. Service was excellent as was the product.

✓ Yes, I recommend this product.

Helpful? 👍 (1)   👎 (0)     Report

Quality of Product

                                      5.0

Value of Product

                                        5.0

★★★★★

**3M quality top-notch**

**Anonymous**

✓ VERIFIED PURCHASER

**3 years ago**

You can't go wrong with buying 3M products. High quality, reliable N95 respirators.

✓ Yes, I recommend this product.

Helpful? 👍 (1)   👎 (0)     Report

Quality of Product

                                      5.0

Value of Product

                                      5.0

★★★★

**Great Mask but fits tight**

**Kia M**

✓ VERIFIED PURCHASER

**3 years ago**

Glad to receive the mask but they are a little tight around my face due to the tight straps. Not sure how to fix this so it's more comfortable to wear.

Helpful? 👍 (4)   👎 (0)     Report



> **Response from 3M**
> **3 years ago**
>
> **PSD Support**
>
> 3M recommends pre-stretching of the 8210 head strap prior to the initial use. If you make the decision to reuse the same respirator, additional pre-stretching is not needed. Depending on the number of reuses, pre-stretching each time could potentially weaken the head strap. Because they're considered disposable respirators, they're not designed for significant reuse.

★★★★★
**3M N95's**
me01

✅ VERIFIED PURCHASER

**3 years ago**

This and the Aura are the best available. Have both

⊘ No, I do not recommend this product.

Helpful? 👍 (2)  👎 (0)    Report

Quality of Product
                                                5.0
Value of Product
                                                5.0

★★★★★
**Comfort and reliable**
Boilermaker

✅ VERIFIED PURCHASER

**3 years ago**

Being involved in the heavy construction industry for 40 years this respirator was the first choice of many

✅ Yes, I recommend this product.

Helpful? 👍 (1)  👎 (0)    Report

Quality of Product
                                                4.0
Value of Product
                                                5.0

★★★★★
**Very good!**
Natedog

✅ VERIFIED PURCHASER

**3 years ago**

Very high quality mask that I have enjoyed wearing

✅ Yes, I recommend this product.

Helpful? 👍 (0)  👎 (0)    Report

Quality of Product

5.0

Value of Product

5.0

★★★★
**Put it on now**
EAOW75

 VERIFIED PURCHASER

3 years ago

The mask is light and can be made to fit pretty snug around the nose and chin. A good choice.

✅ Yes, I recommend this product.

Helpful?  👍 (1)  👎 (1)    Report

Quality of Product

4.0

★★★
**What happened to the old bands**
Bigfrost

3 years ago

In the autobody industry I've been using 3m masks since I was 9 years old. Since covid they've replaced the original bands with these waxy yellow bands and they're terrible they're either super light or break off my head.

❌ No, I do not recommend this product.

Helpful?  👍 (3)  👎 (0)    Report

Quality of Product

3.0

Value of Product

3.6

> 💬 Response from 3M:
> 3 years ago
>
> **PSD Support**
>
> Thank you for taking time to leave a review.
> You may have been previously using the 3M 8210+ N95 Respirator which has a braided head strap. Your current respirator, the 8210 N95, uses a thermoplastic rubber head strap that requires pre-stretching prior to use. If this is not done the head strap can break quickly. The 8210+ N95 is still available, but possibly not through your regular supplier.
>
> Please call the 3M Techline at 800.243.4630, if you require further assistance with product selection.

★★★★
**Over all not a bad mask**
Anonymous

 VERIFIED PURCHASER

3 years ago

Good mask. Poor straps. I think I received old inventory. The straps were very stiff, but could be usable after stretching.

Helpful? 👍 (2) 👎 (0)     Report

Quality of Product

3.0

Value of Product

3.0

★★★★★
**Great Product! Assured by past experience.**
C Nolen Hudson

✅ VERIFIED PURCHASER

3 years ago

I have purchased several cases of the 8511 N95 masks when I had my retail business selling Swiss made sewing machines/computers. Masks were necessary to protect upper and lower airways while blowing out sewing machines sometimes covered with lint. This seen when covers removed. So easy to assume 3M quality when purchasing 8210.

✅ Yes, I recommend this product.

Helpful? 👍 (1) 👎 (1)     Report

Quality of Product

5.0

★★★★★
**Good but...**
Harriette

✅ VERIFIED PURCHASER

3 years ago

Do the job but are rough on my skin and smell somewhat

Helpful? 👍 (3) 👎 (0)     Report

★★★★★
**Great service**
Jon H

✅ VERIFIED PURCHASER

3 years ago

Great service and excellent masks. Perfect for what I need.

Helpful? 👍 (1) 👎 (1)     Report

Quality of Product

5.0

Value of Product

5.0

★★★★★
**3M mask**
DMel

✅ VERIFIED PURCHASER

3 years ago

It Fits well . Very comfortable. I would buy again.

Helpful? 👍 (2) 👎 (1)     Report

★★★★★
**Great masks!!**
Dr TH

 VERIFIED PURCHASER

3 years ago

I'm a doctor working with Covid, these are the way I can stay as safe as possible.

Helpful? 👍 (18) 👎 (5)     Report

★★
**Straps break**
Rogeroger

3 years ago

My complaint is the same as others that the straps break easily. To the other complainants you recommend that the straps should be stretched by you 3M before shipping. The mask are fine.

🚫 No, I do not recommend this product.

Helpful? 👍 (11) 👎 (0)     Report

Quality of Product

2.0

Value of Product

3.0

---

📢 Response from 3M
   3 years ago

**PSD Support**

Thank you for taking the time to leave a review.
3M recommends pre-stretching of the 8210 head strap only prior to the initial use. If the end user makes the decision to reuse the same respirator additional pre-stretching is not needed. Depending on the number of reuses, pre-stretching each time could potentially weaken the head strap. Because they're considered disposable respirators, they're not designed for significant reuse.

---

★★★★
**Could be more comfortable**
Fred A

 VERIFIED PURCHASER

3 years ago

Not the most comfortable version of an N95, but I feel good knowing it's a way better mask than most of the junk being sold today.

✅ Yes, I recommend this product.

Helpful? 👍 (8) 👎 (0)     Report

Quality of Product

4.0

Value of Product

5.0



**★★★★★**
**Durable**
**Flaco_42**

 VERIFIED PURCHASER

3 years ago

Straps are sturdier than most masks on the market. I've yet to have one break.

Helpful? 👍 (14) 👎 (0)    Report

**★★★★★**
**Outstanding**
**Jane Dough**

3 years ago

My employer provided us with these masks in case we needed them but we never did. After Covid-19 hit, this respirator proved to be a lifesaver as I had to work among some people who did not believe in wearing a mask. Although many of them contracted the virus, some infecting their family members, I never did. For the past two years I don one whenever I go out in public even in the summer when Covid #'s went down. I strongly believe that this mask has helped to keep me safe and I wouldn't think of wearing anything else! Careful, there are counterfeit ones out there!

● Yes, I recommend this product.

Helpful? 👍 (29) 👎 (1)    Report

Quality of Product

5.0

Value of Product

5.0



**★★★★★**
**A must**
**Camearacafe**

 VERIFIED PURCHASER

3 years ago

Excellent product, perfect fitting, you can feel the efficacity of this apparel.

Helpful? 👍 (4) 👎 (0)    Report

**★**
**Garbage rubber straps**
**JaredC**

3 years ago

The straps for these masks are made of a thin, barely elastic, rubber strip that fails so quickly and consistently that I have to assume it was engineered to do so. Pre-stretch, re-stretch, I've tried it all and there's no way to get better performance or longevity. I've used 3M N95 masks for over a decade, and suddenly the straps are nowhere near what they were pre-pandemic.

● No, I do not recommend this product.

Helpful? 👍 (50) 👎 (4)    Report

Quality of Product

Value of Product

1.0

1.0

 Response from 3M
**3 years ago**

**PSD Support**

Hello, thank you for taking the time to leave your review. Your experience is not what we would expect, and we would appreciate the opportunity to discuss this with you and gather further details. Please connect with our team at 800-243-4630 Mon-Fri 8am-4:30pm CST. Thanks again, and we look forward to your call.

129 – 158 of 165 Reviews

< >

Similar products





|  | 3M™ Particulate Respirator 8210,.. | 3M™ Qualitative Fit Test Apparat... | 3M™ VFlex™ Particulate... | 3M™ Particulate Respirator 8110... |
|---|---|---|---|---|
| Strap Attachment Type | Welded | | Stapled | Stapled |
| Filter Class | N95 | | N95 | N95 |
| Exhalation Valve | No | | No | No |
| Strap Material | Thermoplastic Elastomer (TPE) | | Polyisoprene | Polyisoprene |
| Nosefoam | Yes | | No | Yes |
| Respirator Size | Standard | | Standard | Small |

## For industrial/occupational use only. Not for consumer sale or use.

3M industrial and occupational products are intended, labeled, and packaged for sale to trained industrial and occupational customers for workplace use. Unless specifically stated otherwise on the applicable product packaging or literature, these products are not intended, labeled, or packaged for sale to or use by consumers (e.g., for home, personal, primary or secondary school, recreational/sporting, or other uses not described in the applicable product packaging or literature), and must be selected and used in compliance with applicable health and safety regulations and standards (e.g., U.S. OSHA, ANSI), as well as all product literature, user instructions, warnings, and other limitations, and the user must take any action required under any recall, field action, or other product use notice. Misuse of 3M industrial and occupational products may result in injury, sickness, death, or property damage. For help with product selection and use, consult your on-site safety professional, industrial hygienist, or other subject matter expert. If this product is being purchased for use in firefighting duties, please review this Notice Regarding Fluorinated Organic Compounds.

Our Company
About 3M
3M Careers
Investor Relations
Customers and Suppliers
Sustainability
People and Community

Ethics & Compliance
News
News Center
Press Releases
Regulatory
SDS, RDS, More Regulatory & Compliance Information
Transport Information Search
CPSIA Certification Search
Lithium Battery UN 38.3 Test Summary Search
Transparency in Supply Chains and Modern Slavery Disclosures
US Ingredient Communication
Product Recalls
Help
Help Center
Site Map
Where to Buy



Legal

Privacy

HIPAA Privacy

DMCA

Accessibility Statement

Your Privacy Choices

Cookie Preferences
© 3M 2025. All Rights Reserved.
Follow Us

The brands listed above are trademarks of 3M

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit J



# 3M Respirator Selection Guide



**Français**

Cliquez ici.

**Español**

Haga clic aquí.

© 3M 2024



# Respirator Capabilities and Limitations

- Selection of appropriate respiratory protective equipment (RPE) will depend on each situation and should be made only by a competent person knowledgeable of the actual working conditions and the limitations of RPE.
- Refer to applicable government regulations regarding respirator selection, which take precedence over a respirator manufacturer's guidance. In the U.S., please see www.osha.gov or https://multimedia.3m.com/mws/media/21916\O/3m-regulations-handbook-respiratory-protection.pdf for more information.
- Respirators help protect against certain airborne contaminants, but no respirator is capable of preventing all airborne contaminants from entering the wearer's breathing zone.
- Hazardous airborne contaminants in the workplace must be identified and quantified. Many contaminants that can be dangerous to a person's health cannot be seen or smelled at dangerous levels.
- Do not use respirators when airborne contaminant concentrations exceed maximum use concentrations established by regulatory agencies.
- Only use self-contained breathing apparatus (SCBA) or combination supplied air/SCBA when concentrations are unknown, or in atmospheres containing less than 19.5% oxygen. Air purifying respirators do not supply oxygen.
- Before use, the wearer must read and understand the respirator User Instructions. **Failure to follow all instructions and limitations on the use of these respirators and/or failure to wear them properly during all times of exposure can reduce respirator effectiveness and may result in sickness or death.**
- Before use of any respirator, the wearer must first be trained by their employer in proper respirator use in accordance with applicable safety and health standards.
- In the U.S., a written respiratory protection program must be implemented meeting all the requirements of OSHA 29 CFR 1910.134 including training, fit testing, and medical evaluation. In Canada, CSA standard Z94.4 requirements must be met and/or requirements of the applicable jurisdiction, as appropriate.
- Leave the contaminated area immediately if dizziness or other distress occurs, if the respirator becomes damaged or breathing becomes difficult, if contaminants can be smelled or tasted, or if irritation occurs.
- Do not use tight-fitting respirators or loose-fitting facepieces with beards or other facial hair or conditions that prevent direct contact between the face and the edge of the respirator.
- Maintenance, cleaning, and storage programs must be established and routinely followed for respirators that are reused.
- For correct use, consult supervisor and *User Instructions*, or call 3M Personal Safety Division (PSD) Technical Service in the U.S.A. at 1-800-243-4630. In Canada, call 1-800-267-4414.

## How to Use This Guide

Respirators are normally selected based upon workplace contaminants, concentrations, application specific requirements and human factors.

## Contaminants

| Contaminant | Filter, Cartridge or Supplied Air | IDLH | OEL | Air Concentration | Hazard Ratio | Respirator Type |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| Summary |  |  |  |  |  |  |

1. Identify the air contaminants present in the workplace and list them on the form contained in this guide or on your own form. If contaminants are unknown, or in atmospheres containing less than 19.5% oxygen, use only self-contained breathing apparatus (SCBA) or combination supplied air/SCBA for the respirator type.

2. Look up each of your contaminants in this guide. Enter the suggested type of filters and/or cartridges or supplied air (SA) in the form. An explanation of the abbreviations is given below. Note:

   - If airborne oil mist is present in addition to your listed contaminants, then a R- or P-series or HEPA filter must be selected instead of a N-series filter.
   - If any of the contaminants are being aerosolized (e.g. sprayed), then a particle filter must be added if not already included.
   - For powered air purifying respirators (PAPRs), use a HEPA filter instead of the N, R or P type particle filters listed in the guide.

On the bottom row, list the type of filter and/or cartridge that is applicable for ALL of the contaminants together on your form. If SA is suggested for any of the contaminants, or if there is no sufficient cartridge/filter for all of the contaminants together, then SA must be used.

```
(F): Full Facepiece (with appropriate cartridges and filters)
  AG: Acid Gas Respirator
  AM: Ammonia/Methylamine Respirator
  FORM: Formaldehyde Respirator
  HF: Hydrogen Fluoride Respirator
  Hg: Mercury Vapor Respirator
  MG: Multi-gas/Vapor Respirator
  N100: N100 Particulate Respirator
  N95: N95 Particulate Respirator
  OV: Organic Vapor Respirator
  OZ: Ozone Respirator
  P100: P100 Particulate Respirator
  P95: P95 Particulate Respirator
  R95: R95 Particulate Respirator
  SA: Supplied Air Respirator
  SA(F): Supplied air respirator with full facepiece, helmet, hood or loose fitting
  facepiece
```

Note: Respirator abbreviations may be combined. For example, (F)OV/AG/P95 is a full facepiece respirator with an organic vapor/acid gas cartridge and a P95 particulate filter.

3M also offers 3M™ Select Software and 3M™ Service Life Software. Select Software helps you select the most appropriate respirator. Service Life Software estimates service life of 3M gas/vapor cartridges. Both programs are simple, accurate and give printable reports. 3M.com/sls

3. Where applicable, list contaminant air concentrations considered immediately dangerous to life or health (IDLH) on the form. IDLH values are published by the National Institute for Occupational Safety and Health (NIOSH) https://www.cdc.gov/niosh/idlh/default.html, but OSHA allows employers to use other IDLH values. The lower explosive level (LEL) or the concentration that would result in an oxygen deficient atmosphere should also be considered IDLH. If contaminant exposure levels are potentially at or above IDLH, use only self-contained breathing apparatus (SCBA) or combination supplied air/SCBA for the respirator type.

4. Enter the occupational exposure limits (OELs) on the form. References for OELs include www.OSHA.gov for permissible exposure limits (PELs) or www.acgih.org for threshold limit values (TLV®s). Depending on the contaminant you may need to enter more than one type of OEL based on the duration and variability of exposure levels:

   - Time Weighted Average (TWA) exposure limits are for an eight (8) hour workday and a forty (40) hour workweek.
   - Short-Term Exposure Limits (STEL) are a 15-minute time weighted average exposure.
   - Ceiling (C) exposure limits refer to concentrations that should not be exceeded during any part of the workday.

   If you have extended work shifts, or multiple contaminants with similar health affects you may wish to adjust the OELs—see an industrial hygienist for assistance.

5. Determine contaminant air concentrations and list them on the form. Air sampling in the worker's breathing zone is highly recommended. Consideration should be given to the 8 hour time weighted average (TWA), 15 minute short term and peak (ceiling) exposures, while keeping in mind seasonal and worker variability and the specific process being used.

6. Calculate the hazard ratio (HR) as the airborne contaminant concentration / OEL. Enter the hazard ratio on the form.

7. Choose a respirator type with an assigned protection factor (APF) that is higher than the hazard ratio. Assigned protection factors* per OSHA 29 CFR 1910.134 are as follows:

| Type of Respirator | Air Purifying Respirators | Powered Air Purifying Respirators | Supplied Air Respirators (airline) | Self-Contained Breathing Apparatus (SCBA) |
|---|---|---|---|---|
| Half facepiece | 10** | 50 | 50 | — |
| Full facepiece | 50**** | 1000 | 1000 | 10,000 |
| Loose-fitting facepiece | — | 25 | 25 | — |
| Helmet or hood | — | 1000*** | 1000*** | 10,000 |

*Assigned protection factors may vary based on specific standards such as those promulgated by U.S. OSHA. Where assigned protection factors in local, state, or federal standards are lower than those listed here, they should be used instead. For additional limitations of 3M respiratory protection products, refer to 3M respirator packaging and *User Instructions*.

** Filtering facepiece/disposable and reusable

*** Respirator manufacturer must provide data demonstrating performance of 1000 or greater, otherwise APF of 25.

**** With quantitative fit testing, otherwise APF of 10

## Other Considerations

- If a gas/vapor cartridge is selected, a change schedule must be implemented, otherwise supplied air respirators must be used instead.
- If any of the respirator codes contain the (F) designation, respirators with half facepieces cannot be used unless appropriate eye protection is also worn.
- If a chemical can be absorbed through the skin, skin protection may be required in addition to respiratory protection. Eye protection may also be necessary if not provided by the respirator. Failure to provide adequate skin or eye protection can invalidate established exposure limits and make respirator use ineffective for protection against certain workplace contaminants.

## Application Specific Requirements and Human Factors

Consider the entire package of safety equipment required for the job. The respirator selected must be compatible with hard hats, goggles, glasses, welding hoods, face shields, etc. In addition, the worker must be able to communicate and perform required job duties without removing the respirator. If strenuous work is to be performed, or if the respirator is to be worn for an extended period of time, it may be desirable to select a lightweight respirator with low breathing resistance. If a respirator does not have good worker acceptance or is not worn consistently, it will not provide the expected protection.

When specifying supplied air respirators, consider the distance the worker must travel to get to an uncontaminated work area, as well as obstacles or equipment present in the area. If ladders or scaffolds must be climbed, a supplied air respirator with air line may not be appropriate.

## Questions?

For assistance, call 3M Personal Safety Division (PSD) Technical Service in the U.S.A. at 1-800-243-4630. In Canada, call 1-800-267-4414.

## Selection Guide Format Explanation

### Contaminant

Contaminant names listed in this guide are generally those used in the Threshold Limit Values and Biological Exposure Indices published by the American Conference of Governmental Industrial Hygienists (ACGIH). Pesticides and chemicals without established occupational exposure limits are not included. Call 3M Technical Service for assistance in selecting respirators for these chemicals.

## CAS#

Chemical abstract service registry numbers were established by the American Chemical Society to harmonize chemical identification regardless of the synonym used or differences in spelling.

## Synonyms

Several common synonyms are listed in this column.

## Respirator Type

This column lists the suggested type of particulate, gas/vapor, or supplied air respirator. The abbreviations used are explained at the end of this document.

Not all of these respirators have been specifically tested against each compound listed. Either specific testing or a review of chemical and physical properties of the materials, as well as adsorption or filtration characteristics of the respirators, forms the basis for the recommendations.

The recommendations are for single substances. When two or more substances are present, a combination respirator may be appropriate. For example, with a spray paint that contains organic solvents and titanium dioxide, a respirator consisting of an organic vapor cartridge and a particle filter may be appropriate. In cases where an air purifying respirator is not available for all of the substances of concern in a mixture, a supplied air respirator may be required.

In some cases, the respirator is preceded by an "(F)" designation. These contaminants have been identified as potential eye irritants. Full facepieces, hoods, helmets or loose fitting facepieces, or half facepieces with appropriate eye protection should be considered.

## Particulate Filter Definitions

N-Series filters may be used for solid or liquid airborne particulates that do not contain oil.

R-Series filters may be used for solid or liquid airborne particulates including oil-based aerosols. If the atmosphere contains oil, R-series filters are limited to 8 hours of continuous or intermittent use.

P-Series filters may be used for solid or liquid airborne particulates including oil-based aerosols. NIOSH requires that respirator manufacturers establish time-use limitations for all P-series filters. 3M recommends that in atmospheres containing oil aerosols, P-series filters are limited to 40 hours of use or 30 days, whichever occurs first.

Note: All particle filters must also be replaced subject to conditions of hygiene, damage or increased breathing resistance/reduced air flow.

Oils are mineral, vegetable and synthetic substances and animal and vegetable fats that are generally slippery, combustible, viscous, liquid or liquefiable at room temperatures soluble in various organic solvents such as ether but not in water.

95 level filter is > 95% filtration efficiency per the NIOSH 42 CFR 84 test method.

100 level filter is > 99.97% filtration efficiency per the NIOSH 42 CFR 84 test method.

HEPA Filter is > 99.97% filtration efficiency per the NIOSH 42 CFR 84 test method for powered air purifying respirators (PAPRs) only. Use instead of N, R, P type filters.

## Comments

Other information may be listed in this column:

A. Short service life means predicted cartridge life of less than 30 minutes at concentrations such as 10 times the OEL, or the contaminant's boiling point is less than 65C. Actual service life will vary considerably depending on concentration levels, temperature, humidity, work rate, etc. See 3M Service Life Software www.3M.com/sls to estimate cartridge service life. Sometimes a supplied air respirator is recommended because the service life may be so short that the frequency required for changing the cartridges is not practical.

B. References to a respirator not being specifically approved refer to a lack of approval for a particular substance. All respirators listed in this guide are NIOSH approved for certain substances and/or conditions.

**C.** References to Ineffective sorbents or Unknown sorbent effectiveness indicate 3M does not make chemical cartridge respirators appropriate for these substances at this time or it is not known how effective the sorbents would be for these materials.

**D.** These compounds have been identified as possibly existing in both particulate and vapor phase in the workplace. For these compounds, 3M recommends that a gas/vapor cartridge be used in addition to the traditionally accepted particulate filter. It is the user's responsibility to determine whether both forms coexist. Both chemical properties and use conditions/processes can affect the physical form in the workplace. Users should consider specific exposure data and workplace conditions before making their final selection.* If a chemical cartridge is used, a change schedule must be established to replace the cartridges before the end of their service life.

**E.** These compounds have been identified as possibly existing in both vapor and particulate phase in the workplace. Even though these chemicals would be expected to be in the vapor phase, when other aerosols are present or there is high humidity, it is possible that the vapor may be adsorbed onto these coexisting particles or dissolved in available water droplets; therefore, 3M recommends a filter for the particulate phase be used in addition to the traditionally accepted chemical cartridge. It is the user's responsibility to determine whether both forms coexist. Both chemical properties and use conditions/processes can affect the physical form in the workplace. Users should consider specific exposure data and workplace conditions before making their final selection.

**F.** It is believed that an N-series filter is sufficient since these materials will not coat the filter fibers, but since this material may contain oil aerosols, an R- or P-series filter is recommended until further research or a regulatory agency takes a specific position.

**G.** R- or P-series filters have been recommended pending more research as to how these materials affect the filter fibers.

**H.** 3M™ Personal Air Monitors may be used to measure the amount of specific organic vapors, aldehydes or ethylene oxide in the air. 3M Monitors may be purchased with or without pre-paid analysis. Please see www.3M.com/badgemonitors for more information.

**I.** Skin notations indicate the substance can be absorbed through the skin. In these cases, appropriate measures must be taken to prevent skin and eye contact to avoid invalidating the OEL.

\* See Perez, C. and S. C. Soderholm: Some Chemicals Requiring Special Consideration When Deciding Whether to Sample the Particle, Vapor, or Both Phases of an Atmosphere. Appl. Occup. Hyg. 6(10): 859-864 (1991).

## Contaminants Table

NOTE: See important warnings, definitions, and explanation of column headings and abbreviations starting on page 1. For occupational exposure limits, please see your local regulatory authority. In the US, please see https://www.osha.gov/annotated-pels.

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Acetaldehyde | 75-07-0 | Acetic aldehyde, Ethanal | | (F)OV<br><br>(F)MG | Short OV service life. Multigas cartridge recommended for longer service life. 3M Formaldehyde Monitors. |
| Acetamide | 60-35-5 | Ethanamide | | OV/N95 | See comment D in Introduction |
| Acetic acid | 64-19-7 | Ethanoic acid, Glacial acetic acid, Methane carboxylic acid, Vinegar acid | | (F)OV/AG | |
| Acetic anhydride | 108-24-7 | Acetic acid anhydride, Acetyl oxide, Ethanoic anhydride | | (F)OV | |
| Acetone | 67-64-1 | 2-Propanone, Dimethyl ketone, Ketone propane | | OV | Short service life. 3M Organic Vapor Monitors. |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Acetone cyanohydrin | 75-86-5 | 2-Cyano-2-propanol, 2-Hydroxy-2-methyl propanenitrile, 2-Methyllactonile, 2-Propane cyanohydrin, a-Hydroxy isobutyronitrile | Y | OV | |
| Acetonitrile | 75-05-8 | Cyanomethane, Ethane nitrile, Ethyl nitrile, Methanecarbonitrile, Methyl cyanide | Y | OV | 3M Organic Vapor Monitors |
| Acetophenone | 98-86-2 | 1-Phenylethanone, Acetyl benzene, Benzoyl methide, Methyl phenyl ketone | | OV | See comment E in Introduction. 3M Organic Vapor Monitors. |
| Acetylsalicylic acid | 50-78-2 | Aspirin | | N95 | |
| Acrolein | 107-02-8 | Acrylaldehyde, Acrylic aldehyde, Allylaldehyde, Propenal | Y | (F)OV | Short service life |
| Acrylamide | 79-06-1 | Acrylamide monomer, Acrylic amide, Propenamide | Y | OV/N95 | See comment D in Introduction |
| Acrylic acid | 79-10-7> | Acroleic acid, Propenoic acid | Y | (F)OV | |
| Acrylonitrile | 107-13-1 | AN, Propenenitrile, Vinyl cyanide | Y | OV | SA if cartridge not disposed of after shift, per 29 CFR 1910.1045. 3M Organic Vapor Monitors. |
| Adipic acid | 124-04-9 | 1,4-Butanedicarboxylic acid, 1,6-Hexanedioic acid, Adipinic acid, Hexanedioic acid | | (F)N95 | |
| Adiponitrile | 111-69-3 | 1,4-Dicyanobutane, Addipic acid dinitrile, Hexanedinitrile, Tetramethylene cyanide | Y | OV | |
| Allyl alcohol | 107-18-6 | 2-Propen-1-ol, 2-Propenol, Vinyl carbinol | Y | (F)OV | 3M Organic Vapor Monitors |
| Allyl bromide | 106-95-6 | 1-Bromo-2-propene; 1-Propene, 3-bromo-; 2-Propenyl bromide; 3-Bromo-1-propene; 3-Bromopropene; 3-Bromoproylene | Y | (F)OV | |
| Allyl chloride | 107-05-1 | 1-Chloro-2-propene, 3-Chloropropene | Y | OV | Short service life. 3M Organic Vapor Monitors. |
| Allyl glycidyl ether | 106-92-3 | 1-Allyloxy-2,3-epoxy-propane, AGE | | (F)OV | |
| Allyl isothiocyanate | 57-06-7 | AITC, Allyl isosulfocyanate, Allyl thiocarbanimide, 3-Isothiocyanate-1-propene, Oil of mustard | Y | OV | SA if used with acids |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Chloramphenicol | 56-75-7 | [R-(R*,R*)]-2,2-dichloro-N-[2,hydroxy-1-(hydroxy methyl)-2-(4-nitrophenyl)ethyl] acetamide; Chloromycetin; Levomycetin | | N95 | |
| Chlorinated diphenyl oxide | 31242-93-0 | Hexachlorodiphenyl oxide | | OV/P95 | |
| Chlorine | 7782-50-5 | | | (F)AG | Irritation also provides warning. See NIOSH approval label to verify appropriate cartridge. |
| Chlorine dioxide | 10049-04-4 | Chlorine oxide, Chlorine peroxide | | AG | See NIOSH approval label to verify appropriate cartridge. |
| Chlorine trifluoride | 7790-91-2 | Chlorine fluoride | | MG | |
| Chloroacetaldehyde | 107-20-0 | 2-Chloroethanal, Chloroacetaldehyde (40% aqueous) | | (F)OV | |
| Chloroacetone | 78-95-5 | Chloracetone, 1-Chloro-2-propanone, Monochloroacetone | Y | (F)OV | |
| Chloroacetyl chloride | 79-04-9 | Chloracetyl chloride | Y | (F)OV/AG | |
| Chlorobenzene | 108-90-7 | Chlorobenzol, MCB, Monochlorobenzene, Phenyl chloride | | OV | 3M Organic Vapor Monitors |
| Chlorobromo-methane | 74-97-5 | Bromochloromethane, CBM, Halon™ 1011, Methylene chlorobromide | | OV | |
| 1-Chloro-1,1-difluoroethane | 75-68-3 | a-Chloroethylidene fluoride, Chlorodifluoroethane, Dymel® 142b, Genetron™ 142b, HCFC-142b | | SA | Short OV service life |
| Chlorodifluoro-methane | 75-45-6 | Freon® 22 | | SA | Ineffective sorbents |
| Chlorodiphenyl (42% chlorine) | 53469-21-9 | PCB, Polychlorinated biphenyl | Y | (F)OV/P95 | See comment D in Introduction |
| Chlorodiphenyl (54% chlorine) | 11097-69-1 | PCB, Polychlorinated biphenyl | Y | (F)OV/P95 | See comment D in Introduction |
| Chloroform | 67-66-3 | Trichloromethane | | OV | 3M Organic Vapor Monitors |
| bis-(2-Chloroisopropyl) ether | 39628-32-9 | BCIPE; bis-(1-methyl-2-chloroethyl) ether; bis-2-chloro-1-methylethyl ether; Dichloroisopropyl ether | | (F)OV | |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| bis-Chloromethyl ether | 542-88-1 | BCME, Chloro (chloromethoxy) methane, Chloromethyl ether, Dichloromethylether | | (F)OV | OSHA requires SA with hood for certain applications; see 29 CFR 1910.1003 |
| Chlorcpentafluoro-ethane | 76-15-3 | FC-115, Monochloropentafluoroethane | | SA | Short OV service life |
| Chloropicrin | 76-06-2 | Nitrochloroform, Nitrotrichloromethane, Trichloronitromethane | | (F)SA | Irritation also provides warning |
| b-Chloroprene | 126-99-8 | 2-Chloro-1,3-butadiene; beta-Chloroprene; Chlorobutadiene | Y | (F)OV | Short service life |
| 2-Chloropropane | 75-29-6 | 2-CP, 2-Propyl chloride, Isoprid, Isopropyl chloride | | OV | Short service life |
| 1-Chloro-2-propanol | 127-00-4 | 1-Chloro-2-hydroxypropane, 1-Chloroisopropyl alcohol, sec-Propylene chlorohydrin | Y | OV | |
| 2-Chloro-1-propanol | 78-89-7 | 1-Hydroxy-2-chloropropane, 2-Chloropropanol, 2-Chloropropyl alcohol, Propylene chlorohydrin | Y | OV | |
| 2-Chloropropionic acid | 598-78-7 | a-Chloropropionic acid | Y | OV/AG | |
| o-Chlorostyrene | 2039-87-4 | 1-Chloro-2-ethenylbenzene, 2-Chlorostyrene | | OV | |
| Chlorosulfonic acid | 7790-94-5 | Chlorosulfuric acid, CSA | | (F)AG/N95 | HCl, SO2 hydrolysis products |
| 2-Chloro-1,1,1,2-tetrafluoroethane | 2837-89-0 | Chlorotetrafluoroethane, Fluorocarbon 124, HCFC124, HFA124 | | SA | Short OV service life |
| o-Chlorotoluene | 95-49-8 | 2-Chloro-1-methylbenzene | | OV | |
| Chlorotrifluoro-ethylene | 79-38-9 | CFE, CTFE, Trifluorochloroethylene, Trifluorovinylchloride | | SA | Short OV service life |
| Chromium (II) compounds (as Cr) | | | | N95 | |
| Chromium (III) | | | | N95 | |
| Chromium (VI) compounds (as Cr) | | Chromic acid, Hexavalent chromium compounds | Y | N95 | Skin notation for water-soluble compounds |
| Chromium metal | 7440-47-3 | | | N95 | |
| Chromyl chloride | 14977-61-8 | Chloro-chromic anhydride, Chromium oxychloride | Y | (F)AG/N95 | See comment E in Introduction |
| Citral | 5392-40-5 | 2,6-Octadienal-3,7-dimethyl; 3,7-Dimethyl-2,6-octadienal | Y | OV/P95 | See comment D in Introduction |
| Coal dust, Anthracite | | | | N95 | May also contain crystaline silica (quartz) |

NOTE: See important warnings, definitions, and explanation of column headings and abbreviations starting on page 1. For occupational exposure limits, please see your local regulatory authority. In the US, please see https://www.osha.gov/annotated-pels.

