# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| STATE OF WEST VIRGINIA, *ex rel.* JOHN B. McCUSKEY, Attorney General,<br><br>          Plaintiff,<br><br>   v.<br><br>3M COMPANY F/K/A MINNESOTA MINING AND MANUFACTURING CO.,<br><br>          Defendant. | Civil Action No. 2:25-cv-00750<br>Judge Irene C. Berger<br><br><br>**ORAL ARGUMENT REQUESTED** |

<u>**3M'S MEMORANDUM IN OPPOSITION TO THE STATE'S MOTION TO REMAND**</u>

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

I.      3M's Federally-Approved 8210 Respirator Is A Gold Standard N95 Respirator. .............3

II.     The Federal Government Directed 3M To Make Respirators Available To FEMA. ..........3

III.    3M Removed The State's Case Under 28 U.S.C. § 1442(a)(1). ........................................5

ARGUMENT .....................................................................................................................6

I.      The Federal Officer Removal Statute Must Be Liberally Construed In Favor Of
        Removal. ...............................................................................................................6

II.     3M Plausibly Alleges The Elements Of The Federal Officer Removal Statute. ................9

        A.      The State Concedes 3M Is A "Person" Under The Act. .........................................9

        B.      3M Acted Under Federal Authority. ...................................................................10

                1.      3M's Production And Sale Of 8210 Respirators Were Under The
                        Federal Government's Subjection, Guidance, and Control. .....................10

                2.      The State's Challenges To "Acting Under" Lack Merit. ..........................12

        C.      The State's Claims Relate To 3M's Actions Under Color Of Federal
                Authority. ...........................................................................................................14

                1.      The State Seeks To Recover For 8210 Respirators Sold Under
                        FEMA's Direction. ................................................................................14

                2.      The State's Challenges To The "Relating To" Element Lack Merit. ........16

                        a.      3M Plausibly Alleges 8210 Respirators Requisitioned By
                                FEMA Remained In Circulation For Years. ................................16

                        b.      There Is No *De Minimis* Exception To Federal Officer
                                Removal. ...................................................................................17

                        c.      The State's Half-Hearted Disclaimer In Its Brief Is
                                Ineffective. ...............................................................................18

        D.      3M Asserts Three Colorable Federal Defenses. ...................................................20

CONCLUSION................................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baker v. Atlantic Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) .............................................................................12, 13, 19

*Caplinger v. Medtronic, Inc.*,
  921 F. Supp. 2d 1206 (W.D. Okla. 2013) ..................................................................22

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
  108 F.4th 340 (5th Cir. 2024) ..............................................................................10, 21

*Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
  996 F.3d 243 (4th Cir. 2021) ...............................................................6, 7, 10, 11, 20

*Dart Cherokee Basin Operating Co. v. Owens*,
  574 U.S. 81 (2014)..........................................................................................................9

*Ellenburg v. Spartan Motors Chassis, Inc.*,
  519 F.3d 192 (4th Cir. 2008) .........................................................................................9

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)........................................................................................................21

*Gov't of Puerto Rico v. Express Scripts, Inc.*,
  119 F.4th 174 (1st Cir. 2024)..................................................................................18, 21

*Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*,
  545 U.S. 308 (2005)........................................................................................................8

*Gunn v. Minton*,
  568 U.S. 251 (2013)........................................................................................................8

*W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*,
  140 F.4th 188 (4th Cir. 2025) .......................................1, 7, 8, 9, 15, 16, 17, 18, 19, 20

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008)........................................................................................14

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999).....................................................................................................20

*Maine v. 3M Co., Inc.*,
  159 F.4th 129 (1st Cir. 2025)............................................................................18, 19, 20

*Maryland v. 3M Co.*,
  130 F.4th 380 (4th Cir. 2025) ..........................................7, 9, 14, 16, 17, 18, 19, 21

*Mayor & City Council of Baltimore v. BP P.L.C.* (*BP II*),
  31 F.4th 178 (4th Cir. 2022) .................................................................................12, 13

*State of W.Va. ex rel. McCuskey v. 3M, et al.*,
 No. 03-C-109 (Aug. 6, 2003) .................................................................................................5

*McFadden v. 3M Co.*,
 2015 WL 905083 (E.D. Mo. Mar. 3, 2015) ..........................................................................21

*West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
 646 F.3d 169 (4th Cir. 2011) ..................................................................................................8

*Mesa v. California*,
 489 U.S. 121 (1989)................................................................................................................17

*Morales v. Trans World Airlines, Inc.*,
 504 U.S. 374 (1992)................................................................................................................15

*Platkin v. Discord, Inc.*,
 2025 WL 3313014 (D.N.J. Sept. 10, 2025) .............................................................................8

*Illinois ex rel. Raoul v. 3M Co.*,
 111 F.4th 846 (7th Cir. 2024) ................................................................................................17

*Sawyer v. Foster Wheeler LLC*,
 860 F.3d 249 (4th Cir. 2017) .............................................................................9, 10, 12, 13, 14

*Tennessee v. Davis*,
 100 U.S. 257 (1879)..................................................................................................................8

*Watson v. Philip Morris Cos.*,
 551 U.S. 142 (2007)...................................................................................................1, 6, 10, 14

*West Virginia State University Board of Governors v. Dow Chemical Co.*
 (*WVSU*),
 23 F.4th 288 (4th Cir. 2022) ............................................................................................13, 20

*Willingham v. Morgan*,
 395 U.S. 402 (1969)..............................................................................................................6, 8

*Winters v. Diamond Shamrock Chemical Co.*,
 149 F.3d 387 (5th Cir. 1998) .................................................................................................13

*Ohio ex rel. Yost v. Ascent Health Servs., LLC*,
 2026 WL 206176 (6th Cir. Jan. 27, 2026) ......................................................8, 11, 12, 14, 18

**Statutes**

28 U.S.C. § 1331....................................................................................................................................8

28 U.S.C. § 1442(a)(1)..............................................................................................................1, 5, 6, 7, 9

29 U.S.C. § 671(d) .................................................................................................................................3

42 U.S.C. § 247d-6d(i)(1)(D) ...............................................................................................................4

50 U.S.C. § 4557.............................................................................................................................21, 22

