**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

STATE OF WEST VIRGINIA,
*ex rel.* JOHN B. MCCUSKEY,
*Attorney General*,

               Plaintiff,

v.                                 CIVIL ACTION NO.   2:25-cv-00750

3M COMPANY, *formerly known as
Minnesota Mining and Manufacturing Co.,*

               Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *The State's Motion to Remand* (Document 14), *The State's Memorandum in Support of the Motion to Remand* (Document 15), *3M's Memorandum in Opposition to the State's Motion to Remand* (Document 24), and *The State's Reply to 3M's Response to the Motion to Remand* (Document 26), as well as the Defendant's *Notice of Removal* (Document 1) and the *Complaint* (Document 1-3).

Additionally, the Court has reviewed *Defendant 3M's Motion to Dismiss Plaintiff State of West Virginia's Complaint* (Document 22), the *Memorandum of Law in Support of 3M's Motion to Dismiss the State's Complaint* (Document 23), *The State's Response to 3M's Motion to Dismiss* (Document 27), and the *Reply in Support of 3M's Motion to Dismiss the State's Complaint* (Document 30).   For the reasons stated herein, the Court finds that it possesses jurisdiction and the motion to dismiss should be granted.

**FACTUAL ALLEGATIONS**

The Plaintiff, State of West Virginia, ex rel. John B. McCuskey, Attorney General, initiated this action in the Circuit Court of Kanawha County, West Virginia, on or about December 22, 2025. West Virginia named as the Defendant, 3M, who manufactures, markets and sells various products, including disposable, valveless respirators.

This case is the second case brought by the State of West Virginia against 3M involving a specific disposable respirator it manufactured. The first case was filed in the Circuit Court of Lincoln County, West Virgina, in 2003 and involves common-law tort claims and alleged violations of the West Virginia Consumer Credit and Protection Act ("WVCCPA") in connection with 3M's marketing and sale of its 8710 respirators. That case is still pending before the Circuit Court of Lincoln County and is currently in its second phase of trial.[1] This second case relates to alleged violations of the WVCCPA in connection with 3M's marketing and sale of its 8210 respirator,[2] which is the successor of the 8710 respirator. Specifically, West Virginia alleges that 3M has violated the WVCCPA (West Virginia Code § 46A-6-104).

West Virginia alleges that, besides the filter being different, both the 8710 and the 8210 respirators have the same or similar "fit characteristics," and, as a result, both contain several of the same defects, of which 3M was aware. (Pl.'s Compl. ¶¶ 30-33.) First, due to the 8710 and 8210 respirators not having inhalation or exhalation valves, a reliable fit check[3] cannot be performed to ensure a proper seal. Similarly, both respirators lack the ability for reliable and

---

[1] The first phase of trial began in January 2025, and the second phase resumed in March 2026.

[2] 3M's 8210 respirator is an N95 respirator that has been approved by NIOSH since 1995. *See* Approval Details for Approval No. 0007, NIOSH Certified Equipment List, https://wwwn.cdc.gov/NIOSH-CEL/ApprovalDetails?schedule=84A&approvalNum=0007.

[3] A fit check is conducted by the user to ensure a proper seal and "should be done every time the respirator is donned and takes a few seconds and certainly less than a minute." (Compl. at ¶ 37.)

practical fit testing[4] to be performed.  Second, the 8710 and 8210 respirators do not have inhalation or exhaustion valves, which allows for "moist, warm, humid exhaled breath [to] condense[] on the exposed filter media. . . causing degradation, loss of filter rigidity, and increased breathing resistance. . . thereby resulting in flexing and often eventual collapse, all of which, in turn. . . [leads] to. . . increased leakage of the face seal."  (*Id.* at ¶ 65.)  Additionally, humidity in the environment, such as that often found in coal mines, "caused the 8710 and causes the 8210 to flex and ultimately collapse."  (*Id.* at ¶ 69.)  Third, both the 8710 and 8210 respirators lack the durability required for use in coal mines.  Fourth, the two non-adjustable head straps on the 8710 and 8210 respirators make it more difficult to achieve proper fit.  Lastly, the single size of the 8710 and 8210 respirators also does not allow all users to achieve a proper fit due to differences in facial features.

Further, West Virginia alleges that despite knowing about these defects, 3M has made several misrepresentations in the marketing of its 8710 and 8210 respirators.  Specifically, 3M's website represents that the 8210 respirator "provide[s] effective respiratory protection for use in industries where workers will be exposed to dust particles," has a "[d]urable, collapse resistant inner shell," provides "[r]eliable, effective protection against fine particles," and "can provide protection equivalent to a rubber facepiece respirator."  (*Id.* at ¶ 134-36, quoting Document 1-6 at 120, 125.)  Additionally, 3M's website lists "coal" as a permissible use and "mining" as a

---

[4] Like a fit check, fit testing is another way of "ensuring a respirator fits the wearer's face and adequately protects him/her."  (Compl. at ¶ 35.)  However, unlike a fit check, fit tests can be "time consuming" and "are intended to be conducted every several months or once a year, not every day."  (*Id.* at ¶ 36.)  Fit tests fall into two categories, quantitative, which involves the use of a probe to "numerically measur[e] the amount of leakage into the respirator," and qualitative, which involves the use of a special agent to test the adequacy of a respirator by using a user's sensory response (i.e., smell or taste).  (*Id.* at ¶¶ 54-55.)

3

permissible industry, and it also provides that the 8210 respirator "fits so it can help protect" the wearer "all day long."   (*Id.* at ¶ 138-42, 145, quoting Document 1-6 at 112, 134, 147.)

West Virginia alleges that the 8210 respirator and its box also contain misrepresentations and omit relevant information.   Specifically, the 8210 respirator contains a warning label that states it "protects against certain dusts and mists" and that "[m]isuse may result in sickness or death," and directs the user to see the box for its proper use, which includes "coal" as a proper use. (*Id.* at ¶ 150-51, quoting Document 1-6 at 132, 134.)   The warning label on the 8210 respirator fails to include a warning that "the 8210 is not suitable for coal mining" and that "the 8210 cannot be properly and consistently fitted."   (*Id.* at ¶ 154.)   Additionally, the 8210 respirator box includes fit check instructions although it is virtually impossible to conduct a fit check with a valveless respirator like the 8210.   West Virginia alleges that the 8210 respirator and its box should have included the following warnings: "'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL' and/or 'CANNOT BE PROPERLY AND CONSISTENTLY FITTED.'"   (*Id.* at ¶ 160-61.)

3M removed this matter to federal court on December 23, 2025, based on federal officer removal under 28 U.S.C. § 1442(a)(1).   Its *Notice of Removal* (Document 1) cites federal officer removal based on its mandated sale of respirators, (including 8210 respirators), to FEMA between April and October 2020 pursuant to the Defense Production Act ("DPA") during the COVID-19 pandemic.   West Virginia has moved to have the case remanded to the Circuit Court of Kanawha County, West Virginia, and 3M has subsequently moved to dismiss.