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Coal dust, Bituminous or Lignite | | | | N95 | May also contain crystaline silica (quartz) |
| Coal tar pitch volatiles (as Benzene solubles) | 65996-93-2 | Particulate polycyclic aromatic hydrocarbons, PPAH | | R95 P95 | Respirators with nuisance level organic vapor or acid gas relief specifically recommended |
| Cobalt, elemental and inorganic compounds (as Co) | 7440-48-4 | | | N95 | |
| Cobalt carbonyl (as Co) | 10210-68-1 | | | SA | Ineffective sorbents |
| Cobalt hydrocarbonyl (as Co) | 16842-03-8 | | | SA | Ineffective sorbents |
| Coke oven emissions | 65996-93-2 | | | R95 P95 | Respirators with nuisance level organic vapor or acid gas relief specifically recommended |
| Copper dust and mist (as Cu) | 7440-50-8 | | | N95 | |
| Copper fume (as Cu) | 7440-50-8 | | | N95 | |
| Cotton dust, raw | | | | N95 | 5X PEL maximum for disposables, per OSHA cotton dust standard. If oil aerosol present, use R or P95. |
| Cresol (all isomers) | 1319-77-3 | Cresylic acid | Y | OV/P95 | See comment D in Introduction. 3M Organic Vapor Monitors. |
| Crotonaldehyde | 4170-30-3 | b-Methylacrolein, Crotonic aldehyde, Propylene aldehyde | | (F)OV | 3M Formaldehyde Monitors |
| Cryolite (as F) | 15096-52-3 | Greenland spar, Icetone | | N95 | |
| Cumene | 98-82-8 | 2-Phenyl propane, Cumol, Isopropyl benzene | | OV | 3M Organic Vapor Monitors |
| Cumene hydroperoxide | 80-15-9 | a,a'-Dimethylbenzyl hydroperoxide, CHP, Cumyl hydroperoxide, Isopropyl benzene hydroperoxide | Y | (F)OV | |
| Cyanamide | 420-04-2 | Carbodiimide, Cyanogenamide | | N95 | |
| Cyanides (as CN) | | | Y | SA | |
| Cyanogen | 460-19-5 | Dicyan, Oxalonitrile | | MG | |
| Cyanogen bromide | 506-68-3 | Bromine cyanide | | (F)SA | |

16

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Cyanogen chloride | 506-77-4 | CNCl | | (F)SA | Short OV service life |
| Cyclohexane | 110-82-7 | Hexahydrobenzene, Hexamethylene | | (F)OV | Irritation also provides warning. 3M Organic Vapor Monitors. |
| Cyclohexanol | 108-93-0 | Anol, Cyclohexyl alcohol, Hexahydrophenol, Hexalin, Hydralin, Hydroxycyclohexane | Y | OV | See comment E in Introduction. 3M Organic Vapor Monitors. |
| Cyclohexanone | 108-94-1 | Cyclohexyl ketone, Pimelic ketone | Y | OV | 3M Organic Vapor Monitors |
| Cyclohexene | 110-83-8 | Benzene tetrahydride | | OV | |
| Cyclohexylamine | 108-91-8 | Aminocyclohexane, Hexahydroaniline | | (F)OV | |
| Cyclonite | 121-82-4 | Hexahydro-1,3,5-trinitro-sym-triazine; RDX; sym-Trimethylene trinitramine | Y | N95 | |
| Cyclopentadiene | 542-92-7 | 1,3-Cylclopentadiene | | OV | Short service life |
| Cyclopentane | 287-92-3 | Pentamethylene | | SA | Short OV service life |
| Decaborane | 17702-41-9 | | Y | SA | Unknown sorbent effectiveness |
| Decabromodiphenyl oxide | 1163-19-5 | bis-(Pentabromophenyl) ether, DBDPO, Decabromodiphenyl ether | | N95 | |
| 1-Decene | 872-05-9 | a-Decene, Decylene | | OV | |
| Dehydrolinalool | 29171-20-8 | | | OV | |
| Diacetone alcohol | 123-42-2 | 2-Methyl-2-pentanol-4-one, 4-Hydroxy-4-methyl-2-pentanone, Diacetone | | (F)OV | 3M Organic Vapor Monitors |
| Diacetyl | 431-03-8 | Biacetyl, 2,3-Butanedione, 2,3-Diketobutane, Dimethyl diketone, Dimethylglyoxal | | OV/P95 | |
| Diallylamine | 124-02-7 | Di-2-propenylamine, N-2-propenyl-2-propen-1-amine | Y | OV | |
| Diazomethane | 334-88-3 | Azimethylene, Diazirine | | SA | Unknown sorbent effectiveness |
| Diborane | 19287-45-7 | Boroethane | | SA | Unknown sorbent effectiveness |
| Dibromochloro-propane | 96-12-8 | 1,2-Dibromo-3-chloropropane; 1-Chloro-2,3-dibromopropane; DBCP | | (F)SA | OSHA requires (F)SA; no change schedule allowed |
| Dibromoneopentyl glycol | 3296-90-0 | Dibromopentaerythritol | | (F)R95/P95 | R95/P95 acceptable with appropriate eye/face protection |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Potassium benzoate | 582-25-2 | | Y | N95 | |
| Potassium bromate | 7758-01-2 | Bromic acid potassium salt | | N95 | |
| Potassium hydroxide | 1310-58-3 | Caustic potash, Lye, Potassium hydrate | | N95 | |
| Propane | 74-98-6 | Dimethyl methane, n-Propane | | SA | Ineffective sorbents |
| 2-Propanol | 67-63-0 | IPA, Isopropanol, Isopropyl alcohol, sec-Propyl alcohol | | (F)OV | Irritation also provides warning. 3M Organic Vapor Monitors. |
| n-Propanol | 71-23-8 | 1-Propanol, Ethyl carbinol, n-Propyl alcohol, Propan-1-ol | | (F)OV | See comment E in Introduction. 3M Organic Vapor Monitors. |
| Propargyl alcohol | 107-19-7 | 2-Propyn-1-ol | Y | OV | |
| Propargyl bromide | 106-96-7 | 1-Bromo-2-propyne; 3-Bromopropyne; Bromopropyne; gama-Bromoallylene; Propyne, 3-bromo | Y | OV | |
| 2-Propenoic acid, Isooctyl ester | 29590-42-9 | IOA, Isoctyl acrylate | | OV | |
| b-Propiolactone | 57-57-8 | 3-Hydroxy beta-lactone; 3-Hydroxypropionic acid; beta-Propiolactone; BPL; Hydroacrylic acid, beta-lactone; Propiolactone | | (F)OV | OSHA requires SA with hood for certain applications; see 29 CFR 1910.1003 |
| Propionaldehyde | 123-38-6 | 1-Propanal, Methylacetalaldhyde, Propylaldehyde | | SA | Short OV service life. 3M Formaldehyde Monitors. |
| Propionic acid | 79-09-4 | Ethylformic acid, Methylacetic acid | | (F)OV | |
| n-Propyl acetate | 109-60-4 | Acetic acid n-propyl ester, Propyl acetate | | (F)OV | 3M Organic Vapor Monitors |
| Propylene | 115-07-1 | 1-Propene, 1-Propylene, Methylethene, Methylethylene, Propene | | SA | |
| Propylene dichloride | 78-87-5 | 1,2-Dichloropropane | | OV | 3M Organic Vapor Monitors |
| Propylene glycol, aerosol only | 57-55-6 | 1,2-Dihydroxy propane, 1,2-Propanediol, Methyl glycol | | R95 P95 | See comment G in Introduction |
| Propylene glycol, vapor and aerosol | 57-55-6 | 1,2-Dihydroxy propane, 1,2-Propanediol, Methyl glycol | | OV/P95 | See comment G in Introduction |
| Propylene glycol dinitrate | 6423-43-4 | 1,2-Propanediol dinitrate, 1,2-Propylene glycol dinitrate | Y | (F)OV | |
| Propylene glycol ethyl ether | 1569-02-4 | Propylene glycol monoethyl ether | Y | (F)OV | |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Propylene glycol monomethyl ether | 107-98-2 | 1-Methoxy-2-propanol | | OV | 3M Organic Vapor Monitors |
| Propylene glycol monomethyl ether acetate | 108-65-6 | 1-Methoxy-2-acetoxypropane, 1-Methyoxy-2-propanol acetate, 2-Methoxy-1-methylethyl acetate, Glycol ether PM acetate, PGMEA | | OV | 3M Organic Vapor Monitors |
| Propyleneimine | 75-55-8 | 2-Methylaziridine | Y | (F)OV | Short service life |
| Propylene oxide | 75-56-9 | 1,2-Epoxypropane, 1,2-Propylene oxide, 2,3-Epoxypropane, Methyloxirane, Propene oxide | | OV | Short service life. 3M Organic Vapor Monitors. |
| n-Propyl nitrate | 627-13-4 | Nitric acid n-propylester | | OV | |
| Pyridine | 110-86-1 | Azabenzene, Azine | | OV | 3M Organic Vapor Monitors |
| Quinoline | 91-22-5 | 1-Azana-phthalene, 1-Benzazine, Chinoline, Lencol, Leukoline | Y | (F)OV | |
| Quinone | 106-51-4 | Benzoquinone, p-Benzoquinone | | (F)OV/N95 | |
| Resorcinol | 108-46-3 | 1,3-Benzenediol, m-Dihydroxybenzene | | N95 | OV/N95 may be preferable if heat is involved |
| Rhodium, metal and insoluble compounds (as Rh) | 7440-16-6 | | | N95 | |
| Rhodium, soluble compounds(as Rh) | | | | N95 | |
| Selenium & compounds (as Se) | 7782-49-2 | | | N95 | |
| Selenium hexafluoride | 7783-79-1 | | | SA | Unknown sorbent effectiveness |
| Sevoflurane | 28523-86-6 | Fluoromethyl 2,2,2,-trifluoro-1-(trifluoromethyl) ethyl ether | | OV | See technical bulletin |
| Silica, amorphous (diatomaceous earth) | 61790-53-2 | Diatomite, Silicon dioxide | | N95 | |
| Silica, crystalline | 14808-60-7 1317-95-9 14464-46-1 15468-32-3 | Crystallized silicon dioxide, Cristobalite, a-Quartz, Silica, Tripoli, Tridymite | | N95 | For mining, see MSHA 30 CFR 60. |
| Silicon | 7440-21-3 | | | N95 | |
| Silicon carbide (fibrous) | 409-21-2 | | | N95 | |

| Contaminant | CAS # | Synonym | Skin? | Respirator | Comments |
|---|---|---|---|---|---|
| Silicon carbide (nonfibrous particles with no asbestos and <1% crystalline silica) | 409-21-2 | | | N95 | |
| Silicon tetrahydride | 7803-62-5 | Silane | | SA | |
| Silver, metal and soluble compounds (as Ag) | 7440-22-4 | | | N95 | |
| Soapstone (particles with no asbestos and <1% crystalline silica) | | Massive talc, Soapstone silicate, Steatite | | N95 | |
| Sodium azide as hydrazoic acid vapor | 26628-22-8 | Hydrazoic acid vapor | | SA | Unknown sorbent effectiveness |
| Sodium azide as sodium azide | 26628-22-8 | Hydrazoic acid (no vapor) | | N95 | |
| Sodium benzoate | 532-32-1 | | Y | N95 | |
| Sodium bisulfite | 7631-90-5 | Sodium hydrogen sulfite | | AG/N95 | N95 alone may be suitable if irritation eliminated |
| Sodium borate, anhydrous | 1330-43-4 | Borates, tetrasodium salts, anhydrous; Borax fused; Boric acid, disodium salt; Disodium tetraborate; Sodium tetraborate, anhydrous | | N95 | |
| Sodium borate, decahydrate | 1303-96-4 | Borascu; Borates, tetrasodium salts, decahydrate; Borax; Borocin; Disodium diborate decahydrate; Disodium tetraborate decahydrate; Sodium pyroborate decahydrate; Sodium tetraborate, decahydrate | | N95 | |
| Sodium borate, pentahydrate | 12179-04-3 | Borates, tetrasodium salts, pentahydrate; Boric acid, pentahydrate; Boron sodium oxide, pentahydrate; Mule team borascu; Sodium tetraborate pentahydrate | | N95 | |
| Sodium chloroacetate | 3926-62-3 | Chloroacetic acid, sodium salt; Monoxone; Sodium monochloroacetate | | N95 | |
| Sodium fluoroacetate | 62-74-8 | 1080, SFA, Sodium monofluoroacetate | Y | N95 | |
| Sodium hydroxide | 1310-73-2 | Caustic soda, Lye, Soda lye | | N95 | |
| Sodium hypochlorite | 7681-52-9 | Hypochlorous acid, sodium salt; Sodium oxychloride | | N95 | Chlorine may also be present |
| Sodium metabisulfite | 7681-57-4 | Sodium pyrosulfite | | AG/N95 | N95 alone may be suitable if irritation eliminated |
| Starch | 9005-25-8 | Corn starch | | N95 | |

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit K

- Go to US Navigation
- Go to Page Content

 (https://www.3m.com/)
- United States (https://www.3m.com/)
- Safety (https://www.3m.com/3M/en_US/safety-us/)
- Worker Health & Safety (https://www.3m.com/3M/en_US/worker-health-safety-us/)
  Safety Now & Next (https://www.3m.com/blog/en_US/safety-now) > Science of Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/) > Quality Products
  (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/) > Fire & Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/fire-safety/) > Why is NIOSH Certification of Respiratory Protection Important?

## Safety Now & Next (https://www.3m.com/blog/en_US/safety-now)



by SafetyNow (https://www.3m.com/blog/en_US/safety-now/author/safetynow/) - March 25, 2022

# Why is NIOSH Certification of Respiratory Protection Important?

What is the significance of having a respirator approved by the National Institute for Occupational Safety and Health (NIOSH)? To answer this, it is important to understand NIOSH as well as U.S. OSHA and the primary function of each.

## What are the Functions of NIOSH and U.S. OSHA?

NIOSH is responsible for conducting research and making recommendations for the prevention of work-related illnesses and injuries. NIOSH is also responsible for approval of respiratory equipment. U.S. OSHA is the federal Occupational Safety & Health Administration and their mission statement identifies their goal as publishing guidance and regulations to help "ensure safe and healthful working conditions for workers by setting and enforcing standards and by providing training, outreach, education and assistance."[1]

One of the referenced U.S. OSHA standards is 29 CFR 1910.134. This standard outlines OSHA requirements for employers who provide respirators to their workers and directs employers on the requirements for a respiratory protection program. As part of any respiratory protection program, OSHA requires that the respirator selected for use is approved by NIOSH.

NIOSH approval is issued only to a specific and complete respirator assembly after the respirator has been evaluated in the laboratory and found to comply with all requirements of Title 42, Code of Federal Regulations, Part 84, and after the manufacturer's quality plan is determined to be satisfactory. A NIOSH approval applies only to the specific respirator that is made up of the components included on the NIOSH approval label.[2]



According to the Centers for Disease Control and Prevention (CDC), worker safety can be compromised by using parts or accessories that are not NIOSH-approved for the specific respirator. Although NIOSH-approved respirators are comprised of various component parts, they are approved as a complete unit. Substitution of components that are not part of the original approved system results in a respirator that has not been evaluated by NIOSH.[3] Unevaluated respirator assemblies may not function at the expected level of protection, putting the worker at risk for exposure to airborne hazards.[4]

## How Do You Know if a Respirator is NIOSH Approved?

It is the employer's responsibility to perform a hazard assessment and determine the correct NIOSH-approved respirator for the task.[5] There are many resources and informational tools to support respiratory programs (https://www.3m.com/3M/en_US/safety-centers-of-expertise-us/respiratory-protection/) and help you understand if a respirator in a specific configuration is approved by NIOSH. We can help you select appropriate NIOSH-approved respiratory products (https://www.3m.com/3M/en_US/worker-health-safety-us/safety-equipment-support/) given the hazards your workers face on a specific worksite while conducting certain applications or tasks.

## What Documentation Should You Look for to Verify NIOSH Approval?



Both an approval label and User Instructions are supplied with all NIOSH-approved respirators. These documents, a single copy of which may accompany either a large or small package of respirators, should not be discarded before all the respirators are used or discarded. In addition to the approval number, the NIOSH approval label contains contact information for the respirator manufacturer/supplier, cautions and limitations for use, and directions for proper use. It is very important to read and follow all the manufacturer's instructions for the respirator that you are using.

## How Do I Check that My 3M Respiratory Products are Approved by NIOSH?

We have a team of dedicated technical support staff ready to assist with questions related to your products. You can reach our health and safety specialists online (https://www.3m.com/3M/en_US/worker-health-safety-us/safety-equipment-support/) or call at 1-800-243-4630.

## How Can Our Application Engineers Help You with PPE and Other Solutions?

Application engineers are specialists that focus on specific product lines and offer technical support in addition to questions relating to product selection, configuration and application. (https://www.3m.com/3M/en_US/worker-health-safety-us/safety-equipment-support/)

## Do You Need Assistance with Buying PPE and Respiratory Products?

Our dedicated sales specialists (http://www.3m.com/3M/en_US/safety-us/sales-rep-locator/) are cross-trained on all personal safety division products in order to provide field support.

## Where Can I Find Other Resources?

U.S. OSHA offers a wide variety of resources (https://www.osha.gov/sites/default/files/publications/3384small-entity-for-respiratory-protection-standard-rev.pdf). Specifically, the OSHA Respiratory Protection Standard, 29 CFR 1910.134 (https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134), speaks to respiratory protection as well as a small business guide (http://OSHA. (2011). Small Entity Compliance Guide for the Respiratory Protection Standard. Retrieved from Occupational Safety and Health Administration: https://www.osha.gov/Publications/3384small-entity-for-respiratory-protection-standard-rev.pdf) to setting up a respiratory protection program.

We also offer a comprehensive site and guide (https://www.3m.com/3M/en_US/respiratory-protection-us/support/center-for-respiratory-protection/) designed for all types of businesses that need to establish and implement a respiration protection program under this federal standard. This guide is intended to assist program administrators and employers who need to develop a program.

For more information about NIOSH approval and choosing the right PPE, please do not hesitate to reach out to our experienced team of professionals (https://www.3m.com/3M/en_US/worker-health-safety-us/safety-equipment-support/) today.

## References:

[1] https://www.osha.gov/aboutosha (https://www.osha.gov/aboutosha)

[2] Ahlers, H. W. (2007, May 4). *Respirators Users Notice.* Retrieved from Department of Health & Human Services: https://www.cdc.gov/niosh/npptl/usernotices/pdfs/UsersNotice05042007-508.pdf (https://www.cdc.gov/niosh/npptl/usernotices/pdfs/UsersNotice05042007-508.pdf)

[3] https://www.cdc.gov/niosh/npptl/resources/pressrel/letters/lttr-031706.html#:~:text=NIOSH%20approval%20is%20issued%20only,is%20determined%20to%20be%20satisfactory (https://www.cdc.gov/niosh/npptl/resources/pressrel/letters/lttr-031706.html#:~:text=NIOSH%20approval%20is%20issued%20only,is%20determined%20to%20be%20satisfactory)

[4] NIOSH. (2016, February). *Use of Aftermarket Replacement Component Parts for NIOSH-Approved Respirators.* Retrieved from Centers for Disease Control and Prevention: https://www.cdc.gov/niosh/docs/2016-107/default.html (https://www.cdc.gov/niosh/docs/2016-107/default.html)

[5] OSHA. (2020). *1910.134 – Respiratory Protection.* Retrieved from Occupational Safety and Health Administration: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134 (https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134)

## Scott Product NIOSH Approved Combinations

NIOSH Rubber Datasheet – https://multimedia.3m.com/mws/media/1923447O/3m-scott-av-series-niosh-rubber-datasheet.pdf (https://multimedia.3m.com/mws/media/1923447O/3m-scott-av-series-niosh-rubber-datasheet.pdf)

NIOSH Kevlar Datasheet – https://multimedia.3m.com/mws/media/1609433O/3m-scott-av-series.pdf (https://multimedia.3m.com/mws/media/1609433O/3m-scott-av-series.pdf)

NIOSH Polyester Datasheet – https://multimedia.3m.com/mws/media/1923446O/3m-scott-av-series-niosh-poly-datasheet.pdf (https://multimedia.3m.com/mws/media/1923446O/3m-scott-av-series-niosh-poly-datasheet.pdf)

- [object Object] (mailto:?subject=Why is NIOSH Certification of Respiratory Protection Important? &body=https%3A%2F%2Fwww.3m.com%2Fblog%2Fen_US%2Fsafety-now%2Fscience-of-safety%2Fregulatory-knowledge%2Fwhy-is-niosh-certification-of-respiratory-protection-important%2F)

- Facebook (https://www.facebook.com/sharer/sharer.php?u=https%3A%2F%2Fwww.3m.com%2Fblog%2Fen_US%2Fsafety-now%2Fscience-of-safety%2Fregulatory-knowledge%2Fwhy-is-niosh-certification-of-respiratory-protection-important%2F%3FWT.mc_id%3D&t=Why is NIOSH Certification of Respiratory Protection Important?)
- Twitter (https://twitter.com/intent/tweet?url=&text=Why%20is%20NIOSH%20Certification%20of%20Respiratory%20Protection%20Important%3F%20https%3A%2F%2Fwww.3m.com%2Fblog%2Fen_US%2now%2Fscience-of-safety%2Fregulatory-knowledge%2Fwhy-is-niosh-certification-of-respiratory-protection-important%2F)
- Youtube (https://www.youtube.com/)
- Linkedin (https://www.linkedin.com/shareArticle?mini=true&url=https%3A%2F%2Fwww.3m.com%2Fblog%2Fen_US%2Fsafety-now%2Fscience-of-safety%2Fregulatory-knowledge%2Fwhy-is-niosh-certification-of-respiratory-protection-important%2F%3FWT.mc_id%3Dsmb_linkedin&title=Why%20is%20NIOSH%20Certification%20of%20Respiratory%20Protection%20Important%3F)
- 

Previous Post (https://www.3m.com/blog/en_US/safety-now/science-of-safety/quality-products/are-your-workers-protected/)

Next Post (https://www.3m.com/blog/en_US/safety-now/science-of-safety-podcast/global-safety-podcast-respiratory-protection-selection-part-i/)

**Search**

|  | Search |
|---|---|

**Recent Posts**

- Exposure Assessment Awareness Part II (https://www.3m.com/blog/en_US/safety-now/science-of-safety/exposure-assessment-awareness-part-ii/)
  September 6, 2024
- Exposure Assessment Awareness Part I (https://www.3m.com/blog/en_US/safety-now/science-of-safety/exposure-assessment-awareness-part-i/)
  June 11, 2024
- Call for Submissions: 2024 3M PSD Occupational Health and Safety Scholarship Program (https://www.3m.com/blog/en_US/safety-now/press-room/call-for-submissions-2024-3m-psd-occupational-health-and-safety-scholarship-program/)
  May 8, 2024
- Balancing Hearing Protection with Hearing and Communication Needs (https://www.3m.com/blog/en_US/safety-now/science-of-safety/balancing-hearing-protection-with-hearing-and-communication-needs/)
  November 15, 2023
- Silica Awareness (https://www.3m.com/blog/en_US/safety-now/science-of-safety/quality-products/respiratory-protection/silica-awareness/)
  September 6, 2023

**Categories**

- 29 CFR 1926.1153 (Silica) (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/regulatory-knowledge/respirable-crystalline-silica/) (9)
- Confined Space (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/hazard-awareness/confined-space/) (9)
- Connected Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/connected-safety/) (3)
- Education & Training (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/) (44)
- Events (https://www.3m.com/blog/en_US/safety-now/category/press-room/events/) (5)
- Eye and Face Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/eye-face-protection/) (8)
- Fall Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/fall-protection/) (39)
- Fire & Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/fire-safety/) (18)
- Have You Heard (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/hearing-conservation/have-you-heard/) (2)
- Hazard Awareness (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/hazard-awareness/) (59)
- Head Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/head-protection/) (8)
- Hearing Conservation (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/hearing-conservation/) (26)
- Hearing Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/hearing-protection/) (31)
- Hearing Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/hearing-conservation/hearing-protection-2/) (3)
- Innovative Technologies (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/innovative-technologies/) (14)
- Managing Safety Programs (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/managing-safety-programs/) (59)
- Natural Disasters (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/hazard-awareness/natural-disasters/) (10)

- Press Room (https://www.3m.com/blog/en_US/safety-now/category/press-room/) (15)

- Quality Products (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/) (97)

- Regulatory Knowledge (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/regulatory-knowledge/) (31)

- Respiratory Protection (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/respiratory-protection/) (78)

- Science of Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/) (78)

- Science of Safety Podcast (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety-podcast/) (19)

- Scotchlite Reflective Material (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/scotchlite-reflective-material/) (5)

- Silica Dust (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/hazard-awareness/silica-dust/) (10)

- The Future of Safety (https://www.3m.com/blog/en_US/safety-now/category/future-of-safety/) (15)

- Uncategorized (https://www.3m.com/blog/en_US/safety-now/category/uncategorized/) (13)

- Using PPE (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/education-training/using-ppe/) (88)

- Welding Safety (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/quality-products/welding-safety/) (9)

- Wildfires (https://www.3m.com/blog/en_US/safety-now/category/science-of-safety/hazard-awareness/wildfires/) (2)

Tag Cloud

29 CFR 1926.1153 (https://www.3m.com/blog/en_US/safety-now/tag/29-cfr-1926-1153/)

asse2016 (https://www.3m.com/blog/en_US/safety-now/tag/asse2016/)    CBRN (https://www.3m.com/blog/en_US/safety-now/tag/cbrn/)

Chemical Exposure (https://www.3m.com/blog/en_US/safety-now/tag/chemical-exposure/)

Competent Person (https://www.3m.com/blog/en_US/safety-now/tag/competent-person/)

Confined space (https://www.3m.com/blog/en_US/safety-now/tag/confined-space/)

COVID-19 (https://www.3m.com/blog/en_US/safety-now/tag/covid-19/)

dropped object solutions (https://www.3m.com/blog/en_US/safety-now/tag/dropped-object-solutions/)

Emergency Responder (https://www.3m.com/blog/en_US/safety-now/tag/emergency-responder/)

firefighters (https://www.3m.com/blog/en_US/safety-now/tag/firefighters/)    Fit Testing (https://www.3m.com/blog/en_US/safety-now/tag/fit-testing/)

Have You Heard (https://www.3m.com/blog/en_US/safety-now/tag/have-you-heard-2/)

Hazard Cleanup (https://www.3m.com/blog/en_US/safety-now/tag/hazard-cleanup/)

hazard ppe (https://www.3m.com/blog/en_US/safety-now/tag/hazard-ppe/)

Hearing Conservation (https://www.3m.com/blog/en_US/safety-now/tag/hearing-conservation/)

Heat Stress (https://www.3m.com/blog/en_US/safety-now/tag/heat-stress/)

Hurricanes and Floods (https://www.3m.com/blog/en_US/safety-now/tag/hurricanes-and-floods/)

industrial hygiene (https://www.3m.com/blog/en_US/safety-now/tag/industrial-hygiene/)

Industrial Workforce Demographics (https://www.3m.com/blog/en_US/safety-now/tag/industrial-workforce-demographics/)

Internet of Things (https://www.3m.com/blog/en_US/safety-now/tag/internet-of-things/)

Leading Edge (https://www.3m.com/blog/en_US/safety-now/tag/leading-edge/)

Medical Marijuana (https://www.3m.com/blog/en_US/safety-now/tag/medical-marijuana/)

Military (https://www.3m.com/blog/en_US/safety-now/tag/military/)     N95 Day (https://www.3m.com/blog/en_US/safety-now/tag/n95-day/)

new professional award (https://www.3m.com/blog/en_US/safety-now/tag/new-professional-award/)

NIHL (https://www.3m.com/blog/en_US/safety-now/tag/nihl/)

Noise Induced Hearing Loss (https://www.3m.com/blog/en_US/safety-now/tag/noise-induced-hearing-loss/)

occupational health and safety (https://www.3m.com/blog/en_US/safety-now/tag/occupational-health-and-safety/)

Online Medical Evaluation (https://www.3m.com/blog/en_US/safety-now/tag/online-medical-evaluation/)

OSHA (https://www.3m.com/blog/en_US/safety-now/tag/osha/)     PAPR (https://www.3m.com/blog/en_US/safety-now/tag/papr/)

Product Testimonial (https://www.3m.com/blog/en_US/safety-now/tag/product-testimonial/)

respiratory protection (https://www.3m.com/blog/en_US/safety-now/tag/respiratory-protection/)

Respiratory Protection Program (https://www.3m.com/blog/en_US/safety-now/tag/respiratory-protection-program/)

Safety2016 (https://www.3m.com/blog/en_US/safety-now/tag/safety2016/)

Safety Management (https://www.3m.com/blog/en_US/safety-now/tag/safety-management/)

safety tech (https://www.3m.com/blog/en_US/safety-now/tag/safety-tech/)

Silica Hazard (https://www.3m.com/blog/en_US/safety-now/tag/silica-hazard/)

Stockpile Management (https://www.3m.com/blog/en_US/safety-now/tag/stockpile-management/)

Virtual Reality (https://www.3m.com/blog/en_US/safety-now/tag/virtual-reality/)     VR/AR (https://www.3m.com/blog/en_US/safety-now/tag/vr-ar/)

Wearable Sensors (https://www.3m.com/blog/en_US/safety-now/tag/wearable-sensors/)

Welding Fume (https://www.3m.com/blog/en_US/safety-now/tag/welding-fume/)

Welding Safety (https://www.3m.com/blog/en_US/safety-now/tag/welding-safety/)

Working at Heights (https://www.3m.com/blog/en_US/safety-now/tag/working-at-heights/)

3M (https://www.3m.com/)
Legal (https://www.3m.com/3M/en_US/company-us/legal-information/)    |    Privacy (https://www.3m.com/3M/en_US/company-us/privacy-policy/)    |    Your Privacy Choices
© 3M 2023. All Rights Reserved.                                                                      The brands listed above are trademarks of 3M.