Removal Clarification Act, Pub. L. No. 112-51, 125 Stat. 545 (2011) .........................................14

W. Va. Code Ann. § 46A-7-111 .................................................................................5, 15, 18

**Other Authorities**

Cigler, Beverly A., *Fighting COVID-19 in the United States with Federalism and Other Constitutional and Statutory Authority*.............................................................10

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................21

**Regulations**

42 C.F.R. § 84.1(a), (c) ................................................................................................3

42 C.F.R. § 84.33(a)................................................................................................1, 21

42 C.F.R. § 84.33(b) ...................................................................................................3

42 C.F.R. § 84.33(g) ..................................................................................................11

85 Fed. Reg. 15,198 (Mar. 17, 2020)........................................................................4, 21

85 Fed. Reg. 16,227 (Mar. 18, 2020)..........................................................................4

FDA Letter, https://www.fda.gov/media/136023/download ...........................................3

**INTRODUCTION**

The State of West Virginia seeks both to enjoin and recover penalties from 3M for the labeling and distribution of 8210 respirators made and distributed under the direction and guidance of the federal government. Indeed, 3M had no choice but to follow the federal government's orders. That West Virginia has now sued 3M for doing what the federal government told it to do—and seeks to haul 3M into *state* court for acting under the authority of federal government—is as unfounded as it is misguided.

3M has properly removed this case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). That statute provides for federal jurisdiction over cases against a defendant who "act[ed] under" the direction of a federal officer, where the case "relates to" the defendant's actions "under color of" federal authority, and the defendant has a colorable federal defense. 28 U.S.C. § 1442(a)(1). Federal officer removal is a "unique power" because, unlike removal in other contexts, removal turns not on the State's original allegations in its complaint, but instead on 3M's plausible allegations in its notice of removal. *W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 195 (4th Cir. 2025). The Court must credit the removing defendant's theory of the case, and the federal officer removal statute "must be 'liberally construed'" in *favor* of removal. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

This case unmistakably belongs in federal court. The 8210 is a gold-standard N95 respirator that meets strict federal regulatory standards for performance and quality. The federal government also imposes strict labeling requirements on approved respirators, like the 8210, and in fact, 3M cannot even change the wording on the label without the federal government's approval. *See* 42 C.F.R. § 84.33(a). During the COVID-19 pandemic, the 8210 respirator protected first-responders, healthcare professionals, and countless others across the United States, including in West Virginia. In April 2020, as fatality rates rose, the federal government took action

1

to respond to the emerging crisis: it ordered 3M—under the Defense Production Act (DPA)—to divert hundreds of millions of respirators, including the 8210, from 3M facilities in Asia to the Federal Emergency Management Agency (FEMA) for distribution in the United States. The federal government specifically required 3M to redirect resources and prioritize FEMA's order.

The State's arguments against removal are meritless. *First*, the State asserts 3M was not acting under the direction of the federal government. But 3M plainly assisted the federal government in its pandemic-response efforts, and 3M did so under the subjection and control of the federal government. Under the express threat of *criminal* penalties, 3M diverted 8210 respirators from plants in other parts of the world and prioritized fulfilling government orders over private contracts. 3M did all this under federal directives to do so, plain and simple.

*Second*, the State says this case is not related to those FEMA-distributed respirators because its suit comes more than four years after the federal government expressly required 3M to provide the 8210 respirators to FEMA. But 8210 respirators have a long shelf life, and 3M plausibly alleges that the State's suit implicates those same respirators sold and distributed at FEMA's direction. Fourth Circuit precedent forecloses the State's efforts to evade federal jurisdiction through a disclaimer that would still require a court to determine the connection between the State's allegations (and requested relief) and 3M's federal work. That is a fact-intensive inquiry that must take place in federal court.

*Finally*, the State claims that 3M lacks a valid federal defense. But 3M has three: federal preemption of state labeling requirements, DPA immunity for complying with the federal government's orders, and immunity under the Public Readiness and Emergency Preparedness (PREP) Act for providing a COVID-19 countermeasure. Not only are 3M's federal defenses more than colorable, but 3M's preemption defense is dispositive at the pleading stage as set forth in

2

3M's motion to dismiss.  3M respectfully submits that the proper and most efficient result is for the Court to deny the State's motion for remand and grant 3M's motion to dismiss.

## BACKGROUND

### I.    3M's Federally-Approved 8210 Respirator Is A Gold Standard N95 Respirator.

3M is a leading manufacturer and distributor of workplace personal protective equipment, including filtering facepiece respirators that assist everyday Americans in safely performing their jobs.  This case concerns one such respirator, identified by its part number, the 8210.  The 8210 respirator is an "N95" respirator, approved by the National Institute for Occupational Safety and Health (NIOSH), Compl. ¶¶ 28–29, which defines N95 respirators as filtering at least 95% of airborne particles.  NOR ¶ 1.

Under the Occupational Safety and Health Act of 1970, NIOSH established "respiratory protection requirements" for respirators and issued regulations allowing manufacturers to obtain NIOSH "approval" for products compliant with its requirements.  *See* 29 U.S.C. § 671(d); 42 C.F.R. § 84.1(a), (c).  NIOSH-approved respirators must comply with specific labeling requirements, which include the NIOSH "emblem," NIOSH "approval number," and NIOSH-imposed "restrictions or limitations."  42 C.F.R. § 84.33(b); NOR ¶ 56.

### II.    The Federal Government Directed 3M To Make Respirators Available To FEMA.

3M's NIOSH-approved 8210 respirator was a vital component of the federal government's response during the COVID-19 pandemic.  The FDA issued an emergency use authorization during the COVID-19 pandemic, specifically declaring that N95 industrial respirators like the 8210 were suitable for use during the pandemic by healthcare professionals.  *See*, *e.g.*, Mar. 11, 2020 FDA Letter, https://www.fda.gov/media/136023/download (last visited Jan. 26, 2026).  Those respirators were distributed in states, including in West Virginia.  In light of the long shelf life of 8210 respirators, they remained in circulation for years after their distribution in 2020.  NOR ¶ 55.