**JURISDICTION**

West Virginia seeks to have this case remanded, arguing that the doctrine of federal officer removal is not applicable. Specifically, West Virginia argues that while there typically is no presumption in favor of remand in federal officer removal cases, because West Virginia brought this action on behalf of its citizens to enforce its consumer protection laws, "the Eleventh Amendment requires a re-calibration back toward putting a thumb on the scale in favoring remand." (Pl.'s Mem. at 6.) West Virginia further argues that 3M has failed to satisfy the nexus requirement under federal officer removal given that the respirators 3M supplied to FEMA were not sold directly in West Virginia but rather were supplied to FEMA outside of West Virginia. West Virginia contends that 3M also failed to satisfy the "acting under" requirement given that the 8210 respirator is a "standardized consumer product" and 3M was merely complying with the DPA. Lastly, West Virginia contends that there is no colorable federal defense.

3M asserts that the doctrine of federal officer removal does apply in this case. Specifically, it argues that it is a "person" and that it plausibly alleged it "acted under" a federal officer given that it assisted the federal government in addressing the COVID-19 pandemic by supplying respirators to FEMA after being ordered to do so pursuant to the DPA. 3M further argues that West Virginia's claim relates to its supplying respirators to FEMA and that West Virginia's disclaimer is ineffective. Lastly, 3M contends that it plausibly alleged three colorable federal defenses, specifically preemption, DPA immunity, and PREP Act immunity.

*A. Removal Standard*

An action may be removed from state court to federal court if the action is against an "officer (or any person acting under that officer) of the United States or of any agency thereof, in

5

an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).   The purpose of § 1442(a)(1) "is to give effect to the legislative principle that those acting at the federal government's direction should be able to defend themselves in federal—not state—court, lest states be able to stymy the federal government's operations."  *Maryland v. 3M Co.*, 130 F.4th 380, 387 (4th Cir. 2025); *see also Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 228 (4th Cir. 2020) ("*Baltimore II*").   A party seeking removal under § 1442(a)(1) "bears the burden on convincing [the Court] that the action[] belong[s] in federal court." *Maryland*, 130 F.4th at 387 (citing *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 297 (4th Cir. 2022)).   "To carry that burden, the notice of removal must plausibly allege that federal jurisdiction through 28 U.S.C. § 1442(a)(1) is proper."  *W. Va. ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 194 (4th Cir. 2025) (citing *Maryland*, 130 F.4th at 387).

Ordinarily, "an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit."  *W. Va. ex rel. Hunt*, 140 F.4th at 196 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).   However, because "§ 1442(a)(1)'s promise of a federal forum is necessarily broad," and therefore requires liberal construction, the ordinary rules of removal do not apply.  *Maryland*, 130 F.4th at 387-88.   Thus, when § 1442(a)(1) is implicated, "[g]eneral removal principals are. . . inverted."  *Id.* at 388.   As such, "'the ordinary presumption against removal does not apply' to federal officer removal."  *Id.* (quoting *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

6

Additionally, the ordinary pleading rules do not apply when § 1442(a)(1) is implicated. *Maryland*, 130 F.4th at 388; *W. Va. ex rel. Hunt*, 140 F.4th at 195. The well-pleaded complaint rule is displaced by § 1442(a)(1) "insofar as it 'allows suits against federal officers to be removed despite the nonfederal cast of the complaint.'" *Maryland*, 130 F.4th at 388 (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n.12 (2006)); *see also W. Va. ex rel. Hunt*, 140 F.4th at 195 ("[T]he right of removal under § 1442(a)(1) is made *absolute*. . . regardless of whether the suit could originally have been brought in a federal court." (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969))). "[A] plaintiff in the § 1442(a)(1) removal context is no longer the master of its complaint in the sense that it cannot preempt removal to a federal court merely because the complaint is glossed only in state law." *Maryland*, 130 F.4th at 389. Thus, in determining whether removal is proper under § 1442(a)(1), courts "look to a defendant's well-pleaded facts of removal to see if it is entitled to a federal forum despite the 'nonfederal cast of the complaint.'" *Id.* (quoting *Kircher*, 547 U.S. at 644 n.12).

### B. Federal Officer Removal

In cases, such as this one, where a private defendant is seeking to remove a case under § 1442(a)(1), it must "plausibly allege[] '(1) that it acted under a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted official authority.'" *W. Va. ex rel. Hunt*, 140 F.4th at 197 (quoting *Anne Arundel Cnty. v. BP P.L.C.*, 94 F.4th 343, 347-48 (4th Cir. (2024)).

### (1) *"Acting under" and Nexus Requirements*

Beginning with the first prong of federal officer removal, the use of the phrase "acting under" by § 1442(a)(1) "describes 'the triggering relationship between a private entity and a federal

officer.'"   *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251 (quoting *Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 461 (4th Cir. 2020) ("*Baltimore I*"), *vacated and remanded on other grounds*, 593 U.S. 230 (2021)).   Although that phrase "benefit[s] from a broad interpretation, it is not 'limitless.'"   *W. Va. ex rel. Hunt*, 140 F.4th at 197 (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251).   A private entity "acts under" a federal officer if it is under the federal officer's "subjection, guidance, or control," and "involve[d] [in] an effort to assist, or to help carry out, the duties or tasks of the federal superior."   *W. Va. State Univ.*, 23 F.4th at 299 (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151-52 (2007)); *see also Cnty. Bd. of Arlington Cnty.* 996 F.3d at 251 ("[A] private contractor may 'act under' a federal officer when the relationship 'is an unusually close one involving detailed regulation, monitoring, or supervision." (quoting *Watson*, 551 U.S. at 153)).

The Fourth Circuit has established guideposts for determining whether a private defendant is "acting under" a federal officer.   *See Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251-52; *W. Va. State Univ.*, 23 F.4th. at 299-302.   The Fourth Circuit has determined that a private defendant is "acting under" a federal officer if it is "working on behalf of the federal government."   *W. Va. State Univ.*, 23 F.4th. at 299; *see also Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251-52 ("[T]he 'acting under' requirement is satisfied where a contractor seeks to remove a case involving injuries from equipment that it manufactured for the government." (quoting *Sawyer*, 860 F.3d at 255).   However, the Fourth Circuit has determined "that 'simply complying with the law' is not sufficient" to establish that a private defendant was acting under a federal officer.   *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 251 (quoting *Watson*, 551 U.S. at 152).   Likewise, the Fourth Circuit has also held that "a private company selling 'standardized consumer product[s]' to the federal

government does not implicate the federal officer removal statute." *Cnty. Bd. of Arlington Cnty.* 996 F.3d at 251 (quoting *Baltimore I*, 952 F.3d at 464); *see also W. Va. State Univ.*, 23 F.4th. at 301 ("[E]ven when a contract specifies the details of the sales and authorizes the government to supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute.").

West Virginia argues that 3M cannot satisfy the "acting under" requirement because 3M sold a "standardized consumer product" to the federal government.   West Virginia further argues that 3M's compliance with the DPA directive is not sufficient to satisfy the "acting under" requirement. It contends that the federal government played no role in the designing or manufacturing of the 8210 respirators, and that there was no "unusual relationship" or "detailed regulation, monitoring or supervision."  (Pl.'s Mem. at 16.)   West Virginia further contends that the fact that the rated order required 3M to fulfill the federal government's contract before other orders does not demonstrate that 3M was acting under a federal officer because "[a] priority contract is not exclusive to use by a government entity or the DPA context," and is "'typical' in commercial contracts."  (*Id.* at 17-18.)