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit L

Electronically Filed
FIRST CIRCUIT
1CC141000708
21-MAY-2024
12:06 PM
Dkt. 2039 FOF

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| STATE OF HAWAI'I, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL, | ) CIVIL NO. 1CC141000708 (JHA)<br>) (Other Non-Vehicle Tort)<br>) |
| Plaintiff, | ) |
| vs. | ) **FINDINGS OF FACT, CONCLUSIONS**<br>) **OF LAW, AND ORDER**<br>) |
| BRISTOL-MYERS SQUIBB COMPANY, SANOFI-AVENTIS U.S. LLC, SANOFI US SERVICES INC., formerly known as SANOFI-AVENTIS U.S. INC., SANOFI-SYNTHELABO INC., SANOFI S.A., and DOE DEFENDANTS 2 to 100, | ) <br>) <br>) <br>) <br>) Trial Date: September 25, 2023 –<br>) October 16, 2023 |
| Defendants. | ) Trial Judge: Honorable James H. Ashford<br>) <br>) <br>) |

## INTRODUCTION

This is a partial retrial of a civil enforcement action brought on behalf of and in the name of the State of Hawai'i by its Attorney General ("**State**" or "**Plaintiff**"), against Defendants Bristol-Myers Squibb Company ("**BMS**") and Sanofi Aventis U.S. LLC, Sanofi US Services Inc., formerly known as Sanofi-Aventis U.S. Inc., and Sanofi-Synthelabo Inc. (collectively "**Sanofi Defendants**," and, together with BMS, "**Defendants**"), under chapter 480, Hawai'i Revised Statutes ("**UDAP**"), Section 661-10, Hawai'i Revised Statutes, and other applicable Hawai'i law.[1]

The gravamen of the State's Second Amended Complaint is that Defendants marketed and sold their prescription antiplatelet medication, Plavix (generic name "**clopidogrel**"), in an unfair or deceptive manner, in violation of Hawai'i Revised Statutes ("**HRS**") Section 480-2 ("**HRS § 480-2**" or "**Section 480-2**") and other applicable Hawai'i law, by failing to warn Plavix patient-consumers and their prescribing physicians that Plavix had diminished or no effect for many patients, particularly those of East Asian and/or Pacific Island ancestry (hereinafter "**diminished response**" or "**resistance**"), due in part to the prevalence of genetic variants ("**polymorphisms**") in the patients' hepatic (liver) enzymes. The State asserts that Defendants engaged in these alleged unfair or deceptive acts or practices from the time Defendants first began selling Plavix in December 1998 (hereinafter "**launch**") until a boxed warning, also known colloquially as a black box warning, was added to the Plavix label at the insistence of the U.S. Food and Drug Administration ("**FDA**") sometime in or after March 2010.

---

[1] At one time, the Sanofi Defendants' French parent company, Sanofi S.A., was also a party to this action. However, it was dismissed as a party by agreement on February 14, 2020. [Dkt. No. 726]

1

In its Second Amended Complaint the State prayed for declaratory and injunctive relief, civil penalties, disgorgement of profits, punitive damages, attorneys' fees, costs of suit, and such other and further relief as the Court deems just in the premises. However, the State only sought penalties under HRS § 480-3.1 during this trial and expressly waived the other claims and remedies at closing argument.

This matter was originally tried before the Honorable Dean E. Ochiai (hereinafter **"original trial court"**) without a jury over a period of four weeks in October and November 2020. On February 15, 2021, the original trial court issued its Findings of Fact, Conclusions of Law, Decision and Order [Dkt. No. 1373], finding, in sum, that Defendants had acted both unfairly and deceptively toward Hawai'i consumers, in violation of Hawaii's UDAP statute, with respect to all retail and non-retail Plavix prescriptions filled and/or refilled between launch of the product in December 1998 and the March 2010 announcement that an FDA-mandated boxed warning would be added to the Plavix label.

The original trial court's unfairness and deceptiveness findings were based upon, among other things, Defendants' failure to investigate information in their possession regarding Plavix resistance, suppression of research, "burying their head in the sand" regarding the resistance issue, and failing to update their Plavix label to warn about the risk of Plavix resistance. Dkt. No. 1373 at 28 and 30-31.

The original trial court found that 834,012 prescriptions were filled or refilled during that period and that each of those fills or refills were violations of Hawaii's UDAP statute because the package insert (label) for each fill and refill omitted material information and was deceptive. *Id.* at 41-42. The original trial court determined that an appropriate per-prescription penalty for

each UDAP violation was $1,000, with half the amount allocated to BMS and half the amount allocated to the three Sanofi Defendants, jointly and severally. *Id.*

On appeal, the Supreme Court of Hawaiʻi affirmed in part and reversed in part the original trial court's judgment, remanding this case for a partial retrial. The Supreme Court affirmed the original trial court's judgment as to the State's unfairness claims, finding "defendant companies' conduct offended public policy" and Defendants "behaved in an 'immoral, unethical, oppressive, unscrupulous' manner." *State of Hawaiʻi ex rel. Shikada v. Bristol-Myers Squibb Co. ("Shikada"),* 152 Hawaiʻi 418, 447, 448, 526 P.3d 395, 424, 425 (2023). In so doing, the Supreme Court cited specific "findings [that] support the court's unfair acts decision," *Shikada,* 152 Hawaiʻi at 448, 526 P.3d at 425:

- Defendants "aimed to avoid their common law duty [to warn consumers when a drug's risks become apparent] by: suppressing research and continuously and repeatedly failing to further investigate the risks of reduced platelet inhibition in poor metabolizers" *Id.* at 447, 526 P.3d at 424.

- "the companies knew—from the moment Plavix launched—about the diminished effects of Plavix in non-White populations" and "the companies did not volunteer this information to the FDA." *Id.*

- "the companies avoided funding studies which could draw more attention to the variability of response, for instance, by rejecting a study on aspirin resistance because 'it could lead to a similar trial on [Plavix] resistance.'" *Id.*

- "[t]he companies' actions . . . set back the research into CYP2C19 by consciously, repeatedly, and actively avoiding the poor responder problem . . . to avoid 'negative marketing implications' for Plavix." *Id.*

- "the companies prioritized profits over patients: defendant companies 'buried their heads in the sand' about the problems with Plavix to protect the corporate bottom line." *Id.* at 448, 526 P.3d at 425.

- "the companies 'continued to deny' the issues surrounding poor response to the drug despite evidence to the contrary, giving the impression that no one had any reason to be alarmed" *Id.*

Independent and regardless of the original trial court's findings and the Supreme Court's findings, the Court also finds that the factual determinations stated in the above six bullet points were equally and independently supported by the evidence presented during the current retrial of this case and independently hereby finds these as facts.

However, the Supreme Court held that it was error for the original trial court to grant partial summary judgment regarding the materiality of the information Defendants omitted from their label, and this error impacted several different aspects of the original trial court's decision.[2] First, the Supreme Court concluded the premature materiality ruling denied Defendants a trial on two essential elements of Plaintiff's deception claim, materiality and tendency to mislead, thereby requiring a new trial on the State's deceptive practices claim. *Shikada,* 152 Hawai'i 443, 526 P.3d 420. Second, the Supreme Court also vacated the original calculation of penalties because the original trial court heavily relied "on its materiality ruling to reach its penalties determination." *Id.* After remand, the case was assigned to this Court.

This Court commenced trial on Monday, September 25, 2023, and concluded on Monday, October 16, 2023. As set forth in detail below, the Court finds in favor of the State and against Defendants for the relief set forth herein. Having considered all of the evidence submitted at trial, the credibility of each witness who testified—as well as the foundation for each witness's

---

[2] The Supreme Court also overturned the original trial court's conclusion that Defendants caused substantial injury under UDAP's unfairness prong because that determination was also influenced by the premature materiality ruling. *Id.* at 444, 526 P.3d at 421. However, because the unfair practices holding was supported on other, independent grounds, the Supreme Court affirmed the unfairness liability judgment. *Id.* at 445-48, 526 P.3d at 422-26. The Supreme Court stated, therefore, that on remand, "there will be no second trial on the unfair acts or practices claim." *Id.* at 423, 526 P.3d 400.

testimony and the foundation for all evidence received—and being fully informed, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.     Plavix, whose generic name is clopidogrel bisulfate (hereinafter "**Plavix**" or "**clopidogrel**"), is an oral antiplatelet medication in tablet form. P0409 at 16 [Plavix 1997 label].[3] "**Platelets**" are cells that circulate in the bloodstream and bind together—aggregate—to form clots when a blood vessel is damaged. Antiplatelet medications are designed to inhibit the aggregation of platelets when the formation of clots is undesirable, for example when a patient has recently suffered a heart attack or stroke and is at risk of another adverse event if the formation of clots is not prevented.

2.     The formation of clots in the blood vessel of a patient who has recently suffered a heart attack or stroke, or who suffers from other cardiovascular conditions such as peripheral artery disease ("**PAD**"), can have catastrophic, and often fatal, consequences. This is especially true for patients who have had metal stents placed in their arteries for the purpose of revascularization, via a procedure called "**percutaneous coronary intervention**," or "**PCI**," in which clots can both form and cause fatal blockages. The purpose of antiplatelet medications like Plavix is to reduce the risk of such recurrent adverse events by inhibiting platelet aggregation.

3.     Plavix was developed, manufactured, and placed into the prescription drug marketplace by BMS and Sanofi Defendants. P0409 at 16 [Plavix 1997 label].

4.     Plavix is what is known as a prodrug. Unlike most medications, which are active when ingested, a prodrug must be activated by the patient's body, usually by enzymes in the

---

[3] In this document, Plaintiff's trial exhibits are identified as "P_____." Defendants' Exhibits are identified as D_____."

5

patient's liver ("**hepatic enzymes**"), but sometimes by enzymes elsewhere in the patient's body or other mechanisms of action.[4] If, for any reason, the patient's body fails to bioactivate the prodrug,[5] it is effectively a placebo and remains inert within the body until it is eliminated, in which case the patient receives none of the risk reduction or other benefit intended. If the patient's body only partially activates the prodrug, the patient may, to a greater or lesser degree, receive only partial benefit or risk reduction, which may be insufficient to prevent an adverse event.

5. Plavix is a prescription drug, and like all prescription drugs its marketing, sale, and prescription are subject to regulation by the FDA. The FDA determines the approved uses (indications) to which a prescription drug may be used, and under what circumstances it may be prescribed. The FDA also issues regulations that impose various obligations on a drug manufacturer regarding labeling and marketing of a drug, as well as post-market surveillance of a drug to detect new or more serious problems with the drug than were detected during the clinical and preclinical trials leading up to FDA approval.

6. In order to obtain FDA approval of a new drug, a manufacturer or other sponsor must file a New Drug Application and subject the drug to a series of preclinical and clinical trials. Preclinical trials involve study of the drug *in vitro* or in animals. Clinical trials involve study of the drug in humans. Clinical trials ordinarily consist of three phases: (a) Phase I, a study of the drug in a relatively small group of healthy volunteers or patients with the

---

[4] An enzyme is a substance, almost always a protein, which acts as a catalyst in living organisms, regulating the speed of biological reactions.

[5] When used herein, terms such as "**bioactivate**" and "**bioactivation**" mean the conversion of a prodrug to its active metabolite in order for the prodrug to produce its intended effect.

disease/condition over a period of several months in order to determine the appropriate dosage for the drug, how it should be given, and how it affects the body; (b) Phase II, a study of up to several hundred patients with the disease/condition over a period of several months to two years in order to evaluate the drug's efficacy and side effects; and (c) Phase III clinical studies, which are often referred to as pivotal clinical studies because they are the studies upon which the FDA bases its final determination of whether the drug is safe and effective for human use and for the indication that will be on the drug's label. Phase III studies are large, usually thousands of patients, and are complex and expensive to perform. 21 CFR 312.21.

7.     The Phase III trial for Plavix involved a combined head-to-head comparison of Plavix to aspirin for the treatment of three different cardiovascular conditions, myocardial infarction ("**heart attack**"), ischemic stroke, and PAD.  The trial is known by the acronym "**CAPRIE**" (Clopidogrel versus Aspirin in Patients at Risk of Ischemic Events). P0551 [CAPRIE Final Study Report – Internal].

8.     In CAPRIE, Plavix was compared to aspirin because aspirin is also an antiplatelet medication. *Id.*  Aspirin has proven effective in reducing cardiovascular events in patients with a recent heart attack or stroke.  From 1997 and on, aspirin was considered the standard of care antiplatelet agent for prevention of arterial thromboses. D1735 at 12 [CAPRIE Protocol].

9.     The results of the CAPRIE study showed Plavix had only a marginal overall benefit over aspirin across the three cardiovascular conditions studied. P0551 at PLAV_SAN_01648982 [CAPRIE Final Study Report – Internal].[6]  For patients who enrolled in the trial on the sole basis of a recent heart attack, Plavix was numerically inferior to aspirin.  The

---

[6] *See, also,* P0472 at bates ending 990 [Blumenthal email, 2007] ("[E]ven in CAPRIE (essentially the only trial of [clopidogrel] vs. [aspirin]), the benefit of [clopidogrel] over [aspirin] is marginal at best . . .")

CAPRIE study showed a significant relative risk reduction for study participants with PAD (23.7%), but the risk reduction was less significant for study participants who had suffered a recent stroke (7.3%) and was actually less significant than aspirin for those who had recently suffered a heart attack (-4.0%). *Id.* at PLAV_SAN_01648999. As a result, Plavix was not approved for the primary prevention of a heart attack, stroke, and/or PAD and was instead approved only for the secondary treatment of patients who had already suffered a heart attack or stroke or who had previously been diagnosed with PAD. P0409 at 7 [Plavix 1997 label]. This approval was issued on November 17, 1997. *Id.*

10.     When Defendants were seeking approval to conduct the CAPRIE clinical trial they made a commitment to the FDA to study the effects of race during the trial. P0021 at PLAV_SAN_01648849 [9/5/91 Letter from FDA]. Yet, when the study was conducted Defendants included only 5% non-Caucasians. P0551 at PLAV_SAN_01648972 [CAPRIE Final Study Report – Internal]. Nevertheless, as relevant here, the CAPRIE trial did detect a statistically significant disparity in the number of adverse events suffered by non-white racial groups. *Id.* at PLAV_SAN_01649007 ("There was a significant interaction between treatment and race (p=0.006), The event rate was higher for clopidogrel in Black patients, Oriental patients, and patients of 'Other' race...."). Dr. Dominique Roome, a former practicing and medication prescribing physician and a former employee of Sanofi, testified that this finding raised a red flag that required further investigation. The Court agrees and so finds.

11.     This racial disparity in the response to Plavix was contained in Defendants' January 13, 1997 *internal* report of the CAPRIE study (hereinafter "**CAPRIE Report**"). *Id.*. However, the medical article about the results of that internal trial that was released by Defendants' Plavix Steering Committee for publication to the broader medical community

8

(hereinafter "**CAPRIE Article**") omitted any mention of this statistically significant racial disparity. D1078 [CAPRIE Published Article]. As a result, outside scientific researchers were denied this important information, which likely impeded the evolution of the science in this area.

12.     In February of 1997, Defendants completed an internal report, "**MIH0012,**" which revealed that three Cytochrome P450 genes were principally involved in the metabolism of Plavix within the body, specifically the isoforms CYP2B6, CYP2C19 and CYP3A4, but others – CYP1A2, CYP2C9 and CYP2E1 – might possibly be involved. P0225 at PLAV_BMS_0063805 [MIH0012 Internal Study Report].

13.     In March of 1998, after FDA approval but prior to Plavix's launch into the commercial market, Defendants completed a meta-analysis of internal data regarding Plavix (hereinafter "**1998 Meta-Analysis**"). P0037 [1998 Meta-Analysis]. The 1998 Meta-Analysis found that almost one-third of Plavix patients (32.2%) had less than 20% response to the drug and 3.4% did not respond to any pharmacological tests used (collectively hereinafter "**poor responders**"). *Id.* at PLAV_SAN_01569368.

14.     This 1998 Meta-Analysis—and its findings that Plavix had a poor responder problem—was not shared with the FDA until 2005 (seven full years after the conclusions were known to Defendants), in which the information was given within hundreds of pages into an appendix of another document. Even when the information was eventually disclosed to the FDA, it was buried in a large volume of other documents in order to obscure the lengthy delay in its disclosure, as well as its findings.

15.     In November of 1998, Defendants completed an internal report, "**MIV0265,**" which confirmed the results of MIH0012 that CYP2C19 was one of the enzymes principally

involved in the metabolism of Plavix within the body. P0226 at PLAV_PP_BMS00110067, PLAV_PP_BMS00110083 [MIV0265 Internal Study Report].

16.     Defendants launched the sale of Plavix to the public in December 1998.

17.     In their attorney's opening statement, Defendants asserted that at the time of launch they did not know precisely how Plavix acted within the body to create its antiplatelet effect, i.e., the inhibition of platelet aggregation. They argued that science evolves, and therefore their failure to include information they did not know cannot be unfair or deceptive. However, several of Defendants' witnesses (i.e., Dr. John Kao, Tony Hebden, and Brian Gavin) conceded, and the Court finds, that science only evolves if you do the research. Court's Exhibit F (10/11/18) at 38:11-39:4 [Gavin]; Court's Exhibit C at 159:15-160:19 [Hebden].

18.     In addition to the results of the 1998 Meta Analysis, Defendants knew at least the following at the time of launch:

a)      Plavix is a prodrug (P0225 [MIH0012 Internal Study Report]);

b)      Plavix is bioactivated by enzymes in the patient's liver (*id.*);

c)      the enzymes necessary to activate a prodrug are often produced by a gene group known as Cytochrome P450 (each one of which is identified by an alphanumeric designation beginning with CYP) (*id.*);

d)      per Defendants' internal reports, CYP2C19 and CYP3A4 were two of the Cytochrome P450 genes principally involved in the metabolism of Plavix within the body (*id.*; P0226 [MIV0265 Internal Study Report]);

e)      CYP2C19 is and was known to be genetically polymorphic, i.e., it had several different variant forms, some of which might potentially be able to

activate a prodrug and some of which might not (P0444 [De Morais, 1994]; P0264 [De Morais,1994]);[7]

f)      CYP3A4 is not polymorphic with respect to the activation of Plavix;

g)      in other drugs known to be metabolized by CYP2C19, the polymorphisms of CYP2C19 had been shown to be less effective or to have no effect in activating the drug (P0444 [De Morais, 1994]; P0264 [De Morais, 1994]);

h)      more than four years before the launch of Plavix, CYP2C19 polymorphisms were shown to interfere with the metabolization of drugs, for example in an anticonvulsant prodrug named S-mephenytoin (P0444 [De Morais, 1994]; P0264 [De Morais, 1994]);

i)      the team of researchers who demonstrated the adverse effect of CYP2C19 polymorphisms on the metabolism of S-mephenytoin (hereinafter **"de Morais Team"**) developed a simple PCR-based laboratory test to identify the CYP2C19 gene and its genetic polymorphisms (P0444 [De Morais, 1994]; P0264 [De Morais, 1994]);

j)      in the published article regarding their study, the de Morais Team explained how to conduct their CYP2C19 PCR-based genetic test in a clinical setting, concluding the PCR-based genetic test for the defective CYP2C19 allele: "will be useful in clinical studies investigating the importance of this genetic defect in drug metabolism in humans." (D1098, at 4 [De Morais, 1994]);

---

[7] Where a gene has several different variations that are common enough not to be considered mutations, each of the variations is referred to as an **"allele"**. Alleles that are unable to activate a prodrug are commonly referred to as **"loss-of-function"** alleles.

k)   the CYP2C19 polymorphisms that were shown to have an impaired effect

on the metabolization of S-mephenytoin (loss-of-function alleles) were

known to be significantly more prevalent in East Asians than in other

major races by as much as five-fold (P0444 [De Morais, 1994]; P0264 [De

Morais, 1994]);

l)   every individual has two CYP2C19 genes, one from each parent, both of

which may be normal or one or both of which may be mutations

(abnormalities) or alleles (normal genetic variations);

m)   in two additional studies conducted by de Morais, CYP2C19

polymorphisms accounted for 100% of Japanese subjects who were "**poor**

**metabolizers**," i.e., who could not properly metabolize the drug (S-

mephenytoin) (P0264 [De Morais, 1994]) and 100% of Chinese subjects

(P0305 [De Morais, 1995]);

n)   there was a group of poor responders to Plavix (P0037 [1998 Meta-

Analysis]); and

o)   Plavix patients who are poor responders, and therefore do not receive the

intended antiplatelet effect, are likely at a higher risk of a recurrent heart

attack or stroke than those who are not poor responders.

19.   The lack of a uniform patient response to Plavix of the kind that was revealed by

the 1998 Meta-Analysis was first called "**Plavix resistance**."[8]  Given the potential severity of the

_____

[8] The concept of Plavix resistance has been renamed—by Defendants—over the years a number
of times for marketing purposes to terms such as Variability of Response ("**VOR**") and
Variability of Platelet Response ("**VPR**"). *See e.g.*, P0610 at PLAV_BMS_00559949 [LCM/DC
Achievements in 2003]; P0430 at PLAV_BMS_00608286 [2005 Competitive Workstream

cardiovascular conditions Plavix was intended to guard against, the discovery that this drug was not working as intended for almost one-third of patients was a matter that would be of great concern to patients and physicians and should have been of great concern to Defendants. Indeed, prior to launch, Defendants' MIH0012 emphasized it was "important [to] identify[] potential interindividual differences in metabolism and/or clearance due to genetic polymorphism." P0225 at PLAV_BMS_00663794 [MIH0012 Internal Study Report]. Defendants further noted that "[t]he use of *in vitro* methods has been recommended to investigate these issues[.]" *Id.* Further, Defendants' witness, Brian Gavin, testified that during the early years of Plavix's sales, Defendants knew that "if one of the redundant pathways was affected, that might have an impact on the generation of the active metabolite." Court's Exhibit F, 02/03/23 at 49:20-50:15 [Gavin].

20.     Despite this acknowledgement and Defendants' awareness that: (1) they did not know precisely how Plavix was bioactivated; (2) CYP2C19 played a primary role in the bioactivation of Plavix; (3) CYP2C19 was genetically polymorphic and its polymorphic nature prevented the activation of other drugs; (4) CYP3A4 did not have a known loss-of-function genetic polymorphism that impaired patients' metabolism and pharmacodynamic responses to drugs; (5) Defendants' own 1998 Meta-Analysis showed that as many as 32.2% percent of test subjects received less than 20% of Plavix's antiplatelet effect and 3.4% received no benefit at all; (6) the CAPRIE clinical trial had shown a statistically significant difference in the effectiveness of Plavix for Caucasians versus those of other races; and (7) the various de Morais studies prior to the Plavix launch indicated that CYP2C19 polymorphisms were found to be a 100% predictor of poor metabolizers (for S-mephenytoin), Defendants did not bring this information to the

---

Meeting Notes]. Plavix resistance also encompasses the concepts of poor metabolism and poor response. These terms may be used interchangeably throughout these findings and conclusions.

13

FDA's or the public's attention, or actively conduct research in an effort to understand the problem and correct it; nor did Defendants try to warn the public or the FDA about the risks associated with Plavix resistance. Instead, Defendants, through their conduct and words over many years, clearly showed that their unmistakable intent was to not conduct or sponsor any research that could confirm the existence or causes of Plavix resistance.

21.    One of the State's medical and regulatory experts, Dr. Laura M. Plunkett ("**Dr. Plunkett**"), presented testimony that Defendants were obligated to update their label to include a warning or precaution concerning the risk to poor metabolizers based on information brought to light by Defendants' 1998 Meta-Analysis, coupled with Defendants' knowledge that CYP2C19 was one of three principal enzymes involved in the metabolism of Plavix. Dr. Plunkett also testified that drug companies should be the primary entity investigating potential problems with their own drugs to ensure their label contains all the warnings and information necessary for the safe and effective use of Plavix. The Court agrees with Dr. Plunkett with respect to the two preceding sentences and so finds. Dr. Plunkett's testimony is consistent with the words of the Supreme Court of Hawai'i, which held: "Pharmaceutical companies have a common law duty to warn consumers 'when the risks of a particular drug become apparent.'" *Shikada*, 152 Hawai'i at 447, 526 P.3d at 424, quoting *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1677 (2019). Dr. Plunkett's regulatory and pharmacological opinions went unrebutted at trial, as Defendants presented no counter expert on either topic.

22.    Instead of investigating the diminished response to Plavix observed in a significant percentage of the patient population, a limitation known to Defendants at the time of launch, and despite their knowledge that CYP2C19 was one of three principal enzymes involved in the metabolism of Plavix and was polymorphic, Defendants instituted a policy of

14

systematically opposing any research into Plavix resistance or related issues. Spanning the entire relevant time period, Defendants' internal records repeatedly demonstrate an intent to avoid pursuing these issues. In many instances, Defendants' internal statements reflecting an unwillingness to support Plavix-related research were tied to concerns about the potential impact of adverse clinical trial results on sales of the drug.

23.     Broadly speaking, the Court finds Defendants' internal emails that were authored long before this lawsuit was filed to be far more telling and probative than much of the trial testimony offered by Defendants' past and current employees. Additionally, the Court finds Defendants' past and present employees to often have little credibility on the facts and issues most important in this case. As a broad generalization, the Court was repeatedly unfavorably impressed with the avoidance and obfuscation by Defendants' past and present employees' testimony at trial. The Court's findings of fact are informed to a large degree by the sentiments expressed in this paragraph.

24.     The State's medical experts, Dr. Plunkett and Dr. Paul A. Gurbel ("**Dr. Gurbel**"), testified at trial (and the Court finds) that at the time of launch, Defendants possessed the means to study the correlation between CYP2C19 polymorphisms and Plavix resistance, as well as the correlation between CYP2C19 polymorphisms and clinical outcomes (i.e., heart attacks, strokes, and cardiovascular death).

25.     During trial, Defendants attempted to justify and defend their inaction and suppression of studies. The Court is not persuaded by Defendants' efforts.

26.     Defendants' representatives testified and argued that they did not investigate the impact of CYP2C19 polymorphisms on Plavix Variability of Response because they believed at the time of launch and for many years afterward that the "**primary metabolic pathway**," i.e., the

15

primary means by which a patient's body produced Plavix's active metabolite, was by way of hepatic enzymes produced by the CYP3A4 gene.

27.    In evaluating Defendants' claim that they did not discover the cause of the poor response by non-Caucasians reflected in the CAPRIE study or the diminished response for 32% of subjects reflected in Defendants' Meta-Analysis, the Court finds much more persuasive the words and actions reflected in Defendants' corporate records and testimony, which prove that Defendants were aware of the risks associated with Plavix resistance from the moment Plavix launched and that Defendants had a clear intent to avoid any studies that might unearth negative information about Plavix.

28.    For example, in May of 2000, BMS's medical director (Mel Blumenthal) proposed supporting a clinical trial to examine response to the drug in "blacks vs. whites" and noted "such a trial would be small, easy to do, and could be done well in time." P0603 at PLAV_JPP_BMS01136522 [Bouthier Email Chain May 2000]. However, Dr. Blumenthal's counterparts at Sanofi quickly admonished him that such a trial "always run[s] the risk to show a difference . . . and then we are really in trouble." *Id.* Sanofi further warned that such a study "could bear significant risk." *Id.* Dr. Roome agreed in her testimony that, based on the CAPRIE study showing a statistically significant difference in race, Defendants needed to further investigate the issue. When asked whether the distinction in responsiveness between Blacks vs. Whites was ever studied, Dr. Roome admitted that Defendants did not do any such study.

29.    Further, Defendants internally noted they "had difficulty mobilizing the LCM (**Life Cycle Management Committee**) to address the importance of understanding Plavix resistance through [their] data and proactive research." P0566 at PLAV_JPP_BMS00805251 [Reddick Email June 10, 2003]. This statement of policy was particularly significant considering

Defendants' earlier observation in the CAPRIE Report of "a statistically significant interaction between treatment and race." [9] P0551 [CAPRIE Final Study Report - Internal].

30.    Defendants' current and former employees testified at trial that the LCM's dismissal of studies was not the end of the analysis because the real studies were being done at the corporate level. However, Defendants' documents betray those assertions. While strategizing to obtain a commercial advantage over a competitor's drug, Defendants noted in an internal planning memo that "[a]dditional studies needed; can be small trials to help us to 'shape the debate." P0430 at PLAV_BMS_00608286 [2005 Competitive Workstream Meeting Notes]. As such, the claim that local studies were somehow less valuable than corporate studies is undermined by Defendants' own words. Further, the Court finds there were no studies at the corporate level or at any level that adequately studied the issues of Plavix resistance or the people affected by it.

31.    In June 2001, the LCM discussed a proposed study on aspirin resistance, but ultimately rejected it because "it could lead to a similar trial on [Plavix] resistance." P0607 at

---

[9] At trial, Defendants introduced testimony of current and former executives that the Life Cycle Management Committee exercised decision-making authority only over "local studies," which were characterized as small studies to be conducted within a particular country. Defendants asserted that larger, more significant studies were addressed at the corporate level. However, Defendants produced no persuasive corporate-level documents confirming the otherwise self-serving testimony of its executives that proposals for any large-scale, appropriately powered studies were being considered or approved for the purpose of determining the impact, if any, of a patient's race on their responsiveness to Plavix, and, if such an impact was found, whether genetic polymorphisms were the cause. Significantly, the State's medical/clinical research expert Dr. Gurbel explained persuasively that the larger studies that Defendants did conduct or sponsor were not designed or powered to resolve the Plavix resistance issue, or the role of CYP2C19 in the bioactivation process, or the impact of race on Plavix resistance. Additionally, all of the corporate studies Defendants identified during trial as representing their efforts to study these issues, were identified contemporaneously by Defendants themselves as failing to be "adequately sized to detect difference in outcome in poor metabolizers." P0835 at PLAV_JPP_BMS00686475 [Stanton Email April 14, 2010].

PLAV_PP_BMS00419339 [LCM/DC Minutes June 21, 2001]. In 2002, the LCM continued to reject any studies regarding aspirin because they "could lead to the same questions about [Plavix]," they "could open the door to '[Plavix] non-responders,'" and because there was "no commercial interest" in such studies. P0608 at PLAV_PP_BMS00509530, -581 [LCM/DC Achievements in 2002].

32.     Later that year, BMS's medical director acknowledged internally that "Sanofi has generally been 'down' on suggestions to study [aspirin] resistance because they are afraid that '[Plavix] resistance is right around the corner." P0562 [Ogletree Email October 19, 2002]. As one of his colleagues noted, "in my opinion, [Sanofi's]/our reluctance to go down the path toward documentation of [Plavix] resistance is understandable, but it will catch up with us and perhaps be an unpleasant and costly surprise when others document it without asking our permission to do so." *Id.* This statement was part of a pattern to conceal, and avoid documenting, facts available to Defendants but unknown to the public, the FDA, or the scientific community.

33.     In 2002, a study conducted by researchers not affiliated with Defendants, Järemo et al., was published that reflected resistance to Plavix among 28% of the patient population. P0259 [Järemo, 2002].

34.     In 2003, several important studies were published. One study was conducted by the State's medical/clinical research expert, Dr. Gurbel, which found "[t]here was marked interindividual variability in drug response" in upwards of 31% of the patient population." P0255 [Gurbel, 2003]. At the time, Defendants praised Dr. Gurbel as important and brilliant. And for many years thereafter, Defendants considered him "the [world-wide] expert on VPR." P0583 [Roome Email July 13, 2006].

18

35.     Subsequent studies published that year confirmed Dr. Gurbel's findings. Nevertheless, Defendants' internal records noted they "remain[ed] adverse to doing any further research on either aspirin—or [Plavix]—resistance because of the potential negative marketing implications." P0569 [Gavin Email Chain June 11, 2003]. This caused one of BMS's employees to observe that he "had difficulty mobilizing the LCM to address the importance of understanding Plavix resistance through our data and proactive research", and another employee to note that "[t]here doesn't appear to be a high sense of urgency around this on their [Sanofi's] side." P0567 [Yost Email Chain June 11, 2003]

36.     In 2004, Defendants continued rejecting clinical trials and made it a blanket policy that "any studies based on clopidogrel resistance hypothesis" were trials that "can not [sic] be done" (P0030 at PLAV_PP_BMS00279637 [Local Trials Implementation Guide]), despite their own determination that it was logical to conclude the variability in response had clinical consequence.

37.     At a November 2005 meeting at the American Heart Association, Defendants' records indicate that one Key Opinion Leader stated that Plavix resistance "is a real phenomenon," however "BMS is putting out anything they can to say it doesn't exist."[10] P0429 at PLAV_JPP_BMS01464236 [AHA Summary, 2005].

38.     In June of 2006, a clinical study conducted by researchers not affiliated with Defendants confirmed a clear association between genetic polymorphisms in patient CYP2C19 liver enzymes and Plavix variability of response, sometimes referred to as VOR. D1194 [Hulot 2006]. Though it was already established that these CYP2C19 polymorphisms were more

---

[10] A **Key Opinion Leader**" or **"KOL"** is an expert, typically a physician, with whom the drug companies work. Court's Exhibit F, at 66:08-66:19 [Gavin]. KOLs are individuals that give advice to the company and who speak on behalf of the company about a specific product. *Id.*

prevalent among certain Asian populations, Defendants took no action to update Plavix's label to inform prescribing physicians and patients about Plavix resistance.

39. That same month, during a Breakout Session of an Anti-Platelet Therapy Working Group, a group of Key Opinion Leaders told Defendants that they had their "head in the sand about . . . clinical resistance." P0082 at PLAV_JPP_BMS004481032 [2006 Anti-Platelet Therapy Working Group].