The COVID-19 pandemic was declared a national emergency on March 13, 2020. NOR ¶ 20. Days later, the Health and Human Services Secretary issued a declaration under the PREP Act, providing immunity for the manufacture, distribution, and sale of respirators, including the 8210. 85 Fed. Reg. 15,198 (Mar. 17, 2020); 42 U.S.C. § 247d-6d(i)(1)(D); *see* NOR ¶ 21.

On March 18, 2020, the federal government invoked the DPA, a Korean-War-era statute that gives the president sweeping authority to direct production, distribution, and sale of products by private companies. 85 Fed. Reg. 16,227 (Mar. 18, 2020); *see* NOR ¶ 22. Pursuant to the DPA, the federal government ordered 3M to provide it with millions of N95 respirators, including 8210s. A presidential memorandum was issued on April 2, 2020, to direct the FEMA Administrator to "use any and all authority available under the Act to acquire, from any appropriate subsidiary or affiliate of 3M company, the number of N-95 respirators that the Administrator determines to be appropriate." NOR ¶ 23; Exhibit 1 (Apr. 2, 2020 Presidential Memorandum). This memorandum was accompanied by a directive from the government that 3M increase the domestic supply of N95 respirators, suspend exports of N95s, and start redirecting respirators from its manufacturing facilities in other countries. NOR ¶ 23. The next day, the FEMA Administrator issued an order to 3M for 180 million "N-95 Filtering Facepiece Respirators." *Id.* ¶ 24; Exhibit 2 (Apr. 3, 2020 Rated Order). The order was not optional: "Acceptance is mandatory." It stated that 3M was "required to comply" and that "[f]ailure to comply fully with this order is a crime." Exhibit 2.

Against this backdrop, and pursuant to negotiations with high-ranking federal officials, 3M followed and fulfilled the government's directives and dictates. Between April and October 2020, 3M diverted more than 228 million respirators, including 8210s that were manufactured in Singapore and South Korea, to FEMA. NOR ¶ 27. These respirators were sold to the government pursuant to a "rated order," which meant that 3M could not fill any private (non-rated) orders for

4

these respirators before it filled the government's order. *Id.* ¶ 30. And the government's rated order included 8210 respirators, which FEMA's DPA procurement contract expressly required to be NIOSH-approved, referencing the specific certification approval number. *Id.* ¶ 29.

FEMA distributed the respirators that it required 3M to divert to the United States, including in West Virginia. NOR ¶¶ 26–28, 32. West Virginia Congressman David McKinley issued a statement in May 2020 acknowledging that the federal government delivered more than one hundred thousand respirators. *Id.* ¶ 32. 8210 respirators have a long shelf life; 8210 respirators imported by FEMA remained in circulation in West Virginia after December of 2021 (the beginning of the statutory four-year lookback period under the West Virginia Consumer Credit and Protection Act (the "Act"), W. Va. Code Ann. § 46A-7-111). *Id.* ¶ 55. This lawsuit challenges—and seeks to enjoin the sale and advertising of—8210 respirators 3M sold to FEMA pursuant to the DPA. *Id.* ¶ 54.

## III.    3M Removed The State's Case Under 28 U.S.C. § 1442(a)(1).

The State and 3M are mid-trial in another case concerning a different and discontinued (since the 1990's) respirator (the 8710), pending in Lincoln County, West Virginia. Compl. ¶ 3. The State filed that action 23 years ago, in 2003, against 3M and other defendants. Like here, that old lawsuit about the discontinued 8710 respirator alleges violations of the Act. *State of W.Va. ex rel. McCuskey v. 3M, et al.*, No. 03-C-109 (Aug. 6, 2003). The first phase of that trial began in January 2025 and will resume in March 2026. Compl. ¶ 3. That trial is unlikely to conclude anytime soon.

Apparently frustrated at the pace and progress of the 8710 litigation (which it had initiated in 2003), the State brought this second suit against 3M in late 2025. The State has made no bones about the fact that this current suit is little more than an attempt to gain leverage to exact a settlement from 3M in the old lawsuit. Dkt. 1-2 at 4–5 (noting the Chief Deputy Attorney General

5

"admitted" to 3M's counsel that the State was "threatening this second lawsuit to 'shake the tree' on settlement efforts in the first case").  Whatever the State's motivation, because the State's claims here relate to 3M's conduct undertaken at the direction of the federal government, and for which it has colorable federal defenses, 3M properly removed this case to federal court.  And federal court is where it should stay, and quickly end.

## ARGUMENT

### I.   The Federal Officer Removal Statute Must Be Liberally Construed In Favor Of Removal.

3M properly removed this case to federal court under the federal officer removal statute. That statute authorizes any officer of the United States, "*or any person acting under* that officer," to remove a civil action if the suit is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added).  "One of the primary purposes of the removal statute was to have [federal officers'] defenses litigated in the federal courts."  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  Section 1442(a)(1) therefore "must be 'liberally construed'" in *favor* of removal.  *Watson*, 551 U.S. at 147.  To that end, Congress has expanded the entitlement to a federal forum for those acting at the direction of the federal government each time it has considered the issue, and most recently in 2011.  The Supreme Court (as well as the Fourth Circuit) has counseled that "federal officer removal 'should not be frustrated by a narrow, grudging interpretation.'"  *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) (quoting *Willingham*, 395 U.S. at 407).

Federal officer removal imposes a minimal burden on a removing defendant to demonstrate federal jurisdiction.  The State contends otherwise, arguing that this Court should impose a higher burden.  Mot. 4–7.  But the State's arguments are foreclosed by Supreme Court and Fourth Circuit precedent.  The State's faulty jumping-off point is reason alone to deny its motion.

6

*First*, the State claims that this Court "must resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." Mot. 5. That is simply wrong: a presumption against remand that may apply in *other* contexts is irrelevant in federal officer removal cases. The Fourth Circuit could not be clearer: "'[T]he ordinary presumption against removal *does not apply*' to federal officer removal." *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251) (emphasis added). Notably, the State itself said as much to the Supreme Court in a recent amicus brief in another federal officer removal case: "'[G]eneral removal principles'—like the presumption against removability that some lower courts have embraced—are 'inverted'" in federal officer cases. Dkt. 1-5 at 6–7. What the State told the Supreme Court in that case was and is correct.