3M responds that it was "acting under" a federal officer because it was required to comply, subject to criminal sanction, with a directive pursuant to the DPA to sell NIOSH-approved respirators, including the 8210 respirators, to FEMA, and was, therefore, under the federal government's "subjection, guidance, and control."   3M argues that it assisted the federal government by supplying respirators to help with the federal government's pandemic response in reducing the spread of COVID-19 and protecting public health.   3M also contends that the federal

9

government "identified regulatory specifications" by requiring NIOSH-approved respirators, and 3M was required to prioritize the government's order over private orders.

The Court finds that 3M was "acting under" a federal officer.   Although this case involves a "standardized consumer product," i.e., the 8210 respirator, it involves more than the simple sale of that standardized consumer product to the federal government.   Specifically, the federal government, pursuant to the DPA, mandated[5] that 3M supply NIOSH-approved respirators to the Federal Emergency Management Agency ("FEMA"), which in turn, distributed those respirators to states, including West Virginia, to be used by healthcare workers and first responders during the COVID-19 pandemic.[6]   *Cf. Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 237 (5th Cir. 2022) (finding that Tyson Foods was not "acting under" a federal officer because none of the communications from federal officials "constituted an 'order' or a 'directive'" for Tyson to keep its plants open, and that the executive order issued by the President "had no immediate legal effect" because it "merely delegated the President's DPA authority to the Secretary of Agriculture," which the Secretary never exercised, but rather, "'encouraged' meat and poultry plants to follow preexisting CDC and OSHA guidance").   Because the federal government mandated that 3M

---

[5] According to the Rated Order provided to 3M, its "[a]cceptance [was] mandatory," and 3M was "required to comply with the. . . order issued pursuant to the DPA" or otherwise it would be subject to "a crime punishable by a fine of not more than $10,000 or imprisonment for not more than one year, or both."   (Document 24-2.)

[6] West Virginia focuses on 3M supplying a "standardized consumer product," relying on Fourth Circuit precedent in *W. Va. State Univ.* and *Baltimore II*, (Pl.'s Mem. at 14), and the fact that the federal government did not control the "manufacture of, design of, or warnings concerning the 8210" respirator.   (Pl.'s Reply at 18.)   However, the Fourth Circuit was concerned that basing the "acting under" prong on the sale of standardized consumer products to the federal government would "bring every seller of contracted goods and services within the ambit of § 1442 when the government is a customer."   *Baltimore II*, 31 F.4th at 230.   Such a concern does not exist under the circumstances presented here because unlike in *Baltimore II*, which dealt with a mere contractual sale between the government and a private entity, see *id.*, this case involves a government mandated sale.   *Cf. W. Va. State Univ.*, 23 F.4th at 300 ("[A] private actor who merely has a contract with the federal government to produce or provide goods is not sufficient, on its own, to justify removal.").

supply it with respirators, 3M was acting under the federal government's "subjection, guidance, or control." *W. Va. State Univ.*, 23 F.4th at 299 (quoting *Watson*, 551 U.S. at 151)

Furthermore, although compliance with the law alone is not sufficient to invoke federal officer removal, 3M did more than merely comply with the law.  By supplying the government with respirators, based on a government mandate during a national emergency, to ensure that healthcare workers and first responders were adequately supplied with respirators, 3M helped the federal government's efforts in reducing the spread of COVID-19 and protecting public health. Thus, it assisted the federal government in fulfilling "a basic governmental task, under the government's control or subjection, that the government would otherwise have [had] to perform itself." *W. Va. State Univ.*, 23 F.4th. at 301-02 (citing *Watson*, 551 U.S. at 152); *see also Cnty. Bd. of Arlington Cnty.* 996 F.3d at 253.

Additionally, there was an "unusually close relationship" between 3M and the federal government.  *Baltimore II*, 31 F.4th at 232 n.22; *see also Cnty. Bd. of Arlington Cnty.* 996 F.3d at 251.  Specifically, beyond the mandate that 3M supply respirators to FEMA, which precluded private orders from being fulfilled until the government's supply was met,[7] 3M worked closely with federal officials. 3M met with the government "to negotiate the precise terms under which 3M would import enormous quantities of respirators made overseas". It also submitted "letters to the FDA pursuant to FDA's March 2, 2020 FDA Emergency Use Authorization…" to inform the FDA of the actions taken by 3M "to assist in the response to the COVID-19 pandemic."  (Notice

---

[7] In a footnote in its reply, West Virginia indicates that because the rated order "provided 'nothing in this order is intended to override, supersede, or duplicate orders for N95 masks produced by 3M Company intended for sale or delivery in the United States,'" it "only changed the fulfillment of 3M orders abroad" and "allowed 3M to fulfill its existing domestic orders."  (Pl.'s Reply at 1 n.1, citing Document 24-2.)  While the rated order did not exclude 3M from fulfilling domestic sales, that exclusion applied only to sales to "U.S. Government agencies, States, [and] healthcare or critical infrastructure distributors in the United States."  (Document 24-2.)  In other words, the rated order took priority over all other domestic sales that did not involve those entities.

11

of Rem. at ¶¶ 26, 31.)   Moreover, the federal government procured aircraft to transport the respirators from 3M manufacturing facilities overseas to the United States, further indicating the close relationship between 3M and the federal government.   Therefore, based on the government mandate and the close relationship between 3M and the federal government in responding to a national emergency, the Court finds 3M was acting under a federal officer.[8]

Having demonstrated that it acted under a federal officer, 3M must also demonstrate a sufficient nexus.   To do so, "a defendant must show it is being sued for an act or acts that it claims were done under—or related to acts done under—federal authority."   *Maryland*, 130 F.4th at 389 (quoting *Anne Arundel Cnty.*, 94 F.4th at 349).   In other words, "there must be a connection or association between *the act* in question and the federal office."   *Anne Arundel Cnty.*, 94 F.4th at 348 (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256).   A court must "credit Defendants' theory of the case when determining whether there is such a connection or association."   *Maryland*, 130 F.4th at 389 (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 256).   However, that does not mean that a defendant will "satisfy the nexus element by alleging only that the 'plaintiff's entire civil action in a general sense' is related to the defendant's federal work."   *Id.* (quoting *Anne Arundel Cnty.*, 94 F.4th at 348).   Nonetheless, establishing the nexus element is a "fairly low" bar because "a removing defendant need not establish an airtight case on the merits in order to show the required. . . connection."   *W. Va. ex rel. Hunt*, 140 F.4th at 199 (quoting

---

[8] West Virginia relies on *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101 (9th Cir. 2022), where the Ninth Circuit explained that "DPA directives are basically regulations," and held that the defendants, who produced oil and gas for the federal government during the Korean War and in the 1970s pursuant to the DPA, were not acting under a federal officer because they "did not serve as government agents and were not subject to close direction or supervision" and thus, their "compliance with the DPA was only lawful obedience," which "is not enough."   39 F.4th at 1107-08. The Court is not bound by that decision, but even if it was, the Court would find it to be distinguishable, given that 3M not only complied with a mandate under the DPA but assisted the federal government in addressing a national emergency and worked closely with the federal government in doing so.