40. Throughout the first decade that Plavix was on the market, Defendants repeatedly tried to position Plavix in the marketplace as superior to aspirin and other antiplatelet medications, particularly with respect to recent heart attacks. Likewise, at trial Defendants tried to argue, and their past and present employees testified, that there were no available alternatives to Plavix for treatment of recent heart attacks. However, from even before Plavix's launch, and continuing through at least 2007, the FDA's Division of Drug Marketing, Advertising, and Communications ("**DDMAC**"), the division within the FDA responsible for evaluating the truthfulness of a drug manufacturer's marketing campaigns, repeatedly advised Defendants they could not state or imply that Plavix was superior to aspirin or other antiplatelet medieations because the scientifie research did not support such a claim. P0115, P0116, P0125, P0127 [DDMAC Letters 1999, 2001, 2005, 2007]. For this reason, the FDA repeatedly told Defendants that such claims were, in the FDA's own words, misleading. P0115, P0116, P0125, P0127 [DDMAC Letters 1999, 2001, 2005, 2007]. This oecurred with respect to both marketing materials that Defendants submitted to the FDA for prior approval and marketing materials the FDA learned were already in circulation through its routine surveillance program. P0115, P0116, P0125, P0127 [DDMAC Letters, 1999, 2001, 2005, 2007]. Thus, the FDA repeatedly told

Defendants, over at least the first nine years of Plavix's life cycle, that it was misleading to claim Plavix was superior to aspirin.

41. Although the State has not asserted claims regarding Defendants' promotional materials for Plavix, these documents undermine Defendants' claims that Plavix was a wonder drug with no alternative courses of treatment. The FDA expressly said Plavix is not superior to aspirin. *See, e.g.,* P0115 at PLAV_SAN_01455747 [DDMAC Letter 1999] ("DDMAC stated that we considered this claim and similar claims to be misleading because . . . they imply superior efficacy of Plavix over aspirin, when such has not been demonstrated by substantial evidence"). As such, aspirin was an alternative that was just as effective as Plavix when they were used as monotherapy.

42. Over the years, despite Defendants' efforts to suppress studies about Plavix's diminished response, independent investigators began to develop a body of research regarding diminished response and its relation to CYP2C19, race, and clinical outcomes.

43. Beginning in 2006 and throughout 2007 and 2008, a number of important studies indicated that CYP2C19 polymorphisms were responsible for poor patient responsiveness to Plavix.[11] In late 2008, and continuing throughout 2009, additional studies established that

---

[11] *See* P0211 [Hulot, 2006] ("Cytochrome P450 2C19 loss-of-function polymorphism is a major determinant of clopidogrel responsiveness in healthy subjects."); P0314 [Brandt, 2006] ("Common polymorphisms of CYP2C19 and CYP2C9 affect the pharmacokinetic and pharmacodynamic response to clopidogrel but not prasugrel"); P0323 at [Giusti, 2007] ("Cytochrome P450 2C19 loss-of-function polymorphism, but not CYP3A4 IVS10 + 12G/A and P2Y12 T744C polymorphisms, is associated with response variability to dual antiplatelet treatment in high-risk vascular patients."); P0274 [Fontana, 2008] ("Biological effect of increased maintenance dose of clopidogrel in cardiovascular outpatients and influence of cytochrome *P450* 2C19*2 allele on clopidogrel responsiveness").

CYP2C19-based poor responsiveness to Plavix led to an increased risk of cardiac events (i.e., clinical outcomes) when compared to patients who were normal responders.[12]

44.     Defendants attempted at trial to show they were performing studies from 2006 and onward regarding resistance and CYP2C19. However, the State showed, and the Court finds, that none of these studies were adequately powered or designed to show any sort of link between Plavix resistance and clinical outcomes. Instead, Defendants designed studies or did retrospective analyses on study populations that would not endanger the safety profile of their drug. *See* P0030, at PLAV_PP_BMS00279638 [Local Studies Strategy Guide] ("trials that cannot be done . . . any study based on safety (clinical or biological) only"); P0584 at PLAV_PP_SAN00498959 [Clopidogrel Investigator-Initiated Trials – 2005 Guidelines and Strategies] ("No studies should be submitted that might jeopardize the current hypothesis and existing data on clopidogrel's mechanism of action...").

45.     For example, the CHARISMA genetic sub-study was completed purportedly to examine whether CYP2C19 status affects outcomes. P0231 [Bhatt, 2012]. However, CHARISMA was a negative trial, meaning the underlying trial showed no benefit to users who took Plavix. Therefore, an analysis under CHARISMA was very unlikely to show any difference between CYP2C19 poor metabolizers and normal metabolizers. From even before the genetic

---

[12] *See* P0294 [Mega, 2008] ("Conclusion: Among persons treated with clopidogrel, carriers of a reduced-function CYP2C19 allele had . . . a higher rate of major adverse cardiovascular events, including stent thrombosis, than did noncarriers."); P0295 [Simon, 2009] ("Conclusion: Among patients with acute myocardial infarction who were receiving clopidogrel, those carrying CYP2C19 loss-of-function alleles had a higher rate of subsequent cardiovascular events than those who were not.").

study was designed[13] to after the analysis was completed, employees and investigators recognized repeatedly that this study was not adequately powered to detect a correlation between poor metabolizers and outcomes.[14] Based on the above, the Court finds Defendants' attempt to present the CHARISMA genetic-sub study as evidence of a lack of correlation between CYP2C19 loss-of-function alleles and outcomes to be unpersuasive.

46.     A study conducted by researchers not associated with Defendants was published in the New England Journal of Medicine which found that, "[a]mong persons treated with clopidogrel, carriers of a reduced-function CYP2C19 allele had significantly lower levels of the active metabolite of clopidogrel, diminished platelet inhibition, and a higher rate of major adverse cardiovascular events, including stent thrombosis, than did noncarriers." P0294 at 354 [Mega, 2008] (emphasis added) (hereinafter "**Mega Study**"). The results of this study, in conjunction with the omeprazole issue, prompted the FDA to insist on the addition of language to the Plavix label explaining the CYP2C19 poor metabolizer phenomenon and noting the availability of genetic testing.

47.     When the FDA continued to insist on the inclusion of VOR-related information in Plavix's label, Defendants sought help from their stable of Key Opinion Leaders, hoping to push back against the FDA's insistence. In an internal email following such an effort, one employee informed his colleagues that their KOLs would provide no such support, stating:

> I have to tell you that I have had in depth 1:1's with about 6 senior KOLs since I have been at [the American College of Cardiology] and the mood is very negative toward us (people like Dr Topol,

---

[13] D2156 at –PLAV_BMS_00608077 [June 2006 Contact Report with Dr. Topol].

[14] P0726 at -PLAV_HIAG_SAN00247508 [2009 Analysis Plan for CHARISMA Genetic Substudy] ("[I]t would be inappropriate to extrapolate any potential absence of genotype effect found in this population to any population in which clopidogrel has a demonstrated benefit."); P0835 at PLAV_JPP_BMS00686475 [Stanton Email April 14, 2010].

> Gurbel, Eikelboom, Fox are all saying that *they have been telling us this for years and we chose to ignore them and bury our head in the sand and so they feel no sympathy toward our current situation!*). Therefore, my concern is that we cannot look to KOL support should the FDA follow through.

P0533 [Hebden Email March 31, 2009] (Emphasis added).

48. The Court finds it significant that none of Defendants' Key Opinion Leaders regarding Plavix testified on Defendants' behalf at trial.

49. In May 2009, the FDA required Defendants to add information to the Plavix label regarding CYP2C19 and Plavix resistance. Court's Exhibit C, at 155:15-208:14 [Hebden]; *see also* P0535 [Hebden Email December 2008]; P0536 [Medical Review Group Chair Meeting notes]; P0540 [Response Letter to FDA Strategic Decision Discussions March 2009]; P0541 [Additional Draft of Response Letter March 2009]; P0410 [May 2009 Plavix Label].

50. This information was included in the Pharmacogenetics section of the Plavix label. But very shortly thereafter, in March of 2010, the FDA took the additional step of requiring Defendants to place this information in a black box warning, and to move information regarding this issue to the Warnings and Precautions section of the label. Court's Exhibit J, at 428:25-429:15 [Emison]; *see also* P0411 [March 2010 Plavix Label].

51. Defendants asserted that a November 2009 label included warning information before the 2010 black box warning was mandated. However, Dr. Plunkett testified, and the Court finds, that consistent with all the documents in this case, there is no evidence the November 2009 label referenced by Defendants in their questioning was ever published to patients or doctors.

52. Under FDA regulations, a boxed warning is a section of the drug label reserved for serious warnings, particularly regarding risks that may lead to death or serious injury. 21 CFR 201.57(c)(1).

53.    The 2010 boxed warning stated the following:

---

**WARNING: DIMINISHED EFFECTIVENESS IN POOR METABOLIZERS**

The effectiveness of Plavix is dependent on its activation to an active metabolite by the cytochrome P450 (CYP) system, principally CYP2C19 *[see Warnings and Precautions (5.1)]*. Plavix at recommended doses forms less of that metabolite and has a smaller effect on platelet function in patients who are CYP2C19 poor metabolizers. Poor metabolizers with acute coronary syndrome or undergoing percutaneous coronary intervention treated with Plavix at recommended doses exhibit higher cardiovascular event rates than do patients with normal CYP2C19 function. Tests are available to identify a patient's CYP2C19 genotype; these tests can be used as an aid in determining therapeutic strategy *[see Clinical Pharmacology (12.5)]*. Consider alternative treatment or treatment strategies in patients identified as CYP2C19 poor metabolizers. *[see Dosage and Administration (2.3)]*.

---

P0411 [March 2010 Plavix Label] (Emphasis in original).

54.    In 2016, the boxed warning was modified to state the following:

---

**WARNING: DIMINISHED ANTIPLATELET EFFECT IN PATIENTS WITH TWO LOSS-OF-FUNCTION ALLELES OF THE CYP2C19 GENE**

The effectiveness of Plavix results from its antiplatelet activity, which is dependent on its conversion to an active metabolite by the cytochrome P450 (CYP) system, principally CYP2C19 *[see Warnings and Precautions (5.1), Clinical Pharmacology (12.3)]*. Plavix at recommended doses forms less of the active metabolite and so has a reduced effect on platelet activity in patients who are homozygous for nonfunctional alleles of the CYP2C19 gene, (termed "CYP2C19 poor metabolizers"). Tests are available to identify patients who are CYP2C19 poor metabolizers *[see Clinical Pharmacology (12.5)]*. Consider use of another platelet P2Y12 inhibitor in patients identified as CYP2C19 poor metabolizers.

---

D2107 [September 2016 Plavix Label] (Emphasis in original).

55.    Defendants argued, and their former and present employees testified at trial, that they could not have included the above information in the Plavix label prior to March of 2010 because they did not know of the information prior to late 2008/early 2009. However, the Court finds that Defendants knew of the risks associated with Plavix resistance from before the drug was launched and, as such, this information triggered Defendants' duty to provide a warning that adequately described those risks as soon as they became apparent, regardless of whether they had

discovered the cause of this risk. Defendants did not offer any credible evidence to challenge the existence of this duty.

56.     Defendants also argued repeatedly, and their former and present employees testified at trial, that they did not know or could not have known the extent to which CYP2C19 played a role in the metabolism of Plavix or in Plavix resistance. Defendants and their former and present employees argued and testified they could not possibly have determined whether people with CYP2C19 polymorphisms experienced diminished effectiveness from the drug. The Court is not persuaded by Defendants' arguments and this testimony. The State's allegations and evidence was not restricted to CYP2C19. As was shown in this retrial, Defendants knew of the risk that Plavix would be less effective or ineffective for a substantial percentage of the patient population. The facts presented at trial show, and the Court finds, that Defendants knew about the risk of diminished response and had the ability to update the Plavix label continuing from launch until many years after. Yet, Defendants did not update the label and instead chose to establish a policy of inaction and denial.

57.     Indeed, Dr. Roome testified that the issue of genetic polymorphisms of the CYP enzymes was on Defendants' radar even prior to launch of Plavix. As such, the Court finds that Defendants, as of 1998, had sufficient knowledge to trigger their duty to update the Plavix label to warn about the risk of variability of response, particularly with regard to patients with genetic mutations of CYP2C19, but nevertheless omitted such information.

58.     Defendants and their past and present employees argued at trial that, because the 2016 boxed warning deleted any reference to a causal relationship between CYP2C19 poor metabolizer status and clinical outcomes, the FDA no longer considers the poor response issue to be important. The Court finds that argument unpersuasive. Because boxed warnings are

26

reserved only for the most serious risks of injury or death, and the boxed warning appears on the Plavix label to this day, clearly the FDA continues to consider reduced effectiveness of Plavix to present a serious risk of injury or death. Further, the Court is instead persuaded by the evidence, as shown in the 2022 update to the Clinical Pharmacogenetics Implementation Consortium Guideline for CYP2C19 Genotype and Clopidogrel Therapy document, which says the 2016 label update broadened the warning to all patients and not just subsets of patients with ACS or those undergoing PCI. P0771 at 961 [Lee, 2022].

59.     Moreover, to this day, Defendants directly tell patients in the Medication Guide that, if they are poor responders, the drug may not work as well for them. P0833 [2022 Plavix Label]. The Court finds that when this is said in the context of a medication that is intended to lower the risk of a heart attack or stroke, the only reasonable interpretation of the message that Plavix "may not work as well for you" is that Plavix may not lower the risk of a heart attack or stroke for poor metabolizers. Dr. Roome agreed during her testimony that this phrase means that poor metabolizers may not be protected. The Court so finds.

60.     Dr. Roome testified, and the Court finds, that it is quite important for prescribing doctors and patients to be fully informed as to the relevant scientific and medical information about a drug every time a prescription is filled and refilled. That information is needed so the patient, in consultation with his or her physician, can receive the best care and make an informed decision as to whether to take a particular drug. That important information, according to Dr. Roome, should be on a drug label. The Court agrees and so finds.

61.     Applying an objective standard, the Court finds that a consumer acting reasonably under the circumstances would find information regarding diminished response of this drug

important to their choices in deciding what treatment to undergo, as the evidence showed during trial.

62.     At trial, the State presented the expert testimony of Dr. Gurbel, a renowned participant in the field of clinical research regarding prescription drugs, and in particular, Plavix.

63.     Dr. Gurbel earned his medical degree at the University of Maryland School of Medicine and completed an internship and residency in internal medicine at Duke University Medical Center. He then completed a fellowship in pulmonary and critical care medicine at Johns Hopkins University, followed by fellowships in cardiovascular disease and interventional cardiology, as well as a chief residency in internal medicine at Duke. He is board certified in internal medicine, cardiovascular disease, and interventional cardiology by the American Board of Internal Medicine. In addition to his prolific research, Dr. Gurbel remains a practicing clinical cardiologist, cardiac interventionalist, and leading expert on Plavix. *See* P0358 [Curriculum Vitae of Dr. Paul A. Gurbel].

64.     Dr. Gurbel serves on the editorial boards for several journals, including *Journal of the American College of Cardiology, The American Heart Journal, Journal of the American College of Cardiology Heart Failure, Circulation, The Journal of the Royal Society of Medicine,* among others. He is also a reviewer for the *New England Journal of Medicine* and has authored over 450 major articles in peer-reviewed journals.

65.     Dr. Gurbel's research and concepts have been published in over 1,000 peer-reviewed documents. In 2012 alone, he authored 30 manuscripts in the peer-reviewed literature and, in fact, in that year three peer-reviewed papers developed by Dr. Gurbel and his team were named "Most Important Papers in Antiplatelet Therapy" by the prestigious medical journal *Circulation.* P0358 [Curriculum Vitae of Dr. Paul A. Gurbel].

28

66.     Since shortly after Plavix was first introduced to the market, Dr. Gurbel's research has paved the way in understanding Plavix's effects. His laboratory pioneered the concept of antiplatelet response variability, a major weakness of clopidogrel. Dr. Roome, a senior medical employee at Sanofi who testified at trial and who was intimately involved with Plavix over the years, readily agreed she has referred to Dr. Gurbel as an important and brilliant Key Opinion Leader, and the world-wide specialist in Variability of Response.

67.     At trial, Dr. Gurbel explained why he focused so much of his research on Plavix, testifying that thrombosis in coronary arteries is what kills patients. Even if a patient develops a clot and ultimately dies from ventricular fibrillation, the primary event that closes the artery is aggregation of platelets. In other words, it is the clot that kills the patient. Thus, Plavix, which is designed to prevent those clots, has to work all the time in order to prevent catastrophe.

68.     Dr. Gurbel further elaborated, and the Court finds, that because doctors were relying on this workhorse drug to prevent fatal events, it was exceedingly important that doctors understand Plavix's limitations, and that everyone else involved in the care of the patients (and the patients themselves), be informed. Patients receiving a stent or getting bypass surgery to prevent catastrophe needed to know whether they could truly rely on the drug to work all the time and as expected.

69.     Dr. Gurbel first expressed concern to Defendants about the lack of platelet inhibition in some patients around the year 2000.

70.     Although Defendants' past and present employees testified that Defendants conducted many studies into resistance, the Court finds (as Dr. Gurbel testified) that Defendants did no meaningful research in this area, and sponsored no studies on Plavix resistance, its causes, or its clinical implications. On this point, Dr. Gurbel systematically addressed the individual

29

studies which Defendants argued reflected meaningful efforts on their part to investigate Plavix resistance. In the Court's view, Dr. Gurbel thoroughly refuted Defendants' argument that they engaged in any efforts to study resistance.

71.     Responding to defense arguments that a study of 45,000 Chinese patients in a clinical trial known by the acronym **"COMMIT"** demonstrated Plavix works just as well for East Asians as for other races, Dr. Gurbel established that the risk reduction seen in the Chinese patients in COMMIT was less than half of the risk reduction seen in Caucasian patients in the CURE study. Thus, the COMMIT study actually demonstrated that Plavix was *less* efficacious for Chinese patients—where rates of CYPC2C19 loss of function alleles are high—as compared to the risk reduction seen in Caucasians.

72.     Responding to Defendants' contention that Defendants could not conduct studies that would establish a link between CYP2C19 poor metabolizers earlier than 2008, Dr. Gurbel established that there were, in fact, no technological limitations to them performing such a study. All of the tools (including genetic tests to identify CYP2C19 poor responders) and background knowledge necessary to conduct a simple study in this area were available to Defendants prior to the launch of Plavix.

73.     Dr. Gurbel and his colleagues were only able to conduct smaller studies, despite enormous interest in the area of Plavix resistance, because Defendants refused to fund them or supply the drugs needed for larger studies. To put together a large-scale trial, such as a study in the tens of thousands (which was needed to develop the necessary data), a large amount of funding is needed. That funding typically comes from a drug manufacturer. But drug manufacturers are averse to funding studies that might cut into their market share, i.e., total sales of the drug. As a result, such large-scale studies are rarely conducted.

74.     Dr. Gurbel additionally explained the necessity of knowing the information related to Plavix resistance in the 1998 through 2010 time frame.  Stenting a patient can result in serious harm, in the form of stent thrombosis, if there is not an antiplatelet drug protecting the patient from clotting.  If cardiologists knew that a significant portion of patients taking Plavix would get an insufficient benefit from the drug, they would pursue alternative courses of treatment (e.g., coronary artery bypass surgery, the use of different anti-clotting drugs, increased monitoring, doubling the dose of Plavix, etc.).  Because procedures like stenting were so new in the early 2000s, doctors began performing them regularly because they were told Plavix was protecting their patients.  Many people died after those procedures due to stent thrombosis.  Had doctors known about the severe limitations of Plavix, many of those deaths may have been avoided.

75.     The Court finds Dr. Gurbel's testimony credible and highly persuasive.

76.     The State also offered the testimony of pharmacology, toxicology and prescription drug regulation expert Dr. Plunkett at trial.

77.     Dr. Plunkett is a pharmacologist, toxicologist, and an FDA regulatory specialist.  She is board-certified as a Diplomate of the American Board of Toxicology and has authored or co-authored numerous scientific publications.  She received her undergraduate degree from the University of Georgia and a Ph.D. in pharmacology in 1984 from the University of Georgia, College of Pharmacy.  Her doctoral research was focused in the area of cardiovascular pharmacology, which is the study of mechanisms underlying drugs used to treat diseases or conditions of the cardiovascular system. P0357 [Curriculum Vitae of Dr. Laura M. Plunkett].

78.     Dr. Plunkett has over thirty years of experience in the areas of pharmacology and toxicology and has worked in both government and academic research.  She has taught

31

pharmacology and toxicology at the undergraduate and post-graduate levels. She has specific

expertise in cardiovascular pharmacology, which is the study of drugs used to treat

cardiovascular diseases, including antithrombotic drugs. She also has expertise in

pharmacokinetics, which is a discipline within the general area of pharmacology that relates to

the way drugs are absorbed, distributed, metabolized, and excreted from the human body. P0357

[Curriculum Vitae of Dr. Laura M. Plunkett].

79.    As a result of her training and work with various clients, Dr. Plunkett has

knowledge, experience, and expertise related to changes in FDA regulations. She is highly

published including peer reviewed literature and book chapters about pharmacovigilance. She

works regularly as a consultant for pharmaceutical companies submitting drug applications and

labels. She has provided expert testimony and been qualified by both state and federal courts in

the areas of pharmacology, pharmacokinetics, toxicology, risk assessment, and FDA regulations.

P0357 [Curriculum Vitae of Dr. Laura M. Plunkett].

80.    Dr. Plunkett testified and the Court finds that Defendants were obligated[15] to

update their label to include a warning that a significant portion of the population experiences a

diminished response to Plavix. Her opinion that the label should be updated and further studies

were required to be done is based upon the type of information brought to light by Defendants'

1998 Meta-Analysis, coupled with Defendants' knowledge that CYP2C19 was one of three

principal enzymes for the metabolism of Plavix, and the signal Defendants identified in their

CAPRIE trial that identified a significant interaction between treatment and race.

---

[15] As evidenced by the federal regulations and Dr. Plunkett's experience in working with drug
companies on labeling issues.

81.     Dr. Plunkett also testified and the Court finds that, in practice and under applicable FDA regulations, Defendants were permitted to add or strengthen a warning or precaution about the poor metabolizer issue without first seeking approval from the FDA. It is appropriate for a pharmaceutical company to update its label when there is a reasonable basis to believe that there is a causal association with a risk.

82.     Addressing Defendants' contention that they had no duty to investigate the reasons for the diminished response to Plavix reflected in the 1998 Meta-Analysis and other available information, Dr. Plunkett testified, and the Court finds, that drug companies like Defendants have an obligation to investigate potential problems with their drugs. A drug manufacturer's basic obligation includes pharmacovigilance and post-market surveillance and otherwise includes continual analysis of data once the drug is approved. In the paradigm for drug development and approval, the manufacturer knows it is testing the drug in a selective population for the purposes of the clinical study that may or may not be relevant to the real-world experience of patients. As a result, drug companies must perform post-market surveillance of their drugs, as well as keep up-to-date with the current medical literature, in order to understand whether their drugs exhibit risks in the real world that are different in kind, frequency, or severity from those that were detected during their clinical development, or to determine if benefits seen in the clinical setting are less evident or are absent in a real-world setting.

83.     Like Dr. Gurbel, Dr. Plunkett testified about the importance of drug companies providing funding for clinical trials. Drug companies have the resources to provide the drug to investigators and the manufacturer is the single best source of knowledge about the drug. Because large clinical studies can be very expensive, it is often difficult for researchers to secure

the necessary funding for such trials. As a result, it is the drug manufacturer's responsibility to cooperate with outside investigators who seek to conduct studies about the manufacturer's drugs.

84.    As Dr. Plunkett testified, the Court finds that prior to addition of the boxed warning, neither Defendants nor anyone else conducted any large clinical trials relating to the poor metabolizer issue which had sufficient power to definitively answer questions related to Plavix resistance and poor responders. Specifically for individuals who carry two loss-of-function alleles, Defendants did not do sufficient research to investigate that issue, even though they had known about an increased risk for such individuals since before launch of the drug.

85.    The Court finds Dr. Plunkett's testimony credible and persuasive.

86.    Defendants knew at the time of launch of Plavix in December 1998 that there was a significant risk associated with diminished patient response to Plavix, particularly in members of non-Caucasian races. For many years after the launch of Plavix, Defendants deliberately turned a blind eye toward the diminished response problem because of Defendants' concern that addressing that problem might adversely affect Plavix sales and Defendants' profits. Defendants deliberately withheld information from the FDA and the greater medical community about the risk. Defendants engaged in a pattern and practice of rejecting any proposed studies that might call attention to or generate interest in the risk associated with Plavix resistance. Defendants failed to conduct any studies that were designed and adequately powered to investigate Plavix resistance and/or the impact of race and/or CYP2C19 polymorphisms on inhibition of platelet response in Plavix patients. By engaging in the foregoing conduct Defendants intentionally set back the progress of research into the risks associated with Plavix resistance by many years. By doing so, Defendants knowingly placed Plavix patients at grave risk of serious injury or death in order to substantially increase their profits.

34

87. Following FDA approval but prior to Plavix's launch, Defendants knew the risks of diminished response to Plavix exhibited by a substantial percentage of patients such that Defendants could have changed Plavix's label under the FDA's Changes Being Effected regulation ("**CBE**") to warn patients and physicians about that risk. Defendants did not update their drug label to inform consumers of the risks of Plavix resistance. The label did not adequately warn about the diminished response risk until March 2010.

88. After the black box warning was added to the label in 2010, Plavix sales declined. According to Defendant BMS's employee and Rule 30(b)(6) designee, Brian Goodman, from shortly after the black box warning was imposed, sales of Plavix in Hawai'i declined 20% over the next two years. Court's Exhibit K, at 231:15-233:08 [Goodman]; P0785-P0789 [BMS 10-Q Filings Oct. 2008-Apr. 2012]. This testimony was corroborated by the State's expert Dr. Nicole Maestas. Defendants' one corporate representative, Dr. Roome, as well as internal contemporaneous corporate documents, also point to the black box warning as causing an immediate and substantial drop in sales. At the end of the two-year period after the black box warning was added, Defendants' exclusive patent on Plavix expired and for all practical purposes sales of brand-name Plavix dropped to extremely low levels. P0344 [Plavix Prescriptions Chart, 2007-2012] (showing steep decline when generic is launched in 2012). Plavix sales did not return to pre-boxed warning levels.

89. BMS's 10-Q documents filed with the SEC also show that sales declined following the addition of the black box warning. P0785-89 [BMS 10-Q Filings Oct. 2008-Apr. 2012]. Before the black box warning, Plavix sales were increasing every year. *Id.* But after the black box warning, Plavix sales across the United States declined for the remaining years of exclusivity. *Id.* The State's expert, Dr. Maestas, confirmed these trends in her analysis of

prescription sales data for Plavix: in the years prior to the black box warning, Plavix sales were increasing annually; yet, from the month the black box warning was added, Plavix sales declined and had a negative trend every year for the remaining years of exclusivity. Defendants' internal documents reflect their acknowledgment that even a 1% drop in sales would have a large impact on revenue derived from Plavix. P0804 [Feldman Email March 7, 2011] ("Subject: Plavix Timeline of Events"). Here, the evidence showed a 20% drop within the State of Hawai'i.

90.     Defendants argued and their past and present employees testified that the drop in sales could be attributed to any number of factors, including the natural lifecycle of a prescription drug. The Court rejects this for several reasons. First, Defendants' own witness, Dr. Roome, admitted at trial that she was aware that sales of Plavix dropped because of the black box warning. Second, Defendants' internal documents showed that in analyzing Plavix sales before and after the black box warning they did not believe Plavix would follow any sort of natural lifecycle of a drug. P0802 at PLAV_JPP_BMS01936309 [PowerPoint – World Review MAT 2010 Q1]. Before the black box warning was added, Defendants themselves expected Plavix sales to continue to increase until exclusivity was lost. *Id.* Moreover, an internal document from Defendants discussed the black box warning as one of the causes of the major decline in sales. P0804 [Feldman Email March 7, 2011] ("Subject: Plavix Timeline of Events"). Nothing in that document discussed the natural lifecycle or declining marketing of the drug in the years leading up to loss of exclusivity. *Id.*

91.     The black box warning also caused a shift in the cardiology community once the issue of diminished response was finally warned about. A few months after the addition of the black box warning, the American College of Cardiology ("**ACC**") and the American Heart Association ("**AHA**") issued a Clinical Alert regarding the black box warning and updated their

practice guidelines to recommend that prescribing physicians consider genetic testing for high-risk patients.[16] P0106 [2010 ACCF/AHA Clopidogrel Clinical Alert]. These guidelines recommended that doctors consider changing the antiplatelet drug used if the patient is found to be a poor metabolizer. *Id.* Several leading medical institutions changed their treatment policies to include genetic testing for CYP2C19 poor metabolizers before starting treatment with Plavix, and health insurers began reimbursing for genetic testing of Plavix patients for CYP2C19 polymorphisms. P0793 [Hughes, 2010]; P0797 [Label Change Market Intelligence Summary slide deck]; P0773 at 18 [Empey, 2018]. The State also presented evidence that at least one Hawai'i cardiologist—described as a thought leader by Defendants—began testing all his Asian patients on Plavix for CYP2C19. P0803 at PLAV_JPP_BMS02824318 [2010 BMS Field Medical Science Update PowerPoint]. The fact that these medical organizations and institutions changed their policies, and the cardiology guidelines incorporated the recommendations as they related to testing for non-functional alleles, shows the importance of this information to patient treatment. While the importance of information as determined by doctors is not synonymous with information considered important by consumers, the evidence shows that once the information was disclosed to the medical community, it was regarded as having clinical importance when treating patients. In the 2010 Clinical Alert that was issued, the ACC and AHA stated ". . . both clinicians and patients need to be aware of genetic polymorphisms that may modulate clopidogrel responsiveness and cause MACE [major adverse cardiac events]." P0106 [2010 ACCF/AHA Clopidogrel Clinical Alert].

---

[16] Defendants argued that the 2021 Guidelines removed the recommendations regarding testing and Plavix poor response. However, the evidence and testimony did not support this argument.

92.     At trial, Defendants presented two Hawai'i cardiologists. Dr. Todd Seto practices general cardiology and Dr. John Kao practices interventional cardiology. They both testified that the information in the black box warning did not change their practices, and that they did not find the diminished response information important to their practice. Further, these cardiologists testified that they knew of no Hawai'i cardiologists who were testing their patients for CYP2C19 loss-of-function alleles. The Court did not find their testimony to be persuasive.

93.     In essence, these experts testified that they did not give any weight or credence to the black box warning because they felt it did not provide them with relevant information or tell them what to do about the information it did provide. They testified instead that they rely upon the practice guidelines of their professional medical organizations, the ACC and/or AHA, to tell them what to do. These witnesses testified that they follow their professional guidelines instead of the black box warning. However, the evidence showed that Defendants' witnesses were not actually following the ACC/AHA guidelines and/or were misstating what the guidelines recommended or required, or both. For example, the ACC/AHA guidelines encourage physicians to engage in shared decision-making with their patients and to take into consideration and respect the patient's preferences regarding treatment. D1232 at e578 [2011 ACCF/AHA/SCAI PCI Guidelines]. The witnesses testified that they agree with these principles. But they then also testified that they prescribe Plavix to most of their patients and do so without ever discussing the boxed warning with any of them. They also testified that they never genetically test any of their Plavix patients to determine whether they may be poor responders, without ever discussing with their patients the availability of genetic testing or asking the patients whether the patients would like to undergo genetic testing.

94.     Dr. Kao and Dr. Seto sought to justify their actions by asserting that the ACC/AHA guidelines recommend against routine genetic testing. But *routine* genetic testing has never been an issue in this case. In truth, the guidelines do not prohibit genetic testing and indeed include a Class IIb recommendation that doctors may consider genetic testing for high-risk patients. D1232 at e615-616 [2011 ACCF/AHA/SCAI PCI Guidelines].  But rather than considering genetic tests for his patients, Dr. Seto actively discourages other cardiologists from using testing.  In fact, however, the guidelines say that a Class IIb recommendation means that the benefit is greater than or equal to the risk for that method of treatment, despite the fact that, in the ACC/AHA's view, the usefulness or effectiveness of the treatment is unknown, unclear, uncertain, or not well established.  Defendants repeatedly argued that the guidelines never recommended genetic testing. However, the plain language of the IIb recommendation demonstrates that genetic testing is in fact a recommendation in the guidelines.

95.     Based on the totality of the evidence presented at trial, the Court gives little weight to the testimony of either Dr. Seto or Dr. Kao on many critical factual issues.