The State nonetheless argues that the federal officer removal standard should not apply in *this* case because, the State's self-serving argument goes, 3M's "assertion of § 1442(a)(1) as grounds for removal is not 'plausible.'" Mot. 5. This circular argument the State invented just for this case can most charitably be described as baseless. When determining *whether* removal is plausible, this Court must apply the "unique lens" required by the federal officer removal statute. *Maryland*, 130 F.4th at 389. It must disregard any presumption against removal, it must "'credit'" 3M's "'theory of the case,'" and it must give 3M "'the benefit of all reasonable inferences from the facts alleged.'" *Id.* at 389, 391 (citation omitted).

*Second*, the State asserts that the Court must place a "thumb on the scale in favoring [*sic*] remand" because the plaintiff in this case is a state. Mot 6. This convenient argument finds zero support in the law. The State does not cite a single federal officer removal case applying a more stringent standard in a case brought by a state. To the contrary, the Fourth Circuit confirmed just last year that the "promise of a federal forum" provided by § 1442(a)(1) applies as "broad[ly]" to

7

states as it does to private parties. *See Maryland*, 130 F.4th at 387; *CaremarkPCS Health*, 140 F.4th at 194. This makes sense, because the federal officer removal statute, while "'deal[ing] with individuals,'" also "'vindicates . . . the interests of [the federal] government itself.'" *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 2026 WL 206176, at *2 (6th Cir. Jan. 27, 2026). Indeed, federal officer removal has *always* applied to cases brought by states. *See, e.g.*, *Tennessee v. Davis*, 100 U.S. 257, 262 (1879) (applying federal officer removal to criminal prosecution by a state).

The State quotes a grab bag of cases from other contexts for its states-are-different argument. But those cases do not concern federal officer removal and do not support the State's position. For example, the State looks to *West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011), for the notion that the court should purportedly exercise "[r]estraint" before permitting removal when a state is a plaintiff. Mot. 7. But *CVS* concerned removal under the Class Action Fairness Act, which does not involve the "exceptional" and "unique power" of the federal officer removal statute. *Caremark PCS Health*, 140 F.4th at 195. The State seeks to shore up its reliance on *CVS* by suggesting that a district court said it "underscore[d] a broader principle." *Platkin v. Discord, Inc.*, 2025 WL 3313014, *9 (D.N.J. Sept. 10, 2025). But *Platkin* concerned *federal question* removal under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005) (applying 28 U.S.C. § 1331)— not *federal officer* removal. *Grable* removal, the Supreme Court has said, applies only in a "special and small category" of cases raising a disputed, substantial federal issue on the face of the complaint. *Gunn v. Minton*, 568 U.S. 251, 258, 264 (2013). Before exercising jurisdiction under *Grable*, courts are required to consider the "appropriate balance of federal and state judicial responsibilities." *Id.* Federal officer removal, by contrast, is neither "narrow" nor "limited." *Willingham*, 395 U.S. at 406. Congress has already made the legislative judgment that defendants

8

alleging to have acted at the direction of the federal government are, as a matter of "'absolute'" right, "entitled to a federal forum." *CaremarkPCS Health*, 140 F.4th at 195.

*Third*, unlike other times a court assesses jurisdiction, federal officer removal does not turn on the *plaintiff's* version of events. *Maryland*, 130 F.4th at 388. Instead, a court must "'credit [the defendant's] theory of the case'" in its notice of removal. *Id.* at 389. That notice of removal need only "'contain[] a short and plain statement of the grounds for removal,'" and it "need not contain evidentiary submissions" at all. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 83–84 (2014); *see also Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 200 (4th Cir. 2008). Thus, the State's repeated criticism that 3M should have submitted evidence in support of removal is off base. See Mot. 1, 3, 12, 14, 17-19.

## II.     3M Plausibly Alleges The Elements Of The Federal Officer Removal Statute.

A private defendant seeking removal under 28 U.S.C. § 1442(a)(1) must plausibly allege four elements: (1) the defendant is a "person"; (2) the defendant "act[ed] under" the direction of a federal officer; (3) the case is "for or relating to" the defendant's actions "under color of" federal authority; and (4) the defendant has a colorable federal defense. 28 U.S.C. § 1442(a)(1); *Maryland*, 130 F.4th at 388. 3M's notice of removal readily establishes all four elements.

### A.     The State Concedes 3M Is A "Person" Under The Act.

As the State concedes, Mot. 8–9, 3M is a person within the meaning of § 1442. The term "person" in the statute allows removal by private corporations. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017). 3M is a corporation. *See* NOR ¶ 45.

**B.      3M Acted Under Federal Authority.**

**1.      3M's Production And Sale Of 8210 Respirators Were Under The Federal Government's Subjection, Guidance, and Control.**

3M plausibly alleges that it "act[ed] under" a federal officer's direction.    28 U.S.C. § 1442(a)(1).  Like the federal officer removal statute as a whole, the "acting under" requirement is to be "liberally construed in favor of the entity seeking removal."  *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted).

The "acting under" requirement is met when an entity "*assist[ed]*, or . . . help[ed] *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 152 (emphasis in original). A private company acts under the federal government when there is "subjection, guidance, or control" by the federal government, typified by an "'unusually close [relationship] involving detailed regulation, monitoring, or supervision.'"  *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251, 253 (citation omitted); a*ccord Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 348 (5th Cir. 2024) (acting-under element met when company "fulfill[ed]" government mandates, and the government maintained "broad oversight").

3M plausibly alleges that its production and sale of 8210 respirators helped carry out the tasks of the federal government.  In March and April 2020, the federal government took action to reduce the spread of COVID-19 and protect public health.  NOR ¶ 20.  It was responsible for developing and implementing a coordinated national response—including regarding resource allocation.  *See generally* Cigler, Beverly A., *Fighting COVID-19 in the United States with Federalism and Other Constitutional and Statutory Authority*, 51 Publius 673–92 (2021).  To that end, the federal government invoked a wartime power and issued an executive order providing that personal protective equipment, including respirators, was "necessary" to "promote the national defense."  NOR ¶¶ 20–24.  Under these circumstances, acquiring and supplying respirators was a

10

government function.  *See id.*  3M plausibly alleges, and there can be no credible dispute, that 3M assisted the federal government's pandemic response by supplying 8210 respirators, including by redirecting respirators from other countries to the United States.