12

*Maryland*, 130 F.4th at 389) (internal quotations omitted); *see also Sawyer*, 860 F.3d at 258 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)).

West Virginia argues that there is no connection between 3M's selling of respirators to FEMA in 2020 and 3M's misrepresentations and omissions related to the advertising and sale of 8210 respirators in West Virginia "after December 22, 2021, the cut-off date, according to 3M" in its Notice of Removal. (Pl.'s Mem. at 10.) West Virginia further argues that the WVCCPA "only governs 3M's sale of 8210's into West Virginia," not those sold outside of West Virginia, and that in any event, "it does not seek civil penalties for sales made to FEMA outside of West Virginia." (*Id.* at 11, n.13.) West Virginia contends that 3M has not shown the specific quantity of 8210 respirators that it supplied to FEMA or the quantity that FEMA distributed in West Virginia, which could be "*de minimis*."

3M argues that it plausibly alleged that West Virginia's claim relates to its selling of 8210 respirators to FEMA. Specifically, 3M contends that West Virginia alleges 3M omitted a warning on its 8210 respirators and the boxes. 3M further contends that the federal government required 3M to supply respirators, including the 8210 respirators, that were approved by NIOSH, which has regulations pertaining to labeling and approval of such labels. 3M asserts that West Virginia's claim relates to the labeling on the 8210 respirators that 3M sold to FEMA in 2020, which could plausibly still be in circulation in West Virginia given their long shelf life. The labels on those 8210 respirators, like the 8210 respirators it sold to distributors in West Virginia, omitted the warning, which West Virginia alleges is a violation of the WVCCPA. 3M also argues that West Virginia cannot attempt to avoid federal officer removal by disclaiming 3M's sale of 8210 respirators to FEMA.

13

Based on 3M's theory of the case, the acts for which West Virginia is suing 3M, namely misrepresentations and omissions associated with selling and marketing its 8210 respirators, related to its supplying NIOSH approved respirators, including the 8210 respirators, to FEMA during the COVID-19 pandemic.  Specifically, West Virginia's claim against 3M relates to labeling that was required for NIOSH-approved respirators supplied to FEMA. West Virginia asserts that 3M violated the WVCCPA by omitting a warning on its 8210 respirator that stated "'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL' and/or 'CANNOT BE PROPERLY AND CONSISTENTLY FITTED.'"  (Pl.'s Compl. at ¶ 160.)  Therefore, West Virginia's claim necessarily implicates the work 3M was ordered to do for the federal government because the federal government required NIOSH-approved respirators.  In sum, given the shelf life of the respirators, there could be respirators in circulation in West Virginia, as a result of the government mandate, that do not contain the labeling West Virginia now claims is required.

To comply with NIOSH labeling requirements, all NIOSH-approved respirators must include a NIOSH "emblem," the applicant's name, "an approval number," "restrictions" or "limitations" placed on the respirator's use by NIOSH, a lot number, as well as any "additional labels, markings, or instructions" required by NIOSH.   42 C.F.R. § 84.33(b), (c), (g).   Moreover, any changes to a NIOSH label must be approved by NIOSH.  *Id.* at § 84.33(a).   Although the federal mandate did not explicitly require 3M to "market and describe" its 8210 respirator "in a certain way", by requiring NIOSH-approved respirators, the federal government, at the very least, "dictated the content of warnings" on 3M's respirators.  *Anne Arundel Cnty.*, 94 F.4th at 349-50.

Furthermore, the 8210 respirators sold to and distributed by FEMA in West Virginia and those sold by 3M directly to distributors in West Virginia are the same respirators and include the

14

same label that omits the warning which West Virginia now claims to be a violation of the WVCCPA. Therefore, it would be difficult to distinguish between these 8210 respirators. Even if it were possible for a factfinder to distinguish 8210 respirators supplied to FEMA from those supplied to distributors, because West Virginia seeks to enjoin 3M from advertising the 8210 respirators in West Virginia, it is unclear how an injunction could be tailored to not include the respirators supplied to FEMA and still in circulation. Nonetheless, "[t]he need to unravel such challenging questions in this case establishes that 3M's federal work is inextricably related to the charged conduct." *Maryland*, 130 F.4th at 391 (explaining that "[w]here the parties dispute difficult factual questions about [a] federal interest, a contractor acting at the government's direction 'should have the opportunity to present their version of the facts to a federal, not a state, court'" (quoting *Willingham*, 395 U.S. at 409)). Therefore, because West Virginia asserts that 3M violated the WVCCPA by omitting a warning on its 8210 respirators, plausibly including those 8210 respirators sold to and distributed by FEMA, and because the federal government dictated the content of warnings when it mandated that 3M supply NIOSH-approved respirators, 3M plausibly alleges that West Virginia's claim is related to its federal work.

West Virginia argues that 3M supplied "respirators" to FEMA generally, and that 3M claims the 8210 respirator was among those supplied. However, West Virginia argues that without providing how many of the respirators supplied to FEMA were 8210 respirators, the number could be "*de minimis*." (Pl.'s Resp. at 11-12.) Although 3M does not provide an exact number of 8210 respirators supplied to FEMA or the quantity that was distributed in West Virginia by FEMA, it was not required to do so. *See Maryland*, 130 F.4th at 390 (stating that a private defendant's theory of connection does not need to "be an 'airtight case on the merits'" (quoting

15

*Jefferson Cnty.*, 527 U.S. at 432)).   3M only needed to demonstrate plausibility, which it did by plausibly alleging that the 8210 respirators may have been among those respirators supplied to and distributed by FEMA in West Virginia given that the 8210 respirator is an N95 respirator and 3M supplied more than 228 million N95 respirators to FEMA.   Moreover, in its *Notice*, 3M plausibly alleged that given the shelf life of the 8210 respirators, there could be 8210 respirators still in circulation in West Virginia that were sold to and distributed by FEMA. Having given credit to 3M's theory of the case, as required, the fact that 3M has not shown that those 8210 respirators were indeed distributed in West Virginia and are still in circulation does not prevent 3M from invoking federal officer removal.

West Virginia further argues that only 3M's direct sales of 8210 respirators in West Virginia are subject to the WVCCPA and that it "is not seeking civil penalties associated with 8210 sales 3M made to FEMA or to others outside of West Virginia."   (Pl.'s Resp. at 11.) However, as the Fourth Circuit has determined, a court cannot "'blindly accept' a plaintiff's purported disclaimer of any federal connection as an attempt to prevent federal officer removal." *W. Va. ex rel. Hunt*, 140 F.4th at 195 (quoting Maryland, 130 F.4th at 389).   West Virginia's claim is not just limited to the sale of 8210 respirators in West Virginia but the advertising of those respirators as well.   (Compl. at ¶¶ 133-61, 172;) *see also* W. Va. Code § 46A-6-102(7)(M) (providing that the term "unfair methods of competition and unfair or deceptive acts or practices" includes "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or *advertisement* of any goods or services" (emphasis added)).   As previously explained,

16

West Virginia's claim necessarily implicates 3M's federal work as it relates to the labeling of its 8210 respirators, and as such, West Virginia's disclaimer is ineffective.  *See W. Va. ex rel. Hunt*, 140 F.4th at 195 (explaining that once a court credits a private defendant's allegations and theory of the case for purposes of federal officer removal, "the disclaimer '[i]s not effective to prevent removal'" (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 190-91 (1st Cir. 2024))). West Virginia cannot avoid federal officer removal by disclaiming those 8210 respirators that were sold to and distributed by FEMA in West Virginia given that its claim plausibly implicates those respirators.