96.     Regardless of these doctors' stated positions on the information regarding diminished response, the Court finds that the information regarding diminished response is something that would be material to a reasonable consumer. When the Court buttonholed Dr. Kao about the importance of a test result showing two non-functional alleles, and asked Dr. Kao whether he would speak with his patients about such a test result, Dr. Kao stated that he would, in fact, discuss the significance of the test result with the patient.  This demonstrates that even Defendants' witness recognized that the information about diminished response is something a patient needs to know when making his or her treatment decisions.

39

97.     In addition, Defendants themselves conducted a survey of physicians they targeted, including cardiologists in the US for the express purpose "to understand how physicians would react to the new label, as well as assess how this could impact Plavix usage." P0104, at PLAV_JPP_SAN00825678 [Physician Response to Plavix Label Change, April 2010]. The survey showed that numerous cardiologists did, in fact, find the information in the black box warning to be important to their practice. *See, generally*, P0104. Defendants' survey, introduced by the State, showed (a) that the label change opened the door to cardiologists using alternative drugs for current patients experiencing problems with Plavix, and potentially for all high-risk ACS patients (*Id*. at PLAV_JPP_SAN00825687); (b) that most physicians surveyed said a positive genetic test would lead them to immediately switch to another drug to avoid the risk of a negative outcome (*Id*. at -689);(c) that most neurologists who participated in the study said the label change lowers the threshold to switch to another drug, like Aggrenox, when a patient has a recurrent event on Plavix (*Id*. at -711); and (d) that most cardiologists surveyed said they would switch to another drug whenever a patient has a recurrent event or symptoms since the patient is likely a poor metabolizer. *Id*. at -712.

98.     Defendants presented evidence that insurance companies and the State's Medicaid programs continue to allow doctors to prescribe Plavix and did not place any restrictions or pre-conditions on them doing so after the black box warning was added. Defendants argue that this means the State did not consider the black box warning important, because, as Defendants theorized, if the State did consider the information important, it would have issued protocols restricting Plavix or imposing pre-conditions on its use, such as prior authorizations or mandatory genetic testing. The Court does not find this argument, or the evidence underlying it, persuasive. The responsibility to ensure that patients and physicians are aware of the limitations

of a drug rests squarely with the manufacturer, *Wyeth v. Levine*, 555 U.S. 555, 579 (2009), not with the State's Medicaid system. As such, the State's decision to not place restrictions on Plavix has little probative value as to whether the information was important to consumers.

99.     The State's claims in this case are that Defendants failed to warn about safety and efficacy information in their label. At no point in the trial did the State argue that Plavix should be restricted or that it is unsafe. The Court has no doubt whatsoever that Plavix has been and can be a critically important and useful drug to many patients, but Defendants should have warned about the serious limitations of Plavix for certain patients so that patients and physicians could coordinate to make informed decisions for patients care. The evidence regarding the State of Hawaii's Medicaid programs and other insurance programs, which leaves the decision as to the course of treatment up to the doctor (and the patient) (Court's Exhibit O, at 35:18-45:05 [Lopez]), is not inconsistent with the State's position and therefore has little if any probative value.

100.     Defendants also argued that the CYP2C19 issue and Plavix resistance was not a real problem for patients. However, the evidence presented at trial proved otherwise. First, the FDA still requires the Plavix label to include a black box warning and a Medication Guide about diminished response to Plavix. Notably, the Plavix drug label was updated in September of 2022. P0833 [September 2022 Plavix Label]. If, as Defendants' experts testified, current science proves there is no risk associated with resistance to the drug, Defendants and/or the FDA would have removed the boxed warning from the label. The September 2022 label evidences that Defendants' assertions to the Court are inconsistent with the assertions they have been making and continue to make to patients for the last 13 years. Defendants argued to the Court there is no problem with the drug, but a Hawai'i consumer who fills a Plavix prescription on the date of this

41

Order is still told by Defendants that the fact Plavix might not work as well in people with certain genetic factors is the most important information they need to know.

101. Overall, the Court finds that Plaintiff offered substantial evidence regarding the materiality of the risk of diminished response to patients and physicians—including, but not limited to, the steady decline in sales that totaled a 20% drop in Hawai'i, the substantial number of doctors and medical institutions that changed their practices and guidelines in response to the black box warning, the fact that the FDA found this information important enough to be added to a black box warning, and the fact that Defendants' Medication Guide says to this day that the fact that Plavix may not work as well for certain people is the most important information a patient needs to know. The testimony of Defendants' experts, conflicting at times with their own guidelines, and exhibiting practices that seem to give no weight to their patients' right to shared decision making, is ultimately unpersuasive.

102. The Court also finds that there was evidence of harm to Hawai'i consumers as a result of Defendants' conduct. Coronary heart disease is the number one killer of both men and women in Hawai'i, as testified by Dr. Seto. Defendants' medical experts testified that the racial makeup of their patients has been roughly equivalent to that of the population of the state as a whole. Dr. Seto testified that 70% of his patients are of East Asian or Pacific Islander descent. The issues raised by this lawsuit are clearly of major significance to the people of Hawai'i.

103. The studies presented at trial showed that Asians and Pacific Islanders have a particularly high percentage of CYP2C19 poor responders (P0697 [Ionova, 2022]; D1946 [Koo, 2021]), but that persons of all races are at risk, to a greater or lesser degree, of being a CYP2C19 poor responder. *Id.*

42

104.    At trial, Defendants argued that the percentage of variability accounted for by CYP2C19 loss of function alleles was extremely low, only 12%. However, Dr. Gurbel testified, and the Court finds, that it doesn't matter if it's 12 percent or 4 percent or 8 percent. It's enough of a contribution to be associated with a tripling or quadrupling of the risk of stent thrombosis.

105.    Plavix resistance affects approximately one third of the population nationwide.[17] Additionally, those people who exhibit Plavix resistance have been repeatedly shown to be at an increased risk of clinical outcomes when viewed by the weight of the evidence.[18] Loss of function allele carriage status similarly has been definitively linked to an increased risk of MACE and cardiovascular death.[19]

---

[17] *See e.g.,* P0037 at 92 [1998 Meta-Analysis]; P0259 [Järemo, 2002]; P0255 [Gurbel, 2003]; P0262 [Mobley, 2004]; P0263 [Angiolilo, 2004]; P0238 at 5 (Table 2) [Gurbel, 2006]; P0721 [Michelson, 2019] at 941("A significant proportion of subjects (about 1/3) treated with clopidogrel are very poor responders, displaying almost no inhibition of platelet function."); *Id.* at 998 ("A fourth paradigmatic shift arose with the recognition that 30%-40% of individuals receiving clopidogrel were functionally nonresponsive.").

[18] *See e.g.,* P0292 [Matetzky, 2004]; D1158 [Gurbel, 2005]; P0250 at 926-7 (Table 1); [Bonello, 2010]; P0666 [Brar, 2011]; D1157 [Gurbel, 2012]; P0677 [Cavallari, 2018]; P0715 at 1522 [Sibbing, 2019] ("[A] multitude of studies have consistently shown that PCI-treated patients with impaired clopidogrel-induced platelet inhibition to be at an increased risk for ischemic events, in particular stent thrombosis."); P0721 at 661 [Michelson, 2019] ("The clinical implications of an inadequate response to clopidogrel therapy have been evaluated by a large number of studies. HRPR ADP by all established platelet function tests has been associated with the occurrence of adverse ischemic events in different patient populations, in particular in patients undergoing PCI."); *Id.* at 991 ("Antiplatelet nonresponsiveness was brought forefront when data suggesting insufficient DAPT increased risk of stent thrombosis nearly 100-fold.")

[19] *See e.g.,* P0294 [Mega, 2008] ("Conclusion: Among persons treated with clopidogrel, carriers of a reduced-function CYP2C19 allele had . . . a higher rate of major adverse cardiovascular events, including stent thrombosis, than did noncarriers."); P0295 [Simon, 2009] ("Conclusion: Among patients with acute myocardial infarction who were receiving clopidogrel, those carrying CYP2C19 loss-of-function alleles had a higher rate of subsequent cardiovascular events than those who were not."); P0709 at 615 [2011 ACC/AHA Guidelines on PCI] ("Patients with decreased *CYP2C19* function because of genetic polymorphisms metabolize clopidogrel poorly

106. Based upon the various studies discussed at trial and/or otherwise introduced into evidence, the weight of the evidence is that approximately one-third of the overall population are carriers of CYP2C19 loss-of-function alleles. Given that Asians and Pacific Islanders have generally been found to have considerably higher rates of CYP2C19 loss-of-function alleles than other races, coupled with the fact that Asians and Pacific Islanders make up a much larger percentage of the Hawai'i population (D2491 [State of Hawai'i Data Book 2010]) than would ordinarily be found almost anywhere else in the United States, the Court finds that the percentage of the population in Hawai'i who are carriers of the CYP2C19 loss-of-function alleles is higher than that overall average in the nation.

107. The Court also finds, based on the totality of the evidence, that a significant number of Plavix patients in Hawai'i were unnecessarily exposed to the risk of an adverse event, including serious physical injury or death, because they were carriers of CYP2C19 loss-of-

---

and have higher rates of cardiovascular events after ACS and PCI than patients with normal *CYP2C19* function."); P0715 at 1533 [Sibbing, 2019] (Taking the available evidence into consideration, strong and consistent associations were observed for CYP2C19 LoF (*2 and *3) alleles with ischemic events including stent thrombosis . . ."); P0721 at 667 [Michelson, 2019] ("Loss-of-function polymorphisms of the CYP P-450 enzyme system impair hepatic metabolism of clopidogrel to its active form resulting in HRPR ADP and an increased risk of MACE during clopidogrel therapy. In particular, carriers of the *2 allelic variant of CYP2C19 were more likely to exhibit a poor response to clopidogrel and develop ischemic risk."); *Id.* at 998 ("Moreover, high on-treatment platelet reactivity and slow metabolism (e.g. carriers of CYP2C19 *2 allele) correlate with ischemic risk while low on-treatment reactivity and fast metabolism (e.g. CYP2C19 *17) correlate with bleeding."); P0682 [Wang, 2021] ("Among Chinese patients with minor ischemic stroke or TIA who were carriers of *CYP2C19* loss-of-function alleles, the risk of stroke at 90 days was modestly lower with ticagrelor than with clopidogrel."); P0681 [Pereira, 2021]; P0771 at 961 [Lee, 2022] ("[S]ubstantial evidence exists linking *CYP2C19* no function alleles with poorer clinical outcomes among patients with clopidogrel-treated ACS, particularly those undergoing PCI, likely as a result of decreased clopidogrel active metabolite formation."); P0772 at 830 [Lee, 2023] ("The *CYP2C19* gene has polymorphisms, and its loss-of-function allele is associated with the poor metabolism of clopidogrel, followed by an increased risk of cardiovascular events.").

function alleles. The State presented sufficient evidence to show that there were alternative courses of treatment that could have been taken had patients and physicians been informed of the limitations of Plavix. Therefore, by depriving consumers of the diminished response information, Defendants denied Hawai'i consumers the ability to make an informed decision regarding their care, which based on the evidence presented at trial is inconsistent with the national guidelines Defendants' medical experts purport to follow. Based on the weight of the evidence presented at trial, the statistical likelihood that every CYP2C19 poor or intermediate responder in Hawai'i escaped unscathed from Defendants' failure to disclose the poor responder issue and the availability of genetic testing is, in the Court's view, not only highly improbable, but not reasonably possible.

108. The Court's finding is supported by the testimony of the State's interventional cardiology expert, Dr. Gurbel, who testified that Hawai'i patients *did* suffer physical harm as a result of Defendants' nondisclosure and concealment.[20]

109. Moreover, common sense and ordinary life experience tell us that, for every consumer-patient who was injured by Defendants' misconduct, and in most circumstances many others around them—friends, family and other loved ones—also suffered as a result.

110. The Court finds that Hawai'i consumers were injured as a result of Defendants' omissions from the Plavix drug label. Withholding such important and vital information regarding whether a preventative cardiovascular drug works can quite literally mean the difference between life and death. The fact that Hawai'i consumers were prevented from learning

---

[20] Dr. Seto also testified that he had patients die of recurrent ischemic events while on Plavix. However, he could not say whether those patients died as a result of being poor metabolizers because he never tests his patients for loss of function alleles or reduced platelet inhibition.

this information due to Defendants' failures to update the label and their suppression of studies surrounding CYP2C19 poor responders and Plavix resistance in general constitutes injury.

111. At trial, the State presented the expert testimony of Dr. Maestas regarding the number of retail prescriptions, refills and non-retail units sold in Hawai'i between December 1998 and March 2010. Dr. Maestas is an associate professor of Health Care Policy at Harvard Medical School and a research associate at the National Bureau of Economic Research. She is an economist with broad training in the fields of health economics and health policy whose research concerns the economics of health care utilization, health insurance, and health outcomes. She has many years of experience analyzing health care data of different types, including prescription drug claims, using a wide range of methodologies.

112. Dr. Maestas calculated the number of retail prescriptions, refills and non-retail units sold during the relevant time period to be 834,012. P0349 [Maestas table 3.c., summarizing results].

113. The Court finds Dr. Maestas's testimony to be both helpful and credible, and Defendants offered no expert testimony to dispute or otherwise counter her calculations. The Court finds that approximately 834,012 Plavix retail prescriptions, refills and non-retail units were sold in Hawai'i between December 1998 and March 12, 2010.

114. Defendants' unfair conduct, as affirmed on appeal, continued for a period of approximately 4,100 days, from December 1998 through March 12, 2010.

115. If any of the findings of fact set forth herein shall be deemed conclusions of law, they are hereby incorporated by reference in the conclusions of law set forth below.

<u>CONCLUSIONS OF LAW</u>

1.     This Court has jurisdiction over the parties and the claims in this action.

2.     HRS § 480-3.1 grants the Attorney General the authority to bring a civil action for civil penalties against "[a]ny person, firm, company, association, or corporation violating any provisions of section 480-2[.]"

## I.     THE STATE'S UDAP CLAIMS

3.     HRS § 480-2(a) declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

4.     Hawaii's UDAP statute "outlaws unfair methods of competition and unfair or deceptive trade practices in sweeping terms." *Han v. Yang*, 84 Hawai'i 162, 177, 931 P.2d 604, 619 (App. 1997) (emphasis added). The statute "was constructed in broad language in order to constitute a flexible tool to stop fraudulent, unfair or deceptive practices for the protection of both consumers and honest businessmen [and businesswomen]." *Id.*

5.     To state a claim under UDAP, the State need only prove that Defendants engaged in "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." HRS § 480-2(a). "To violate HRS § 480-2, a practice need only be unfair or deceptive, not both." *Shikada*, 152 Hawai'i at 443, 526 P.3d at 420.

### A.     Deceptive Acts or Practices of Defendants

6.     Based on the totality of the evidence discussed above, including the nature of the conditions involved, the potential severity of the risks involved, and the potential and likely consequences if a poor responder unwittingly relied on Plavix to protect himself or herself; and taking into account the credibility of the witnesses and the content and character of the

47

documentary evidence, the Court concludes that Defendants' omissions from the Plavix label were deceptive under UDAP.

7.      A practice is deceptive within the meaning of UDAP when (1) there is a representation, omission, or practice (2) that is likely to mislead consumers acting reasonably under the circumstances and (3) the representation, omission, or practice is material. *Shikada, supra,* 152 Hawai'i at 443, 526 P.3d at 420 (citing *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 262, 141 P.3d 427, 435 (2006)).

8.      The Hawai'i courts have made it clear that a material statement or omission is "deceptive" if it had "the capacity or tendency to mislead or deceive[.]" *Courbat v. Dahana Ranch, Inc.,* 111 Hawai'i 254, 261, 141 P.3d 427, 434 (2006), quoting *State ex rel. Bronster v. United States Steel Corp.,* 82 Haw. 32, 50, 919 P.2d 294, 312 (1996) (emphasis added).

9.      UDAP does not require a plaintiff to show that there was any actual deception, nor that the defendant had an intent to deceive. *Courbat,* 111 Hawai'i at 262 n.9, 141 P.3d at 435 n.9.

10.     The Supreme Court of Hawai'i has stated that, "Under UDAP, a representation or omission is considered material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Shikada, supra,* at 440, 526 P.3d at 417 (quoting *Courbat,* 111 Hawai'i at 262, 141 P.3d at 435) (internal quotations omitted; emphasis added). This test "is objective, not subjective" and "considers the viewpoint of the 'reasonable consumer, not the particular consumer.'" *Id.*

11.     There is a rebuttable presumption of materiality for "claims that significantly involve health, safety, or other areas with which the reasonable consumer would be concerned, including a claim that concerns the purpose, safety, efficacy, . . . performance, . . . or a finding by

another agency regarding the product." *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (construing the Federal Trade Commission Act "**FTC Act**"); *see also Tokuhisa v. Cutter Mgmt. Co.*, 122 Hawai'i 181, 195, 223 P.3d 246, 260 (App. 2009) (finding that Hawai'i courts should look to federal cases interpreting the FTC Act when interpreting Hawaii's UDAP statutes).

12.    However, the Supreme Court has observed that "[o]vercoming the presumption is 'not a high hurdle." *Shikada*, 152 Hawai'i at 441, 526 P.3d at 418. It "does not end things" and is "not 'an inflexible rule that eliminates [the] need to look at materiality on a case-by-case basis.'" *Id.*

13.    As the Supreme Court found, pharmaceutical companies have a common law duty to warn consumers "when risks of a particular drug become apparent." *Shikada*, 152 Hawai'i at 444, 526 P.3d at 395 (quotation omitted). The Court acknowledges that Defendants could not have placed a "black box warning" on the label without the FDA's prior approval. However, Defendants had the ability to update the label, specifically to add or strengthen a warning, under the FDA's CBE regulation. *See* 21 C.F.R. § 314.70(c)(6)(iii)(A); *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019).

14.    The Court concludes that Defendants knew enough about the poor responder issue after FDA approval but prior to launch to trigger a duty under state law to update the Plavix label to warn patients and physicians about the risks associated with lack of response or diminished response, and that, given the FDA's expansive definition of "newly acquired information," to effectuate that update through the CBE regulations.[21] Defendants had sufficient knowledge, as

---

[21] The definition of "**newly acquired information**" provided in 21 CFR § 314.3(b) is: Newly acquired information is data, analyses, or other information not previously submitted to the

well as the technical ability, to investigate the cause of Plavix resistance, which was known to Defendants before the drug launched in December of 1998.

15.     The Court also concludes that the safety and efficacy information omitted from the Plavix label was material to consumers. The State has presented substantial evidence to show that, applying an objective standard, consumers acting reasonably under the circumstances would find the information omitted from the Plavix label to be important and would likely affect their choice or conduct regarding whether to use Plavix. Common sense also leads to the inevitable conclusion that the omitted information is material to a reasonable person faced with the medical issues for which Plavix can be prescribed. The most relevant period for examining materiality is the time from the launch of Plavix in December 1998 until the black box warning was first used in March 2010. That is the time period put at issue by the State. Therefore, that is the time period when materiality must be determined, based upon the state of medical knowledge and other pertinent circumstances at that time. Even without the presumption of materiality for health and safety information, the above discussed findings of fact are sufficient to demonstrate materiality. The State has therefore met its burden to show materiality.

16.     The Court also concludes that the omission of this material information had the tendency or capacity to mislead consumers. The ability to give informed consent to medical treatment is a well-established tenet of our jurisprudence. It was important that the most up-to-date medical and scientific information was on a label so that prescribing physicians could give the best treatment or care to the informed patient. As established at trial, doctors are expected to

---

Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analysis of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.

inform their patients about all risks and benefits of the drugs they prescribe so that the patient can make an informed decision concerning their course of treatment. Omitting information from a drug label about the efficacy and safety profile of a drug like Plavix, which is intended to lower the risk of heart attacks and strokes, certainly has the capacity and likelihood to mislead reasonable consumers. Given that drug manufacturers have a duty to disclose known safety risks and update label information under Hawai'i law, the Court concludes that Defendants' omission of the risks of diminished response to Plavix had the tendency or capacity to mislead consumers into believing that no such risk existed and that Plavix was effective for all patients.

17. Therefore, the Court determines that, based on the evidence presented at trial, all the elements for a claim of deceptive acts or practices have been met.

**B. Unfair Acts or Practices of Defendants**

18. The Supreme Court of Hawai'i has already affirmed the original trial prior court's ruling that "Defendants committed unfair acts or practices[,]" both for violating public policy and engaging in immoral, unethical, and unscrupulous conduct. *Shikada, supra*, 152 Hawai'i at 448, 526 P.3d at 425. As such, there are no additional conclusions of law that need to be determined by this Court with respect to Defendants' liability for unfair practices.

**II. DEFENDANTS' AFFIRMATIVE DEFENSES**

19. In their August 28, 2023, Trial Brief, filed as Docket No. 1885, Defendants raised several affirmative defenses which the Court addresses below. The Court will discuss the reasons why each of these defenses are unsuccessful.

## A.    Preemption Defense

20.    In their Trial Brief Defendants argued that the State's UDAP claim is preempted by federal law related to the issues of platelet function testing and intermediate metabolizers. However, the Supreme Court affirmed the original trial court's order rejecting this defense, finding that "Defendants have not established it would have been impossible under federal law for them to add information about the poor responder issue to the Plavix label." *Shikada*, 152 Hawai'i at 439, 526 P.3d at 416. Therefore, to the extent Defendants litigated this issue at the trial and appellate court levels, the Supreme Court has necessarily resolved that issue. To the extent Defendants failed to raise this precise articulation of the issue before the trial and/or appellate court level, it has been waived.

## B.    Duty to Test on the Deceptiveness Claim

21.    Defendants raised as an affirmative defense that there is no duty to test under the deceptiveness claim and therefore their suppression of research is irrelevant to the State's deceptiveness claim under UDAP. However, this is not an affirmative defense and the Court is not persuaded. First, Defendants are the ones who presented evidence that they did not know about the issues related to Plavix resistance and CYP2C19 because they were not known by the larger scientific community. As such, the State is entitled and allowed under Hawai'i law to rebut those claims by showing that the scientific community (apart from Defendants) did not know about these safety and efficacy issues because of Defendants' suppression of scientific research. Second, Defendants' suppression and failure to investigate the risks of Plavix resistance is directly relevant to penalties factors for the deceptiveness claim. As discussed below, one of the factors to consider in a penalties calculation under a statute such as UDAP is the good or bad faith of the defendant. The fact that Defendants deliberately engaged in a campaign to prevent

52

the development of science of a known risk that would have reduced the marketability of their drug for the sole purpose of protecting sales of that same drug, is highly probative to the penalties inquiry.

### C. Penalties Defenses

22.     Defendants also assert as affirmative defenses the claim that there is no authority for the Attorney General to bring a standalone UDAP claim for civil penalties. This issue has already been decided against Defendants on appeal. They made this argument to the Supreme Court of Hawaiʻi, and the Court, by remanding this case for a determination of the amount of civil penalties to be awarded, necessarily rejected Defendants' argument.

23.     Additionally, Defendants assert as an affirmative defense that violations based on a duty to study cannot stand under due process in the absence of a finding of harm. The Court is skeptical of Defendants' argument that harm is required, as Defendants cite no law to support their position. However, as discussed below and as found in the above factual findings, the Court has found harm in this case. As such, this defense is moot.

## III.   PENALTIES

24.     Based on the foregoing and the evidence presented at trial, the Court concludes that the imposition of civil penalties under HRS § 480-3.1 is warranted.

### A. Factors to Consider in Penalties Calculations

25.     Courts exercising discretion in determining the measure of penalties to be assessed under the FTC Act or similar state consumer protections statutes utilize the factors articulated in *United States v. Reader's Digest Ass'n (Reader's Digest)*, 662 F.2d 955, 967 (3rd Cir. 1981):

(1) The good faith or bad faith of the Defendant;

53

(2) The injury to the public;

(3) The desire to eliminate the benefits derived by a violation;

(4) The necessity of vindicating the authority of the agency involved; and

(5) The Defendant's ability to pay.

*See State ex rel. Wilson v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 414 S.C. 33, 84-85, 777

S.E.2d 176, 203 (2015); *U.S. v. Natl. Fin. Services, Inc.*, 98 F.3d 131, 140 (4th Cir. 1996); *U.S. v.*

*Gurley*, 235 F. Supp. 2d 797, 806 (W.D. Tenn. 2002), *aff'd*, 384 F.3d 316 (6th Cir. 2004); *U.S.*

*Dept. of J. v. Daniel Chapter One*, 89 F. Supp. 3d 132, 148 (D.D.C. 2015). In addition, courts

also consider the factors of: (1) "the deterrence value of the assessed penalties" and (2) "the

duration of the defendant's unlawful conduct." *Wilson*, 414 S.C. at 85, 777 S.E.2d at 203. Here,

the Court considers each of these factors in turn in determining the civil penalties to impose on

Defendants.

**B.      Penalties for Deceptiveness**

    **i.      *Reader's Digest* Factor**

        **1.      Good or Bad Faith of Defendants**

26.      The Court finds that the Defendants acted in bad faith during the relevant period

of December 1998 to March 2010. As discussed above, the law allowed Defendants to

unilaterally strengthen the warning section of the drug label as soon as there was reasonable

evidence of a safety and efficacy risk with their drug.  Defendants knew from the time of launch

that there was a risk that about thirty percent of patients might have a diminished response to

Plavix, but they did not update their label.  Nothing in those regulations required a showing of

any sort of association of "clinical outcomes" before making such updates, as Defendants

argued. As early as 1998, Defendants also had knowledge of the involvement of CYP2C19 in the

metabolism of Plavix and the ability of its polymorphisms to prevent activation of other drugs, as well as Plavix's own issues with variability of response, before the drug was ever sold on the market. Yet, Defendants ignored these glaring warning signs and did nothing to warn patients or physicians. P0008 [Hebden Email, March 30, 2009].

27. From after launch until 2010—for over a decade—studies by outside investigators repeatedly affirmed Defendants' internal meta-analysis showing that approximately 30% of patients were poor responders to the drug. However, Defendants never updated the label until the FDA started asking questions about resistance. Defendants' internal documents clearly articulated the reason why: they feared the negative marketing implications. *Shikada* 152 Hawai'i at 448, 526 P.3d at 425. Rather than inform consumers about the issues related to the risk of diminished response, Defendants debated internally how to deal with the issue of Plavix resistance, discussing things like the "potential threat for future sales" as well as how it might "increase [the] risk of receiving questions from Health Authorities." P0811at PLAV_PP_BMS00284199 [2003 Action Plan]. Defendants also, instead of warning patients, developed a strategy for "shaping the market" by taking several actions including "challeng[ing] the links to clinical outcomes." P0430 at PLAV_BMS_00608286 [Wolf Email December 2, 2005]. Later Defendants discussed their view that resistance stood "as a threat to clopidogrel's future success on its own" in terms of "reimbursement, selective use, [and] efficacy image." P0433 at PLAV_JPP_BMS02495397 [2006 Variability of Response Strategic Workshop PowerPoint]. These are only two examples of Defendants' deceptiveness that were shown at trial. The Court finds Defendants' internal communications to be highly probative and damning.

28. From 1998 to March 2010, Defendants had the ability and knowledge necessary to update the Plavix drug label. Yet, they chose not to because they believed it would affect their

bottom line. Defendants repeatedly chose to act in their own financial best interest rather than fulfilling their obligations with respect to patient safety. Given the importance of the medical issues typically faced by a Plavix consumer, the significance and impact of Defendants' bad faith during the period of December 1998 to March 2010 is both substantial and deeply troubling.

## 2. Injury to the Public

29. The Court finds the issues in this case to be of critical importance to the public. Requiring drug manufacturers to fully disclose all material information available to them concerning the safety and efficacy of their drugs in a fair and non-deceptive manner is of paramount importance to the health and safety of those using the drugs. This is especially true where, as here, the drug at issue is a potentially lifesaving course of therapy, but a patient's inability to fully bioactivate the drug may still leave them more vulnerable to heart attacks, strokes, and cardiovascular death. Doctors and patients can only make fully informed decisions regarding treatment when a complete, honest, and fair disclosure of material information is made by the drug manufacturer. Moreover, a lack of disclosure undermines the national guidelines, addressed at trial, that provide for shared decision making between the doctor and the patient.

30. Drug manufacturers have the best and most complete information about their drug, which is why there is a common law duty to keep abreast of developments and data regarding their drug, including information about safety risks, and strengthen label warnings, if necessary. For this reason, the public reasonably relies on these companies (as does the FDA) to timely disclose important information, including a lack of efficacy based on genetic factors. As found above, injury to the public has occurred given the evidence in this trial. Hawai'i consumers and their prescribing physicians were denied material information by the drug manufacturer regarding the safety and efficacy of Plavix that was necessary in order for Plavix

patients to make informed choices among their treatment options. The fact that the injury is neither calculated nor quantified does not mean there is no injury.

31.     Although this is not a medical malpractice case that directly implicates the Hawai'i doctrine of informed consent, it is an analogous set of circumstances that raises the same concerns about a patient's human dignity, personal autonomy, and self-determination. It raises the question whether a consumer-patient is harmed when a drug company, rather than a doctor, decides to tell the consumer-patient only what the drug company wants the consumer-patient to know, rather than what the consumer-patient needs to know in order to make an informed decision about whether to take the drug or not, and if so, whether to take additional precautions to protect his or her health and safety if the drug fails to work properly.

32.     While physical injury is not required to prove injury under this element, based on the totality of the evidence, the Court also finds that it is likely that Hawai'i patients suffered major adverse cardiac events, in some cases fatal, because they did not get the intended anti-platelet effect from Plavix.

### 3.     Desire to Eliminate the Benefits Derived from a Violation

33.     The benefits derived by Defendants as a result of their material omissions from the Plavix label were substantial. After its launch in 1998, Plavix became a blockbuster drug for Defendants and the prescription of Plavix, often in conjunction with aspirin, became a goldmine for Defendants in the treatment of many cardiovascular conditions.  Defendants were able to reap huge financial benefit from the success of Plavix, including from consumers within the State of Hawai'i. P0359-0375 [BMS SEC Filings]; P0385-0394 [Sanofi SEC Filings]. These extraordinary revenues were generated in part as a result of Defendants' deceptive practices. Moreover, the evidence at trial clearly established that Defendants themselves feared the loss of

57

Plavix sales and questions from health authorities should the limitations of their drug be documented. P0811 at PLAV_JPP_BMS00284199 [Action Plan July 2003]. The civil penalty calculations therefore must also account for the need to eliminate the benefits derived by Defendants from their use of deceptive business practices.

### 4. Necessity of Vindicating the Authority of the Agency Involved

34. The UDAP statute was enacted by the Hawai'i Legislature to act as a consumer protection measure and under HRS § 480-3.1 and 480-20(a), the Attorney General was given both the power and the responsibility to enforce those protective measures for the people of Hawai'i. When corporations or other business entities come into this State and conduct their business in violation of UDAP, it is incumbent upon the Attorney General, as the chief law enforcement officer of the State, to protect the public's interest.

35. Remedial statutes, such as UDAP, are to be construed "to suppress the perceived evil and advance the enacted remedy." *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 229, 11 P.3d 1, 17 (2000).

36. The Court finds that the State has a particularly strong interest in ensuring that drug companies operate legally, honestly and fairly in Hawai'i and do not omit material information about pharmaceutical drugs from their labels, especially when it comes to potentially life-saving drugs like Plavix. The State's interest is heightened where, as here, the omission of warning information raises a serious risk of harm to all consumers, but a particularly high risk to patients of East Asian and Pacific Island descent, who represent a significant portion of Hawai'i's population.

37. As such, the penalties imposed in this case will take into account the interests of the State in preventing similar acts and practices in the future.

### 5. Defendants' Ability to Pay

38. Here, it is important to consider what penalties are necessary for Defendants to fully appreciate the wrongfulness of their conduct and to deter them from taking similar actions in the future. To achieve that goal, the penalty must take into consideration the wrongdoer's financial ability to pay. Given that important purposes of statutes such as UDAP are to protect consumers and deter future unfair or deceptive conduct, the penalty must be of an amount that is appropriate for each particular defendant.

39. If a penalty is more than a defendant can pay, then justice would not be served. Similarly, if a penalty is so small that it can be written off as a mere cost of doing business, then consumers would not be adequately protected. *See United States v. ITT Continental Baking Co. ("ITT Continental Baking")*, 420 U.S. 223, 231 (1975). In *ITT Continental Baking*, the United States Supreme Court noted that in adopting the FTC Act, Congress was concerned with avoiding a situation where a statutory penalty would be regarded by violators as "nothing more than an acceptable cost of violation, rather than as a deterrence to violation." *Id.* The Court concludes that the same concern applies to awarding an appropriate penalty for the commission of unfair and deceptive trade practices under Chapter 480.