3M did so under the federal government's "subjection, guidance, and control."  *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251.  As detailed in the NOR, on April 2, 2020, FEMA ordered 3M to cease all exports of N95 respirators and to begin importing respirators from manufacturing plants overseas.  NOR ¶ 23.  The next day, FEMA issued an order under the DPA for N95 respirators, which provided that 3M was "required to comply" and "[a]cceptance is mandatory."  *Id.* ¶ 24.  The order further provided that noncompliance may give rise to *criminal penalties*.  Exhibit 2.  Thereafter, 3M acceded to the government's directive to divert and enable FEMA to import hundreds of millions of N95 respirators from plants in Asia—including NIOSH-approved 8210 respirators manufactured in Singapore and South Korea.  That sale occurred under a rated order, which required 3M to satisfy the government's orders before fulfilling orders by private purchasers.  NOR ¶ 30.

3M also carried out its compliance with the federal government's orders within a regulatory framework that subjected 3M to the government's "guidance" and "control."  *Ohio*, 2026 WL 206176, at *3.  The rated order expressly called for the provision of NIOSH-approved respirators.  NOR ¶¶ 29, 66.  As 3M explained in its notice of removal, NIOSH imposes strict government standards for performance and quality.  *Id.* ¶ 1.  NIOSH also requires specific labeling on products that meet its certifications.  *See, e.g., id.* ¶¶ 7, 13, 29, 56–57, 66–67; 42 C.F.R. § 84.33(g) (requiring that respirators "shall . . . be labeled distinctly").  Because "NIOSH prescribes what 3M is permitted to print on the front of its product," *id.* ¶ 66, the federal government directed 3M to make certain statements, including those at issue in this litigation.

11

### 2.    The State's Challenges To "Acting Under" Lack Merit.

The State urges this Court to disregard 3M's plausible allegations describing the federal government's exertion of control over 3M's labeling, distribution, and sale of 8210 respirators.  It makes two arguments.  Both fail.

The State first argues that 3M was not "acting under" the federal government because it contends 3M's work for the federal government was merely a sale of an "'off-the-shelf' type product" pursuant to a contract, with terms "'typical' [of any] commercial contract[]."  Mot. 18 (citing *Mayor & City Council of Baltimore v. BP P.L.C.* (*BP II*), 31 F.4th 178, 231 (4th Cir. 2022)).  But that is simply not an accurate characterization, as 3M's allegations demonstrate.  And whether a product or service may also be available to private purchasers does not dictate the outcome of the "acting under" analysis.  *See Caremark PCS Health*, 140 F.4th at 195–198 (insulin rebates); *Ohio*, 2026 WL 206176, at *1 (drug rebates).  Instead, the critical inquiry is whether the federal government allegedly exercised "intense direction and control" when a defendant provided the product or service to the federal government.  *Sawyer*, 860 F.3d at 253.

As discussed above, 3M followed the federal government's "mandatory" orders in its provision of 8210s.  NOR ¶ 24.  The circumstances of 3M's work for the federal government are much like those confronted by the Seventh Circuit in *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020).  There, the court held that the defendant's allegations—related to its manufacture and supply of "commodities" that were "necessary" for both military and "civilian goods"— readily met the acting-under element.  *Id.* at 940–43.  The defendant had contracted with the U.S. military.  *Id.*  Federal regulations "mandated" that the defendant "prioritize" its sales to "companies holding defense contracts" and "set[] aside . . . predetermined quantities for the federal government."  *Id.*  And the government also imposed "price control, with violations punishable by criminal prosecution."  *Id.*  On these facts, the court reasoned the "acting under" element was met

12

because the defendant acted (in part) pursuant to a government contract, consistent with the government's "detailed specifications," under the government's "compulsion to provide the product," and subject to government's "continuous federal supervision." *Id.* at 943.

The same is true here. 3M plausibly alleges that the federal government directed 3M to fulfill an order for 166.5 million respirators (an arrangement twice extended), NOR ¶¶ 26–27, it identified regulatory specifications for those respirators, *id.* ¶ 29, the rated order required 3M to prioritize the government's orders over private orders, *id.* ¶ 30, and 3M was compelled (under threat of criminal penalties) to divert 8210s from Asia for importation by FEMA in the United States. Those facts support a finding that 3M "work[ed] hand-in-hand with the federal government to achieve a task that further[ed] an end of the federal government." *Baker*, 962 F.3d at 942–43.

The Fourth Circuit's decision in *BP II* is no help to the State. In *BP II*, the defendants removed the case to federal court, invoking the federal officer removal statute, based in part on gasoline supply agreements for service stations on Navy bases. 31 F.4th at 230. The Fourth Circuit remanded the case to state court. But it did so because the defendants lacked allegations of "close supervision" that 3M plainly alleges here. *Id.* at 231. In keeping with that rationale, *BP II* distinguished cases approving federal officer removal like *Winters v. Diamond Shamrock Chemical Co.*, where the defendant followed the federal government's directives under threat of criminal sanctions, 149 F.3d 387, 398 (5th Cir. 1998), and *Sawyer v. Foster Wheeler, LLC*, where the defendant acted under the government's "intense direction and control," 860 F.3d at 253. This case falls squarely into the latter category; as the defendants in *Winters* and *Sawyer*, 3M acted under the threat of criminal sanctions and subject to intense federal direction and control.

The State also quotes heavily from *West Virginia State University Board of Governors v. Dow Chemical Co.* (*WVSU*), 23 F.4th 288, 300–01 (4th Cir. 2022), for the notion that a private

13

company selling consumer products to the federal government "did not implicate the federal officer removal statute." Mot. 14. But there, unlike here, the relationship between the defendants and the federal government was exclusively "one of statutory compliance and not contractual." *Id.* at 302. Here, 3M did not merely follow a general statute; rather, 3M followed the federal government's express orders directed specifically at 3M under pain of criminal penalties.