### (2) Colorable Federal Defense Requirement

Having satisfied the acting under and nexus requirements, 3M must demonstrate a "colorable federal defense."  *W. Va. ex rel. Hunt*, 140 F.4th at 198 (quoting *Anne Arundel Cnty.*, 94 F.4th at 347).   "A colorable federal defense is one that 'is defensive and based in federal law,' and that 'arise[s] out of a defendant's official duties.'"  *Id.* (quoting *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254).   To be colorable, "the defense must only be plausible," rather than "clearly sustainable."  *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254.   Like the nexus requirement, demonstrating a colorable federal defense is a "low bar."  *W. Va. ex rel. Hunt*, 140 F.4th at 198.

3M asserts three federal defenses.   First, 3M asserts that it is immune under the DPA due to the State seeking to penalize 3M for at least some of the acts that resulted directly or indirectly from its compliance with the federal government's mandate under the DPA.   Second, it asserts that West Virginia's claim is preempted by NIOSH regulations.   Lastly, 3M asserts that the 8210 respirators it supplied to FEMA are "covered countermeasures" pursuant to the Public Readiness

17

and Emergency Preparedness ("PREP") Act, and because West Virginia's claim relates to the "administration" of those respirators, it is immune under the PREP Act.

West Virginia argues that none of these federal defenses are colorable. Specifically, West Virginia argues 3M's DPA immunity defense is not colorable because 3M has not demonstrated that the DPA order required it to sell 8210 respirators into West Virginia or "required it to misrepresent, omit, and/or mislead in connection with the sale of 8210's into West Virginia." (Pl.'s Mem. at 20.) West Virginia further argues that there is no such thing as NIOSH preemption, and therefore, that defense too is not colorable. West Virginia contends that 3M has not asserted a colorable PREP Act immunity defense because the term "loss" as defined under the PREP Act's immunity clause does not include West Virginia's claim for civil penalties and injunctive relief.

Beginning with 3M's DPA immunity defense, without addressing whether 3M will actually prevail on that defense, the Court finds that it is colorable. The DPA provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to" the DPA. 50 U.S.C. § 4557. As previously discussed, 3M was mandated, pursuant to the DPA, to supply FEMA with NIOSH-approved respirators, including the 8210 respirators. Because West Virginia's claim could encompass those 8210 respirators, possibly subjecting 3M to civil penalties for the omission of warnings on the labels of its 8210 respirators based on its compliance with the directive to supply NIOSH-approved respirators, it is plausible that 3M has a valid DPA immunity defense.[9]

---

[9] Whether 3M would be subject to civil penalties for the 8210 respirators it supplied to FEMA will largely depend on whether those respirators could be distinguished from those sold by 3M to distributors in West Virginia, but even if they ultimately could, it is not relevant for purposes of determining whether 3M's DPA immunity defense is colorable since the question is not whether 3M will be able to "clearly sustain[]" or prevail on that defense, but rather, whether

18

Next, without addressing the merits of 3M's NIOSH preemption defense, the Court finds this defense is also colorable.   3M asserts that because West Virginia's claim would require it to include on the label of its 8210 respirator a warning that conflicts with NIOSH regulations, it therefore is preempted by those regulations.   Conflict Preemption occurs "when compliance with both federal and state regulations is impossible. . . [or] when a state law stands as an obstacle to the accomplishment and execution of the full purposes of the federal law."   *N. Va. Hemp and Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025).   As previously discussed, NIOSH requires labels containing specific information to be placed on approved respirators, and any changes to such labels must be submitted to NIOSH for approval.   *See* 42 C.F.R. § 84.33(a), (b), (c), (g).   Because West Virginia's claim would require 3M to include a warning stating "NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL," which seems to be inconsistent with NIOSH's certification and approval of the 8210 respirator and would ultimately require the label to be approved by NIOSH, it would appear that West Virginia's claim conflicts with NIOSH regulations.   Thus, it is plausible that 3M has a valid preemption claim.

Lastly, the Court finds 3M's PREP Act immunity defense not to be colorable.   The PREP Act's immunity provision provides that "a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."   42 U.S.C. § 247d-6d(a)(1).   Although 3M's 8210 respirator is considered a "covered countermeasure,"[10] the remedies that West Virginia is seeking are not included among the types

---

that defense is "plausible."   *Cnty. Bd. of Arlington Cnty.*, 996 F.3d at 254.

[10] The PREP Act defines a "covered countermeasure" to include "a respiratory protective device that is approved by

of "loss" covered by the PREP Act's immunity provision.    The PREP Act's immunity provision defines "loss" as "any type of loss, including (i) death; (ii) physical, mental, or emotional injury, illness, disability or condition; (iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and (iv) loss of or damage to property, including business interruption loss."    *Id.* at § 247d-6d(a)(2)(A).    West Virginia is seeking civil penalties under the WVCCPA, as well as an injunction, which do not fall under any of the categories of loss, which are compensatory in nature.    *See State ex rel. Dodrill Heating and Cooling, LLC v. Akers*, 874 S.E.2d 265, 273 (W. Va. 2022) (explaining that a "violation of the WVCCPA itself gives rise to civil penalties that are independent of compensatory damages"); *Village of Depue v. Viacom Intern.*, Inc., 632 F.Supp.2d 854, 864 (C.D. Ill. 2009) ("[A] civil penalty is designed to punish a wrongful act and to deter the wrongdoer from doing it again; a penalty is not designed to compensate anyone." (citing *United States v. WCI Steel, Inc.*, 72 F.Supp.2d 810, 833 (N.D. Ohio 1999))).    Accordingly, 3M has not plausibly pled a valid PREP Act immunity defense.    Despite 3M's PREP Act immunity defense not being colorable, 3M plausibly alleged two other colorable federal defenses, and, therefore, is entitled to federal officer removal.

As a final note on jurisdiction, West Virginia, relying heavily on *W. Va. ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169 (4th Cir. 2011), asserts that its sovereign immunity under the Eleventh Amendment tips the scale in favor of remand.    However, *W. Va. ex rel. McGraw* stands for the proposition that federal courts "should be most reluctant to compel" removal of a case

---

the National Institute for Occupational Safety and Health under part 84 of title 42, Code of Federal Regulations (or any successor regulations), and that the Secretary determines to be a priority for use during a public health emergency declared under section 247d of this title."    42 U.S.C. § 247d-6d(i)(1)(D).