40. The Hawaii Legislature has already determined the fair range of penalties under § 480-3.1: to be between $500 and $10,000 per violation. Therefore, the Court must determine an amount within that range.

41. Defendants in this case are large multinational corporations with very substantial resources. As shown by Defendants' financial filings with the SEC for years 1998 through 2012, BMS reported net sales of Plavix totaling $50.3 billion. P0359-P0384 [BMS SEC Filings]. In the financial filings with the SEC for years 2002 through 2012, Sanofi reported net sales from

Plavix totaling €22.1 billion.[22] P0385-P0403 [Sanofi SEC Filings]. Therefore, Defendants have the ability to pay an award appropriate to the egregiousness of their misconduct toward Hawai'i consumers.

42.     While all of the foregoing factors and considerations are important, in the circumstances of this case, the Court finds Defendants' bad faith, Defendants' ability to pay, the desire to eliminate benefits derived from violation, and the need to deter to be particularly compelling.

### ii.     What Constitutes a Violation

43.     The Court finds that Defendants' deceptive conduct in this case was far-reaching and persistent. Based upon the evidence presented at trial and the above findings of fact and conclusions of law, the Court finds that the distribution of each copy of the Plavix label (package insert) with every retail prescription filled and refilled and non-retail units sold, in the State of Hawai'i was a deceptive act or practice in violation of UDAP because each Plavix label omitted material safety and efficacy information and therefore had the capacity to mislead consumers.

44.     Other courts applying the federal counterpart to Hawaii's UDAP statute—the FTC Act—and other statutes similar to UDAP have routinely found that each piece of material containing the deceptive statement was a separate and independent violation. *See e.g., United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 965–66 (3d Cir. 1981) (holding that "*each letter* included as part of a mass mailing constitutes a separate violation") (emphasis added); *United States v. J. B. Williams Co.*, 498 F.2d 414, 435 (2d Cir. 1974) (holding that "*each separate broadcast* of [a] commercial was a separate violation" rather than each day the

---

[22] These sales figures do not include numerous other drugs, from which each Defendant has also generated billions of dollars in sales, according to the SEC filings in evidence.

commercial aired) (emphasis added); *United States v. Floersheim*, No. CV 74-484-RF, 1980 WL
1852, at *9 (C.D. Cal. May 1, 1980) (holding that *"[e]ach individual form* [containing the
misrepresentations] constitutes a separate violation") (emphasis added); *State ex rel. Wilson v*
*Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, No. 07-CP-42-1438, 2011 WL 2185861
(S.C.Com.Pl. June 03, 2011).

45.     Tallying the number of violations in terms of the retail prescriptions filled and
nonretail units sold is appropriate given the circumstances of the deceptive acts in this case. The
warnings, risks, and benefits listed in a drug's label are the cornerstone to the patient's ability to
make an informed decision regarding that drug. The Medication Guide portion of Defendants'
own label instructs patients to read the label before they "start taking Plavix and each time [they]
get a refill." P0416. Every time a consumer of Plavix initially filled, or subsequently refilled a
Plavix prescription, that consumer was deceived. As Dr. Roome acknowledged, it is important
for prescribing doctors and patients to be fully informed as to the relevant scientific and medical
information about a drug every time a prescription is filled and refilled. The label also notes that
the information in the boxed warning is "the most important information [you] should know
about Plavix[.]" P0412 [Plavix Label March 2010]; P0416 [Medication Guide May 2019];
P0833 [Plavix Label September 2022]. As such, the Court finds that each retail prescription,
filled and refilled, and non-retail units sold in the State of Hawai'i constitutes a separate and
distinct deceptive act in violation of UDAP. A per prescription penalty makes sense if the
missing black box warning was material to consumers. *See Shikada*, 152 Hawai'i at 448.

46.     The Court finds Defendants' arguments about reducing the number of violations
unconvincing, as well as unsupported by the law or evidence presented in this case. Defendants
argued that the number of violations should be reduced only to the percentage of people that

61

were CYP2C19 poor metabolizers in Hawai'i. The Court disagrees. There are poor responders among all races, and Defendants omitted material information from the labels of all Hawai'i consumers of Plavix, thereby undermining their ability to give informed consent. Patients cannot know whether they are poor metabolizers until they get tested. The fact that Defendants withheld material information from all Hawai'i consumers requires that Defendants be penalized for each and every Plavix label that omitted this critical risk information.

### iii.    Number of Violations and Penalty Amount

47.    Given the evidence presented at trial, the factual findings affirmed by the Supreme Court, the above findings of fact, and the above conclusions of law, the Court finds that each retail prescription filled and refilled, and each non-retail unit sold in the state of Hawai'i by Defendants, between December 1998 and March 12, 2010 to be a separate deceptive act or practice in violation of UDAP. Defendants argued that the penalties should be limited to prescriptions filled or refilled after the publication of either (1) the research paper published by Jessica Mega in November 2008 (which Defendants contend first showed the prevalence of CYP2C19 in Plavix metabolism) (D1252 [Mega, 2009]), or (2) the paper published by Jean Sebastian Hulot in 2006 (which was an independent research study showing the link between CYP2C19 poor metabolizers and poor responders). D1194 [Hulot, 2006]. The Court is not persuaded by these arguments. As discussed above, the overwhelming weight of the evidence is that Defendants' deceptive business practices extended back to the launch of Plavix in December 1998. As such, the Court finds that the number of deceptive acts or practices violations resulting from the Defendants' joint misconduct is 834,012, as calculated by the State's expert Dr. Nicole Maestas.

48.     Given the factors discussed above and the findings of fact, the Court concludes the appropriate penalty to be $1,000 per violation, for a total of $834,012,000 in civil penalties.

**C.     Penalties for Unfairness**

49.     As the Supreme Court affirmed on appeal, Defendants also committed unfair acts and practices in violation of UDAP, including the failure to investigate the poor responder issue, suppression of studies regarding that and related issues, and burying their heads in the sand. *Shikada, supra*, 152 Hawaiʻi at 445-48, 526 P.3d at 422-25. This Court finds that those unfair acts or practices, which are based on separate conduct from that underlying Defendants' deceptive practices described above, constitute independent violations of UDAP for which penalties may also be imposed. *Id.* at 443, 526 P.3d at 420 ("*Unfair* act UDAP claims are distinct from deceptive act UDAP claims." (emphasis in original)).

50.     This Court was tasked on remand with evaluating appropriate penalties for these unfair acts or practices.

### i.     *Reader's Digest* Factors

51.     The *Reader's Digest* and other factors discussed above apply to unfair acts, as well as to deceptive acts. Because analysis of most of those factors is the same, whether applied to unfairness or deception, the Court need only examine Defendants' good or bad faith and injury to the public separately with respect to Defendant's unfair acts.

### 1.     Good or Bad Faith of Defendants

52.     The Court concludes that Defendants' unfair acts or practices were deliberate and pervasive, and they slowed and negatively affected the development of science related to Plavix for over a decade. The Court's findings show that—despite Dr. Roome's admission that the Defendants should know the pharmacology, strengths, and weaknesses of their own drugs better

63

than anyone—Defendants made and followed policies to reject any studies for fear of the

development of literature relating to Plavix resistance. Further, when the scientific community

began to independently discover the issues Defendants already knew, Defendants did not

immediately take steps to ensure patient safety. Instead, they continued to deny the existence of

Plavix resistance, choosing instead to rename the phenomenon to something they thought was

less harmful to their marketing efforts, variability of response. They also avoided conducting

any studies that might reveal how harmful Plavix resistance was to patients.[23] Then, cynically,

Defendants later pointed to the absence of such studies as justification for their failure to update

their label. By doing so, Defendants created and maintained a self-sustaining feedback loop that

prevented the public from learning about Plavix's serious limitations. All of this was done to

benefit Defendants' financial bottom line. The Court further notes that it rejects Defendants'

argument that because Defendants developed an "action plan" supposedly to study Plavix

variability of response in 2003, Defendants should be spared from imposition of a daily penalty

for unfairness from June 2003 forward.

53.     Document after document authored by Defendants showed that marketing and

sales considerations were the reasons why studies were not done. The Supreme Court

commented on Defendants' misconduct, stating that "[p]reventing risks from becoming apparent

for financial gain offends Hawai'i public policy." *Shikada*, 152 Hawai'i at 447, 526 P.3d at 424.

---

[23] Defendants argued at length at trial that they were in fact performing studies. However, each study Defendants cited was either not designed or powered to determine how Plavix resistance, including CYP2C19 poor responders, led to increased rates of heart attacks and strokes, or the results came from negative trials (where Plavix was shown to have no benefit for the population studies) or in low-risk populations where the benefits of Plavix were marginal at best. Defendants' arguments that they were meaningfully studying the problem are not credible and are substantially outweighed by the State's evidence. Indeed, Dr. Gavin, BMS' Director of Medical Affairs, testified that they never conducted a study linking poor metabolizers and clinical outcomes. Court's Exhibit G at 116:16-20.

All of these facts show the extent of Defendants' significant and troubling bad faith as it relates to their unfair acts or practices.

## 2. Injury to the Public

54.     In addition, the Court finds that Defendants' unfair conduct of suppressing studies caused substantial injury to Hawai'i consumers. First, as discussed above, the record shows that the information related to Plavix resistance, including CYP2C19 poor responders, is material because such facts are important to a reasonable consumer. As such, the fact that the scientific research surrounding Plavix resistance was suppressed since before the drug was launched until the FDA mandated its inclusion in the Plavix label over a decade later creates a substantial injury to consumers. Second, the evidence shows that Plavix resistance caused harm to patients. Study after study linked Plavix poor responders to higher rates of heart attack and stroke while taking Plavix as compared to normal responders. Despite the mounting evidence regarding the link between poor responders and clinical outcomes from outside researchers, Defendants continued to bury their heads in the sand and ignore the issue. Again, the fact that the injury is neither calculated nor quantified does not mean that there is no injury.

55.     Indeed, it is reasonable for the Court to find that Hawai'i patient care involving Plavix would have been improved had Defendants put forth appropriate efforts to research Plavix resistance and its cause during that substantial time period and had they followed their duty to ensure the sufficiency of their label as soon as the risk of Plavix resistance became apparent. By suppressing research, Defendants created an environment where Hawai'i prescribing physicians practiced for more than a decade without the necessary information needed to evaluate the serious limitations of this heart medication.

56. Defendants presented to the world the impression that Plavix would reduce the risk of heart attack and stroke. And for many people it obviously did. Even the State does not deny that. However, Defendants' campaign to suppress research, and their refusal to acknowledge the legitimacy of independent medical literature showing Plavix's safety and efficacy risks, resulted in an untold number of Hawaiʻi patients taking a drug that may not have worked as well for them as intended, or may not have worked at all.

57. Defendants argued at trial that a finding of injury to consumers requires physical injury to the consumer. The Court disagrees for the reasons discussed herein.

58. Hawaiʻi courts have always exhibited great respect for human dignity and personal autonomy of Hawaii's citizens. One example of that is the Hawaiʻi courts' adoption of a patient-oriented standard of informed consent in which a patient must be told *not* what his or her doctor *thinks* he or she should be told, but what an objectively reasonable patient would need to know in order to make an informed decision about his or her medical treatment.

59. For the above-stated reasons, the Court finds that the *Reader's Digest* "injury to the public" factor has been met.

### ii. Number of Violations and Penalty Amount for Unfairness Claim

60. In the *Shikada* decision, the Supreme Court of Hawaiʻi suggested, but did not expressly decide, that an appropriate penalty for the kind of conduct that was found to be unfair in this case would be a daily penalty. *Shikada, supra*, 152 Hawaiʻi at 449, 526 P.3d at 426 ("In these circumstances, an appropriate penalty would correlate more with the length of time the Defendants 'buried their heads in the sand.'"). In light of the above discussed factors and the Court's findings in this case, the Court concludes that a per-day penalty is appropriate for Defendants' unfair acts or practices.

61.    As noted previously, approximately 4,100 days elapsed from the time of the

Plavix launch in December 1998 to announcement of the Plavix boxed warning on March 12,

2010. In light of the substantial evidence discussed above, the Court finds that a daily penalty of

$10,000 per day is warranted as to each of the Defendant groups.

**D.    Assessment of Penalties**

62.    Under Hawai'i law, the Court acknowledges that the penalties under §480-3.1

may not be assessed jointly and severally against distinct legal entities except where several

entities are subject to a single control, such as in the corporate parent-subsidiary

relationship. *State by Doi v. Shasteen*, 9 Haw. App. 106, 113, 826 P.2d 879, 883 (1992). While

Sanofi and Bristol-Myers Squibb acted jointly in their venture of selling Plavix between

December 1998 and March 12, 2010, the Court finds that they are legally separate entities. On

the other hand, the Court finds that defendants Sanofi-Aventis U.S. LLC, Sanofi US Services,

Inc., and Sanofi-Synethelabo LLC are all entities under a single control and thus shall be

considered one legal entity for purposes of penalty assessment. Therefore, the Court will assess

one set of penalties against Bristol-Myers Squibb and one set of penalties jointly and several

against the Sanofi Defendants.

63.    The Court finds substantial evidence in the record showing that both BMS and the

Sanofi Defendants committed the unfair and deceptive practices as part of their Joint Venture.

64.    Under the deceptiveness claim, the Court finds that Bristol-Myers Squibb and the

Sanofi Defendants are equally responsible for each deceptive violation, and for each fill or refill

of Plavix in Hawai'i. The Court assesses civil penalties in the amount of $417,006,000 against

Defendant Bristol-Myers Squibb Company and civil penalties in the amount of $417,006,000,

jointly and severally, against Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Sanofi-Synthelabo Inc.

65.     Under the unfairness claim, the Court finds that Bristol-Meyers Squibb and the Sanofi Defendants both committed the unfair acts and practices as affirmed by the Supreme Court of Hawai'i. Based upon a time span of 4,100 days, the Court awards civil penalties of $41,000,000 against Defendant Bristol-Myers Squibb Company and civil penalties in the amount of $41,000,000, jointly and severally, against Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Sanofi-Synthelabo Inc.

66.     If any of the conclusions of law set forth herein shall be deemed instead to be findings of fact, they are hereby incorporated by reference in the findings of fact set forth herein above.

## **ORDER**

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment shall be entered in favor of Plaintiff State of Hawai'i and against (1) Defendant Bristol-Myers Squibb Company in the amount of $458,006,000, and (2) Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Sanofi-Synthelabo Inc., jointly and severally, in the amount of $458,006,000.

DATED: Honolulu, Hawai'i,     May 21, 2024          .

/s/ James H. Ashford
JUDGE OF THE ABOVE-ENTITLED COURT

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

# Exhibit M

## IN THE CIRCUIT COURT OF BOONE COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA**
*ex rel.* **PATRICK MORRISEY,**
Attorney General,
**JOSEPH THORNTON,**
in his capacity as the Secretary of the
**WEST VIRGINIA DEPARTMENT
OF MILITARY AFFAIRS AND PUBLIC SAFETY,**
an agency of the State of West Virginia, and
**KAREN BOWLING,**
in her capacity as the Secretary of the
**WEST VIRGINIA DEPARTMENT
OF HEALTH & HUMAN RESOURCES,**
an agency of the State of West Virginia,

        Plaintiffs,

v.

                                Civil Action No.12-C-141
                           (Hon. William S. Thompson, Judge)

**AMERISOURCEBERGEN DRUG CORP.,**
a Delaware corporation doing business in West Virginia,
**MIAMI-LUKEN, INC.,**
an Ohio corporation doing business in West Virginia,
**J.M. SMITH CORP. d/b/a SMITH DRUG CO.,**
a South Carolina corporation doing business in West Virginia,
**THE HARVARD DRUG GROUP, LLC,**
a Michigan corporation doing business in West Virginia,
**ANDA INC.,**
a Florida corporation doing business in West Virginia,
**ASSOCIATED PHARMACIES, INC.,**
an Alabama corporation doing business in West Virginia,
**H.D. SMITH WHOLESALE DRUG CO.,**
a Delaware corporation doing business in West Virginia,
**KEYSOURCE MEDICAL INC.,**
an Ohio corporation doing business in West Virginia,
**MASTERS PHARMACEUTICALS, INC.,**
an Ohio corporation doing business in West Virginia,
**QUEST PHARMACEUTICALS, INC.,**
a Kentucky corporation doing business in West Virginia,
**RICHIE PHARMACAL CO., INC.,**
a Kentucky corporation doing business in West Virginia, and
**TOP RX, INC., a**
Tennessee corporation doing business in West Virginia,

        Defendants.

## <u>ORDER DENYING MOTIONS TO DISMISS</u>

On June 5, 2014 came Plaintiffs, by counsel, and came Defendants, by counsel, for a hearing on Defendants' various Motions to Dismiss. After oral argument, full briefing and mature consideration, and for the reasons that follow, the Court hereby **DENIES** Defendants' Motions to Dismiss.

## THE MOTION-TO-DISMISS STANDARD

1.     "A complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Conrad v. ARA Szabo*, 198 W. Va. 362, 369–70, 480 S.E.2d 801, 808–09 (1996).

2.     "Although entitlement to relief must be shown, a plaintiff is not required to set out facts upon which the claim is based." *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 776, 461 S.E.2d 516, 522 (1995).

3.     "In view of the liberal policy of the rules of pleading with regard to the construction of plaintiff's complaint, and in view of the policy of the rules favoring the determination of actions on the merits, the motion to dismiss for failure to state a claim should be viewed with disfavor and rarely granted. The standard which plaintiff must meet to overcome a Rule 12(b)(6) motion is a liberal standard, and few complaints fail to meet it." *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 161 W. Va. 603, 606, 245 S.E.2d 157, 159 (1978).

4.     "Complaints are to be read liberally as required by the notice pleading theory underlying the West Virginia Rules of Civil Procedure." *State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 227, 488 S.E.2d 901, 907 (1997) (quoting *Scott Runyan*, 194 W.Va. at 776, 461 S.E.2d at 522).

2

5.     "In reviewing a motion to dismiss, this Court is required to accept all the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Murphy v. Smallridge,* 196 W. Va. 35, 36, 468 S.E.2d 167, 168 (1996).  The Court therefore accepts the following allegations in the Amended Complaint as true, and draws all reasonable inferences therefrom in favor of Plaintiffs.

## FACTS ALLEGED IN AMENDED COMPLAINT

6.     The State alleges the problems caused by the prescription drug epidemic in West Virginia contributed by Defendants includes the fact that West Virginia is the Nation's "most medicated state" – citing data showing West Virginia pharmacies supplied by Defendants filled almost twice as many prescriptions as the national average on a *per capita* basis.  (Am. Compl. ¶ 6(e)).

7.     The State of West Virginia and two of its agencies, the West Virginia Department of Military Affairs and Public Safety and the West Virginia Department of Health & Human Resources (collectively "the State") bring this action to address "the epidemic of prescription drug abuse and its costs to the State of West Virginia."  The State pleads five claims: Injunctive Relief for Violations of West Virginia Controlled Substances Act (Count I), Damages from Negligence and Violations of Controlled Substances Act (Count II), Violations of West Virginia Consumer Credit and Protection Act (Count III), Public Nuisance (Count IV), and Negligence (Count V).

8.     It is alleged prescription drug abuse is widespread and costs the State hundreds of millions of dollars annually, devastates West Virginia communities and families, reduces the State's economic productivity, adversely affects West Virginia's hospitals, schools, courts, social service agencies, jails and prisons as well as diminishing the quality of life in the State's cities and towns.  (*Id.* ¶¶ 1, 6).

9.     Defendants are distributors of addictive controlled substances who supply controlled substances to pharmacies dispensing those drugs for illegitimate medical purposes, and that some of those pharmacies located in rural or low population areas order large quantities of commonly abused controlled substances from Defendants in amounts much greater than the populations in those areas would warrant, such that those orders are, at the very least, suspicious. (*Id.* ¶ 3).

10.     The Amended Complaint identifies many abused controlled substances the Defendants allegedly wrongfully distribute in West Virginia. (*Id.* ¶ 6(k)).

11.     The State claims Defendants profit from the prescription drug epidemic in West Virginia by distributing controlled substances in amounts in excess of the amount of controlled substances legitimately medically required. By distributing these excessive amounts of controlled substances, it is alleged Defendants violate West Virginia law by failing to implement, or more particularly, to follow and adhere to effective controls to guard against prescription drug diversion and by failing to effectively monitor, enforce and/or disclose suspicious orders they fill. (*Id.* ¶ 8).

12.     In paragraph 29 of the Amended Complaint, the State alleges Defendants conduct violates industry customs and standards:

> "The Defendants are distributors of controlled substances and must comply both with the laws of the State into which they distribute controlled substances and with industry custom and standards. In the instant case, the standard of conduct for Defendants' industry requires Defendants know their customers, which includes, *inter alia*, an awareness of their customer base (including but not limited to population levels of the immediate area), knowledge of the average prescriptions filled each day, the percentage of diverted and/or abused controlled

4

substances distributed as compared to overall purchases, how the dispenser fulfills

its responsibility to ensure that prescriptions filled are for legitimate medical

purposes, and identification of physicians and bogus centers for the alleged

treatment of pain that are the dispenser's frequent prescribers."

13.     In paragraph 30 of the Amended Complaint, the State claims:

"Defendants have willfully turned a blind eye towards the foregoing factors by

regularly distributing large quantities of commonly abused controlled substances

to clients who are serving a customer base comprised of individuals who are

themselves abusing prescription medications, many of whom are addicted and

whom reasonably can be expected to become addicted or to engage in illicit drug

transactions. The Defendants negligent acts and omissions in violation of West

Virginia's drug laws have lead to the dispensing of controlled substances for non-

legitimate medical purposes of epidemic proportions, including the operation of

bogus pain clinics that do little more than provide prescriptions for addictive

controlled substances and thereby creating and continuing addictions to

prescription medications."

14.     The State asserts each of the Defendants were aware of this epidemic of prescription drug

abuse in West Virginia, but they nevertheless persisted in a pattern of distributing commonly

abused and diverted controlled substances in geographic areas, and in such quantities and with

such frequency, that each of the Defendants knew or should have known these commonly abused

controlled substances were not being prescribed and consumed for legitimate medical purposes.

(*Id.* ¶ 50).

15.    Regulations promulgated pursuant to the West Virginia Controlled Substances Act

require Defendants to do the following:

•      "All registrants shall provide effective controls and procedures to guard against theft and
diversion of controlled substances [. . . .]" 15 W.Va.C.S.R. § 2-4.2.1.

•      "The registrant shall design and operate a system to disclose to the registrant suspicious
orders of controlled substances. The registrant shall inform the Office of the West Virginia
Board of Pharmacy of suspicious orders when discovered by the registrant. Suspicious orders
include orders of unusual size, orders deviating substantially from a normal pattern, and orders of
unusual frequency." 15 W.Va.C.S.R. § 2-4.4.

(*Id.* ¶ 20).

16.    The State further alleges Defendants have not complied with the requirements in the

foregoing regulations (*Id.* ¶¶ 21-22), and that by distributing excessive amounts of controlled

substances, Defendants violate West Virginia law (15 *WVCSR* § 2-4.2.1 and 15 *WVCSR* § 2-4.4)

by failing to implement effective controls to guard against prescription drug diversion and by

failing to effectively monitor, enforce and/or disclose suspicious orders they fill. (*Id.* ¶ 8).

17.    The State alleges that between 2007 and 2013, certain Defendants have -- based on

similar allegations regarding their lack of oversight of painkiller sales and failure to effectively

detect, identify and report suspicious orders of controlled substances -- either had their licenses

suspended for a period of time, paid fines to various U.S. Attorney's Offices based on Drug

Enforcement Agency investigations or acknowledged such federal investigations. (*Id.*).

## THE AMENDED COMPLAINT IS NOT PLED ENTIRELY SUFFICIENTLY

18.    "The trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion,

should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief." *Syl.* Pt. 2, *Sedlock v.*

*Moyle,* 222 W. Va. 547, 668 S.E.2d 176 (2008) (*per curiam*) (quoting *Syl.* Pt. 3, *Chapman v.*

*Kane Transfer Co., Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977)); *accord Syl.* Pt. 1, *Hill v. Stowers*, 224 W. Va. 51, 680 S.E.2d 66, 70 (2009) (*per curiam*) (quoting *Chapman*).

19.     A plaintiff is not required to set out claims in detail – the pleading standard is not based on how much detail is alleged, but rather whether the Court and opposing parties can understand whether a valid claim is alleged. As our Supreme Court held in *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 776, 461 S.E.2d 516, 522 (1995):

> "Complaints are to be read liberally as required by the notice pleading theory underlying the West Virginia Rules of Civil Procedure. – The circuit court, viewing all the facts in a light most favorable to the nonmoving party, may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his[, her, or its] claim which would entitle him[, her, or it] to relief." – Indeed, Rule 8 of the Rules of Civil Procedure requires clarity but not detail. Specifically, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" In addition, Rule 8(e)(1) states, in part, that "[e]ach averment of a pleading shall be simple, concise, and direct." The primary purpose of these provisions is rooted in fair notice. Under Rule 8, a complaint must be intelligibly sufficient for a circuit court or an opposing party to understand whether a valid claim is alleged and, if so, what it is. Although entitlement to relief must be shown, a plaintiff is not required to set out facts upon which the claim is based."

20.     The Court finds and concludes the State has not entirely met its pleading burden and its claims to satisfy Rule 12. The Amended Complaint's allegations put Defendants on fair notice

of the claims being pled against them; however, the Court Orders Plaintiffs to amend the

Amended Complaint with more clarity.[1],[2]

## CONCLUSIONS OF LAW

### STANDING

21.    "[S]tanding is defined as '[a] party's right to make a legal claim or seek judicial

enforcement of a duty or right.'" *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 94,

576 S.E.2d 807, 821 (2002) (quoting *Black's Law Dictionary* 1413 (7th ed.1999)).

> "'Standing is comprised of three elements: First, the party attempting to establish standing must have suffered an 'injury-in-fact'-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.'"

*Syl. Pt. 2, Doering v. City of Ronceverte*, 228 W.Va. 147, 718 S.E.2d 497 (2011) (quoting *Syl. pt.

5, Findley v. State Farm Mutual Automobile Insurance Company*, 213 W.Va. 80, 576 S.E.2d 807

(2002)).

22.    This case is brought by the Plaintiffs in the name of the State of West Virginia.

23.    The Attorney General is the lawyer, and although he may be the representative of the

State, the claims are brought in the name of the State, and for the benefit of the State, and the

---

[1] At the conclusion of the hearing on June 5, 2014, the Court allowed certain Defendants who had not filed their own memoranda or replies in favor of Motions to Dismiss to nevertheless submit a proposed order regarding their Motions to Dismiss.  On June 18, 2014, a proposed order was submitted jointly by Defendants Top Rx, Inc., Keysource Medical, Inc., Miami Luken, Inc., The Harvard Drug Group, LLC, Associated Pharmacies, Inc., Masters Pharmaceutical, Inc. and Quest Pharmaceuticals, Inc.  The Court converts the proposed order into a joint motion. These Defendants essentially argue the State does not allege they have "sold a sufficient amount of controlled substances in West Virginia" for liability to attach.  However, the Amended Complaint alleges, for example, "Defendants are major distributors," who have "received substantial revenue from West Virginia entities while engaging in wholesale drug distribution in West Virginia and in supplying West Virginia Pill Mills." (Am. Compl. ¶¶ 3, 5).  The Motion to Dismiss of these Defendants is thus denied.

[2] Although the Defendants may not have explicitly asked for a more definite statement in either their written or oral motions before this Court, the Defendants implicitly argued for one in both their written and oral motions before this Court.  The Court feels that the Defendants' arguments in their motions to dismiss can be adequately addressed by this Court requiring a more definite statement.  Therefore, the Court is granting this implied motion.

State, not the Attorney General; thus, the State is the real party in interest. *See Lawyer Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 800, 461 S.E.2d 850, 862 (1995) (explaining the Attorney General is the State's lawyer).

24.    "A State may have standing to assert an injury to a sovereign interest, to some proprietary interest, or to its parens patriae interest. A State has standing to sue in its sovereign capacity if it has suffered an economic injury." 72 Am.Jur.2d *States, etc.* § 93 at 516 (2012); *see also id.,* § 89 at 513 (2012) ("A state, as a political corporation, has the right, independent of any statutory provision, to institute a suit in any of its courts[,] whether doing so is required by its pecuniary interests or by the general public welfare. It possesses this right both in its sovereign capacity and by virtue of its corporate rights.").

25.    The Court notes the Attorney General's representation of the State has been challenged unsuccessfully in other cases.[3]

26.    The Attorney General regularly represents the State in these types of claims. In addition to the inherent standing of the State to bring the instant claims, the Attorney General is authorized to do so pursuant to the common law and several statutes, including inter alia *W.Va. Code* §§ 5-3-1, 5-3-2, 14-1-1, 14-1-2, 14-1-3, and 23-1-1(e).[4]

27.    The fact that West Virginia Governor Earl Ray Tomblin requested and authorized the State's claims on behalf of the Department of Military Affairs and Public Safety and the Department of Health and Human Resources in writing confirms the named Plaintiffs are

---

[3] *See State of West Virginia ex rel. McGraw v. Purdue Pharma, et al.* (McDowell County Civil Action No. 01-C-137-S); *State of West Virginia ex rel McGraw v. Warrick Pharmaceuticals, et al.* (Kanawha County Civil Action No. 01-C-3011); *State ex rel. McGraw v Minnesota Mining, et al.* (Lincoln County Civil Action No. 03-0107).

[4] In a case in this Circuit, *State ex rel. McGraw v Minnesota Mining, et al,* (Lincoln County Civil Action No. 03-C-0107), Chief Judge Hoke denied a Motion to Dismiss where similar "standing" arguments were made as are made here.

9

authorized to bring the instant claims in the name of the State. (*See* Ex. A to State's Resp. to H.D. Smith's M.T.D.).

28. Defendants' "standing" argument ignores the well-recognized right of a State, through its officers, to bring a proprietary suit in which it sues much like a private party suffering a direct, tangible injury or to bring a *parens patriae* suit to vindicate "quasi-sovereign" interests on behalf of its citizens.

29. "A State may bring a proprietary suit in which it sues much like a private party suffering a direct, tangible injury. . . . It may also bring a *parens patriae* suit in which it seeks to vindicate a 'quasi-sovereign' interest on behalf of its citizens. . . . A State's 'quasi-sovereign' interests include protecting the 'health and well-being—both physical and economic—of its residents in general.'" *In re Oxycontin Antitrust Litig.*, 821 F. Supp. 2d 591, 601 (S.D.N.Y. 2011) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02, 607 (1982); citing *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir. 2002)).

30. The Court concludes the State has standing, first, by virtue of its direct, tangible injury, and second, by its *parens patriae* authority.

## PARENS PATRIAE STANDING

31. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600-01 (1982), the United States Supreme Court held Puerto Rico had *parens patriae* standing to seek redress from private parties for discriminating against its citizens. The Court held a State may sue in court to enforce its quasi-sovereign interests, that "consist of a set of interests that the State has in the well-being of its populace[.]" *Id.* at 602. This includes "both [the] physical and economic" well-being "of its residents in general." *Id.* at 607. "Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as

well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.* at 607.

32.     *Snapp* illustrates the basic point that a statute need not expressly provide for suit by states in a quasi-sovereign capacity in order for such standing to be found. *See, e.g., Maryland v. Louisiana*, 451 U.S. 725, 735-39 (1981) (state's suit in *parens patriae* on behalf of citizens as consumers of natural gas recognized without statutory text).

33.     The only limit on a State's *parens patriae* standing is that a State may not sue in its quasi-sovereign capacity when it is solely a nominal party representing the interests of others. *Id.* The Court concludes *Snapp, supra,* and *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439 (1945) are applicable here. The State is not a mere nominal party to this suit, is asserting damages in its own right, and is seeking to protect the health and well-being of its citizens. As stated in paragraph 1 of the Amended Complaint:

> "This civil action addresses the epidemic of prescription drug abuse and its costs to the State of West Virginia. Prescription drug abuse costs the State of West Virginia hundreds of millions of dollars annually. Beyond the actual dollars lost, prescription drug abuse devastates West Virginia communities and families and reduces the State's economic productivity. The damage done by prescription drug abuse adversely affects West Virginia's hospitals, schools, courts, social service agencies, jails and prisons as well as diminishing the very quality of life in our cities and towns."