The State's fallback argument is that "[t]o the extent 3M seeks to meet its 'acting under' burden based upon regulations," that is not sufficient because "[w]ithout more" than compliance with regulations, private firms "are unable to remove under the federal officer removal state." Mot. 15–16. The State attacks a straw man. 3M does not seek removal solely on the basis that it sold a federally regulated product. *Cf. Watson*, 551 U.S. at 157. Instead, 3M—under the subjection and control of the federal government—fulfilled the federal government's directives and priority contract under threat of criminal sanction *and* did so within a detailed "regulatory framework," including NIOSH's requirements for approved respirators. *Ohio*, 2026 WL 206176 at *3. These circumstances readily satisfy the "acting under" element. *Id.*

## C. The State's Claims Relate To 3M's Actions Under Color Of Federal Authority.

### 1. The State Seeks To Recover For 8210 Respirators Sold Under FEMA's Direction.

The State's suit is also "for or relating to" actions that 3M took "under color of federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted). Courts construe the phrase "relating to" broadly—the standard is satisfied when the court can "plausibly infer" that the defendant's acts "contributed to at least a portion of their relevant conduct." *Maryland*, 130 F.4th at 391 (citations omitted). In other words, "the hurdle erected by this requirement is quite low." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).

14

As the State itself acknowledges, Mot. 7 n.9, Congress amended the federal officer removal statute in 2011, clarifying that the right to federal officer removal includes not just lawsuits "for" actions taken under federal direction, but any suit "relating to" such actions. *See* Removal Clarification Act, Pub. L. No. 112-51, 125 Stat. 545 (2011). It should go without saying that "relating to" is broader than "for." The State emphasized the breadth of the phrase "relating to" in its amicus brief before the United States Supreme Court: "[R]emoval is not just warranted when it comes to actions premised on (that is, 'for') acts taken under color of a federal office—but also the matters that 'relate' to those actions." Dkt. 1-5 at 9; *see also id.* at 8. As the State emphasized in its *Chevron* amicus brief, "the phrase 'relating to' is expansive" and "exceptionally broad." *Id.* at 8; *see id.* (noting that "such language 'has a broad scope, and an expansive sweep, and that it is broadly worded, deliberately expansive, and conspicuous for its breadth'") (quoting *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 384 (1992)). The State can run but it cannot hide from its (correct) position in the *Chevron* case.

3M's plausible allegations readily clear this low bar. Here, the State alleges that 3M "violat[ed]" the Act because 3M "should have provided a warning" that included "IGNORE NIOSH COAL APPROVAL" on the respirators it advertised and sold in West Virginia. Compl. ¶ 160. Those claims relate (at least in part) to 3M's labeling and sale of 8210 respirators sold to FEMA under the DPA. NOR ¶¶ 54, 66. The federal government demanded that 3M enable FEMA to import NIOSH-approved 8210 respirators, from plants in Asia, *id.* ¶¶ 29, 66, and NIOSH prescribes what 3M is permitted to print on its respirators, *id*. ¶¶ 56, 66. The 8210 respirators that 3M sold to FEMA did not include "IGNORE NIOSH COAL APPROVAL"—the absence of which the State challenges in this suit. *Id.* ¶ 57; Compl. ¶ 160.

15

Thus, the State's claims against 3M—including the State's claims about the labeling of the 8210 respirators—relate to 3M's acts taken under color of federal office. *See CaremarkPCS Health*, 140 F.4th at 199 (under-color element satisfied because the defendants' "theory of the case is that West Virginia attempts to hold them liable" for conduct "undertaken for all its clients— federal and non-federal alike").

### 2. The State's Challenges To The "Relating To" Element Lack Merit.

The State takes issue with the allegations in 3M's notice of removal, advancing three attacks on 3M's showing of a relationship between the State's claims and 3M's federal acts. Each fails. The State says that its suit (under 3M's view of the limitations period) has no connection to 8210s labeled and sold in 2020 as part of the government's COVID-19 response. But its position misinterprets the legal standard, which turns on what 3M is *being sued for*, and the State does not purport to cabin the recovery it seeks to civil penalties for 8210 respirators sold in the last four years. The State also argues that 3M offers no evidence of the number of 8210s imported by FEMA into West Virginia, and the number could be *de minimis*. But 3M need only make plausible allegations, and federal officer jurisdiction is triggered for even a small amount (as the Fourth and Seventh Circuits have said, a "morsel") of federally-implicated products. *Maryland*, 130 F.4th at 392. The State additionally argues that its purported disclaimers of redress for 8210 respirators sold to FEMA insulates its case from federal court. But the Fourth Circuit has correctly rejected that same theory.

### a. 3M Plausibly Alleges 8210 Respirators Requisitioned By FEMA Remained In Circulation For Years.

The State unilaterally declares there is "*no* connection," Mot. 10, between 3M's acts under federal office (in response to COVID-19) and the State's allegations in its suit, because "2020 is not even mentioned in the Complaint," *id.* at 9. That is form over substance. The relevant inquiry

16

is whether 3M "'*is being sued for* an act or acts that it claims were done under—or related to acts done under—federal authority.'" *CaremarkPCS Health*, 140 F.4th at 199 (emphasis added). And here, 3M's conduct in 2020—then undertaken under federal authority—clearly "relates to" the advertising and sale of 8210 respirators that are the subject of this lawsuit. 3M plausibly alleges that the NIOSH-labeled masks that were imported by FEMA, including into West Virginia, are still in circulation during the period for which the State seeks to recover. NOR ¶ 55. Under 3M's "'theory of the case,'" which this Court must credit when considering federal officer removal, *CaremarkPCS Health*, 140 F.4th at 195, there is a sufficient connection between 3M's manufacture, labeling, and distribution of 8210 respirators—requisitioned by FEMA in 2020—and the State's suit. And make no mistake, the State seeks penalties for 8210 respirators sold many years ago—squarely within the time period 3M distributed them under the direction of the federal government.