20

involving a state enforcing its own laws on behalf of its own citizens unless "removal serves an overriding federal interest."  646 F.3d at 178-79 (stating that courts should be careful "before 'snatch[ing] cases which a State has brought from the courts of that State, unless some clear rule demands it'" (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 21 n.22 (1983))).  Because this case involves federal officer removal, which, as previously mentioned, serves the purpose of "ensur[ing] a federal forum in any case where a federal official or private actors acting on that official's behalf may raise a defense arising out of his official duties," *Maryland*, 130 F.4th at 387, it implicates a substantial federal interest.  *Cf. W. Va. ex rel. McGraw*, 646 F.3d at 179 (finding removal not proper because West Virginia's action did not implicate any "federal interests as articulated in" the Class Action Fairness Act of 2005).  Therefore, in this case, West Virginia cannot rely on its sovereign immunity to prevent removal when federal officer removal is implicated.

Because the Court is satisfied that it has jurisdiction under § 1442(a)(1), the Court will proceed to consider the pending motion to dismiss.

**STANDARD OF REVIEW**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint or pleading.  *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008).  Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Additionally, allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

21

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007)).   In other words, "a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.   Moreover, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancements." *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

The Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).   The Court must also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).   However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim.   *Iqbal,* 556 U.S. at 679.   Furthermore, the court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments."   *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"   *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"   *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570).   In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'"   *Francis,*

22

588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 570).   A plaintiff must, using the complaint, "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief."   *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 557).   "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   *Iqbal,* 556 U.S. at 679.

## DISCUSSION

3M first argues that West Virginia's claim should be dismissed because it is preempted due to a conflict with the NIOSH and MSHA regulatory scheme.   Specifically, 3M contends that it is impossible for 3M to comply with West Virginia's claim and that the claim stands as an obstacle to the NIOSH and MSHA regulatory scheme.   3M further argues that West Virginia has failed to state a claim because the WVCCPA "does not and cannot impose liability for statements that are consistent with federal requirements."   (Def.'s Mem. at 12.)   Lastly, 3M asserts that West Virginia's claim is time barred and that laches bars the requested injunctive relief.

West Virginia argues that its claim is not preempted.   Specifically, West Virginia argues that no court has found NIOSH preemption of a state law claim involving respirators and that a 2010 OSHA letter confirms that such preemption does not exist.   It argues that the presumption against preemption applies, that there is no indication that Congress intended for its claim to be preempted, and it is possible for 3M to comply with both federal and West Virginia law given that NIOSH regulations only set forth minimum requirements.   West Virginia also asserts that laches does not apply, and its claim is not time-barred given the rule related to continuing violations.

23

"The Supremacy Clause of the Constitution dictates that 'the Laws of the United States' are 'the supreme Law of the Land.'" *Guthrie v. PHH Mortgage Corp.*, 79 F.4th 328, 336 (4th Cir. 2023) (quoting U.S. Const. art. VI). "[T]his means that federal law preempts—or bars—claims under state law that either interfere with or are contrary to federal law." *Id.* (citing *S. Blasting Servs. Inc. v. Wilkes Cnty.*, 288 F.3d 584, 589 (4th Cir. 2002)). However, when assessing whether a state law is preempted by federal law, courts are to presume "that a federal statute has not supplanted state law." *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 271 (4th Cir. 2025) (quoting *Bates v. Dow Agrosciences*, LLC, 544 U.S. 431, 449 (2005)). Such a "presumption applies with particular force when the state is exercising its police power." *Oakley v. Coast Pro., Inc.*, 570 F.Supp.3d 365, 373 (S.D. W. Va. 2021) (quoting *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020)). Although there is a presumption against preemption, that presumption can be overcome if Congress has indicated a "clear and manifest" intention for state law to be preempted. *GenBioPro, Inc.*, 144 F.4th at 271 (quoting *Bates*, 544 U.S. at 449); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (stating that "the purpose of Congress is the ultimate touchstone in every preemption case").

The presumption against preemption can be overcome through one of three types of preemption: express preemption, field preemption, and conflict preemption. *See N. Va. Hemp and Agric., LLC v. Virginia*, 125 F.4th 472, 492-93 (4th Cir. 2025). Conflict preemption, the type of preemption at issue here, "occurs when a state law 'actually conflicts with federal law.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (quoting *S. Blasting Servs. Inc.*, 288 F.3d at 590). There are two types of conflict preemption: impossibility preemption and obstacle preemption. *See N. Va. Hemp and Agric., LLC*, 125 F.4th at 493 (citing Guthrie, 79 F.4th

24

at 337).   Addressing both types of conflict preemption below, the Court finds that West Virginia's claim conflicts with federal law.

### A.  Impossibility Preemption

Impossibility preemption applies to the extent that "compliance with both federal and state regulations is impossible." *N. Va. Hemp and Agric., LLC*, 125 F.4th at 493.   "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 60 (2011).   "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission or assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24.

West Virginia's claim would impose a duty that 3M cannot independently satisfy without permission from NIOSH.   As previously mentioned, NIOSH requires "[f]ull-scale reproductions of approval labels and markings. . . together with instructions for the use and maintenance of the respirator [to] be submitted to the Institute for approval."   42 C.F.R. § 84.33(a).   Under its claim, West Virginia asserts that 3M violated the WVCCPA by failing to include a warning label on its 8210 respirator that stated "'NOT FOR USE IN COAL MINING/IGNORE NIOSH COAL APPROVAL' and/or 'CANNOT BE PROPERLY AND CONSISTENTLY FITTED.'"   (Pl.'s Compl. at ¶ 160.)   Such labeling requirements would require 3M to obtain NIOSH approval prior to the placement of such warning label on its 8210 respirators.   Because NIOSH has discretion to approve proposed labels, it is not guaranteed that NIOSH would even approve the label required under West Virginia's claim, especially considering that West Virginia's label directs users to

25

"IGNORE NIOSH COAL APPROVAL."  (*Id.*)  3M cannot independently comply with West Virginia's claimed labeling requirements without running afoul of NIOSH requirements.

West Virgina, relying on a 2010 OSHA letter, argues that its claim is not preempted because NIOSH's labeling requirements under § 84.33 "impose only minimum requirements." (Pl.'s Resp. at 9, citing Document 27-4.)  However, even if § 84.33 does impose minimum requirements for labeling, as previously explained, any proposed label, whether it satisfies or goes beyond the minimum requirements, must be approved by NIOSH.  *See* 42 C.F.R. § 84.33(a). Moreover, the OSHA letter relied upon by West Virginia predates the Supreme Court's decision in *Mensing*.  *See* 564 U.S. 604 (2011).    In that case, the Court found state tort claims preempted because it was impossible for the drug manufacturers to independently include a safer label for their generic drugs because the manufacturers' only course of action to comply with the state law requirements was to ask for the FDA's assistance because FDA regulations required labels for generic drugs to be the same as their brand name counterparts.  *Id.* at 618, 623.  Like the manufacturers in *Mensing* being unable to act independently without requesting FDA assistance to comply with a duty imposed by state tort claims, 3M cannot act independently without NIOSH approval to satisfy West Virginia's claimed labeling requirements.[11]

West Virginia, relying on the 2010 OSHA letter, also argues that it is not impossible for 3M to comply with its labeling requirements because NIOSH does not require approval for instructions not placed on the respirator.  However, NIOSH regulations explicitly encompass "instructions for the use and maintenance of the respirator," and nothing from this language