34.     The foregoing are the sorts of quasi-sovereign interests that give the State standing to sue under *Snapp, supra*. Thus, the State has "articulate[d] an interest apart from the interests of particular private parties." 458 U.S. at 607. The Court concludes the State has *parens patriae* standing here.

## THE ATTORNEY GENERAL'S COMMON LAW POWERS

35.    In *Syllabus* Point 3 of *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 231 W. Va. 227,

744 S.E.2d 625, 627 (2013), the Supreme Court of Appeals affirmed that the Office of Attorney

General retains inherent common law powers:

> "The Office of Attorney General retains inherent common law powers, when not
>
> expressly restricted or limited by statute. The extent of those powers is to be
>
> determined on a case-by-case basis. Insofar as the decision in *Manchin v.*
>
> *Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), is inconsistent with this
>
> holding, it is expressly overruled."

36.    "Under the common law, the attorney general has the power to bring any action which

he or she thinks necessary to protect the public interest, a broad grant of authority which includes

the power to enforce the state's statutes. In the exercise of these common law powers, an

attorney general may control and manage all litigation on behalf of the state[.]" 7 Am.Jur.2d

*Attorney General* § 6 at 11 (2007).

37.    "Pursuant to his or her statutory, constitutional, or common-law powers as the chief law

officer of the state, the attorney general may institute, conduct and maintain all such suits and

proceedings as he or she deems necessary for the enforcement of the laws of the state, the

preservation of order, and the protection of public rights." *Id.* § 21 at 26.

38.    It is acknowledged generally an attorney general is the proper party to determine the

necessity and advisability of undertaking or prosecuting actions on the part of the state[.]" *Id.* §

23 at 27.

39.    Defendants do not argue the Attorney General's common law power to bring this suit is

"expressly restricted or limited by statute," as required by *State ex rel. Discover Fin. Servs., Inc.*

*v. Nibert, supra.* Instead, they assert the Attorney General's common law authority has been

limited *impliedly*. The Court concludes that because there is no *express* statutory restriction or limitation on the Attorney General's common law powers, the Attorney General has standing to bring the instant claims on behalf of the State, and Defendants' arguments to the contrary fail.[5]

## THE AMENDED COMPLAINT STATES VALID CAUSES OF ACTION

40.     The State asserts claims for, *inter alia,* negligence.

41.     "'The liability to make reparation for an injury, by negligence, is founded upon an original moral duty, enjoined upon every person, so to conduct himself, or exercise his own rights, as not to injure another.'" *Syllabus* Point 1, *Robertson v. LeMaster*, 171 W. Va. 607, 301 S.E.2d 563 (1983) (internal citation omitted).

42.     "One who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm." *Id. Syl.* Pt. 2.

43.     The Court concludes the State's negligence claims constitute valid claims. The State alleges Defendants engaged in affirmative conduct, that is, the heavy distribution and sale of addictive controlled substances to Pill Mill pharmacies in unusually large amounts for the population base, when they knew or should have known that the distribution of addictive controlled substances in such amounts in such areas would be diverted and/or improperly used thereby creating an unreasonable risk of harm and damage to others, in the form of increased crimes and other public health and safety dangers in West Virginia communities. *(See, e.g.,* Am. Compl. ¶¶ 3, 29). *Syl. Pts.* 1 and 2, *Robertson v. LeMaster*, 171 W. Va. 607, 301 S.E.2d 563 (1983).

44.     Moreover, questions of negligence are for the jury, not for the Court on a motion to

---

[5] Even if the Attorney General lacked common law authority, he would have standing under *W.Va. Code* § 60A-5-501(c), both independently and pursuant to the request of the State Police – he is not expressly restricted to taking only such actions on behalf of the State as requested by the Board of Pharmacy, as asserted by Defendants

13

dismiss. "'The questions of negligence and contributory negligence are for the jury when the evidence is conflicting or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them.'" *Id. Syl.* Pt. 5 (internal citation omitted). Thus, questions of negligence presented by the State's Amended Complaint are for a jury, not for a court on a motion to dismiss.

## PRIVATE CAUSE OF ACTION UNDER THE CONTROLLED SUBSTANCES ACT

45.     *West Virginia Code* § 55-7-9 permits the recovery of damages stemming from a violation of a statute:

> "Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages."

46.     A violation of a statute or ordinance can constitute actionable negligence. *Syllabus* Point 4, *State Rd. Comm'n v. Ball*, 138 W. Va. 349, 350, 76 S.E.2d 55 (1953) ("The violation of a statute or ordinance, which is the proximate cause of an injury or contributed thereto, constitutes actionable negligence.").

47.     Even if the State had not presented valid negligence claims pursuant to *Robertson v. LeMaster, supra,* the violation of a statute also is *prima facie* evidence of negligence, provided such violation is the proximate cause of injury. *See, e.g., Powell v. Mitchell,* 120 W.Va. 9, 196 S.E. 153 (1938); *Porterfield v. Sudduth,* 117 W.Va. 231, 185 S.E. 209 (1936). *See also Syl* Pt. 1, *Anderson v. Moulder,* 183 W.Va. 77, 394 S.E.2d 61 (1990) ("Violation of a statute is *prima facie*

evidence of negligence.")[6]

48.    Whether a private cause of action exists based on a violation of a statute is determined by
applying the four part test set forth in *Hurley v. Allied Chemical Corp.*, 164 W.Va. 268, 262
S.E.2d 757 (1980). *Syllabus* Point 1 of *Hurley, supra*, states:

> "The following is the appropriate test to determine when a State statute gives rise
> by implication to a private cause of action: (1) the plaintiff must be a member of the class
> for whose benefit the statute was enacted; (2) consideration must be given to legislative
> intent, express or implied, to determine whether a private cause of action was intended;
> (3) an analysis must be made of whether a private cause of action is consistent with the
> underlying purposes of the legislative scheme; and (4) such private cause of action must
> not intrude into an area delegated exclusively to the federal government."

49.    The Court concludes the State and its agencies are Plaintiffs in this case as
representatives of the State and the public, for whose benefit the statute and accompanying
regulations was enacted, so the first prong of the *Hurley* test is satisfied.

50.    As for the second factor of "legislative intent," our Supreme Court has cautioned that,
"state statutes often have sparse legislative history or none at all . . . and in its absence, a state
court would be unable to utilize the second factor. *Hurley, supra*, 262 S.E.2d at 762.[7]    Such is
the case here, as no "legislative history" exists.

51.    As for the third *Hurley* factor, it has been held that, "a private remedy should not be
implied if it would frustrate the underlying purpose of the legislative scheme. On the other hand,
when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose,
the Court is decidedly receptive to its implication under the statute. *Hurley*, 262 at 762, quoting
*Cort v Ash*, 441 U.S. at 703. The Court concludes the State's causes of action are helpful to the

---

[6] The same is true for violations of regulations. *See Hersh v. E T Enterprises, Ltd. P'ship*, 232 W.Va. 305,
752 S.E.2d 336, 342 (2013); *see also Syllabus* Point 1, in part, *Miller v. Warren*, 182 W.Va. 560, 390 S.E.2d 207
(1990); *Syllabus* Point 1, in part, *Johnson v. Monongahela Power Co.*, 146 W.Va. 900, 123 S.E.2d 81, 83 (1961).
[7] It is not necessary to show an intention to create a private cause of action, although an explicit purpose to
deny such cause of action would be controlling.'" *Hurley, supra*, 262 S.E.2d at 761-62. The Court finds no "explicit
purpose to deny such cause of action" here.

statutory purpose – it is alleged by the State that there is an epidemic of prescription drug abuse in West Virginia, and that the Defendants put their desire for profits above and beyond their duty to put in place effective controls and procedures to prevent diversion of controlled substances and wholly failed in their duties to design and implement a system to disclose suspicious orders. The Court agrees the remedies sought by the State here, including damages, will be "helpful" to accomplish the statutory purposes of putting in effective controls against controlled substance diversions and reporting suspicious orders. Therefore, the Court concludes the third prong of *Hurley* is satisfied.[8]

52.   As to the fourth factor, the pending matter is not an area delegated exclusively to the federal government; thus, the factor is satisfied.

53.   On balance under *Hurley*, the private cause of action plead by the State exists.

## PUBLIC NUISANCE

54.   "Generally, [public nuisance] has been described as 'the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public." *State ex rel. Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 n. 28, 488 S.E.2d 901, 925 n. 28 (1997).

55.   The Court concludes the Amended Complaint sufficiently alleges Defendants either did something or failed to do something that injuriously affected the safety, health, and morals of the public, or worked some substantial annoyance, inconvenience or injury to the public – which is the accepted definition of "public nuisance".

56.   Our Supreme Court of Appeals repeatedly has explained a public nuisance: "'is an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons. . . .

---

[8] The Court concludes the fourth prong of the *Hurley* test is not relevant, as the State's claims are based on state laws and therefore do not intrude on federal authority.

[A] public nuisance . . . affects the general public . . . .'" *Kermit Lumber*, 200 W. Va. at 241, 488 S.E.2d at 921 (internal citations omitted).[9]

57.　　West Virginia law on public nuisance is consistent with the definition of "public nuisance" in 4 Restatement of the Law 2d, *Torts* (1965) ("Restatement"), which explains that a "public nuisance" is "an unreasonable interference with a right common to the general public." 4 Restatement of the Law 2d, *Torts* § 821B(1).

58.　　An "unreasonable interference" includes acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware. *Id*. § 821B(2); see Am. Compl. ¶ 8.[10]

59.　　The Court concludes the Amended Complaint's allegations fit squarely within the definition of a public nuisance under West Virginia law. The State alleges Defendants "failed to do something," that is, they failed to provide effective controls against the diversion of controlled

---

[9] Our Supreme Court has stated that a nuisance has a "broad definition" and that "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations." *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 621 (1985) (emphasis added). In *Sharon Steel*, the Court stated:

> "A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable.... A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort.... When the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well being, comfort, repose, and enjoyment of the ordinary normal individual residing therein, the carrying on of such business in such locality becomes a nuisance, and may be enjoined." (Citations omitted).

*Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 620-621 (1985) (quoting *Martin v. Williams*, 141 W.Va. 595, 610 11, 93 S.E.2d 835, 844, 56 A.L.R.2d 756, 768 (1956)).

[10] To the extent Defendants attempt to recast the State's public nuisance claim as one that attaches to the *lawful distribution* of controlled substances, similar to the lawful sale of firearms, their argument has no merit. The cases they cite are distinguishable and off-point because the Amended Complaint alleges something very different – that Defendants' distribution of controlled substances in West Virginia violated well-established regulations and industry standards requiring them to provide effective controls against the diversion of controlled substances and design and operate a system that discloses suspicious orders of controlled substances.

17

substances and failed to design and operate a system that discloses suspicious orders of controlled substances, failed to live up to industry standards – each one a failure that "injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public." *Kermit Lumber*, 200 W. Va. at 245 n. 28, 488 S.E.2d at 925 n. 28; *Rush v. Concrete Materials & Construction Co.*, 238 P.2d 704, 707 (Kan. 1951) ("all those who contribute" to the nuisance are liable, and one who creates the nuisance continues to be liable as long as the nuisance continues).

60.    To the extent Defendants argue the Legislature intended to immunize their conduct from a "public nuisance" claim because the Controlled Substances Act ("CSA") includes a criminal law provision deeming stores where "drug paraphernalia" are sold to be a *per se* public nuisance, while not addressing the massive harm allegedly done by Defendants' acts and omissions, the Court rejects this contention. The "maxim" of *"expressio unius est exclusio alterius"* argued by Defendants is not a rule of law, but rather a mode a statutory construction used to delineate legislative intent. There is nothing about the criminalizing of the selling of "drug paraphernalia" that suggests the Legislature intended to thereby remove a claim of public nuisance for wrongful conduct in the distribution of controlled substances. In an analogous situation, our Supreme Court in *Reed v. Phillips*, 192 W. Va. 392, 398, 452 S.E.2d 708, 714 (1994) held a statute limiting civil liability where smoke detectors are required in one statutory section applied only to that section, and would not limit tort liability relating to smoke detectors generally. By the same logic, the *expressio unius est exclusio alterius* maxim does not apply because the Legislature, in a separate section addressing drug paraphernalia crimes that have nothing to do with the Defendants' duty of care in distributing drugs to Pill Mill pharmacies, cannot be said to have intended to limit the State's ability to pursue public nuisance claims here.

61. The Court further concludes that *W.Va. Code* § 60A-4-404 expresses the opposite legislative intent to that asserted by Defendants – declaring that any penalty or sanction listed in the Act is "in addition to, and not in lieu of, any civil or administrative penalty or sanction otherwise authorized by law, which would include the State's public nuisance claim." *Id*. Thus, the Court concludes the Legislature's intent was not to make the per se public nuisance of buildings where drug paraphernalia is sold the exclusive provision addressing a public nuisance, but rather it was intended to be in addition other civil sanctions and remedies such as the public nuisance claim asserted by the State here.

62. Defendants also argue the State has not alleged any rights "common to the general public" to which they have interfered. The Court disagrees. In paragraph 44 of the Amended Complaint, the State alleges Defendants interfered with West Virginians' common right,

> "to be free from unwarranted injuries, addictions, diseases and sicknesses and have caused ongoing damage, hurt or inconvenience to West Virginia residents exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other adverse consequences from the use of the addictive prescription drugs distributed by Defendants, and countless others who will suffer the same fate in the future as Defendants' conduct is continuing."

(Am. Compl. ¶ 44). The State further alleges in paragraph 51 of the Amended Complaint that a "public nuisance so created, injuriously, and in many areas pervasively, affects West Virginia communities and the State, and endangers the public health and safety and inconveniences the citizens of the State in many ways, including:

• Hospital services, especially those services provided by emergency rooms, are being consumed by persons with prescription drug abuse issues;

• Law enforcement and prosecutorial resources are being exhausted and consumed by having to address prescription drug abuse issues to the exclusion of other matters;

• Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the public at large;

- Court dockets are congested by prescription drug-related cases as well as by crimes committed by addicts, thereby diminishing access to our courts by others;

- Jails and prisons suffer from overcrowding;

- Crimes and other dangerous activities have increased[.]"

63. The Court concludes the State's public nuisance claim sufficiently alleges the safety and health and morals of the people of West Virginia has been compromised due to Defendants' alleged wrongful influx of addictive, controlled substances into West Virginia, thereby causing substantial injury to West Virginia citizens and taxpayers. At the pleading stage, all facts and inferences therefrom supporting the public nuisance claim must be taken as true, and because the Amended Complaint sufficiently asserts a claim for public nuisance, the motion to dismiss that claim is denied.[11]

## PROXIMATE CAUSE

64. Under West Virginia law, questions of negligence and proximate cause are questions of fact for a jury to determine. *Aikens v. Debow*, 541 S.E.2d 576, 580 (W.Va. 2001); *Wehner v. Weinstein*, 444 S.E.2d 27, 32 (W.Va. 1994); *see Chapman*, 236 S.E.2d at 211-212. "A party in a tort action is not required to prove that the negligence of one sought to be charged with an injury was the sole proximate cause of an injury." *Syllabus* Point 2, in part, *Everly v. Columbia Gas of West Virginia, Inc.*, 171 W.Va. 534, 301 S.E.2d 165 (1982). Defendants' argument for dismissal on this basis is denied.

---

[11] To the extent it is argued that a comment in 4 Restatement of Law 2d, *Torts* to the effect that the one person's right to be free from a criminal assault is an individual right as opposed to common right applies to the statewide crime surge and other damages caused by the prescription drug epidemic to which the Defendants contributed is not an actionable public nuisance, the Court concludes the Restatement comment is meant to address something very different than what the State alleges here. The State's Amended Complaint does not allege that the public nuisance is one single assault, but rather that the prescription drug abuse fueled by Defendants' acts and omissions make up 90% of the criminal docket in some counties and has changed the way of life in many West Virginia communities. The Restatement comment cited by Defendants is not directed in any way towards the conduct alleged in the State's Complaint and therefore does not apply.

## FORESEEABLE CRIMINAL ACTS

65.    West Virginia case law holds the element of causation may be satisfied even where the immediate cause of the injury was a criminal act by a third party. For example, in *Osborne v. U.S.*, 166 F.Supp.2d 479 (S.D.W.Va. 2001), Chief Judge Haden applied West Virginia law to hold that a doctor's treatment of a patient, whereby he persistently prescribed addictive medications over a period of several years to a known drug and alcohol abuser, fell below the appropriate standard of medical care and treatment and was the proximate cause of the death, injuries, and damages suffered by plaintiffs in a motor vehicle accident in which a wife and daughter were injured and a husband was killed by the drug abuser. *Osborne v. U.S.*, 166 F.Supp.2d at 493. In rejecting the defense's contention that the plaintiffs could not show proximate cause because of the actions of the drug abuser, the court noted: "For the plaintiff to prove his case, he need not show his injury resulted solely from the physician's negligence." *Id.* at 498. This case later was certified to the Supreme Court of Appeals, which upheld the finding of liability, noting it agreed with Chief Judge Haden's finding that all of the elements of liability, including proximate cause, had been met. *Osborne v. U.S.*, 211 W. Va. 667, 675 n. 15, 567 S.E.2d 677, 685 n. 15 (2002).

66.    In *Miller v. Whitworth* 455 S.E.2d 821 (W.Va. 1995), our Supreme Court refused to fashion a bright-line rule that a landlord can never be held liable for injuries a tenant receives from a third party's criminal activity. Noting that the landlord's duty should be determined on a case-by-case basis, the Court found that "when the landlord could reasonably foresee that his own actions or omissions have unreasonably created or increased the risk of injury from the intentional criminal activity," such a duty would arise. *Id.*

67.     In *Blake v. John Skidmore Truck Stop*, 493 S.E.2d 887 (W.Va. 1997), our Supreme Court overturned a directed verdict in favor of the defense. The case involved a deliberate-intent claim against the plaintiff's employer for failure to provide appropriate security at the convenience store where the plaintiff worked. The plaintiff was stabbed repeatedly and suffered serious injury during a robbery of the convenience store. The defendant argued that, because criminal acts are unforeseeable, the employer could not possibly have "a subjective realization" of the risk as required by the deliberate-intent statute. The lower court agreed. However, our Supreme Court reversed, finding that "such a contention [did not] comport with common sense." *Id.* Thus, even in a deliberate-intent action, where the plaintiff carries a heavy burden to prove the employer's "subjective realization" of the risk, a criminal act by a third party does not break the chain of causation.

68.     In *Marcus v. Staubs*, 230 W. Va. 127, 736 S.E.2d 360 (2012), our Supreme Court held the issue of whether subsequent acts of minors and their friends in illegally consuming alcohol, stealing a vehicle, and recklessly operating the vehicle without a license while intoxicated amounted to intervening causes in a negligence action brought against an individual who allegedly helped supply minors with alcohol were questions for a jury.

69.     In West Virginia, intervening criminal acts break the chain of causation only when they are unforeseeable. *In re Flood Litigation*, 216 W.Va. 534, 607 S.E.2d 863, 878 (W.Va.2004). Additionally, "an intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." *Sydenstricker v. Mohan*, 217 W.Va. 552, 618 S.E.2d 561, 568 (2005) (emphasis added). That is not the case here.

70.    The Court concludes Defendants are unable to show any "intervening cause" constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury, as required by *Sydenstricker, supra.* Therefore, the "intervening causes" argument fails.

71.    There may be more than one proximate cause of an injury. When several factors contribute to produce an injury, one actor's negligence will be considered a proximate cause of the harm if it was a substantial factor in producing the injury. *Hundall v. Mate Creek Trucking, Inc.,* 200 W.Va. 454, 490 S.E.2d 56, 59 60 (1997).

72.    Whenever causation is required to be proved, it is well settled that causation of an injury or loss can be, and often is, the result of multiple causes. A defendant's conduct need not be the sole proximate cause. "A party is at fault when his or her negligence or fault was a proximate cause or *contributing factor* to the event which brought about the damages for which the claim is made." *Shia v. Chvasta,* 377 S.E.2d 644 (W.Va. 1988). In a concurrent negligence case, the fault of the defendant tortfeasor need only be a cause of the injury. *See, e.g., Everly v. Columbia Gas,* 301 S.E.2d 165 (W.Va. 1983). Moreover, "a plaintiff may sue any or all of those responsible for his injuries and collect his damages from whoever is able to pay, irrespective of their percentage of fault." *Syl.* Pt. 3, *Miller v. Monongahela Power Co.,* 403 S.E.2d 406 (W.Va. 1991)("makes no difference whether Monongahela was 90 percent at fault or 1 percent at fault as long as the plaintiff was not more than 50 percent at fault." (Citing *King v. Kayak Mfg. Corp.,* 387 S.E.2d 511 (W.Va. 1989)).

73.    The Court concludes the Amended Complaint alleges facts from which a jury could conclude Defendants' acts and omissions were a "substantial factor" producing damage to the

State and its citizens.[12] Foreseeability is the touchstone. The Court concludes that if it was foreseeable that Defendants' acts and omissions, in failing to provide effective controls against the diversion of controlled substances and design, and in failing to operate a system that discloses suspicious orders of controlled substances contributes to the prescription drug abuse epidemic in West Virginia, then Defendants' alleged actions constitute a proximate cause; a jury may conclude from the State's allegations that Defendants' alleged actions were a substantial contributing factor to the harm and damage alleged by the State in this case.

## THE *ARBAUGH* CASE

74.     The State alleges Defendants, as distributors of controlled substances, have a duty, *inter alia*, to report suspicious orders they receive from "Pill Mills." It is alleged Defendants habitually and unlawfully fail to do so in order to profit from these dubious orders. Defendants argue their wrongful failure to report suspicious orders of controlled substances can never be the proximate cause of damages as a matter of law based on *Arbaugh v. Bd. of Educ.*, 214 W.Va. 667, 591 S.E.2d 235 (2003).

75.     The Court concludes the *Arbaugh* case does not hold that a "failure to report" never can be the proximate cause of damages. To the contrary, *Arbaugh* states that a cause of action "may be brought based on negligence with the failure to report admissible as evidence in that context." *Arbaugh, supra* at 684., *but cf. Barbina v. Curry*, 221 W. Va. 41, 47, 650 S.E.2d 140, 146 (2007) (*Arbaugh* "states only that in a properly brought negligence action, a plaintiff may introduce evidence regarding failure to report. However, such evidence is not the basis for a cause of action; rather, it is evidence to support a legally recognized cause of action.").

---

[12] The primary case upon which they rely for their proximate cause arguments (an unpublished federal district court opinion) recognizes, "West Virginia does require that an intervening illegal act be unforeseeable[.]" *Bertovich v. Advanced Brands & Importing Co.*, 2006 WL 2382273 (N.D.W.Va. 2006).

76.     Moreover, *Arbaugh* discusses difficulties of establishing proximate cause solely in the context of reporting child abuse:

> "The problems with causation are further complicated when one considers that the statute conditions the reporting requirement on the exercise of judgment of an individual reporter who may become aware of a possible case of child abuse only through rumors, innuendo or second-hand reports. The diverse backgrounds, professions and occupations represented in the statutorily defined class of persons required to report make it all the more difficult to define what conduct is required in various conceivable situations."

*Id.*, 591 S.E.2d at 240.

77.     The Court concludes the reporting duties of the Defendant drug distributors are substantially different from the duty to report placed on certain professionals to report child abuse – unlike those upon whom a duty to report child abuse is placed, Defendants are intimately connected with and profit from the sale of dangerous, addicted controlled substances – so along with the privilege to profit from the sale of these addictive drugs, there is a duty imposed upon them to provide effective controls and procedures to guard against diversion of those addictive controlled substances, and also to "design and operate a system" to report suspicious orders like those at issue in this case.[13]

78.     Because Defendants must "design and operate a system" to report suspicious orders, and also provide effective controls and procedures to guard against diversion of those addictive controlled substances, their duties and the conduct they are required to report are not vague or "difficult to define" as was the case in *Arbaugh* .  Moreover, Defendants' duty to report is only

---

[13] Defendants have the duty to "provide effective controls and procedures to guard against . . . diversion of controlled substances [and] shall design and operate a system to disclose to the registrant suspicious orders of controlled substances[.]" 15 *W.Va.C.S.R.* §§ 2-4.2.1 - 4.4.

part of the breach of duty alleged by the State. The reporting duty complements Defendants' specific duty to put in place effective controls and procedures to guard against diversion of the addictive controlled substances they sell and distribute, duties that do not exist for those who are supposed to report child abuse. Thus, *Arbaugh's* reasoning, which addresses the much more limited duty to report child abuse by professionals who might happen to come into contact with abused children, is inapposite, and is limited to the reporting of child abuse by licensed professionals. Defendants' arguments for dismissal based on *Arbaugh* are denied.

## WVCCPA

79.     The purpose of the West Virginia Consumer and Credit Protection Act ("WVCCPA") is to protect the public and promote sound business practices. See *W. Va. Code* § 46A-6-101.

80.     West Virginia Code § 46A-6-104 is "among the most broadly drawn provisions" in the WVCCPA, *McFoy v. Amerigas*, 295 S.E.2d 16, 19 (W. Va. 1982), and must be interpreted liberally to further its remedial purposes. *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.* 194 W.Va. 770, 778, 461 S.E.2d 516, 524 (1995); *see also State ex rel. McGraw v. Rite Aid of WV, Inc.*, Civil Action 09-C-217 (Cir. Ct. Boone Cty. March 15, 2011 ¶ 9).

81.     Likewise, the Attorney General has broadly-stated powers under Article 7 of the WVCCPA, and those powers are to be interpreted broadly. *Scott Runyan*, 194 W.Va. at 779, 781, 461 S.E.2d at 525, 527; *see also State ex rel. McGraw v. Rite Aid of WV, Inc., supra* ¶ 9.

82.     In its Amended Complaint, the State alleges Defendants engaged in improper and illegal sales of prescription drugs to Pill Mills without the proper anti-diversion controls (as mandated by state regulations). (Am. Compl. ¶¶ 2-5, 8). The State further alleges this conduct of Defendants has caused and continues to cause harm to the public. (*Id.* ¶¶ 1, 6). Under the Attorney General's broadly-worded and broadly-interpreted authority in Article 7, the State

asserts the aforementioned conduct by Defendants constitutes an illegal "unfair or deceptive act or practice in the conduct of any trade or commerce," under the plain and broad wording of *W. Va. Code* § 46A-6-104.

83.     Essentially, Defendants make two arguments. *First*, Defendants argue the alleged conduct is not unfair. The list of specifically-enumerated practices in W. Va. Code § 46A-6-102(f) contain the previous qualifier that an unfair or deceptive act or practice ("UDAP") "includes, but [is] not limited to" that specifically-enumerated list. *W. Va. Code* § 46A-6-102(7); *see also State ex rel. McGraw v. Rite Aid of WV, supra,* ¶ 10. This language indicates the list is not exclusive, and other conduct can constitute unfair or deceptive acts or practices.[14]  *Id.* Defendants counter that not all violations of a statute or regulation are unfair. Other courts have articulated such a limit and stated, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Kertesz v. Net Transactions, Ltd.,* 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009).[15] This question of "unfairness" is decided on a case-by-case basis. *See, e.g., Siegel v. Shell Oil Co.,* 612 F.3d 932, 935 (7th Cir. 2010). The State has pled that Defendants have profited off of the prescription drug epidemic by ignoring state-law anti-diversion regulations, thereby supplying Pill Mills. (Am. Compl. ¶¶ 2-4). That meets the pleading requirement of unfairness at

---

[14] The importance of *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 516 F. Supp. 2d 1072, 1118 (N.D. Cal. 2007) is over-stated by Defendants. While the court noted the private antitrust (price-fixing) suit brought by indirect purchaser businesses did not allege conduct similar to that enumerated in the non-exhaustive list of examples of UDAP's, it found dispositive the fact that, "the provision of the WVCCP that authorizes plaintiffs' private action expressly states that any such action may only be brought by a person or persons injured as a result '*of the use or employment by another person of a method, act or practice prohibited or declared to be unlawful by the provisions of this article[.]*'" *Id.* (emphasis in original). The same limitation does not apply to the State's WVCCPA claim in this case. *DRAM* does not require a different result here.

[15] *See also PNR, Inc. v. Beacon Property Management, Inc.,* 842 So.2d 773, 777 (Fla. 2003) (same); *Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla.Dist.Ct.App.2006) (same); *Speigel v. FTC,* 540 F.2d 287, 293 (7th Cir.1976); *Newcomb v. Cambridge Home Loans, Inc.,* 861 F. Supp. 2d 1153, 1168 (D. Haw. 2012); *Walker v. Fleetwood Homes of N. Carolina, Inc.,* 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007); *Marshall v. Miller,* 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

this stage. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 672 (7th Cir. 2008) ("Although the complaint does not use specifically the words "immoral, unethical, oppressive, or unscrupulous," it alleges conduct that, if proven, could support this statutory definition of unfairness under the Consumer Fraud Act."). Accordingly, Defendants' first basis for dismissal of the WVCCPA claim is rejected.

84.    *Second*, Defendants attempt to read into the WVCCPA a requirement that Defendants must make a sale directly to a "consumer" (as that term is defined in the WVCCPA) in order for the State to have a valid WVCCPA claim. To the extent Defendants seek to write in such a requirement, that is simply not contained in the language of *W. Va. Code* § 46A-6-104 or Article 7. Nothing about the declaration in § 46A-6-104 banning unfair or deceptive acts or practices in any trade or commerce indicates that statute only protects and applies to a defendant's sales made directly to a "consumer." Two published opinions, *Fed. Trade Comm'n v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 10 (D.D.C. 1999) and *West Virginia ex rel. McGraw v. Minnesota Mining and Mfg. Co.* ("3M"), 354 F. Supp.2d 660, 667 (S.D. W. Va. 2005), have noted that the UDAP statute and Article 7 do not require a defendant to make a sale directly to a "consumer." *See id.*; *see also State ex rel. McGraw v. Rite Aid of WV, Inc., supra*, ¶ 11. In reply, Defendants essentially cite two other authorities, but neither change the result in this case.

    a.    Defendants cite the unpublished opinion of *Cather v. Seneca Upshur Petroleum, Inc.*, 2010 WL 3271965, *7 (N.D. W.Va. Aug. 18, 2010). *Cather* concluded: "Because the plaintiffs . . . are lessors of oil and natural gas, and not 'consumers' as defined in W. Va.Code § 46A–6–102(2) or 46A–1–102, the WVCCPA does not provide them with a legal remedy in this case." *Id.* In *Cather*, the WVCCPA claim was not permitted to go forward because of the type of plaintiffs asserting

the claim. While the lessors of natural gas in *Cather* could not assert their WVCCPA claim under Article 6, there is nothing that precludes the State from bringing its claim pursuant to the Attorney General's powers in Article 7 of the WVCCPA. Furthermore, *Cather* even acknowledges *W. Va. Code* § 46A-6-104 "does not require a consumer or consumer transaction."[16]

b.  Defendants also note that the title of Article 6 of the WVCCPA is "General Consumer Protection." Though the State may focus on Defendants' transactions that do not involve a sale directly to a "consumer," (as it is defined in the WVCCPA), the State nevertheless is seeking to "protect consumers" through Count III of this lawsuit. The title, therefore, does not add a requirement into the State's enforcement of W. Va. Code § 46A-6-104 that Defendants must make a sale directly to a "consumer."[17] The Court concludes the WVCCPA claim may proceed.[18]

---

[16] Another point of clarification is needed regarding *W. Va. Code* § 46A-1-104, to which *Cather* and Defendants make reference. Two published opinions specifically have rejected the use of *W. Va. Code* § 46A-1-104 as a means of limiting other provisions of the WVCCPA. In *Polis v. Am. Liberty Fin., Inc.*, 237 F. Supp. 2d 681, 686 (S.D. W.Va. 2002) and *Rhoades v. W. Virginia Credit Bureau Reporting Servs., Inc.*, 96 F. Supp. 2d 528, 534 (S.D.W.Va. 2000), the Southern District of West Virginia underscored that § 1-104 is a choice-of-law provision that does not say WVCCPA only applies to the kinds of consumer transactions described in that specific choice-of-law provision. This point is even more poignant where, as here, the Attorney General's broad powers in Article 7 are at stake. The Attorney General's powers in Article 7 cannot be constrained by the choice-of-law provision in *W. Va. Code* § 46A-1-104, and the Court follows the lead of *Polis* and *Rhodes* in refusing to extrapolate from *W. Va. Code* § 46A-1-104 to "wipe out almost all of the WVCCPA." *Rhoades*, 96 F. Supp.2d at 534.