### b.      There Is No *De Minimis* Exception To Federal Officer Removal.

The State also argues that the "relating to" prong is not satisfied because "[f]rom what 3M has submitted, any shipment of 8210's could be de minimis." Mot. 12. However, there is no *de minimis* exception to federal officer removal. Congress's broad policy in favor of federal officer jurisdiction means that jurisdiction is proper even when the federal defense is only a "'single … ingredient in the mass.'" *Mesa v. California*, 489 U.S. 121, 129 (1989); *see also Maryland*, 130 F.4th at 392 (quoting *Illinois ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024)) (federal jurisdiction triggered if "even a morsel" of the alleged contamination came from firefighting foam made to military specifications). In any event, 3M plausibly alleges that it enabled FEMA to import hundreds of millions of N95s, including 8210 respirators, at least some of which were

distributed in West Virginia.  NOR ¶ 54.  The Court need look no further to conclude that 3M adequately alleged a connection or association between the charged conduct and 3M's federal acts.

### c.    The State's Half-Hearted Disclaimer In Its Brief Is Ineffective.

The State also contends that its suit does not relate to 3M's federal conduct because the State says "[a]ny sales 3M made to FEMA were not made into West Virginia" and it "does not seek redress for any sales 3M made to FEMA."  Mot. 2.  But the State does not identify any representations in its *complaint* limiting the scope of the State's requested relief.  Instead, the State points to developments in a *different* lawsuit about a *different* 3M product.  *Id.* at 1, 11.  Specifically, the State argues that in the "8710 case," "3M has argued – and . . . the State has agreed" that "only 3M's direct sales into West Virginia are subject to" the Act.  *Id.* at 11.  And so, the State says in its motion:  "To the extent the State has to specifically disclaim what is obvious from the face of the Complaint and the history of this litigation – that it does not seek civil penalties for sales made to FEMA outside West Virginia – it hereby does so."  *Id.* at 11 n.13.

The fact of the matter is, the State cannot in its motion gerrymander its ways out of federal jurisdiction.  Courts frequently reject plaintiffs' attempts to plead around federal officer removal by cursorily disclaiming relief for federal conduct.  *See*, *e.g.*, *Maryland*, 130 F.4th at 389; *CaremarkPCS Health*, 140 F.4th at 195; *Ohio*, 2026 WL 206176 at *5–6; *Maine v. 3M Co., Inc.*, 159 F.4th 129, 131–32, 137–39 (1st Cir. 2025); *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 186–94  (1st Cir. 2024).  The State's disclaimers are ineffective for at least four reasons.

*First*, and most obviously, the conduct that the State alleges is wrongful—the NIOSH-required labeling, Compl. ¶ 184—"includes indivisible federal and non-federal conduct."  The Fourth Circuit rejected remand under similar circumstances in West Virginia's suit against *CaremarkPCS Health*, where the State accused Caremark of conspiring to inflate the price of insulin.  140 F.4th at 199.  Caremark removed its case under the federal officer removal statute,

18

alleging that the State's suit was "related to" Caremark's conduct under color of federal office because it negotiated rebates in contracts with drug manufactures "for all of its clients—federal and nonfederal." *Id.* The Court of Appeals reasoned that "Caremark's indivisible negotiation is 'related to' its role in administering federal benefits" under color of federal authority. *Id.*

Same here. 3M's NIOSH labeling is the same whether the 8210 respirators were sold to the federal government or private purchasers. *See CaremarkPCS Health*, 140 F.4th at 195. 3M's plausible allegations of "indivisible" conduct mean the State's disclaimers are not "effective to prevent removal." *Id.* Nor is it clear how the State's requested relief—to enjoin 3M from "advertising . . . the 8210 into West Virginia"—could be tailored so as not to implicate the NIOSH labeling on the respirators and packaging, Compl. ¶¶ 160–61, that were distributed by FEMA in West Virginia and may remain in circulation. NOR ¶ 55. Accordingly, the State's claims about 3M's label, and its requested relief, relate to 3M's federal acts.

*Second*, the State's efforts to preclude removal by way of purported disclaimers fail because 3M's "work for private clients cannot be disaggregated from its work for the federal government." *CaremarkPCS Health*, 140 F.4th at 196 (citation omitted). This is starkly illustrated by the State's motion. The State invokes the "testimony of the State's statistical expert" from the 8710 case to support its argument that a "civil penalties model" in that case estimates the number of respirators sold "into West Virginia to 3-4 safety distributors." Mot. 1. But the very fact that the State turns to a statistical expert to make this point suggests that deciding whether certain respirators were requisitioned by the U.S. government or were sold to private parties is a causation question that will "ultimately fall to a factfinder." *Maryland*, 130 F.4th at 391. This only serves to reinforce difficulty inherent in attempting to "disaggregate[]" 3M's work for the federal government. *CaremarkPCS Health*, 140 F.4th at 196. "The need to unravel such challenging

19

questions in this case establishes that 3M's federal work is inextricably related to the charged conduct." *Maryland*, 130 F.4th at 391 (citing *Baker*, 962 F.3d at 943–45).

*Third*, the State's disclaimers are "ambiguous." *Maine*, 159 F.4th at 139 & n.23. In its motion, the State articulates multiple variations on its proposed disclaimer, including one disclaiming "*redress* for any sales 3M made to FEMA." Mot. 2. (emphasis added); *see also id.* at 11 n.13, 13. But the State seeks an injunction, as well as civil penalties, and for that reason alone, "redress" is susceptible to multiple meanings. Purposeful or not, this is an independent reason that its "disclaimers" cannot defeat removal. *Maine*, 159 F.4th at 139 & n.23.

*Fourth*, the State's representations in its motion "change[] nothing" because "its complaint still seeks to hold" 3M liable for advertising and sale that "includes federal government work." *CaremarkPCS Health*, 140 F.4th at 195–96. Precedent is clear: a party cannot effect a "mid-litigation disclaimer of federal claims so as to preclude federal officer removal." *Id.* at 196 n.4.