---

[11] West Virginia also relies on *Wyeth v. Levine*, 555 U.S. 555 (2009).  However, that case is distinguishable because Wyeth, a brand name manufacturer, did not have to obtain prior FDA approval to strengthen its warning label, and therefore, it was not impossible for it to independently comply with both state and federal law.  *See Wyeth*, 555 U.S. at 572-73; *see also Mensing*, 564 U.S. at 624.

indicates that it is limited to instructions on the respirator itself.[12]   Therefore, even if West Virginia's labeling requirements were limited to warnings that accompany the 8210 respirator, 3M would still be unable to independently comply without NIOSH approval.[13]

Because it is impossible for 3M to independently comply with West Virginia's claimed labeling requirements without running afoul of NIOSH requirements, West Virginia's claim, related to labeling, is preempted.[14]

### B.  Obstacle Preemption

To the extent that other aspects of West Virginia's claim would not require 3M to seek approval from NIOSH, the claim is still preempted because it would impose requirements that pose an obstacle to the purposes and objectives of the NIOSH and MSHA regulatory scheme.   A state law stands as an obstacle to federal law if (1) Congress had "significant objectives in passing the federal law," and (2) "the state law 'stands as an obstacle to the accomplishment' of those significant federal objectives." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 662 (4th Cir. 2024) (quoting *Guthrie*, 79 F.4th at 338).   A state law "may pose an obstacle" to the accomplishment of significant federal objectives either by interfering with those "actual objectives, or by interfering with the methods that Congress selected for meeting those legislative goals." *College Loan Corp.*

---

[12] There are indications that § 84.33(a) is not just limited to those instructions placed on the respirator.   Specifically, § 84.33(a) lists "instructions" after listing several "positions" where the "labels and markings" could be placed on a respirator.   If "instructions" was limited to those placed on the respirator, then § 84.33(a) would have likely listed "instructions" prior to listing applicable "positions" for placement.   Additionally, under § 84.33(e), which lists approved locations for labels, one of the approved label locations for another type of respirator, a supplied air respirator, is an instruction card, indicating further that "instructions" also include those that accompany the respirator.

[13] The OSHA letter relied upon by West Virginia also mentions that manufacturers may use customer mailings or other media to provide additional warnings.   Even if warnings provided by such means are not subject to NIOSH approval, the letter still provides that the information contained in such warnings must "not conflict with the approved labeling."   (Document 27-4.)   It can hardly be said that a warning to "IGNORE NIOSH COAL APPROVAL" is consistent with labeling approved by NIOSH.   (Pl.'s Compl. at ¶ 160.)

[14] Given that other aspects of West Virginia's claim not pertaining to labeling, such as those relating to alleged misrepresentations on 3M's website, would not require NIOSH approval, they are not preempted under impossibility preemption.

*v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005) (citing *Gade v. Nat'l Sold Wastes Mgmt. Assoc.*, 505 U.S. 88, 103 (1992)).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014).  Such analysis "is more an exercise of policy choices by a court than strict statutory construction."  *Oakley*, 570 F.Supp.3d at 372 (quoting *Columbia Venture, LLC v. Dewberry & Davis*, LLC, 604 F.3d 824, 830 (4th Cir. 2010)).

3M argues that the requirements under West Virginia's claim stand as an obstacle to the purposes of the NIOSH and MSHA regulatory scheme.  Specifically, it asserts that, under the regime created by Congress, "NIOSH and MSHA—not the State—are the leading regulators" of the use of respirators in mines.  (Def.'s Mem. at 10.)  3M contends that under this regime, "NIOSH's label is critical to conveying specific information," such as NIOSH approval and that it has "passed NIOSH's 'strict quality assurance and performance requirements.'"  (*Id.* at 9, quoting How to Tell if Your N95 Respirator is NIOSH Approved, NIOSH Pub. No. 2021-124.)  3M further contends that "MSHA has 'plac[ed] responsibility for certifying most respirators' for use in mining 'with NIOSH.'"  (Def.'s Reply at 8, citing 60 Fed. Reg. 30336, 30339 (June 8, 1995).)  3M argues that West Virginia's claim would undermine this regulatory scheme because it would require 3M to convey to "consumers the exact opposite of what NIOSH says and requires—that the 8210 respirator is not 'effective' for the very uses NIOSH and MSHA authorize."  (Def.'s Mem. at 9.)  3M also contends that it does not matter that both federal and state law share the same goal because state law will be preempted when it interferes with the methods that federal law utilizes to reach that goal.

28

West Virginia argues that its claim is not preempted and that no court has found NIOSH regulations preempted a state law claim regarding defective respirators.  West Virginia points to *McFadden v. 3M Co.*, No. 4:14-CV-803 (CEJ), 2015 WL 905083 (E.D. Mo. Mar. 3, 2015), arguing that it demonstrates that its claim against 3M is not preempted.  West Virginia asserts that the presumption against preemption applies in this case, especially given that it is exercising its police powers.  It further asserts that there is no indication that Congress intended for its claim to be preempted and that it is permitted to supplement federal regulations so long as its claim is "not incompatible."  (Pl.'s Resp. at 8.)  West Virginia contends that the NIOSH approval process is dependent on manufacturers and their good faith, and that current federal regulations do not involve testing a respirator's fit.  It further contends that NIOSH does not require 3M to produce the 8210 respirator or to advertise it for certain uses, such as coal mining.  West Virginia argues that its "claim seeks to vindicate its interest in having 3M accurately and truthfully represent the uses and limitations of the 8210, which has real-world implications of safety in this case as coal miners rely on the 8210 to protect themselves from lung disease."  (*Id.* at 12.)

Congress had significant objectives when it established the regulatory scheme for the regulation of respirators and their use in coal mines.  This regulatory scheme is encompassed under two federal statutes: the Occupational Safety and Health Act of 1970 ("OSH Act") and the Federal Mine Safety and Health Act of 1977 ("Mine Act").  Beginning with the OSH Act, Congress sought "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions."  29 U.S.C. § 651(b).  To carry out this policy goal, "Congress authorized the Secretary of Labor to set mandatory occupational safety and health standards applicable to all businesses affecting interstate commerce, 29 U.S.C. § 651(b)(3), and thereby

29

brought the Federal Government into a field that traditionally had been occupied by the States." *Gade v. Nat'l Solid Wastes Management Ass'n*, 505 U.S. 88, 96 (1992). Further, Congress also established NIOSH, an agency in the Department of Health and Human Services and authorized it to conduct research and "develop and establish recommended occupational safety and health standards."[15] 29 U.S.C. § 671(c).