[17] Defendants also cite *White v. Wyeth*, 227 W. Va. 131, 705 S.E.2d 828 (2010), *State ex rel. McGraw v. Bear Stearns*, 217 W. Va. 573, 618 S.E.2d 582 (2005), and *Forster v. Pierce Cnty.*, 99 Wash. App. 168, 991 P.2d 687 (2000). Neither control the WVCCPA claim alleged here. In *White*, the holding dealt with "[t]he private cause of action afforded consumers under *West Virginia Code* § 46A 6 106(a)[.]." *Syl.* Pt. 6, *White v. Wyeth*, 227 W. Va. 131, 133, 705 S.E.2d 828, 830 (2010). Here, Section 106 is not at issue, and the State, not individual consumers, brings this action under the broader and liberally-construed powers afforded to it in Article 7 of the WVCCPA, specifically *W. Va. Code* §§ 46A 7-108, 110, and 111.

In *Bear Stearns*, the issue was whether an express exemption in the WVCCPA for buying and selling securities (*W. Va. Code* § 46A-1-102(21)) could be bypassed by the fact that advice was given in the selling of the securities. *Id.* 217 W. Va. at 579, 618 S.E.2d at 588. *Bear Stearns* reasoned "the service of providing investment advice and analyses is so ancillary or subsidiary to the buying and selling of securities" such that it falls within this statutory exemption embodied in the WVCCPA. *See id.* 217 W. Va. at 577, 618 S.E.2d at 586. Our Supreme Court

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

85.     Article 8 of the Controlled Substances Act ("CSA") is a licensing statute. "The Wholesale Drug Distribution Licensing Act of 1991" added Article 8 to the CSA. *W.Va. Code* § 60A-8-1. The purpose of Article 8 was to ensure that those selling prescription drugs would be licensed by the Board of Pharmacy. *Id.* § 60A-8-3. Under Article 8 of the CSA, however, even the Board of Pharmacy is limited to taking action against a distributor's license, imposing a penalty "not to exceed $1,000," and, in certain limited circumstances, placing drugs under seal. *Id.* § 60A-8-14(a), (c).

86.     By contrast, Article 5 of the CSA is entitled "Enforcement and Administrative Provisions." Article 5 explicitly recognizes the Board of Pharmacy is not the exclusive administrative body charged with enforcement of the CSA. For example, enforcement authority and various other responsibilities are bestowed upon the State Police (a subdivision of Plaintiff DMAPS). *See W.Va. Code* § 60A-5-501(a)(5), *W.Va. Code* § 60A-5-501(c)(3)-(6). Further, the Attorney General is charged with "assist[ing] in the enforcement of the act" and "cooperat[ing] with all agencies charged with the enforcement of the laws . . . of this state[.]" *W. Va. Code* § 60A-5-501(c). Article 5 further provides a judicial remedy: "The courts of record of this state have and may exercise jurisdiction to restrain or enjoin violations of this act." *Id.* § 60A 5 503(a).

---

was careful to explain "the legal issue before us is a narrow one" and the "opinion should not be read as an attempt to in any way diminish the power of the office of the Attorney General." *Id.* at 217 W. Va. at 579, 618 S.E.2d at 588.

In *Forster*, the Washington court explained at the outset, "[t]he question . . . is whether a person convicted of delivering drugs in 1972 has an unrestricted right to possess firearms in 1997." 99 Wash. App. at 170, 991 P.2d at 690. Neither of these cases compel the State's WVCCPA claim be dismissed here.

[18] To the extent Defendants continue to argue the State did not comply with pre-suit notice provisions, the notice provision in sub-section (b) only applies to claims brought by individuals pursuant to *W.Va. Code* § 46A 6 106 and does not apply to the State pursuant to its authority under Article 7 of the WVCCPA. Consequently, the Court concludes pre-suit notice is not a basis for dismissal of Count III.

87.     The Court concludes the State Plaintiffs were not required to exhaust administrative remedies for a multitude of reasons.

88.     *First,* there is no administrative remedy available to the State Plaintiffs in this case. "'The rule which requires the exhaustion of administrative remedies is inapplicable where no administrative remedy is provided by law.'" *Syl.* Pt. 3, *CBC Holdings, LLC v. Dynatec Corp., USA,* 224 W. Va. 25, 680 S.E.2d 40 (2009) (internal quotation omitted). The Attorney General, DMAPS, and DHHR are suing for money damages, statutory damages under the WVCCPA, attorney fees, injunctive relief, *etc.* (*See generally* Am. Compl.). They are not suing to revoke Defendants' licenses. (*See id.*). The administrative remedy provided in Article 8 of the CSA confers rights to the Board of Pharmacy, and the Board alone, to pursue the licensing privileges of drug distributors. Demonstrating this point is the fact that no party has argued the State Plaintiffs have authority under Article 8 to revoke Defendants' licenses.

89.     Contrary to Defendants' assertions, however, the two vague references to "complaints" and the like in W. Va. Code § 60A-8-10(a) and W. Va. Code § 60A-8-11(a) made in the context of the Board of Pharmacy's rights do not somehow convert the Board of Pharmacy's power over licensing and inspection of drug distributors into an administrative remedy available to the State Plaintiffs to appear before the Board. The sections Defendants rely on for their argument provide as follows:

> **§60A 8 10. West Virginia board of pharmacy complaint provisions.**
>
> Complaints arising under any provision of this article shall be handled as follows:
>
> The board of pharmacy is hereby authorized and empowered, when complaints or examinations or inspections of a wholesale drug distributor disclose that a wholesale drug distributor is not operating or conducting business according to the state and federal laws, to file a written complaint with the board charging the holder of a license to operate a wholesale drug distributorship operation with violations of this article which are grounds for restriction, suspension or revocation of the wholesale drug distributor's license.

31

\* \* \* \*

### §60A 8 11. The West Virginia board of pharmacy inspection powers and access to wholesale drug distributor records.

(a) A person authorized by the board may inspect during normal business hours any premises being used by a wholesale drug distributor in this state in the course of its business. Any wholesale drug distributor providing adequate documentation of the most recent satisfactory inspection less than three years old of such distributor's wholesale drug distribution activities and facilities by either the food and drug administration or a state agency, or any person or entity lawfully designated by a state agency to perform such inspection, determined to be comparable by the board shall be exempt from further inspection for a period of time to be determined by the board of pharmacy. Such exemption shall not bar the board from initiating an investigation pursuant to a public or governmental complaint received by the board regarding a wholesale drug distributor.

*Id.* (Boldface in original). These two sub-sections allow the Board of Pharmacy (and its designees) to take action against drug distributors' licensing privileges and to inspect drug distributors' premises. While these sections in Article 8 confer or limit rights of the Board of Pharmacy under the CSA, they do not limit the right of the State Plaintiffs to bring the instant claims. Because there is not an administrative remedy available to the State Plaintiffs in this case, there is no requirement that they exhaust one.

90.    *Second*, if these sections in Article 8 somehow can be construed to allow for an administrative remedy for the Attorney General, DMAPS and/or DHHR, it would be (at most) *permissive, not mandatory or exclusive.* Nowhere in Article 8 of the CSA, including all of the provisions cited by Defendants – *W. Va. Code* §§ 60A-8-7(h),[19] 60A-8-10, 60A-8-11, 60A-8-

---

[19] Defendants also contend that because *W. Va. Code* § 60A-8-7(b)(3) indicates the Board of Pharmacy may not issue a license to a drug distributor "unless the distributor operates in a manner prescribed by law," their licenses issued by the Board somehow amounts to conclusive proof that Defendants have complied with all laws. While Defendants offer the Board of Pharmacy's renewal of their licenses as having some sort of *res judicata* or collateral estoppel effect, the Court concludes the renewals are not conclusive proof that Defendants have complied with all laws and regulations for all of time which or warrant dismissal of the case. The Amended Complaint alleges Defendants violated state law, and the Court must accept those allegations as true at this stage of litigation.

14(a)-(c) and 15 *W.Va.C.S.R.* § 5.7.1 – is there a *requirement* that a state entity with damages caused by wrongful acts by a controlled prescription drug distributor make a complaint for damages with the Board of Pharmacy or otherwise work through the Board of Pharmacy's internal process of trying to restrict the drug distributor's license before proceeding to circuit court.[20] And so, there cannot be an exhaustion requirement imposed on the State Plaintiffs. *Syl.* Pt. 6, *Weimer v. Sanders*, 232 W. Va. 367, 752 S.E.2d 398, 401 (2013); *Collins v. Elkay Min. Co.*, 179 W. Va. 549, 554, 371 S.E.2d 46, 51 (1988); *see also State ex rel. McGraw v. Rite Aid of WV, Inc., supra*, ¶ 8.

91.     *Third and furthermore*, the CSA includes a specific statutory grant of authority to seek injunctive relief in court in *W. Va. Code* § 60A 5 503(a). Contrary to *W. Va. Code* §§ 60A-4-403 and 60A-8-12 in the CSA, which limit those judicial remedies to prosecuting attorneys, certain individuals, and the Board of Pharmacy, the judicial remedy in § 60A 5 503(a) of the CSA does not limit the State authorities who may pursue relief under that section. When a statute offers a judicial remedy, there can be no exhaustion requirement, absent an express statement by the Legislature. *Weimer*, 752 S.E.2d at 406 n. 4; *Syl.* pt. 3, *Beichler v. West Virginia Univ. at Parkersburg*, 226 W.Va. 321, 700 S.E.2d 532 (2010); *State ex rel. McGraw v. Rite Aid of WV, Inc., supra*, ¶ 8. There is no such statement by the Legislature in this context.

92.     *Fourth and moreover*, the inadequacy exception to the doctrine applies. "The exhaustion of administrative remedies doctrine is not ironclad; exceptions to the rule exist." *Hicks v. Mani*,

---

[20] Defendants hone in on the prelude to *W. Va. Code* § 60A-8-10, that provides: "Complaints arising under any provision of this **article** shall be handled as follows[.]" *Id.* (emphasis added). The parties differ over the meaning of the phrase, "shall be handled." The State contends it merely describes the mandatory processes the Board of Pharmacy must follow if it chooses to pursue a restriction on a distributor's license in terms of time periods as set out in *W.Va. Code* § 60A-8-10(b), *etc.* Defendants suggest the Board of Pharmacy has mandatory authority over regulation of prescription drug distributors. In any event, the word, "article," is dispositive. Any authority under § 60A-8-10 is limited to the Board of Pharmacy's undisputed regulation of licensing in "article" 8 (as indicated in the prelude to that section). And so, resolution of the dispute over the meaning of "shall be handled" makes no difference to the result here because either way the Board of Pharmacy does not have exclusive authority outside the licensing sphere.

230 W. Va. 9, 13 14, 736 S.E.2d 9, 13 14 (2012). Because relief is unavailable to the Attorney General, DMAPS, or DHHR through any such CSA administrative licensing procedures and because the Board of Pharmacy has no jurisdiction over WVCCPA enforcement actions, even if the CSA's administrative remedies were exclusive and § 60A 5 503(a) did not confer the right to seek judicial relief, those administrative remedies would be inadequate and therefore need not be pursued. *See, e.g., Weimer,* 752 S.E.2d at 406 n. 5; *Collins,* 179 W. Va. at 551 52, 371 S.E.2d at 48; *Syl.* Pt. 2, *Wiggins v. E. Associated Coal Corp.,* 357 S.E.2d 745 (1987).

93.     *Fifth and lastly,* the futility exception to the doctrine applies as well. "The exhaustion doctrine contemplates an efficacious administrative remedy." *State ex rel. Bd. of Educ. of Kanawha Cnty. v. Casey,* 176 W. Va. 733, 735, 349 S.E.2d 436, 438 (1986). Neither the Attorney General, DMAPS or DHHR have the authority to participate in the Board of Pharmacy's ability to restrict the licensing privileges of Defendants. Further, the Board of Pharmacy itself cannot seek monetary damages beyond the limit of $1,000. *W. Va. Code* § 60A-8-14(a). Any such remedy available to the State Plaintiffs would thus be futile, and the State Plaintiffs are not required to engage in such futility. *See, e.g., Syl.* pt. 1, *Casey,* 176 W.Va. 733, 349 S.E.2d 436; *Weimer,* 752 S.E.2d at 406 n. 5.

94.     Based upon the foregoing, the Court finds the State Plaintiffs were not required to exhaust any administrative remedies before filing this case in circuit court.

## MUNICIPAL COST RECOVERY DOCTRINE

95.     As the name suggests, the "municipal cost recovery doctrine," never before has been extended to claims made by a State. *See, e.g., State v. Lead Ind. Assn., Inc.,* 99 5226, 2001 WL 345830, *5 (R.I. Super. Apr. 2, 2001) (unpublished). States hold a very different and special place in our federalist system than municipalities. *See, e.g., Alden v. Maine,* 527 U.S. 706, 715

(1999); *see also West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011).

96.     Even in the case of municipalities, no court in West Virginia has ever recognized the "municipal cost recovery doctrine" or applied it to bar claims by a municipality.  Finding this common law doctrine to be misguided, the Indiana Supreme Court and New Jersey Appellate Court have rejected the application of this doctrine altogether – even to municipalities.  *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243 (Ind. 2003) (citing, *inter alia, James v. Arms Tech., Inc.*, 359 N.J. Super. 291, 820 A.2d 27, 49 (N.J. App.Div.2003)).

97.     Moreover, when the municipal cost recovery doctrine has been applied, it has, by and large,[21] been applied only to discrete, one-time events and not to ongoing public problems such as the facts alleged here. *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, 428, 768 N.E.2d 1136, 1149 50 (Ohio 2002) (refusing to apply doctrine to gun violence problem); *James,* 820 A.2d at 49 (same); *City of Boston v. Smith & Wesson Corp.*, 199902590, 2000 WL 1473568 (Mass. Super. July 13, 2000) (same); *Cf In re Oil Spill by The Amoco Cadiz,* 954 F.2d 1279, 1310 (7th Cir. 1992) *(per curiam)* (oil spill); *District of Columbia v. Air Fla, Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984) (plane crash); *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 150-51 (2d Cir. 2013) (plane crash); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983) (train derailment); *Walker v. Tri-County Crematory*, 643 S.E.2d 324,

[21] In *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 213 Ill.2d 351 (2004), that court expanded the municipal cost recovery doctrine to encompass ongoing public problems, but no other court since then has adopted such a broad application of the doctrine. Even among those courts that have chosen to apply the doctrine to municipalities at all, the *Chicago* case is an outlier to the rule of demarcation drawn by such courts between sudden disasters and ongoing public problems.

327-28 (Ga. Ct. App. 2007) (unburied human remains found at crematorium).[22] The Amended Complaint alleges an ongoing problem.

98.     Based on the foregoing, the Court concludes the "municipal cost recovery doctrine" does not bar any of the State's claims as alleged.

## ECONOMIC LOSS DOCTRINE

99.     To the extent Defendants are seeking dismissal of the statutory claims in Counts I, II, and III or the public nuisance claim in Count IV based on the economic loss doctrine, the doctrine plainly does not apply to these types of claims. *See Stuart v. Weisflog's Showroom Gallery, Inc.,* 2008 WI 22, 308 Wis. 2d 103, 124, 746 N.W.2d 762, 772 (Wis. 2008) (holding the economic loss doctrine does not apply to statutory claims); *Aikens v. Debow,* 208 W. Va. 486, 501, 541 S.E.2d 576, 591 (2000) (explaining the doctrine does not apply to nuisance claims).

100.    Contrary to Defendants' contention, the economic loss doctrine does not bar Count V either. The economic loss doctrine is a means of limiting the duty required of certain potential tortfeasors, but it does not limit damages recoverable in an otherwise proper negligence action. *Brian & Christie, Inc. v. Leishman Elec., Inc.,* 150 Idaho 22, 28, 244 P.3d 166, 172 (2010); *see also AmeriSource Mem.* In Supp. Of M.T.D. at 16. When Defendants argue for application of the economic loss doctrine, they are arguing that no duty exists. The economic loss doctrine "does not bar recovery in tort where the defendant had a duty imposed by law rather than by contract and where the defendant's intentional breach of that duty caused purely monetary harm to the plaintiff." *Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865, 879 (9th Cir. 2007). "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may

---

[22] Because the doctrine does not apply based on the allegations in the Amended Complaint, the Court need not address whether the alleged conduct fits into one of the following two exceptions for those cases where courts have chosen to apply the doctrine: (1) where Defendant(s)' acts create a public nuisance the government seeks to abate and (2) where there is specific statutory authority for recovery of the losses suffered by the government. *See, e.g., Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St. 3d 416, 428, 768 N.E.2d 1136, 1149 50 (Ohio 2002).

result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" *Syl.* Pt. 8, *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000) (quoting *Syl.* Pt. 3, *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988)). "[A] court's overall purpose in its consideration of foreseeability in conjunction with the duty owed is to discern in general terms whether the type of conduct at issue is sufficiently likely to result in the kind of harm experienced based on the evidence presented." *Strahin v. Cleavenger*, 216 W. Va. 175, 185, 603 S.E.2d 197, 207 (2004). Here, it is foreseeable the conduct alleged – failing to put in place proper anti-diversion controls so that West Virginia Pill Mills would not be supplied and enabled to fuel the prescription drug epidemic – is sufficiently likely to result in the State having to spend additional resources to combat the escalation of the prescription drug epidemic. Under the allegations in the Amended Complaint, Defendants owe a duty to the State, and the economic loss doctrine does not bar Count V.

101.    In *Aikens*, the Supreme Court of Appeals "emphasized that the holding" only "applies strictly to plaintiffs alleging purely economic loss from an interruption in commerce caused by another's negligence." 208 W. Va. at 501, 541 S.E.2d at 591 (internal citations omitted). Defendants nevertheless try to seize on *Syllabus* Point 9 of *Aikens*, which held:

> "An *individual* who sustains *economic loss* from an *interruption in commerce* caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor."

*Syl.* Pt. 9, *Aikens*, 208 W. Va. 486, 541 S.E.2d 576 (emphasis added). *Syllabus* Point 9 of *Aikens* does not control this case for, at least, three reasons. *First,* the State brings this action as

opposed to an individual plaintiff. *Second*, beyond the statutory damages in the WVCCPA and injunctive relief, the State also brings this case in its *parens patriae* capacity to vindicate a 'quasi sovereign' interest on behalf of its citizens, including the physical injury to the health and well-being of West Virginia residents generally. *See supra* pp. 11-13.[23] While not a claim for particularized personal injury, the alleged physical harm to the State's residents generally means there is more at issue than purely economic loss. *Third and last*, the State seeks, *inter alia*, economic loss in the form of costs paid out by the State in dealing with the prescription drug epidemic; whereas, *Aikens* involved a motel-restaurant's right to seek speculative and prospective "purely economic loss *as a result of an interruption in commerce*" caused by a truck accident that damaged the road leading to the motel-restaurant.

102. However, even within the framework of *Syllabus* Point 9 of *Aikens*, the State fits into the "special relationship" caveat to any ban on purely economic loss for an interruption in commerce in the absence of personal injury, property damage or contract such that a duty must be imposed. *See Syl.* Pt. 9, *Aikens, supra.* "In defining the proper considerations for ascertaining the existence of a duty . . . in addition to the [1] primary question of foreseeability of risk in discerning the existence of a duty, consideration must also be given to [2] 'the likelihood of injury, [3] the magnitude of the burden of guarding against it, and [4] the consequences of placing that burden on the defendant.'" *E. Steel Constructors, Inc. v. City of Salem*, 209 W. Va. 392, 397, 549 S.E.2d 266, 271 (2001) (Davis, J.) (citing *Aikens*, 208 W.Va. at 491, 541 S.E.2d at 581; *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983)).

103. Based upon the State's allegations in the pleadings that Defendants have violated anti-diversion regulations, it is foreseeable that injury to the State was likely to occur in the form of

---

[23] *In re Oxycontin Antitrust Litig.*, 821 F. Supp. 2d 591, 601 (S.D.N.Y. 2011) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02, 607 (1982); citing *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir.2002)); Am. Compl. ¶¶ 6b, 6c, 6h, and 6i.

increased costs in dealing with the prescription drug abuse epidemic, and the magnitude and consequences of placing this burden on Defendants is low because the duty already exists in state and federal regulations. The Court concludes Defendants may have owed a duty to the State. Based upon the foregoing, it is, accordingly, **ORDERED** as follows:

1.      The Motions to Dismiss of all Defendants in the above-captioned case be, and they hereby are, DENIED;

2.      However, the Court GRANTS Defendants' Motion for a More Definite Statement;

3.      The Plaintiffs are hereby ORDERED to amend the Complaint to include a More Definite Statement within thirty (30) days upon entry of this Order;

4.      Specifically, the Court Orders the Plaintiffs to use more specificity by alleging each individual Defendants' wrongful act(s) instead of using one broad category of Defendants, along with addressing each wrongful act(s) with clarity;

5.      Subsequent to the Court receiving and being satisfied with Plaintiffs' More Definite statement, the stay of discovery previously issued will be lifted and the Court will allow discovery until September 1, 2015;

6.      There shall be a stay between September 1, 2015 and October 31, 2015 for another mediation session.

7.      After mediation has occurred, the parties shall appear before this Court on the 9th day of November, 2015 at 9:30 a.m. for a status hearing.


Entered this _12th_ day of December 2014.

_Will S._

William S. Thompson, Judge

A COPY ATTEST

_Sue Ann Zickefoose_

39

CIRCUIT COURT

E-FILED | 12/22/2025 10:41 AM
CC-20-2025-C-1514
Kanawha County Circuit Clerk
Cathy S. Gatson

CIVIL CASE INFORMATION STATEMENT
CIVIL CASES

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

I.      CASE STYLE:

Plaintiff(s)                                           Case #: _____

                                                       Judge: _____

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL,**

        Plaintiff,
v.

|  | Days to Answer | Type of Service |
|---|---|---|
| Defendant(s) | | |
| **3M COMPANY** f/k/a **MINNESOTA MINING AND MANUFACTURING CO.** c/o CORPORATION SERVICE COMPANY 808 GREENBRIER STREET CHARLESTON, WV, 25311 | 30 | Secretary of State |

<table>
<tr><td>

**STATE OF WEST VIRGINIA,**<br>
*ex rel.* **JOHN B. McCUSKEY,**<br>
**ATTORNEY GENERAL** v. **3M COMPANY** f/k/a<br>
**MINNESOTA MINING AND**<br>
**MANUFACTURING CO.**

</td><td>

CASE NUMBER:

</td></tr>
<tr><td></td><td></td></tr>
</table>

II.    TYPE OF CASE:

| TORTS | OTHER   CIVIL | |
|---|---|---|
| ☐  Asbestos | ☐  Adoption | ☐  Appeal from Magistrate Court |
| ☐  Professional Malpractice | ☐  Contract | ☐  Petition for Modification of Magistrate Sentence |
| ☐  Personal Injury | ☐  Real Property | ☐  Miscellaneous Civil |
| ☐  Product Liability | ☐  Mental Health | ■  Other |
| ☐  Other Tort | ☐  Appeal of Administrative Agency | ☐  Fraud or Conversion |

III.    JURY DEMAND:    ☐  Yes    ■  No

CASE WILL BE READY FOR TRIAL BY  *(MONTH/YEAR)*: 12/2026

IV.    DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL
ACCOMMODATIONS DUE TO A DISABILITY OR AGE?    ☐  YES    ☐  NO
IF YES, PLEASE SPECIFY:
☐  Wheelchair accessible hearing room and other facilities
☐  Interpreter or other auxiliary aid for the hearing impaired

☐  Reader or other auxiliary aid for the visually impaired
☐  Spokesperson or other auxiliary aid for the speech impaired
☐  Other:      Unknown at this time

Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
(WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
(WV Bar # 8231)
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021
Facsimile: 304-558-0140

J. Timothy DiPiero    (W.Va. Bar # 1021)
Lonnie C. Simmons    (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar # 9616)
**DiPIERO SIMMONS**
**McGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133
Facsimile: 304-342-4605
Rob.bastress@dbdlawfirm.com

Michael T. Gallagher, Esq.
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713)222-8080
Facsimile: (713)222-0066

Alva A. Hollon, Jr., Esq.
**HOLLON LAW FIRM, P.A.**
100 Executive Way, Suite 211
Ponte Vedra Beach, Florida 32082-2713
Telephone: (904) 737-1995

*Representing:*_■ *Plaintiff*    ☐ *Defendant*

Dated: December 22, 2025__


   /s/ Robert M. Bastress III
   *Signature*

**SUMMONS**

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL**

       Plaintiff,

v.

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.**

       Defendant.

Civil Action No. _____

Judge: _____

**To the above-named Defendant:**

**3M COMPANY** f/k/a
**MINNESOTA MINING AND**
**MANUFACTURING CO.**
c/o CORPORATION SERVICE COMPANY
808 GREENBRIER STREET
CHARLESTON, WV, 25311

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby Summoned and required to serve upon **Robert M. Bastress III,** Plaintiff's attorney, whose address is **P.O. Box 1631, Charleston, West Virginia 25326-1631,** an answer, including any related counterclaim you may have, to the **Complaint** filed against you, in the above-styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer to the Complaint within thirty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint, and you will be thereafter barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated_____

_____
Clerk of Court

By _____

# SUMMONS

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA
### John B. McCuskey, Attorney General v. 3M COMPANY

Service Type:     Filer - Secretary of State

NOTICE TO:   3M COMPANY, Corporation Service Company, 808 Greenbrier Street, Charleston, WV 25311

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Robert Bastress, PO Box 1631, , Charleston, WV 25326

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

12/22/2025 10:41:28 AM                    /s/ Cathy S. Gatson
Date                                              Clerk

RETURN ON SERVICE:

☐  Return receipt of certified mail received in this office on

☐  I certify that I personally delivered a copy of the Summons and Complaint t

☐  I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling or usual place of abode to
, someone who is eighteen (18) years of age or above and resides there.

☐  I certify that I personally delivered a copy of the Summons and Complaint to                    , an agent or attorney-
in-fact authorized by appointment or statute to receive service of process for the individual.

☐  I have reviewed documentation authorizing the above-named person to accept service on behalf of the individual named on the summons.

☐  I have not reviewed documentation authorizing the above-named person to accept service on behalf of the individual named on the summons.

☐  Not Found in Bailiwick

Date                                              Server's Signature

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL,**

       Plaintiff,

v.                             Civil Action No.  25-C-_____
                                 Judge _____

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.,**

       Defendant.

## THE STATE'S MOTION TO SEAL

Now comes Plaintiff, State of West Virginia *ex rel.* John B. McCuskey, Attorney General ("The State"), by counsel, and moves the Court to file under seal, for the time being, (1) the unredacted version of the "**COMPLAINT AND APPLICATION FOR TEMPORARY RELIEF PURSUANT TO *W.VA. CODE* § 46A-7-110**" and (2) two binders of exhibits and various materials upon which the State is relying (among other things) in its "Complaint and Application for Temporary Relief Pursuant to *W.Va. Code* § 46A-7-110."  The State requests the Court enter the attached, proposed Order allowing these items to be filed under seal for the time being.

With that said, the State disagrees with many of the confidentiality designations of Defendant 3M. Nevertheless, the State complies with the protective Order(s) entered in other cases and seeks permission to temporarily file these documents under seal until such further time as the Court has adequate time and briefing to determine the legitimacy of the confidentiality designations. The State will nevertheless be requesting that, after the Court has had time to review, the confidentiality designations be removed on some or all of the Exhibits submitted, and they be filed

publicly.

WHEREFORE, the State respectfully requests the Court grant the instant Motion to Seal and sign and enter the attached, proposed Order allowing the aforementioned items to be filed under seal for the time being.

Respectfully submitted,

**STATE OF WEST VIRGINIA,** *ex rel***.**
John B. McCuskey, Attorney General**,**

By Counsel,

/s/ *Robert M. Bastress III*
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021
Facsimile: 304-558-0140

J. Timothy DiPiero
Lonnie C. Simmons
Robert M. Bastress III
**DiPIERO SIMMONS**
**MCGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133
Facsimile: 304-342-4605

Michael T. Gallagher, Esq.
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713)222-8080
Facsimile: (713)222-0066

Alva A. Hollon, Jr., Esq.

2

**HOLLON LAW FIRM**
100 Executive Way, Suite 211
Ponte Vedra Beach, FL 32082-2713
Telephone: (904) 737-1995
*Counsel for The State*

# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL,**

       Plaintiff,

v.                            Civil Action No.  25-C-_____

                                     Judge _____

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.**

       Defendant.

## CERTIFICATE OF SERVICE

       I, Robert M. Bastress III, counsel for the State/Plaintiff hereby certifies that the service of the foregoing **"THE STATE'S MOTION TO SEAL"** has been made upon counsel for 3M  via the Court's e-filing system, email, hand delivery and/or regular mail on this, on this, the 22nd day of December, 2025, as follows:

Bryant J. Spann, Esq./Robert Akers, Esq.
**THOMAS, COMBS & SPANN, PLLC**
P.O. Box 3824
Charleston, WV 25338-3824
*Counsel for 3M Company*

                               */s/ Robert M. Bastress III*_____
                               Robert M. Bastress III
                               **DiPIERO SIMMONS**
                               **McGINLEY & BASTRESS PLLC**
                               P.O. Box 1631
                               Charleston, West Virginia 25326
                               Telephone: 304-342-0133
                               Facsimile: 304-342-4605
                               *Counsel for Plaintiff/the State*

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
*ex rel.* **JOHN B. McCUSKEY,**
**ATTORNEY GENERAL,**

        Plaintiff,

v.
                                Civil Action No.  25-C-_____
                                Judge _____

**3M COMPANY** f/k/a
**MINNESOTA MINING AND MANUFACTURING CO.**

        Defendant.

## <u>ORDER GRANTING THE STATE'S MOTION TO ALLOW CERTAIN PLEADINGS TO BE FILED UNDER SEAL</u>

Pending is the Motion of the State, filed December 22, 2025, for permission to file the following items under seal:

1.    An unredacted version of "**<u>COMPLAINT AND APPLICATION FOR TEMPORARY RELIEF PURSUANT TO *W.VA. CODE* § 46A-7-110</u>**" because the publicly-filed version of the Complaint redacted portions that quote documents that 3M has designated confidential in other litigation matters; and

2.    Two binders of exhibits and various materials upon which the State is relying (among other things) in its "Complaint and Application for Temporary Relief Pursuant to *W.Va. Code* § 46A-7-110," some of which may make reference to documents that 3M has designated confidential in other litigation matters.

For reasons appearing to the Court, it is, accordingly, ORDERED that the State's Motion for permission to file the above-referenced items temporarily under seal be, and it hereby is, GRANTED.  It is further hereby ORDERED the above two items be, and they hereby are, directed

to be filed under seal pending further Order of the Court.

_____
The Honorable
Circuit Court Judge

Entered:        This _____ day of _____, 202\_\_\_.

Prepared by:

*/s/ Robert M. Bastress III*

_____

Jace H. Goins, Esq., Chief Deputy Att'y. Gen.,
Vaughn T. Sizemore, Esq., Deputy Att'y. Gen.,
**OFFICE OF THE ATTORNEY GENERAL**
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: 304-558-2021
Facsimile: 304-558-0140

J. Timothy DiPiero
Lonnie C. Simmons
Robert M. Bastress III
**DiPIERO SIMMONS**
**McGINLEY BASTRESS, PLLC**
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: 304-342-0133

Michael T. Gallagher, Esq.
**THE GALLAGHER LAW FIRM**
2905 Sackett Street
Houston, Texas 77098
Telephone: (713)222-8080

Alva A. Hollon, Jr., Esq.
**HOLLON LAW FIRM, P.A.**
100 Executive Way, Suite 211
Ponte Vedra Beach, Florida 32082-2713
Telephone: (904) 737-1995
*Counsel for The State*

3



West Virginia E-Filing Notice

CC-20-2025-C-1514

Judge: Kenneth Ballard

**To:** Robert Bastress
rob.bastress@dbdlawfirm.com

---

# NOTICE OF FILING

---

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA
John B. McCuskey, Attorney General v. 3M COMPANY
CC-20-2025-C-1514

The following motion was FILED on 12/22/2025 10:54:48 AM

Notice Date:      12/22/2025 10:54:48 AM

Cathy S. Gatson
CLERK OF THE CIRCUIT COURT
Kanawha County
P.O. Box 2351
CHARLESTON, WV 25301

(304) 357-0440