### D.    3M Asserts Three Colorable Federal Defenses.

3M need only advance one "colorable" federal defense. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). That requirement sets a "low bar." *CaremarkPCS Health*, 140 F.4th at 198. Such a defense is one that is "based in federal law," and that "arise[s] out of a defendant's official duties." *Id.* (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254). Recognizing that litigating federal-officer defenses in federal court is "'one of the most important reasons for removal,'" the Supreme Court has explained that a defendant need not present "an airtight case on the merits." *Jefferson Cnty.*, 527 U.S. at 431–32. After all, such a prerequisite to having a federal court decide the merits of its federal defense would make no sense. "Proof of a colorable federal defense does not require the defendant to win his case before he can have it removed or even establish that his defense is clearly sustainable." *CaremarkPCS Health*, 140 F.4th at 198 (quoting *WVSU*, 23 F.4th at 297). Instead, courts have consistently held that the defense need only be "plausible," meaning

20

it is not "immaterial" or "wholly insubstantial and frivolous." *Id.* (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254; *Puerto Rico*, 119 F.4th at 186). 3M's defenses easily clear that low bar.[1]

*First*, 3M's preemption defense can and should be resolved in 3M's favor now under Rule 12(b)(6). Dkt. 23 at 5–13 (Feb. 5, 2026). The State is attempting to use a general consumer-protection statute to fabricate a state-law labeling and warning requirement for the 8210 respirator. But the State's proposed warning, instructing users to "IGNORE NIOSH COAL APPROVAL," conflicts with federal regulations requiring specific "labels and markings," 42 C.F.R. § 84.33(a). Indeed, the State contends 3M should tell consumers the exact opposite of what NIOSH has done in certifying the 8210 respirators. Among other things, that stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" embodied in the NIOSH regulatory regime. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). 3M's "federal preemption defense" is plainly "colorable." *Caris MPI*, 108 F.4th at 347.

The State claims that "3M already lost" its preemption argument, but merely cites an out-of-circuit district-court decision on different facts. Mot. 21 (citing *McFadden v. 3M Co.*, 2015 WL 905083, at *1 (E.D. Mo. Mar. 3, 2015)). *McFadden* found no preemption because the claims did not "actually conflict" with federal law. 2015 WL 905083, at *3. But the court was clear that a "state law claim that depends upon a finding that the manufacturer should have varied from [federal] 'requirements' is preempted"—such as, a claim "that the manufacturer should have provided additional warnings above and beyond those on the [federally]-approved label." *Id.*

---

[1] 3M is moving to dismiss on preemption grounds, but it is not presently seeking dismissal under either DPA or PREP Act immunity. DPA immunity covers those respirators sold and distributed pursuant to the federal government's DPA orders, 50 U.S.C. § 4557, and PREP Act immunity applies to those sold after they were declared covered countermeasures, 85 Fed. Reg. 15,198. What respirators are covered is therefore not readily susceptible to a Rule 12(b)(6) motion to dismiss based on the allegations in the State's operative complaint. But the ultimate resolution of these "factual questions" belongs in "a federal, not a state, court." *Maryland*, 130 F.4th at 391.

(citing *Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206, 1219 (W.D. Okla. 2013)). If anything, *McFadden* counsels in 3M's favor.

Finally, the State seems to suggest that a preemption defense is somehow unavailable here because 3M did not assert it in a different case the case about 8710 respirators, Mot. 20. Of course, whether a defendant raised a particular defense in a different case on different facts about a different and discontinued product sold under a different certification regime has no bearing on whether it is colorable as a matter of law in *this* case.

*Second*, 3M has a plausible federal defense under the DPA, which immunizes 3M from liability for acts directly or indirectly related to its compliance with the DPA. Those acts include the manufacture, distribution, and sale of 8210 respirators in West Virginia. 50 U.S.C. § 4557; *see also* NOR ¶¶ 64–71. The State asserts that this defense is not colorable because the DPA immunity may apply to only a percentage of the 8210 respirators at issue, and that any order did not "require[]" 3M "to misrepresent, omit, and/or mislead" or "sell 8210's into West Virginia." Mot. 20–21. The State's DPA argument, however, has nothing to do with the merits of 3M's defense. Instead, it merely retreads the assertion that 3M's conduct does not sufficiently relate to the State's claims. As discussed above, 3M plausibly alleges that it does. *See supra* at 14–20.

*Third*, 3M also has a colorable claim of immunity under the PREP Act because 3M manufactured and enabled the importation of 8210s—a NIOSH-approved countermeasure covered by the PREP Act. NOR ¶¶ 79–83. Again, the State offers no argument on the merits. The State merely repeats the elements of PREP Act immunity and maintains—without explanation—that 3M cannot meet them. Mot. 22. And the State's resort to the same argument that 3M's conduct does not relate to the State's claims. That, too, fails. *See supra* at 14–20.

## CONCLUSION

For the foregoing reasons, the Court should deny the State's motion to remand.

22

Dated: February 5, 2026                         Respectfully submitted,

*/s/ Bryant J. Spann*

Bryant J. Spann, Esq. (WV Bar No. 8628)
THOMAS COMBS & SPANN, PLLC
300 Summers Street, Suite 1380
Charleston, WV 25301
(304) 414-1800

*/s/ Lauren Goldman*

Lauren Goldman, *pro hac vice*
Justine Goeke, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000

Steven R. Ruby, Esq. (WV Bar No. 10752)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower
707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323

*Counsel for Defendant 3M Company*

23

**CERTIFICATE OF SERVICE**

I, Bryant J. Spann, hereby certify that on February 5, 2026, a copy of the foregoing was served on counsel for Plaintiff by electronic filing through the CM/ECF system.

Jace H. Goins, Esq., Chief Deputy Att'y Gen., (WV Bar # 6894)
Vaughn T. Sizemore, Esq., Deputy Att'y Gen., (WV Bar # 8231)
OFFICE OF THE ATTORNEY GENERAL
Building 1, Room 26-E
Capitol Complex
Charleston, West Virginia 25305
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

J. Timothy DiPiero (W.Va. Bar # 9616)
Lonnie C. Simmons (W.Va. Bar # 3406)
Robert M. Bastress III (W.Va. Bar # 9616)
DiPIERO SIMMONS
McGINLEY BASTRESS, PLLC
P.O. Box 1631
Charleston, West Virginia 25326
Telephone: (304) 342-0133
Facsimile: (304) 342-4605
Rob.bastress@dbdlawfirm.com

*Counsel for The State*

Dated: February 5, 2026

*/s/ Bryant J. Spann*
Bryant J. Spann, Esq. (WV Bar No. 8628)

*Counsel for Defendant 3M Company*

24