Turning to the Mine Act, Congress enacted it "to establish. . . mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners." 30 U.S.C. § 801(g). To implement this policy goal, Congress authorized the Secretary of Labor, acting through MSHA, to "develop, promulgate, and advise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." *Id.* at § 811(a); *see also Wiley v. Kennedy*, 789 F.Supp.3d 447, 456 (S.D. W. Va. 2025). Congress referenced NIOSH, "including providing for NIOSH and HHS to submit the results of 'research, demonstrations, and experiments,' advising the Secretary of Labor of the need for promulgation of new rules to effectuate the objectives of the Mine Act." *Wiley*, 789 F.Supp.3d at 456-57 (citing 30 U.S.C. § 811(a)(1)). Congress also included a preemption clause in the Mine Act, which provides that "[n]o State law. . . shall be superseded by any provision of this chapter or order issued or any mandatory health or safety standard, except insofar as such State law is in conflict with this chapter or with any order issued or any mandatory health or safety standard."[16] 30 U.S.C. § 955(a).

---

[15] Additionally, Congress created OSHA "in the Department of Labor and gave it broad regulatory and enforcement authority with respect to workplace safety standards." *Nat'l Min. Ass'n v. Secretary, U.S. Dept. of Labor*, 812 F.3d 843, 853 (11th Cir. 2016).

[16] The OSH Act also contains a preemption provision, which is discussed later in this opinion.

Pursuant to the OSH and Mine Acts, both NIOSH and MSHA have promulgated regulations pertaining to respirators and their use in coal mines. NIOSH regulations set forth procedures and requirements for the approval of respirators that meet "applicable construction, performance, and respiratory protection requirements." 42 C.F.R. § 84.1(c); *see also id.* at § 84.10-84.66. They further set forth those minimum requirements depending on the type of respirator, see *id.* at § 84.70-84.311, and provide that if such minimum requirements are met after being "examined, inspected, and tested" by NIOSH, the respirator will be approved. *Id.* at § 84.30(a). Under MSHA regulations, all coal miners must be supplied with NIOSH-approved respirators. *See* 30 C.F.R. § 72.700(a).

Finding that Congress had significant objectives when it authorized the creation of the NIOSH and MSHA regulatory scheme under the OSH and Mine Acts, West Virginia's claim stands as an obstacle to those objectives that Congress sought to accomplish through that regulatory scheme. Besides the omission of the warning labels, West Virginia claims that 3M violated the WVCCPA by making several misrepresentations on its website, the box for the 8210 respirator, and the 8210 respirator itself, including that the 8210 respirator offers "effective and/or reliable 'protection,'" is durable and collapse resistant, can be utilized for "'coal' and/or 'mining,'" and that it "fits" and "protects all day long." (Compl. at ¶ 172.) West Virginia further claims that 3M made several omissions relating to the 8210 respirator's unsuitability for coal mining, inability to be fit checked and fit tested, lack of durability, tendency to flex and collapse in humid environments, and inability to fit all faces. Additionally, West Virginia asserts that by referencing NIOSH certification, "3M suggests and implies that NIOSH approval connotes a measure of safety and proper fit." (*Id.* at ¶ 40.) In other words, West Virginia is seeking to require 3M to tell users

31

that its 8210 respirator is not suitable and effective for the purposes for which it was authorized by NIOSH and MSHA.

Such a requirement would be contrary to NIOSH's approval of the 8210 respirators, which demonstrates that it has been "examined, inspected, and tested" by NIOSH and meets the minimum requirements set forth in 42 C.F.R. § 84, and MSHA's authorization of its use in coal mines as a NIOSH-approved respirator. *See, e.g.*, *Caplinger v. Medtronic, Inc.*, 921 F.Supp.2d 1206, 1222 (W.D. Okla. Feb. 6, 2013) (finding state law claim preempted because it would require the "plaintiff. . . [to] persuade a jury that the Infuse Device was not safe and effective, a finding that would be contrary to the FDA's approval"). Further, given that NIOSH approval conveys that the 8210 respirator meets "applicable construction, performance, and respiratory protection requirements" for its class of respirator, see 42 C.F.R. § 84.170-84.174, West Virginia's claim essentially would undermine such approval.

Although West Virginia may have the same admirable goal of protecting coal miners, that is not sufficient to avoid preemption. *See Gade*, 505 U.S. at 103 (explaining that "'it is not enough to say that the ultimate goal of both federal and state' is the same" because "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987))). As in *Gade*, West Virginia's claim would interfere with the methods utilized under the NIOSH and MSHA regulatory scheme, and is, therefore, preempted.

West Virginia argues that *McFadden v. 3M Co.*, No. 4:14-CV-803 (CEJ), 2015 WL 905083 (E.D. Mo. Mar. 3, 2015) demonstrates that its claim is not preempted. However, that case is distinguishable. *McFadden* involved an individual miner who brought state tort claims after

developing pneumoconiosis and/or silicosis due to alleged defects with 3M respirators supplied by his employer. *McFadden*, No. 4:14-CV-803 (CEJ), 2015 WL 905083, at *1 (E.D. Mo. Mar. 3, 2015). The court in *McFaden* found that the miner's claims were not preempted because they fell within the scope of the OSH Act's savings clause.[17] *Id.* at *4. The OSH Act's savings clause is not applicable to this case, and therefore, *McFadden* does not support West Virginia's proposition that its claim is not preempted.

Relying on the presumption against preemption, West Virginia further argues that there is no indication that Congress intended for its claim to be preempted and that it is permitted to supplement federal regulation so long as its requirements "are not incompatible." (Pl.'s Resp. at 6-8.) However, the presumption against preemption can be overcome if state law conflicts with significant federal objectives. Clearly, West Virginia's claim conflicts with significant objectives that Congress sought when it authorized the NIOSH and MSHA regulatory scheme. Moreover, there is an indication that Congress sought to preempt state laws that interfere with the regulation of respirators in workplaces such as coal mines. *See* 29 U.S.C. § 667; *see also Gade*, 505 U.S. 88 (1992). The Supreme Court in *Gade* determined that the OSH Act's preemption provisions preempt "all state law that 'constitutes, in a direct, clear and substantial way, regulation of worker health and safety'" and foreclose states' ability to supplement federal regulations. *Gade*, 505 U.S. at 107; *see also id.* at 112-14 (Kennedy, J., concurring) (explaining that the OSH Act's preemption

---

[17] The OSH Act's savings clause provides:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

29 U.S.C. § 653(b)(4).

provision does not allow states to supplement federal regulation). Although West Virginia's claim falls under the WVCCPA, which is not a worker health and safety statute, the alleged facts and requested relief support the relevancy of the OSH Act's preemption provision given that it demonstrates that Congress intended for there to be only one regulatory scheme under the OSH Act, which includes the regulation of respirators in workplaces such as coal mines. Thus, given that West Virginia's claim and its requested relief would interfere with that regulatory scheme, Congress intended preemption. Because all aspects of West Virginia's claim are preempted, its claim must be dismissed.[18]

### CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *The State's Motion to Remand* (Document 14) be **DENIED**. The Court further **ORDERS** that *Defendant 3M's Motion to Dismiss Plaintiff State of West Virginia's Complaint* (Document 22) be **GRANTED**, that the *Complaint* (Document 1-3) be **DISMISSED WITH PREJUDICE**, and that this matter be **REMOVED** from the Court's docket.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:    April 21, 2026

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

---

[18] Because the Court finds that West Virginia's claim is preempted, the Court need not address whether West Virginia has a valid claim, whether its claim is barred by the applicable statute of limitations, or if laches applies.

34